## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

SUSAN SHIRLEY, CAITLIN SHIRLEY, FRANCISCO MOLINAR, FRANK MOLINAR, DEBRA AUSTRUM, ELIZABETH ASHLEY MOLINAR, DESTINY ENGLISH, PORTER GOODMAN, DALE GOODMAN, TERESA GOODMAN, IAN GOODMAN, LEVI GOODMAN, TANNIS GOODMAN, JESSICA WAGNER, FREEMAN STEVENSON, ROBERT STEVENSON, PAIGE ATWOOD, MEGHAN STEVENSON, CHELSEA NIEHAUS *as next friend to* M. N-K, a minor, and L.N-K, a minor, REGINALD SAVAGE, BRENNA SAVAGE, DAVID TODD, RACHEL TODD, RICARDO TODD, TAMMY GRODT, KAYLEE DEDRICK *as next friend to* T.G., a minor, MEGHANN CONFORTI, STEPHANIE DAWSON, EMILY GRODT, JOHN GRODT, KAITLYN DOXIE, REBECCA TAYLOR, DAVID TAYLOR, SR., and LAUREN SAMUELS,

      Plaintiffs,

      v.

LAFARGE S.A., LAFARGE CEMENT, HOLDING LIMITED, and LAFARGE CEMENT SYRIA S.A.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**No:** 25-cv-04248

**COMPLAINT**

**JURY TRIAL DEMANDED**

### INTRODUCTION

1.      The Islamic State in Iraq and Syria ("ISIS") rose to infamy through murder, torture, and enslavement. As ISIS spread with astonishing speed across Syria and then Iraq, its online promoters shared flashy videos crowing about how it murdered those who refused to comply with its fundamentalist religious precepts, violated its "laws," or were simply practicing the wrong

religion.  ISIS used violence to control resources, industry, and millions of people.  Its fighters specialized in building improvised explosive devices ("IEDs") that they would hide in unexpected places to kill their opponents as well as innocent civilians.  Armed with stockpiles of weapons and fueled by money from the industries under its control, ISIS took years to defeat.

2.      Seeing the evil that ISIS wreaked and wanting to do their part to stop it, brave Americans went of their own volition to defend those in ISIS's line of fire, specifically the Kurdish and Yazidi people.  They joined the Kurdish People's Defense Units ("YPG"), the most prominent armed group in northern Syria, and the ally on which the U.S. depended and backed heavily to defeat ISIS.  Even with the considerable firepower of U.S. air support, U.S. special forces trainers, and explosive ordinance disposal specialists, it took years for the U.S. and YPG to defeat ISIS in Syria.  This suit is against Lafarge S.A. ("Lafarge") and its subsidiaries, who entered into a criminal conspiracy with ISIS as it reached its greatest strength.  It is on behalf of those Americans and their families who lost their lives, their health, and their loved ones in their fight against ISIS's onslaught.

3.      On October 18, 2022, the Department of Justice announced its first-ever prosecution of a corporation for conspiring to provide material support to a terrorist organization. According to Deputy Attorney General Lisa O. Monaco, Lafarge, Lafarge Cement Holding Limited ("Lafarge Cyprus"), and Lafarge Syria S.A. ("LCS") (collectively, "Defendants") "partnered with [the Islamic State in Iraq and Syria ("ISIS")], one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share—all while ISIS engaged in a notorious campaign of violence during the Syrian civil war."

4.      As part of its plea agreement, Lafarge and LCS agreed to a 52-page Statement of Facts detailing their unlawful conduct ("Statement of Facts"), which Plaintiffs incorporate into this

Complaint in its entirety to the extent not inconsistent with the allegations herein.[1]  *See United States v. Lafarge S.A. et al.*, No. 1:22-cr-00444 (E.D.N.Y. Oct. 18, 2022), ECF No. 10.  Lafarge and LCS agreed in the guilty plea that they "will not dispute the Statement of Facts."

5.  Among the facts to which Defendants admitted was that they paid ISIS and another al-Qaeda offshoot, Al-Nusra Front ("ANF"), nearly $6 million between July 2012 and October 2014.  Defendants also admitted that they let ISIS seize over $3.1 million of cement.

6.  The money paid by Defendants to ISIS went directly to ISIS's operations, including its acts of international terrorism.  As an Assistant Attorney General said in announcing the plea, Lafarge "routed nearly six million dollars in illicit payments to two of the world's most notorious terrorist organizations—ISIS and al-Nusrah Front in Syria—at a time those groups were brutalizing innocent civilians in Syria and actively plotting to harm Americans."

7.  Based on the heinous conduct underlying their guilty plea, U.S. District Judge William F. Kuntz II sentenced Lafarge and LCS to terms of probation and to pay financial penalties, including criminal fines and forfeiture, totaling $777.78 million.  At the conclusion of the sentencing hearing, Judge Kuntz said:  "This case impacts global communities.  This case impacts the national security of the United States.  This case impacts the victims of terrorist acts perpetrated by ISIS and ANF."

8.  Documents indicate that Defendants paid millions of dollars more, starting before July 2012 and continuing after October 2014, and did not take steps to unwind the conspiracy until years later, after the criminal conspiracy was publicly exposed.

---

[1] Plaintiffs' investigation has revealed additional facts beyond those to which Lafarge and LCS have admitted in connection with their guilty plea.  Upon information and belief, the factual admissions in connection with the guilty plea were limited by design and carefully crafted in an effort to avoid civil liability like that threatened by the instant proceedings.

9.      Defendants were able to conceal their conspiracy with ANF, ISIS, and their intermediaries for so long because, among other things, they took extraordinary steps to repeatedly and systematically route financial transactions and email traffic in furtherance of the conspiracy through the United States.  They undertook these activities in the United States purposefully to avoid the scrutiny of Lafarge's French auditors and law enforcement officials, and to avoid having to engage in banking transactions in or through Syria and in Syrian currency.

10.     On information and belief, Defendants did not begin cooperating with the U.S. Department of Justice until at least 2019 and did not fully disclose their conduct to the U.S. government until a significant time after that.  Even then, their cooperation with the U.S. government was incomplete, and criticized by the Department of Justice:  As the Plea Agreement states, Lafarge's "criminal conduct" was "not voluntarily self-reported to the Department of Justice," which "did not receive timely and full cooperation with [its] investigation."

11.     The factual admissions in the Statement of Facts established Defendants' criminal liability under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2339B(a)(1), and give rise to civil liability under the ATA, 18 U.S.C. § 2333.

12.     Because Defendants aided and abetted ISIS's acts of international terrorism and conspired with ISIS and intermediaries, they must pay compensation to the survivors.  In this civil action under the ATA, American citizens harmed by ISIS's acts of international terrorism committed in conspiracy with Defendants seek to collect the treble damages authorized by the ATA for Defendants' violations thereof.

## BACKGROUND

13.     After investing $680 million to construct a cement plant in northern Syria ("Cement Plant"), Defendants faced a critical moment in 2011.  Conflict in Syria had devolved into an all-consuming civil war, and terrorist groups were imposing their will on the population.  Unlike other

4

multinational companies, which halted their Syrian operations and fled the country, Defendants saw opportunity in partnering with the terrorists and pursuing shared purposes.

14.     At the specific direction of the companies' highest management levels—including the CEOs of both Lafarge and LCS—Defendants entered into and sustained a multi-faceted and mutually beneficial conspiracy with ISIS and intermediaries at the same time ISIS was killing Americans.  For the explicit purpose of incentivizing ISIS to act in a manner that would promote their common interests, Defendants' executives agreed to make monthly payments to ISIS and ANF, to pay ISIS based on the volume of cement LCS sold, to purchase raw materials from ISIS-controlled suppliers, and to sell its cement to ISIS.  Defendants ultimately solidified their relationship with ISIS by entering into a formal revenue-sharing agreement.  Transactions in furtherance of this criminal conspiracy were purposefully made in U.S. dollars and transferred through and processed in New York.

15.     Defendants received crucial benefits in exchange for these payments.  ISIS permitted access to raw materials sourced from the expanding territory and markets under its control so that the Cement Plant could produce cement; ISIS allowed LCS employees, suppliers, and customer-distributors safe passage through terrorist checkpoints; and ISIS agreed to impose costs on, and in some cases block the importation of, competing cement from Turkey.  ISIS—quite literally—agreed to take out Defendants' competition.

16.     Defendants' knowing provision of material support to ISIS enabled ISIS to expand the territories and markets under its control, fund low-cost acts of terrorism directed at Americans, and build the infrastructure necessary to kill Americans.

17.     Defendants referred to their "profit" as a "cake," and stated they were happy to "share" a slice with ISIS so long as ISIS continued to protect and enhance Defendants' interests.

5

18.     Defendants were fully aware that they were transacting with ANF and ISIS, and that their conduct flagrantly violated U.S. law.  Indeed, Defendants' executives frequently and expressly communicated about the challenges of dealing with those who were "classified as terrorists by international organizations and the US."[2]

19.     To avoid detection, Defendants went to great lengths to conceal their relationship with ANF and ISIS.  For one thing, rather than directly transacting with terrorists, Defendants worked through intermediaries.  As one LCS security consultant admitted, "it was especially important that the relationship would be handled by [intermediaries], since an exposure of this sort would have been compromising for LCS.  But via [intermediaries], we did in fact contribute to the economy of ISIS."  Relatedly, Defendants ensured that documents regarding terrorist payments did not reference the word "Lafarge."  For example, LCS's CEO instructed an intermediary that "the name of Lafarge should never appear for obvious reasons in any documents of this nature.  Please use the words Cement Plant if you need but never the one of Lafarge."  Finally, Defendants purposefully availed themselves of U.S. dollar transactions routed through the U.S. financial system and personal email addresses using services based in the United States—rather than Lafarge email addresses—to conceal their illegal activities from their auditors and French law enforcement authorities.

20.     Defendants have admitted making payments of at least $5.92 million to ISIS and ANF from 2012 through 2014.  These payments consisted of at least $816,000 of monthly "donations" to ISIS; at least $3,447,528 in payments to ISIS-controlled suppliers; and at least $1,654,466 in payments based on the amount of cement LCS sold.  Defendants have also admitted

---

[2] All citations to written correspondence include original spelling, punctuation, and grammar.

to leaving behind cement when they turned over the factory to ISIS, and that ISIS sold the cement at prices that would have yielded ISIS another $3.21 million.

21.    Defendants' own documents suggest their total payments to various groups, including designated terrorist groups, actually exceeded $15 million.  A July 14, 2014 email written to LCS's CEO refers to even more payments "in addition to the ten millions that we pay directly to them, i.e. to ISIS" (see *infra* at Part V).[3]  In addition, Lafarge entered into a written contract in October 2014, back-dated to September 2014, obligating it to continue to make U.S. dollar payments indefinitely, money destined for terrorists (described *infra* at Part VII).  And a publicly available intelligence report also indicates that ISIS in fact secured at least $11.5 million by selling the cement it took from the Cement Plant after Lafarge fled—on top of the millions of dollars' worth of cement that Defendants sold directly to ISIS.

22.    Defendants' payments to and partnership with ISIS provided ISIS capital to transform from a fledgling militia in the early 2010s into a brutal terroristic behemoth with the capability and intent to kill Americans.  The revenue stream enabled the terrorist attacks that targeted Plaintiffs and their family members.  Defendants' money translated directly into fighters, guns, and bombs the terrorists used to plan and execute their terrorist acts against Plaintiffs.  It allowed ISIS to create more explosives, capture more territory, recruit new members, and expand to new regions and countries.  According to a former U.S. Ambassador to the United Nations, funding enabled ISIS to "pay its followers," create a massive salaried military force that included snipers, planners, and suicide bombers, and "fund attacks around the world."

---

[3] The email communication likely refers only to one type of payment to ISIS at one point in time.  Lafarge made numerous types of payments to ISIS over a lengthy period of time (described *infra* at Parts III and XI).

23.    Given the low costs of terrorist attacks, Defendants' payments had a substantial impact on ISIS's capabilities.  Their multimillion-dollar bribes were enough to finance *thousands* of ISIS terrorist attacks—enough to kill and maim every Plaintiff in this case many times over.  These attacks were the foreseeable, obvious and even intended results of doing business with ISIS.  Terrorist attacks enabled ISIS to maintain and expand its control over territories and markets.  The more territory and markets ISIS controlled, the greater the co-conspirators' profits.

24.    Defendants' payments were channeled to ISIS's leadership, under ISIS's centralized and carefully tracked system.  ISIS's founder and leader Abu Bakr Al-Baghdadi supervised the collection and disbursement of the "taxes" Defendants paid to it.  On information and belief, Al-Baghdadi's ISIS Leadership Cell (described *infra* at Part XI(A)) skimmed 20% off the top of the money ISIS collected, including the payments made willingly by Defendants, to help plan, authorize, and commit the terrorist acts alleged below (see *infra* Part XIII).  In addition, Lafarge was located near the main ISIS headquarters in Raqqa.  Raqqa was the largest city ISIS held, its de facto and self-described capital.  The rest of Lafarge's money would have gone to the Raqqa province, led by the Raqqa Cell.  The Raqqa Cell, in turn, was run by Ali Musa Al-Shawakh, or Abu Luqman, and played a key role in maintaining fighters, funding, and planning the attacks described below.  Lafarge, through intermediaries and with knowledge and intent, directly conspired with Abu Luqman's Raqqa Cell, which controlled the local territory around Lafarge's cement plant in northern Syria.  The Raqqa Cell collected funds from Lafarge and directed and/or perpetrated the individual attacks that harmed Plaintiffs.

25.    Defendants' scheme depended on connections to the United States.  Throughout, Defendants exploited New York's banking system by executing at least 15 U.S.-dollar wire transfers they caused to clear through New York.  That was no coincidence.  Defendants chose to

pay in U.S. dollars – they called "USD" their "preferred option" – and they deliberately routed their wires through New York banks. By using New York correspondent banks to clear those U.S.-dollar wires, Defendants advanced their criminal scheme: they made the payments look legitimate; avoided the operational risks posed by unreliable foreign-clearing options; supplied the terrorists with their preferred currency; and hedged against the foreign-exchange risk posed by the collapsing Syrian pound. New York clearing helped them capture all those benefits. True, Defendants had a sophisticated understanding of the U.S. sanctions, which sometimes forced them to avoid New York banks. But they learned first-hand that doing so made their scheme less effective, more expensive, and harder to conceal. That is why they used New York clearing when they could, and in a manner that was carefully designed to avoid triggering U.S. sanctions. And they knew, as Lafarge's accounting manager explained in one illustrative email, that their U.S.-dollar wires required the involvement of "US correspondent bank[s]."

26. Defendants also formed U.S. contacts by relying on American email providers – mainly Gmail – to communicate about their terrorist payoffs. Again, this was no coincidence. Defendants often coordinated their payments using Gmail, rather than corporate email, so they could hide their conduct from French auditors and regulators. And in using Gmail to do so, Defendants relied on a U.S. service provider and benefited from U.S. infrastructure, U.S. engineering, and U.S. law. Because Gmail is an American service, U.S. legal protections also impeded foreign agencies from easily accessing Defendants' Gmail messages. By sending their emails through the United States, Defendants sought to make it harder for French law enforcement – the authority otherwise most likely to criminally charge their executives (as has now in fact happened) – to discover their scheme.

27.     Defendants' conspiracy itself was integrally linked to the United States, as Defendants knew, foresaw, and intended.  Harming and killing foreigners, especially Americans, whom ISIS referred to as "crusaders," was a potent way for ISIS to maintain and expand its grip on power, territory and markets.  By taking on the world's strongest power, the United States, and killing Americans, ISIS terrorized its subjects, recruited new followers, and deepened its territorial reach.  Defendants intentionally, purposefully, and foreseeably benefitted from ISIS's protection, strength, and terrorist acts against Americans as part of their partnership with ISIS to control local markets and increase profits.

28.     Thus, Defendants entered a conspiracy with ISIS and intermediaries whose overall object was to maintain and expand ISIS's territorial control of Syria and Iraq and thereby promote ISIS's control and protection rackets within that territory.  ISIS's acts of international terrorism targeting U.S. citizens, including the attacks that killed and injured Plaintiffs, furthered the overall object of Defendants' conspiracy by strengthening ISIS's perceived power.

29.     Plaintiffs—American citizens harmed by ANF and ISIS, and their family members—are entitled to recover for the economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss of their relatives' life, society, companionship, wages, comfort, advice, and counsel that they experienced as a result of Defendants' misconduct. Defendants aided and abetted the ISIS and ANF attacks that killed or injured Plaintiffs and their family members.  Defendants also conspired with ISIS, ANF, and intermediaries, making Defendants liable for the terrorist attacks that ISIS and ANF foreseeably committed in furtherance of their conspiracy.

### THE PARTIES AND PRINCIPAL CO-CONSPIRATORS

30.     Plaintiffs are U.S. nationals and survivors and/or heirs and family members of individuals harmed by ISIS terrorist acts in Syria.

31.    The Plaintiffs and the details of each attack are described below (see *infra* at Part XIII).

32.    **Defendant Lafarge S.A.** ("Lafarge") is the parent company of a multinational building materials business, which is organized under the laws of France and headquartered in Paris, France.  At pertinent times, Lafarge, together with its subsidiaries, employed 63,000 people to manufacture and sell cement, construction aggregates, concrete, and other building materials at 1,612 production sites in approximately 61 countries, including the United States.

33.    On July 10, 2015, Lafarge merged with its leading competitor, Holcim, Ltd., a Zurich, Switzerland-based building materials business to create LafargeHolcim.  At the time of the merger, Holcim and Lafarge were the two largest multinational building materials companies in the world.[4]

34.    During all times pertinent to this Complaint, Lafarge oversaw and directed the conduct of two Defendant subsidiaries it wholly controlled, LCS and Lafarge Cyprus.

a.    **LCS** was a direct subsidiary of Lafarge Cyprus, organized under the laws of Syria and headquartered in Damascus, Syria.  Lafarge indirectly owned 98.7% of LCS through four subsidiaries, primary among them Lafarge Cyprus.  From approximately May 2010 to September 2014, Lafarge, through LCS, operated a cement plant in the Jalabiyeh region of Syria, located in northern Syria near the Turkish border and between the cities of Manbij and Raqqa. LCS made agreements and effectuated transactions with ISIS and ANF "at the direction of LAFARGE's and LCS's senior management," including Christian Herrault, a Lafarge Executive Vice President based in Paris.  Lafarge executives were thoroughly informed of LCS's decisions and directions in interacting with terrorists.  As Herrault wrote in 2017, LCS's "local concessions"

---

[4] LafargeHolcim rebranded itself as Holcim Group in 2021.

to terrorists "were made with the clear and repeated approval" of senior Lafarge leadership. Thus, when allegations herein refer to LCS or LCS employees, the described conduct occurred at Lafarge's direction and for Lafarge's benefit.

b.  **Lafarge Cyprus** is the entity through which Lafarge held the majority of its shares in LCS until Lafarge's 2015 merger with Holcim Ltd. It is organized under the laws of Cyprus and headquartered in Cyprus. Lafarge Cyprus functioned as the corporate instrument through which Lafarge often routed money to LCS and intermediaries, including through international bank transfers that went through New York, and thereby financed Lafarge's payments to ISIS and ANF. Lafarge Cyprus's financing of LCS's transfers was done knowingly and at Lafarge's direction and with Lafarge's approval. In 2014, Lafarge Cyprus executed a consulting agreement with Firas Tlass to conceal Defendants' payments to ISIS.

35.  Jean Claude Veillard is a citizen and national of France and was Vice President of Security for Lafarge from approximately October 2008 until September 2017. He was based at Lafarge's headquarters in Paris, France. Veillard was also a member of Lafarge's Security Committee.

36.  Christian Herrault is a citizen and national of France and was an Executive Vice President of Operations of Lafarge from approximately 2012 to December 2015. Herrault supervised Lafarge's operating subsidiaries in numerous countries, including Syria. Herrault was based at Lafarge's headquarters in Paris, France and reported directly to Lafarge's Chairman and CEO, Bruno Lafont. Herrault was a member of Lafarge's Security Committee and, beginning on July 4, 2013, served as Chairman of the Board of Directors of LCS.

37.  Bruno Pescheux is a citizen and national of France and was CEO of LCS from approximately 2008 to July 2014. While CEO of LCS, Pescheux was based at LCS's headquarters

in Damascus, Syria before relocating to Cairo, Egypt in 2012 when LCS evacuated its foreign employees in the face of growing unrest around its plant. He reported directly to Herrault.

38. Fredric Jolibois is a citizen and national of France who became CEO of LCS in approximately July 2014 and remained in that role until approximately January 2016, and reported directly to Herrault until Herrault left Lafarge.

39. Guillaume Roux is a citizen of the United States and of France, and was an Executive Vice President of Lafarge until January 2016. Roux was also a member of Lafarge's Security Committee, and a member of LCS's Board of Directors until January 2016 and its Chairman from 2008 until July 4, 2013. Roux was based at Lafarge's headquarters in Paris, France and reported directly to Lafarge's Chairman of the Board of Directors and CEO, Bruno Lafont.

40. Bruno Lafont is a citizen and national of France and was Lafarge's Chairman of the Board of Directors and CEO of Lafarge until the completion of the merger with Holcim Ltd. in 2015. Upon Lafarge's merger, he became Co-Chair of LafargeHolcim's Board of Directors and served there until May 2017. He was based at Lafarge's headquarters in Paris, France.

41. Firas Tlass is a citizen and national of Syria and was a minority shareholder in LCS until the Syrian government confiscated his shares in LCS in approximately 2012. Tlass was paid by LCS, with Lafarge's knowledge and approval, to provide "security" services to LCS, which included negotiating with various local terrorist groups, including ISIS and the ANF. Tlass was paid by LCS, with Lafarge S.A.'s knowledge and approval, to negotiate with and deliver payments to ISIS and ANF.

42. Amro Taleb is a citizen of Canada and of Syria and a former consultant to LCS who held himself out as a broker capable of sourcing raw materials from ISIS-controlled territories. LCS paid Taleb to negotiate with and pay ISIS for raw materials, with Defendants' knowledge and

approval.  After ISIS raided the Cement Plant, Taleb negotiated the sale and liquidation of its cement and equipment, while receiving payment from Defendants.  As Defendants' paid consultant, he then visited Lafarge's headquarters in Paris in January 2015 to discuss Defendants' further cooperation and conspiracy with ISIS to re-open the Cement Plant.

43.    Defendants, through Veillard, Herrault, Pescheux, Jolibois, Roux, Lafont, Tlass, and Taleb, among others, acted in concert with, and for the purpose of furthering Defendants', ISIS's, and ANF's common objectives.  They conspired and worked in concert with ANF and ISIS, with the full knowledge of ANF's and ISIS's designation as Foreign Terrorist Organizations ("FTO" or "FTOs"), their terrorist acts, and their purposeful targeting of Americans and others.

## JURISDICTION AND VENUE

44.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(d), and 18 U.S.C. § 2338, as a civil action brought by citizens of the United States who have been killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

45.    Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b), (c), and (d) and 18 U.S.C. § 2334(a).

46.    Lafarge, Lafarge Cyprus, and LCS are subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a) and N.Y. C.P.L.R. § 302(a)(1), based on Defendants' use of New York banks in carrying out their scheme.  Alternatively, personal jurisdiction exists under Fed. R. Civ. P. 4(k), based on Defendants' use of New York banks and U.S.-based email service providers in carrying out their scheme.  Rule 4(k)(2) jurisdiction also exists based on Defendants' conspiracy with ISIS, a terrorist group that purposefully targeted the United States, caused tortious effects on and within the United States, and carried out overt acts in furtherance of the conspiracy within and targeting the United States.  If the Court were to find jurisdiction lacking under New York's long-arm

statute, Plaintiffs certify based on the reasonably available information that Defendants would not then be subject to suit in the courts of general jurisdiction of any other state, which would make Rule 4(k)(2) jurisdiction appropriate.  Jurisdiction under these provisions is appropriate based on the following:

47.    Defendants' conspiracy with ANF and ISIS and intermediaries had a substantial nexus to the United States and to New York, including by virtue of Defendants' and its agents' deliberate, repeated, and systematic use of U.S. dollar transactions and banks in New York to pay, conspire with, and aid and abet terrorists, including via intermediaries.  Defendants' "preferred option" for paying terrorists was to make "bank transfer[s] in USD," because, among other things, it helped avoid detection by Lafarge's auditors and governmental entities.

48.    Specifically, Defendants directed their banks to complete U.S.-dollar-denominated wire transfers to support their scheme to fund ISIS and ANF, and Defendants' officials knew those directions required the use of New York banks.  Defendants' wire instructions caused their payments to clear in New York, including through one admitted suit-related transaction in this District.  Defendants' executives regularly received specific transaction confirmations alerting them to the particular U.S. correspondent and intermediary banks that routed their transactions.  On information and belief, Defendants regularly requested and received confirmations from their banks notifying them of the New York banks involved in clearing their transfers, as part of Defendants' process of approving the transactions.

49.    By routinely, purposefully, and knowingly conducting transactions in U.S. dollar-denominated transactions processed through New York, Defendants purposefully availed themselves of the benefit of doing business in the United States generally and New York specifically, and thus are subject to personal jurisdiction.

50. As Defendants knew and intended, Defendants' aiding and abetting of and conspiracy with ANF and ISIS and intermediaries enabled ANF and ISIS to commit the acts of international terrorism that expanded ISIS's power and territorial control that benefitted Defendants, and that injured and killed victims in Syria, thereby injuring Plaintiffs.

51. In addition, as described further below, Defendants conspired with ISIS and its intermediaries to (a) provide material support to ANF and ISIS, designated terrorist organizations, knowing and intending that ANF and ISIS would use Defendants' material support to commit acts of violence that would endanger human life and would intimidate or coerce a civilian population, in violation of 18 U.S.C. 2333(a); and (b) commit acts of terrorism, knowing and intending that ISIS would target American citizens and American interests, in violation of 18 U.S.C. 2333(d). Defendants and their co-conspirators and agents' conspiracies had a substantial connection to and were in and affecting the United States and, in particular, New York.

52. In furtherance of the conspiracies, Defendants purposefully made numerous U.S.-dollar payments to ISIS through intermediaries and to facilitate the conspiracy with ISIS and intermediaries, payments that were wired through New York. This was done at Lafarge's instruction and with its knowledge, in reliance on the U.S. financial system for efficiency, security, and secrecy.

53. For example, Lafarge has admitted to making a lump sum wire transfer of $210,000 from its operating account at a financial institution in Paris to intermediary banks in New York City through this District. The contract pursuant to which that payment was made, and additional agreements made in the course of the conspiracy, required Defendants to make ongoing payments after October 2014. On information and belief, Defendants did so.

54. Also in furtherance of the conspiracies, Defendants' executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their corporate email addresses, to coordinate and carry out elements of their partnership with ISIS. U.S.-based email service providers enabled Defendants to conceal their illegal conduct from French auditors and authorities.

55. Further, Defendants are subject to personal jurisdiction given their participation in a scheme and conspiracy with ISIS and intermediaries that was directed at the United States and whose overall object was to maintain ISIS's territorial control of Syria and Iraq.

56. ISIS was public about its intent to commit acts of terrorism against the United States as well as its intentional recruitment from the United States. In July 2012, Al-Baghdadi, ISIS's founder and leader, threatened to strike at the "heart" of America, proclaiming that the United States "will soon witness how attacks will resound in the heart of your land, because our war with you has now started." In January 2014, Al-Baghdadi announced to Americans: "Soon we will be in direct confrontation." And in June 2014, Al-Baghdadi threatened Americans: "You should know, you defender of the cross, that getting others to fight on your behalf will not do for you in Syria as it will not do for you in Iraq," and "soon enough, you will be in direct confrontation—forced to do so, God willing. And the sons of Islam have prepared themselves for this day. So wait, and we will be waiting, too."

57. The threat to U.S. citizens was well known outside Syria. On June 27, 2014, U.S. senators observed publicly that "[t]he conflict in Syria has deteriorated and spread so dangerously that it is now the source of direct threats to the United States" and that "[t]he leader of ISIS, Abu Bakr al-Baghdadi, has already stated his ambitions to attack the U.S. homeland."

58. The threats to American citizens proved all too real. In August 2014, ISIS broadcasted its beheading of U.S. journalist James Foley, and threatened the life of another if President Obama did not end military operations in Iraq. Tellingly, the beheading videos of both Foley and Steven Sotloff (in September 2014) were titled "Message to America" and "A Second Message to America," respectively. ISIS announced that its killing of Sotloff was specifically in response to U.S. airstrikes targeting it in Iraq. Defendants nonetheless pressed ahead with making payments to ISIS.

59. Likewise, in September 2014, ISIS spokesperson Sheikh Abu Muhammad Al-'Adnani Al-Shami gave a speech entitled "Indeed, Your Lord is Ever Watchful," in which he explicitly spelled out ISIS's anti-American objectives, stating, for example:

> O America, O allies of America, and O crusaders, know that the matter is more dangerous than you have imagined and greater than you have envisioned. . . . O Obama, O mule of the Jews, you are vile. You are vile. You are vile. And you will be disappointed, Obama. Is this all you were capable of doing in this campaign of yours? Is this how far America has reached in incapacity and weakness? Are America and its allies from amongst the crusaders and atheists unable to come down to the ground? . . .
>
> O Allah, America, France, and their allies transgressed against us. They came with their legions to fight us out of their enmity for your religion. . . . We have no way to deal with their airplanes. O Allah, you have said what is true, 'So do not weaken and do not grieve, and you will be superior if you are [true].'

60. A leading terrorism expert testified before the Subcommittee on Counterterrorism and Intelligence of the House Committee on Homeland Security that the "U.S. military has ostensibly become a primary target for the Islamic State."

61. The United States has convicted ISIS terrorists based on their targeting of the United States. On September 2, 2021, former British citizen Alexanda Amon Kotey pleaded guilty in the Eastern District of Virginia to an eight-count indictment consisting of one count of

conspiracy to commit hostage taking resulting in death; four counts of hostage taking resulting in the deaths of four Americans (Foley, Sotloff, Kayla Mueller, and Abdul-Rahman (Peter) Kassig); one count of conspiracy to murder U.S. citizens outside of the United States; one count of conspiracy to provide material support or resources to terrorists resulting in the deaths of U.S., British and Japanese nationals; and one count of conspiracy to provide material support or resources to a designated FTO resulting in the deaths of U.S., British, and Japanese nationals, for his participation in ISIS's hostage-taking and terrorist activities.

62.     On April 14, 2022, a federal jury in the Eastern District of Virginia convicted Kotey's co-conspirator, former British citizen El Shafee Elsheikh, for his participation in the same ISIS scheme. Witnesses at the trial presented evidence from November 2012 through February 7, 2015 of Elsheikh's participation in torturing the hostages.

63.     Other ISIS members have been tried and convicted in this District. For example, in 2013, Mirsad Kandic traveled from Brooklyn to a city outside of Aleppo, Syria to work directly with ISIS leadership. Kandic managed ISIS social media accounts and recruited thousands to ISIS, including from New York. In 2022, Kandic was convicted of five counts of providing material support to ISIS, and one count of conspiracy to do the same. Likewise, Ruslan Maratovich Asainov, a U.S. citizen from Bay Ridge, New York, was convicted in the Eastern District of New York for providing material support to ISIS. Asainov fought with ISIS as a sniper from 2013 until he surrendered in 2019, rising in ISIS's ranks to become the lead trainer and organizer of ISIS's sniper force. He ran a private chat group for ISIS members to sell and trade weapons called "Khilafah (Caliphate) Market," of which Raqqa governor Abu Luqman (see *infra* at Part XI(B)) was a member.

64.     ISIS's overt acts targeted the United States and U.S. citizens.  Lafarge bought protection and entered a complex conspiracy with ANF and ISIS and intermediaries, with the awareness that they were terrorist-classified groups.  Lafarge conspired with full knowledge of and intent to enable their terrorist acts, including their targeting of the United States and American citizens, in order to control markets and increase profits.  As a result of the conspiracy between Defendants, intermediaries, and ISIS, ISIS's overt acts targeting the United States and U.S. citizens, including Plaintiffs and their loved ones, are attributable to Defendants.

65.     Based on conduct that occurred "within the Eastern District of New York and the extraterritorial jurisdiction of the United States," the Department of Justice charged Defendants with conspiring to provide material support to terrorists.  The Department of Justice further charged that "the defendants were brought into and found in the United States, the offense occurred in part within the United States, the offense occurred in and affected interstate and foreign commerce, and the defendants conspired with a national of the United States."  Based on these contacts with the United States, Lafarge and LCS "admit[ted] the Court's jurisdiction over the Defendants and the subject matter of such action . . . ."

## FACTUAL ALLEGATIONS

## I.    ISIS BECOMES THE WORLD'S MOST RUTHLESS TERRORIST GROUP

66.     In March 2011, after anti-government protests associated with the Arab Spring had spread across the region, Syrian police detained and tortured teenage protestors.  As mass protests erupted across the country, armed militias arose in the following months, with the goal of overthrowing the Syrian government.  Syria quickly descended into a full-scale civil war.

67.     In August 2011, seeing an opportunity among the numerous armed factions battling in Syria, Al-Qaeda in Iraq ("AQI") and Islamic State of Iraq ("ISI") leader Abu Bakr Al-Baghdadi sent AQI operative with the nom de guerre Abu Muhammad Al-Julani (now known as Ahmed al-

Sharaa) into northeast Syria to organize the network of militant jihadist cells in Syria into one cohesive group. Al-Julani's Al-Qaeda sub-group in Syria, ANF, wasted no time spreading terror throughout the region. Its first operation was a massive suicide bombing in Damascus, which killed over forty people in December 2011.

68.    On December 11, 2012, the United States amended the FTO and Executive Order (E.O.) 13224 designations for Al-Qaeda to include ANF, under the new aliases: Al-Nusrah Front; Jabhat Al-Nusrah; Jabhet Al-Nusra; The Victory Front; and Al Nusrah Front for the People of the Levant. In its accompanying press release, the Department of State warned that ANF "has sought to portray itself as part of the legitimate Syrian opposition while it is, in fact, an attempt by AQI to hijack the struggles of the Syrian people for its own malign purposes." To date, ANF remains a designated FTO.

69.    Threatened by ANF's and Al-Julani's increasing power in May 2013, Al-Baghdadi (the Al-Qaeda leader who had originally sent Al-Julani to Syria) declared the formation of Al-Dawlah Al-Islamiyah fi Al-'Iraq wa Al-Sham (The Islamic State of Iraq and Syria, "ISIS"). Al-Baghdadi declared that, under his leadership, ISI and ANF would merge into a single Sunni Islamist organization, ISIS. ISIS's stated goal was to seize control first of Iraq and Syria and then beyond, to form a unified religious state across national boundaries, a "caliphate."

70.    Al-Julani, ANF's head, objected to Al-Baghdadi's declaration, and publicly pledged allegiance to Al-Qaeda leadership. On May 15, 2014, when the Secretary of State amended AQI's designation to rename it the "Islamic State of Iraq and the Levant," the Secretary also amended that designation to remove ANF's aliases, and at the same time, separately designated ANF as its own FTO and Specially Designated Global Terrorist.

71.    ANF and ISIS quickly became rivals in the jihadist community, competing for international legitimacy and Syrian and Iraqi territory.  It soon became clear ISIS would be more successful than ANF, in part because of its extreme brutality and global ambition, but also because of its greater resources, including money, weapons, and fighters.  Through brute force, ISIS took the upper hand and rapidly seized Raqqa, one of the largest cities in Syria and the largest near the Cement Plant.  ANF leaders began defecting to ISIS.

72.    Lafarge was aware that foreign fighters and defectors from other terrorist groups were increasing ISIS's ranks.  Its security consultant concluded that the group's membership came at first from Iraqi fighters and ANF defectors, but that as time went on, "jihadi tourists" (as Lafarge's security consultant called them) came to Syria and Iraq to join the group and commit terrorist attacks.

73.    Unlike most of the other militant groups fighting in Syria in opposition to the Syrian government, ISIS did not target Syria alone: its goal, as Defendants knew, was the construction of a self-described "caliphate" or empire.  The U.S. government and others categorically rejected any suggestion that ISIS, despite its name, was a "state," that it had any legitimate governmental function, or that it did anything other than propagate terrorist violence.  ISIS maintained and expanded its control over civilian populations using violence and fear, rather than legitimate governance.  It solidified its control by entering into criminal conspiracies like the one it had with Defendants, and by attacking foreign powers including the United States.  Its acts of mass terrorist violence violated international law, including the laws of war, and included kidnapping, human trafficking, and murder.

74.    Many of ISIS's acts were intended to intimidate and silence its opponents.  Its fighters patrolled the streets with weapons and suicide vests.  To sow fear among the local

22

populations, ISIS shot opponents from behind (including children), beheaded them, lit them on fire, and hung them in public squares.

75.    In Iraq, while Defendants were providing material support to ISIS, ISIS murdered approximately five thousand people of the Yazidi ethnic minority, buried men in mass graves, including some while alive, forced women into sexual slavery, and besieged thousands without food or water on Sinjar Mountain.

76.    ISIS also kidnapped and murdered journalists and aid workers while Defendants were providing it material support. Their victims, including Americans, were frequently beheaded, sometimes on videos broadcasted online for Americans and others to watch in horror.

77.    According to the U.N. Human Rights Council, ISIS "made calculated use of public brutality and indoctrination to ensure the submission of communities under its control." Its aim was "to subjugate civilians under its control and dominate every aspect of their lives through terror . . . ."

78.    Throughout 2014, ISIS took over more and more territory in Iraq and Syria, ultimately controlling forty percent of Iraq and thirty percent of Syria, ruling over more than 11 million people. Over 40,000 foreign fighters interested in ISIS's extreme jihadist ideology flocked to join its ranks in Iraq and Syria, including Americans and even individuals convicted of federal crimes in this District.[5]

79.    On May 14, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of E.O. 13224 to add the alias Islamic State of Iraq and

---

[5] Press Release, U.S. Attorney's Office for the Eastern District of New York, *High Level Members of ISIS Sentenced to Life in Prison for Material Support to a Foreign Terrorist Organization Resulting in Death* (July 14, 2023), https://www.justice.gov/usao-edny/pr/high-level-member-isis-sentenced-life-prison-material-support-foreign-terrorist.

the Levant ("ISIL").[6]  The Secretary of State also added the aliases The Islamic State of Iraq and Al-Sham ("ISIS," which is how the FTO is referenced herein); The Islamic State of Iraq and Syria; ad-Dawla Al-Islamiyya fi Al-Iraq wa-sh-Sham; Daesh; Dawla Al Islamiya; and Al-Furquan Establishment for Media Production.  ISIS remains a designated FTO to the present.

80.    Lafarge's security advisor was aware of ANF's and ISIS's designations, observing publicly that "The ISI [Islamic State of Iraq] and later ISIS/ISIL had been listed as a terrorist group since 2004 by the USA, the UN, and the EU," and that moreover "in LCS we knew that Al-Nusra Front had been listed by the Americans . . . ."

81.    To grow as quickly as it did from a small armed group in 2013 to an international terrorist organization ruling over millions of people, ISIS needed money—and a lot of it.  ISIS robbed the resources under its control, including by exploiting manufacturing plants, looting banks, pumping oil and gas to sell on the black market, taxing agricultural products, selling humans as slaves, and demanding passage tolls and protection payments.

82.    Capturing cement plants was an essential part of ISIS's growth plan.  Between its territory in Syria and Iraq, ISIS seized five cement plants, which could produce a total of $583 million in annual revenue.  Cement plants were a particularly appealing target for a number of reasons, including that they generated significant revenue from which ISIS could pilfer; they contained raw materials that ISIS could use to create explosives, and cement to build tunnels and other structures used for attacks.  ISIS had distribution networks it used to sell cement.

83.    Of the five cement plants ISIS seized, Lafarge's Cement Plant was by far the largest.  In fact, the production capacity of the Cement Plant was more than twice as much as that of the second largest, in Iraq.  And ISIS did not simply capture and rob the Cement Plant.  Rather,

---

[6] The United States Secretary of State designated AQI as an FTO on October 15, 2004.

before ISIS overran the Cement Plant and seized all the materials Lafarge left behind, Defendants and ISIS had become close partners, pursuing common objectives, and generating millions of dollars in profit for each.

## II.    THE SYRIAN CIVIL WAR THREATENS THE CEMENT PLANT, SO DEFENDANTS PARTNER WITH TERRORISTS

84.    Long before ISIS had even emerged, Lafarge in 2007 took a major step in its quest to dominate the Middle Eastern cement market.  That year, Lafarge acquired Egyptian cement multinational Orascom Cement in a deal financed with over €7.4 billion in debt.  As part of the deal, Lafarge purchased the Cement Plant, which Orascom had started to build.

85.    Lafarge and LCS completed the construction of the Cement Plant at the significant cost of $680 million.  When the Cement Plant finally opened for business in May 2010, Lafarge's CEO Bruno Lafont toured the facility with reporters and the French Ambassador to Syria.  The plant produced 160 truckloads of cement a day, amounting to half a million dollars' worth of daily sales.

86.    At the beginning of LCS's operations, it faced strong competition from cheaper cement imported into northern Syria from Turkey.  To address this issue, in December 2010, Pescheux (LCS's CEO) requested that then-minority shareholder Tlass, a Syrian citizen with close connections to the Syrian regime and local groups, intervene with the Syrian government to curtail imports of competing Turkish cement.

87.    Less than a year later, however, the Cement Plant faced a more existential threat: the civil protests in Syria had erupted into a full-fledged civil war.  In response to this crisis, in September 2011, the European Union barred its member states from buying, importing, and/or transporting oil and other petroleum products from Syria, and from engaging in financial or insurance services for such transactions.  The United States forbid import of its products into Syria,

25

embargoed Syrian oil, and froze the assets of several Syrian individuals. And in December 2011, the United Nations Office of the High Commissioner for Human Rights declared that Syria was in a state of civil war.

88.    In 2012, as the civil war continued, ISIS and ANF gained control over large swaths of Syria and committed brutal terrorist acts. ISIS killed thousands, among them numerous U.S. citizens, including through graphic and well-publicized beheadings.

89.    As expected, the danger of operating in an active warzone, combined with the actions of the European Union, the United Nations, and the United States, prompted a mass exodus of multinational corporations from Syria. For example, in December 2011, two of the largest oil companies in the world—Royal Dutch Shell and Total—announced that they were leaving Syria.

90.    Defendants, by contrast, saw an opportunity in partnering with the terrorists in the battle for territorial control. Even though armed conflict had spread to the area immediately surrounding the Cement Plant, Lafarge and LCS doubled down on their $680 million investment and joined forces with the terrorists to help them maintain and expand their control, instead of ending their operations in Syria.

91.    Pescheux (LCS's CEO) described the plan to Herrault (Lafarge's Executive Vice President of Operations) as follows:

> [p]reserving the integrity of our physical assets (avoiding the plant to be looted), keeping our personnel ready for the end of the crisis (knowing the huge investment we have made in terms of recruitment and competency development), staying in the market (to keep our distributors' network and to prevent to let Turkish imports flooding North and East of Syria), making some profit to at least repay the interests of the loan and giving some assurance to the lenders.

92.    Starting in the summer of 2012, Lafarge and LCS forged ahead with their plan to make financial payments to various armed factions.

93.    On September 23, 2012, Veillard and Tlass met in Gaziantep, Turkey with representatives of armed militants in areas surrounding the Cement Plant.  Tlass recommended that LCS make payments to each of the armed militias based on the quantity of cement produced or according to a monthly fee.

94.    By November 2012, Lafarge and LCS executives had approved a plan to establish relations with ANF through Tlass.  On November 11, 2012, Tlass notified Pescheux that LCS was engaging directly with ANF: "gazi entab [Gaziantep, Turkey] was good we hav now conextion with jabhat al nosra [ANF]."

95.    The situation became more critical in 2013.  By March 2013, ISIS, ANF, and other armed groups had taken over the area around Raqqa and both groups quickly established checkpoints at access roads to the Cement Plant.  ISIS and ANF guarded their checkpoints with snipers, rockets, and homemade artillery.

96.    On April 7, 2013, Tlass recommended that LCS executives negotiate an agreement to pay ANF monthly or by the truckload to ensure continued access to the plant.

97.    Several months later, on August 30, 2013, Pescheux reported to Veillard (Lafarge Vice President of Security) and Herrault: "It is clear that we have an issue with ISIS and Al Nusra and we have asked our partner [Tlass] to work on it."

98.    Lafarge and LCS executives were fully aware at the time that they were dealing with terrorist organizations.

99.    For example, in a December 10, 2012 email, Veillard wrote: "The Islamist group Jabhat Al-Nusra, which is on USA's list of terrorist organisations, has reportedly recruited several Norwegian citizens to fight in Syria."

100.    Similarly, in a March 1, 2013 email, LCS's risk manager warned Pescheux that ANF "follow[s] a global jihadi ideology (similar to al-Qaida) and are more open to receive foreign fighters" and had "ties to al-Qaeda, exemplified by participating al-Qaida veterans, mainly from Iraq, and . . . some of their statements are quickly published in the main al-Qaida news outlet."

101.    Likewise, notes from a September 11, 2013 meeting of Lafarge's Security Committee, which Veillard and Herrault received, stated: "It gets harder and harder to operate without having to directly or indirectly negotiate with networks classified as terrorists by international organizations and the US.  The main challenge being to assess how far their demands and threats will reach, and consequently, the limits that we want to impose for the site to operate."

102.    Despite this knowledge, Defendants decided to dispense with any "limits" and instead to conspire with the terrorists.

## III.    DEFENDANTS BEGIN MAKING PAYMENTS TO TERRORISTS

103.    Recognizing that ISIS "demand[ed] that a 'tax be paid,'" Defendants proceeded to make millions of dollars in payments to terrorists.  These payments came primarily through four mechanisms: (1) payments per truckload for buyer and supplier access to the plant; (2) volume-based payments for cement sold; (3) monthly fixed-rate payments; and (4) payments to ISIS-controlled suppliers.  Defendants also knowingly sold cement to ISIS, which ISIS used to plan and carry out its acts of international terrorism.

104.    Instead of leaving Syria, as other multinational companies had done, LCS saw the collapse of the country and increasing power of ISIS as an opportunity for further mutual enrichment and entrenchment by cooperating to sell more cement, at higher margins.  Defendants continued paying ISIS and ANF because doing so increased profits.  Defendants' payments did not protect local employees—in fact, on information and belief, LCS threatened to fire employees who did not come to the factory, insisting that they travel through armed groups' checkpoints to

and from Jalabiyeh, and to Aleppo to take out cash from banks.  LCS fired an employee after he was abducted.

### A. Lafarge And LCS Pay Terrorists $150 Per Truck To Pass Through Checkpoints

105.   On August 26, 2013, Pescheux emailed Tlass a map of the area around the plant and summarized the "strong improvement" "[o]n the west side of the plant towards Menbij, Al Bab, Aleppo, Idlib," but highlighted that "[o]n the east side of the plant towards Hassakeh and Qamishli, [t]here are 2 check points held by jihadists (see the map) which are blocking the trucks to go to and from the plants," and "[o]n the south of the plant, in the region of Al Thawra, Raqqah, Sokhna: there is a check point held by jihadists between Al Thawra and Raqqah and also potential problems at Sokhna."  Pescheux summarized the problem by stating "[g]enerally speaking, it is clear we have an issue with ISIS and Al Nusra in the east, especially in Raqqah."

106.   Tlass responded "no probleme let me work on it today . . . i cal u tomorow to breef you."  The next day Tlass emailed Pescheux, "We Negotiate with (DAWLET AL IRAQ WAL SHAM) AL ISLAMIA & AL NUSRA I got a News that the situation In the Plant is Very Good."

107.   The situation was "Very Good" because, by October, Lafarge began paying money directly to ANF and ISIS to ensure they would permit trucks to pass.  In early September 2013, Pescheux asked Tlass for updates regarding truck passage to the east of the plant, and Tlass responded "better now Al Nusra do not obstruct Lafarge trucks ever as long as we pay them . . ." and on October 14, 2013, an LCS risk manager reported that "our customer has reached long term agreements with leading groups Islamic State in Iraq and al-Sham (ISIS) in Raqqa, the agreement let the trucks coming back and forth from the east side of the plant.  Each cement truck has to pay 150$."

**B. LCS Pays Terrorists Based On Cement Sold**

108.    As part of a separate agreement, LCS paid ISIS based on the amount of cement that it sold.  This agreement, dated November 6, 2013, and on ISIS letterhead, was between ISIS and LCS.  The agreement provided that ISIS would assess trucks 400 Syrian pounds[7] for each transported ton of cement and, in exchange, ISIS would ensure the safety and free access of the trucks to the cement plant.

109.    Additionally, an ISIS vehicle pass dated April 26, 2014, and bearing ISIS's letterhead and stamp, allowed LCS employees to "pass through after the required work.  This is after they have fulfilled their dues to us."

**C. LCS Makes Fixed Monthly "Donations" To Terrorists**

110.    LCS also made fixed monthly "donation" payments through Tlass to ISIS, ANF, and other armed groups that controlled the area surrounding the Cement Plant.

111.    These payments, which, according to Lafarge and LCS's plea, exceeded $816,000 in total, began as early as July 2012, when armed groups started taking over territory around the Cement Plant.  Defendants initially gave Tlass between $80,000 and $100,000 per month to distribute to the armed groups around the factory.  By February 2013, at Pescheux's request, Tlass had begun periodically providing lists identifying the armed groups to which he was making payments on Defendants' behalf and the amounts he was paying to the groups each month.

112.    Beginning in February 2013 and continuing through at least July 31, 2013, Tlass advised Pescheux that he was making payments of 200,000 Syrian pounds at first, and later 325,000 Syrian pounds per month to a group he identified as the "ALRAQA People," which was a reference to ANF.

---

[7] At this time, the exchange rate of Syrian pounds to U.S. dollars was approximately 112 to 1.

113.    In a July 2, 2013 email with the subject line "Donations," Pescheux calculated that the new total of monthly payments to armed factions was 17.4 million Syrian pounds, or over $155,000 USD per month.

114.    In an August 5, 2013 email with the subject line "Update on donations," Pescheux wrote to Herrault that "some elements on the donations were are paying to [Tlass] and that he is supposed to channel to the various beneficiaries.  As discussed in Dubai end of May and as reminded in my recent mail to you and [Roux], these donations are distinct from the monthly remuneration of our partner."

### D. LCS Pays Fixed Monthly Security Payments To Terrorists

115.    In November 2013, Defendants decided that Tlass should make fixed monthly security payments to ISIS as well.  In a November 29, 2013 email, Lafarge and LCS executives exchanged a list of "donations we are paying to [Tlass] and that he is supposed to channel to the various beneficiaries."  The email contained a "List valid from November 1, 2013," which included a five million Syrian pound monthly payment for "Daesh (ISIS)."  The list showed that the monthly donation payments to all armed groups now totaled 24 million Syrian pounds.

116.    On February 4, 2014, Pescheux directed Tlass to limit the monthly payments to armed groups to 20 million Syrian pounds, including limiting assessments on sales to 200 Syrian pounds per ton.  Tlass responded that his representatives were meeting to discuss the payments with ISIS in Raqqa and with ANF in Aleppo.

117.    Following those meetings, Tlass advised LCS to increase payments to the terrorists. As Tlass explained in a March 31, 2014 email pointing out the extent of Defendants' investment and the scope of its current profit:

> Is Lafarge able to bear a loss of about $600 million, because we are operating in a difficult situation?  … As long as we are selling and are able to overcome the obstacles, we should continue.

… We currently sell for $8 to $10 million per month, with a $2 million profit, and pay less than 1/4 for protection. Other factories are paying for protection just to exist, without making the profits we are.... **in this case we have to pay about 300milion SYP [approximately $2.7 million USD] monthly**.

118. Defendants' monthly payments to terrorists allowed it to continue producing and selling cement at the Cement Plant into 2014, earning millions of dollars in profits for it—and for ISIS.

119. On May 8, 2014, Tlass emailed LCS executives advising that LCS's operations were not impeded by local armed groups, stating that as to ISIS and ANF, "all we have good relations recently . . . ." Defendants maintained "good relations" with ISIS and ANF by paying them ever-increasing amounts.

120. On September 15, 2014, LCS executives exchanged an email with Tlass's initials as the subject line, containing two attachments. The first attachment was a document named "List of donations last version.pdf," which listed a monthly payment of 10 million Syrian pounds to "Daesh" [ISIS] as of May 1, 2014. In a second attachment to the email, titled "Evolution of the security donations 2012-2013-2014," Pescheux listed, on top of the total amount of LCS's monthly "donation" payments, an additional "10 MSYP [10 million Syrian pounds] paid on April 23 to ISIS to unlock the West road."

**E. Defendants Purchase Materials From ISIS-Controlled Suppliers And Sell Cement To ISIS**

121. In addition to making regular payments to terrorists, Defendants purchased materials from ISIS-controlled suppliers as part of its conspiracy with ISIS, making additional payments to terrorist-controlled suppliers totaling at least $3,447,528. They also sold cement to ISIS, knowing that ISIS intended to use the cement in terrorist activities.

32

122.    As ISIS expanded its control over northern Syria, it captured quarries of minerals LCS needed to continue to produce cement.  LCS agreed to purchase raw materials from ISIS-controlled enterprises who paid ISIS based on the amount of their sales to LCS.  Defendants also purchased oil from ISIS.

123.    On November 6, 2013, for example, LCS and ISIS entered into a written agreement on ISIS letterhead providing that LCS would purchase pozzolana—a type of volcanic ash used to make blended cement—from ISIS for 1,300 Syrian pounds per ton.  Under the agreement, ISIS would allow LCS's suppliers who mined and transported the pozzolana from ISIS-controlled quarries near Raqqa to retain some of LCS's payment for the raw material as profit.

124.    In late 2013, Taleb, an intermediary between Defendants and ISIS who had previously assisted LCS with environmental licensing, explained to LCS's board that he wished to discuss "[t]he security issue of Lafarge . . . in Syria.  I build up strong relationships with civilian and Military Locals," specifically "Islamic state which are in control of all logistic path in and out of . . . Lafarge . . . ."  Taleb repeatedly and explicitly identified ISIS as the seller of the raw materials that he brokered.

125.    For example, in a September 24, 2013 email about a recent order with the subject line "Urgent Fuel pozzolana Coal petcoke/Islamic state," Taleb informed LCS executives that LCS had already agreed to accept pozzolana sold by ISIS and stated "FOR pozzolana 15000 tons ready to be shipped they are just waiting for signed P.O today max tomorrow please islamic state very senstive about this issue."

126.    In a separate email chain a few days later, Pescheux disputed the intermediary's assertion that LCS had already agreed to purchase, but nevertheless responded that "[a]fter my mail, our Purchasing team has contacted the contractor and the price is confirmed.  We will place

an order early next week for a limited quantity (probably around 5,000 tons) as we need to see how it will work. If it is OK we will increase the quantity."

127. As another example, in a September 28, 2013 email, Taleb declared, "I OFFICIALLY REPRESENT ISLAMIC STATE FOR INVESTMENTS… You ll get letter for that . So far im on LCS side but please Im asking kindly to have my Fees ."

128. Defendants' executives understood that transacting with ISIS in this manner was illegal.

129. In a December 7, 2013 email, Pescheux informed Herrault that the following activities likely violated Syrian government regulations: "Purchasing gypsum and pozzolana from rebellion," "Purchasing Heavy Fuel Oil from rebellion," and "Paying every month the various rebel entities." Nonetheless, Pescheux determined that these activities were "needed for business continuity."

130. Thus, with Defendants' blessing, Tlass and Taleb negotiated deals in which Defendants purchased critical raw materials for use in the Cement Plant, including coal, fuel, and pozzolana, from ISIS-controlled sources.

131. In early 2014, LCS agreed to purchase massive amounts of material from ISIS-controlled suppliers, including 100,000 tons of pozzolana at 1,650 Syrian pounds per ton; another 100,000 tons of pozzolana at 1,675 Syrian pounds per ton; 4,000 tons of heavy fuel oil at 39,000 Syrian pounds per ton; another 12,000 tons of heavy fuel oil at 26,500 Syrian pounds per ton; 15,000 tons of "dirt" fuel at 17,500 Syrian pounds per ton; and an option for 35,000 additional tons of dirty fuel at the same price, as well as yellow sand and coal. Pescheux reported these planned transactions to Defendants' executives and, on February 16, 2014, wrote to Herrault that the

34

"situation with Daech (the jihadists of Islamic State in Iraq and Sham (ISIS)) is relatively calm and we are currently finalizing purchasing of pozzolana and fuel oil."

132.    Defendants did not hand only money to ISIS.  They also provided ISIS cement, even before ISIS took over the Cement Plant (*see infra* at Part VI).  In a 2014 email to Jolibois, an LCS risk manager said ISIS was "looking for distributors in Syria like ours" for 150,000 tons of cement, and Defendants memorialized in an internal company note that ISIS was seeking such cement for its "personal consumption" rather than for "market."[8]  News reports confirm that Lafarge and LCS agreed to ISIS's request for cement.  A former LCS employee stated in an interview, when the terrorists "needed cement to build their tunnels and trenches," an LCS "manager would give it to them."  The same LCS employee continued that it was "not a simple business relationship between a company offering cement and terrorist groups that needed money and cement for their defensive positions and tunnels."  Defendants "could do anything.  They had deals with ISIS."

133.    A former French intelligence analyst testified that Defendants sold cement to ANF and ISIS in Syria.  In his words, "ISIS needed primary resources provided by whatever actor. Lafarge was one of them."  News reports stated that "With the supplied cement, [ISIS] reportedly constructed fortified shelters and tunnel networks against the US-led coalition."  Lafarge's cement helped ISIS extend its reach and ability to commit acts of international terrorism.  ISIS used Lafarge's cement to fortify its network of underground tunnels and bunkers, used for hiding from and launching attacks against U.S. and coalition counterterrorism forces, including in northern Syria and near the Syria-Iraq border.  It built fortified tunnels—on information and belief,

---

[8] Some documents referenced herein are discussed in *Foley et al. v. Lafarge S.A. et al.*, 23-cv-05691 (E.D.N.Y.), a case related to this one, based on similar acts of the same Defendants.  Counsel has relied on the well-pleaded allegations as made in *Foley*.

requiring high-grade cement only LCS could provide—to move terrorist operatives, hostages, weapons, and equipment without being detected by U.S. coalition forces and aerial imagery. Defendants' cement sales thus directly aided the attacks that injured or killed Plaintiffs and their family members.

134.    Likewise, as described below (see *infra* Part XII(C)), Defendants knew and intended that it would receive concomitant benefits from their aid of and conspiracy with ISIS, including ISIS's acts of international terrorism.

## IV.    DEFENDANTS GO TO GREAT LENGTHS TO CONCEAL THEIR PARTNERSHIP WITH DESIGNATED TERRORIST GROUPS

135.    Defendants' support for ANF and ISIS directly and via intermediaries allowed them to dominate the cement market and increase profits.  But the conspiracy was not without risks. Fully aware that paying millions of dollars to terrorists violated several jurisdictions' laws, including those of the United States, Defendants and their agents and co-conspirators took numerous steps to conceal their partnership with ISIS.

136.    First, Defendants' executives ensured that any documents regarding these terrorist payments did not reference the word "Lafarge."  For example, on September 16, 2013, Pescheux instructed Tlass that "the name of Lafarge should never appear for obvious reasons in any documents of this nature," referring to checkpoint passes from ISIS.  He continued, "[p]lease use the words Cement Plant if you need but never the one of Lafarge."

137.    Similarly, on September 4, 2014, Jolibois, LCS's incoming CEO, complained to Tlass about documents that specifically referred to "Lafarge" by name: "The name Lafarge and the fact that Lafarge 'paid' appears on the laissez-passer passes issued by ISIS.  This is completely against our agreement with ISIS.  It is clear that these passes were issued for the distributors, not for Lafarge.  Could you look into solving this issue?"  Tlass agreed that "we have to change the

name or have an alias that all the laissez-passer passes use as well as the distributors because ISIS cannot let all the cements get through, just ours."

138.    Second, and relatedly, Defendants had intermediaries—rather than Lafarge or LCS executives—engage directly with ISIS and ANF.  As one of LCS's security consultants put it, "it was especially important that the relationship would be handled by [Tlass's] middlemen, since an exposure of this sort would have been compromising for LCS."  The LCS consultant concedes: "But via [Tlass], we did in fact contribute to the economy of ISIS."

139.    Not only did Defendants prefer to work through intermediaries, but they took steps to conceal the payments they made to them.  In fact, Lafarge and LCS executives directed Tlass and Taleb to submit invoices that did not reference their own names or the names of their companies, and that instead referenced payments for donations, unspecified professional fees, or personal expenses.

140.    For example, on December 13, 2012, Pescheux emailed Tlass and directed that any future invoice should not be on Tlass's company's letterhead, but instead should be on that of a company outside of Syria:

> I would like to remind you that we still need to receive correct invoices from [Tlass's company] for the months of September and October.  We discussed this issue many times and you told me it is not a problem so please send them as soon as possible.  For the November payment, we cannot take the documents you prepared with [the Intermediary 1 Company] in the title.
>
> As I told you, you need to send us the references of a [new] company located outside of Syria.
>
> This will avoid problems with the Syrian authorities and with our Auditors.
>
> We absolutely need to move forward before the end of the year to be able to present clean justifications for the [] closing of our accounts.

141.    Third, in connection with their efforts to conceal payments and falsify records, Defendants purposely availed themselves of the U.S. financial system to funnel U.S. dollars to straw-man companies outside Syria and Iraq.  LCS executives made clear that they preferred to transact through U.S. dollar bank transfers.  On June 30, 2013, Pescheux emailed Tlass, "[W]e cannot continue the way we are settling the turnover invoices.  Our preferred option would be the one we told you last October:  a bank transfer in USD to the account of a duly registered company," as opposed to a direct payment to Tlass in cash, which would appear more suspicious.  Thus, Defendants instructed Tlass, their ISIS intermediary, to create a new corporate entity in Dubai so that Defendants could surreptitiously transact in U.S. dollars, transactions that Defendants knew would transfer, clear, and be processed through New York.

142.    Pescheux also sent an internal email instructing several LCS employees that "we all have to stop [using] the acronym of an organization which is on terrorist lists" and instead use code words, indicating that he was both aware of and concerned about disclosure of Lafarge's support for FTOs.

143.    Similarly, a February 2, 2014 "External Support Agreement" between LCS and a new company created by Tlass in Dubai confirmed that payments should be made in U.S. dollars.  LCS agreed to pay the new company "a monthly remuneration of 75.000USD."

144.    Lafarge and LCS executives made similar efforts to disguise the nature of payments to Taleb, including by directing that payments reference only environmental consulting and be made using U.S. dollars.  For example, on January 12, 2014, Pescheux emailed Taleb:

> Prepare an invoice from [Taleb's company], send to me by email and bring the original next week, for an amount of 4,402 USD just with "Environmental consultancy services for the months of October, November and December 2013" as a justification.
>
> For your understanding hereunder are the details of the calculation:

- pozzolana: 18,270 tons equivalent to 914 USD (he has delivered the first order of 15,000 tons and 3,270 tons out of the order of 100,000 tons)

- HFo: 3,488 tons equivalent to 3,488 USD (he has not yet completed the first order of 4,000 tons, it remains 512 tons to deliver and he has not started the 12.000 tons of standard quality)

Total:4,402 USD

145.    A few weeks later, on February 5, 2014, Pescheux again required that payments reference only environmental consulting and be made in U.S. dollars:

If you want to have a chance to get paid for pozzolana and HFO, you have to prepare an invoice following my instructions and not your imagination.

So you have to issue an invoice mentioning only:

Consultancy services performed up to January 31,2014 for a total amount of 4,836 USD

This amount has been calculated as follows (up to 31-1-2014) HFO: 3,488 tons out of the order of 4,000tons= 3,488 USD

Pozzolana: 15,000t out of the order of 15,000t (completed) plus 11,964t from the order of 100,000t i.e total 26,964/20= 1348 USD

146.    On February 13, 2014, Taleb sent Pescheux the invoice "[b]ase[d] on your instruction."  The invoice, payable in U.S. dollars to the intermediary's company, purported to be for "[c]onsultancy services."  International financial transactions denominated in U.S. dollars, unlike transactions denominated in Syrian pounds, are cleared through U.S.-based financial institutions located in New York.

147.    In addition, as another way to conceal their partnership with ISIS from French auditors and law enforcement authorities, Lafarge and LCS executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their Lafarge corporate email addresses, to coordinate and carry out elements of their partnership with ISIS.

148.    LCS's own legal counsel instructed LCS's CEO not to create business records concerning the company's illegal terrorist financing.  On September 8, 2014, in connection with a discussion about documents received from ISIS, Jolibois wrote to Veillard, "Thank you for sharing this information with [Herrault], I don't want to write to him about this topic at his professional address (as recommended by [in-house counsel])."  Lafarge executives used Gmail accounts to communicate about the conspiracy, and thus avoided leaving incriminating evidence on corporate email servers located in France that would be available to French auditors, regulators and law enforcement officials.

## V.    LAFARGE AND ISIS NEGOTIATE A LONG-TERM REVENUE AGREEMENT AS ISIS TERRORISM GARNERS GLOBAL ATTENTION

149.    In 2014, Defendants' executives thought of a way to capitalize further on their business relationship with ISIS.  They foresaw mutual benefit:  if ISIS could block or tax cement imported from Turkey into Syria, LCS's revenues would go up, and so too would ISIS's share of the revenues.  Defendants negotiated a long-term revenue sharing and market control agreement with ISIS.

150.    Pescheux proposed that ISIS should "take a 'toll fee' on each truck loaded with Turkish cement."  Such a toll would allow ISIS to gain revenue while simultaneously "reduc[ing] the attractiveness of Turkish cement.  It would reinforce our competitiveness [and] therefore increase our volumes and increase the fees paid [to] our distributors or Da'ech [ISIS]."

151.    A July 14, 2014 Gmail message from Tlass to Pescheux discussed these "negotiations with ISIS," proposed providing ISIS with a "monthly statement," and sought input

from Pescheux about how much Lafarge's distributors should pay the terrorists "in addition to the ten millions that we pay directly to them, i.e. ISIS."[9]

152.   Negotiations continued throughout the summer and into fall 2014.  In August 2014, Tlass emailed Jolibois, LCS's new CEO, to inform him that ISIS wanted a monthly fee in addition to an assessment on each ton of cement sold:

> Negotiations with ISIS are complex and not easy at all.  In their last request yesterday, they asked us to pay S.P.100 million/month, but I told them today morning that they will gain more than 100 million/month from the factory in case the agreement includes the fixed monthly amount + the introduction amount + the amount of our purchases of pozolana, sand and fuel.

153.   Jolibois responded: "If ISIS wants higher tax from us, it's better for them to stop Turkish cement and Iraki cement, so that we may increase the price."  In response, Tlass said that

---

[9] It is unclear from the face of the email to what currency the sender is referring.

ISIS was prepared to stop importation of Turkish cement upon consummation of a revenue sharing agreement.

154.    As Lafarge was negotiating the minutiae of its deal with ISIS, ISIS fighters were committing genocide against and enslaving the Yazidi people as part of its territorial expansion. On August 5, 2014, just two days after ISIS launched a massive attack on the Yazidi ethnic and religious minority in Sinjar in Iraq to immediate international condemnation, Tlass sent Jolibois a draft of the proposed revenue-sharing agreement between LCS and ISIS.[10]  The next day, Jolibois confirmed Lafarge's and LCS's agreement to share ten percent of Lafarge's profits with the terrorist group, in return for ISIS's agreement to take out the competition by stopping importation of Turkish cement in areas under its control or taxing those areas at a rate equivalent to or higher than the Cement Plant, as well as other benefits.  As Jolibois put it:

> As per our phone call today, hereafter what I understand from the agreement with ISIS, that I approve:
>
> - o ISIS will receive the payment of 750SP/ton, by customers, every two weeks
> - o ISIS ensure the security and the free movement of our customers and suppliers vehicles as well as our employees
> - o ISIS will stop import of Turkish cement in the areas under its control (as of today: Al Rakka, Dair El Zor, Hasaka, Qamishli and Al Mayaden, Srin, Menbij, Al-Bab, Deir Hafer and Maskaneh), or implement in those areas taxes as high or higher than to Jalabieyeh cement plant.
> - o The agreement is valid until February 5th, 2015.
>
> I hope the agreement to be signed today, and sales to restart tomorrow.
>
> ISIS needs to clarify which office (AlRaqqah or Membij) is certified to receive payments and deliver permission letters.[11]

---

[10] SOF ¶ 78.
[11] SOF ¶ 79.

155.    The next day, as accounts of ISIS's brutality in Sinjar increased, Jolibois announced to Herrault:

I just finalized with Firas this morning:

ISIS 750 SP/ton, to be paid every 15 days by distributors; fixed portion to be reviewed (today 10M), but should not increase because it is against the Sharia Law; the distributors are ok and ready.

156.    While Lafarge was aware that ANF and ISIS were classified as terrorist groups by the United States, United Nations, and European Union, business negotiations between Defendants and ISIS became more complicated on August 15, 2014, when the United Nations Security Council passed a resolution condemning ISIS, ANF, and Al-Qaeda, and calling on U.N. members to prohibit all financial and trade relations with the groups.  On August 18, 2014, the United States Department of State added ISIS member Mohamed Al-Adnani and ANF member Said Arif to its list of Specially Designated Global Terrorists.

157.    Defendants' executives were closely following these developments, not to comply with these directives, but to avoid getting caught violating them.  On August 18, 2014, Veillard emailed Herrault and Jolibois with the subject heading "terrorist watch list" and wrote that the United States had designated ISIS's Al-Adnani and ANF's Arif to the list of Specially Designated Global Terrorists.  Yet Lafarge did not stop negotiations, despite the terrorist designations, and even as ISIS continued to demand more concessions.

158.    On or about August 15, 2014, Tlass informed Jolibois that

Da'ysh [ISIS] have changed their mind and began to negotiate that they want 10% of the cement, and they want them as cement, in addition to that, they want 25% out of the value of our raw materials according to the bills . . .

They will take S.P1500 for each ton sold in their areas . . . And in addition, they take 15 millions monthly as charges of the pass of workers and raw materials. . . .[12]

---

[12] SOF ¶ 81.

Even though ISIS had increased their demands, Lafarge was willing to comply, calculating their "operational margin" with the increased concessions ISIS wanted.[13]

159.    On August 19, 2014, ISIS executed American journalist James Foley and released a video of the horrific act, entitled "Message to America," online. Advocates for Foley had approached LCS in 2012 to ask for LCS's assistance in negotiating for Foley's freedom when he was taken hostage. Two weeks later, on September 2, 2014, ISIS released a video of the beheading of Steven Sotloff, another American journalist, titled "A Second Message to America."

160.    Notwithstanding ISIS's heinous acts, including the televised murder of Americans, and the international community's universal condemnation of the terrorist group, LCS ironed out a final revenue-sharing agreement with ISIS on or about August 20, 2014—after consulting with Lafarge's in-house counsel.

161.    Herrault updated Lafarge's Executive Committee during a meeting on August 27, 2014. The notes from the meeting reflect that Herrault highlighted ISIS's agreement to impose costs on imported Turkish cement that were equal to the costs imposed on LCS: "In our agreement with Daesh [ISIS], we said that in terms of taxation we must have the same treatment as Turkish imports."

162.    Lafarge's executives were aware that they were in peril, at least legally. The notes further reflect that Lafont, Lafarge's CEO, responded that "we have to make sure that what we do is risk free (also vis-à-vis the U.S.)." Also Lafarge's Chairman, Lafont knew that Defendants' partnership with ISIS was illegal under U.S. law and would have consequences in the United States. In response, Herrault replied that "the best protection is to keep the plant in operation, sales have resumed, we are maintaining contact with everyone."

---

[13] SOF ¶ 76.

163.    Lafarge had now solidified its shared objectives with ISIS.  Each co-conspirator, including Defendants, intermediaries, and ISIS, would benefit from ISIS's violent rise to power, which placed it in a position to control the local cement market to their mutual advantage.

## VI.    DEFENDANTS SELL CEMENT TO ISIS, AND, WHEN ISIS FORCES THEM OUT, LEAVE CEMENT AND EXPLOSIVE MATERIAL FOR ISIS TO SEIZE

164.    Defendants did not hand only money to ISIS.  They also sold ISIS cement—even before ISIS took over the Cement Plant.  In a 2014 email to Jolibois, an LCS risk manager said ISIS was "looking for distributors in Syria like ours" for 150,000 tons of cement, and Defendants memorialized in an internal company note that ISIS was seeking such cement for its "personal consumption" rather than for "market."  News reports confirm that Lafarge and LCS agreed to ISIS's request for cement: a former LCS employee also stated in an interview that when the terrorists "needed cement to build their tunnels and trenches," an LCS "manager would give it to them."  And ultimately under the long-term revenue-sharing agreement, LCS agreed to give ISIS a fixed supply of cement in addition to a percentage of its revenues.  *See supra* Part V.

165.    The same LCS employee suspected that there was "not a simple business relationship between a company offering cement and terrorist groups that needed money and cement for their defensive positions and tunnels."  Defendants "could do anything.  They had deals with ISIS."

166.    A former French intelligence analyst also testified that Defendants sold cement to ISIS in Syria.  This was reflected in periodic sales reports that an LCS sales manager sent to Pescheux, stating "it was not our problem that Daesh received our cement."  In the words of a France-based legal expert and researcher, "ISIS needed primary resources provided by whatever actor.  Lafarge was one of them."

167.    In addition to the supply of cement that LCS sold ISIS, when LCS evacuated the Cement Plant in September 2014, ISIS came into another windfall of cement, as well as explosive materials such as hydrazine that are used in the manufacture of cement.

168.    On September 10, 2014, President Obama outlined a strategy for the United States to lead an international coalition to defeat ISIS.  In the following days, ISIS advanced on the Cement Plant with an eye towards complete control of the region.  Even in the face of this grave threat from ISIS, Lafarge and LCS executives wanted to continue with the conspiracy.  Jolibois argued strenuously against shutting down the Cement Plant, saying that if LCS suspended operations "for the next few months until after the completion of the merger [with Holcim] we will surely be watched closely when we seek to resume them, and nothing says that the area will have been freed from the grip of ISIS, nor that it will be free from it for years."[14]

169.    Likewise, on September 12, 2014, Veillard sent an email to Herrault saying, "I think it's imperative to maintain the plant in working order and to be able to restart quickly."  Veillard went on to say, "[i]t seems to me that this option is totally doable. . . ."[15]

170.    The Lafarge and LCS executives' desire to remain in the area despite ISIS's control, coalition airstrikes, and danger to their employees meant that they did not implement a safe evacuation plan for their local staff nor take steps to prevent the plant's operations and explosive raw materials from falling into terrorists' hands.

171.    As it turns out, terrorists are not trustworthy business partners.  When ISIS informed employees early in the morning of September 18, 2014 that it intended to advance on the plant, Jolibois abandoned these locals to their fate, ordering them to "prepare mattresses, food, water,

---

[14] SOF ¶ 92.
[15] SOF ¶ 93.

sugar" and to shelter in the plant's electrical tunnels rather than evacuate. The employees eventually tried to flee by hitching rides with the fleeing canteen vendors and on local buses. But it was too late: ISIS kidnapped four employees during its advance.

172. When they left, LCS employees left the plant entirely operational. All start-up technology and hard drives were left in place, and one diesel generator was still running. Lafarge could have shut down the plant's operating computers remotely, but chose not to.

173. ISIS completed its seizure of the Cement Plant on September 19, 2014, and promptly released propaganda videos showing its militants at the plant.[16]

174. In the Cement Plant, ISIS took what it wanted. ISIS seized the cement that LCS had produced in furtherance of the conspiracy, and ISIS ultimately sold that cement for what Lafarge and LCS's plea deal admitted was approximately $3.21 million. The actual value of ISIS's seizure of the Cement Plant was much higher. According to publicly available French intelligence reports and media reports, the value of the Cement Plant at the time that ISIS seized it was approximately $25 million.

175. As reported in the press, "[w]ith the supplied cement, [ISIS] reportedly constructed fortified shelters and tunnel networks against the U.S.-led coalition."

176. And ISIS seized raw materials at the Cement Plant, including hydrazine, a chemical that ISIS could use to produce explosives for terrorist attacks. Defendants' intermediary Taleb was present for some of the negotiations for the disposition of these remaining materials, which by December 2014 had already yielded approximately $11.5 million. Thus, according to French intelligence, following October 2014, "the dismantling of the Lafarge plant in Syria continues to the financial benefit of both Daesh [ISIS] and the businessmen involved." In December 2014,

---

[16] SOF ¶ 95.

Taleb visited Lafarge's headquarters in Paris to explain the ongoing negotiations relating to materials left at the plant.

177.    Of the five cement plants ISIS seized in its campaign in Iraq and Syria, Lafarge's Cement Plant was by far the largest—its production capacity was more than twice as much as that of ISIS's second-largest plant.

## VII.   AFTER EVACUATING THE CEMENT PLANT, DEFENDANTS ATTEMPT TO CONCEAL THEIR PARTNERSHIP WITH ISIS

178.   After Defendants' employees fled the Cement Plant, and as the international community stepped up its multi-front action against ISIS, Defendants took further steps to conceal their conspiracy with ISIS.  They did so by drafting a backdated contract-termination agreement that would allow them to falsely claim that Tlass's relationship with LCS had been terminated before he conducted negotiations with ISIS in August and September 2014.

179.   Specifically, on September 29, 2014, Tlass informed Herrault and Jolibois that, in response to their prior requests, Tlass had opened a bank account in Dubai in the name of a new company that was not publicly linked to Tlass ("Tlass NewCo").

180.   On October 9, 2014, Jolibois sent an internal email to Pescheux and Lafarge's in-house counsel with the subject "New contract for [Tlass]" and saying that LCS owed Tlass "Monthly fees 2*75kUSD for services in July and August" plus "August sales tax to PYD, already paid by [Tlass] to PYD : 10.5 M SYP = 60kUSD)" totaling "210kUSD."  Jolibois further wrote that the in-house lawyer "would like to terminate the previous contract [with Tlass] on the date of 18th August to show evidence of company reaction to UN resolution, and to get a new contract to start from September 1st, 2014."  In a subsequent email on October 14, Herrault clarified Lafarge would not pay Tlass without a new backdated contract.

181.   Jolibois then sent an email to Tlass with the subject line "Agreement for Regional Security Consulting Services," which attached copies of (1) the new consulting agreement between a holding company created by LCS ("LCS NewCo") and Tlass NewCo, and (2) the backdated Termination Agreement between LCS and Tlass NewCo.

182.   In his cover email, Jolibois explained that the new consulting agreement was "written in such a way as to" take "into account the compensation for termination of the previous

contract (210k USD for 202k USD which are actually due)." A $210,000 lump sum payment compensated ISIS intermediary Tlass for work he had already performed negotiating an agreement with ISIS, and to reimburse him for making fixed monthly "donation" payments to terrorist groups, including ISIS.

183. In addition to the lump sum payment to compensate him for work he had already performed, Defendants continued to pay its intermediaries to work with ISIS. Those payments for ISIS, including to or through Taleb, continued after Lafarge left the Cement Plant, according to a post-dated contract and reports. The new consulting agreement with Tlass required the Defendants to make monthly payments of $30,000 on a going-forward basis.

184. The Termination Agreement with Tlass was backdated to August 18, 2014 before the United Nations Security Council called on member states to prohibit transactions with ISIS and ANF. The metadata of the backdated Termination Agreement indicates that the document was not drafted by Lafarge's in-house lawyer until October 3, 2014, two weeks after LCS had evacuated.

185. On October 23, 2014, after the parties signed the new consulting agreement and the backdated Termination Agreement, Tlass sent an invoice for USD $210,000. Lafarge paid the $210,000 invoice with a wire transfer from Lafarge's operating account at a financial institution in Paris, through the Eastern District of New York, to intermediary banks in New York City, which transmitted the wire to Tlass NewCo's account at a financial institution in Dubai (see *infra* Part XII).

186. On information and belief, any additional U.S. dollar payments due under the Consulting Agreement were paid after October 2014 in the same manner.

187.    Legal proceedings against Lafarge in France revealed that intermediary Taleb continued to negotiate with Lafarge for payment for materials in the plant.  According to a publicly available French intelligence report, at a meeting between the parties in December 2014, Lafarge handed over 65,000 tons of cement, worth $6.5 million.  At the meeting, ISIS representatives signed a contract for an additional $5 million of the cement left at the plant.  Following October 2014, "[t]he dismantling of the Lafarge factory in Syria continues to the financial benefit of both Daesh [ISIS] and the businessmen involved," stated the intelligence report.

## VIII.    THE YPG DEVELOPS INTO A CLOSE U.S. ALLY IN OPERATION INHERENT RESOLVE

188.    As the Syrian civil war broke out in 2011, Kurds in Syria's northern region began joining informal militias to protect themselves against the numerous battling factions and regime. A group of these officially declared themselves the People's Defense Units (in Kurdish, Yekîneyên Parastina Gel, "YPG") in 2011.  The YPG is ISIS's polar opposite; YPG upholds the importance of religious tolerance, democracy, and women's rights.

189.    In 2012, the YPG began taking control of villages and cities with Kurdish majorities in northern Syria as then-president Bashar al-Assad's regime forces withdrew.  The YPG formed an offshoot all-women militia, called the Women's Protection Units.  They put in place government institutions and utilities, and created local self-administration in the areas of Syria they controlled.  Their political party, the Democratic Union Party, promoted women's rights, social equality, multicultural recognition, self-determination, and democracy.

190.    In addition to fighting against Assad's forces and stabilizing Syria, the YPG was also trying to stop ISIS's unrelenting expansion—one of the only groups to successfully do so. When ISIS invaded Sinjar, Iraq with the intent to wipe out or enslave the Yazidi community in early August 2014, the very same time that Lafarge was negotiating its profit-sharing agreement

with the terrorist group, the YPG stepped in to help.  The Peshmerga (a separate Kurdish armed force in Iraqi Kurdistan) had fled as ISIS advanced, leaving the Yazidi community defenseless. Tens of thousands were trapped on the arid and scorching Sinjar Mountain, surrounded by ISIS fighters.  ISIS had already forced the Yazidi men it captured to convert, or killed them, enslaved the women and girls, and taken boys as child soldiers.  Like the rest of the world, the YPG was shocked by the widely publicized horror, and YPG members traveled to Sinjar to intervene.  At the same time, Americans were pushing the U.S. government to act.  On August 7, 2014, President Obama announced that he had authorized airstrikes against ISIS to try to prevent a "massacre." American planes struck ISIS locations around the mountain, as the YPG cleared a path for the starving and wounded Yazidis stranded on Sinjar Mountain to escape.

191.    But as the United States and YPG beat back ISIS in Sinjar, ISIS was also attacking the YPG in Syria.  In September 2014, just after taking over the Cement Plant, ISIS fighters surrounded the northern YPG-held town of Kobani.  ISIS raised black flags and prepared to defeat Kobani as easily as they did Mosul and the Sinjar region of Iraq.  They pummeled the YPG with heavy fire as the Kurdish militia members were only able to return fire with pistols and handguns.

192.    The YPG and the United States cooperated to hold ISIS out of Kobani for a month, with the United States conducting hundreds of air strikes on ISIS targets as the YPG fought on the ground.  But the besieged YPG fighters were running out of ammunition and guns.  In October, the United States intervened to help the determined fighters who were battling ISIS: it airdropped three C-130 aircraft cargo loads of weapons and medical supplies, provided by Iraqi Kurdistan authorities, to the YPG in Kobani.  U.S. Secretary of State John Kerry said it would have been "morally very difficult to turn your back on a community fighting [ISIS]," and a senior official

said the airdrop was to support the YPG taking out ISIS fighters—stating that the YPG was doing so with "impressive" force.

193.    Despite the YPG's impressive commitment to defending the Yazidi community and vanquishing ISIS, the terrorist group had grown into a massive empire spanning Iraq and Syria, fueled by financing and support from entities including Lafarge.  ISIS had thousands of fighters and access to weapons it had stolen, made, or bought on the black market.  The YPG was a scrappy group of local fighters.  It took the YPG a five full months, until January 2015, to push ISIS out from Kobani, and only thanks to substantial and continued U.S. air support.  When the YPG finally liberated Kobani, U.S. Central Command "congratulate[d] these courageous fighters and thanks them for their efforts," and said that the YPG had "fought aggressively with resilience and fortitude.  While the fight against [ISIS] is far from over, [ISIS's] failure in Kobani has denied them one of their strategic objectives."

194.    The U.S. had found a dependable ally and redoubled its efforts to defeat ISIS. Under the banner of "Operation Inherent Resolve," a name that Central Command said reflected its deep commitment to defeat ISIS in Syria and Iraq utilizing a network of partner nations who were dedicated to "work[ing] closely with our friends in the region," the U.S. trained and supported local groups who could in turn govern their nations after pushing out ISIS.  Speaking to U.S. troops, President Barak Obama "stressed that American service members will lead the fight against [ISIS], but will not shoulder the entire burden"—that local resistance, meaning the YPG and its allies, would have U.S. backing to "secure their own countr[y's] future[]."

195.    Following the success of their coordination in Kobani, the U.S. saw the YPG as a reliable partner to defeat ISIS in Syria.  President Obama committed U.S. air support and training to help the YPG defeat ISIS entirely, and U.S. forces began training and fighting alongside the

53

YPG and other vetted local Syrian opposition forces that were part of the Syrian Defense Forces ("SDF"), the new coalition of armed groups led by the YPG. They liberated 35,000 square miles from ISIS in Syria, including the strongholds closest to the Lafarge Cement Plant, Manbij and ISIS's capital Raqqa, securing Raqqa in October 2017. The YPG and U.S. forces both used the defunct Cement Plant as a base to continue beating back ISIS.

## IX.  AMERICANS AND OTHER FOREIGNERS JOIN YPG FORCES TO DEFEAT AN ISIS STRENGTHENED BY YEARS OF FINANCING AND FIGHTING

196.    The U.S. military was not alone in wanting to help the YPG. Dozens of Americans, Europeans, and others volunteered to join the YPG. "I was so impressed with what I saw the Kurds accomplishing" and their "self-built democracy," explained one young man who volunteered, Plaintiff Porter Goodman. "The democratic project that they were implementing, which champions the rights of ethnic and religious minorities, really counters corruption, which is one of the fundamental issues plaguing the Middle East, and it really champions gender equality and women's rights." Goodman had served a tour in the U.S. Army, learning field medicine. He was a student at Brigham Young University when he decided to pause his studies and join the YPG. With the YPG, he organized a medical unit and provided combat medicine training that saved lives. Goodman was sent to the front lines with the YPG to coordinate medical care during battles with ISIS.

197.    One night during a lull in the fighting he and another American volunteer, Levi Shirley, were sharing a Meal Ready to Eat ("MRE"). Shirley had desperately wanted to be a Marine, but his poor eyesight disqualified him, even after his mother spent her savings on surgery. When he saw ISIS beheading journalists and slaughtering Yazidi children, he told a documentary filmmaker, "I thought to myself, *There's got to be something I can do to stop that.*" Shirley had said that ISIS was "my definition of pure evil" and declared, "I don't believe good people in a

society can stick someone in a cage and set them on fire, so I came here to stop that." Shirley had joined the YPG in February of 2015, returned home, and then told his mother he was moving to Texas to keep her from worrying that he would be hurt in Syria.

198.    But Shirley was not in Texas. He and Goodman were in Manbij, the city closest to the Cement Plant. The YPG, including Shirley and Goodman, had liberated this small section of Manbij from ISIS's control.

199.    ISIS had kept an iron grip on the city, using cash from its dealings with Lafarge—at a minimum $5.92 million to as much as $15 million in payments, and more profit in kind. ISIS used this money, in part, to make IEDs. According to Mark Wilkinson of the United Nations Mine Action Service, ISIS's IED production included mortar bombs, air-dropped munitions, suicide belts, missile enhancements, launchers, and entire vehicles that were either remote, self-, or victim-activated, amounting to "a level, scale, and quality of arms manufacturing . . . equivalent to conventional arms manufacturers." It did so to kill the U.S.-led coalition forces, to kill, maim, and terrify civilians and sow distrust among the population, and to displace, influence, and intimidate local and foreign governments.

200.    In Manbij, where many Cement Plant workers lived, ISIS left thousands of tiny explosive devices, hidden "in doorways and windows, under mattresses and piles of shoes, in refrigerators and bags of clothes, and in television sets and kitchen sink taps."

201.    Taking a break from the battle, Goodman and Shirley went into a building that was thought to be clear. Shirley stepped on an undiscovered pressure plate trigger and was killed instantly. The explosion flung Goodman across the room, knocking him unconscious and giving him head and leg injuries.

202.    In yet another assault, Freeman Stevenson was guarding a lookout alongside the YPG from the top of a home in Manbij, in a team composed of four Kurds and two Americans. An ISIS fighter armed with grenades and an automatic rifle snuck up to the upper levels of a building and attacked, immediately killing the man standing watch.  While trying to pull the sentry's body from the melee, Stevenson was hit by bullets and shrapnel that embedded in his arm. Stevenson went to the medic and rejoined the fight.  Just two weeks later in the small village of Dahr al-Maghayer, Stevenson's unit was hit by another ISIS grenade and gunfire, wounding him across his body.  He was evacuated to an American-run triage center and then a local hospital for treatment.  Stevenson, who had been inspired to join the YPG after seeing how strongly it defended the Yazidis against ISIS, and the YPG's rebuttal to ISIS's repression of women by having women join the fight, returned again to the battlefield yet again in spite of his injuries.  In October 2016, the trauma and stress of fighting foes as horrific as ISIS forced him to return home.

203.    Jacob Klipsch was the other American at the rooftop firefight that first injured Stevenson.  Klipsch was hit by shrapnel, and also returned to battle as soon as he was able.  Klipsch, thirty-five and the father of two children, had been discharged from the U.S. Army during training in his youth and still thought of his friends who had fought and lost their lives in Iraq.  He flew to join the YPG in a battle that was "as simple as good versus evil."  He was one of the few, if not the only, American who blogged about his experience in the YPG.  His last post, in 2017, titled On Losing People, showed a photo of four smiling young men sitting in a stairwell, with the caption "Half the guys in this photo didn't make it out alive."  Klipsch wrote in that post that he was at a loss for words "to describe the sensation of wrapping your newly Shaheed [martyred] friend in a blanket."  Klipsch stayed to fight for the liberation of Raqqa and later died in Syria in early 2018.

204.    Francisco Molinar was likewise an American injured in the battle for Manbij, the so-called "Manbij Meatgrinder." Molinar, once a National Guard member, always aspired to fight on the good side, "in defense of, and in solidarity with the terrorized." He joined the YPG and was assigned to an all-foreigner fighting group in Manbij whose position faced constant assault from ISIS by long-distance sniper fire. One afternoon an entire ISIS unit snuck up on their position. Molinar was attacked while trying to relocate the machine gun he was manning to target more fighters, and was shot through the neck and the leg, fracturing his femur.

205.    Another American volunteer would lose his life in Manbij before the YPG finished clearing the city. Like Shirley, a medical problem, namely a childhood seizure, kept William Savage from being able to join the U.S. military. He flew to Syria and trained and fought with the YPG instead. Savage was severely wounded by mortar fire while trying to help people escape a building that was being shelled by ISIS. "He was fearless," said Savage's father, who lives in Raleigh, North Carolina. "He wanted to help the Kurds." The YPG medics were unable to save Savage, who died from ISIS-inflicted wounds. Two days later, the last ISIS fighters were pushed out of Manbij.

206.    Though they were forced out of Kobani and Manbij, ISIS was far from defeated. Its capital of Raqqa was strong, and it was fortifying its defenses against U.S. airstrikes and SDF ground attacks. The SDF, working with U.S. forces, planned an attack on Raqqa called Operation Wrath of Euphrates. The operation took an entire year to execute. The SDF had to slowly encircle Raqqa and then push ISIS into increasingly concentrated spaces to eliminate the terrorists. U.S. Secretary of Defense Ash Carter welcomed the SDF's announcement that "the operation to free Raqqa from [ISIS's] barbaric grip [had] begun," and confirmed that the liberation of Raqqa "marks the next step in our coalition campaign plan." ISIS had dug in deeply in Raqqa, pushing human

shields to the front lines and digging tunnels or hanging drapes over streets to avoid aerial surveillance. A U.S. commander said that the battle for Raqqa was the most intense urban fighting since World War II.

207. Along with scores of Kurdish fighters, Americans were killed as ISIS fought its demise. During the advance to Raqqa, Paolo Todd of California, known in Kurdish as Kawa Ahmed, was killed by a land mine ISIS planted north of Raqqa. Robert Grodt, given the name Demhat Goldman by the YPG, was an "idealist who has always stood… for liberation of people who have been oppressed." As the YPG marched toward Raqqa in the darkness overnight during the early morning hours of July 6, ISIS killed Grodt instantly with an IED blast. Just ten days later, David Taylor II, a Marine who had served for ten months in Afghanistan and who joined in part to support the YPG's protection of women's rights and the environment, was killed in a third Raqqa-area roadside blast. The SDF would not fully push ISIS out of Raqqa for another three brutal months of air strikes and close fighting.

## X.  LAFARGEHOLCIM DISCLOSES THAT LAFARGE AND LCS TRANSACTED WITH TERRORISTS

208. In January 2015, as the U.S.-backed YPG coalition was trying to drive ISIS out of Kobani, a Lafarge intermediary flew to France. He was traveling to inform Lafarge's executives in person about ISIS's progress selling the millions of dollars of cement that Lafarge had left behind when it failed to fully shut the plant down as its workers fled for their lives, and then did not even turn off the production computers remotely.[17]

209. A few months later, in July 2015, after over a year of negotiations, Holcim completed its merger with Lafarge, combining the two largest building materials companies in the

---

[17] See *supra*, ¶ 172.

world to make a mega-manufacturer.  The companies have claimed that the payments to terrorists were not disclosed to Holcim or its representatives during pre-acquisition due diligence meetings, although Lafarge executives who had been aware of Lafarge's payments to ISIS remained in leadership positions in the newly formed company, LafargeHolcim.

210.    On February 19, 2016, a website run by an opposition group to the Syrian regime reported that Lafarge and LCS had purchased raw materials from and made other payments to ISIS.  The report included partially redacted images of emails sent to and from Lafarge and LCS executives' email accounts, discussing payments to ISIS.

211.    On April 24, 2017, after retaining a U.S. law firm to conduct an investigation, LafargeHolcim issued a press release acknowledging for the first time that Lafarge and LCS made payments to terrorists:  as "terrorist groups designated by the US and the EU were expanding into the area" of the Cement Plant, LCS made "payments" to intermediaries to "avoid direct contact with these armed groups."  LafargeHolcim admitted that "LCS management kept Lafarge SA well-informed of developments."

## XI.    DEFENDANTS' PAYMENTS AND COOPERATION SUBSTANTIALLY ASSISTED THE ACTS OF INTERNATIONAL TERRORISM THAT INJURED PLAINTIFFS AND KILLED THEIR FAMILY MEMBERS

212.    Defendants made payments to ISIS and ANF that financed their operations, including acts of international terrorism that injured Plaintiffs.  Without funding, terrorist attacks cannot be planned, fighters cannot be paid, and propaganda cannot be generated, edited, and distributed.  But more than that, Lafarge sought to partner with ISIS *because of* its ruthlessness and brutality.  Lafarge did not only pay into the protection racket ISIS enforced.  It sought to partner as closely as possible with ISIS, to pay percentages of its sales to ISIS, purchase materials from ISIS and sell its cement to ISIS, and ultimately to enter an agreement for ISIS to block its competitors in exchange for a slice of all of the Cement Plant's profit.  In return, ISIS carried out

exactly the types of attacks that had made it such an enticing business partner in the first place: terrorist attacks to expand and maintain its control of territory and markets.

213. The millions of dollars Defendants gave ISIS materially enhanced ISIS's and ANF's ability to expand or sustain their power and territorial control by committing the terrorist attacks described in this Complaint, as Defendants foresaw and intended for their own financial benefit. The cost of ISIS's and ANF's individual attacks, and salaries for their fighters, paled in comparison to the funding provided to those groups by Defendants.

214. ISIS fighters received a base pay of $200-400 per month. Just $5,000 to ISIS or ANF could have paid 20 terrorists (at $200 per fighter) and three commanders (at $333 per commander) in the field for a month. $5,000 could purchase dozens of bomb components or finance multiple complex attacks. ISIS publicly confirmed in a video that it deployed its "taxes," that is, money collected from its territory, including from Defendants, to support "[t]he mujahidin and jihad"—that is, its fighters and its fight. The money ISIS got from Lafarge was used to pay fighters, control territory and markets, and commit terrorist attacks.

215. Lafarge pled guilty and admitted giving ISIS and ANF $5.92 million, though the actual payments are believed to be much higher. Lafarge also left millions of dollars of cement in ISIS's hands, or sold it to them directly. ISIS recruited tens of thousands of foreign fighters to commit attacks. The limiting factor on its attacks was money, not manpower. As Mustafa Abu al-Yazid, an al-Qaeda financing chief, said: "There are hundreds wishing to carry out martyrdom-seeking operations, but they can't find the funds to equip themselves. So funding is the mainstay of jihad." Defendants' payments, given at a time when ISIS was looking to expand and commit attacks, materially strengthened the terrorists' ability to commit the attacks that killed and injured Plaintiffs. Indeed, following the payments by Defendants, ISIS attacks, and territorial control,

increased. These attacks began with its beheadings of American journalists and humanitarian workers in 2014, which ISIS announced as horrific 'Message[s] to America.' ISIS's targeting of Americans rapidly expanded, following and utilizing Defendants' payments, to killing Americans in Syria, Iraq, across Europe, and other countries around the world.

216. The money Defendants admitted to placing in ANF's and ISIS's hands from 2012-14 had a lasting impact. ISIS had sophisticated financial accounting and saving systems. As late as February 2019, long after the attacks herein, a U.S. government report stated that ISIS continued to hold onto amounts of "stockpiled cash." Moreover, the cement that Lafarge handed over to ISIS was durable, by its very nature. The tunnels and infrastructure ISIS built with Lafarge's cement would have lasted past 2014, and could have been utilized years later in the attacks in Manbij, Raqqa, and the surrounding areas that wounded Plaintiffs or killed their relatives. Defendants' admitted material support for ISIS in 2014 foreseeably contributed to ISIS's long-term savings and its ability to commit attacks multiple years later; material support in subsequent periods to which Defendants have not admitted contributed to ISIS's ability to commit attacks even later.

217. ISIS's fundraising apparatus was organized and centralized, meaning that there was a strong link between Defendants' payments and ISIS's terrorist attacks. Terrorism scholars Dr. Colin Clarke and Dr. Phil Williams explain that "[m]uch like its predecessor, AQI, [ISIS] . . . adopted a top-down approach that maintained hierarchical control over and a high degree of accountability for its financial assets as it worked to keep an ironclad grip over the money it earned from a series of rackets." The U.N. Security Council's ISIS panel notes that ISIS's "core leadership" in Syria and Iraq exercised "systematic financial direction" over its provinces'

financing.  Such systematic financial direction ensured that Defendants' money in Syria supported ISIS's terrorist attacks in other areas in which it operated.

218.    Defendants' payments of course had an especially close nexus to ISIS's acts in Iraq and Syria.  ISIS, which originally formed in Iraq before becoming primarily centralized around Raqqa in Syria, controlled all of the territory around the Cement Plant.  Because of ISIS's structure and organization, Defendants' payments were specifically funneled to certain cells.  The following ISIS cells played a key role in both handling Defendants' money and planning or committing the attacks that targeted Plaintiffs and their family members.

## A.  At Least 20% Of Lafarge's Money Was Used To Harm Plaintiffs

219.    **ISIS's Leadership Cell**, also called the "Shura Council," "Governance Council," or "Delegated Committee," was, during relevant periods, a unified leadership group that approved new ISIS membership, expansion plans, and strategy.  ISIS's Leadership Cell was composed of Al-Baghdadi and several advisors.  It ensured that all major ISIS actions were in accord with Islamic law and ISIS's overall strategy.  ISIS's predecessor ISI's known funding structures required that 20% of all income derived from its taxation went to Al-Baghdadi and his Leadership Cell for use in planning and committing attacks, and ISIS continued the same practices.  According to terrorism scholar Brian Fishman, the "provinces," or geographic areas under its control, "carefully tracked both revenue and expenditures and passed 20 percent of their income to the national-level ISI [al-Baghdadi and the group's leadership], which redistributed the funds as needed."  ISIS was a remarkably centralized group, with the Leadership Cell commanding specific areas to expand or stop sending fighters, and with all fighters loyal to the same authority under Al-Baghdadi.  According to multiple sources, including its magazine Daqbiq and a guide to its "tax" practices, ISIS mandated payment amounts depending on its interpretation of Islamic law.  This interpretation specified that twenty percent of goods such as spoils of war and of underground or

mineral wealth be paid to ISIS's central funds. Thus, it is likely that twenty percent of the funds Defendants have admitted to paying ISIS went to Al-Baghdadi and the Leadership Cell (over $1.1 million U.S. dollars), to plan and execute the acts that harmed Plaintiffs. Specifically, the funding supported the following acts of international terrorism:

220. Al-Baghdadi and the Leadership Cell planned and authorized ISIS's battle plans, broader strategy, and attacks against the United States and its allies inside ISIS's territory in Syria 2014-17, including the attacks that killed or injured Levi Shirley, Porter Goodman, William Savage, Paolo Todd, Robert Grodt, and David Taylor II. The Leadership Cell's role included: (1) financing ISIS's cells and operatives to commit such attacks; (2) ordering ISIS's members to specifically target and attack the United States within Syria and Iraq; (3) supervising ISIS's strategies and tactics to target the United States in Syria and Iraq; (4) deploying a strategy to leverage American deaths and injuries to pressure others to submit to ISIS; and (5) using American deaths and injuries to increase ISIS's influence, recruit members and maintain and expand its control over territory and markets.

**B. Lafarge Channeled Funds Into ISIS's Center In Raqqa, Where The Attacks That Harmed Plaintiffs Were Directed Or Occurred**

221. The Cement Plant was in Raqqa, one of the first cities to fall to opposition groups during Syria's civil war, and subsequently dominated by ISIS. ISIS's Raqqa Cell attained prominence within ISIS itself because of its central location and the large population under its control. It became critical to planning ISIS's outward reach, and ISIS leadership flocked there. While ISIS was founded and led by Al-Baghdadi in Iraq, its expansionary military strategy and much of its operations and planning were centered in Raqqa. Al-Baghdadi declared that Raqqa would be the seat of his state, due to its proximity to both Iraq and Syria. According to LCS's former risk manager, Lafarge negotiated with ISIS's representatives in Raqqa.

222.    As the capital, ISIS's leadership and strategy were set in Raqqa.  Secretary of State John Kerry stated in 2015 that Raqqa was "the core where they're [ISIS] planning" attacks.  A Pentagon spokesperson likewise confirmed that ISIS's militant administration and leadership were based in Raqqa.  As described by the Commander of U.S. Central Command, Raqqa was "where [ISIS's] plotting takes place. . . . Raqqa is recognized as the financial, leadership and external ops center of the Islamic State."

223.    ISIS's Raqqa Cell was led by Abu Luqman, also known as Ali Musa Al-Shawakh, from early 2014 until his death in an airstrike in 2018.  Abu Luqman had been a powerful ANF terrorist but then switched his allegiance to ISIS and recruited several hundred ANF fighters to join ISIS's ranks in Raqqa.  He served on ISIS's Leadership Cell, as well as on ISIS's Intelligence Cell.  Abu Luqman was head of ISIS's Directorate of General Security, which was responsible for intelligence gathering, detentions, state security, and external intelligence.  Public reports state that Abu Luqman served on a "shadow board" of the Cement Plant.  Abu Luqman also controlled ISIS's oil sales in northern Syria, which likely included sales of fuel to LCS.

224.    In December 2014, Abu Luqman himself was present, alongside Lafarge's agent Taleb, to facilitate ISIS's purchase of remaining materials in Lafarge's factory, worth $11.5 million.  The next month, at Defendants' expense, Taleb visited Lafarge's headquarters in Paris to report on the ongoing negotiations with Abu Luqman to re-open the plant under Lafarge's supervision.

225.    The Raqqa Cell and Abu Luqman not only coordinated with Defendants or their agents and directly received their material support, but directly participated in the acts of international terrorism that injured Plaintiffs.

226.    Abu Luqman and the Raqqa Cell participated in planning and authorizing ISIS's battle plans, strategy, and attacks against the United States and its allies inside ISIS's territory from 2014-17.  Abu Luqman, commander of the Directorate of General Security, collected intelligence and developed plans to commit attacks specifically targeting Americans, and to try to defend against the YPG and SDF.

227.    The Raqqa Cell provided funds, fighters, training, resources, and propaganda, and aided in planning and training the fighters who committed the attacks that killed or injured Levi Shirley, Porter Goodman, William Savage, Paolo Todd, Robert Grodt, and David Taylor II.

## XII.   DEFENDANTS' UNLAWFUL CONDUCT HAD A SUBSTANTIAL NEXUS TO NEW YORK AND THE UNITED STATES

228.    Defendants' scheme to finance ISIS and ANF relied on substantial touchpoints with New York and the United States.  In pleading guilty to conspiring to provide material support to ISIS and ANF, Lafarge and LCS admitted that their "offense occurred in part within the United States."[18]  That concession reflected several U.S. contacts that Defendants formed in effectuating their scheme.  Those U.S. contacts included:  (1) Defendants' intentional use of New York banks to clear their U.S.-dollar transactions; (2) Defendants' use of U.S.-based email services; and (3) Defendants' conspiracy with ISIS and ANF, designated terrorist groups that purposefully targeted the United States and reached into U.S. territory to further the scheme.

### A. Defendants Purposefully Used New York Banks To Clear The U.S.-Dollar Transactions They Used To Finance Terrorism

229.    Defendants purposefully availed themselves of New York's banking system by executing wire transfers they intentionally caused to clear through New York banks.

---

[18] Plea Agreement ¶ 3, *United States v. Lafarge S.A.*, No. 22-cr-444-WFK (E.D.N.Y. Oct. 18, 2022), Dkt. 10.  On information and belief, this Plea Agreement was heavily negotiated by Lafarge's lawyers and does not disclose every U.S. contact supporting personal jurisdiction.

**1.    Defendants Executed U.S.-Dollar Transactions Using New York Correspondent Banks**

230.    Defendants' payments to terrorists relied on correspondent and intermediary banks located in New York.  Correspondent banking is often defined as "an arrangement under which one bank (correspondent) holds deposits owned by other banks (respondents) and provides payment and other services to those respondent banks."[19]  Such arrangements are needed when a sender seeks to transfer funds to a recipient whose bank lacks a direct relationship with the sender's bank.  In that scenario, the sender must rely on additional banks – typically called "correspondent" or "intermediary" banks – to establish a chain of banking relationships that can complete the transfer from sender to recipient.  Correspondent banking is "an essential component of the global payment system, especially for cross-border transactions."[20]

231.    New York banks are vital to this global system of correspondent banking.  As the Treasury Department reported in 2006, most cross-border transactions depended on "major funds transfer payment and messaging systems" located in New York.[21]  Those systems used a "relatively small number of major money center banks" that "specialize in facilitating international funds transfers" and thus "form a key link in the vast majority of all international funds transfers."[22]  The large money center banks that facilitate international U.S.-dollar transactions are based predominantly in New York.  Thus, when a company like Lafarge wires U.S. dollars to a recipient with which its bank lacks a direct banking relationship, it typically relies on New York correspondent banks to ensure that its dollars reach the intended recipient.

---

[19] Bank for International Settlements Committee on Payments and Market Infrastructures, *Correspondent Banking* at 9 (July 2016).

[20] *Id.* at 6.

[21] U.S. Dep't of Treasury, Financial Crimes Enforcement Network ("FINCEN"), *Feasibility of a Cross-Border Electronic Funds Transfer Reporting System under the Bank Secrecy Act* at 57 (Oct. 2006).

[22] *Id.* at 57.

232.    New York banks typically perform the *clearing* process for U.S.-dollar wire transfers.  "Clearing" generally refers to the process of transmitting, reconciling, and confirming payment on electronic-funds transfers.  The Clearing House Interbank Payments System ("CHIPS") is the dominant electronic-funds-transfer system for clearing U.S.-dollar transfers among international parties.  Defendants' U.S.-dollar wires relied on CHIPS, which handled both the transmission of interbank messages and the settlement of payment for the wires.

233.    To use CHIPS's clearing services, a foreign money sender must involve a U.S. bank that is subject to supervision by U.S. banking regulators.  As the Treasury Department explained, access to CHIPS "is conditional upon a financial institution's U.S. presence," in part to ensure that U.S. law will govern cross-border U.S.-dollar transactions.[23]  And given New York's status as a global financial hub, the major U.S. banks responsible for clearing transactions through CHIPS reside overwhelmingly in New York.  For that reason, as *Reuters* reported, "[t]o legally transact (clear) the U.S. dollar globally, correspondent banks are required to maintain a New York branch and comply with U.S. [anti-money-laundering] regulations."[24]

234.    Defendants relied on New York banks to clear many of their transactions supporting ISIS and ANF.  That reliance reflected Defendants' choice to transact in U.S. dollars.  As Pescheux wrote in a June 30, 2013 email to Tlass, Defendants' "preferred option" for paying Tlass was to make "bank transfer[s] in USD to the account of a duly registered company" – and "USD" meant U.S. dollars.[25]  Consistent with that preference, Defendants specified in their

---

[23] *Id*. at 62.

[24] Joshua Fruth (Thomson Reuters Regulatory Intelligence), *'Crypto-Cleansing:' Strategies To Fight Digital Currency Money Laundering And Sanctions Evasion*, Reuters (Feb. 14, 2018), https://tinyurl.com/4p27pwzs.

[25] Plea Statement ¶ 60; *see* Ex. 1 (7/1/2013 Tlass-Pescheux Email String) ("Preferred Option Email"). Citations to exhibits ("Ex.") in this Complaint refer to the exhibits attached to the August 5, 2024 Amended Complaint in *Foley et al. v. Lafarge S.A. et al.*, 1:23-cv-05691.

contracts with Tlass that they would pay him in U.S. dollars.[26] Defendants also often paid Taleb in U.S. dollars, knowing he would in turn use the U.S. dollars to pay ISIS.[27] And Defendants at all times considered it a business imperative to combat the "scarcity of USD" in Syria, going to extreme lengths to ensure LCS's liquidity in U.S. dollars specifically.[28]

235. Defendants' decision to transact in U.S. dollars led them to use New York banks. That is the ordinary practice for sophisticated companies executing cross-border U.S.-dollar transactions. Indeed, CHIPS estimated in 2015 that it "process[ed] more than 95 percent of U.S. dollar-denominated cross-border transactions."[29] The dominance of a U.S. clearing center in processing U.S.-dollar wires was no accident. As a practical matter, at the time of Defendants' unlawful conduct, "any financial institutional doing business in dollars need[ed] to hold accounts in correspondent U.S. banks in order to complete transactions."[30] Because typically "all dollar transactions are cleared via the American banking system,"[31] nearly all U.S.-dollar wires necessarily passed "through correspondent accounts" in New York.[32]

236. Defendants chose to follow the norm and exploit New York banks in orchestrating the U.S.-dollar wire transfers on which their conspiracy depended. Plaintiffs have identified at

---

[26] Ex. 2 ("2009 Tlass Agreement," ATA0020920 at -922) art. 4 ("US Dollars"); Ex. 3 ("2010 Tlass Agreement," ATA0010207 at -211) art. 4 ("US Dollars"); Ex. 4 ("Feb. 2014 Tlass Agreement," ATA0021426 at -427) art. 4 ("75,000USD"); Ex. 5 (Oct. 2014 Tlass Agreement) § 3.1 ("210,000US$").

[27] *E.g.*, Plea Statement ¶ 63; Ex. 6 (ATA0000244) (paying Taleb "USD 4,836.00").

[28] Ex. 7 (ATA0009139).

[29] U.S. Dep't of Treasury, *National Money Laundering Risk Assessment* at 35 (2015).

[30] Christian Caryl et al., *Pocketbook Policing: Washington Has Finally Found A Strategy That Is Putting Real Pressure On The Regime – Going After Its Sources Of Cash, All Across The World*, Newsweek Int'l (Apr. 10, 2006), 2006 WLNR 5632771.

[31] Economist, *Digital Currencies: A New Species* (Apr. 13, 2013), 2013 WLNR 8890628.

[32] *Role of U.S. Correspondent Banking in International Money Laundering: Hearings Before the Permanent Subcomm. on Investigations of the S. Comm. on Governmental Affairs*, 107th Cong. 287 (Mar. 6, 2001) (quoting Minority Staff, *Report on Correspondent Banking: A Gateway For Money Laundering* (Feb. 5, 2001)).

least 15 such transfers that Defendants executed in connection with their terrorist-funding scheme.

All cleared through New York banks.  The chart below depicts each one:

| Date | Category | Originating Bank (Swift) | Beneficiary Bank (Swift) | NY Bank(s) (Swift) | USD Amount |
|---|---|---|---|---|---|
| 1/18/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | Citibank N.A. (CITIUS33) | $8,454,183 |
| 1/18/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | Citibank N.A. (CITIUS33) | $5,714 |
| 1/18/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | Citibank N.A. (CITIUS33) | $2,857 |
| 1/18/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | Citibank N.A. (CITIUS33) | $2,857 |
| 2/28/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | Citibank N.A. (CITIUS33) | $12,710,000 |
| 2/28/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | Citibank N.A. (CITIUS33) | $8,592 |
| 2/28/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | Citibank N.A. (CITIUS33) | $4,296 |
| 2/28/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | Citibank N.A. (CITIUS33) | $4,296 |
| 4/14/11 | Upstream Loan | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | Citibank N.A. (CITIUS33) | $20,000,000 |
| 7/7/11 | Upstream Loan | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | Citibank N.A. (CITIUS33) | $5,000,000 |
| 8/8/11 | Upstream Loan | Citi UAE (CITIEAD) | Audi Lebanon (AUDBLBB) | Citibank N.A. (CITIUS33) JPM NY (CHASUS33) | $10,000,000 |
| 8/15/11 | Upstream Loan | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | Citibank N.A. (CITIUS33) | $5,000,000 |
| 9/12/13 | LMEA | Unknown | NSGB Egypt (NSGBEGC) | BNY Mellon (IRVTUS3) | $200,000 |
| 9/26/13 | LMEA | Al Baraka (ABRKEGCA) | NSGB Egypt (NSGBEGC) | BNY Mellon (IRVTUS3) | $299,810 |
| 10/24/14 | Tlass | BNPP Paris (BNPAFRPP) | Abu Dhabi Islamic Bank (ABDIAED) | BNPP NY (BNPAUS3) | $210,000 |

| Date | Category | Originating Bank (Swift) | Beneficiary Bank (Swift) | NY Bank(s) (Swift) | USD Amount |
|------|----------|-------------------------|--------------------------|--------------------|------------|
|      |          |                         |                          | JPM NY (CHASUS33)  |            |

237.   This chart is based on Defendants' bank records, SWIFT messages, and other transaction data and documents they maintained in the ordinary course of business.  The "Date" column describes the transaction's value date.  The "Category" column describes the transaction types:  "Upstream Equity" means Lafarge's equity contributions to LCS through four affiliated LCS shareholders; "Upstream Loan" means loan disbursements by Lafarge (through Lafarge Cyprus) to LCS; "LMEA" means payments LCS accepted into its illegal bank account in Egypt; and "Tlass" means payments to Firas Tlass.  The "Originating Bank" is the bank that initiated the wire transfer on the sender's behalf.  The "Beneficiary Bank" is the bank that received the wire transfer on the recipient's behalf.  And the "NY Bank" is the New York correspondent bank (or banks) that cleared the wire transfer.  All were material to Defendants' terrorist payoffs.

238.   **Tlass Payments.**  Tlass was an original LCS shareholder and Lafarge's first business partner in Syria.[33]  Defendants initially transacted with Tlass through his Syrian company, MAS Group ("MAS"), with which LCS executed a Local Project Support Agreement on February 15, 2009.[34]  The next year, LCS amended the contract and agreed to pay Tlass "One Million and Five Hundred Thousand (1,500,000) US Dollars per annum" for his work in 2009 and 2010.[35]  In exchange, Tlass provided "overall advisory services," helping Defendants with "the smooth operation" of the Jalabiyeh plant and cultivating a "[r]elationship with stakeholders and relevant

---

[33] Ex. 8 (ATA0031879) (detailing Tlass's equity contributions to LCS since inception).

[34] 2009 Tlass Agreement at -920.

[35] 2010 Tlass Agreement art. 4.  Starting in 2011, the contract called for LCS to pay Tlass in an amount equal to 1% of LCS's annual net sales.  *Id.*

regulators."[36]  Tlass acted under this Local Project Support Agreement when paying terrorists on Defendants' behalf.  It remained in force until February 2014, when Defendants renegotiated to pay Tlass $75,000 per month under a similar agreement with his new front company, North Logistics Consultancy Service JLT ("North Logistics").[37]    Under both contracts, which continuously governed Tlass's work during the conspiracy, Defendants' payments to Tlass were "explicitly conditioned on [his] continuing to make payments on LAFARGE's and LCS's behalf to armed groups, which included ISIS and ANF."[38]

239.    Early in the scheme, Defendants used MAS – Tlass's company – to pay Tlass his annual fees and to funnel him money to distribute onward to terrorists.[39]  To that end, Defendants regularly transferred money into MAS's bank account, including in U.S. dollars.  On January 17, 2011, LCS used its U.S.-dollar account at Bank Audi Syria S.A. ("Audi Syria") to send $375,000 to MAS's account.[40]  That payment compensated Tlass for his "advisory" work and served as an inducement for him to continue providing LCS the same services under the contract moving forward.[41]  LCS made this payment under the same contract that governed most of Tlass's terrorist payoffs giving rise to Plaintiffs' claims, and LCS funded the payment through the upstream dollars it sourced via New York banks, alleged below.

---

[36] 2010 Tlass Agreement arts. 1, 1(d).

[37] Plea Statement ¶ 61; Feb. 2014 Tlass Agreement art. 4.  The 2014 agreement appears to have a typo referring to Tlass's company as "Nort Logistics."  *Id*. at -426.

[38] Plea Statement ¶ 61.

[39] Ex. 9 ("Project Alpha Report," ATA0004181 at -226).  The Project Alpha Report was prepared by Baker McKenzie and PwC, which LafargeHolcim retained in 2016 to investigate their payments to terrorists.  *Id*. at -223.

[40] Project Alpha Report at -260 (denoting "Electronic Transfer" to "Mass Co."); Ex. 10 (ATA0005778, Row 101) (describing this as a bank "Transfer" to "Mas Group," with value date of January 17, 2011 and a "Bank fee" of $5); Ex. 11 (ATA0005465, Row 19) (confirming Audi Syria executed the transfer from Account No. -0405).

[41] Ex. 10 (ATA0005778, Row 101) ("Payment against Services rendered by MAS").

240.    The final entry in Paragraph 236 depicts a payment to Tlass that Defendants cleared through New York.  In late 2014, Jolibois directed Tlass to issue a $210,000 invoice from North Logistics for his services negotiating with ISIS.[42]  To provide cover for that illegal payment, Lafarge's senior regional counsel Jean-Jerome Khodara drafted a sham consulting contract between LCS and Tlass, which the parties executed in conjunction with a back-dated agreement purporting to terminate their prior arrangement months earlier.[43]  Tlass then issued the $210,000 invoice Jolibois had requested from North Logistics.  It specified a new U.S.-dollar bank account at Abu Dhabi Islamic Bank that Tlass had opened to receive U.S.-dollar wires from Lafarge.[44]

241.    On October 24, 2014, Lafarge paid Tlass by wiring $210,000 through New York banks.  To initiate payment, Khodara sent the invoice to Richard Benattar, Lafarge's accounting manager, and told Benattar the invoice "should be paid quickly if possible."[45]  Upon reviewing the invoice, Benattar realized it was in U.S. dollars and thus required the use of U.S. correspondent banks.  He responded to Khodara:  "I just need the invoice with the original [Herrault] signature *and the US correspondent bank of the supplier's bank (the invoice is in USD)*."[46]  Benattar needed to know North Logistics' "U.S. correspondent bank" because he needed to enter North Logistics' payment details into Quantum, Lafarge's electronic payment software.[47]  Benattar soon concluded that he and his accounts-payable colleague, Narkice Vaisoul, could verify the routing details themselves.[48]  And once they confirmed that the money needed to go to JPMorgan Chase

---

[42] Plea Statement ¶¶ 97-102; Ex. 16 (ATA0000160 at -165) (identifying North Logistics).

[43] Plea Statement ¶¶ 97-102; Ex. 16 (ATA0000160 at -161-64); Ex. 17 (ATA0000032).

[44] Ex. 16 (ATA0000160 at -160).

[45] Ex. 18 (ATA0032474 at -474) (certified English translation).

[46] Ex. 19 (ATA0004739 at -739) (certified English translation).

[47] *Infra* ¶¶ 283-84.

[48] Ex. 18 (ATA0032474 at -474) (certified English translation) (telling Khodara and Jolibois, "We'll take care of it – we've got the supplier's email address").

in New York, they initiated the wire.  Benattar personally confirmed payment by signing the wire record with his initials "RB."[49]

242.    Benattar effectuated payment by instructing BNP Paribas's Paris branch to originate a $210,000 wire transfer from Lafarge Cyprus to North Logistics.[50]  Following Lafarge's directions, BNP Paribas's Paris branch executed the wire through its New York correspondent account at BNP Paribas's New York branch, which wired the money to JPMorgan Chase's New York branch, which transmitted the money to Tlass's U.S.-dollar account at Abu Dhabi Islamic Bank.[51]  As Defendants later admitted, the money passed through the "Eastern District of New York" and involved multiple "intermediary banks in New York City."[52]  Once Benattar and Vaisoul verified payment, Vaisoul wrote to Khodara and Jolibois to "confirm that this invoice has just been paid," and included the full prior email chain with Benattar's discussion of "the US correspondent bank."[53]  Jolibois replied:  "Good."[54]

243.    This $210,000 wire was instrumental to Defendants' terrorist-funding conspiracy. As Defendants admitted, "the $210,000 lump sum payment compensated [Tlass] for the work he had already performed negotiating an agreement with ISIS, and to reimburse him for making the fixed monthly 'donation' payments to armed groups, including ISIS."[55]  At ISIS's and ANF's going per-attack cost, the $210,000 alone was enough to pay for every attack in this case.[56]

---

[49] Ex. 20 ("210k Wire Instruction," ATA0000071 at -075).

[50] 210k Wire Instruction at -071; Ex. 21 (Interrog. Resp. No. 4).

[51] Ex. 22 (BNPP-NY 000004, Rows 2913-2915); Ex. 23 (BNPP-NY 000001, Excerpt from JPMC Subpoena Response, Row 2).

[52] Plea Statement ¶ 103.

[53] Ex. 24 (ATA0032468 at -468) (certified English translation).

[54] Ex. 24 (ATA0032468 at -468) (certified English translation).

[55] Plea Statement ¶ 101.

[56] *Supra* ¶ 214.

244.    **Upstream Equity and Loan Payments.**  Paragraph 236 also includes 12 upstream U.S.-dollar payments to LCS:  eight equity contributions and four loan disbursements.  Lafarge made the equity contributions through Lafarge Cyprus and three other Lafarge-affiliated LCS shareholders:  Lafarge Aggregate Holdings, Cemitalia Ltd., and Lafarge Building Materials Egypt.[57]  The payments occurred via eight wire transfers totaling $21,192,525.  Lafarge initiated each wire from Citibank's Dubai branch, through a correspondent account maintained at Citibank's New York branch, and then to LCS's U.S.-dollar account at Audi Syria.[58]

245.    Lafarge paid the four U.S.-dollar loan disbursements under an April 7, 2011 loan agreement between Lafarge Cyprus and LCS.[59]  Lafarge's General Counsel and Corporate Secretary signed the loan agreement on Lafarge Cyprus's behalf and oversaw the disbursements it made.[60]  As his involvement demonstrates, Lafarge Cyprus funded LCS at Lafarge's direction and subject to its control.  Lafarge used Lafarge Cyprus to funnel money to LCS because the latter was LCS's majority shareholder, "through which LAFARGE held nearly all of its shares in LCS."[61]  Indeed, Lafarge admitted it was responsible for the October 24, 2014 payment to Tlass, even though it structured that payment as nominally originating from Lafarge Cyprus.[62]  The other Lafarge Cyprus payments similarly occurred at Lafarge's direction.

246.    Lafarge Cyprus made these loan disbursements by wiring U.S. dollars from Citibank's Dubai branch, through a correspondent account maintained at Citibank's New York

---

[57] Ex. 25 (ATA0005192 at -200); Ex. 26 (ATA0005437 at -437-39).

[58] Ex. 12 (ATA0031866 at -866-68) (SWIFT confirmations for January 2011 transfers); Ex. 26 (ATA0005437 at -442-43) (SWIFT confirmation showing routing details for February 2011 transfer); *id.* at -437 (confirming "Citibank NY" routed each wire and charged fees for doing so).

[59] Ex. 27 (ATA0000316) ("2011 Loan Agreement").

[60] 2011 Loan Agreement at -327; Project Alpha Report at -227.

[61] Plea Statement ¶ 99.

[62] Plea Statement ¶¶ 99, 103.

branch, and then to LCS's U.S.-dollar accounts in Syria and Lebanon.[63]  For three of the four, Lafarge Cyprus sent the wire to LCS's account at Audi Syria.[64]  For the fourth, Lafarge Cyprus sent the wire to LCS's account at Bank Audi Lebanon SAL ("Audi Lebanon"), which was cleared by both Citibank New York and JPMorgan Chase New York.[65]  In each instance, Defendants obtained a SWIFT message confirming the New York banks' involvement.[66]

247.   This upstream funding was vital to Defendants' terrorist-funding scheme.  By injecting U.S. dollars into LCS, Lafarge enabled LCS to pay Tlass and Taleb in U.S. dollars. Indeed, the accounts LCS used to receive the upstream funding were the same ones it used to pay its terrorist intermediaries.[67]  As PwC explained in a forensic review it performed at Defendants' direction after Defendants' terrorist-funding scheme became public, the "*[f]unds within the receiving bank accounts were used* by LCS for capital expenditure and operating expenses and also *to pay the monthly USD remuneration of Firas Tlass, make USD payments to Amro Taleb and for three alleged USD Security Payments [to ISIS].*"[68]

248.   LCS routinely used the U.S. dollars it acquired to pay Tlass and Taleb.  Relying in part on the upstream dollars Defendants sourced through New York banks, LCS made many downstream payments to Tlass and Taleb in U.S. dollars.[69]  Nine were monthly $75,000 stipends LCS paid to Tlass via an agreement contemplating that Tlass would "retain $50,000 and the

---

[63] Ex. 21 (Interrog. Resp. No. 4); Ex. 13 (ATA0000358 at -358).

[64] Ex. 21 (Interrog. Resp. No. 5, Transfer Nos. 1, 2, and 4).

[65] Ex. 21 (Interrog. Resp. No. 4, Transfer No. 3); Ex. 28 (ATA0000220 at -223-24).

[66] Ex. 13 (ATA0000358 at -358) (4/14/2011 transfer); Ex. 14 (ATA0000047 at -049-50) (7/7/2011 transfer); Ex. 28 (ATA0000220 at -223-24) (8/8/2011 transfer); Ex. 15 (ATA0000060 at -060) (8/15/2011 transfer).

[67] Project Alpha Report at -238-39.

[68] Project Alpha Report at -227.

[69] Project Alpha Report at -190-91 ("LCS maintained US dollar denominated bank accounts . . . used to make and receive numerous US dollar payments, including the monthly fee of USD 75,000 to Tlass and commission payments for Taleb, as detailed above.").

remaining $25,000 would be disbursed to armed groups."[70]  Under that agreement, Defendants paid Tlass a monthly $75,000 stipend at least from November 2013 to July 2014.[71]

249.    Defendants similarly used LCS's supply of U.S. dollars to make at least five "commission" payments to Taleb.  As PwC's forensic review concluded, "Taleb received a small monthly commission for sales of pozzolana and heavy fuel sourced" from ISIS-linked suppliers.[72] The "total value of these commissions" was roughly "USD 10,356."[73]  Defendants' financial records indicate that this $10,356 comprised five separate U.S.-dollar payments LCS made to Taleb:  (1) $4,836 on February 24, 2014; (2) $3,265 on April 25, 2014; (3) $976 on July 1, 2014; (4) $597 on July 1, 2014; and (5) $682 on October 7, 2014.[74]  LCS made each of these payments from its U.S.-dollar accounts at Audi Lebanon.  As with the Tlass stipends, Lafarge's upstream provision of U.S. dollars helped LCS finance these commissions.

250.    LCS's unique U.S.-dollar liquidity constraints amplified the nexus between Lafarge's upstream payments and LCS's downstream payments to terrorists.  Starting in 2011, LCS faced a severe liquidity crunch in U.S. dollars.[75]  For LCS to come up with the money to pay terrorists, therefore, Lafarge had to devise a plan to ensure that LCS had a steady supply of U.S.

---

[70] Plea Statement ¶ 61.

[71] Ex. 29 (ATA0000256) (Nov. 2013); Ex. 30 (ATA0000291) (Dec. 2013); Ex. 31 (ATA0000289) (Jan. 2014 #1); Ex. 32 (ATA0000288) (Jan. 2014 #2); Ex. 33 (ATA0000292) (Mar. 2014); Ex. 34 (ATA0000293) (Apr. 2014); Ex. 35 (ATA0000294) (May 2014); Ex. 36 (ATA0000290) (June 2014); Ex. 37 (ATA0032008) (July 2014).

[72] Project Alpha Report at -190.

[73] Project Alpha Report at -190.

[74] Ex. 38 (ATA0008287, In.Out Flow Tab, Rows 1838, 1840, 2550, 3143, 3144, 3195, 4194).

[75] Ex. 39 ("Feb. 2012 Exec. Presentation," ATA0059026 at -039) (describing "cash shortage" and challenges of "Foreign Currency sourcing"); Ex. 40 ("Cash Shortfall Memo," ATA0009065 at -065-67) (noting need for "additional funding" and "cash shortage"); Ex. 41 (ATA0005040 at -040) (stressing "urgency of payments" in U.S. dollars); Ex. 14 (ATA0000047 at -047) (noting need for new "Lebanon Bank account" to hold U.S. dollars to give LCS "Cash Management flexibility").

dollars.[76]  But it was difficult for LCS to raise money, given sanctions affecting Syria.[77]  The best way for LCS to access the capital it needed to pay terrorists was thus to obtain U.S. dollars from Lafarge Cyprus and other affiliates.  In fact, had Lafarge not agreed to loan U.S. dollars to LCS in April 2011, LCS would have defaulted on its debt covenants with its senior lenders and would likely have had to shut down its Syrian plant altogether.[78]

251.   U.S. and U.N. sanctions regimes targeting Syria were designed to promote just that sort of U.S. dollar scarcity, to restrict the flow of U.S. dollars to violent actors.  U.S. Treasury Department officials publicly confirmed that intent.  In 2011, for example, after a raft of counterterrorism sanctions, "[a] US Treasury spokeswoman said that 'designating' companies made it difficult for them to operate, especially if business involved US dollar transfers, which all passed through the New York banking system" when "payments[] were made in US dollars."[79]  In 2014, likewise, senior Treasury official David Cohen explained how U.S. policymakers sought to leverage the power of New York's banking system to impede terrorists from raising money and funding their operations.[80]

---

[76] Ex. 42 (ATA0000938 at -938) (Pescheux emphasizing to CFO that "I really rely on you to review . . . the way we have been managing our cash so far and our practices in terms of currency conversion," stressing "need to improve our reactivity in this period of high volatility"); *id.* at -940-42 (detailing cumbersome process "to source FX to pay our foreign commitments").

[77] Feb. 2012 Exec. Presentation at -028, -039 (detailing challenges); *see* Exec. Order No. 13,573 (May 18, 2011); Exec. Order No. 13,572 (Apr. 29, 2011) (2011 sanctions orders).

[78] *E.g.*, Ex. 43 (ATA0018237 at -239) (describing need for "rapid[]" cash infusion "to avoid a payment default"); Ex. 15 (ATA0000060 at -067-68) (demanding "hectic" loan payment "to urgently ensure a transfer of 3 Musd ASAP" to cover "daily Cash needs" and to allow LCS "to disburse 5 Musd" in compliance with outstanding letter of credit); Cash Shortfall Memo at -065 (similarly noting "need" in February 2012 for "additional funding from Lafarge" to avoid "default under the loan repayment").  If LCS missed a repayment to its external lenders, the lenders could have cancelled their commitments and accelerated all remaining secured liabilities. *See* Ex. 44 (ATA0020635 at -726, -731-32) §§ 33.1 (default for non-payment), 35.1 (remedies, including cancellation and acceleration).

[79] Keith Wallis, *Law Firms Cautioned On Iran Sanctions British Government Warns Companies*, South China Morning Post (Jan. 26, 2011), 2011 WLNR 1534856.

[80] *Interview with David Cohen; Interview with Nabil Fahmy; The Sultan and the Sharia Law*, Fareed Zakaria GPS (May 4, 2014), 2014 WLNR 11967166.

252.    U.S. sanctions designations were similar.  In 2014, for example, the Treasury Department emphasized that U.S. sanctions sought to deprive violent Syrian actors of U.S. dollars and force them to use the collapsing Syrian pound.[81]  The United States reinforced that the same logic applied to ISIS when it sanctioned ISIS financiers from 2016 through 2019:  allowing ISIS to access U.S. dollars through New York banks directly financed ISIS's attacks by giving ISIS more purchasing power than it would have had by using Syrian pounds.[82]

253.    The 2011 upstream payments were likewise linked to Defendants' terror-financing scheme through their connection to Tlass.  When Defendants decided to go into business with Firas Tlass, his father Mustafa had been Syria's long-time defense minister and confidant of Bashar al-Assad's father.  Firas was himself close with the Assad family, too.  The Tlass family's long-established connections with and patronage of the al-Assad regime were lucrative.  Indeed, MAS's growth was largely attributable to contracts it received to supply the Syrian Arab Army with food, medicine, and clothing.[83]  Those connections to the Assad regime also made Tlass and MAS attractive to Lafarge as a joint-venture partner in Syria.

254.    When Defendants made their 2011 upstream payments while in business with Tlass, they knew terrorist violence was a foreseeable consequence.  From 2003 through 2014, many public sources – including U.S. and U.N. counterterrorism findings – alerted Defendants that the Syrian regime sponsored AQI attacks targeting the United States.  DOD, for example,

---

[81] *See* Press Release, U.S. Dep't of Treasury, *Treasury Sanctions a Syrian Official Responsible for Human Rights Abuses in Syria and Syrian Regime Supporters and Officials* (Oct. 16, 2014).

[82] *See*, *e.g.*, Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Senior IsiL Financier and Two Money Services Businesses* (Dec. 13, 2016); Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Iraq-Based ISIS Financial Facilitation Network; Action Underscores Continued U.S. Collaboration with the Government of Iraq on Countering ISIS's Terrorism Financing Operations* (June 15, 2017).

[83] Ayman Aldassouky, *The Families of Rastan and the Syrian Regime:  Transformation and Continuity*, Wartime and Post-Conflict in Syria, Issue 2021/14, at 8-9 (Aug. 6, 2021).

reported that Syria provided "safe haven, border transit, and limited logistical support" to "Iraqi insurgents," including AQI.[84]    U.N. Security Council reports similarly highlighted the "nexus between large numbers of Al-Qaida affiliated foreign fighters and Jabhat-al-Nusrah" in Syria, which risked "new pan-Arab and pan-European networks of extremists emerg[ing]."[85]

255.    Media reports also warned before 2011 that the Assad regime supported AQI attacks against the United States.  As early as May 2004, the *Washington Times* reported on the "mounting body of evidence link[ing] the Assad regime with the Zarqawi network and terrorist activities in Iraq."[86]    The *National Post* corroborated that point in February 2013, noting that "experts believe Mr. Assad provided critical support" for "weapons and money coming through Syria to . . . Iraq" for "extremists" who would "bring pain to the Americans."[87]    As "[n]umerous courts" later found after considering the evidence, "Syria supported ISIS and its predecessor organizations."[88]    Defendants' U.S.-dollar financing in 2011, used to pay a notorious Syrian regime fixer, thus was linked to Syrian terrorism from the very outset.

---

[84] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2007 Report to Congress in Accordance with the Department of Defense Appropriations Act 2007 (Section 9010, Public Law 109-289)*, at 16-17 (Mar. 2, 2007); *see* U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, May 2006 Report to Congress in Accordance with the Department of Defense Appropriations Act 2006 (Section 9010)*, at 28 (May 26, 2006); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2009 Report to Congress in Accordance with the Department of Defense Supplemental Appropriations Act 2008 (Section 9204, Public Law 110-252)*, at vii, 8 (Jan. 29, 2010).

[85] U.N. Security Council, *Fifteenth Report of the Analytical Support and Sanctions Monitoring Team Submitted Pursuant to Resolution 2083 (2012) Concerning Al-Qaida and Associated Individuals and Entities* ¶ 8 (Jan. 23, 2014).

[86] *Assad's Terror Network*, Wash. Times (May 26, 2004) (Editorial), 2004 WLNR 777961; *see* Frederick W. Kagan & William Kristol, *Now Can We Fight the Enemy?*, Weekly Standard (June 4, 2007), 2007 WLNR 30043601 ("The Syrian regime permits al Qaeda terrorists to move into Iraq" to "kill as many Americans as possible.").

[87] Scott Barber, *Islamic Extremism Threatens Stability; Gaining Sympathy, Recruiting Radicals, Breeding Terrorists*, Nat'l Post (Canada) (Feb. 9, 2013), 2013 WLNR 3252489.

[88] *Fields v. Syrian Arab Republic*, 2021 WL 9244135, at *3 (D.D.C. Sept. 29, 2021).

256.    The suite of U.S. and U.N. antiterrorism sanctions on Syria – which Defendants schemed to circumvent – strengthened the nexus between their 2011 payments and terrorism.[89] Because Defendants knew that Tlass was a prominent Assad ally and regime cutout facilitating Defendants' business interests in a heavily sanctioned country, it was foreseeable that their dealings with him in 2011 would enable AQI/ISIS terrorist attacks against the United States.

257.    Defendants also knew Tlass personally (including through MAS) had facilitated AQI terrorism by brokering arms deals, participating in U.S.-dollar-denominated illicit Oil-for-Food program transactions, and channeling hundreds of millions in Iraqi oil revenue stranded in Syrian banks to terrorist financiers in Iraq and Syria.[90] Those dollars and illicit weapons supported the Zarqawi network, which powered AQI's regional expansion and its evolution into ANF and ISIS.[91] By funding a joint venture with a notorious AQI financier, Defendants' 2011 upstream payments implemented a scheme of which terrorism was a foreseeable consequence.    Had

---

[89] *See*, *e.g.*, White House (Office of the Press Secretary), *Fact Sheet:  Implementing the Syria Accountability and Lebanese Sovereignty Restoration Act of 2003* (May 11, 2004) (sanctions designed "to address the Syrian government's support for terrorist groups" and "actions to undermine U.S." efforts to stabilize Iraq), https://tinyurl.com/mr46kwf6; U.S. Dep't of Treasury, *Treasury Designates Commercial Bank of Syria as Financial Institution of Primary Money Laundering Concern* (May 11, 2004) (designating Commercial Bank of Syria as an institution of primary money laundering concern "in response to the Syrian government's continued support of international terrorism").

[90] David Rennie, *Tough Questions For 270 Named In Iraqi Documents*, Daily Telegraph (Apr. 23, 2004), 2004 WLNR 4205658 (reporting congressional testimony identifying Tlass as being on a "list" of "non-end users" who helped evade sanctions under Oil-for-Food and observing that Mr. Tlass was on a "list" containing "someone with a lot of explaining to do"); Niles Lathem, *Syrian Bigs Conned U.N.*, N.Y. Post (July 27, 2005), 2005 WLNR 23207829 (reporting IRS report documents naming Tlass as an "intermediar[y]" in many Iraq-Syrian transactions that earned [him] 10 to 15 percent commissions on each deal [he] handled").

[91] *See*, *e.g.*, Daniel L. Glaser, *quoted in* U.S. Dep't of Treasury, *Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005) ("[T]he Zarqawi Network and other jihadist groups use a variety of classic al Qaida-type terrorist financing mechanisms, including:  Funds provided by charities, Iraqi expatriates, and other deep pocket donors, primarily in the Gulf, but also in *Syria*, Lebanon, Jordan, Iran, and Europe."), https://tinyurl.com/56j2r5t8.

Defendants been unwilling to pay AQI or similar FTOs in Syria, they never could have hired Tlass because their ordinary due diligence would have never "cleared" him.

258.    Although the specific identity of the terrorists Tlass supported evolved over the years, the core concept remained the same:  Lafarge and LCS continuously paid Tlass in U.S. dollars to maintain good relations with violent Syrian actors.  Those efforts focused at first on the Assad regime and AQI, and they later evolved to include ISIS and ANF.  All reflected a continuous course of conduct dating back at least to 2010.  When Lafarge used New York's banking system to cover LCS's payments to Tlass in 2011, therefore, it knew it was paying him to maintain LCS's relationships with Syrian terrorists.  Lafarge's decision to extend that strategy to ISIS and ANF in 2013 and 2014 was a foreseeable outgrowth of the same conduct.

259.    **LMEA.**  The remaining two New York-cleared wires in Paragraph 236 were transfers LCS accepted into its LMEA account.  Defendants opened that account in Egypt to allow LCS to make and receive illegal U.S.-dollar payments.  They called it their "LMEA account" because it was held in the name of Lafarge's Egyptian subsidiary, Lafarge Middle East & Africa Building Materials.[92]  But LCS was the one that controlled the money.  The account's purpose, as described by Defendants' external forensic review, was to allow LCS "to receive US dollar . . . payments for sales to customers in Syria and to make payments on LCS's behalf."[93]

260.    Defendants opened the LMEA account to circumvent U.S. sanctions on Syria.  By July 2013, U.S. sanctions had caused a rapid "devaluation of the Syrian pound."[94]  The resulting

---

[92] Project Alpha Report at -227.

[93] Project Alpha Report at -191.

[94] Ex. 45 (ATA0014297 at -302).

foreign-exchange risks imperiled LCS's business.[95]  Indeed, LCS struggled to acquire U.S. dollars – the currency in which it preferred to operate – because U.S. sanctions barred New York banks from clearing dollars for Syrian entities like LCS.[96]  So LCS came up with a workaround:  a U.S.-dollar account in Egypt that looked like it was for a non-sanctioned Egyptian affiliate instead.[97]  It devised that workaround after Bank Audi refused LCS's request to open an Egyptian bank account in its own name.  Bank Audi's refusal convinced Valery Mirakoff, LCS's CFO, that "no bank" would allow LCS to open an Egyptian account because "they would be faced with the same 'compliance' limitation that Bank Audi faced to deny us such account."[98]

261.    The LMEA account offered an elegant, if illegal, solution to that problem.  The Egyptian company nominally owned the account for compliance purposes, but "Lafarge Syria solely ha[d] all the rights on [the] amounts" in it.[99]  The point was to allow Lafarge to transact in U.S. dollars for LCS without external correspondent banks blocking the transfers as required by international sanctions.[100]  LCS and LMEA memorialized their arrangement in a July 10, 2013 contract.  The agreement enlisted LMEA's cooperation, among other things, in helping LCS satisfy its "external financial obligations."[101]  It required LMEA "to receive and deposit in its bank

---

[95] Ex. 45 (ATA0014297 at -302) (noting "high difficulties in managing our Syrian cash exposure due to the on going devaluation of the Syrian pound"); Ex. 7 (ATA0009139) (Pescheux describing LCS's "scarcity of USD" as a "nightmare" for LCS's business).

[96] Ex. 46 ("S&S Memo," ATA0018284 at -286-88) (noting that sanctions meant that "commercial banking services by US banks, wherever located, to Syria became impermissible"); Ex. 47 (ATA0018291 at -291) (blaming "US sanctions" for inability to execute "USD transfer").

[97] Ex. 48 ("LMEA Cooperation Agreement") § 2 ("LMEA to receive and deposit in its bank account such dues on behalf, and under the disposal, of Lafarge Syria.").

[98] Ex. 45 (ATA0014297 at -302) (email from Mirakoff).

[99] LMEA Cooperation Agreement § 3.

[100] Ex. 49 (ATA0000503 at -506) ("[A] significant percentage of our wire transfer to beneficiary outside of Syria were rejected because of international sanctions and the foreign correspondent banks reluctance to operate any transfer originating from . . . a Syrian company.").

[101] LMEA Cooperation Agreement at 1 (Preamble).

account" incoming payments "on behalf, and under the disposal, of Lafarge Syria," and to make payments from the account to "specified third part[ies]" as LCS directed.[102]

262.    Benattar personally approved the LMEA account for Lafarge and Lafarge Cyprus, after a conversation with Mirakoff.[103]  Yet even then, Lafarge's Egyptian affiliate remained hesitant and demanded "Group and legal clearance" before the parties could "proceed" with the LMEA account.[104]  In urging Mirakoff to obtain the necessary internal approvals, Pescheux warned him to avoid emails with his LMEA counterpart, advising him "to call him on the phone or even to meet with him, it might prove more efficient than communicating by email."[105]  A few weeks later, after LCS opened the account, Mirakoff urged the Egyptian treasury employees responsible for the new account "not to copy Bruno Pescheux anymore o[n] the exchanges of [e]mails" about the payments they were making out of the LMEA account.[106]

263.    LCS officially opened the "LMEA USD bank account" on July 15, 2013.[107]  LCS held this U.S.-dollar-denominated account at National Societe Generale Bank's ("NSGB") branch in Egypt.[108]  LCS then instructed its customers to send U.S. dollars into that account.[109]

264.    LCS used the LMEA account to execute hundreds of U.S.-dollar transactions. According to PwC's forensic review, LCS used the account for 73 outgoing U.S.-dollar payments

---

[102] LMEA Cooperation Agreement §§ 2, 4.

[103] Ex. 45 (ATA0014297 at -298) (LCS's CFO writing, "I spoke personally to Richard Benattar whose opinion [h]as been required by LMEA on the subject.  Richard confirmed that . . . he would not object to such operation.").

[104] Ex. 45 (ATA0014297 at -297).

[105] Ex. 45 (ATA0014297 at -297).

[106] Ex. 50 (ATA0010065 at -065).

[107] Ex. 50 (ATA0010065 at -066).

[108] Ex. 50 (ATA0010065 at -066); Project Alpha Report at -237.

[109] Ex. 50 (ATA0010065 at -067) (LCS CFO asking for the LMEA "account number to be given to our customers for their deposit").

totaling $13,245,747 and 111 incoming payments totaling $13,260,125.[110]  "At least some of the payments in and out of the US dollar accounts," the report concluded, "were transfers that are *likely to have been processed by a US financial institution*."[111]

265.    The report was correct.  NSGB Egypt maintained standard settlement instructions calling for U.S.-dollar clearing through New York.  Most banks maintain such standard instructions, which describe the bank's processes for routing electronic-funds transfers in various currencies.[112]  Those instructions detail the accounts a financial institution will use to complete transactions depending on the currency the institution's customer selects.  For example, if a customer instructs its bank to execute a U.S.-dollar-denominated wire transfer, the bank's standard settlement instructions provide the names, locations, and account numbers of the correspondent accounts the bank will use to complete the transfer.  And those standard instructions typically remain consistent from transaction to transaction.  That means that, if a financial institution transacts one U.S.-dollar-denominated transfer through a particular U.S. bank account, its other U.S.-dollar-denominated transfers will likely route via the same account.

266.    Before the relevant period, NSGB Egypt published its standard settlement instructions in the Bankers Almanac, an authoritative compendium of international banking information.  Those instructions, available and well-known to Defendants,[113] specified that NSGB

---

[110] Project Alpha Report at -237.

[111] Project Alpha Report at -191.

[112] *E.g.*, Ex. 51 (ATA0058827 at -827) (Lafarge deputy international treasurer verifying bank's "SSIs," or standard settlement instructions); Ex. 52 (ATA0031601 at -602) (European Investment Bank sending Lafarge its "Standard Settlement Instructions"); Ex. 53 (ATA0024767 at -767) (attaching Citibank's "SSIs").

[113] Ex. 51 (ATA0058827 at -829) (Lafarge's deputy international treasurer writing to ask "[d]o we still have the Bankers Almanac" so he could verify "the USD correspondent" for a counterparty); *id.* at -827 (after subordinate says he is unaware of Almanac, deputy international treasurer "contact[s] [bank] directly to get the [standard settlement instructions]").

Egypt settled U.S.-dollar wire transfers through "The Bank of New York, New York."[114] For that reason, when Defendants directed an LCS customer to wire U.S. dollars into the LMEA account, they knew the dollars would arrive via a New York correspondent account.

267.    Paragraph 236 details two examples of New York-cleared wires LCS accepted into the LMEA account. The first was a $200,000 wire sent by an LCS customer on September 12, 2013.[115] The second was a $299,810 wire sent by another LCS customer, with a September 26, 2013 value date, from an account at Al-Baraka Bank in Egypt.[116] Both cleared via New York, in accordance with NSGB Egypt's standard settlement instructions. Indeed, LCS received a SWIFT message confirming that the latter wire cleared through NSGB's account at "THE BANK OF NEW YORK MELLON" at "ONE WALL STREET NEW YORK, NY."[117]

268.    The LMEA account played a key role in Defendants' terrorist-funding scheme. That account functioned as a slush fund that gave LCS a pool of U.S. dollars it could spend at will, including for its criminal conspiracy.[118] In fact, one of the first things Defendants planned for the LMEA account was to pay Tlass's monthly $75,000 stipend for July 2013. As Pescheux emailed Herrault on August 5, 2013, Defendants intended to cover "the recently agreed remuneration of FT" (*i.e.*, Firas Tlass) by wiring U.S. dollars "directly to his offshore account from an account LCS is having through LMEA in Egypt."[119] The reason for using the LMEA account was simple.

---

[114] Ex. 54 (Bankers Almanac at 3216 (Vol. 2, 2008)) (identifying NSGB's "USD" standard settlement instructions as routing through "The Bank of New York, New York").

[115] Ex. 55 (ATA0035605) (referring to "swift of the USD 200k transfer"); Ex. 56 (ATA0008289, In.Out Flow Tab, Rows 120-21) (recording incoming $200,000 transfer and associated $8 bank fee charged by NSGB). NSGB charged "USD 8" on "incoming transfers" involving a foreign "correspondent bank." Ex. 57 (ATA0035592 at -592).

[116] Ex. 58 (ATA0024362 at -362-64); Ex. 57 (ATA0035592 at -592-93).

[117] Ex. 58 (ATA0024362 at -364).

[118] *See*, *e.g.*, Ex. 49 (ATA0000503 at -507-09) (identifying "cash pooling" via the "LME account in Egypt" as one key way to "secure our FX needs").

[119] Ex. 59 (8/5/2013 Pescheux-Herrault Email) ("Suspicion Email").

Routing U.S. dollars from the LMEA account was how Defendants "intend[ed] to proceed in the future to sever[] any suspicion in connecting LCS and FT."[120]

269.    Defendants considered the $75,000 payment to Tlass to be "very critical to be finalized urgently."[121]  So LCS initiated a U.S.-dollar wire transfer from its LMEA account, which was "in process by the bank" and which was going to clear through New York.[122]  But LCS was foiled by "a problem with the compliance department in the bank to transfer the USD" – stemming from requirements imposed by New York clearing banks – and so had to re-issue the wire in Euros.[123]  Lafarge Egypt's head of treasury circulated a SWIFT message confirming that LCS had paid the wire from its LMEA account to Tlass's account at Audi Lebanon.[124]

270.    Defendants did not like paying in Euros and so immediately reverted to paying Tlass's monthly $75,000 stipend in U.S. dollars.  But because New York banks would not clear U.S.-dollar wires from Egypt to Tlass's account at Audi Lebanon,[125] Defendants had to come up with another way to pay him.  So they devised a new workaround in which LCS paid Tlass through an internal book transfer between Audi Lebanon accounts[126] and then reimbursed itself on the back-end out of the LMEA account.  PwC's forensic review identified two such intracompany

---

[120] Suspicion Email at 1.

[121] Ex. 60 (ATA0004874 at -876).

[122] Ex. 60 (ATA0004874 at -875).

[123] Ex. 60 (ATA0004874 at -875).

[124] Ex. 60 (ATA0004874 at -874, -878).

[125] Ex. 47 (ATA0018291 at -291-92) (noting that "US sanctions prohibit Syrian persons and organizations to enter the US Financial System, i.e. no USD transfer involving Lafarge Cement Syria can be made," so "USD may probably not be received in our bank account in Lebanon").

[126] *E.g.*, Ex. 32 (ATA0000288) (example of Jan. 2014 payment instruction).

transfers coded as "Adv to Mr. Bruno/LMEA Acc."[127]  Those transfers used the U.S. dollars stockpiled in the LMEA account to finance Pescheux's payments to Tlass.[128]

271.    More broadly, LCS repeatedly used its LMEA slush fund to preserve its U.S.-dollar liquidity and cover its U.S.-dollar expenses, including by making large interest payments to its lenders.[129]  Without the supply of U.S. dollars from this account, LCS would have had a harder time covering its expenses and freeing up the U.S.-dollar cash it needed to pay Tlass, Taleb, and the terrorists they were paying.  Paying LCS's operating expenses from the LMEA account also enabled the Jalabiyeh plant to manufacture the cement LCS sold to ISIS.[130]  And the U.S.-dollar wires LCS routed into that account – relying on NSGB's correspondent account with BNY Mellon – were vital to sourcing the U.S. dollars on which the whole scheme depended.

**2.    Defendants Instructed Their Banks To Execute These U.S.-Dollar Transactions Knowing They Would Clear Through New York**

272.    When Defendants ordered the U.S.-dollar transfers in Paragraph 236, they instructed their banks to execute the wires knowing they would clear through New York.

273.    Defendants' internal documents reflected their understanding that U.S.-dollar wires typically require New York clearing.  In November 2011, Bank Audi sent a memo from Shearman & Sterling to several LCS executives, including Pescheux, Mirakoff, and LCS's treasury manager, addressing LCS's loan-repayment obligations.[131]  The memo conveyed the widely held

---

[127] Project Alpha Report at -237-38; *see* Ex. 61 (ATA0003037, Rows 7510, 7511) (recording both transfers in Defendants' master bank file).

[128] *See, e.g.*, Project Alpha Report at -230, -237-38.

[129] Ex. 62 (ATA0003359, In.Out Flow Tab, Rows 120, 238, 268, 928, 964, 1138, 1183, 1194, 1248, 1625, 1739, 1952, 2016, 2105, 2244, 2387, 2416, 2502).

[130] *E.g.*, Ex. 63 (ATA0018621 at -623) ("It is critical for us to receive money from abroad and manage our cash flows in an efficient manner if we want to be able to continue paying our loan.").

[131] Ex. 64 (ATA0018518 at -518) (Bank Audi sending memo to Valery Mirakoff and copying Pescheux and Alzaim); *see id*. at -540-46.

understanding that U.S.-dollar wires clear through New York, warning LCS: "[b]ecause the proposed repayment[s] to the Lenders *are in US dollars*, *they would be processed through some New York correspondent bank*."[132]  Lafarge emails echoed the same theme.  Defendants often expressed the view that U.S. sanctions blocked LCS from wiring U.S. dollars because "*USD transfer[s]*" necessarily required LCS "*to enter the US Financial System*."[133]

274.    Defendants also revealed that understanding in other contexts.  Benattar conveyed his knowledge of U.S. correspondent banks when wiring Lafarge's October 2014 payment to Tlass, informing his colleagues that he "need[ed]" to know "*the US correspondent bank* of the supplier's bank" because "*the invoice is in USD*."[134]  The year before, BNP Paribas – Lafarge's main bank – had similarly clarified to Benattar and others that "*USD flows transit through our subsidiary BNP Paribas New York*."[135]  And a few months after, Lafarge's International Treasurer told a counterparty that, "to properly execute [a] payment" "in USD," Lafarge's "Back Office will need the *intermediary bank & its details for a USD transfer*."[136]  Lafarge did not think a "European" bank could process a U.S.-dollar wire, he explained, which is "*why we expect it [to] work with a partner bank in the USA*."[137]  Lafarge thus recommended using "Bank of NY Mellon" as the intermediary bank to clear U.S. dollars through New York.[138]

---

[132] S&S Memo at -287.

[133] Ex. 47 (ATA0018291 at -291); *see*, *e.g.*, Ex. 65 (ATA0002153 at -153) (LCS treasury manager telling counterparty, "As you for sure are aware, all payments in USD from Syria are being blocked."); Ex. 66 (ATA0005162 at -167) (same LCS official emphasizing that "[d]ue to US sanctions no more payments in US Dollars are possible from Syria" given the compliance policies followed by "the correspondent banks"); Ex. 67 (ATA0002227 at -229) (attributing foreign-currency challenges to "political restriction on usage of US financial system").

[134] Ex. 19 (ATA0004739 at -739) (certified English translation).

[135] Ex. 68 (ATA0032337 at -337) (certified English translation).

[136] Ex. 69 (ATA0025059 at -060) (certified English translation).

[137] *Id*.

[138] *Id*.

275.    Defendants' experience with failed U.S.-dollar wires cemented that understanding. In late 2011, for example, LCS tried to pay U.S. dollars to an affiliate's account at HSBC Singapore, but the affiliate warned that the funds would "be blocked" due to sanctions because they would have to go through "HSBC USA (USD)."[139]  The same month, LCS tried to send U.S. dollars to an Indian company's account at Standard Chartered New Delhi.  The SWIFT message confirmed that Standard Chartered used its New York branch as the correspondent, which had "reject[ed]" the transfer.[140]  Mirakoff explained the reason:  "the rejected transfer went through SCB New York" and "a US bank will not transfer funds to a Syrian bank," leading him to worry that "the funds could be blocked in NY forever."[141]  Likewise, in 2015, Lafarge's Treasury Back Office team had a U.S.-dollar wire fail because of an error using "SCB [Standard Chartered] Frankfurt" as the "USD correspondent bank."[142]  Lafarge quickly discerned that "the issue is fully related to the correspond[e]nt, as it should be SCB NY."[143]  So Lafarge's treasury team corrected the payment by "adding USD Correspondent bank SWIFT of SCB NY."[144]

276.    Defendants fared better in executing other U.S.-dollar transactions through New York correspondent accounts.  Lafarge often received invoices calling for U.S.-dollar execution through New York, such as a Jordanian consultant's April 2012 invoice calling for U.S.-dollar payment to "Jordan National Bank" in Amman "[t]hrough:  JP Morgan Chase, New York – USA."[145]  Lafarge also periodically received Standard Settlement Instructions from the European

---

[139] Ex. 70 (ATA0002267 at -275).

[140] Ex. 71 (ATA0002156 at -156); *see id*. at -157 (using SWIFT code SCBLUS33XXX for intermediary bank).

[141] Ex. 72 (ATA0002286 at -286).

[142] Ex. 73 (ATA0024796 at -796).

[143] Ex. 73 (ATA0024796 at -796).

[144] Ex. 73 (ATA0024796 at -796).

[145] Ex. 74 (ATA0032118 at -219).

Investment Bank instructing it to use BNY Mellon in New York as the correspondent bank.[146] Lafarge even made regulatory filings in a foreign jurisdiction that demanded filing fees be paid through a "Correspondent Bank" at "111 Wall Street" in "New York, USA."[147] Benattar, Vaisoul, and Khodara all had similar experiences with New York clearing. Each of them – the people most involved in the mechanics of wiring Tlass money through New York – was intimately familiar with using New York correspondent banks in other contexts.[148]

277. Lafarge's outside consultants had the same understanding. LafargeHolcim retained Baker McKenzie and PwC in 2016 to review Lafarge's payments to Syrian terrorists, and they produced a report for Lafarge entitled "*Project Alpha* Forensic Transaction Review."[149] That report further manifested the view that U.S.-dollar transfers virtually always clear through U.S. correspondent banks. Indeed, without knowing the precise routing details of several "bank transfer[s]," Baker McKenzie opined: "PwC's review reflects that these payments were ***made in USD and it is therefore presumed that they were processed through the US financial system***."[150] Defendants shared that same presumption at all relevant times.

278. Non-privileged client alerts by Defendants' counsel also alerted them that their transactions used the U.S. banking system. For example, while Shearman & Sterling LLP was advising Lafarge, it published an alert warning its clients that U.S. courts endorsed an "expansive assertion of territorial jurisdiction over non-U.S. defendants," extending to "overseas financial transactions involving US dollars, premised on the fact that virtually all such transactions clear

---

[146] *E.g.*, Ex. 52 (ATA0031601 at -602).

[147] Ex. 75 (ATA0009182 at -185).

[148] Ex. 76 (ATA0032717 at -717, -719-20) (certified English translation) (Benattar); Ex. 77 (ATA0027565 at -565, -569) (Benattar); Ex. 78 (ATA0039494 at -494, -503) (Vaisoul); Ex. 79 (ATA0060118 at -118, -121) (Vaisoul); Ex. 80 (ATA0023925 at -925) (Khodara).

[149] Project Alpha Report at -223.

[150] Project Alpha Report at -190.

through correspondent banking accounts in the U.S."[151]  Similarly, Baker & McKenzie represented Lafarge during and after the scheme, and in the earlier period published a "client alert" warning that "a wire transfer from or to a U.S. bank or otherwise using the U.S. banking system" could confer U.S. jurisdiction based on "the use of correspondent bank accounts."[152]

279.    Syrian government decrees likewise alerted Defendants that their U.S.-dollar transactions depended on the U.S. banking system.  For example, in February 2006, the Syrian government issued Circular Number 810/15, requiring that all foreign-currency transactions for the government that had previously been denominated in U.S. dollars instead occur in Euros, specifically to avoid U.S.-dollar clearing by New York banks.  That decision, of which Defendants knew, reflected the widespread understanding in Syria that "US laws stipulate that any dollar transfers must pass through the US banking system."[153]

280.    Defendants also received confirmations specific to the transactions in Paragraph 236.  Those confirmations typically took the form of SWIFT MT103 messages.[154]  SWIFT, which stands for the Society for Worldwide Interbank Financial Telecommunication, is the standard communications system for sending wire-transfer messages between financial institutions.  An

---

[151] Shearman & Sterling LLP (Philip Urofsky, Stephen Fishbein, Danforth Newcomb, Patrick D. Robbins, Paula Howell Anderson, Richard Kreindler, Markus S. Rieder, Richard Kelly, Jo Rickard, Brian G. Burke & Brian C. Wheller), *Shearman & Sterling Client Publication: The New FCPA Guide: The DOJ and the SEC Do Not Break New Ground But Offer Useful Guidance and Some Ominous Warnings* at 3 (Nov. 15, 2012), https://tinyurl.com/5dx8mndc.

[152] Baker & McKenzie LLP (Paul J. McNulty, Joan E. Meyer, Robert W. Kent, Jr., John P. Cunningham, Crystal R. Jezierski, Peter B. Andres, and Erica C. Spencer), *Baker & McKenzie Client Alert: Inside the U.S. Government's Highly-Anticipated FCPA Resource Guide* at 2 (Nov. 16, 2012), https://tinyurl.com/5n7xus77.

[153] BBC International Reports (Middle East), *Syria Replaces Dollar With Euro For State Transactions* (Feb. 24, 2006) ("Text of report by Hayam Ali headlined 'The euro used in state transactions', published by Syrian newspaper Al-Thawrah website on 13 February [2006]").

[154] *See*, *e.g.*, Ex. 28 (ATA0000220 at -220) (LMEA treasury employee informing LCS that a U.S.-dollar "transfer is being done now, will provide you with the swift within the coming hour"); *id*. at -223-24 (also providing MT103 for earlier transfer wired into LCS account).

MT103 (or Message Type 103) is a standard message confirming the details of an executed transaction. Fields 53, 54, and 56 in an MT103 typically disclose the correspondent and intermediary banks involved. Defendants' "usual" practice in executing a wire transfer was to request from their banks the "swift message" identifying the correspondent banks involved.[155]

281. Defendants have produced the SWIFT confirmations they received for 10 of the 15 New York-cleared wires identified in Paragraph 236; each informed Defendants that a specific New York bank had processed their payment.[156] Defendants likely once had, but have since destroyed, the SWIFT confirmations for the other five that also indicated the participation of a New York bank.

282. Defendants sometimes obtained the MT103 as part of their approval process for the transaction. For example, Pescheux specifically "[a]pproved" the August 8, 2011 upstream loan disbursement to LCS's Audi Lebanon account after receiving the SWIFT message disclosing that JPMorgan Chase's and Citibank's New York branches had routed the payment.[157]

283. Defendants also typically verified the correspondent-bank routing before ordering a wire. They did so through Quantum, Lafarge's electronic-payment software. As explained by

---

[155] Ex. 81 (ATA0060033 at -034) (certified English translation) (Lafarge's back-office team telling BNP Paribas that Lafarge "received an amount of 32,519.64USD . . . of which we do not have any details" and asking the bank to "send us a swift message regarding this receipt" consistent with "usual support"); *see id.* at -033-34 (providing SWIFT message); Ex. 82 (ATA0032366 at -367-68) (sharing "MT 103 confirming the transmission of funds" through New York); Ex. 83 (ATA0021482 at -483-84) (SWIFT message for New York wire); Ex. 84 (ATA0032193 at -193, -197) (attaching "transfer swift" confirming wire through "BNP PARIBAS U.S.A-NEW YORK BRANCH"); Ex. 85 (ATA0001916 at -916) (requiring "SWIFT letter so I can trace the transfer with our bank"); Ex. 28 (ATA0000220 at -226) ("will send you the swift once [I] get it").

[156] Ex. 12 (ATA0031866 at -866-68) (four 1/18/2011 transfers); Ex. 26 (ATA0005437 at -442-43) (2/28/2011 transfer); Ex. 13 (ATA0000358 at -358) (4/14/2011 transfer); Ex. 14 (ATA0000047 at -049-50) (7/7/2011 transfer); Ex. 28 (ATA0000220 at -223-24) (8/8/2011 transfer); Ex. 15 (ATA0000060 at -060) (8/15/2011 transfer); Ex. 58 (ATA0024362 at -364) (9/26/2013 transfer).

[157] Ex. 28 (ATA0000220 at -221) (Pescheux's approval); *id.* at -223 (MT103 confirming that Citi and JPM Chase New York branches were involved).

Lafarge's Deputy International Treasurer, before wiring money to a counterparty, Lafarge "need[ed] to create" the counterparty "as [a] beneficiary in Quantum to be able to make a transfer."[158]  And that process of adding information to be "created in Quantum" required Lafarge to enter the payment currency, beneficiary bank, correspondent bank, and correspondent bank address.[159]  As Lafarge's International Treasurer confirmed, "*[n]ormally there is an intermediary bank to be entered in Quantum*," which was "necessary for international payments in a currency other than that of the beneficiary's country."[160]  Defendants thus investigated the correspondent "bank accounts' information" before setting up new "counter-parties in our system" for wire transfers.[161]  It was what Lafarge's back office demanded:  "to properly execute [a] payment," Lafarge "*need[ed] the intermediary bank & its details for a USD transfer*."[162]

284.    A Quantum screenshot, taken from a Lafarge email, illustrates the point.[163]  As the screenshot demonstrates (red boxes added), Quantum provided an interface for Lafarge to enter its "Approved Counterparty Delivery Instructions."  The interface required Defendants to select the payment currency and to choose whether to follow the beneficiary bank's "Standard Settlement Instruction."  The interface also contained a tab called "Intermediary Bank:"

---

[158] Ex. 86 (ATA0050870 at -870).

[159] Ex. 86 (ATA0050870 at -870) (listing fields).

[160] Ex. 69 (ATA0025059 at -059) (certified English translation).

[161] Ex. 87 (ATA0024476 at -476); *see* Ex. 51 (ATA0058827 at -833) ("To be able to create in Quantum the bank accounts below, can you please tell us the swift code of the intermediary bank for the USD accounts?"); Ex. 88 (ATA0025152 at -152); Ex. 89 (ATA0000383 at -383).

[162] Ex. 69 (ATA0025059 at -060) (certified English translation); *see* Ex. 51 (ATA0058827 at -833) ("To be able to create in Quantum the bank accounts below, can you please tell us the swift code of the intermediary bank for the USD accounts?").

[163] Ex. 90 (ATA0050876 at -876).



For each of the U.S.-dollar wires described in Paragraph 236, Defendants used this interface to execute the wire. That required Defendants to type into Quantum the "Intermediary Bank" that would clear the wire – *including its New York address* – before they executed the first transfer to any payee, and to rely again on that same set of instructions for each subsequent transfer.

285. Even apart from Quantum, Defendants had bank-specific knowledge of the New York financial system's role in clearing their 15 suit-related U.S.-dollar wires.

286. **BNP Paribas Paris.** Defendants specifically knew that BNP Paribas's Paris branch – which originated the $210,000 wire to Tlass in October 2014 – used BNP Paribas's New York branch to clear Lafarge's U.S.-dollar wires. Lafarge was telling its own counterparties as early as 2012 that Lafarge's account with "BNP Paribas, Paris" used a "USD correspondent bank : BNP NEW YORK (SWIFT code :BNPAUS3N)."[164] In early 2013, Lafarge's International Treasurer

---

[164] Ex. 91 (ATA0058766).

reiterated that the "Lafarge SA bank account reference for USD remains unchanged," with a "Correspondent bank" of "BNP NEW YORK."[165]  In July 2013, BNP Paribas reminded Lafarge's International Treasurer – copying Benattar and Lafarge's entire Treasury Back Office team – that *"USD flows transit through our subsidiary BNP Paribas New York*."[166]  And in 2015, Benattar told a law firm that the "bank address for the USD transfer to Lafarge SA" must use "BNP NEW YORK" as the "Correspondent bank."[167]  So when Benattar and his colleagues instructed BNP Paribas to send Tlass a U.S.-dollar wire, they had no doubt where it was going:  through the same BNP Paribas New York account they always used.

287.    BNP Paribas's use of its New York branch to clear U.S.-dollar transfers also tracked its standard settlement instructions.  Before the relevant period, BNP Paribas published its standard settlement instructions for its Paris branch in the Bankers Almanac, which specified that it typically settled "USD" transfers through "BNP Paribas SA, New York."[168]

288.    **Bank Audi.**  Defendants likewise knew their U.S.-dollar transfers through Bank Audi relied on New York correspondent banks.  For the upstream payments Lafarge made into LCS's Audi Syria accounts, they received SWIFT MT103 confirmations specifically reporting that each cleared through Citibank New York.[169]

289.    Defendants gained even more precise knowledge that their Audi Lebanon account relied on a New York correspondent bank.  The account-opening process made that clear.  In July 2011, LCS became uncomfortable with Audi Syria, viewing the continued reliance on a Syrian

---

[165] Ex. 92 (ATA0057787 at -787).

[166] Ex. 68 (ATA0032337 at -337) (certified English translation).

[167] Ex. 93 (ATA0032069 at -069).

[168] Ex. 54 (Bankers Almanac at 1424 (Vol. 1, July 2008)).

[169] *Supra* ¶¶ 280-282 (citing SWIFT messages, each referencing Citi NY's SWIFT code).

bank as posing risks to LCS's "Cash Management flexibility."[170]  So LCS set out to open a new Lebanese account from which it could more freely send and receive U.S. dollars.  It initiated that process on July 12, 2011, when Mirakoff met with the "Audi Lebanon Team" to discuss the new account.[171]  A few weeks later, on July 28, Bank Audi approved LCS for a new "US Dollar Operating Account with Bank Audi SAL – Audi Saradar Group" in Lebanon.[172]

290.  Audi Lebanon immediately informed LCS that its new account would use JP Morgan Chase's New York branch as the U.S.-dollar correspondent.  Once the account was officially approved, LCS's treasury manager asked for the "account's references as soon as available."[173]  Bank Audi responded by emailing LCS the account "coordinates" as follows:

> Correspondent Bank Name:  JP Morgan Chase
> Address:  New York
> SWIFT of Correspondent Bank:  CHASUS333
> BANK Name:  Bank Audi SAL – Audi Saradar Group
> BANK Account No with Correspondent:  ▮▮▮▮027
> SWIFT of BANK:  AUDBLBBX[174]

291.  Roughly two weeks after opening the Audi Lebanon account, Lafarge wired $10 million (via Lafarge Cyprus) into that account, using the designated JP Morgan Chase correspondent account in New York.  The SWIFT message confirming the transfer, which Defendants circulated internally, described JP Morgan Chase's involvement.[175]  LCS's treasury manager forwarded the SWIFT confirmation to two LCS accountants, while also attaching the

---

[170] Ex. 14 (ATA0000047 at -047).

[171] Ex. 14 (ATA0000047 at -047).

[172] Ex. 94 (ATA0002147 at -148-49).

[173] Ex. 94 (ATA0002147 at -148).

[174] Ex. 94 (ATA0002147 at -247).

[175] Ex. 95 (ATA0000186 at -187) (field 56A).

"Lebanon Account references."[176]  Those references reiterated to both LCS employees that the "***Correspondent Bank Name***" was "***JP Morgan Chase***" in "***New York***."[177]

292.    Audi Lebanon's use of JPMorgan Chase to route U.S.-dollar wires also matched its public settlement instructions.  Before the relevant period, Audi Lebanon published its standard instructions in the Bankers Almanac, which specified that it typically settled U.S.-dollar wire transfers through correspondent accounts at "The Bank of New York" and "JPMorgan Chase Bank, National Association," which is JPMorgan's New York branch.[178]

293.    U.S. government findings also alerted Defendants that Bank Audi relied on U.S. correspondent banks.  On February 17, 2011, for example, the Treasury Department published findings that "[t]here are 66 banks incorporated in Lebanon, and all major banks" – which included Bank Audi – "have correspondent relationships with U.S. financial institutions."[179]

294.    **NSGB Egypt.**  Defendants had similar knowledge about their LMEA account at NSGB Egypt.  Shortly after LCS opened the account, it received a SWIFT message about an incoming U.S.-dollar wire disclosing that BNY Mellon in New York had routed the money.[180] Once again, that confirmation tracked NSGB's standard settlement instructions, which publicly alerted Defendants to NSGB's practice of routing U.S. dollars through BNY Mellon.[181]

295.    As these transactions demonstrate, all three Defendants were intimately involved in directing and routing the U.S.-dollar transfers they executed.  They did not simply leave the

---

[176] Ex. 95 (ATA0000186 at -186).

[177] Ex. 95 (ATA0000186 at -192).

[178] Ex. 54 (Bankers Almanac at 772 (Vol. 1, 2008)).

[179] U.S. Dep't of Treasury (FinCEN), *Finding That the Lebanese Canadian Bank SAL Is a Financial Institution of Primary Money Laundering Concern*, 76 Fed. Reg. 9403, 9404 (Feb. 17, 2011) (footnote omitted), https://tinyurl.com/b2tpah7r.

[180] Ex. 58 (ATA0024362 at -364).

[181] *Supra* ¶ 271.

routing decisions to their banks; the details were too important to Lafarge.[182]  Defendants belonged to a sophisticated multinational conglomerate that employed large treasury and back-office teams to supervise their banks and to manage their currency exposure across several markets.[183]  For that reason, Defendants regularly communicated with their banks about how to route their money, including with respect to the correspondent banks used.[184]

296.    Defendants were not indifferent to the choice of correspondent banks.  LCS knew its struggles to source "USD" were "mainly depend[ent] on the banks emitting the transfer."[185]  That recognition led LCS to observe, for all transactions touching Syria:  "*we have to cho[o]se wisely the bank correspondant*."[186]    Defendants thus often took steps to verify the "correspond[ent] USD bank" clearing their wires, so they could "pass it on to our [own] correspondents" to facilitate the smooth flow of currency across geographic jurisdictions.[187]

---

[182] *Compare*, *e.g.*, Ex. 94 (ATA0002147 at -147) (LCS describing plan to open a new Lebanese bank account to wire U.S. dollars instead of Syrian account) *with* Ex. 41 (ATA0005040 at -040) (LCS instructing Lafarge Egypt to "transfer the amount to the Syrian Account" rather than Lebanon account, to avoid "additional useless days" in routing).

[183] *See*, *e.g.*, Ex. 69 (ATA0025059 at -059-60) (certified English translation) (copying "treasury.backoffice@lafarge.com" and informing counterparty that "Back Office" needed to verify "intermediary bank").

[184] *See*, *e.g.*, Ex. 96 (ATA0035568 at -568) (detailing "our pressure on Audi Lebanon to by themselves practice continuous pressure on the foreign banks," to ensure that correspondent banks "process the payments" despite the "embargo . . . effected by the US"); Ex. 97 (ATA0021174 at -176) (Lafarge finance personnel noting urgent need to funnel "fresh cash" into LCS and to "channel the funds to Syria through Lebanon, to lower the risk of cash being trapped by banks' compliance policies linked to sanctions affecting Syria").

[185] Ex. 47 (ATA0018291 at -292).

[186] Ex. 47 (ATA0018291 at -292).

[187] Ex. 68 (ATA0032337 at -337-38) (certified English translation); *see* Ex. 98 (ATA0005043 at -046) (supplying "details of the correspondent bank"); Ex. 66 (ATA0005162 at -167) (verifying that transfer was workable for "all the correspondent banks involved"); Ex. 63 (ATA0018621 at -627) (promising to "communicate" with counterparty about "the transfer process and route"); Ex. 99 (12/5/2013 Khayer-ElAnsary-Sandook Email String at 2) (identifying "correspondent bank to be transferred through"); Ex. 100 (ATA0018698 at -701) (instructing counterparty to provide new account "that will accept transfers from Syria going through Commerzbank Frankfurt as Correspondent"); Ex. 101 (ATA0014184 at -186-88) (describing laborious process to find workable transfer route from Syria to India).

297.    When Defendants instructed their banks to process U.S.-dollar wires, they intended to (and did) cause their banks to wire money through New York correspondent accounts.  And when Defendants' banks carried out those instructions, they did so as Defendants' agents.  In a cross-border wire transfer, the originating bank – the bank that first receives the order from the wire originator – carries out the transfer on the originator's behalf.  The originator also exercises substantial control over the originating bank.  Among other things, Defendants here specified each transfer's date, amount, and currency denomination.  Each time, Defendants' originating bank had to follow Defendants' instructions.  Those instructions effectively mandated that the banks rely on New York's financial system, on Defendants' behalf.

298.    Defendants also had the right to dictate the use of specific correspondent or intermediary banks.[188]    Defendants sometimes exercised that control by dictating to their originating bank a particular intermediary Defendants wanted to use.[189]  Lafarge also routinely instructed its counterparties to send money to its chosen U.S.-dollar correspondent account at BNP Paribas, New York.[190]  Thus, for each of their U.S.-dollar transactions that cleared in New York, Defendants could have dictated use of a non-U.S. correspondent bank but consciously declined to do so.  More often, Defendants simply instructed their banks – using Quantum's Counterparty

---

[188] Ex. 69 (ATA0025059 at -059) (certified English translation) (describing Lafarge's right to "impos[e] an intermediary bank on the issuing bank (BNPP in this case)").

[189] Ex. 102 (ATA0024755 at -755) (LCS treasury manager "called Sandra/Audi Lebanon Bank and told her that we can not execute the payment through JP Morgan Chase Bank," instead requesting use of "another bank account"); Ex. 103 (ATA0008980 at -985-87) (discussing strategy to avoid "designated intermediary" bank); Ex. 101 (ATA0014184 at -190) (rejecting designation of "Bank of America" and demanding "Commerz Bank" as "correspondent bank").

[190] *E.g.*, Ex. 104 (ATA0032527 at -548) (Benattar signing payment form that included in the "Payment Instructions" field:  "Correspondent bank : BNP New York").

Delivery Instructions interface – to follow their standard settlement protocol.[191]   Defendants understood that those instructions here dictated the use of New York banks.

299.    Defendants' control extended still further over their outgoing wires, including for the $210,000 they wired to Tlass in October 2014.  For example, Defendants input into Quantum North Logistics' U.S.-dollar correspondent bank – JPMorgan Chase, New York – and instructed BNP Paribas to execute through that intermediary, thus requiring the use of New York's clearing services.[192]   In addition, Defendants knew BNP Paribas would route the money to JPMorgan Chase via its own New York branch, consistent with its standard settlement instructions.

300.    Defendants also paid banking fees to the New York banks that cleared their transactions.  Correspondent banks typically charge a fee for each wire transfer that they process.  Those fees can be paid in three ways; the specific payment mechanism is typically reported at Field 71A of the SWIFT MT103.  Option one – denoted by "OUR" – has the originator cover the fees separately, on top of the amount transferred.  Option two, denoted by "BEN," covers the fees by deducting them from the amount transferred.  Option three, denoted by "SHA," is a mix of the two.  In each scenario, the sender wires the money to the intermediary or correspondent bank to compensate that bank for the service of processing the transaction.  Thus, when Defendants relied on New York banks to clear their transactions, they knowingly sent money into New York to compensate those banks for the service.

301.    Defendants paid New York banking fees to clear every U.S.-dollar wire for which they have produced a SWIFT confirmation.  For 11 of those wires, the SWIFT message designated

---

[191] *Supra* ¶ 284.
[192] *Supra* ¶¶ 242, 282-83.

"SHA" in Field 71A, meaning that the sender and recipient split the banking fees.[193]  In all but one of those 11 transfers, Defendants were on both sides of the wire, so Lafarge or Lafarge Cyprus split the fees with LCS.  For two more, Field 71A stated "OUR," meaning that the sender – in both cases, Lafarge Cyprus – covered the fees.[194]  In every instance, therefore, at least one Lafarge entity paid some of the fee the New York bank charged for its service clearing the wire.  And Defendants were aware of those fees, observing in March 2011 that their upstream equity contributions had yielded "differences between the credited amount and the transferred amounts" due to "***bank charges from Citibank NY***."[195]  They made a similar observation for the September 2013 LMEA transfer, noting they had to pay "the ***charges deducted by the remitter and the correspondent bank***"[196] – in that case, BNY Mellon in New York.

### 3. Defendants Purposefully Benefited From New York Clearing

302.  Defendants' New York contacts enhanced the potency of the aid they gave to ISIS and ANF.  Not every payment made was in U.S. dollars.  But Defendants' preference was to pay in U.S. dollars when possible, and using U.S. dollars (even if not exclusively) was critical to the conspiracy.  Indeed, Defendants' ability to reliably transfer U.S. dollars – which depended on their access to New York's banking system – was vital to the scheme's success.  Defendants' conscious choice to use U.S. dollars and New York banks offered at least three benefits.

303.  *First*, transacting in U.S. dollars through U.S. banks helped Defendants legitimize their payments and reduce unwanted scrutiny from outside auditors.  Given the deteriorating security situation in Syria, and the resulting U.S. and international sanctions, Lafarge's Syrian

---

[193] Ex. 12 (ATA0031866 at -866-68); Ex. 26 (ATA0005437 at -437-42); Ex. 13 (ATA0000358 at -358); Ex. 14 (ATA0000047 at -050); Ex. 58 (ATA0024362 at -364).

[194] Ex. 28 (ATA0000220 at -224); Ex. 15 (ATA0000060 at -060).

[195] Ex. 26 (ATA0005437 at -437).

[196] Ex. 57 (ATA0035592 at -592).

operations faced significant financial scrutiny.[197]  To continue making payments to terrorists in that environment, Defendants had to design a system to "arouse less suspicion by LCS's external auditors and conceal the purpose of the payments."[198]  U.S. dollars helped Defendants avoid such suspicion.  At the time, Syria's financial system was in severe distress, plagued by rapidly spreading black markets for illicit financial activity.  By contrast, the U.S. dollar was the global reserve currency for legitimate transactions among established, multinational businesses.  Lafarge's "preferred option" was thus to make "bank transfer[s] in USD," so that its wire transfers would have the imprimatur of legitimacy associated with U.S.-dollar transactions.[199]

304.    Defendants' contract machinations confirm the point.  Until July 2013, LCS was paying Tlass in Syrian pounds by making so-called "turnover" payments equal to 1% of LCS's net revenue.[200]  But as Defendants' unlawful payments escalated, they grew uncomfortable with that arrangement.[201]  Defendants thus insisted on a new contract – not with Tlass personally, but with a Tlass-controlled shell company in Dubai – calling for payment in U.S. dollars.  And rather than structure those payments as a percentage of net revenue, they agreed on a flat $75,000 monthly fee, denominated in U.S. dollars.[202]  Pescheux explained the logic in an August 5, 2013 email to Herrault, a Lafarge executive and his direct report.  As Pescheux wrote, wiring $75,000 in "USD"

---

[197] *E.g.*, Ex. 105 (ATA0009218 at -218) (Herrault telling Tlass that his preferred method of paying dollars in his "Account in Beirut" was "put[ting] the company at risk at it has to stop").

[198] Plea Statement ¶ 56.

[199] *Id.* ¶ 60; Preferred Option Email at 2.

[200] 2010 Tlass Agreement art. 4 ("Service Fees shall be 1% of the net sales of LCS").  In addition to the "turnover" payments, Defendants also "pa[id] him a monthly donations which normally is supposed to be entirely distributed" to terrorists.  Ex. 106 (ATA0000541 at -541).

[201] Preferred Option Email at 2 ("As discussed many times, we cannot continue the way we are settling the turnover invoices.").

[202] Feb. 2014 Tlass Agreement at -426 (contract with "Nort Logistics Consultancy Service JLT"); *id.* art. 4 ("From July 1, 2013, the Employer shall pay a monthly remuneration of 75,000USD."); Ex. 107 (ATA0009228 at -228) (Pescheux demanding new contract with "company you control").

from the "LMEA Account" to Tlass's "offshore account" was how Defendants wanted "to proceed in the future to sever[ ] any suspicion in connecting LCS and FT."[203]

305.    Defendants' use of U.S. dollars to mask their activities matched their broader concealment efforts.  Among other things, Defendants funneled their payments through a web of 54 different bank accounts, which PwC called "[un]usual[ ] and excessive."[204]  By using so many accounts, Lafarge made it more difficult for others to detect the scheme.

306.    *Second*, transacting in U.S. dollars protected Defendants and their agents from foreign-exchange risk.  Due to international sanctions and Syria's civil war, the value of the Syrian pound plummeted during Defendants' scheme.[205]  When Defendants' arrangement with Tlass began, the Syrian pound was trading against the U.S. dollar at roughly 47:1.  By the middle of 2013, it had depreciated to roughly 220:1 (having lost roughly 3/4 its value).[206]  The Syrian pound's rapid "depreciation" prompted Tlass to demand payment from LCS in U.S. dollars.[207]  Indeed, in a meeting with Pescheux in August 2013, Tlass "***ended by saying he would prefer a fixed monthly fee in USD***."[208]  And Defendants – which constantly monitored the USD-SYP exchange rate[209] – had similar preferences, going to great lengths to hold as much of LCS's cash

---

[203] Suspicion Email at 1; *see* Plea Statement ¶ 62.

[204] Project Alpha Report at -227.

[205] Ex. 7 (ATA0009139) (identifying "swift depreciation of the Syrian Pound" as a "nightmare" that ranked among LCS's "major problems").

[206] Ex. 106 (ATA0000541 at -541).

[207] Ex. 106 (ATA0000541 at -541) ("remuneration based on turnover is now challenged by FT" in part due to "depreciation of the Syrian Pound vs USD").

[208] Ex. 106 (ATA0000541 at -541).

[209] Ex. 108 (ATA0022737 at -738) ("LCS observes and determines USD/SYP rate as the parallel market is driven by the USD/SYP exchange rate.").

as possible in U.S. dollars.[210]  LCS became so desperate for U.S. dollars that it was even willing to buy them on the Syrian "grey market" at exorbitant exchange rates.[211]

307.    *Third*, Defendants' payments satisfied ISIS's and ANF's general preference for U.S. dollars.  Real-time public reports linked ISIS's fundraising prowess – and its recruiting success – to its stockpile of U.S. dollars.  As *Business Insider* reported in 2015:

> According to [an ISIS defector], a large number of people are joining ISIS because they need money.  ***After joining [ISIS], people are paid in US dollars instead of Syrian liras***.  . . . ISIS members receive additional incentives to fight for the group.  "I rented a house, which was paid for by ISIS," Abu Khaled, who worked for ISIS's internal-security forces and "provided training for foreign operatives," [said].  "It cost $50 per month.  [ISIS] paid for the house, the electricity.  Plus, I was married, so I got an ***additional $50 per month*** for my wife.  If you have kids, you get ***$35 for each***.  If you have parents, they pay ***$50 for each parent***.  This is a welfare state."  And ***those financial benefits are not just limited to the organization's fighters.***[212]

308.    Investigative reports sourced to witnesses from inside ISIS's territory reinforce that connection.  For example, according to the *Independent*, a leading British newspaper that has covered ISIS extensively since its inception, the "Islamic State was already known to pay its recruits in [U.S.] dollars, sell[] oil and looted antiques for dollars, and accept extorted taxation and hostage money in dollars."[213]  ISIS "promoted the idea that it was hitting the US economy by issuing its own currency but the organisation on the ground is doing exactly the opposite, having ***built a financial system entirely dependent on the US dollar***."[214]

---

[210] Ex. 109 (ATA0020481 at -487) ("To alleviate the risk relating to currency devaluation, LCS attempts to maximize the cash denominated in USD and EUR.").

[211] Cash Shortfall Memo at -066 ("As we cannot get Fx currency from the Central Bank of Syria, we buy it either on the grey market or from the commercial banks.").

[212] Jeremy Bender, *An ISIS Defector Explained A Key Reason People Continue Joining The Group*, Bus. Insider (Nov. 18, 2015), https://tinyurl.com/3ced6xs5.

[213] Lizzie Dearden, *ISIS' Attempt To Topple US Economy With Own Currency 'Failing' As Reliance On American Dollars Increases*, Indep. Online (UK) (Mar. 26, 2016), 2016 WLNR 9336286.

[214] *Id*.

309.     Defendants' reliance on New York banks helped them capture all these benefits of their U.S.-dollar payments.  New York is the global hub of cross-border U.S.-dollar transfers for good reason:  companies that wire their U.S. dollars through New York gain from the legitimacy, reliability, and speed offered by New York clearing.  Transacting through other clearing centers is possible – there are other ways to move U.S. dollars in theory – but all present operational risks that New York clearing avoids.  By routing the payments identified in Paragraph 236 through New York, Defendants maximized the potency of their terrorist funding.

310.     New York clearing enhanced the legitimacy of Defendants' U.S.-dollar payments and helped Defendants conceal their scheme from auditors.  As noted above, Defendants chose to transact in U.S. dollars in part to make their payments look like ordinary "bank transfer[s]."[215]  New York clearing helped achieve that effect.  That is because the vast majority of U.S.-dollar transactions clear through CHIPS and flow through New York banks – so routing a U.S.-dollar payment through New York correspondent accounts would have represented business as usual for a legitimate company making legitimate business payments.  Had Defendants routed their U.S.-dollar payments some other way, it would have stood out as unusual – risking the very type of outside attention from auditors and regulators Defendants were striving to avoid.

311.     Defendants worried constantly about satisfying their "external auditors."[216]  In 2012, Pescheux began discussing with Tlass the need to "draft invoices that would not raise red flags,"[217] warning him that Tlass's sloppy invoices meant that "our financial statements for 2012 cannot be approved."[218]  Pescheux thus demanded that Tlass form a company "in Dubai" and

---

[215] Preferred Option Email at 2.
[216] Ex. 110 (ATA0009234 at -234).
[217] Plea Statement ¶ 58.
[218] Ex. 110 (ATA0009234 at -234).

present new invoices from that company "with a minimum of formalism."[219]    Defendants requested such formalism "even if we continue to settle the invoices in Syrian Pounds."[220]  But as Pescheux repeatedly made clear, settlement in Syrian pounds was not his preference.  He knew that shifting into U.S. dollars offered a safer course for satisfying LCS's auditors.[221]  "The best solution," he concluded, was for Lafarge to pay Tlass "*in foreign currency on a foreign account to a foreign entity*" – which is exactly what then happened, via a New York wire.[222]

312.    Defendants' ensuing efforts to pay Tlass demonstrate the value they ultimately reaped from New York clearing.  On agreeing to pay Tlass in U.S. dollars, LCS first attempted to pay him by wire originated from its LMEA account, through New York, but was stymied by the bank's "compliance department."[223]  So LCS was forced to wire Tlass his July 2013 payment in Euros instead.[224]  That was neither side's preference, and Defendants reverted to paying U.S. dollars in future months.  At the time, however, Tlass had not created a bank account capable of receiving U.S.-dollar wires from outside Lebanon, so Defendants had to devise a convoluted workaround.  First, they sourced U.S. dollars into LCS's own account at Audi Lebanon – sometimes from LCS's illegal LMEA account,[225] other times by approaching grey-market foreign-exchange dealers to convert Euros or Syrian pounds into dollars.[226]  Then, Defendants instructed

---

[219] Ex. 110 (ATA0009234 at -234).

[220] Ex. 110 (ATA0009234 at -234).

[221] Ex. 111 (ATA0015463) (Pescheux telling Tlass, copying Mirakoff, that "we cannot continue to pay these amounts in Syrian p[o]unds"); Preferred Option Email at 2 (Pescheux reminding Tlass that "we cannot continue the way we are settling the turnover invoices" and that he "preferred" to make "a bank transfer in USD"); Suspicion Email at 1 (ordering U.S.-dollar "transfer[ ]" to Tlass's "offshore account" to "sever[ ] any suspicion in connecting LCS and FT");

[222] Ex. 111 (ATA0015463).

[223] Ex. 60 (ATA0004874 at -875).

[224] Ex. 60 (ATA0004874 at -874-75).

[225] *Supra* ¶¶ 267-70.

[226] *Infra* ¶ 320.

Audi Lebanon to engage in an internal book transfer through which it moved the U.S. dollars from LCS's account into what Tlass called "my account" at the same bank.[227]  Finally, Tlass had an associate come withdraw the U.S. dollars out of his account in Lebanon.[228]

313.    Defendants expressed grave concerns about this book-transfer procedure and repeatedly pressured Tlass to change it.  On March 15, 2014, Pescheux told Tlass he had just "given the instruction for paying the monthly fee of February to your personal bank account in Lebanon," but reiterated that "***this situation is putting us at risk*** . . . as the confidentiality of the transaction is an illusion."[229]  Pescheux warned Tlass that he was "not in favor to continue the way we currently use for the March payment."[230]  Herrault replied by offering to "intervene with Firas" and remarking of the payment process:  "This is becoming ridiculous."[231]

314.    Pescheux followed up two weeks later, reminding Tlass that the continuing non-wire U.S.-dollar payments were "putting me in a difficult situation" with Defendants' "[e]xternal auditors." [232]  Any solution, Pescheux stressed, could no longer rely on book transfers into Tlass's "personal bank account."[233]  Although Tlass continued to pay off terrorists – updating Pescheux about "[o]ur negotiations with ISIS" – he resisted opening a non-Lebanese bank account capable of receiving normal U.S.-dollar wires.[234]  His delay prompted Defendants to withhold payment. A few months later, Herrault reminded Tlass that Lafarge would not continue with the "monthly

---

[227] Ex. 112 (ATA0021127 at -128) (certified English translation); *see*, *e.g.*, *supra* ¶ 247 (collecting bank instructions).

[228] Ex. 112 (ATA0021127 at -128) (certified English translation).

[229] Ex. 113 (ATA0021905) (certified English translation).

[230] Ex. 113 (ATA0021905) (certified English translation).

[231] Ex. 113 (ATA0021905) (certified English translation).

[232] Ex. 114 (ATA0009220).

[233] Ex. 114 (ATA0009220).

[234] Ex. 115 (ATA0009216 at -216).

payment plan" because the convoluted payment process "***puts the company at risk and it has to stop***."[235]  By July 2014, when Tlass expressed frustration that he had not "received the payment of $75000 in my account in Beirut," Pescheux responded tersely:  "We are still waiting for any progress in the opening of your company's bank account."[236]

315.    By early September, Lafarge and LCS had begun to devise "a way of remunerating FT in different manners."[237]  While those discussions continued, Defendants announced "we no longer wish" to make "the USD payment" to Tlass "from our account in Beirut."[238]  Although Tlass still requested payment into "his personal account in Beirut," Lafarge refused.  On the advice of Khodara and Lafarge's General Counsel, Lafarge emphasized that LCS could "no longer pay" through Audi Lebanon and "need[ed] to find a new way of operating."[239]  And any solution, Lafarge insisted, must involve a transfer into a new "company" account.[240]  The pressure worked. On September 29, 2014, Jolibois reported to Khodara and a Lafarge Senior Finance VP that Tlass had "finally [been] able to open an account in Dubai."[241]

316.    Defendants immediately prepared to wire U.S. dollars into Tlass's new North Logistics account in Dubai.  But they realized they could not send the payments from Syria or Lebanon.  After opening the North Logistics account, Tlass asked LCS to promptly "transfer [the] overdue amounts" into his new "bank account" in Dubai.[242]  Herrault exclaimed:  "This can no

---

[235] Ex. 105 (ATA0009218 at -218).

[236] Ex. 115 (ATA0009216 at -216-17).

[237] Ex. 116 (ATA0022824 at -824) (certified English translation).

[238] Ex. 117 (ATA0000166 at -167) (certified English translation).

[239] Ex. 117 (ATA0000166 at -166) (certified English translation).

[240] Ex. 117 (ATA0000166 at -166) (certified English translation).

[241] Ex. 117 (ATA0000166 at -166) (certified English translation).

[242] Ex. 118 (9/29/2014 Jolibois-Block-Herrault Email String at 1).

longer be done from Syria!"[243]  And just a week earlier, Jolibois had reminded his colleagues that LCS could no longer reliably pay U.S. dollars "from our account in Beirut."[244]

317.   That led Lafarge to send a bank wire through New York's financial system, described above.[245]  Having convinced Tlass to create a shell company outside Syria, Defendants finally made good on their desire to effect payment through "a bank transfer in USD to the account of a duly registered company."[246]  Their machinations had solved their auditor problem: Defendants could now pay Tlass with an ordinary bank wire flowing through ordinary New York banking channels, rather than LCS's convoluted and highly suspicious book-transfer process. They had also solved their U.S. sanctions problem:  by wiring money between Cypriot and Dubai companies, Lafarge duped BNP Paribas and JP Morgan Chase into processing the wire.[247]  Nobody else knew it was an illegal U.S.-dollar payment between two Syrian entities.[248]

318.   New York clearing also enhanced the speed and reliability of Defendants' U.S.-dollar transactions.  During Defendants' scheme, a limited number of non-U.S. banks were able to clear cross-border U.S.-dollar wire transfers.  These alternative U.S.-dollar clearing centers were in Tokyo, Hong Kong, Singapore, and Manila.  But each presented extra cost and risk.  Indeed, those banks were not commonly used by Western financial institutions, and the Federal Reserve allowed them to clear U.S.-dollar transfers only because of the time-zone difference with East Asia.  That arrangement did not permit Defendants to wire money from France into Dubai, Lebanon, Syria, or Egypt.  Had Defendants routed those transactions through non-U.S. banks,

---

[243] Ex. 118 (9/29/2014 Jolibois-Block-Herrault Email String at 1).

[244] Ex. 117 (ATA0000166 at -167) (certified English translation).

[245] *Supra* ¶¶ 239-42.

[246] Preferred Option Email at 2.

[247] Ex. 22 (BNPP-NY 000004, Rows 2913-2915); Ex. 23 (BNPP-NY 000001, Excerpt from JPMC Subpoena Response, Row 2).

[248] Plea Statement ¶¶ 96-103.

rather than New York banks, they would have exposed themselves to credit and operational risk, and likely would have had to pay higher banking fees as well.

319.    Defendants experienced those operational risks first-hand.  By August 2011, U.S. sanctions were substantially constricting Defendants' ability to route U.S. dollars in and out of Syria.  Defendants strongly preferred to transact in U.S. dollars:  that is how Lafarge made its upstream payments until August 2011, and it is how Defendants wanted to proceed even after President Obama ratcheted up sanctions in August 2011.  But U.S. sanctions effectively blocked Lafarge and LCS from continuing "to wire USD to Syria" because they stopped New York banks from clearing the wires.[249]  In 2012, therefore, Lafarge had to start paying LCS by wiring money in Euros, after which LCS would "buy USD on shore."[250]

320.    The need for LCS to buy U.S. dollars on shore in Syria created operational headaches.  For one thing, the currency conversion process was complex, forcing LCS personnel to devote significant time to managing it.[251]  For another, it was expensive:  LCS (and thus Lafarge and Lafarge Cyprus) was forced to pay high prices to convert Euros and Syrian pounds into U.S. dollars by buying them from Syria's Central Bank, commercial banks, or private currency dealers on the grey market.[252]  All this together compounded the financial challenges faced by Lafarge's

---

[249] Ex. 89 (ATA0000383 at -392) ("We understand that due to recent restrictions on Syria, it is today very difficult and almost impossible to wire USD to Syria.  We are still having discussions with some banks but at this stage, the only route that we can eventually considered is to wire EUR via LBMHE (to be confirmed).").

[250] Ex. 89 (ATA0000383 at -392); *see id*. at -383 ("We've ascertained that we can transfer EURO to Lafarge Cement Syria," even while Lafarge would "book" the loan "in USD").

[251] Ex. 49 (ATA0000503 at -505-14) (describing complex, five-phase "Forex Management Process"); Cash Shortfall Memo at -069 (similar); Ex. 42 (ATA0000938 at -938).

[252] Ex. 63 (ATA0018621 at -621) ("Since the application of US sanctions, we bear heavy exchange losses when effecting any transfer from or to our USD Operating Account."); Cash Shortfall Memo at -069-72 (detailing parallel-market FX deals); Ex. 49 (ATA0000503 at -507) (noting LCS "ha[s] to add the spread demanded by the trader").  By mid-2013, even the Syrian Central Bank refused to sell U.S. dollars to LCS "at the official rate" and demanded pricing "at the 'intervention' rate, close to the pa[r]allel market." Ex. 119 (ATA0005001 at -001).

Syrian business during the criminal conspiracy.  As Pescheux told Herrault in June 2013, the "scarcity of USD" in Syria was "really a nightmare."[253]  Wiring dollars through New York banks – which Defendants did whenever they could – was easier, faster, and cheaper.

321.    Defendants knew from public U.S. enforcement actions that the sanctions regime they were flouting was designed to prevent U.S. banks from helping finance attacks by FTOs.[254] In 2015, moreover, the Treasury Department confirmed that FTOs like ISIS and ANF relied on their ability to leverage the U.S. financial system to facilitate U.S.-dollar transfers:

> Given the ***central role U.S. banks play in facilitating global payments***, ***the United States is vulnerable to the movement of funds associated with [terrorist financing]*** through the banking system.  To address this, the U.S. government has focused on developing and implementing preventive measures to reduce the vulnerability of these institutions to [terrorist financing], used additional tools and authorities to more effectively target [terrorist financing], and ***imposed substantial financial penalties on noncompliant institutions***.  Even with these measures, the U.S. banking system is exposed to residual [terrorist financing] risk, such as from foreign correspondents that may not have effective AML/CFT [i.e., Anti-Money Laundering/Countering the Financing of Terrorism] programs.[255]

322.    The Treasury Department repeated a similar warning on October 16, 2014, eight days before Defendants' $210,000 wire to Tlass, when it sanctioned a violent, Syrian-regime-affiliated actor.  The designation emphasized that U.S. sanctions on Syria sought to deprive violent Syrian-related actors of U.S. dollars and force them to instead use a collapsing Syrian pound, reducing their ability to fund the kidnapping and murder of innocent victims in Syria.[256]

323.    New York prosecutors also pursued enforcement actions alerting Defendants that terrorist groups sought to leverage multinational corporations' choice to use the New York banking

---

[253] Ex. 7 (ATA0009139).

[254] *See*, *e.g.*, U.S. Dep't of Treasury, *National Terrorist Financing Risk Assessment* at 49 (Aug. 24, 2015).

[255] *Id.* at 60.

[256] *See* Press Release, U.S. Dep't of Treasury, *Treasury Sanctions a Syrian Official Responsible for Human Rights Abuses in Syria and Syrian Regime Supporters and Officials* (Oct. 16, 2014).

system.  In 2009, for example, after New York regulators announced counterterrorism-related enforcement actions against European banks, the Manhattan District Attorney told Bloomberg that New York was prosecuting "big cases," including "[o]ne involving Lloyd's [of London], where they were taking Iranian money, stripping the identification, and then sending it to U.S. . . . correspondent banks to get dollars to buy equipment for weapons" and observed that "[p]eople" – even terrorists – "still want to be paid in dollars," which was "the reason they go through U.S. banks."[257]  In 2014, likewise, the Manhattan District Attorney warned multinational corporations that, "if you are going to use the American banking system, particularly New York, for your dollar clearing transactions, you are going to have to abide by [America's] rules."[258]

324.    Defendants also witnessed the difference between speedy New York execution and unreliable foreign execution.  In March 2013, for example, a Taleb subcontractor sought payment in U.S. dollars through Bank of America, prompting LCS to warn Taleb that "we can't transfer to Bank of America, or any bank in USA," and to ask instead for a new "bank account" designating "Commerz Bank" as the correspondent.[259]  But the parties were unable to find an alternative execution route, despite exploring everything from Turkish banks to Chinese banks to Western Union.[260]  The resulting payment delays led the subcontractor to complain, spurring Taleb to explain that "we did transfer the payments but all the way failed" to clear through the subcontractor's preferred Bank of America correspondent account.[261]  Eventually, Taleb had to personally pay the subcontractor out of his own funds and then collect the money from LCS via

---

[257] Robert Morgenthau, *quoted in* Margaret Brennan, *Manhattan District Attorney Robert Morgenthau on Bloomberg TV*, CEO Wire (Sept. 11, 2009), 2009 WLNR 17857284.

[258] Cyrus Vance, Jr., *quoted in Manhattan DA Cyrus Vance Jr. Intvd on Bloomberg TV*, Bloomberg TV (Aug. 6, 2014), 2014 WLNR 21514304.

[259] Ex. 101 (ATA0014184 at -190).

[260] Ex. 101 (ATA0014184 at -186-88).

[261] Ex. 101 (ATA0014184 at -187).

"Audi Bank in Lebanon"[262] – the same risky process Lafarge later refused to continue with Tlass. These delays nearly ruined the project and ruptured Lafarge's relationship with Taleb.[263]

325.    When Defendants were able to exploit New York clearing, New York banks solved these problems for them.[264]   And Defendants valued the speed New York clearing delivered.  On many occasions, LCS's precarious cash position sparked a sense of urgency in demanding speedy upstream payment.[265]   And in October 2014, after Khodara had negotiated Defendants' illegal contract with Tlass, he too demanded urgency by instructing Benattar to effect payment "quickly."[266]   New York routing allowed Lafarge to achieve that objective.  Had Defendants tried to execute their U.S.-dollar wire transfers through some other means, their scheme would have become less effective, more expensive, and harder to conceal.

### B. Defendants Relied On U.S.-Based Email Providers To Carry Out Their Terrorist-Financing Scheme

326.    In carrying out their scheme to pay ISIS and ANF, Defendants also reached into the United States to avail themselves of U.S.-based email services.  Defendants' use of those services formed additional U.S. touchpoints and allowed Defendants to reap the benefit of their email providers' U.S. presence.   Those U.S.-driven benefits also materially contributed to Defendants' scheme and enhanced their ability to pay terrorists.

327.    As Lafarge and LCS have admitted, their executives "used personal email accounts serviced by U.S-based email service providers, instead of their LAFARGE corporate email

---

[262] Ex. 101 (ATA0014184 at -185).

[263] Ex. 120 (ATA0009942 at -942-43).

[264] *Supra* ¶¶ 228-69 (detailing New York-cleared transactions).

[265] Ex. 41 (ATA0005040 at -040) (conveying "urgency of payments" and stressing need to avoid "days" of delay); Ex. 28 (ATA0000220 at -222) (requesting fast transfer because of need to cover outgoing payment "urgently"); *id*. at -227 ("you are kindly requested to urgently ensure a transfer of 3 Musd ASAP allowing us to cover the daily Cash needs").

[266] Ex. 24 (ATA0032468 at -468) (certified English translation).

addresses, to carry out some aspects of the conspiracy."[267]   Mainly, that was Gmail.  During at least 2013 and 2014, Defendants regularly used U.S.-based Gmail accounts to plan their conspiracy.  On information and belief, Defendants sent and received hundreds of scheme-related communications through these and other such accounts:

| Account Owner | Role of Account Owner | Email Address |
|---|---|---|
| Bruno Pescheux | CEO of LCS until July 2014 | brunopescheux@gmail.com |
| Firas Tlass | Defendants' agent and intermediary who paid ISIS on their behalf | Firastlass01@gmail.com |
| Mamdouh al-Khaled | LCS Purchasing Manager | Mamdouh.lafarge@gmail.com |
| Hassan al-Saleh | LCS Plant Manager | Hassan.cement65@gmail.com |
| Ahmad Jamal | ISIS representative who supplied materials to LCS | Ahmad.jamal1966@gmail.com |

328.    Defendants and their agents routinely advanced their scheme to pay terrorists by sending emails to and from these U.S.-based accounts.  Plaintiffs set forth a few examples of these communications below.   These examples are illustrative, not exhaustive, and again reflect information without discovery.  On information and belief, discovery will uncover many additional email communications using these and other U.S.-based accounts:

a.    Pescheux (Gmail) to Tlass (Gmail), July 2, 2013:  Pescheux emailed Tlass to provide "clarifications" regarding Tlass's payments to armed groups in and around Jalabiyeh.  The email identified more than 10 groups Tlass was paying on Defendants' behalf – including ANF specifically – and conveyed Pescheux's understanding that "you are dealing with a lot of different people and I have no problem with that."  Pescheux sent this email from his Gmail account to Tlass's Gmail account.

b.    Tlass (Gmail) to Pescheux (Gmail), July 3, 2013:  Tlass responded by providing Pescheux a "road map to know how we pay" the armed groups in and around the Jalabiyeh plant, listing at least 14 such groups, including ANF.  Tlass sent this email from his Gmail account to Pescheux's Gmail account.

c.    Tlass (Gmail) to Pescheux (Gmail), March 31, 2014:  Tlass emailed Pescheux, among others, describing the "security situation in and around the plant area."  In his email, Tlass

---

[267] Plea Statement ¶ 18.

114

described the "Skype" calls he conducted with ISIS's "Amir Minbej or Raqa" [likely a reference to Abu Luqman] and noted that Lafarge made "$2 million profit" per month while "pay[ing] less than 1/4 for protection," including to ISIS. Tlass sent this email from his Gmail account to, among other addresses, Pescheux's Gmail account.

**d.**    Tlass (Gmail) to Pescheux (Gmail), July 14, 2014: Tlass wrote to Pescheux updating him on Tlass's "negotiations with ISIS" and expressing "confiden[ce] that we can reach to a logical agreement with them." Tlass sent this email from his Gmail account to Pescheux's Gmail account.

329.    Defendants' use of these email accounts was purposeful. As Lafarge and LCS admitted, their executives and agents used "U.S.-based email service providers," rather than their "corporate email addresses," in a conscious effort "to conceal their conduct from others within and outside of LAFARGE and LCS."[268] That strategy implemented Lafarge's directive, conveyed by Khodara, to avoid creating discoverable email records of terrorist payoffs. As Pescheux wrote in a September 8, 2014 email from his Gmail address to Jolibois's personal email address, Khodara had instructed him not to email Herrault "at his professional address."[269] That instruction followed Khodara's broader dictate that he not "receive anything" about the conspiracy "by email."[270] That is why Pescheux used Gmail to communicate about the ISIS payoffs. It reflected a conscious choice, in line with guidance from Lafarge's headquarters.

330.    Defendants' decision to carry out their criminal conspiracy via Gmail, rather than corporate email, matched standard practice among terrorists and their funders. According to security analysts quoted by the *Associated Press*, "super-encrypted corporate emails are unlikely to be used by militants, ***who prefer more anonymous technologies, like Gmail***."[271]

---

[268] *Id.* ¶ 18.

[269] *Id.* ¶ 88; *see* Ex. 121 (9/12/2014 Herrault-Veillard Email String) (certified English translation).

[270] Ex. 121 (9/12/2014 Herrault-Veillard Email String) (certified English translation).

[271] Assoc. Press, *republished in* Hamilton Spectator, *RIM Averts BlackBerry Ban In India* (Aug. 31, 2010).

331.   Defendants' and their agents' use of these U.S.-based email accounts also entailed substantial U.S. contacts.  In both opening and using those accounts, Defendants and their agents reached into the United States in several ways.

332.   **Defendants Transacted With A U.S. Counterparty.**  Defendants' agents relied on an email service owned and operated out of the United States by a U.S.-headquartered company. When they used their Gmail accounts, they agreed to Google's Terms of Service, which in 2013 made clear that Gmail was "provided by Google, Inc. ("Google"), located at 1600 Amphitheatre Parkway, Mountain View, CA 94043, United States."  Defendants thus knew that they were carrying out their conspiracy using a U.S.-based service "provided by" a U.S.-based company. Defendants also agreed that the "laws of California, U.S.A., excluding California's conflict of laws rules, will apply to any disputes arising out of or relating to these terms or the Services," including Gmail.  Defendants further agreed that they would not "misuse" Gmail and that they would use Google's services "only as permitted by law."  Defendants conveyed those agreements into the United States as a condition of accessing Gmail's U.S.-based service.

333.   Defendants also obtained Gmail's services by sending their data to Google in the United States.  In using Gmail, Defendants knowingly allowed their data to be transferred into the United States for Google's data-mining activities, which were used in the United States for (among other things) targeted search suggestions and ad sales.  Defendants did so in part by agreeing that Google could scan the contents of their emails – a process directed by engineers in the United States – to "provide customized advertising to its email users."[272]

334.   Defendants knew they were providing their valuable data to an American company because it was widely reported at the time.  In one example, CNN reported in April 2014 that,

---

[272] Anna Bernasek, *Encryption Protects Gmail From Everyone But Google*, Newsweek (July 4, 2014).

116

although Google "may not charge for its Gmail accounts," it was "still collecting payment in the form of massive amounts of personal information about the people who use it."[273]  Thus, when Defendants signed up for Gmail and used it to carry out their scheme, they knew they were paying an American company for the American service they were using.  But rather than sending a wire transfer delivering cash to their U.S. counterparty, they delivered their data.

335.    **Defendants' Email Communications Relied On U.S. Infrastructure.**  By using Gmail to carry out and conceal their scheme, Defendants and their agents exploited a service that was created, engineered, and maintained in the United States.  During the time of Defendants' conspiracy, Google operated the majority of its data centers in the United States, which enabled Defendants' conspiracy-related emails to reach their destinations securely and reliably.  Those U.S.-based servers were important in part because they provided Google with the ability to back up Gmail customers' data in the United States, which minimized outages and enhanced reliability.  On information and belief, the bulk of Defendants' conspiracy-related Gmail communications traveled through or were stored at least in part on U.S.-based servers.

336.    **Defendants' Use Of U.S. Email Servers Offered Them The Benefits Of U.S. Law.**  Gmail's status as a U.S.-owned and -operated service also afforded Defendants protection from foreign law enforcement, including French prosecutors.  That is because U.S. law placed constraints on U.S.-based communications providers like Google when releasing customer data to foreign governments.  As one British paper explained, European law enforcement officials generally could not "get[] access to the secret Gmail . . . messages of terrorists" because, "[c]urrently, US internet giants are banned from handing over emails and private messages to

---

[273] Heather Kelly (CNN Money Reporter), *Why Gmail And Other E-mail Services Aren't Really Free*, CNN Business (Apr. 1, 2014), https://tinyurl.com/39jtbv83.

117

foreign law enforcement officials in all but a tiny number of cases."[274]  That restriction was in place "[b]ecause Google is a US-based company," which meant that requests for Gmail data "f[ell] squarely under US law."[275]  Defendants thus knew that, had they chosen to use non-U.S.-based email, their communications would have been more susceptible to surveillance by French law enforcement – the authority otherwise most likely to discover their scheme, stop it, and bring criminal charges against the individuals involved.  Indeed, Lafarge and several of the executives outlined above are currently facing criminal charges in France for having funded terrorists.

337.    The experience of India's counterterrorism agencies was typical of how terrorists leveraged Gmail's U.S. presence to stymie foreign law enforcement.  According to Indian officials, "since Google servers are based in US and their IP addresses are masked, it takes a long time to get the real IP addresses and log details of the culprits" who used Gmail for criminal purposes.[276]  For that reason, "Indian security agencies" had a "tough time in catching criminals and terrorists who are [customers] of Google-owned Gmail."  On information and belief, similar logic applied in France, Dubai, and Syria – where Defendants and their agents used Gmail to communicate about their criminal conspiracy with added protection from local law enforcement.

338.    These well-known features made Gmail especially attractive for terrorists and their funders.  In 2013, for example, the *Washington Post* published a high-profile story with the

---

[274] Ben Riley-Smith, *Britain On The Brink Of Gaining Access To Terrorists' Facebook And Gmail Messages For First Time*, Telegraph Online (Mar. 22, 2018), 2018 WLNR 8844426; *see* Daily Telegraph, *Net Closes On Terror As US Law Lifts Lid On Messaging* (Mar. 23, 2018), 2018 WLNR 8865323 ("[c]urrently, US internet giants hand over" "secret Gmail . . . messages sent by terrorists" "to foreign law enforcement bodies only in exceptional cases").

[275] Zack Whittaker, *What Google Does When A Government Requests Your Data*, ZDNet (Jan. 28, 2013), https://tinyurl.com/4ydf7v7j; *see id.* (when requests originated from "outside the US," Google "[didn't] really have the same level of requirement to hand over data to foreign governments or law-enforcement");

[276] Economic Times, *Orkut Won't Let Cops Hack Terrorists* (Dec. 12, 2006), 2006 WLNR 27469168.

headline, "***Former NSA and CIA director says terrorists love using Gmail***."[277] The article then quoted General Michael Hayden observing, "***Gmail is the preferred Internet service provider of terrorists*** worldwide," and noting, "I don't think you're going to see that in a Google commercial, but it's free, it's ubiquitous, so of course it is" a frequently used platform for terrorist communications.[278]  As the *Post* reported, General Hayden also described "the Internet's origins in the United States" and stated, "We built it here, and it was quintessentially American."[279]  When Defendants used Gmail to advance their scheme, therefore, they knowingly exploited an iconic American service commonly used by terrorists around the globe.

### C.    Defendants Entered A Conspiracy With ISIS, Pursuant To Which ISIS Engaged In Acts That Targeted The United States

339.    As alleged herein, Defendants entered a conspiracy with ISIS whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within those countries.

340.    ISIS was good for Lafarge's business in Syria.  Most fundamentally, ISIS's terrorist activities helped drive from Syria virtually every other Western company, leaving Lafarge with minimal competition for the Syrian market.  So long as the terrorists remained in power, Lafarge's unusual willingness to do business with them gave it a unique opportunity to seize market share.  ISIS's protection racket also delivered Lafarge a more specific benefit:  the ability to partner with terrorists who were willing and able to threaten Lafarge's competitors.  That is why Defendants "commit[ted] to revenue sharing with ISIS" and sought to "incentivize the terrorist group to act in

---

[277] Andrea Peterson, *Former NSA And CIA Director Says Terrorists Love Using Gmail*, Washington Post (Sept. 15, 2013) (emphasis added).

[278] *Id*.

[279] *Id*.

LCS's economic interest."[280] Their commitment worked, at least for a time. Defendants' Syrian business was profitable in part because ISIS "agreed to impose costs on, and in some cases block the importation of, competing cement."[281]

341. The existence of a Lafarge-ISIS conspiracy – reflected in Defendants' purposeful "agreements with ISIS"[282] – is undisputed and apparent on the face of Lafarge's guilty plea. The plea confirmed, among other things, that Lafarge and LCS executives sought to actively partner with ISIS and "*share the 'cake'*" of their mutual enterprise – with Lafarge executives reasoning that it was important for ISIS to have a "vested interest to have the [Jalabiyeh] plant run well."[283] That sentiment reflected Lafarge's recognition that ISIS could be good for business. As LCS's former risk manager admitted, Lafarge expected that "Nusra Front, later ISI[S]," would use their "effective and disciplined fighters" to "bring order to the chaos of corruption that reigned in northern Syria." The resulting relationship went beyond passive payments. As Deputy Attorney General Monaco stated, Lafarge "*partnered with ISIS*, one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share."[284]

342. Terrorist violence was vital to that agreement. For Lafarge to reap the benefits of its conspiracy with ISIS, two things had to be true: (1) ISIS had to retain control of its territory; and (2) ISIS's protection rackets had to remain effective against Lafarge's would-be competitors. Neither could work without terrorist violence and coercion. For example, as *Janes*, the iconic defense industry publication, observed, ISIS "relies on informants and operatives who threaten

---

[280] Plea Statement ¶ 73.

[281] *Id.* ¶ 15.

[282] *Id.* ¶ 18.

[283] *Id.* ¶ 73 (emphasis added).

[284] U.S. Dep't of Justice, *Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations* (Oct. 18, 2022) (emphasis added).

and pressure the local population to pay extortion money.  Islamic State's ***frequent small arms and improvised explosive device (IED) attacks*** . . . ***act as a reminder*** of the imminent threat and presence of the militants."[285]  Violence thus was crucial to the racket, because it lent credence to ISIS "intimidation" and "pressure" on local entities to "pay levies" the group demanded.[286]

343.    ISIS religious doctrine confirmed that violence underpinned the conspiracy Defendants joined.   For example, official ISIS propaganda notified the public, including Defendants, that ISIS would spend protection payments to "support[] jihad"; and that ISIS's maintenance of the racket was backed by the threat of violence against others, including the potential to execute ISIS's enemies.  Similarly, ISIS offered a purported religious mandate for its taxes, with punishments (including execution) threatened against those who did not pay.  When Defendants cooperated with ISIS in advancing this protection racket, they joined a conspiracy whose stated rationale revolved around the perpetration of terrorist violence.

344.    In furtherance of this conspiracy, ISIS engaged in numerous overt acts both in and expressly aimed at the United States.  In building their territorial control and strengthening their protection racket, ISIS committed many terrorist attacks aimed at the United States.  As Deputy Attorney General Monaco stated in connection with Lafarge's and LCS's guilty plea, during the Defendants' conspiracy, the rest of "the world watched in horror as ISIS murdered innocent journalists and aid workers," inflicting "unimaginable pain and suffering" on "American families whose loved ones were brutally murdered by ISIS."[287]  ISIS publicly celebrated those acts and

---

[285] Shady Alkhayer, *Money Flow:  Islamic State Continues To Finance Operations In Central Syria Through Extortion And Intimidation*, Janes (Sept. 2, 2022), 2022 WLNR 27802943 (emphasis added).

[286] *Id*.

[287] U.S. Dep't of Justice, *Deputy Attorney General Lisa O. Monaco Delivers Remarks Announcing A Guilty Plea By Lafarge On Terrorism Charges* (Oct. 18, 2022).

made clear, both before and during Defendants' conspiracy, that its efforts to grow its caliphate relied on an ongoing terrorist campaign aimed at the United States.

345.   ISIS's specific attacks on Plaintiffs also furthered the conspiracy.  For example, ISIS captured and beheaded James Foley and Steven Sotloff to send a message of intimidation and control, including by publicizing the brutal murders in videos titled "A Message to America" and "A Second Message to America," respectively.  The capture of these American journalists helped ISIS's conspiracy with Defendants by strengthening ISIS's territorial control and bolstering the credibility of ISIS's threats against others, including Lafarge's competitors.

346.   Scholarly analyses confirm that connection.  As terrorism scholars Clarke and Williams wrote, "Da'esh . . . used kidnapping as a weapon against its enemies—particularly the United States" given that the U.S. government "refused to pay[] ransoms for the release of its citizens" and therefore ISIS believed that attacks that targeted Americans could serve as "an important fund-raising method" like "was done with U.S. journalist James Foley" because "***the great virtue of kidnapping is that it can be used symbolically*** to spread fear and deliver a message of defiance."  They continued:

> This was done with U.S. journalist James Foley who was captured in 2012; a video of his execution was released in August 2014.  Although Da'esh in an e-mail communication with Foley's family had demanded millions for his release, how serious this was remains uncertain.  After Foley was executed, Da'esh, in what Cragin and Padilla contend was an attempt to ***embarrass and humiliate the United States***, claimed that Obama was to blame.  Yet the profit motive might also have been present:  the ***killing of Foley certainly increased the pressure to pay for the release of hostages*** from other countries to ensure they did not share the same fate.[288]

---

[288] Clarke & Williams, *Da'esh In Iraq And Syria* at 33 (emphasis added).

As that analysis illustrates, protection rackets work only if the threat of violence is credible. And ISIS could make good on its promise block competing cement only if it convinced Lafarge's competitors that there would be consequences if they said no.

347.    There was no more effective way for ISIS to accomplish those goals than to publicly kill and maim Americans. Given the United States' status as the sole global superpower, ISIS's public attacks on Americans conveyed unique credibility to its enemies. For example, as Dr. Daniel Byman explained in 2014, ISIS perpetrated "[a]cts of senseless violence and unspeakable brutality" that targeted the United States because:

> Videos showing the beheadings of captured US . . . citizens in particular are ***designed to send a message to American . . . people***:    stay out of our business. . . . Islamic State believes that the people in [America] are reluctant to become entangled in yet another war in the Middle East and that savagely murdering an American . . . each time the US . . . government starts to get involved will make them even more so. They [believe] that the United States does not have the stomach for a tough fight and will pull out of a conflict as soon as Americans start getting killed.[289]

348.    Given the United States' unique military credibility, ISIS's attacks on U.S. allies and Americans in Syria, including Plaintiffs, likewise furthered the conspiracy. As described, *supra*, Part VIII, the YPG and SDF were critical U.S. allies in defeating ISIS. Americans trained them, supported them with aerial strikes in combat, and were embedded with them, whether as volunteers or as U.S. military servicemembers. This made them an even greater target for ISIS. As Secretary of Defense Ashton Carter publicly observed in 2016, "ISIL has demonstrated a clear intent to target U.S. servicemembers and facilities."[290]    ISIS, and AQI before it, long touted the

---

[289] Daniel Byman, *Al Qaeda, The Islamic State, And The Global Jihadist Movement: What Everyone Needs To Know* 175-77 (Oxford Univ. Press 2015).

[290] Secretary of Defense Ash Carter, *quoted in* Federal News Service Transcripts, *Secretary Of Defense Ash Carter Delivers Remarks At The NORAD And U.S. Northern Command Change-Of-Command Ceremony* (May 13, 2016), 2016 WLNR 14688349.

unique symbolic value of its attacks on U.S. servicemembers, which the terrorists used to amplify their broader message to everyone in Syria that ISIS remained a threat and that America was weak.[291]

349.    ISIS's attacks targeting the United States, and its allies, including its attacks seeking to kill and maim Americans in Syria, including Plaintiffs, also uniquely powered ISIS's recruitment of jihadists to commit attacks because ISIS relied upon a recruitment narrative centered upon ISIS's purported jihad against America.  For example, as President Obama observed in 2015, "Al Qaeda and ISIL . . . are desperate for legitimacy" and "try to portray themselves as . . . holy warriors in defense of Islam": "That's why ISIL . . . propagate[s] the notion that America . . . is at war with Islam.  That's how they recruit."[292]

350.    ISIS also reached into the United States to further the conspiracy.  For example, ISIS transmitted threats to the United States, as part of its strategy to intimidate the United States.  Other acts involved former residents of this District.  For example, on May 24, 2022, a federal jury in this District convicted Mirsad Kandic – a former Brooklyn resident – of providing material support to ISIS, including by assisting ISIS's media department and facilitating travel for ISIS terrorists.[293]  On February 7, 2023, another federal jury in this District convicted Ruslan Asainov, a former Brooklyn resident, of similar crimes for providing sniper training to ISIS fighters.[294]  ISIS

---

[291] *See, e.g.*, Daily Telegraph (UK), *Four US Troops Killed As ISIL Shows It Is Still Deadly Threat In Syria* (Jan. 17, 2019), 2019 WLNR 1580204 (reporting that ISIS's murder of "four American servicemen," who "were killed in an ISIL suicide bombing in northern Syria" had "put[] into question" whether "the Islamist group ha[d] been defeated" and quoting "Charles Lister, director of countering terrorism and extremism at the Washington-based Middle East Institute" that the "attack show[ed] to all concerned . . . that the reality on the ground" in Syria and Iraq was such that "the battle against ISIL [was] far from over").

[292] President Barack Obama, *Remarks by the President in Closing of the Summit on Countering Violent Extremism*, White House (Feb. 18, 2015), https://tinyurl.com/mr3ek3zz.

[293] Jury Verdict, *United States v. Kandic*, No. 17-cr-00449-NGG (E.D.N.Y. May 24, 2022), Dkt. 321.

[294] Jury Verdict, *United States v. Asainov*, No. 19-cr-00402-NGG (E.D.N.Y. Feb. 7, 2023), Dkt. 167.

124

also sought to finance other attacks in the United States including by sending thousands of dollars to Maryland resident Mohamed Elshinawy in 2016 to encourage terror attacks.

351.    ISIS enticed hundreds of U.S. citizens to join its ranks by targeting the United States for recruitment.  Roughly 300 U.S. citizens joined or attempted to join ISIS, in part because ISIS tailored its propaganda to U.S. audiences.  For example, ISIS members sought to capitalize on unrest in Ferguson, Missouri and Baltimore, Maryland, asking protestors in those cities to join ISIS.  ISIS also sent money to U.S. citizens to fund terror attacks on U.S. soil and sought and received funding from U.S. citizens to finance operations in Syria and Iraq.

352.    The U.S. government has recognized, on a bipartisan basis, that ISIS specifically targeted the United States and Americans for attack.  For example, in 2022, the White House observed that "ISIS has directed terrorist operations targeting Americans . . . in the Middle East, Africa, and in South Asia,"[295] which echoed a White House observation in 2018 that "ISIS remain[ed] the . . . primary transnational terrorist threat to the United States" . . . "and its senior leaders continue to call for attacks against the United States,"[296] similar to the view expressed by the U.S. government, in 2015, that ISIS's "strength and expansionist agenda pose an ongoing threat to . . . U.S. facilities and personnel in [] the Middle East."[297]

353.    ISIS's contacts with the United States and Americans were foreseeable to Defendants.  Defendants were aware that the U.S. government had designated ISIS as an FTO because of its shocking acts of violence against U.S. citizens.  As Assistant Attorney General Olsen explained, Defendants partnered with ISIS and ANF "at a time those groups were brutalizing

---

[295] President Joseph R. Biden, Jr., *quoted in* White House, *Remarks by President Biden on a Successful Counterterrorism Operation* (Feb. 3, 2022), https://tinyurl.com/4vcfbsd6.

[296] White House, *National Strategy for Counterterrorism of the United States of America*, at 8 (Oct. 1, 2018).

[297] U.S. Dep't of Treasury, *National Terrorist Financing Risk Assessment*, at 12 (Aug. 24, 2015).

innocent civilians in Syria and actively plotting to harm Americans."[298]   And Defendants were aware of ISIS's desire to eject U.S. forces from the region and of their frequent acts of violence to that end.  That knowledge came in part from Defendants' long awareness of AQI, which they knew had conducted a brutal terrorist campaign against U.S. citizens in the Middle East.  Indeed, Defendants specifically understood – in part through Tlass and LCS's former risk manager – that ISIS and ANF were AQI's successors and were continuing AQI's terrorist campaign against the United States.  The attacks on Plaintiffs and their families, as well as ISIS's other U.S. contacts, were a foreseeable outgrowth of the conspiracy that Defendants voluntarily joined.

354.    Given Defendants' knowledge of AQI's (and later ANF's and ISIS's) practice of targeting of U.S. nationals, and fighting the U.S. in Syria, based on multiple U.S. government statements and warnings to that effect, Defendants' illegal payments directly to those groups independently constituted conduct that was expressly aimed at the United States.

## XIII.  <u>ACTS OF INTERNATIONAL TERRORISM THAT RESULTED IN PLAINTIFFS' INJURIES</u>

355.    The millions of dollars Defendants gave as material support to FTOs substantially assisted sophisticated ISIS attacks against Americans fighting ISIS in Syria.  Each of the attacks occurred after Defendants' payments to ISIS, each attack was carried out in areas near the Cement Plant or Raqqa, where the payments were directed, and each attack benefited directly from these payments.  Defendants' material support was linked directly to each of these attacks targeting the United States and Americans in Syria in areas close to Defendants' Cement Plant through the participation of ISIS's Leadership Cell, Raqqa Cell, and Abu Luqman, as well as its sale and delivery of cement to ISIS.

---

[298] U.S. Dep't of Justice, *Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations* (Oct. 18, 2022).

**Family of Levi Shirley**

356.    Levi Shirley was domiciled in the state of Colorado.

357.    In January 2015, Levi Shirley traveled to Syria to work alongside the YPG to defend the Yazidi people against ISIS.  He was known in Kurdish as Heval Agir.

358.    Levi Shirley was killed on July 14, 2016 by an improvised explosive device planted by ISIS in Manbij, Syria.

359.    Plaintiff Susan Shirley is a citizen of the United States and domiciled in the state of Colorado.  She is the mother of Levi Shirley.

360.    Plaintiff Caitlin Shirley is a citizen of the United States and domiciled in the state of Colorado.  She is the sister of Levi Shirley.

361.    As a result of the attack and the death of Levi Shirley, Plaintiffs Susan Shirley and Caitlin Shirley have experienced economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss of their son and brother's society, companionship, comfort, advice, and counsel.

**Francisco Molinar and Family**

362.    Plaintiff Francisco Molinar is domiciled in the state of Arizona.

363.    In July 2015, he traveled to Syria to work alongside the YPG to defend the Yazidi people against ISIS.

364.    Plaintiff Francisco Molinar was permanently injured on June 9, 2016 by an ISIS assault on his unit's position in Manbij, Syria.

365.    Plaintiff Frank Molinar is a citizen of the United States and domiciled in the state of Arizona.  He is Plaintiff Francisco Molinar's father.

366.    Plaintiff Debra Austrum is a citizen of the United States and domiciled in the state of Texas.  She is Plaintiff Francisco Molinar's mother.

367.    Plaintiff Elizabeth Ashley Molinar is a citizen of the United States and domiciled in the state of Arizona.  She is Plaintiff Francisco Molinar's sister.

368.    Plaintiff Destiny English is a citizen of the United States and domiciled in the state of Arizona.  She is Plaintiff Francisco Molinar's sister.

369.    As a result of the attack, Plaintiffs Francisco Molinar, Frank Molinar, Debra Austrum, Elizabeth Ashley Molinar, and Destiny English have experienced economic injuries, severe mental anguish and extreme emotional pain and suffering.

**Porter Goodman and Family**

370.    Plaintiff Porter Goodman is domiciled in the state of Utah.

371.    In January 2016, he traveled to Syria to work alongside the YPG to defend the Yazidi people against ISIS.  Plaintiff Porter Goodman served as a medic in the fight against ISIS to defend the Yazidi people.

372.    Plaintiff Porter Goodman was permanently injured on July 14, 2016 by an improvised explosive device planted by ISIS in Manbij, Syria.

373.    Plaintiff Dale Goodman is a citizen of the United States and domiciled in the state of California.  He is Plaintiff Porter Goodman's father.

374.    Plaintiff Teresa Goodman is a citizen of the United States and domiciled in the state of California.  She is Plaintiff Porter Goodman's mother.

375.    Plaintiff Ian Goodman is a citizen of the United States and domiciled in the state of Utah.  He is Plaintiff Porter Goodman's brother.

376.    Plaintiff Levi Goodman is a citizen of the United States and domiciled in the state of Utah.  He is Plaintiff Porter Goodman's brother.

377.    Plaintiff Tannis Goodman is a citizen of the United States and domiciled in the state of Montana.  She is Plaintiff Porter Goodman's sister.

378.    Plaintiff Jessica Wagner is a citizen of the United States and domiciled in the state of California.  She is Plaintiff Porter Goodman's sister.

379.    As a result of the attack, Plaintiffs Porter Goodman, Dale Goodman, Teresa Goodman, Ian Goodman, Levi Goodman, Tannis Goodman and Jessica Wagner have experienced economic injuries, severe mental anguish and extreme emotional pain and suffering.

**Freeman Stevenson and Family**

380.    Plaintiff Freeman Stevenson is domiciled in the state of Utah.

381.    In January 2016, he traveled to Syria to work alongside the YPG to defend the Yazidi people against ISIS.

382.    Plaintiff Freeman Stevenson was injured on August 3, 2016 by gunfire during an ISIS attack in Manbij, Syria, and was injured again on August 18, 2016 by a grenade thrown by ISIS fighters in Dahr al-Maghayer, Syria, and continued to fight in Manbij and surrounding areas until October 2016.

383.    Plaintiff Robert Stevenson is a citizen of the United States and domiciled in the state of Utah.  He is Plaintiff Freeman Stevenson's father.

384.    Plaintiff Paige Atwood is a citizen of the United States and domiciled in the state of Utah.  She is Plaintiff Freeman Stevenson's sister.

385.    Plaintiff Meghan Stevenson is a citizen of the United States and domiciled in the state of Utah.  She is Plaintiff Freeman Stevenson's sister.

386.    As a result of the attack, Plaintiffs Freeman Stevenson, Robert Stevenson, Paige Atwood, and Meghan Stevenson have experienced economic injuries, severe mental anguish and extreme emotional pain and suffering.

**Family of Jacob Klipsch**

387.    Jacob Klipsch was domiciled in the state of Indiana.

388.    In December 2015, Jacob Klipsch traveled to Syria to work alongside the YPG to defend the Yazidi people against ISIS.  He was known in Kurdish as Delîl Emerîka.

389.    Jacob Klipsch was injured on August 3, 2016 by gunfire during an ISIS attack Manbij, Syria.  He witnessed two other Americans fighting alongside him killed by ISIS gunfire and an ISIS IED.  He continued working alongside the YPG until his death in Syria in January 2018.

390.    Plaintiff M. N.-K. is represented as next friend by his mother Chelsea Niehaus.  Plaintiff M. N.-K. is a citizen of the United States and domiciled in the state of Louisiana.  He is Jacob Klipsch's minor son.

391.    Plaintiff L. N-K. is represented as next friend by her mother Chelsea Niehaus.  Plaintiff L. N.-K. is a citizen of the United States and domiciled in the state of Louisiana.  She is Jacob Klipsch's minor daughter.

392.    As a result of the attack and the death of Jacob Klipsch, Plaintiffs M. N.-K. and L. N.-K. via next friend Chelsea Niehaus have experienced economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss of their father's society, companionship, comfort, advice, and counsel.

**Family of William Savage**

393.    William Savage was domiciled in the state of North Carolina.

394.    In January 2015, William Savage traveled to Syria to work alongside the YPG to defend the Yazidi people against ISIS.  He was known in Kurdish as Amed Kobane.

395.    William Savage was killed on August 10, 2016 by ISIS mortar fire while helping families escape from ISIS-occupied Manbij, Syria.

396.    Plaintiff Reginald Savage is a citizen of the United States and domiciled in the state of North Carolina.  He is the father of William Savage.

397.    Plaintiff Brenna Savage is a citizen of the United States and domiciled in the state of Maryland.  She is the sister of William Savage.

398.    As a result of the attack, and the death of William Savage, Plaintiffs Reginald Savage and Brenna Savage have experienced economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss of their son and brother's society, companionship, comfort, advice, and counsel.

**Family of Paolo Todd**

399.    Paolo Todd was domiciled in the state of California.

400.    In November 2016, Paolo Todd travelled to Syria to work alongside the YPG to defend the Yazidi people against ISIS.  He was known in Kurdish as Kawa Ahmed.

401.    He was killed by an improvised explosive device planted by ISIS in Al-Suwaydiya, Syria on January 15, 2017.

402.    Plaintiff David Todd is a citizen of the United States and domiciled in the state of Maryland.  He is the father of Paolo Todd.

403.    Plaintiff Rachel Todd is a citizen of the United States and domiciled in the state of Maryland.  She is the mother of Paolo Todd.

404.    Plaintiff Ricardo Todd is a citizen of the United States and domiciled in the state of Maryland.  He is the brother of Paolo Todd.

405.    As a result of the attack, and the death of Paolo Todd, Plaintiffs David Todd, Rachel Todd, and Ricardo Todd have experienced economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss of their son and brother's society, companionship, comfort, advice, and counsel.

**Family of Robert Grodt**

406.    Robert Grodt was domiciled in the state of New York.

131

407.     In early 2017, Robert Grodt traveled to Syria to work alongside the YPG to defend the Yazidi people against ISIS.  He was known in Kurdish as Demhat Goldman.

408.     He was killed by an explosive device planted by ISIS during a battle outside the city of Raqqa on July 6, 2017.

409.     Plaintiff Tammy Grodt is a citizen of the United States and domiciled in the state of California.  She is Robert Grodt's mother.

410.     Plaintiff T. G. is represented as next friend by her mother Kaylee Dedrick.  Plaintiff T.G. is a citizen of the United States and domiciled in the state of New York.  She is Robert Grodt's minor daughter.

411.     Plaintiff Meghann Conforti is a citizen of the United States and domiciled in the state of California.  She is Robert Grodt's sister.

412.     Plaintiff Stephanie Dawson is a citizen of the United States and domiciled in the state of California.  She is Robert Grodt's sister.

413.     Plaintiff Emily Grodt is a citizen of the United States and domiciled in the state of California.  She is Robert Grodt's sister.

414.     Plaintiff John Grodt is a citizen of the United States and domiciled in the state of California.  He is Robert Grodt's brother.

415.     As a result of the attack, and the death of Robert Grodt, Plaintiffs Tammy Grodt, T.G. via next friend Kaylee Dedrick, Meghann Conforti, Stephanie Dawson, Emily Grodt, and John Grodt have experienced economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss of their son, father, and brother's society, companionship, income, comfort, advice, and counsel.

**Family of David Taylor II**

416.    David Taylor II was a former U.S. Marine who served his country from 2012-2016 with two tours of duty, including a ten-month tour in Afghanistan.

417.    David Taylor II was domiciled in the state of West Virginia.

418.    In May 2017, David Taylor II travelled to Syria to work alongside the YPG to defend the Yazidi people against ISIS.  He was known in Kurdish as Zafer Qerecox.

419.    He was killed by an ISIS improvised explosive device in Raqqa, Syria on July 16, 2017.

420.    Plaintiff David Taylor, Sr. is a citizen of the United States and domiciled in the state of West Virginia.  He is the father of David Taylor II.

421.    Plaintiff Rebecca Taylor is a citizen of the United States and domiciled in the state of Florida.  She is the mother of David Taylor II.

422.    Plaintiff Kaitlyn Doxie is a citizen of the United States and domiciled in the state of Pennsylvania.  She is the sister of David Taylor II.

423.    Plaintiff Lauren Samuels is a citizen of the United States and domiciled in the state of Colorado.  She is the sister of David Taylor II.

424.    As a result of the attack, and the death of David Taylor II, Plaintiffs Kaitlyn Doxie, Rebecca Taylor, David Taylor, Sr., and Lauren Samuels have experienced economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss of their son and brother's society, companionship, comfort, advice, and counsel.

## COUNT ONE:  VIOLATION OF THE ATA, 18 U.S.C. § 2333(d)
### (JASTA, Aiding and Abetting Liability)

425.    Plaintiffs incorporate their allegations above.

133

426.    Lafarge S.A. and LCS pleaded guilty to violating 18 U.S.C. § 2339B in the Eastern District of New York on October 18, 2022.

427.    The United States has designated ISIS as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2004 under the name Al-Qaeda in Iraq and, later, under the name of ISIS and associated aliases.

428.    The United States has designated ANF as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2012.

429.    ISIS and ANF committed violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, and that would be a criminal violation if committed within the jurisdiction of the United States or of any State; including the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, rape, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing government facilities, financing terrorism, forced labor, and trafficking.  ISIS's and ANF's acts violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2339C(a)(1)(B), 2339D, 1589, and 1590.  Defendants, ISIS, and ANF structured their transactions to disguise the nature of their support, in further violation of 18 U.S.C. § 2339A.  Defendants knew that their substantial assistance and material support would be used by FTOs in the preparation for, or in carrying out, the above acts.

430.    ISIS's and ANF's acts appeared to be intended to intimidate or coerce civilian populations of Syria and the United States, among others, to influence the policy of the Syrian,

134

American, and other governments by intimidation or coercion, and to affect the conduct of a government by mass destruction, assassination, or kidnapping.

431. ISIS's and ANF's attacks occurred primarily outside the territorial jurisdiction of the United States, and transcended national boundaries in terms of the means by which they were accomplished, the persons they appeared intended to intimidate or coerce, and the locale in which their perpetrators operated.

432. Defendants aided and abetted ISIS's and ANF's acts of international terrorism by knowingly providing substantial assistance, including by making cash and covert payments through the U.S. financial system and foreign shell companies and intermediaries to, purchasing raw material from, selling cement to, and making revenue-sharing agreements with the FTOs, and by failing to safely shut down and evacuate the Cement Plant, thereby placing tons of valuable cement and raw materials, including materials that can be used to make explosives, in the hands of ISIS. Defendants knew that their material support was provided to FTOs and would be used to commit acts of international terrorism.

433. Defendants provided substantial support to ISIS and ANF, knowing that the reasonable and foreseeable risk—and occurrence in fact—was that the FTOs would in turn perform numerous wrongful acts, including the murder of thousands of civilians, among them U.S. citizens and relatives of Plaintiffs. Defendants were generally and specifically aware of the FTOs' tortious, terrorist scheme, and their role in it. Defendants were generally and specifically aware that their actions would put further resources into FTOs' hands to commit further terrorist acts. Defendants therefore knowingly and substantially aided and abetted the FTOs, including ISIS, in committing the acts of international terrorism that injured Plaintiffs.

434.    The terrorist attacks committed by ISIS and/or ANF were intended to intimidate and coerce the civilian populations of Syria and the United States; to influence through intimidation or coercion the policy of the governments of Syria and the United States; and to affect the conduct of the governments of Syria and the United States by means of mass destruction, assassination, and kidnapping.

435.    The terrorist attacks committed by ISIS and/or ANF occurred primarily outside the territorial jurisdiction of the United States and transcended national boundaries in terms of their means, locations, and intended audiences.

436.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the estate, survivors, or heirs of U.S. nationals who suffered such injuries; or both.

437.    As a result of Defendants' violation of 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT TWO:  VIOLATION OF THE ATA, 18 U.S.C. § 2333(d)**
**(JASTA, Conspiracy Liability)**

438.    Plaintiffs incorporate their allegations above.

439.    Defendants entered a conspiracy with ISIS whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within that territory, in violation of (among other statutes) 18 U.S.C. §§ 2339A, 2339B, and 2339C.

440.    ISIS's acts of international terrorism targeting U.S. citizens, including the attacks that killed and injured Plaintiffs, furthered the overall object of Defendants' conspiracy and were a foreseeable consequence of that conspiracy.

136

441. Continuously since 2004, the United States has designated ISIS and ANF as FTOs, under various names, under 11 U.S.C. § 1189.

442. Lafarge and LCS pleaded guilty in the United States District Court for the Eastern District of New York to conspiring to provide material support to ISIS and ANF, in violation of 18 U.S.C. § 2339B(a)(1).

443. The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism committed by ISIS and/or ANF. They were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the territorial jurisdiction of the United States or of the States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2339C(a)(1)(B), and 2339D.

444. The terrorist attacks committed by ISIS and/or ANF were intended to intimidate and coerce the civilian populations of Syria and the United States; to influence through intimidation or coercion the policy of the governments of Syria and the United States; and to affect the conduct of the governments of Syria and the United States by means of mass destruction, assassination, and kidnapping.

445. Defendants also entered a related conspiracy with ISIS and ANF with the overall goal of providing material support for those organization in violation of 18 U.S.C. § 2339B. Defendants, ISIS, and ANF also structured their transactions to disguise the nature of their support, in violation of 18 U.S.C. § 2339A. These FTOs foreseeably attacked civilians, including U.S. civilians, throughout the conspiracy, with Defendants' knowledge. A foreseeable and indeed inevitable outcome of that conspiracy was the terrorist acts that caused Plaintiffs' injuries.

137

446.    The terrorist attacks committed by ISIS and/or ANF occurred primarily outside the territorial jurisdiction of the United States and transcended national boundaries in terms of their means, locations, and intended audiences.

447.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the estate, survivors or heirs of U.S. nationals who suffered such injuries; or both.

448.    As a result of Defendants' violation of 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and noneconomic damages, including solatium damages.

## JURY DEMAND

449.    In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Plaintiffs request that the Court:

(a)    Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b)    Award Plaintiffs compensatory damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(d);

(c)    Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(d);

(d)    Award Plaintiffs prejudgment interest; and

(e)    Award Plaintiffs any such further relief the Court deems just and proper.

Dated:  July 30, 2025

Respectfully submitted,

By: /s/ *Lee Wolosky*
Lee Wolosky
Andrew J. Lichtman
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
212-728-8000
lwolosky@willkie.com
alichtman@willkie.com

Todd C. Toral
JENNER & BLOCK LLP
2029 Century Park East
Los Angeles, CA 90067
213-239-2294
ttoral@jenner.com

Brent Caslin*
JENNER & BLOCK LLP
515 S. Flower Street
Los Angeles, CA 90071
213-239-5100
bcaslin@jenner.com

Alyssa G. Bernstein*
JENNER & BLOCK LLP
1099 New York Avenue
Washington, DC 20001
202-639-6000
abernstein@jenner.com

Craig W. Carlson*
Langdon D. Southworth*
THE CARLSON LAW FIRM
100 East Central Texas Expressway
Killeen, TX 76541
254-526-5688
ccarlson@carlsonattorneys.com
lsouthworth@carlsonattorneys.com

*Attorneys for Plaintiffs*
*\*pro hac vice forthcoming*

139