Date of Service: April 1, 2026

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHARISS FINAN, *et al.*, | |
| Plaintiffs, | Case No. 22-cv-07831-NGG-PK |
| v. | ORAL ARGUMENT REQUESTED |
| LAFARGE S.A., *et al.*, | |
| Defendants. | |
| SUSAN SHIRLEY, et al., | |
| Plaintiffs, | Case No. 25-cv-04248-NGG-PK |
| v. | ORAL ARGUMENT REQUESTED |
| LAFARGE S.A., et al., | |
| Defendants. | |
| NADIA MURAD, et al., | |
| Plaintiffs, | Case No. 23-cv-09186-NGG-PK |
| v. | ORAL ARGUMENT REQUESTED |
| LAFARGE S.A., et al., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISQUALIFY WILLKIE FARR & GALLAGHER LLP**

**TABLE OF CONTENTS**

Page

BACKGROUND ..................................................................................................................1

    A.    Willkie Represents Lafarge's Former CEO And Chairman, Bruno Lafont, In Closely Related Matters................................................................1

    B.    Willkie Is Concurrently Prosecuting Plaintiffs' Claims Against Lafarge ................3

    C.    Willkie Presents Diametrically Opposed And Irreconcilable Material Facts As True In Its Concurrent Representations......................................................4

    D.    Procedural History .........................................................................................5

LEGAL STANDARD .........................................................................................................5

ARGUMENT ......................................................................................................................6

I.    Willkie's Concurrent Representation Of Plaintiffs And Lafont Creates A Disqualifying Conflict ..............................................................................................6

    A.    Willkie's Simultaneous, Conflicting, And Closely Related Representations Are Disqualifying Under New York Rule Of Professional Conduct 1.7 ........................................................................6

    B.    Willkie's Concurrent Representations Taint These Proceedings ............................8

    C.    Willkie Has Not Obtained Plaintiffs' Informed Consent, Which In Any Event Would Not Remedy The Conflict ...............................................................11

    D.    Willkie's Access To Lafarge's Privileged And Confidential Materials Through Its Representation Of Lafont Further Taints the Proceedings .................12

II.    Willkie's Responses Are Unavailing.......................................................................12

CONCLUSION..................................................................................................................15

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Akagi v. Turin Housing Development Fund Co.*,
    2017 WL 1076345 (S.D.N.Y. Mar. 22, 2017) ....................................................................11

*Benevida Foods, LLC v. Advance Magazine Publishers Inc.*,
    2016 WL 3453342 (S.D.N.Y. June 15, 2016) ....................................................................6

*Cohen v. Strouch*,
    2011 WL 1143067 (S.D.N.Y. Mar. 24, 2011) ........................................................6, 12, 14

*DeAngelis v. American Airlines, Inc.*,
    2010 WL 1270005 (E.D.N.Y. Mar. 26, 2010) ..................................................................8

*Decker v. Nagel Rice LLC*,
    716 F. Supp. 2d 228 (S.D.N.Y. 2010)...............................................................................9

*Estates Theatres, Inc. v. Columbia Pictures Indus., Inc.*,
    345 F. Supp. 93 (S.D.N.Y. 1972) ..............................................................................8, 14

*European Community v. RJR Nabisco, Inc.*,
    134 F. Supp. 2d 297 (E.D.N.Y. 2001) ..............................................................................9

*Firestone Tire & Rubber Co. v. Risjord*,
    449 U.S. 368 (1981).........................................................................................................11

*First NBC Bank v. Murex, LLC*,
    259 F. Supp. 3d 38 (S.D.N.Y. 2017)................................................................................8

*Hempstead Video, Inc. v. Incorporated Village of Valley Stream*,
    409 F.3d 127 (2d Cir. 2005)..........................................................................................6, 9

*HLP Properties LLC v. Consolidated Edison Co. of N.Y.*,
    2014 WL 5285926 (S.D.N.Y. Oct. 16, 2014)..................................................................15

*Hull v. Celanese Corp.*,
    513 F.2d 568 (2d Cir. 1975)..............................................................................................9

*In re ALBA Petróleos de El Salvador S.E.M. de C.V.*,
    82 F.4th 105 (2d Cir. 2023) ............................................................................................11

*In re Cendant Corp. Securities Litigation*,
    124 F. Supp. 2d 235 (D.N.J. 2000)................................................................................10

*Inspire Medical Systems, Inc. v. Nyxoah, Inc.*,
    2025 WL 3215657 (D. Del. Nov. 18, 2025)...................................................................12

*Khidirnazarov v. United Parcel Service General Services Co.*,
88 Misc. 3d 1233(A) (N.Y. Sup. Ct. Mar. 13, 2026) ......................................................7

*Merck Eprova AG v. ProThera, Inc.*,
670 F. Supp. 2d 201 (S.D.N.Y. 2009) ..............................................................5, 6, 8, 12

*Pacheco v. 1454 Diner, Inc.*,
2026 WL 279832 (E.D.N.Y. Feb. 3, 2026) ...............................................................7, 14

*Rothstein v. American Int'l Group, Inc.*,
837 F.3d 195 (2d Cir. 2016) ...........................................................................................11

*U.S. Football League v. National Football League*,
605 F. Supp. 1448 (S.D.N.Y. 1985) ...............................................................................13

*United States v. Massino*,
303 F. Supp. 2d 258 (E.D.N.Y. 2003) ............................................................................10

*United States v. Rogers*,
9 F.3d 1025 (2d Cir. 1993) ..............................................................................................10

*Zalewski v. Shelroc Homes, LLC*,
856 F. Supp. 2d 426 (N.D.N.Y. 2012) ............................................................................12

**DOCKETED CASES**

*In re Franchise Grp., Inc.*, No. 1:24-bk-12480 (Bankr. D. Del.) ....................................13

*In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices. &
Products Liability Litigation,* No. 3:16-MD-02738-MAS-RLS (D.N.J.) .........................15

*United States v. Lafarge S.A.*, No. 22-cr-444 (WFK) (E.D.N.Y.) .............................2, 3

**STATUTES, RULES, AND REGULATIONS**

New York Rule of Professional Conduct 1.6.....................................................................12

New York Rule of Professional Conduct 1.7............................................................ *passim*

New York Rule of Professional Conduct 1.10...................................................................13

Willkie Farr & Gallagher LLP represents nearly 1,000 victims of terrorism claiming that Lafarge's former CEO and Chairman, Bruno Lafont, was a "principal co-conspirator" with terrorists, while simultaneously representing Lafont in closely related French criminal and civil proceedings professing his innocence.  Willkie is simultaneously asserting that Lafont—and through him, Lafarge—*did* and *did not* conspire with terrorists, *did* and *did not* provide material support to terrorists, and *did* and *did not* knowingly aid and abet terrorists.  Willkie thus advances contrary interests on behalf of each set of its clients—none of whom, to Defendants' knowledge, has consented to this arrangement.  Nor could they, as Willkie's conflicts are irreconcilable and unwaivable.  Willkie's concurrent representations fundamentally taint these proceedings and inject substantial risk of collateral attack on the ground that Willkie's divided loyalties adversely affect its advocacy, judgment, and representation of Plaintiffs.  This is unfair, not just to the Court and to Plaintiffs, but also to Defendants, who have a manifest interest in the integrity of these proceedings.  To make matters worse, Willkie gained access to Lafarge's highly sensitive, privileged and confidential information, including during Lafarge's internal investigation of the events at issue here—raising independent grounds for disqualification.  In these extraordinary circumstances, Defendants respectfully submit that Willkie's disqualification is necessary to protect the interests of all parties, preserve the fairness of these proceedings, avoid unnecessary appeals, and maintain public confidence in the judicial process.

## BACKGROUND

### A. Willkie Represents Lafarge's Former CEO And Chairman, Bruno Lafont, In Closely Related Matters

Bruno Lafont served as the CEO of Defendant Lafarge, S.A. ("Lafarge") from 2006 to 2015.  He also served as Lafarge's Chairman of the Board from 2007 to 2015 and as LafargeHolcim's Co-Chairman of the Board from 2015 to 2017.  In 2016, LafargeHolcim

1

learned of allegations that Lafarge and its Syrian subsidiary, Defendant Lafarge Cement Syria ("LCS"), made payments, through intermediaries, to ISIS and other armed groups from 2013 to 2014—while Lafont was Lafarge's CEO and Chairman.

Those allegations prompted the Board of LafargeHolcim to commission a privileged and confidential internal investigation. In mid-2016, LafargeHolcim engaged the law firm Baker McKenzie to lead the investigation, called "Project Alpha," during which outside counsel collected millions of documents, engaged PwC to conduct a forensic accounting of relevant payments, and interviewed Lafarge personnel, including Lafont. During Project Alpha, Lafont engaged Willkie, which cooperated with Baker McKenzie pursuant to a common interest between Lafont and LafargeHolcim, Ex. 1, Fayhee Decl. ¶¶ 9-10. Willkie thereby gained access to hundreds of thousands of Lafarge emails and documents, including Lafont's files, investigative report drafts, and other privileged and confidential information, Ex. 1, ¶¶ 7-8.

In June 2017, Paris's Public Prosecutor opened a criminal investigation into whether Lafarge, Lafont, and other Lafarge executives financed terrorism in Syria. The Public Prosecutor eventually brought charges against Lafarge, Lafont, and others, whose criminal trials concluded in December 2025. Verdicts are expected in April 2026. Willkie has continuously represented Lafont throughout Project Alpha and the French criminal proceedings, from 2016 to the present. Lafarge and Lafont shared a common interest in defending against the French prosecutions, and Lafarge indemnified Lafont for Willkie's legal fees from 2016 through 2022.

In October 2022, Lafarge and LCS pleaded guilty in the United States to conspiring to provide material support to designated "foreign terrorist organizations" and agreed to pay $777.78 million in forfeitures and fines. *U.S. v. Lafarge S.A.*, No. 22-cr-444 (WFK) (E.D.N.Y. 2022), Plea Agreement, Dkt. No. 10 ("Plea"). Pursuant to this Plea, Lafarge admitted to a 117-

2

paragraph Statement of Facts, based on facts known in 2022, detailing Lafarge's and LCS's conduct in Syria and that of its executives. *U.S. v. Lafarge S.A.*, No. 22-cr-444 (WFK), Attachment A to Plea: Statement of Facts, Dkt. No. 10-1 ("SOF"). The SOF asserts material facts about Lafont, *i.e.*, "Executive 6," including that he was a principal co-conspirator, had direct knowledge of payments to armed groups, and was involved in discussions with LCS and others regarding such arrangements. *See* SOF at 1, ¶¶ 8, 86, 92, 94.

In February 2022, Lafarge initiated a civil action in French court against Lafont, seeking indemnification for liabilities arising from the payments to armed groups. *See* Ex. 2, *Summons Before the Paris Commercial Court* at 12-13 (Feb. 21, 2022) (seeking compensation from Lafont and others, jointly and severally, in the sum of €150 million, subject to adjustment, to Lafarge S.A. and Holcim for their losses, and reserving right to seek compensation for additional losses). In the French civil action, Lafarge contends that Lafont is liable to it for damages arising from misconduct in Syria. *Id.* As a result, Lafont and Lafarge share a common interest in defending against the Antiterrorism Act ("ATA") claims that Willkie is advancing here (because Lafont is potentially liable for any judgment against Lafarge here).

**B.      Willkie Is Concurrently Prosecuting Plaintiffs' Claims Against Lafarge**

In three cases before this Court—*Finan*, *Murad*, and *Shirley*—Willkie represents nearly 1,000 Plaintiffs who claim that Lafarge and its subsidiaries are liable under the ATA for terrorist attacks between 2012 and 2017, when Lafont was Lafarge's CEO and Chairman. Two Willkie partners, Lee Wolosky and Andrew Lichtman, were previously partners at Jenner & Block when they commenced the *Finan* and *Murad* lawsuits. In early 2025, Mr. Wolosky and Mr. Lichtman moved to Willkie, where they continue to represent Plaintiffs in *Finan* and *Murad* and now also represent Plaintiffs in *Shirley*, which they filed in July 2025. Jenner remains as co-counsel in all three cases (*Finan*, *Shirley*, and *Murad*); the Office of Amal Clooney is also co-counsel in

*Murad*; and the Carlson Law Firm is also co-counsel in *Shirley*.

In its representation of Plaintiffs, Willkie cites the Plea and SOF to support its allegations that Lafarge and its subsidiaries knowingly made payments to terrorist organizations. *See, e.g.*, *Shirley* Am. Compl. ¶¶ 5, 11; *Murad* Am. Compl. ¶¶ 4, 45; *Finan* 4th Am. Compl. ¶¶ 3, 9. Willkie expressly accuses its own client, Lafont, of being a "principal co-conspirator" and attributes to him personal knowledge of, and responsibility for, the alleged conspiracy that Willkie asserts is the basis for Plaintiffs' ATA claims. *See Shirley* Am. Compl. at 11, ¶¶ 40, 43; *Finan* 4th Am. Compl. at 9, ¶¶ 38, 41; *Murad* Am. Compl. at 19, ¶¶ 54, 62. Those assertions are central to Willkie's claims on behalf of Plaintiffs because they link the actions of Lafarge's second-tier subsidiary in Syria (LCS) and Lafarge, which Lafont led.

### C.    Willkie Presents Diametrically Opposed And Irreconcilable Material Facts As True In Its Concurrent Representations

Willkie has advanced conflicting facts in the French proceedings that contradict material facts at the heart of Plaintiffs' cases before this Court, as illustrated in the attached chart. *See* Ex. 3, Chart Summarizing Contradictions in Willkie's Representations of Plaintiffs and Lafont. Taking just two examples:

- In the *Shirley* Complaint, Willkie alleges that Lafont directed, authorized, and knowingly sustained a conspiracy between Lafarge, ISIS, and intermediaries, and that payments reflected deliberate decisions made by the companies' "highest management levels"—with the very highest-ranking "principal co-conspirator" being "Lafont" specifically. *Shirley* Am. Compl. ¶¶ 14, 35-43; *accord Murad* Am. Compl. ¶¶ 8, 54-62; *Finan* 4th Am. Compl. ¶¶ 12, 33-41.
  - But just days after filing the *Shirley* Complaint, in the French criminal trial, Willkie argued that Lafont had no such involvement and was not even "informed of the existence of these payments." Ex. 4, *Motion for Dismissal* at 36 (Dec. 15, 2025).

- In this Court, Willkie alleges connections between Lafarge, ISIS, intermediaries, and other armed groups, including that Lafont directed arrangements with ISIS and understood their illegality. *Shirley* Am. Compl. ¶¶ 14, 162; *accord Murad* Am. Compl. ¶¶ 8, 207; *Finan* 4th Am. Compl. ¶¶ 12, 162.
  - But in the French proceedings, Willkie asserts that the situation on the ground was

animated by the fog of war and the "[d]ifficulty in [i]dentifying and [u]nderstanding the [a]rmed [g]roups [f]orming the [r]ebellion."  Ex. 4, at 11.

Willkie's core contradictions extend to the Plea and SOF, which form the basis for the claims of Willkie's Plaintiffs here.  In France, Willkie objects to the Plea and SOF, asserting that they violate Lafont's presumption of innocence and challenging their factual basis.  Ex. 6, *Conclusions for the Annulment of the Referral Order* at 9-13 (Oct. 28, 2025).  For example, in the trial that concluded in December 2025, Willkie attacked the Plea and SOF and asserted that Lafont lacked knowledge of any "agreed-upon payments" to terrorists.  Ex. 4, at 10, 36.  Thus, Willkie treats the Plea and SOF as authoritative and dispositive in these cases, but in France Willkie discredits the Plea and SOF as flawed, unreliable, and inaccurate.

### D.   Procedural History

Promptly upon discovering the conflict, Defendants raised the issue with Willkie.  *See* Ex. 7, D. Bowker's January 22, 2026 Ltr. To L. Wolosky; Ex. 8 at 3-4, D. Bowker's January 26, 2026 Email to L. Wolosky.  Willkie denied the existence of any conflict and defended its actions as "fully consistent" with its professional responsibilities.  Ex. 9, at 1, D. Kozusko's February 6, 2026 Ltr. To D. Bowker.  Willkie argued that its internal "walls" were sufficient, *see* Ex. 8 at 4-5; Ex. 9, but failed to address fundamental concerns regarding its duty of candor, the integrity of these proceedings, the absence of informed consent, and the substantial risk of collateral attack on any judgment in these proceedings.  Willkie's subsequent argument before this Court likewise failed to put any of these issues to rest.  *See Shirley*, Dkt. No. 57 (Mar. 6, 2026).

### LEGAL STANDARD

Disqualification is "warranted where an attorney's conduct tends to taint the underlying proceedings."  *Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 208 (S.D.N.Y. 2009) (collecting cases).  Requests for disqualification are serious matters, and disqualification is

5

generally "'disfavor[ed].'" *Benevida Foods, LLC v. Advance Mag. Publishers Inc.*, 2016 WL 3453342, at *9 (S.D.N.Y. June 15, 2016).  But in those rare circumstances "where the record presents a close question as to whether disqualification would be appropriate, courts 'must resolve any doubts in favor of disqualification.'" *Id.* at *10.  Courts have discretion to do so based on their "inherent power to 'preserve the integrity of the adversary process.'" *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005).  In cases of concurrent representations, "it is 'prima facie improper' for an attorney to simultaneously represent a client and another party with interests directly adverse to that client." *Id.* at 133.  In such cases, the attorney "must be disqualified unless [he] can demonstrate that there is 'no actual or apparent conflict in loyalties' and that the vigor of [his] representation would not be diminished." *Merck Eprova AG*, 670 F. Supp. 2d at 212.

## ARGUMENT

**I.     WILLKIE'S CONCURRENT REPRESENTATION OF PLAINTIFFS AND LAFONT CREATES A DISQUALIFYING CONFLICT**

Where, as here, a firm "takes on multiple representations that will require advocating a position for one client that would directly adversely affect another client's interest, there is an 'imminent threat of a serious conflict,' making disqualification appropriate." *Cohen v. Strouch*, 2011 WL 1143067, at *4 (S.D.N.Y. Mar. 24, 2011).  Willkie's concurrent representations have already given rise to serious conflicts, causing the firm to directly undercut each set of its clients on behalf of the other, in plain violation of the New York Rules of Professional Conduct. Willkie's conflicts have thus tainted the proceedings and will continue to do so at each stage of the litigation.  Disqualification is the only sufficient remedy.

**A.     Willkie's Simultaneous, Conflicting, And Closely Related Representations Are Disqualifying Under New York Rule Of Professional Conduct 1.7**

Willkie's concurrent representation of clients with divergent interests in closely related

6

matters violates the New York Rules of Professional Conduct.  *See* N.Y. R. Prof'l Conduct 1.7; *id.* 1.10 cmt. 5.  Contrary to Willkie's contention, *Murad*, Dkt. No. 91 at 3, direct adversity in the same litigation is not the only circumstance that commands disqualification.  Rather, disqualification is also appropriate where an attorney undertakes conflicting representations that create a "significant risk" that the attorney's independent "professional judgment on behalf of a client will be adversely affected by," or that the representation "will be materially limited by," the lawyer's responsibilities to another client.  N.Y. R. Prof'l Conduct 1.7(a)(2).[1]  Here, there is far more than a "significant risk" of these outcomes.  Both have already occurred:  Willkie's divided loyalties have led the firm to take positions against its clients' interests and materially limited its representation of each.

In France, Willkie is taking positions that directly undercut Plaintiffs' core factual assertions against Lafarge and Lafont here.  Conversely, here Willkie accuses its own client, Lafont, of conspiring with terrorists, thereby directly undercutting Willkie's ongoing defense of Lafont in France, where he could be convicted and sent to prison.  *See supra*, at pp. 4-5.  Such conflicts are impermissible and unwaivable.  Allowing Willkie to continue to represent Plaintiffs would put "the Court's imprimatur" on Willkie's conflicted positions and "would invite questions whether, going forward, [Willkie] could be counted on to honor its duty of loyalty."

---

[1] Before November 2025, Rule 1.7(a)(1) expressly prohibited attorneys from taking on a representation that "will involve the lawyer in representing differing interests."  Rule 1.7(a)(1) was amended in November 2025 to address situations of direct adversity and Rule 1.7(a)(2) was amended to add the language quoted above, *see* N.Y. State Bar Ass'n, N.Y. Rules of Professional Conduct (as amended through Nov. 10, 2025), https://tinyurl.com/yeykn5pp, but courts applying Rule 1.7 since have continued to invoke the "differing interests" standard.  *See, e.g.*, *Pacheco v. 1454 Diner, Inc.*, 2026 WL 279832, at *5 (E.D.N.Y. Feb. 3, 2026); *Khidirnazarov v. United Parcel Serv. Gen. Servs. Co.*, 88 Misc. 3d 1233(A) (N.Y. Sup. Ct. Mar. 13, 2026).  Willkie's concurrent representation of Plaintiffs and Lafont began before the November 2025 amendment and continues into the present, and it is disqualifying under both versions of Rule 1.7.

*First NBC Bank v. Murex, LLC*, 259 F. Supp. 3d 38, 70 (S.D.N.Y. 2017).  "Given the inevitability of conflicting loyalties and their likely impact on presentations made to the court, disqualification ... appears necessary."  *DeAngelis v. Am. Airlines, Inc.*, 2010 WL 1270005, at *3 (E.D.N.Y. Mar. 26, 2010) (Garaufis, J.).  Willkie "must be disqualified" because there is an "actual ... conflict in loyalties" in its parallel representations that has "diminished" its representation and undercut the interests of its clients.  *Merck Eprova AG*, 670 F. Supp. 2d at 212.  Indeed, Willkie "cannot at one and the same time be the prosecutor of [P]laintiff[s]' claim ... and the defender of the target"—here, Lafont.  *Ests. Theatres, Inc. v. Columbia Pictures Indus., Inc.*, 345 F. Supp. 93, 99 (S.D.N.Y. 1972) (ordering disqualification where plaintiff's attorney separately represented non-party who plaintiff alleged was "a co-conspirator with the named defendants in th[e] case.").[2]

### B.    Willkie's Concurrent Representations Taint These Proceedings

Disqualification is warranted where concurrent representations put a firm in the "conflicted position" of advancing contradictory facts on behalf of adverse clients in separate proceedings.  *See Merck Eprova AG*, 670 F. Supp. 2d at 212-13.  In addition to the examples already discussed above, it cannot be that Lafont was both a "principal co-conspirator" linking Lafarge in Paris to agreements to pay terrorists in Syria, *Shirley* Am. Compl. ¶ 43, and that he had no awareness of such agreements or payments, Ex. 4, at 36.  Nor can it both be true that Lafarge paid terrorists "at a minimum $5.92 million to as much as $15 million," *Shirley* Am. Compl. ¶ 199, and that "the maximum amount of sums that could have been passed on to

---

[2] Willkie argues that Plaintiffs and Lafont "are not directly adverse in the Actions" and "any potential adversity is merely theoretical."  *Murad*, Dkt. No. 91 at 3.  This ignores that Willkie has already taken positions adverse to its own clients' interests, and, as noted, that Rule 1.7 expressly prohibits representations that are "materially limited by" the lawyer's responsibilities to another client, even where there is not direct adversity.  N.Y. R. Prof'l Conduct 1.7(a)(2).

organizations listed as terrorist amounted to $563,054," Ex. 5, *Observations Seeking a Dismissal and Response to the Final Submissions of the Prosecution* at 58 (Mar. 8, 2024). And Willkie's claim in this Court that Lafarge chose to continue operations in Syria and "pay[] ISIS and ANF because doing so increased profits," *Shirley* Am. Compl. ¶ 104, is flatly contradicted by its assertion in France that "the thesis that the continued operation of the plant was compelled by economic considerations does not withstand analysis." Ex. 4, at 31.

Willkie's conflicting representations "taint" these proceedings and undermine the "integrity of the adversary process." *Hempstead Video*, 409 F.3d at 132; *see also Hull v. Celanese Corp.*, 513 F.2d 568, 572 (2d Cir. 1975). By advancing diametrically opposed factual assertions in concurrent representations, Willkie is diminishing its effectiveness for each of its clients, and adversely affecting its ability to appear before this Court with the requisite candor and vigor. *See Decker v. Nagel Rice LLC*, 716 F. Supp. 2d 228, 235-36 (S.D.N.Y. 2010); *accord Eur. Cmty. v. RJR Nabisco, Inc.*, 134 F. Supp. 2d 297, 303 (E.D.N.Y. 2001) (Garaufis, J.) ("An attorney's conduct may 'taint the underlying trial' when a conflict of interest ... 'disturb[s] the balance of the presentations' in the case").[3]

The impacts on Willkie's efficacy and the material limitations on its representations will become only more pronounced as these cases proceed through discovery, motions practice, trial, and any settlement negotiations. Willkie claims it can mitigate harm to its clients by recusing itself from "Lafont's deposition or examination at trial," Ex. 9, at 2, but this is exactly the type of material limitation that supports disqualification, *see* N.Y. R. Prof'l Conduct 1.7(a)(2); *see also*

---

[3] Willkie has asserted that the allegations it made against Lafont in these proceedings merely "echo[] the first page of Lafarge's guilty plea." Ex. 9, at 2 n.1. But this only underscores the conflict—here, Willkie relies on the Plea, whereas in France Willkie vigorously discredits the Plea.

*United States v. Rogers*, 9 F.3d 1025, 1028, 1032 (2d Cir. 1993) (affirming disqualification where attorney was unable to cross examine a "key trial witness" that attorney had *previously* represented and client did not consent to "such a limitation"); *accord United States v. Massino*, 303 F. Supp. 2d 258, 262 (E.D.N.Y. 2003) (Garaufis, J.) (expressing concern that counsel "would pursue a particular defense strategy because of his loyalty to a witness testifying against his client"). Willkie's proposed recusal thus demonstrates (rather than solves) the problem. Willkie's inability to examine Lafont will adversely affect its representation of Plaintiffs, especially given Willkie's assertion that Lafont was a top mastermind of the alleged conspiracy that supposedly links Lafarge in France to the alleged misconduct of LCS, its corporate affiliate in Syria. Moreover, Willkie cannot avoid the conflict by passing off certain work to co-counsel, as Willkie needs to "work with co-counsel to develop trial strategy, organize opening and closing arguments, and prepare other aspects of the case." *In re Cendant Corp. Sec. Litig.*, 124 F. Supp. 2d 235, 243 (D.N.J. 2000). Indeed, Willkie recently revealed how closely it works with co-counsel. Mar. 10, 2026 Conf. Tr. at 17:19-21.

Willkie's conflict also creates an impossible settlement dynamic. Willkie is defending Lafont in French civil proceedings against claims by Lafarge that Lafont is personally liable for damages to Lafarge relating to the conduct at issue here. Ex. 2, at 12-13 (seeking compensation from Lafont and others, jointly and severally, in the sum of €150 million, subject to adjustment, to Lafarge S.A. and Holcim for their losses, and reserving right to seek compensation for any additional losses). Thus, when Willkie demands more in settlement for the benefit of Plaintiffs, it harms the interests of Willkie's other client, Lafont, who faces potential indemnification liability. Moreover, when Plaintiffs learn of Willkie's conflicting obligations to Lafont to minimize Lafarge's liability here, Plaintiffs may question Willkie's divided loyalty and challenge

10

any settlement.

Willkie's conflicts also create fodder for appeal by any one of the nearly 1,000 Plaintiffs who might wish to challenge a decision of this Court. Indeed, an "order refusing to disqualify counsel" is itself "reviewable on appeal after final judgment." *In re ALBA Petróleos de El Salvador S.E.M. de C.V.*, 82 F.4th 105, 112 (2d Cir. 2023) (citing *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 377 (1981)). If this motion were denied, any party could seek such post-judgment appellate review of the order and potentially use it as a basis for collateral attack. Non-parties whose interests are affected, *e.g.*, Plaintiffs in the related actions and Lafont, could also seek to appeal. *See id.*; *Rothstein v. Am. Int'l Grp., Inc.*, 837 F.3d 195, 204 (2d Cir. 2016) (non-party may appeal a final judgment where it plausibly asserts an interest affected). Should the Second Circuit "conclude after the trial has ended that permitting continuing representation was prejudicial error, it would … vacate the judgment … and order a new trial," a remedy approved by the Supreme Court. *In re ALBA Petróleos*, 82 F.4th at 112; *Firestone*, 449 U.S. at 378. Defendants thus have a compelling interest in disqualification, especially given the severity of the conflict, the lack of informed consent by Willkie's clients, and the likelihood of appeal by any dissatisfied Plaintiffs and/or interested non-parties such as Lafont.

C.    **Willkie Has Not Obtained Plaintiffs' Informed Consent, Which In Any Event Would Not Remedy The Conflict**

To Defendants' knowledge—Willkie has refused to say—Willkie has not obtained informed consent from Lafont or any of the nearly 1,000 Plaintiffs. Even if it had, disqualification would still be required because the conflict here is "nonconsentable." N.Y. R. Prof'l Conduct 1.7(b)(4); *id.* cmts. 2, 14. "[I]n New York, informed written consent, standing alone, does not cure an attorney's concurrent-representation conflict of interest." *Akagi v. Turin Hous. Dev. Fund Co.*, 2017 WL 1076345, at *15 (S.D.N.Y. Mar. 22, 2017); N.Y. R. Prof'l

11

Conduct 1.7(b)(1). "[S]ome conflicts are nonconsentable," N.Y. R. Prof'l Conduct 1.7(b)(1), cmt. 14, because even when "'both affected clients have provided [consent]' ... New York law 'also requires a belief under a reasonable lawyer standard ... that the attorney will be able to provide competent and diligent representation to each affected client,'" *Cohen*, 2011 WL 1143067, at *5. Willkie cannot meet this standard because it is *per se* unreasonable for the same firm to simultaneously represent clients with divergent interests in closely related matters, advancing diametrically opposed legal arguments and factual assertions that undercut each of the firm's respective clients.

### D. Willkie's Access To Lafarge's Privileged And Confidential Materials Through Its Representation Of Lafont Further Taints the Proceedings

In its representation of Lafont, Willkie gained access to "hundreds of thousands" of Lafarge documents. Ex. 1, ¶ 7. This includes both Lafont's privileged and confidential Lafarge communications, as well as the privileged and confidential Project Alpha materials, including preliminary investigative findings and portions of the draft report. *Id*. ¶ 8. Willkie obtained these materials pursuant to a common interest between Lafont and Lafarge. *Id*. ¶¶ 7-10. Willkie says it put up an ethical wall for lawyers in 2018 (addressed *infra*, at pp. 13-14), but it came two years after the investigation commenced and did not apply to staff. Willkie's access to Lafarge's confidential and privileged materials is itself disqualifying, *Inspire Med. Sys., Inc. v. Nyxoah, Inc*., 2025 WL 3215657, at *6-7 (D. Del. Nov. 18, 2025) (granting motion to disqualify), and "taint[s]" the proceedings, *Merck Eprova AG*, 670 F. Supp. 2d at 208 (same); *see also Zalewski v. Shelroc Homes, LLC*, 856 F. Supp. 2d 426, 436 (N.D.N.Y. 2012); N.Y. R. Prof'l Conduct 1.6(a).

## II. WILLKIE'S RESPONSES ARE UNAVAILING

Willkie flatly denies any problem and insists its conflicting representations are "fully consistent" with the rules. Ex. 9, at 1. This raises further questions about Willkie's view of

conflicts and is simply wrong. *See supra*, at pp. 6-12. As for Willkie's arguments invoking an internal wall, challenging Defendants' motivations, and claiming prejudice on Plaintiffs' behalf, none has merit.

**Willkie's Internal Wall.** Willkie erected its first wall in 2018, roughly two years after it began representing Lafont in 2016 and roughly a year after the Project Alpha investigation was completed in 2017. Thus, from 2016 to 2018, the entire Willkie firm had unrestricted access to Lafarge's privileged and confidential information. Willkie's belated screen did not cover staff and, in any case, is "tantamount to closing the barn door once the cow has run out ... there is no telling what information travelled within the firm." *U.S. Football League v. Nat'l Football League*, 605 F. Supp. 1448, 1466-67 (S.D.N.Y. 1985); *see also* Hr'g Transcript at 20, *In re Franchise Grp., Inc.*, No. 1:24-bk-12480 (Bankr. D. Del. Feb. 13, 2025), Dkt. No. 975 (Willkie's belated ethical wall did not cure conflict where "knowledge gained from [separate] representation" was "imputed to the firm as a whole").

Willkie erected its second wall in 2025, *Murad*, Dkt. No. 91 at 3-4, but that too is no comfort. The 2025 wall should not have been necessary if, as Willkie contends, there was a wall erected in 2018. Willkie does not say if the 2018 wall failed, was lifted, or was incomplete or ineffective. In any case, walls address *potential* conflicts arising from *successive* representations—not, as here, *actual* conflicts arising from *concurrent* representations. *See* N.Y. R. Prof'l Conduct 1.10(a), (c)(2) (permitting walls for potential conflicts from successive representations). Moreover, walls are ineffective where newly associated lawyers "substantially participated in the management and direction" of a conflicting litigation. N.Y. R. Prof'l Conduct 1.10(c)(3); *see also id.* cmt. 5F. The rules do not authorize the use of a wall to address the situation here, where Willkie's lawyers concurrently represent clients with divergent interests in

13

*ongoing* litigations involving the same events.  And, of course, even if a wall could have been constructed to solve the taint from its access to privileged information, it does nothing to cure the separate intractable problem requiring disqualification.  Willkie's wall was not designed to stop—and has not stopped—its lawyers from advancing diametrically opposed legal arguments and factual assertions on behalf of clients with opposing interests in related parallel matters.

**Lafarge's Standing.**  Willkie's challenge to Lafarge's standing is baseless.  Lafarge has standing as a party with a concrete interest in the integrity of these proceedings.  Moreover, courts in this Circuit have held that all "parties have standing to seek disqualification of opposing counsel on conflict of interest grounds."  *Pacheco v. 1454 Diner*, 2026 WL 279832, at *3 (E.D.N.Y. Feb. 3, 2026) (collecting cases); *Cohen*, 2011 WL 1143067, at *4 (granting motion to disqualify brought by non-client); *Estates Theatres, Inc.*, 345 F. Supp. at 98 (granting motion to disqualify brought by non-client and recognizing that "[w]hat is involved is a matter of public interest involving the integrity of the Bar").

**Lafarge's Motivations.**  There also is no merit to Willkie's claim that this motion is "tactically motivated."  *Murad*, Dkt. No. 91 at 4.  Lafarge would gain no tactical advantage from Willkie's disqualification, as Plaintiffs are also represented by Jenner (co-counsel in all three cases), the Office of Amal Clooney (additional co-counsel in *Murad*), and the Carlson Law Firm (additional co-counsel in *Shirley*).  Lafarge's motivations are to ensure the integrity of these proceedings, prevent Plaintiffs from accessing Lafarge's privileged and confidential materials, and protect against collateral attacks against any judgment here through later appeals on conflict grounds.

**Prejudice.**  Finally, disqualification would not prejudice Plaintiffs.  *Murad*, Dkt. No. 91 at 5.  As discussed, Plaintiffs are represented by experienced and sophisticated co-counsel.  If

14

Willkie were disqualified, Plaintiffs would not be required to find "new litigation counsel" as was the case in *HLP Properties*, on which Willkie relies. *HLP Props. LLC v. Consol. Edison Co. of N.Y.*, 2014 WL 5285926, at \*6 (S.D.N.Y. Oct. 16, 2014); *Murad*, Dkt. No. 91 at 5. Instead, Plaintiffs would continue to be represented by the same co-counsel who have been with these cases from the start. Plaintiffs would also have the option of engaging any of the eight other firms representing Plaintiffs in the six related cases. *See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 3:16-MD-02738-MAS-RLS, Mem. Op. at 38 (D.N.J. Mar. 26, 2026), Dkt. No. 44423 (disqualifying a lead plaintiff firm in MDL where "there are many lawyers representing thousands of Plaintiffs in this MDL who have not generated the [same] concerns"). Plaintiffs therefore would not suffer any prejudice from disqualification, let alone prejudice sufficient to justify the very substantial prejudice that all parties would suffer from *not disqualifying* Willkie and allowing its conflict to taint these proceedings.

## CONCLUSION

Defendants respectfully submit that Willkie Farr & Gallagher LLP should be disqualified.

15

Date of Service: April 1, 2026

Respectfully submitted,

/s/ David W. Bowker

ALYSON ZUREICK
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8875 (t)
(212) 230-8888 (t)
alyson.zureick@wilmerhale.com

DAVID W. BOWKER
JONATHAN E. PAIKIN
ALBINAS PRIZGINTAS (*pro hac vice*)
MICHAELA S. WILKES KLEIN (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 663-6000 (t)
(202) 663-6363 (f)
david.bowker@wilmerhale.com
jonathan.paikin@wilmerhale.com
albinas.prizgintas@wilmerhale.com

*Attorneys for Lafarge S.A., Lafarge Cement Holding Limited, and Lafarge Cement Syria S.A.*

16

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by email.

Dated: April 1, 2026                              /s/ David W. Bowker
                                                  DAVID W. BOWKER