# EXHIBIT 2

Private Professional Company
**Raynald PARKER
Raphaël PERROT
and Thibauld TAUPIN**
Associated Bailiffs
7 avenue de la Grande – 75116 PARIS

FIRST
CERTIFIED COPY

## SUMMONS BEFORE THE PARIS COMMERCIAL COURT

IN THE YEAR TWO THOUSAND TWENTY-TWO

ON    **FEBRUARY TWENTY-FIRST**

**AT THE REQUEST OF:**

**Lafarge SA,** a public limited company [société anonyme] with share capital of 1,160,623,852 euros, whose registered office is located at 14–16 boulevard Garibaldi, 92130 Issy-les-Moulineaux, registered with the Nanterre Trade and Companies Register under number 542 105 572, acting through its legal representatives.

**Holcim SA,** a Swiss public limited company (*Aktiengesellschaft*) with share capital of 1,231,858,118 Swiss francs (CHF), whose registered office is located at Grafenauweg 10, CH-6300 Zug (Switzerland), registered with the Commercial Register of the Canton of Zug under number CHE-100.136.893, acting through its legal representatives.

*Electing domicile at the offices of their appointed attorney at the address indicated below*

*Plaintiffs*

Having appointed as attorney:      **Pierre Herné**
Attorney at the Paris Bar
16 rue Gustave Courbet – 75116 Paris

And as trial attorneys:      **Christophe Ingrain and Nicolas Mennesson**
Attorneys at the Paris Bar
Darrois Villey Maillot Brochier AARPI
69 avenue Victor Hugo – 75116 Paris
Tel.: 01.45.02.19.19 / Fax: 01.45.02.49.59
Bar mailbox: R170

**Denis Chemla**
Attorney at the Paris Bar
Allen & Overy LLP
52 avenue Hoche – 75008 Paris
Tel.: 01.40.06.54.00 / Fax: 01.40.06.54.54
Bar mailbox: J022

1

**I, THE UNDERSIGNED BAILIFF,**

Raynald PARKER, Raphaël PERROT, and Thibauld TAUPIN, Associated Bailiffs
Private Professional Company with a Bailiff's Office,
7 avenue de la Grande Armée, 75116 PARIS, by one of the undersigned.

**HEREBY SERVE SUMMONS UPON:**

- **Mr. Bruno Lafont,** born on REDACTED - GDPR in Boulogne-Billancourt REDACTED - GDPI, of French nationality, residing at REDACTED - GDPR        Paris, retired;
  As stated on the final page of the instrument

- **Mr. Bruno Pescheux,** born on REDACTED - GDPR in Morée REDACTED - GDPI, of French nationality, residing at REDACTED - GDPR        Lyon, retired;
  by separate instrument

- **Mr. Frédéric Jolibois,** born on REDACTED - GDPR in Saint-Mandé REDACTED - GDPI, of French nationality, residing at REDACTED - GDPR        Pibrac, retired;
  by separate instrument

- **Mr. Christian Herrault,** born on REDACTED - GDPR in Paris REDACTED - GD), of French nationality, residing at REDACTED - GDPR        Paris, retired;
  by separate instrument

- **Mr. Hassan Firas Tlass,** born on REDACTED - GDPR in Aleppo (Syria), of Syrian nationality, whose last known address is REDACTED - GDPR        , Damascus (Syria), businessman.
  by separate instrument

*Defendants*

> To appear before the President and Judges composing the 18th chamber of the Paris Commercial Court, located at 1 Quai de la Corse – 75004 Paris, at the hearing to be held on <u>June 16, 2022 at 11:00 a.m.</u>

## **<u>VERY IMPORTANT</u>**

*Pursuant to the rules set forth in Articles 56, 643, 853, 855, and 861-2 of the French Code of Civil Procedure, the Plaintiffs hereby inform the recipients of this summons that:*

–   *Unless otherwise provided, the parties are required to appoint an attorney before the Commercial Court.*

–   *The appointment of an attorney constitutes an election of domicile.*

–   *The parties are exempt from the obligation to appoint an attorney in the cases provided for by law or regulation when the claim concerns an amount less than or equal to €10,000, in proceedings instituted under Book VI of the French Commercial Code, or in disputes relating to the maintenance of the Trade and Companies Register.*

    *In such cases, they may be assisted or represented by any person of their choosing.*

    *If the representative is not an attorney, he must provide proof of a special power of attorney.*

–   *If the defendant fails to appear, a decision may be rendered against him solely on the basis of the evidence provided by his opponent.*

–   *The exhibits on which the claims set forth in this summons are based are listed at the end of this instrument.*

–   *The defendants are reminded that, pursuant to Article 861-2 of the French Code of Civil Procedure:*

    *"Without prejudice to the provisions of Article 68, an incidental application seeking the grant of a payment extension pursuant to Article 1343-5 of the Civil Code may be filed by petition submitted, delivered, or sent to the clerk's office, where it is recorded. The author of such application must demonstrate prior to the hearing that the opposing party has been informed thereof by registered letter with acknowledgment of receipt. The documents relied upon in support of the application for a payment extension shall be attached to the petition.*

    *The author of such incidental application is not required to appear at the hearing, pursuant to the second paragraph of Article 446-1. In such case, the judge shall grant the claims brought against that party only if they are deemed regular, admissible, and well-founded."*

–   *Defendants are further reminded of the following provisions reproduced below:*

    *Article 641 of the French Code of Civil Procedure:*

    *"When a time period is expressed in days, the day of the act, event, decision, or notification that triggers the period shall not be counted.*

*When a time period is expressed in months or years, such period expires on the day of the last month or of the last year bearing the same calendar date as the day of the act, event, decision, or notification that triggers the period. If no identical calendar date exists, the period expires on the last day of the month.*

*When a time period is expressed in months and days, the months shall first be counted, followed by the days."*

*Article 642 of the French Code of Civil Procedure:*

*"All time periods expire on the last day at midnight.*

*Any time period that would normally expire on a Saturday, Sunday, or legal holiday or non-working day shall be extended until the next business day."*

*Article 643 of the French Code of Civil Procedure:*

*"When the claim is brought before a court seated in metropolitan France, the time limits for appearance, appeal, opposition, third-party opposition in the case provided for in Article 586 paragraph 3, applications for revision, and appeals in cassation are extended by:*

*1. One month for persons residing in Guadeloupe, French Guiana, Martinique, Réunion, Mayotte, Saint-Barthélemy, Saint-Martin, Saint-Pierre-et-Miquelon, French Polynesia, the Wallis and Futuna Islands, New Caledonia, and the French Southern and Antarctic Territories;*

*2. Two months for persons residing abroad."*

4

**Summary of the dispute**

The present dispute is related to the conduct of certain former executives of the Lafarge group in connection with the group's operations in Syria during the Syrian civil war.

Beginning in 2010, the Lafarge group operated the Jalabiya cement plant in Syria through Lafarge Cement Syria (hereinafter "**LCS**"), a Syrian-law subsidiary indirectly owned by Lafarge SA (hereinafter "**LSA**").

Between 2011 and 2015, the situation of the Jalabiya cement plant was destabilized by the Syrian civil war, during which terrorist organizations—including in particular the Islamic State and the Al-Nusra Front—took control of territories in northeastern Syria. The Jalabiya cement plant nevertheless remained in operation.

In 2017, several former executives of LSA and LCS were placed under formal investigation, in particular for acts of financing terrorism allegedly committed between 2011 and 2014 in connection with the activities of LCS. These formal investigations led, in 2018, to the formal investigation of LSA.

Based on the information currently available to LSA and Holcim SA (hereinafter "**Holcim**"), the parent company of LSA since 2015, it appears that four of the individuals placed under formal investigation played a decisive role in the relationships that were maintained between LCS and armed groups, some of which were affiliated with terrorist organizations (hereinafter the "**Armed Groups**"): Messrs. Bruno Lafont, Bruno Pescheux, Frédéric Jolibois, and Christian Herrault, all former executives of the Lafarge group. Furthermore, based on currently available information, Mr. Hassan Firas Tlass, currently subject to an international arrest warrant, also played a decisive intermediary role in the acts in question.

The conduct of Messrs. Lafont, Pescheux, Jolibois, Herrault, and Tlass in the management of LCS caused significant reputational, moral, and financial harm to LSA and to Holcim, which have initiated the present action in order to obtain an order requiring them to compensate for this harm.

The criminal proceedings relating to the facts that are the subject of the present action are currently pending. It is therefore requested that the court stay the present proceedings until the conclusion of the criminal proceedings.

5

**MAY IT PLEASE THE COURT**

---

I.    STATEMENT OF FACTS

Following a presentation of the parties (**A**), it is necessary to describe the circumstances in which the relationships between LCS and Armed Groups were revealed (**B**). These relationships were established at the initiative of the defendants (**C**) and caused the plaintiffs considerable harm (**D**).

### A)  Presentation of the parties

It is appropriate to present the plaintiffs (*1*) and the defendants in the present proceedings (*2*).

### 1)  Presentation of the plaintiffs

1.    The Lafarge group was founded in 1833 in Ardèche by the Pavin de Lafarge family and, during the second half of the 19th century, established itself as a leading French company in the construction industry. It became the leading cement producer in France in 1939 and one of the leading cement producers worldwide in the 2000s. Until the merger between the Lafarge group and the Holcim group, LSA was the parent company of the Lafarge group[1].

2.    The Holcim group was founded in 1912 in the canton of Aargau (Switzerland) in connection with the construction of the Holderbank cement plant. From the 1920s onwards, the Holcim group expanded in Europe and overseas. By the 2000s, the Holcim group was also one of the leading cement producers worldwide.

3.    In 2015, the Lafarge group and the Holcim group merged to create the LafargeHolcim group. Holcim then became the parent company of the consolidated group and has since held LSA as a wholly owned subsidiary. The consolidated group has recently been renamed "Holcim." The parent company of the Holcim group is the Swiss-law company Holcim[2].

4.    As of December 31, 2020, the Holcim group employed more than 70,000 employees worldwide and operated nearly 2,300 production sites for cement, concrete, and aggregates[3]. As of the same date, the Holcim group employed 4,300 employees in France across more than 400 sites[4].

### 2)  Presentation of the defendants

5.    The Lafarge group established operations in Syria in 2008 in connection with the acquisition of the Egyptian group Orascom[5]. The acquisition of the Orascom group for €8.8 billion was intended to enable the implementation of the Lafarge group's major expansion strategy in emerging markets, which was conceived, initiated, and led by Mr. Bruno Lafont, who served as Chairman and Chief Executive Officer of LSA between 2006 and 2015, the year of the merger with the Holcim group.

---

[1] Exhibit No. 1: K-bis extract of Lafarge SA.
[2] Exhibit No. 2: Extract from the Commercial Register for Holcim SA.
[3] Exhibit No. 3: Consolidated annual report of the Holcim group dated December 31, 2020, p. 18.
[4] Exhibit No. 4: LafargeHolcim France 2020 sustainability report, p. 8.
[5] Exhibit No. 5: Le Figaro Economie, "*Lafarge s'offre Orascom pour 8,8 milliards de dollars*" ["Lafarge acquires Orascom for $8.8 billion"], December 10, 2007.

6.  At that time, the Orascom group was constructing a cement plant located in Jalabiya, in northeastern Syria, in partnership with Mr. Hassan Firas Tlass, a businessman from an influential family with connections in Syrian political circles. Mr. Tlass was involved in the negotiations relating to the acquisition of the Orascom group, during which he established ties with Mr. Lafont.

7.  Following its acquisition by the Lafarge group, the Jalabiya cement plant was commissioned and operated through LCS, indirectly owned 98.67% by LSA. LCS is a Syrian-law public joint stock company (*anonymous Arab Syrian joint stock company*)[6] whose management is carried out by a *Board of Directors*[7], under the authority of a *Chairman of the Board*[8]. The day-to-day management of the company is entrusted to a *General Manager* appointed by the Board of Directors[9].

8.  The present action is brought against four former executives of LCS:

    –   Mr. Bruno Pescheux, who served as General Manager of LCS between 2009 and July 2014;

    –   Mr. Frédéric Jolibois, who served as General Manager of LCS between July 2014 and 2016;

    –   Mr. Christian Herrault, who served as Chairman of the Board of Directors of LCS between 2012 and 2015; and

    –   Mr. Tlass, who served as a member of the Board of Directors of LCS until 2013 and was also a minority shareholder[10].

9.  The present action is also brought against Mr. Lafont who, in addition to his duties as Chairman and Chief Executive Officer of LSA, interfered in the management of LCS (see below, sections 27–30).

**B)  The discovery of links between LCS and Armed Groups**

10.  On February 19, 2016, the Syrian media outlet Zaman Al-Wasl published an article reporting suspicions of links between LCS and Armed Groups in the context of the Syrian civil war[11]. These allegations were subsequently reported in an article published on June 21, 2016 by the newspaper Le Monde[12].

11.  In July 2016, Holcim and LSA retained the law firm Baker McKenzie to conduct an independent internal investigation, the purpose of which was to determine the existence and extent of potential links between LCS and Armed Groups and, where applicable, individual responsibilities within the former Lafarge group.

---

[6] Exhibit No. 6: Articles of Association of Lafarge Cement Syria, Article 1
[7] Exhibit No. 6: Articles of Association of Lafarge Cement Syria, Article 17
[8] Exhibit No. 6: Articles of Association of Lafarge Cement Syria, Article 33.
[9] Exhibit No. 6: Articles of Association of Lafarge Cement Syria, Article 34.
[10] Mr. Tlass held 1.33% of the capital of LCS following the acquisition of the Orascom group by the Lafarge group.
[11] Exhibit No. 7: Zaman Al-Wasl, "*French cement company buys oil from ISIS: documents*," February 19, 2016.
[12] Exhibit No. 8: Le Monde, "*Comment le cimentier Lafarge a travaillé avec l'Etat islamique*" ["How the cement producer Lafarge worked with the Islamic State"], June 21, 2016.

12.  The internal investigation report prepared by Baker McKenzie was presented to the Board of Directors of Holcim on April 4, 2017[13]. The findings of this report confirmed certain of the press allegations concerning the links maintained by LCS with Armed Groups in Syria.

13.  In 2017, several former executives and employees of the Lafarge group, including Messrs. Lafont, Pescheux, Jolibois, and Herrault, were placed under formal investigation for acts of financing terrorism, customs violations, and endangering the lives of others in connection with the activities of LCS.

14.  Mr. Tlass, for his part, did not comply with the summons issued by the investigating judge, and an international arrest warrant was issued against him.

15.  In June 2018, LSA was in turn placed under formal investigation for these three offenses, as well as for complicity in crimes against humanity, on account of the offenses attributed to its former representatives. LSA thereby gained access to the investigation file, enabling it to identify more precisely the individuals responsible for establishing links between LCS and Armed Groups during the Syrian civil war.

### C)  The conduct of Messrs. Lafont, Pescheux, Jolibois, Herrault, and Tlass in connection with the activities of the former Lafarge group in Syria

Based on the information available to Holcim and LSA, in order to maintain its operations in Syria in the context of the Syrian civil war, LCS maintained relationships with Armed Groups (*1*). It also appears that these relationships between LCS and Armed Groups are attributable to the defendants in the present proceedings (*2*).

#### 1)  *The links established between LCS and Armed Groups during the Syrian civil war*

16.  Beginning in 2011, Syria was the scene of clashes between the Ba'athist regime and several rebel groups with differing affiliations. In this context, several terrorist organizations took control of territories in northern Syria: first the "Al-Nusra Front," a rebel group recognized in 2013 by the international community as the Syrian branch of the terrorist organization Al-Qaeda, followed by the "Islamic State," which entered the region beginning in 2013 and proclaimed the formation of a proto-state in Syria in July 2014.

17.  The Jalabiya cement plant was located in an active conflict zone. Beginning in 2011, the presence of armed forces operating in the region threatened the safety of employees at the Jalabiya cement plant as well as the road transport of the raw materials necessary for its operations.

18.  Based on the information available to Holcim and LSA, in order to maintain operations at the Jalabiya cement plant, LCS in particular[14]:

  – made funds available to Mr. Tlass so that he could make payments to Armed Groups operating in the area where the plant was located;

  – purchased raw materials, including refined petroleum, from suppliers, some of whom were affiliated with Armed Groups or sourced supplies from Armed Groups;

---

[13] Exhibit No. 9: Baker McKenzie report dated April 4, 2017, Annex – Timeline of Project Alpha, p. 28.
[14] Exhibit No. 9: Baker McKenzie report dated April 4, 2017, p. 2.

– purchased oil within Syrian territory in violation of the embargo measures imposed on Syria since September 2011;

– conducted transactions with groups designated on lists of entities subject to sanctions by the European Union and the United States;

– conducted transactions in U.S. dollars in Syria.

### 2) *The defendants' involvement in the links maintained by LCS with Armed Groups during the Syrian civil war*

19. It is apparent from the Baker McKenzie report and from the evidence in the investigation file that the defendants bear particular responsibility for the establishment of links between LCS and Armed Groups during the Syrian civil war.

20. As regards Mr. Pescheux, he was responsible for the day-to-day management of all of LCS's operations between 2009 and 2014 in his capacity as the company's General Manager[15].

21. Mr. Pescheux set up monthly payments to Mr. Tlass intended for Armed Groups, some of which were made in U.S. dollars. Mr. Pescheux also acquired raw materials from Armed Groups[16].

22. As regards Mr. Jolibois, he assumed Mr. Pescheux's responsibilities from July 2014, the date on which the latter left his position as General Manager of LCS.

23. He was informed in detail of the practices put in place by Mr. Pescheux as soon as he took office and continued them during 2014. Thus, it is apparent from the report prepared by Baker McKenzie that Mr. Jolibois committed the same wrongful acts as Mr. Pescheux in connection with the Lafarge group's operations in Syria[17].

24. As regards Mr. Herrault, he held the office of Chairman of the Board of Directors of LCS. In that capacity, he was responsible for LCS's overall strategic direction[18] and had the authority to bind the company[19]. Mr. Herrault intervened directly in the management of LCS during the Syrian civil war.

25. Mr. Herrault was in regular communication with Mr. Pescheux concerning the Syrian crisis. He participated in the negotiations and in the payments made for the benefit of Armed Groups through Mr. Tlass[20].

26. As regards Mr. Tlass, he acted as an intermediary between LCS and the Armed Groups, negotiating with those groups and paying them in order to ensure the movement of goods and persons around the Jalabiya cement plant.

---

[15] Exhibit No. 6: Articles of Association of Lafarge Cement Syria, Article 34.
[16] Exhibit No. 9: Baker McKenzie report dated April 4, 2017, Annex IV and V, p. 32 and 38–41.
[17] Exhibit No. 9: Baker McKenzie report dated April 4, 2017, *Ibid.*
[18] Exhibit No. 6: Articles of Association of Lafarge Cement Syria, Article 32.
[19] Exhibit No. 6: Articles of Association of Lafarge Cement Syria, Article 33.
[20] Exhibit No. 9: Baker McKenzie report dated April 4, 2017, Annex IV and V, p. 35–36 and 38–41.

27.  Lastly, as regards <u>Mr. Lafont</u>, it has recently emerged that he was behind the decision to keep the Jalabiya cement plant in operation, despite the presence of Armed Groups active in the region, and even though all international groups present in Syrian territory at that time left the country in 2012, when embargo measures were put in place against Syria.

28.  In order to ensure, at all costs, that production in Syria was maintained, Mr. Lafont <u>interfered in the management of LCS</u>.

29.  <u>First</u>, beginning in 2012, Mr. Lafont requested to be kept informed of the situation of LCS in Syria on a very regular basis. To that end, Mr. Lafont in particular requested that the minutes of the Lafarge group Security Committee, whose official role was to manage the Syrian crisis and of which Mr. Lafont was not an ex officio member, be delivered to him in a sealed envelope (and not by email)[21]. Between 2012 and 2014, Mr. Lafont maintained very regular contact with Messrs. Pescheux, Jolibois, and Herrault regarding the situation of the Jalabiya cement plant[22]. It is further recalled that Mr. Lafont had maintained privileged ties with Mr. Tlass since the Lafarge group's establishment in Syria (see above, section 6).

30.  <u>Second</u>, pursuant to the Lafarge group's internal rules between 2011 and 2015, the decision to shut down the Jalabiya cement plant rested with Mr. Lafont, even though he was not a statutory officer of LCS. Mr. Lafont took part in the management decisions made by LCS's officers in connection with the handling of the Syrian situation. Mr. Lafont thus gave instructions to Messrs. Pescheux, Jolibois, and Herrault in connection with the management of LCS during the Syrian civil war.

### D) The consequences of the wrongful acts committed by the defendants for LSA and Holcim

31.  The wrongful acts committed by Messrs. Lafont, Pescheux, Jolibois, Herrault, and Tlass had serious consequences for LSA and Holcim.

32.  <u>First</u>, the conduct of Messrs. Lafont, Pescheux, Jolibois, Herrault, and Tlass caused particularly serious harm to LSA's reputation. Indeed, the image of the trade name "Lafarge" was irreparably tarnished by the establishment of links between the Lafarge group and Armed Groups during the Syrian civil war. Since those events, the trade name "Lafarge" has, in the minds of the public, the market, and the group's employees, become associated with terrorist organizations, in particular including the Islamic State. Holcim's image was likewise affected by the defendants' conduct.

33.  <u>Second</u>, the acts attributable to Messrs. Lafont, Pescheux, Jolibois, Herrault, and Tlass had significant consequences for the morale and well-being of LSA's and Holcim's employees.

34.  <u>Third</u>, the adverse repercussions of the defendants' conduct on LSA and Holcim caused them financial harm, which took the form of the substantial costs they were forced to incur in the context of the crisis generated by the defendants' conduct (advisory, audit, and communications fees), as well as the loss of numerous commercial and financial opportunities.

---

[21] Exhibits Nos. 10 and 9: L'Express, "*Lafarge : ce patron qui ne savait rien sur Daech*" ["Lafarge: this executive who knew nothing about ISIS"], June 28, 2018; Baker McKenzie report dated 4 April 2017, Annex IV, pp. 36–37

[22] Exhibit No. 11: Le JDD, "*Activités de Lafarge en Syrie : ces deux réunions au cœur de l'enquête*" ["Lafarge's activities in Syria: the two meetings at the heart of the investigation"], January 4, 2018.

35. <u>Fourth</u>, the relationships between LCS and Armed Groups in Syria led to requests for information addressed to the Holcim group by the U.S. government's *Department of Justice* (hereinafter the "**DOJ**"). In accordance with its obligations, Holcim informed the market of the DOJ's requests for information in its half-year report published on July 31, 2021[23]. Holcim's share price dropped significantly upon publication of that announcement.

36. <u>Fifth</u>, Holcim suffered a loss of financing as a result of the defendants' actions. A number of institutional lenders severed their ties with Holcim because their risk management policies and/or the protection of their image did not permit them to finance a group whose reputation had been tainted by allegations of financing terrorism. The defendants' conduct had similar consequences for debt securities issued by Holcim, from which investors withdrew. The loss of that financing caused a significant increase in Holcim's financing costs.

37. It was under these circumstances that LSA and Holcim decided to bring the matter before the Paris Commercial Court in order to obtain compensation for the substantial harm caused by the former executives of the Lafarge group.

## II.    DISCUSSION

*In limine litis,* the court is requested to stay the present proceedings until the conclusion of the ongoing criminal proceedings relating to the facts forming the subject matter of this summons (**A**). On the merits, LSA and Holcim seek an order requiring the defendants to compensate them for their losses (**B**).

### A)   *In limine litis,* on the stay of proceedings pending the criminal decision to be rendered

38. Pursuant to Article 4 of the French Code of Criminal Procedure:

> *"The civil action seeking compensation for damage caused by the offense referred to in Article 2 may be brought before a civil court separately from the public prosecution.*
>
> *However, judgment on such action shall be stayed until a final decision has been rendered on the public prosecution where such prosecution has been initiated.*
>
> *The initiation of the public prosecution does not require the suspension of judgment on other actions brought before the civil court, of whatever nature, even if the decision to be rendered in the criminal proceedings is likely to influence, directly or indirectly, the resolution of the civil dispute."*

39. This provision is the basis of the principle according to which "*criminal proceedings take precedence over civil proceedings."* This rule is justified by the principle of the binding authority of criminal decisions over civil decisions and guided by the objective of avoiding any contradiction between a civil judgment and a criminal judgment.

40. In the present case, LSA and Holcim bring this action in order to obtain compensation for the wrongful acts committed by Messrs. Lafont, Pescheux, Jolibois, Herrault, and Tlass in connection with the activities of LCS. The conduct alleged against them in the present proceedings is also the subject of criminal proceedings registered under Prosecutor's Office number 1632201114.

---

[23] Exhibit No. 12: Holcim group half-year report dated July 29, 2021, p. 29.

41. Accordingly, the court is requested to stay the present proceedings until the conclusion of those criminal proceedings.

**B) On the liability of Messrs. Lafont, Pescheux, Jolibois, Herrault, and Tlass**

42. As a preliminary matter, it is well established that the law applicable to actions brought against the officers of a foreign company is the *lex societatis,* that is, the law governing the incorporation of that company.

43. The present action seeks to establish the liability of the defendants for their conduct in connection with the management of LCS.

44. <u>On the one hand</u>, the present action seeks to establish the liability of Mr. Lafont for the wrongful acts he committed both:

   – in his capacity as a de facto officer of LCS, which is a company incorporated under Syrian law. In this respect, Mr. Lafont is liable toward LSA and Holcim under Syrian law, pursuant to which his conduct constitutes wrongful acts[24]; and

   – in his capacity as a de jure officer of LSA, which is a company incorporated under French law. In this respect, Mr. Lafont is liable toward LSA and Holcim under French law, pursuant to which his conduct likewise constitutes wrongful acts[25].

45. <u>On the other hand</u>, the present action seeks to establish the liability of Messrs. Pescheux, Jolibois, Herrault, and Tlass for the wrongful acts they committed in their capacities as de jure officers of LCS.

46. The liability of Messrs. Pescheux, Jolibois, Herrault, and Tlass for their conduct in connection with the management of LCS is therefore governed by Syrian law, pursuant to which their conduct constitutes wrongful acts giving rise to a right to compensation for LSA and Holcim[26].

47. The defendants' conduct in connection with the management of LCS caused significant harm to LSA and Holcim.

48. <u>LSA</u> suffered:

   – reputational harm resulting from damage to its image;

   – non-material harm resulting from deterioration in the morale and well-being of its employees; and

   – financial harm resulting from the costs it was compelled to incur due to the defendants' actions and from the loss of numerous commercial and financial opportunities.

49. LSA estimates these losses at the amount of fifty million (**50,000,000**) euros, subject to adjustment.

---

[24] Article 164 of the Syrian Civil Code.
[25] Article 225-251 of the Commercial Code.
[26] Article 164 of the Syrian Civil Code.

50.   <u>Holcim</u> suffered:

–   reputational harm resulting from damage to its image;

–   non-material harm resulting from deterioration in the morale and well-being of its employees;

–   financial harm resulting from the costs it was compelled to incur due to the defendants' actions and from the loss of numerous commercial and financial opportunities;

–   financial harm resulting from advisory costs incurred following the initiation of the French criminal proceedings and the requests for information addressed by the DOJ; and

–   financial harm resulting from the increase in the cost of its financing caused by the defendants' conduct.

51.   Holcim estimates these losses at the amount of one hundred million (**100,000,000**) euros, subject to adjustment.

52.   Accordingly, the court is requested to:

–   order Messrs. Lafont and Tlass, jointly and severally (*in solidum*), to pay the sum of fifty million (**50,000,000**) euros, subject to adjustment, to LSA as compensation for its losses;

–   order Messrs. Lafont, Pescheux, Jolibois, Herrault, and Tlass, jointly and severally (*in solidum*), to pay the sum of one hundred million (**100,000,000**) euros, subject to adjustment, to Holcim as compensation for its losses.

53.   LSA and Holcim reserve the right to seek compensation for any additional losses arising or to arise from the defendants' actions in the context of the present proceedings.

**FOR THESE REASONS**

---

The court is requested to:

*In limine litis,*

–   **STAY** the present proceedings until the conclusion of the ongoing criminal proceedings registered under Prosecutor's Office number 1632201114;

–   **RESERVE** costs.

On the merits,

–   **ORDER**, jointly and severally (*in solidum*), Messrs. Bruno Lafont and Hassan Firas Tlass to pay to Lafarge SA the sum of fifty million (**50,000,000**) euros, subject to adjustment;

–   **ORDER**, jointly and severally (*in solidum*), Messrs. Bruno Lafont, Bruno Pescheux, Frédéric Jolibois, Christian Herrault, and Hassan Firas Tlass to pay to Holcim SA the sum of one hundred million (**100,000,000**) euros, subject to adjustment.

14

## LIST OF EXHIBITS

**Exhibit No. 1**   K-bis extract of Lafarge SA

**Exhibit No. 2**   Extract from the Commercial Register for Holcim SA

**Exhibit No. 3**   Consolidated annual report of the Holcim group dated December 31, 2020

**Exhibit No. 4**   LafargeHolcim France 2020 sustainability report

**Exhibit No. 5**   Le Figaro Economie, "Lafarge s'offre Orascom pour 8,8 milliards de dollars" ["Lafarge acquires Orascom for $8.8 billion"], December 10, 2007

**Exhibit No. 6**   Articles of Association of Lafarge Cement Syria

**Exhibit No. 7**   Zaman Al-Wasl, "*French cement company buys oil from ISIS: documents*," February 19, 2016

**Exhibit No. 8**   Le Monde, "*Comment le cimentier Lafarge a travaillé avec l'Etat islamique*" ["How the cement producer Lafarge worked with the Islamic State"], June 21, 2016

**Exhibit No. 9**   Baker McKenzie report dated April 4, 2017

**Exhibit No. 10**   L'Express, "*Lafarge : ce patron qui ne savait rien sur Daech*" ["Lafarge: this executive who knew nothing about ISIS"], June 28, 2018

**Exhibit No. 11**   Le JDD, "*Activités de Lafarge en Syrie : ces deux réunions au cœur de l'enquête*" ["Lafarge's activities in Syria: the two meetings at the heart of the investigation"], January 4, 2018

**Exhibit No. 12**   Holcim group half-year report dated July 29, 2021

15



MD:61743

Instrument: 83851

**Associated Bailiffs**

## SCP PARKER PERROT TAUPIN

*Associated Bailiffs*

Raynald PARKER
Raphaël PERROT
Thibauld TAUPIN

7 av. de la Grande Armée
75116 PARIS – France

Tel.: +33 1 45 56 01 02

scp@parker-perrot.com

Bank details:

IBAN: REDACTED - GDPR
REDACTED - GDPR

BIC: REDACTED - GDPR

Online payment website:
www.jepaieparcarte.com

Accepts payment by
credit card

---

BAILIFF'S
INSTRUMENT

---

REFERENCES TO BE STATED
MD:61743 - TT

---

| COST OF THE INSTRUMENT | |
|---|---|
| Service fee | 36.18 |
| SCT | 7.67 |
| Excl. VAT | 43.85 |
| VAT 20% | 8.77 |
| Stamps | 3.40 |
| Total incl. VAT | 56.02 |

---

# SERVICE UPON A THIRD PARTY PRESENT AT THE RESIDENCE

**Applicants**: LAFARGE SA, HOLCIM SA

**Title of instrument served**: SUMMONS BEFORE THE PARIS COMMERCIAL COURT

**Date of service:** February 21, 2022

**Recipient: Mr. Bruno LAFONT** residing at REDACTED - GDPR         PARIS

The instrument was served by a sworn clerk, speaking with REDACTED - GDPR , spouse of the addressee, encountered at the premises, who confirmed the residence and agreed to receive the envelope containing a copy of the instrument in the absence of the addressee.

The envelope is sealed and bears no other indication than, on one side, the name and address of the recipient of the instrument and, on the other side, the bailiff's stamp affixed over the seal of the envelope.

A notice of service dated today informing the addressee of delivery of the copy, stating the nature of the instrument, the name of the applicant, and the information relating to the person to whom the copy was delivered, was left at the residence.

The letter provided for in Article 658 of the French Code of Civil Procedure, containing the same information as the notice of service and a copy of the instrument of service, was sent within the time limit prescribed by law.

The present instrument is not subject to fiscal tax.

The served copy comprises 16 pages.

The information relating to service has been certified by the Bailiff.

Thibauld TAUPIN

[signature]



[seal: SCP Raynald PARKER, Raphaël PERROT, and Thibauld TAUPIN | Associated Bailiffs | 7 av. de la Grande Armée 75116 PARIS]

4

morningtrans.com



# TRANSLATION CERTIFICATION

Date: March 28, 2026

To whom it may concern:

I, Hugh T. Robinson, a translator fluent in the French and English languages, on behalf of Morningside, do solemnly and sincerely declare that the following is, to the best of my knowledge and belief, a true and correct translation of the document(s) listed below in a form that best reflects the intention and meaning of the original text.

The document is designated as:

- Assignation devant le tribunal de commerce de Paris

*Hugh T. Robinson*

Signature

Hugh T. Robinson

Print

Questel Confidential: Limited External Use

299 South Main Street, Suite 1300
Salt Lake City, UT 84111

Société Civile Professionnelle
**Raynald PARKER**
**Raphaël PERROT**
**et Thibauld TAUPIN**
Huissiers de Justice associés
7 avenue de la Grande Armée - 75116 PARIS

**PREMIERE EXPEDITION**

**ASSIGNATION DEVANT LE TRIBUNAL DE COMMERCE DE PARIS**

## L'AN DEUX MILLE VINGT-DEUX

### LE    VINGT ET UN FEVRIER

## À LA DEMANDE DE :

**Lafarge SA**, société anonyme au capital de 1.160.623.852 euros, dont le siège social est situé 14-16 boulevard Garibaldi 92130 Issy-Les-Moulineaux, immatriculée au registre du commerce et des sociétés de Nanterre sous le numéro 542.105.572, agissant par ses représentants légaux.

**Holcim SA**, société anonyme de droit suisse (*Aktiengesellschaft*) au capital de 1.231.858.118 francs suisses (CHF), dont le siège social est situé Grafenauweg 10, CH 6300 Zoug (Suisse), immatriculée au registre du commerce du canton de Zoug sous le numéro CHE-100.136.893, agissant par ses représentants légaux.

*Elisant domicile chez leur avocat constitué à l'adresse indiquée ci-dessous*

*Demanderesses*

Ayant pour avocat constitué :

**Pierre Herné**
Avocat au Barreau de Paris
16 rue Gustave Courbet – 75116 Paris

Et pour avocats plaidants :

**Christophe Ingrain et Nicolas Mennesson**
Avocats au Barreau de Paris
Darrois Villey Maillot Brochier AARPI
69 avenue Victor Hugo – 75116 Paris
Tél. : 01.45.02.19.19 / Fax : 01.45.02.49.59
Toque : R170

**Denis Chemla**
Avocat au Barreau de Paris
Allen & Overy LLP
52 avenue Hoche – 75008 Paris
Tél. : 01.40.06.54.00 / Fax : 01.40.06.54.54
Toque : J022

1

**J'AI, HUISSIER DE JUSTICE SOUSSIGNE,**

Raynald PARKER, Raphaël PERROT et Thibauld TAUPIN, Huissiers de Justice associés Société Civile Professionnelle titulaire d'un Office d'Huissier de Justice, 7 avenue de la Grande Armée, 75116 PARIS, par l'un d'eux soussigné.

**DONNE ASSIGNATION À :**

— **Monsieur Bruno Lafont**, né le REDACTED - GDPR à Boulogne-Billancourt REDACTED - GDPR de nationalité française, demeurant **REDACTED - GDPR** Paris, retraité ;

Comme il est dit sur le feuillet de fin d'acte

— **Monsieur Bruno Pescheux**, né le REDACTED - GDPR à Morée REDACTED - GDPR de nationalité française, demeurant **REDACTED - GDPR** Lyon, retraité ;

par acte séparé

— **Monsieur Frédéric Jolibois**, né le REDACTED - GDPR à Saint-Mandé REDACTED - GDPR de nationalité française, demeurant **REDACTED - GDPR** Pibrac, retraité ;

par acte séparé

— **Monsieur Christian Herrault**, né le REDACTED - GDPR à Paris REDACTED - GDPR de nationalité française, demeurant **REDACTED - GDPR** Paris, retraité ;

par acte séparé

— **Monsieur Hassan Firas Tlass**, né le REDACTED - GDPR à Alep (Syrie), de nationalité syrienne, dont la dernière adresse connue est **REDACTED - GDPR** – Mazzeh à Damas (Syrie), homme d'affaires.

par acte séparé

*Défendeurs*

---

D'avoir à comparaître par devant les Président et Juges composant la 18ème chambre du Tribunal de commerce de Paris, situé 1 Quai de la Corse – 75004 Paris, à l'audience qui se tiendra le 16 juin 2022 à 11h.

---

2

## TRÈS IMPORTANT

*Conformément aux règles fixées par les articles 56, 643, 853, 855, 861-2 du code de procédure civile, les demanderesses informent les destinataires de la présente assignation que :*

– *Les parties sont, sauf disposition contraire, tenues de constituer avocat devant le tribunal de commerce.*

– *La constitution de l'avocat emporte l'élection de domicile.*

– *Les parties sont dispensées de l'obligation de constituer avocat dans les cas prévus par la loi ou le règlement, lorsque la demande porte sur un montant inférieur ou égal à 10.000 euros, dans le cadre des procédures instituées par le livre VI du code de commerce ou pour les litiges relatifs à la tenue du registre du commerce et des sociétés.*

  *Dans ces cas, elles ont la faculté de se faire assister ou représenter par toute personne de leur choix.*

  *Le représentant, s'il n'est avocat, doit justifier d'un pouvoir spécial.*

– *Faute pour le défendeur de comparaître, il s'expose à ce qu'une décision soit rendue contre lui sur les seuls éléments fournis par son adversaire.*

– *Les pièces sur lesquelles se fondent les demandes formulées aux termes de la présente assignation sont indiquées en fin d'acte.*

– *Il est rappelé aux défendeurs qu'aux termes de l'article 861-2 du code de procédure civile :*

  *« Sans préjudice des dispositions de l'article 68, la demande incidente tendant à l'octroi d'un délai de paiement en application de l'article 1343-5 du code civil peut être formée par requête faite, remise ou adressée au greffe, où elle est enregistrée. L'auteur de cette demande doit justifier avant l'audience que l'adversaire en a eu connaissance par lettre recommandée avec demande d'avis de réception. Les pièces que la partie invoque à l'appui de sa demande de délai de paiement sont jointes à la requête.*

  *L'auteur de cette demande incidente peut ne pas se présenter à l'audience, conformément au second alinéa de l'article 446-1. Dans ce cas, le juge ne fait droit aux demandes présentées contre cette partie que s'il les estime régulières, recevables et bien fondées. »*

– *Il est par ailleurs rappelé aux défendeurs les articles suivants ci-après reproduits :*

  *Article 641 du code de procédure civile :*

  *« Lorsqu'un délai est exprimé en jours, celui de l'acte, de l'événement, de la décision ou de la notification qui le fait courir ne compte pas.*

3

Lorsqu'un délai est exprimé en mois ou en années, ce délai expire le jour du dernier mois ou de la dernière année qui porte le même quantième que le jour de l'acte, de l'événement, de la décision ou de la notification qui fait courir le délai. A défaut d'un quantième identique, le délai expire le dernier jour du mois.

Lorsqu'un délai est exprimé en mois et en jours, les mois sont d'abord décomptés, puis les jours ».

Article 642 du code de procédure civile :

« Tout délai expire le dernier jour à vingt-quatre heures.

Le délai qui expirerait normalement un samedi, un dimanche ou un jour férié ou chômé est prorogé jusqu'au premier jour ouvrable suivant. »

Article 643 du code de procédure civile :

« Lorsque la demande est portée devant une juridiction qui a son siège en France métropolitaine, les délais de comparution, d'appel, d'opposition, de tierce opposition dans l'hypothèse prévue à l'article 586 alinéa 3, de recours en révision et de pourvoi en cassation sont augmentés de :

1. Un mois pour les personnes qui demeurent en Guadeloupe, en Guyane, à la Martinique, à La Réunion, à Mayotte, à Saint-Barthélemy, à Saint-Martin, à Saint-Pierre-et-Miquelon, en Polynésie française, dans les îles Wallis et Futuna, en Nouvelle-Calédonie et dans les Terres australes et antarctiques françaises ;

2. Deux mois pour celles qui demeurent à l'étranger. »

4

## Synthèse du litige

Le présent litige est lié aux agissements de certains anciens dirigeants du groupe Lafarge dans le cadre de l'activité du groupe en Syrie pendant la guerre civile syrienne.

A compter de 2010, le groupe Lafarge a exploité la cimenterie de Jalabiya en Syrie par l'intermédiaire de Lafarge Cement Syria (ci-après « **LCS** »), filiale de droit syrien indirectement détenue par Lafarge SA (ci-après « **LSA** »).

Entre 2011 et 2015, la situation de la cimenterie de Jalabiya a été déstabilisée par la guerre civile syrienne, au cours de laquelle des organisations terroristes – dont notamment l'Etat islamique et le Front Al-Nosra – ont pris le contrôle de territoires dans le nord-est de la Syrie. La cimenterie de Jalabiya a cependant été maintenue en activité.

En 2017, plusieurs anciens dirigeants de LSA et de LCS ont été mis en examen, notamment pour des faits de financement du terrorisme commis entre 2011 et 2014 dans le cadre de l'activité de LCS. Ces mises en examen ont entraîné, en 2018, la mise en examen de LSA.

En l'état des informations dont disposent LSA et Holcim SA (ci-après « **Holcim** »), société mère de LSA depuis 2015, il apparait que quatre des personnes mises en examen ont joué un rôle déterminant dans les liens qui ont été entretenus entre LCS et des groupes armés dont certains étaient affiliés à des organisations terroristes (ci-après les « **Groupes Armés** ») : MM. Bruno Lafont, Bruno Pescheux, Frédéric Jolibois et Christian Herrault, qui sont tous d'anciens dirigeants du groupe Lafarge. Il ressort par ailleurs des informations accessibles à ce jour que M. Hassan Firas Tlass, actuellement placé sous mandat d'arrêt international, a également joué un rôle d'intermédiaire déterminant dans les faits en question.

Les agissements de MM. Lafont, Pescheux, Jolibois, Herrault et Tlass dans le cadre de la gestion de LCS ont causé un important préjudice de réputation, moral et financier à LSA et à Holcim, qui engagent la présente action aux fins de les voir condamner à réparer ce préjudice.

La procédure pénale portant sur les faits objets de la présente instance est actuellement pendante. Il est donc demandé au tribunal de surseoir à statuer dans la présente instance jusqu'au terme de la procédure pénale.

5

PLAISE AU TRIBUNAL

## I.    RAPPEL DES FAITS

Après une présentation des parties (**A**), il convient d'exposer les conditions dans lesquelles ont été révélées les relations entre LCS et des Groupes Armés (**B**). Ces relations ont été nouées à l'initiative des défendeurs (**C**) et ont causé aux demanderesses des préjudices considérables (**D**).

### A)  Présentation des parties

Il convient de présenter les demanderesses (**1**) et les défendeurs à la présente instance (**2**).

#### 1)  Présentation des demanderesses

1. Le groupe Lafarge a été fondé en 1833 en Ardèche par la famille Pavin de Lafarge et s'est, au cours de la seconde moitié du XIX$^{ème}$ siècle, imposé comme un fleuron français de l'industrie de la construction. Il est devenu le premier cimentier français en 1939 et un des premiers cimentiers mondiaux dans les années 2000. Jusqu'au rapprochement du groupe Lafarge avec le groupe Holcim, la société LSA était la société mère du groupe Lafarge[1].

2. Le groupe Holcim a été fondé en 1912 dans le canton d'Argovie (Suisse), à l'occasion de la construction de la cimenterie d'Holderbank. Dès les années 1920, le groupe Holcim s'est étendu en Europe et en Outre-mer. Dans les années 2000, le groupe Holcim était également un des premiers cimentiers à l'échelle mondiale.

3. En 2015, le groupe Lafarge et le groupe Holcim se sont rapprochés pour créer le groupe LafargeHolcim. Holcim est alors devenue la société mère du groupe consolidé et compte depuis lors LSA parmi ses filiales à 100%. Le groupe consolidé a récemment été renommé « Holcim ». La société mère du groupe Holcim est la société de droit suisse Holcim[2].

4. Au 31 décembre 2020, le groupe Holcim employait plus de 70.000 collaborateurs à l'échelle mondiale et exploitait près de 2.300 sites de production de ciments, bétons, et granulats[3]. A la même date, le groupe Holcim employait 4.300 collaborateurs en France sur plus de 400 sites[4].

#### 2)  Présentation des défendeurs

5. Le groupe Lafarge s'est implanté en Syrie en 2008, à l'occasion de l'acquisition du groupe égyptien Orascom[5]. Le rachat du groupe Orascom pour 8,8 milliards d'euros devait permettre la réalisation du grand projet de déploiement du groupe Lafarge dans les pays émergents, voulu, initié et mené par M. Bruno Lafont, qui a exercé les fonctions de président directeur général de LSA entre 2006 et 2015, année du rapprochement avec le groupe Holcim.

---

[1] Pièce n°1 : Extrait K-bis de Lafarge SA.
[2] Pièce n°2 : Extrait du registre du commerce d'Holcim SA.
[3] Pièce n°3 : Rapport annuel consolidé du groupe Holcim en date du 31 décembre 2020, p.18.
[4] Pièce n°4 : Rapport développement durable 2020 de LafargeHolcim France, p.8.
[5] Pièce n°5 : Le Figaro Economie, *Lafarge s'offre Orascom pour 8,8 milliards de dollars*, 10 décembre 2007.

6

6. Le groupe Orascom construisait alors une cimenterie située à Jalabiya, dans le nord-est de la Syrie, en partenariat avec M. Hassan Firas Tlass, un homme d'affaires issu d'une famille influente et introduite dans les milieux politiques syriens. M. Tlass était impliqué dans les négociations lors du rachat du groupe Orascom, à l'occasion desquelles il a noué des liens avec M. Lafont.

7. A l'issue de son acquisition par le groupe Lafarge, la cimenterie de Jalabiya a été mise en service et exploitée par l'intermédiaire de LCS, indirectement détenue à 98,67% par LSA. LCS est une société anonyme de droit syrien (*anonymous Arab Syrian joint stock company*)[6] dont la direction est assurée par un conseil d'administration (*Board of Directors*)[7], placé sous l'autorité d'un président du conseil d'administration (*Chairman of the Board*)[8]. La gestion quotidienne de la société est confiée à un directeur général (*General Manager*) nommé par le conseil d'administration[9].

8. La présente action est exercée contre quatre anciens dirigeants de LCS :

   - M. Bruno Pescheux, qui a exercé les fonctions de directeur général de LCS entre 2009 et juillet 2014 ;

   - M. Frédéric Jolibois, qui a exercé les fonctions de directeur général de LCS entre juillet 2014 et 2016 ;

   - M. Christian Herrault, qui a exercé les fonctions de président du conseil d'administration de LCS entre 2012 et 2015 ; et

   - M. Tlass, qui a exercé les fonctions de membre du conseil d'administration de LCS jusqu'en 2013 et en était par ailleurs actionnaire minoritaire[10].

9. La présente action vise également M. Lafont qui, outre ses fonctions de président directeur général de LSA, s'est immiscé dans la gestion de LCS (cf. *infra*, §27-30).

**B) La découverte de liens entre LCS et des Groupes Armés**

10. Le 19 février 2016, le média syrien Zaman Al-Wasl a publié un article faisant état de soupçons de liens entre LCS et des Groupes Armés dans le contexte de la guerre civile syrienne[11]. Ces allégations ont été reprises dans un article du 21 juin 2016 publié par le journal le Monde[12].

11. En juillet 2016, Holcim et LSA ont mandaté le cabinet Baker McKenzie pour conduire une enquête interne indépendante, dont l'objet était de déterminer l'existence et l'étendue de potentiels liens entre LCS et des Groupes Armés, et le cas échéant les responsabilités individuelles au sein de l'ancien groupe Lafarge.

---

[6] Pièce n°6 : Statuts de Lafarge Cement Syria, Article 1.
[7] Pièce n°6 : Statuts de Lafarge Cement Syria, Article 17.
[8] Pièce n°6 : Statuts de Lafarge Cement Syria, Article 33.
[9] Pièce n°6 : Statuts de Lafarge Cement Syria, Article 34.
[10] M. Tlass détenait 1,33% du capital de LCS à la suite du rachat du groupe Orascom par le groupe Lafarge.
[11] Pièce n°7 : Zaman Al-Wasl, *French cement company buys oil from ISIS: documents*, 19 février 2016.
[12] Pièce n°8 : Le Monde, *Comment le cimentier Lafarge a travaillé avec l'Etat islamique*, 21 juin 2016.

12. Le rapport d'enquête interne du cabinet Baker McKenzie a été présenté au conseil d'administration d'Holcim le 4 avril 2017[13]. Les conclusions de ce rapport ont confirmé certaines des allégations de la presse relatives aux liens entretenus par LCS avec des Groupes Armés en Syrie.

13. En 2017, plusieurs anciens dirigeants et employés du groupe Lafarge, dont MM. Lafont, Pescheux, Jolibois et Herrault, ont été mis en examen pour des faits de financement du terrorisme, d'infractions douanières et de mise en danger de la vie d'autrui en lien avec l'activité de LCS.

14. M. Tlass n'a quant à lui pas déféré à la convocation du juge chargé d'instruire l'affaire et un mandat d'arrêt international a été décerné à son encontre.

15. En juin 2018, LSA a été à son tour mise en examen pour ces trois délits, mais également pour complicité de crimes contre l'humanité, du fait des infractions imputées à ses anciens représentants. LSA a ainsi eu accès au dossier d'instruction, ce qui lui a permis d'identifier avec plus de précision les personnes responsables de l'établissement de liens entre LCS et des Groupes Armés lors de la guerre civile syrienne.

### C) Les agissements de MM. Lafont, Pescheux, Jolibois, Herrault et Tlass dans le cadre de l'activité de l'ancien groupe Lafarge en Syrie

Il ressort des informations accessibles à Holcim et LSA que, pour maintenir son activité en Syrie dans le contexte de la guerre civile syrienne, LCS a entretenu des liens avec des Groupes Armés (*1*). Il apparait également que ces relations entre LCS et des Groupes Armés sont imputables aux défendeurs à la présente instance (*2*).

#### 1) Les liens établis entre LCS et des Groupes Armés lors de la guerre civile syrienne

16. A compter de 2011, la Syrie a été le théâtre d'affrontements entre le régime baasiste et plusieurs groupes rebelles d'affiliations disparates. Dans ce contexte, plusieurs organisations terroristes ont pris le contrôle de territoires dans le nord de la Syrie : tout d'abord le « Front Al-Nosra », groupe rebelle reconnu en 2013 par la communauté internationale comme la branche syrienne de l'organisation terroriste Al-Qaïda, suivi de « l'Etat islamique » qui est intervenu dans la région à compter de 2013 et a proclamé la formation d'un proto-état en Syrie en juillet 2014.

17. La cimenterie de Jalabiya était située sur un territoire d'affrontement. Dès 2011, la présence de forces armées opérant dans la région menaçait la sécurité des salariés de la cimenterie de Jalabiya ainsi que le transport par route des matières premières nécessaires à son activité.

18. Il ressort des éléments accessibles à Holcim et LSA que, pour maintenir l'activité de la cimenterie de Jalabiya, LCS a notamment[14] :

   – mis des sommes d'argent à la disposition de M. Tlass, pour que celui-ci effectue des paiements au profit de Groupes Armés opérant dans la zone où l'usine était située ;

   – acheté des matières premières, notamment du pétrole raffiné, auprès de fournisseurs dont certains étaient affiliés à des Groupes Armés ou se fournissaient auprès de Groupes Armés ;

---

[13] Pièce n°9 : Rapport du cabinet Baker McKenzie en date du 4 avril 2017, Annexe – Chronologie du Projet Alpha, p.28.
[14] Pièce n°9 : Rapport du cabinet Baker McKenzie en date du 4 avril 2017, p.2.

8

- acheté du pétrole sur le territoire syrien en violation des mesures d'embargo qui frappaient la Syrie depuis septembre 2011 ;

- effectué des transactions avec des groupes désignés au sein des listes d'entités soumises à des sanctions par l'Union européenne et les Etats-Unis ;

- effectué des transactions en dollars américains en Syrie.

### 2) L'implication des défendeurs dans les liens entretenus par LCS avec des Groupes Armés lors de la guerre civile syrienne

19. Il ressort du rapport du cabinet Baker McKenzie et des éléments du dossier d'instruction que les défendeurs ont une responsabilité particulière dans l'établissement de liens entre LCS et des Groupes Armés lors de la guerre civile syrienne.

20. S'agissant de M. Pescheux, il était responsable de la gestion quotidienne de toute l'activité de LCS entre 2009 et 2014 en sa qualité de directeur général de la société[15].

21. M. Pescheux a mis en place des versements mensuels au profit de M. Tlass destinés aux Groupes Armés, dont certains étaient effectués en dollars américains. M. Pescheux a également procédé à l'acquisition de matières premières auprès de Groupes Armés[16].

22. S'agissant de M. Jolibois, il exerçait les responsabilités de M. Pescheux à compter de juillet 2014, date à laquelle ce dernier a quitté ses fonctions de directeur général de LCS.

23. Il était informé en détail des pratiques mises en place par M. Pescheux dès son entrée en fonction et les a continuées sur l'année 2014. Il ressort ainsi du rapport établi par le cabinet Baker McKenzie que M. Jolibois a commis les mêmes fautes que M. Pescheux dans le cadre de l'activité du groupe Lafarge en Syrie[17].

24. S'agissant de M. Herrault, il exerçait les fonctions de président du conseil d'administration de LCS. Il était à ce titre responsable des grandes orientations de LCS[18] et disposait du pouvoir d'engager la société[19]. M. Herrault intervenait directement dans la gestion de LCS pendant la guerre civile syrienne.

25. M. Herrault était en communication régulière avec M. Pescheux au sujet de la crise syrienne. Il a participé aux négociations et aux paiements effectués au profit de Groupes Armés par l'intermédiaire de M. Tlass[20].

26. S'agissant de M. Tlass, il jouait un rôle d'intermédiaire entre LCS et les Groupes Armés, en négociant avec ces groupes et en les payant pour assurer la circulation des marchandises et des personnes autour de la cimenterie de Jalabiya.

---

[15] Pièce n°6 : Statuts de Lafarge Cement Syria, Article 34.
[16] Pièce n°9 : Rapport du cabinet Baker McKenzie en date du 4 avril 2017, Annexe IV et V, p.32 et 38-41.
[17] Pièce n°9 : Rapport du cabinet Baker McKenzie en date du 4 avril 2017, Ibid.
[18] Pièce n°6 : Statuts de Lafarge Cement Syria, Article 32.
[19] Pièce n°6 : Statuts de Lafarge Cement Syria, Article 33.
[20] Pièce n°9 : Rapport du cabinet Baker McKenzie en date du 4 avril 2017, Annexe IV et V, p.35-36 et 38-41.

27. Enfin, s'agissant de M. Lafont, il est récemment apparu qu'il était à l'origine de la décision de maintenir la cimenterie de Jalabiya en activité, malgré la présence de Groupes Armés en activité dans la région, et alors même que tous les groupes internationaux présents sur le territoire syrien à cette époque ont quitté le pays en 2012, lorsque des mesures d'embargo ont été mises en place contre la Syrie.

28. Pour assurer, coûte que coûte, le maintien de la production en Syrie, M. Lafont s'est immiscé dans la gestion de LCS.

29. D'une part, à compter de 2012, M. Lafont a demandé à être tenu informé de la situation de LCS en Syrie de manière très régulière. Pour ce faire, M. Lafont a notamment demandé qu'on lui remette sous pli (et non par courriel) les minutes du Comité de Sécurité du groupe Lafarge, dont le rôle officiel était de gérer la crise syrienne, et dont M. Lafont n'était pas membre de droit[21]. M. Lafont a entretenu des contacts très réguliers avec MM. Pescheux, Jolibois et Herrault entre 2012 et 2014 au sujet de la situation de la cimenterie de Jalabiya[22]. Il est par ailleurs rappelé que M. Lafont entretenait des liens privilégiés avec M. Tlass depuis l'implantation du groupe Lafarge en Syrie (cf. *supra* §6).

30. D'autre part, en application des règles internes au groupe Lafarge entre 2011 et 2015, la décision de fermeture de la cimenterie de Jalabiya revenait à M. Lafont, quand bien même celui-ci n'était pas dirigeant statutaire de LCS. M. Lafont prenait part aux décisions de gestion prises par les dirigeants de LCS dans le cadre de la gestion de la situation syrienne. M. Lafont donnait ainsi des directives à MM. Pescheux, Jolibois et Herrault dans le cadre de la gestion de LCS pendant la guerre civile syrienne.

### D) Les conséquences des fautes commises par les défendeurs sur LSA et Holcim

31. Les fautes commises par MM. Lafont, Pescheux, Jolibois, Herrault et Tlass ont eu de graves conséquences pour LSA et Holcim.

32. En premier lieu, les agissements de MM. Lafont, Pescheux, Jolibois, Herrault et Tlass ont causé une atteinte d'une particulière gravité à la réputation de LSA. En effet, l'image du nom commercial « Lafarge » a été irrémédiablement ternie par l'établissement de liens entre le groupe Lafarge et des Groupes Armés lors de la guerre civile syrienne. Depuis ces évènements, le nom commercial « Lafarge » est associé dans l'esprit du public, du marché et des collaborateurs du groupe, à des organisations terroristes, incluant en particulier l'Etat islamique. L'image d'Holcim a également été affectée par les agissements des défendeurs.

33. En deuxième lieu, les faits imputables à MM. Lafont, Pescheux, Jolibois, Herrault et Tlass ont entraîné des conséquences significatives sur le moral et le bien-être des salariés de LSA et d'Holcim.

34. En troisième lieu, les retombées négatives des agissements des défendeurs sur LSA et Holcim leur ont causé un préjudice financier qui s'est matérialisé par les coûts importants qu'elles ont été contraintes d'engager dans le contexte de crise engendré par les agissements des défendeurs (frais de conseil, d'audit, de communication) ainsi que par la perte par celles-ci de nombreuses opportunités commerciales et financières.

---

[21] Pièces n°10 et 9 : L'Express, *Lafarge : ce patron qui ne savait rien sur Daech*, 28 juin 2018 ; Rapport du cabinet Baker McKenzie en date du 4 avril 2017, Annexe IV, pp.36-37.

[22] Pièce n°11 : Le JDD, *Activités de Lafarge en Syrie : ces deux réunions au cœur de l'enquête*, 4 janvier 2018.

10

35. <u>En quatrième lieu</u>, les relations entre LCS et des Groupes Armés en Syrie ont conduit à des demandes d'information de la part du *Department of Justice* du gouvernement américain (ci-après le « **DOJ** ») adressées au groupe Holcim. Conformément à ses obligations, Holcim a informé le marché des demandes d'information du DOJ dans son rapport biannuel publié le 31 juillet 2021[23]. Le cours de bourse d'Holcim a chuté de manière significative à la publication de cette annonce.

36. <u>En cinquième lieu</u>, Holcim a subi une perte de financements à la suite des actions des défendeurs. En effet, un certain nombre de prêteurs institutionnels ont rompu leurs liens avec Holcim dans la mesure où leur politique de gestion des risques et/ou la préservation de leur image ne leur permet pas de financer un groupe dont la réputation est entachée par des accusations de financement du terrorisme. Les agissements des défendeurs ont entraîné des conséquences analogues sur les titres de dette émis par Holcim, dont les investisseurs se sont désengagés. La perte de ces financements a entraîné un renchérissement significatif du coût des financements d'Holcim.

37. C'est dans ces conditions que LSA et Holcim ont décidé de saisir le Tribunal de commerce de Paris pour obtenir réparation de l'important préjudice causé par les anciens dirigeants du groupe Lafarge.

## II. DISCUSSION

*In limine litis*, il est demandé au tribunal de surseoir à statuer dans la présente instance jusqu'à la fin de la procédure pénale en cours visant les faits objets de la présente assignation (**A**). Sur le fond, LSA et Holcim sollicitent la condamnation des défendeurs à réparer leurs préjudices (**B**).

### A) *In limine litis*, sur le sursis à statuer dans l'attente de la décision pénale à intervenir

38. Aux termes de l'article 4 du code de procédure pénale :

> « *L'action civile en réparation du dommage causé par l'infraction prévue par l'article 2 peut être exercée devant une juridiction civile, séparément de l'action publique.*
>
> *Toutefois, il est sursis au jugement de cette action tant qu'il n'a pas été prononcé définitivement sur l'action publique lorsque celle-ci a été mise en mouvement.*
>
> *La mise en mouvement de l'action publique n'impose pas la suspension du jugement des autres actions exercées devant la juridiction civile, de quelque nature qu'elles soient, même si la décision à intervenir au pénal est susceptible d'exercer, directement ou indirectement, une influence sur la solution du procès civil.* »

39. Ce texte est le fondement du principe selon lequel « *le criminel tient le civil en l'état* ». Cette règle est justifiée par le principe d'autorité des décisions pénales sur les décisions civiles et guidée par l'objectif d'éviter toute contradiction entre une décision civile et une décision pénale.

40. En l'espèce, LSA et Holcim engagent la présente instance aux fins d'obtenir réparation pour les fautes commises par MM. Lafont, Pescheux, Jolibois, Herrault et Tlass dans le cadre de l'activité de LCS. Les agissements qui leurs sont reprochés dans le cadre de la présente instance font par ailleurs l'objet d'une procédure pénale enregistrée sous le numéro de Parquet 1632201114.

---

[23] Pièce n°12 : Rapport biannuel du groupe Holcim en date du 29 juillet 2021, p.29.

11

41.   En conséquence, il est demandé au tribunal de surseoir à statuer dans le cadre de la présente instance jusqu'au terme de cette procédure pénale.

**B) Sur la responsabilité de MM. Lafont, Pescheux, Jolibois, Herrault et Tlass**

42.   A titre liminaire, il est constant que la loi applicable aux actions exercées contre les dirigeants d'une société étrangère est la *lex societatis*, c'est-à-dire, la loi au regard de laquelle cette société est constituée.

43.   La présente action vise à engager la responsabilité des défendeurs pour leurs agissements dans le cadre de la gestion de LCS.

44.   <u>D'une part</u>, la présente action vise à mettre en œuvre la responsabilité de M. Lafont pour les fautes qu'il a commises à la fois :

– en qualité de dirigeant de fait de LCS, qui est une société de droit syrien. A ce titre, M. Lafont est responsable envers LSA et Holcim sur le fondement du droit syrien, au titre duquel ses agissements constituent des fautes[24] ; et

– en qualité de dirigeant de droit de LSA, qui est une société de droit français. A ce titre, M. Lafont est responsable envers LSA et Holcim sur le fondement du droit français, au titre duquel ses agissements constituent également des fautes[25].

45.   <u>D'autre part</u>, la présente action vise à mettre en œuvre la responsabilité de MM. Pescheux, Jolibois, Herrault et Tlass pour les fautes qu'ils ont commises en qualité de dirigeants de droit de LCS.

46.   La responsabilité de MM. Pescheux, Jolibois, Herrault et Tlass pour leurs agissements dans le cadre de la gestion de LCS est donc soumise au droit syrien, au titre duquel leurs agissements constituent des fautes qui ouvrent droit à réparation à LSA et à Holcim[26].

47.   Les agissements des défendeurs dans le cadre de la gestion de LCS ont causé d'importants préjudices à LSA et à Holcim.

48.   <u>LSA</u> a subi :

– un préjudice de réputation lié à la dégradation de son image ;

– un préjudice moral lié à la dégradation du moral et du bien-être de ses salariés ; et

– un préjudice financier lié aux frais qu'elle a été contrainte d'engager du fait des actions des défendeurs et à la perte de nombreuses opportunités commerciales et financières.

49.   LSA évalue ces préjudices à la somme de cinquante millions (**50.000.000**) euros, sauf à parfaire.

---

[24] Article 164 du code civil syrien.
[25] Article 225-251 du code de commerce.
[26] Article 164 du code civil Syrien.

12

50. <u>Holcim</u> a subi :

- un préjudice de réputation lié à la dégradation de son image ;

- un préjudice moral lié à la dégradation du moral et du bien-être de ses salariés ;

- un préjudice financier lié aux frais qu'elle a été contrainte d'engager du fait des actions des défendeurs et à la perte de nombreuses opportunités commerciales et financières ;

- un préjudice financier lié aux frais de conseil qu'elle a dû engager à la suite de l'ouverture de la procédure pénale française et des demandes d'information adressées par le DOJ ; et

- un préjudice financier lié au renchérissement du coût de ses financements provoqué par les agissements des défendeurs.

51. Holcim évalue ces préjudices à la somme de cent millions (**100.000.000**) euros, sauf à parfaire.

52. En conséquence, il est demandé au tribunal de :

- condamner *in solidum* MM. Lafont et Tlass à payer la somme de cinquante millions (**50.000.000**) euros, sauf à parfaire, à LSA en réparation de ses préjudices ;

- condamner *in solidum* MM. Lafont, Pescheux, Jolibois, Herrault et Tlass à payer la somme de cent millions (**100.000.000**) euros, sauf à parfaire, à Holcim en réparation de ses préjudices.

53. LSA et Holcim réservent leurs droits de demander réparation d'autres préjudices nés ou à naitre du fait des actions des défendeurs dans le cadre de la présente instance.

13

## PAR CES MOTIFS

Il est demandé au tribunal de :

*In limine litis,*

- **SURSEOIR** à statuer dans la présente instance jusqu'à la fin de la procédure pénale en cours enregistrée sous le numéro de Parquet 1632201114 ;

- **RESERVER** les dépens.

Au fond,

- **CONDAMNER** *in solidum* Messieurs Bruno Lafont et Hassan Firas Tlass à payer à la société Lafarge SA la somme de cinquante millions (**50.000.000**) euros, sauf à parfaire ;

- **CONDAMNER** *in solidum* Messieurs Bruno Lafont, Bruno Pescheux, Frédéric Jolibois, Christian Herrault et Hassan Firas Tlass à payer à la société Holcim SA la somme de cent millions (**100.000.000**) euros, sauf à parfaire.

14

## LISTE DES PIECES

**Pièce n°1**      Extrait K-bis de Lafarge SA

**Pièce n°2**      Extrait du registre du commerce d'Holcim SA

**Pièce n°3**      Rapport annuel consolidé du groupe Holcim en date du 31 décembre 2020

**Pièce n°4**      Rapport développement durable 2020 de LafargeHolcim France

**Pièce n°5**      Le Figaro Economie, Lafarge s'offre Orascom pour 8,8 milliards de dollars, 10 décembre 2007

**Pièce n°6**      Statuts de Lafarge Cement Syria

**Pièce n°7**      Zaman Al-Wasl, *French cement company buys oil from ISIS: documents*, 19 février 2016

**Pièce n°8**      Le Monde, *Comment le cimentier Lafarge a travaillé avec l'Etat islamique*, 21 juin 2016

**Pièce n°9**      Rapport du cabinet Baker McKenzie en date du 4 avril 2017

**Pièce n°10**     L'Express, *Lafarge : ce patron qui ne savait rien sur Daech*, 28 juin 2018

**Pièce n°11**     Le JDD, *Activités de Lafarge en Syrie : ces deux réunions au cœur de l'enquête*, 4 janvier 2018

**Pièce n°12**     Rapport biannuel du groupe Holcim en date du 29 juillet 2021



**SCP PARKER PERROT TAUPIN**

*Huissiers de Justice Associés*

Raynald PARKER
Raphaël PERROT
Thibauld TAUPIN

7 av. de la Grande Armée
75116 PARIS - France

Tél. : +33 1 45 56 01 02

scp@parker-perrot.com

Références bancaires :

IBAN : **REDACTED - GDPR**
**REDACTED - GDPR**

BIC : REDACTED - GDPR

Site internet  paiement en ligne
www.jepaieparcarte.com

**Accepte le paiement par carte bancaire**

**ACTE D'HUISSIER DE JUSTICE**

REFERENCES A RAPPELER
MD:61743 - TT

| COUT DE L'ACTE | |
| --- | --- |
| Emol. | 36,18 |
| SCT | 7,67 |
| H.T. | 43,85 |
| TVA 20% | 8,77 |
| Timbres | 3,40 |
| T.T.C | 56,02 |

MD:61743

Acte : 83851

## REMISE A UN TIERS PRESENT AU DOMICILE

**Requérantes :** SA LAFARGE, Société HOLCIM SA

**Titre de l'acte signifié :** ASSIGNATION DEVANT LE TRIBUNAL DE COMMERCE DE PARIS

**Date de signification :** 21 février 2022

**Destinataire : Monsieur LAFONT Bruno** demeurant **REDACTED - GDPR** PARIS

L'acte a été délivré par Clerc assermenté, parlant à **REDACTED - GDPR** épouse de l'intéressé ainsi déclaré, rencontrée dans les lieux, qui a certifié le domicile et a accepté de recevoir l'enveloppe contenant copie de l'acte en l'absence de l'intéressé.

Cette enveloppe est fermée et ne comporte d'autres indications que d'un côté le nom et l'adresse du destinataire de l'acte et de l'autre le cachet de l'huissier apposé sur la fermeture du pli.

Un avis de passage daté avertissant le signifié de la remise de la copie en mentionnant la nature de l'acte, le nom du requérant ainsi que les indications relatives à la personne à laquelle la copie a été remise a été laissé ce jour au domicile.

La lettre prévue par l'article 658 du C.P.C. comportant les mêmes mentions que l'avis de passage et copie de l'acte de signification a été adressée dans le délai prévu par la loi.

Le présent acte n'est pas soumis à taxe fiscale.

L'expédition signifiée comporte 16 pages.

Les mentions relatives à la signification sont visées par l'Huissier de Justice.

Thibauld TAUPIN

