# EXHIBIT 4

Case 1:25-cv-04248-NGG-PK    Document 79-6    Filed 04/30/26    Page 1 of 192 PageID #: 2183

*Defense of Mr. Bruno LAFONT:*
*Acquittal – Draft of December 15, 2025*

**To the Presiding Judge,**
**and to the Honorable Judges of the 16th Criminal**
**Division of the Paris Judicial Court**

**Court No.: 16322001114**
**Hearing from November 4 to December 19, 2025**

---

## MOTION FOR DISMISSAL

---

**FOR:**   **Mr. Bruno LAFONT**
Born on REDACTED - GDPR in Boulogne-Billancourt
REDACTED a French citizen
Residing at   **REDACTED - GDPR**

*DEFENDANT*

*Case Attorneys:*   **Attorney Jacqueline LAFFONT-HAIK**
**HAIK & ASSOCIATES AARPI**
Attorney at Law
15 rue Soufflot – 75005 Paris
Tel: 01 43 25 73 73 – Fax: 01 43 25 62 19
Lawyer ID number: E 1305 – Email: j.laffont@cabinethaik.com

**Attorney Quentin de MARGERIE**
**TEMIME ET ASSOCIES**
Attorney at Law
156 rue de Rivoli – 75001 Paris
Tel: 01 49 27 00 55 – Fax: 01 42 60 62 44
Lawyer ID number: C 1537 – Email: quentin.demargerie@temime.fr

**Attorney Grégoire BERTROU**
**WILKIE FARR & GALLAGHER**
Attorney at Law
21 boulevard Malesherbes – 75008 Paris
Tel: 01 53 43 45 00 – Fax: 01 53 43 46 99
Lawyer ID number: J003 – Email: GBertrou@willkie.com

**VERSUS:**   **THE PUBLIC PROSECUTOR'S OFFICE**

**TABLE OF CONTENTS**

PRELIMINARY SECTION ....................................................................................................6

I.    I. A Proceeding Marked by an Infringement of Bruno LAFONT's Presumption of Innocence Resulting from LAFARGE's Procedural Choices Under Its New Shareholder ....................................6

    A.    An Investigation Targeting a Legal Entity Deprived of Autonomy ..........................................6

    B.    The Entry by the Legal Entity, Under Its New Shareholder, into a Guilty Plea Agreement in the United States, the Use of Which Infringes upon Bruno LAFONT's Rights .................................9

II.   Prosecutions Based on a Retrospective Analysis of the Syrian Geopolitical Context. ............ 10

    A.    A LAFARGE Subsidiary Operating in a Rapidly Evolving and Highly Complex National Geopolitical Environment .........................................................................................................10

        1.  From the Arab Spring to the Islamic State: Radicalization of the Syrian Conflict ............................ 11

        2.  Difficulty in Identifying and Understanding the Armed Groups Forming the Rebellion ................11

    B.    The Unique Geographical Position of the Jalabiya Cement Plant Under Kurdish Control ........... 14

    C.    France's Position with Respect to the Syrian Conflict ................................................................14

        1.  On the Political Front ...............................................................................................................15

        2.  On the Diplomatic Front ..........................................................................................................16

    III.  French Intelligence Services ......................................................................................................18

PART ONE: THE CHARGES ARE NOT FACTUALLY SUPPORTED ...................................22

I.    "Participation" in the Financing of a Terrorist Organization Is Not a Criminal Offense Under the Law 24

II.   Absence of Any Allegation of an Act Constituting Terrorist Financing, Precluding the Establishment of the Offense ............................................................................................................26

    A.    The Exhaustive Nature of Conduct Criminalized Under Terrorist Financing Statutes, Which Excludes the Alleged "Authorization" Attributed to Bruno LAFONT ........................................27

    B.    The Absence of Any Allegation That Bruno LAFONT Committed an Affirmative Act of Financing ................................................................................................................................................28

PART TWO: THE CHARGES ARE NOT FACTUALLY SUPPORTED ...................................30

I.    Preliminary Observation: Absence of Any Financial Motive ....................................................30

II.   Intent: Bruno LAFONT was not "aware that this operation notably involved agreed-upon security payments for the benefit of these terrorist entities." ...................................................36

    A.   The Corporate Structure of LAFARGE S.A., in Which Bruno LAFONT Served as Chief Executive Officer, Precludes Any Presumption of Knowledge of the Conduct Alleged in the Charges 36

        1.  A Globally Operating Group Structured to Reflect the Specific Characteristics of the Cement Industry ..................................................................................................................................... 37

        2.  Role and Responsibilities of the Chief Executive Officer .......................................................... 37

    B.    The Case File Contains No Evidence That Bruno LAFONT Was Aware of Payments to Terrorist Organizations ............................................................................................................................ 48

        1.  Arguments Relied Upon by the Prosecution to Suggest that Bruno LAFONT Must Necessarily Have Been Informed of Payments to Terrorist Organizations .....................................................49

        2.  Autonomous Management of Security Conditions at the Jalabiya Plant............................................ 70

III.  Material Elements: Bruno LAFONT did not "authorize the continuation of operations at the cement plant operated by LCS, despite allegedly being the sole individual empowered to order its closure," with knowledge of the relevant facts.

    A.    Bruno LAFONT Was Not the Sole Individual Authorized to Order the Closure of the Plant. .....76

        1.  Bruno LAFONT Was Not the Only Person With Authority to Terminate Operations at the Jalabiya Plant..........................................................................................................................................76

        2.  Individuals Other Than Bruno LAFONT Did, in Fact, Order the Closure of the Jalabiya Plant

During the Period Covered by the Charges................................................................ 77

B.    Bruno LAFONT Issued No Authorization to Maintain Operations at the Jalabiya Plant During the Period Covered by the Charges ..................................................................................78

**ALLEGED OFFENSE OF NON-COMPLIANCE WITH CUSTOMS SANCTIONS............... 91**

A.    Inapplicability of French Customs Law...........................................................................91

B.    Inapplicability of the European Union Regulations Cited in the Charges ...........................92

**FOR THESE REASONS...................................................................................................95**

## THE COURT IS RESPECTFULLY REQUESTED TO

By order dated October 16, 2024, following a judicial investigation opened upon a criminal complaint with a civil party application (D1), initiated by an introductory prosecutorial submission dated June 9, 2017 (D204), Bruno LAFONT was committed for trial before the Criminal Court for acts different from those referred to in his indictment of December 8, 2017 (D587), described as follows:

> *"On national territory and indivisibly in Syria, during 2013 and until September 19, 2014, in any event during a period not barred by the statute of limitations, in his capacity as Chairman and Chief Executive Officer of Lafarge SA controlling its Syrian subsidiary LCS, participated in the financing of terrorist enterprises by providing, collecting, or managing funds, securities, or any property whatsoever, or by giving advice for that purpose, with the intention that such funds be used, or knowing that they were intended to be used, in whole or in part, to commit acts of terrorism, irrespective of their occurrence, for the benefit of the terrorist entities Ahrar al-Sham, Jabhat al-Nosra, and the Islamic State in Iraq and the Levant, later known as the Islamic State; in particular by authorizing the continuation of operations of the cement plant operated by LCS, while he alone was empowered to bring them to an end, knowing that such operations necessarily involved, inter alia, agreed security payments for the benefit of those terrorist entities, remuneration of suppliers operating from areas that had fallen under their control, and intermediaries with those group;*

>> *Acts established as financing of terrorist enterprises, as provided for and punishable under Articles 113-2, 113-13, 421-1, 421-2-2, 421-5, 421-7, 421-8, 422-3, 422-4, 422-6, and 422-7 of the Criminal Code (NATINF No. 25457).*

>> *On national territory and indivisibly in Syria, from June 30, 2013, to September 19, 2014, in any event during a period not barred by the statute of limitations, and in the context of his duties as Chairman and Chief Executive Officer of Lafarge SA controlling its Syrian subsidiary LCS, [he] intentionally violated the provisions of Community Regulation No. 881/2002 of February 27, 2002, and its implementing Regulation (EU) No. 632/2013 of June 28, 2013, which prohibit any financial or commercial relationship with the jihadist organizations Jabhat al-Nosra and the Islamic State in Iraq and the Levant, later known as the Islamic State, in particular by authorizing the continuation of operations of the cement plant operated by LCS, even though he alone was empowered to bring them to an end, with the knowledge that such operations necessarily involved, inter alia, agreed security payments for the benefit of those terrorist entities, the remuneration of suppliers operating from areas that had fallen under their control, and intermediaries with those groups.*

>> *Acts established as non-compliance with international financial sanctions, as provided for and punishable under Article 113-2 of the Criminal Code, Articles 459 §1, §1 bis, §1 ter, §2, §4, §5, 451, 451-bis, 432-bis, and 433-bis of the Customs Code, Council Regulation (EC) No. 881/2002 of February 27, 2002, and its implementing Regulation (EU) No. 632/2013 of June 28, 2013 (NATINF No. 23134).*

Bruno LAFONT, former Chairman and Chief Executive Officer of Lafarge SA, is thus being prosecuted before the Court alongside the legal entity he directed and represented, as well as five of its former employees and/or agents of its local subsidiary, in respect of payments allegedly made to terrorist groups in connection with the operations of the Jalabiya plant in Syria between 2013 and September 19, 2014.

The proceedings in which these prosecutions arise present undeniable specific features relating to the position of the legal entity Lafarge SA, since absorbed by HOLCIM, particularly vis-à-vis the United States authorities, which merit emphasis in addition to the motions filed in limine litis (**I**).

4

It is then necessary to reconstruct, through a retrospective analysis based primarily on the elements of the case file, the <u>general context</u> in which the interactions between Lafarge Cement Syria (hereinafter "LCS") and armed, or even terrorist, groups took place during that period (**II**).

In light of these components of the case, it will be demonstrated that <u>no offense</u> is established with respect to Bruno LAFONT, for lack of both a material element and an intentional element (**III**).

**PRELIMINARY SECTION**

The configuration of the case submitted for examination by the Criminal Court is unprecedented, both in form and in substance, insofar as the prosecution brought against Bruno LAFONT:

- was constructed within the framework of a judicial investigation marked by the accusation brought against Lafarge by the HOLCIM group, which absorbed it both legally and economically and compelled it to enter into a criminal settlement in the United States, thereby preventing it from defending itself (**I**);

- it is based, in substance, and as regards the payments to terrorist groups at the heart of the prosecution, on a retrospective reading of a complex geopolitical context (**II**);

- refuses to take into consideration the possible impact on the conduct at issue of the close cooperation that existed between French state services and, in particular, Lafarge's head of security during the period covered by the charges (**III**).

These specific features, set out below, must nevertheless be taken into account in the assessment of the alleged facts and of Bruno LAFONT's role in the present case.

**I.    A Proceeding Marked by an Infringement of Bruno LAFONT's Presumption of Innocence Resulting from LAFARGE's Procedural Choices Under Its New Shareholder**

*According to the committal order, Lafarge is accused of having participated in the financing of terrorist enterprises in particular through "the actions of its bodies or representatives (…) namely Bruno PESCHEUX and Frédéric JOLIBOIS, (…) Christian HERRAULT as their hierarchical superior (…) and Bruno LAFONT, head of the group, having validated the strategy pursued by maintaining the activity of the cement plant with knowledge of the financing distributed to terrorist groups"* (**D3346/264**).

The judicial investigation that led to this committal order was conducted, in practice, in the absence of Lafarge, an entity that no longer had any autonomy since the HOLCIM group took control of it (**A**).

More seriously, Lafarge relinquished any challenge to the facts attributed to it by entering, under the authority of its new shareholder, into a plea agreement in the United States, the use of which during the investigation and up to the closing order irreparably undermined Bruno LAFONT's rights (B).

**A.  <u>An Investigation Targeting a Legal Entity Deprived of Autonomy</u>**

Contrary to the initial ambition of building a global cement leader born of a merger of equals, Lafarge was, in practice, progressively absorbed by HOLCIM, such that it has now disappeared as an autonomous entity in favor of its former competitor.

It was therefore an entity controlled by HOLCIM that appeared during the investigation and that waived its right to defend itself.

Announced on April 7, 2014, following several months of confidential negotiations between their respective executives, the merger project between Lafarge and HOLCIM, which was to take the form of a public exchange offer, was initially intended to be strictly equal.

This intention was reflected in the exchange parity (one Lafarge share for one HOLCIM share) and in the composition of the board of directors of the new entity, made up of seven members from each of the two companies.

At the end of March 2015, however, the financial and governance conditions of the proposed merger of equals were called into question by HOLCIM, which obtained a more favorable exchange ratio (nine HOLCIM shares for ten Lafarge shares). Bruno LAFONT, initially expected to serve as chief executive officer of the merged entity, was then confined to a non-executive role as co-chairman of the board of directors.

Completed in July 2015, the merger resulted in the creation of the LafargeHolcim group, stemming from the acquisition of Lafarge SA and its subsidiaries by the Swiss entity HOLCIM, chaired by HOLCIM's former chairman, with Mr. Eric OLSEN as Chief Executive Officer.

Following the publication by the newspaper Le Monde on June 21, 2016 of articles alleging that Lafarge had financed terrorist groups in connection with its operations in Syria, the LafargeHolcim group announced the opening of an internal investigation tasked with shedding light on the reality of the alleged conduct.

By a further press release dated April 24, 2017, LafargeHolcim announced that its board of directors had closed the investigation into Syria and implemented corrective measures (**D265**).

The resignations of Eric OLSEN (**D265**) and the departure of Bruno LAFONT occurred in the spring of 2017, following the conclusions of the internal investigation report prepared by the law firm Baker & McKenzie (**D1958/8**).

On December 14, 2017, the newspaper Libération published an article entitled *"The Lafarge affair benefits Holcim,"* stating that: *"The accusation of financing the Islamic State in Syria is causing turmoil within the recently created Lafarge-Holcim group. The French suspect the Swiss of taking advantage of the legal difficulties in order to marginalize them within the management."*

Indeed, in May 2018, LafargeHolcim announced the transfer of its registered office and all executive functions to Switzerland, to Zug. Then, at its general meeting on April 4, 2021, LafargeHolcim approved the change of its corporate name from "LafargeHolcim Ltd" to "HOLCIM Ltd."

Today, no former Lafarge member sits on the board of directors of the new HOLCIM entity, thereby confirming the disappearance of the French company, which is now merely a subsidiary of the new group, devoid of any decision-making autonomy.

The de facto absorption of Lafarge by HOLCIM did not escape the attention of either the investigators or the public prosecutor.

The investigators noted in a report dated April 24, 2017: *"the merger between Lafarge and HOLCIM is not a merger, but rather a takeover of the French company by the Swiss company, and the former Lafarge directors are being removed one after another"* (**D264/1**).

7

The prosecutor likewise emphasized in the final submissions that, following the merger, *"Lafarge SA became a subsidiary of Holcim Ltd, but continued, without any operational purpose, as a holding company owning all the entities of the Lafarge group, at least immediately after the merger"* (**D3128/78**).

The press reached the same conclusion. On April 9, 2021, Le Figaro published an article entitled *"The Cement Company Definitively Buries Lafarge."* On September 11, 2021, Le Point ran the following headline: *"Suspected of having financed ISIS in Syria, Lafarge Cement has been wiped off the map, swallowed up by the Swiss company Holcim with which it had merged."*

Having become a subsidiary without autonomy, LAFARGE was unable to freely determine its defense in the course of the investigation.

<u>On the one</u> hand, although it retained its legal personality, its representatives were never the direct interlocutors of the judges.

Both during the initial appearance hearing of June 28, 2018 (**D1338**) and during the hearing of November 21, 2021 (**D2654**), LAFARGE's legal representative, Magali ANDERSON, *"delegated her powers"* to the Chairman of the Board of Directors of HOLCIM, Beat HESS.

The latter stated to the judge: *"I know that I am formally present today in my capacity as representative of LAFARGE SA by virtue of a power of attorney that you have in the file, but I am also here in my capacity as Chairman of the Board of Directors of HOLCIM, given the seriousness of the situation"* (**D2654/2**).

<u>Furthermore, and most</u> importantly, during his second examination as LAFARGE's representative, Beat HESS expressly sought to emphasize the responsibility of "nine former executives" of the French group— among them Bruno LAFONT—whom he claimed had knowingly concealed the prosecuted facts from HOLCIM at the time of the merger, thereby adopting a position reflecting the exclusive defense of the interests of that group, and not those of LAFARGE.

This attitude was all the more surprising given that, at the same time, he acknowledged that he *"did not know what was happening at LAFARGE"* (**D2654/21**).

Less than 48 hours after the examination, the HOLCIM group published a press release entitled *"Statement by the Holcim Group Following the Hearing of Lafarge SA on November 29, 2021, Paris, France,"* which stated: *"Holcim continues its full cooperation with the French justice system, which heard the representative of Lafarge SA on Monday, November 29, for the second time since June 2018."* The same press release reported a statement by Beat HESS in which he declared: *"The Board of Directors of Holcim and I wish to reiterate how shocked and outraged we are by the allegations against Lafarge SA."*[1].

It was under these circumstances—its leader having acknowledged both that he *"feels […] like someone totally unconnected to these events"* and that he has *"no knowledge of any additional analysis beyond the Baker McKenzie report"* (**D2654**)—that the LafargeHolcim group, now HOLCIM, made the deliberate choice not to defend its subsidiary or the actions of its former executives.

---

[1]  https://www.holcim.com/sites/holcim/files/documents/20211201_press_holcim_decl aration_du_groupe_fr.pdf.

**B. Entry by the Legal Entity, Under Its New Shareholder, into a Guilty Plea Agreement in the United States, the Use of Which Infringes upon Bruno LAFONT's Rights 9**

After being the subject of an internal investigation commissioned by the Board of Directors of LafargeHolcim and intended exclusively for it (**D596**), LAFARGE was compelled by its new shareholder to enter into a plea agreement with the United States authorities, undoubtedly advantageous for the HOLCIM group from a commercial standpoint, but concluded in disregard of the natural persons now committed for trial.

Claiming territorial jurisdiction that is at the very least questionable, based on the use by certain protagonists—who do not include Bruno LAFONT—of Gmail accounts ("Many of the LAFARGE and LCS executives involved in the offense conduct also used personal email accounts serviced by _U.S.-based email service providers_, instead of their LAFARGE corporate email addresses, to carry out some aspects of the conspiracy"), the U.S. authorities thus initiated, on a date that remains undetermined despite repeated requests from Bruno LAFONT's defense, discussions with the executives of the HOLCIM group, which resulted, on October 18, 2022, in LAFARGE entering into a guilty plea with the United States Department of Justice.

Under the terms of that guilty plea, the legal entity agreed to pay the sum of USD 777.78 million for acts of "conspiracy to provide material support to one or more foreign terrorist organizations" (**D2798, D2800**).

Under the terms of that agreement, LAFARGE acknowledged its guilt by attributing it to the alleged conduct of various former executives, foremost among whom was Bruno LAFONT, who embodied the group in his capacity as Chief Executive Officer at the time of the events at issue.

LAFARGE was required to admit that the factual allegations set out in the indictment and the statement of facts of the guilty plea "are true and correct, that they [LAFARGE and LCS] are responsible for the acts of their officers, directors, employees, and agents described in the indictment, and that the indictment and statement of facts accurately reflect the criminal conduct of the defendants" (**D2800/9**), and a non-contradiction clause inserted in the guilty plea now prohibits LAFARGE from revisiting the facts it admitted, on pain of having the U.S. proceedings reinstated.

Bruno LAFONT appears in several places, in a perfectly identifiable manner, in the guilty plea, under the designation "Executive 6," in the factual narrative constituting the statement of facts on which the admission of guilt is based (**D2794/33**).

Under this transparent designation, Bruno LAFONT is repeatedly presented publicly as guilty of acts of _"conspiracy to provide material support to one or more foreign terrorist organizations."_

The process is all the more questionable in that the agreement was signed by LAFARGE without any involvement or information of the natural persons concerned, in particular the former executives, who were nevertheless implicated and designated as guilty in the version of facts agreed with the U.S. authorities. Only Jacob WAERNESS appears to have been able to participate in those "discussions" with the U.S. Department of Justice, something Bruno LAFONT discovered only during the former's statements at the hearing.

With that sole exception, none of the individual protagonists in the case were associated with, or even heard in, that procedure, even though Bruno LAFONT had expressly put HOLCIM on notice, by letter dated March 7, 2022, "not to make any admission of fact or law in the context of its ongoing discussions with the United States Department of Justice (or any similar procedure), without first allowing Mr. LAFONT to fully exercise his right to defend himself" (**Exhibit No. 1**).

Bruno LAFONT learned of the existence of the guilty plea through the press.

As held by the Paris Economic Activities Court in a decision dated April 8, 2025, ruling on a counterclaim brought by Bruno LAFONT in the context of a damages action initiated by HOLCIM and LAFARGE against him seeking an order that he pay no less than EUR 200 million in damages (to be supplemented), the press releases published by those two companies in connection with the conclusion of the guilty plea directly violate Mr. LAFONT's presumption of innocence (**Exhibit No. 2**).

Even more seriously, as Bruno LAFONT has already set out in submissions in limine litis, the examination of which the Court has joined to the merits, the use against him by the investigating judges of the guilty plea and of the civil actions brought by LAFARGE and HOLCIM violates, once again, his presumption of innocence and results in the nullity of the order committing the case for trial before the Criminal Court.

For its part, in the months following the conclusion of that agreement, HOLCIM announced the listing of its U.S. business ("Amrize") on the New York Stock Exchange, with financial prospects in that market of CHF 20 billion (i.e., two-thirds of the group's current turnover).

Such a long-planned initial public offering could clearly not take place without the group first eliminating the threat of prosecution in the United States against its subsidiary LAFARGE, by accepting the plea agreement, dictated by manifest financial interests.

## II.    Prosecutions Based on a Retrospective Analysis of the Syrian Geopolitical Context

The prosecutions brought against the former executives of LAFARGE SA are based on a retrospective reading of geopolitical events that occurred in Syria between March 2011 and September 2014, events of extreme complexity.

The facts referred to in the committal order must be placed back into the context of the time: first, with regard to the general understanding of the Syrian conflict (**A**); second, with regard to the events that occurred in the vicinity of the plant (**B**); and finally, in light of the position of the French State and the diplomatic authorities (**C**).

### A.  A LAFARGE Subsidiary Operating in a Rapidly Evolving and Highly Complex National Geopolitical Environment

Initially peaceful, the protest movements against the regime of Bashar al-Assad quickly intensified in response to the violence of the repression organized from Damascus. The demands for reform raised in the first weeks of the uprising quickly gave way to an outright challenge to the Baathist regime and the Assad family.

10

Very rapidly, the country descended into an extremely violent conflict. Gradually, the war became radicalized. However, this radicalization, which is apparent today with hindsight, was by no means perceptible at the time (**1**).

The forces present were numerous and their allegiances shifting, making their identification by the international community almost impossible and therefore significantly delayed (**2**).

### 1.    From the Arab Spring to the Islamic State: Radicalization of the Syrian Conflict

In March 2011, peaceful demonstrations broke out across Syria, inspired by the winds of democratic change of the Arab Spring. The Baathist regime responded with fierce repression[2].

The Syrian uprising was initially comparable, in social and economic terms, to the events that occurred in Tunisia and Egypt, but it gradually diverged due to the exacerbated communalism structuring Syrian society.

This "clan-based" character of Syrian society provides essential insight: it demonstrates that the situation in one region could not be transposed elsewhere in the country, even before the uprising broke out.

From the outset of the uprising, the Syrian opposition suffered from deep divisions. Opposition groups failed to reach agreement, and ideological differences prevented their unity.

The Free Syrian Army (FSA), the armed wing of the uprising, had to contend with those divisions.

In 2012, the armed conflict spread rapidly across northern and eastern Syria. The regime of Bashar al-Assad therefore chose to refocus on the strategic Latakia–Damascus axis and withdrew from certain areas. This withdrawal allowed Kurdish forces, in particular the People's Protection Units (YPG), to take control of a large part of Syrian Kurdistan, including the Jalabiya region where the cement plant was located.

The year 2013 marked a turning point. The rise in power of jihadist and Salafist factions led to the gradual decline of the FSA and moderate opposition groups. In this climate of confusion and fragmentation, more radical factions emerged and began to impose their influence.

However, the emergence of the Islamic State as a central actor in the conflict should not obscure the fact that, initially and until early 2014, that organization fought alongside the rebellion, as correctly noted by the specialist assistant of the Crimes Against Humanity Unit of the Paris High Court in his note on the context in Syria in 2013/2014 (**D1693/25**).

Thus, although the Syrian conflict gradually descended into extreme violence, the radicalization of certain groups could not be immediately identified, as the fight against Bashar al-Assad initially brought together and united numerous militias, ranging from the Free Syrian Army to Islamist groups.

### 2.    Difficulty in Identifying and Understanding the Armed Groups Forming the Rebellion

While the Syrian conflict may today appear to have been structured around major forces, the Free Syrian Army (FSA), the al-Nosra Front, its ally Ahrar al-Sham, the Islamic State, or the Kurds, in reality, at the time of the events at issue and on the ground,

---

2      Balanche, Fabrice, "Geography of the Syrian Revolt," Outre-Terre, vol. 29, no. 3, 2011, p. 437-458.

11

Based on the facts at issue and on the ground, the Syrian rebellion consisted of a multitude of small armed units,
—the *katibats*.

Each group, primarily defending its local interests, pledged allegiance to one organization or another depending on the benefits received, whether in the form of remuneration or weapons supplied (**D1950/13**).

Thus, Jean-Claude VEILLARD, the security director responsible for monitoring the evolution of the conflict around the plant, stated: *"Some fighters who were one day Kurdish or part of the Free Army could be al-Nosra the next day; it also depended on the funding, whether it came from Qataris or Saudis"* (**D236/6**).

On November 14, 2017, the DGSI identified in a memorandum approximately thirty armed groups present in Syria as of 2011, the majority of which were, and remain, entirely unknown (**D423**).

The situation on the ground was therefore difficult to decipher, especially given the very high degree of permeability among the multiple rebel factions present, as confirmed at the hearing by the DGSI officer cited by the PNAT, in particular with respect to FSA fighters who progressively joined jihadist groups.

This complexity and volatility made the assessment of the situation particularly difficult for the employees and executives of LCS, as well as for those of the LAFARGE group.

## 2.1 Confusion surrounding the classification of certain factions as "terrorist."

The prosecution alleges against Bruno LAFONT that, by authorizing the continuation of the plant's operations, he participated in financing *"for the benefit of terrorist entities Ahrar al-Sham, Jabhat al-Nosra, and the Islamic State in Iraq and the Levant, now the Islamic State"* (**ORTC p.262**).

As he has consistently stated throughout the proceedings, Bruno LAFONT never had knowledge of payments made to any terrorist group.

In any event, the terrorist classification of the aforementioned organizations was particularly uncertain and difficult to ascertain at the time of the events.

### (i) With respect to the Ahrar al-Sham movement

Created in January 2012 by former jihadist detainees released from Seydnaya prison (Damascus), Ahrar al-Sham was formed as a Salafist rebel group distinct from Jabhat al-Nosra, advocating the establishment of Sharia law without nevertheless subscribing to a terrorist logic, as Islamism or Salafism cannot, in and of themselves, be equated with terrorism, contrary to what is stated in the committal order (**ORTC p. 57**).

It is undisputed that this group has never been designated as a terrorist organization by the European Union, the United Nations Security Council, or any other international body.

In May 2016, France exercised its veto power in the United Nations Security Council to oppose the Russian proposal to add Ahrar al-Sham to the list of terrorist organizations[3].

---

[3] The New Arab, *"Russian attempt to blacklist Syria's Islamist rebels blocked,"* May 11, 2016.

It is also established that Ahrar al-Sham has never appeared on the list annexed to Council Common Position 2001/931/CFSP of the European Union, nor on the list of Foreign Terrorist Organizations published by the United States Department of State.

Admittedly, in an unpublished decision issued in 2021, the Court of Cassation approved the reasoning of a court of appeal that had upheld the offense of participation in a terrorist criminal association in the case of an individual who had joined that organization.

On that occasion, it specified that *"the classification of acts as terrorism must be determined, by the French criminal judge seized of proceedings against a defendant, solely through an examination of the facts alleged against him in light of the criteria set out in Article 421-1 of the Criminal Code"* (Crim., April 14, 2021, No. 20-83.420).

However, in that ruling, the Court of Cassation took care to note that the Court of Appeal had "based its decision on the concrete participation of the defendant in the preparation of acts of terrorism."

Thus, it was through a concrete reference both to the acts and to the stated aspirations of the defendant himself, which were concretely directed toward the commission of acts of a terrorist nature, that the judges ruled in that case.

The ruling, moreover rendered long after the period covered by the charges, is not transposable to the present case and in no way establishes the abstract inclusion of the Ahrar al-Sham group within the scope of Article 421-1 of the Criminal Code.

However, the elements of the case file show the absence of any adherence by Bruno LAFONT to the values of that group, nor the commission of any act of a violent nature.

This finding alone justifies that an acquittal be pronounced with respect to all facts relating to that group.

> (ii)      *With regard to the Jabhat al-Nosra movement*

Similarly, Bruno LAFONT is not accused of any contact with that group, nor of adherence to any terrorist ideology.

In these circumstances, and in order to comply with the principle of foreseeability of criminal law, it is necessary to take into account the two fundamental factors that the classification of Jabhat al-Nosra and of the Islamic State or Daesh occurred during the period covered by the charges, from 2013 until September 19, 2014, or even very late in that period in the case of the latter.

The prosecution relied on May 30, 2013 as the date on which Jabhat al-Nosra was recognized as a terrorist organization (Security Council resolution SC/11019).

However, the decision adopted on that date by the United Nations Security Council Sanctions Committee in fact merely amended an existing entry in the list of persons, groups, and entities subject to asset-freezing measures. That document, which is nearly one hundred pages long, was simply updated to

13

specify the aliases of al-Qaeda, and therefore cannot be interpreted as an autonomous classification of Jabhat al-Nosra as a terrorist organization.

> *(iii)    With regard to the Islamic State in Iraq and the Levant, which became the Islamic State,*

It was only as from August 2014 that the terrorist nature of the Islamic State in Iraq and the Levant (ISIL) was the subject of a specific recognition by the United Nations Security Council, with the adoption, on August 15, 2014, of Resolution 2170 (2014).

Subsequently, on December 17, 2015, by Resolution 2253 (2015), the United Nations Security Council broadened the designation criteria, explicitly mentioned Daesh, and consolidated both the classification of that organization and the applicable sanctions regime.

Accordingly, it should be noted that it was only as from August 15, 2014 that Daesh was recognized as a terrorist organization by international bodies, i.e., one month before the definitive closure of the plant.

In any event, the rapid radicalization of a conflict initially presented as a simple popular uprising, combined with the difficult and belated classification of terrorist groups, illustrates the extreme complexity of the Syrian conflict.

## B.    The Unique Geographical Position of the Jalabiya Cement Plant Under Kurdish Control

Due to its geographical location, the Jalabiyah plant remained under the control of Kurdish factions from the summer of 2012 to September 2014, as several observers have pointed out and as Jean-Claude VEILLARD recalled: *"the plant was safe. We are in a Kurdish area, very isolated compared to other multinationals which were more exposed"* (**D236/6**).

Located in northeastern Syria, within the Aleppo Governorate, in the heart of Syrian Kurdistan and near Kobane, the plant was indeed situated in an area that the Syrian regime abandoned as early as 2012.

At that time, the plant was placed under the control of Kurdish forces, which, as from October 2013 and through the PYD administration, formalized with LCS a commitment to protect the site (**D411/1**), while at the same time exerting constant pressure on LCS in the form of extortion and blackmail (**D371/28; D452/38**; **D1912/58**).

A declassified DGSE memorandum dated November 7, 2013 reports that **"overall, order prevailed in the areas controlled by the Syrian regime or by the Kurds, and economic activity between regions remained possible there"** (**D1253/1**).

## C.    France's Position with Respect to the Syrian Conflict

An analysis of the position of the French State at the time of the events highlights a political and diplomatic orientation marked by firm opposition to the regime of Bashar al-Assad and clear support for the Syrian rebellion.

14

## 1. <u>On the Political Front</u>

That position resulted in a direct and deliberate commitment by France alongside the opposition, until a late doctrinal shift occurred after the 2015 attacks, when the fight against terrorism became the priority.

The public positions taken by various political leaders in favor of the rebels (**D1706**) were numerous and consistently confirmed the resolutely "anti-Assad" policy of the French State.

Thus:

- On April 26, 2011, Mr. Nicolas SARKOZY, President of the Republic, stated that it was necessary
*"to accompany, support, and help peoples who have chosen to be free"*[4] ;

- On April 16, 2011, Alain JUPPÉ, Minister of Foreign Affairs, stated:

  **"Mr. Ben Salem just told us that the Islamists were going to surprise us. Very well! Surprise us, that is all I ask.** *And we will surprise you as well, because we are not at all in a frame of mind that consists in stigmatizing the Muslim world or the Muslim religion, but quite the opposite, in engaging in dialogue with it"*[5].

This position of France was reaffirmed following the election of François HOLLANDE in 2012.

On December 12, 2012, Laurent FABIUS, Minister of Foreign Affairs, during a press conference in Marrakech (Morocco), when questioned about the links between the Syrian rebellion and the al-Nosra Front, refused to disqualify those who, in his words, were conducting *"effective and useful"* action against the Syrian regime, specifying that France could have a different view from that of the United States regarding the terrorist classification of the al-Nosra Front:

> *"There was a discussion on this subject; you are right. Because there are diverse groups. And there is, in particular, one group that holds significant military positions, but the Americans have determined that this group, given its orientations,* **should be placed on the terrorist list** *[a clear reference to the al-Nosra Front].* **Other countries, I am thinking of a number of Arab countries, have said that this did not seem relevant to them.** *And the chairman of the coalition said that, obviously,* <u>**one could have different views on this subject, but when a group was carrying out action that was effective and useful in the service of the Syrians and against Bashar al-Assad, it was very difficult to disqualify it as such.**</u> *As far as France is concerned,* **we will examine this issue**, *because it is a question that cannot be avoided"*[6].

---

[4]    Nicolas Sarkozy. Televised address on political developments in Arab countries, February 27, 2011. Available on: http://discours.vie-publique.fr/notices/117000524.html.

[5]    Alain Juppé. Declaration on renewal and political transition in Arab countries, Arab World Institute, April 16, 2011. Available on: http://discours.vie-publique.fr/notices/113000969.html.

[6]    https://www.vie-publique.fr/discours/186636-conference-de-presse-de-m-laurent-fabius-ministre-des-strange affairs .

15

On August 20, 2014, in an interview with the newspaper Le Monde, François HOLLANDE confirmed that France had delivered weapons to the Syrian "democratic opposition," justifying that choice by the need to support the rebels against Bashar al-Assad.[7]

Those weapons deliveries, although presented as being in compliance with European commitments, led as early as 2014 to the marginalization of the Free Syrian Army and the strengthening of Islamist groups.

In an interview given to journalists Guillaume DASQUIÉ and Nicolas JAILLARD for their documentary on the LAFARGE cement plant in Syria broadcast on April 2, 2023, François HOLLANDE stated:

> *"My concern was both to ensure delivery to that military opposition to Bashar al-Assad and to prevent those weapons from falling into hostile hands. (…) <u>Were there losses along the way?</u>*
> *<u>? That is possible</u>, because that Free Syrian Army was ultimately a composite force. And when, from August 2013 onward, there was indeed a fragmentation of the Syrian opposition and a radicalization of that opposition, particularly on the al-Nosra side, perhaps some of those weapons were used, but they were always used against the regime of Bashar al-Assad"* (**D2925/15**).

At the hearing, General Christophe GOMART, former Director of Military Intelligence, confirmed that there was a *"polarization of French political figures around Bashar al-Assad and the fall of Bashar al-Assad,"* stressing twice that it was only following the January 2015 attacks that a real change in mindset occurred within the French intelligence services.

During the investigation, the DGSI officer in contact with Jean-Claude VEILLARD had already noted the turning point that the attacks on French soil represented for the intelligence services (**D1454/5 and 8**).

This positioning of the French political authorities at the time of the events can be explained by a lack of precise and intelligible knowledge of the contours of the Syrian rebellion, as well as by the belief in a rapid fall of the regime of Bashar al-Assad.

### 2.  <u>On the Political Front</u>

The elements of the case file demonstrate the existence of ongoing and acknowledged relations between the French State and LAFARGE, without any warning or specific recommendation having been addressed to the employees or to Bruno LAFONT in his capacity as Chief Executive Officer.

Although the committal order notes that "certain documents [show] that Lafarge's situation in Syria at the beginning of the Syrian civil war was monitored," while considering that the file contains no trace of *"<u>any sharing with the French diplomatic authorities of Lafarge's methods for managing security risks,</u>* or of any encouragement by those authorities to maintain activity despite the risks" (**ORTC p. 91**), the existence of effective monitoring of LAFARGE's activities in Syria by the French diplomatic authorities is established.

---

[7]    Le Monde, *"François Hollande's Main Announcements to Le Monde,"* August 20, 2014, by Gérard Davet and Fabrice Lhomme. Un président ne devrait pas dire ça (A President Shouldn't Say That), Paris: Stock, 2016.

Beyond the mere issuance of travel advice for individuals, it is incumbent upon diplomatic authorities to support and alert French companies operating abroad and facing political contexts as difficult as that in which LAFARGE was operating in Syria.[8]

That monitoring and oversight of LCS by the French diplomatic authorities is evidenced by the letter dated July 25, 2012, sent by Serge MOSTURA, representative of the Crisis Center of the Ministry of Foreign Affairs, to Jean-Claude VEILLARD: *"The French Embassy in Amman informed my services* **today** *of the presence in Damascus of two French nationals, Mr. Bruno PESCHEUX and Mr. Valery MIRAKOFF, employees of your company"* (**D1921/21**).

Furthermore, that letter expressly sets out a recommendation from the Ministry of Foreign Affairs to LAFARGE: *"in this context, i***t seems reasonable to me** *to prohibit travel by your employees to Syria"* (**D1921/21**).

That letter attests to particularly close and attentive monitoring by the French diplomatic authorities of LCS's activities in Syria and of the movements of its employees, information relating to the presence in Damascus of two of them having been brought to their attention on the same day.

The investigations further established the existence of sustained relations between LCS and the services of the Ministry of Foreign Affairs.

The minutes of the meeting of the Director of ANMO—the North Africa and Middle East Directorate—attached to the Ministry of Foreign Affairs, with Jean DESAZARS de MONTGAILHARD, Deputy Chief Executive Officer for Strategy, Development, and Public Affairs of the LAFARGE group, dated October 23, 2012, are worded as follows: *"Ultimately, it was agreed to establish a regular link between the Lafarge group and that directorate in order to monitor political and security developments and to inform the Department of the company's projects in the region. (RR)"* (**D919/2**).

The existence of these direct contacts with the French ambassadors in Syria, Éric CHEVALLIER or Franck GELLET, is also established by the statements of:

- Jean-Claude VEILLARD: *"In August 2012, the UN legally classified Syria as a country in civil war. Why stay in a country at war? Who makes this decision?*
  *Answer 47:* […] **We have always had the support of the Ambassador; Mr. GELLET has always supported us, and as long as we could maintain operations safely, we had to do so,** *because that maintained a very important local economic fabric for Syrians"* (**D236/6**).

- Christian HERRAULT: *"Every six months we went to the Quai d'Orsay, which urged us to stay. The Quai d'Orsay strongly encouraged us, in 2012, to stay. […] The Quai d'Orsay said we had to hold on, that it would be resolved"* (**D253/4/6**).

---

[8] Ministry for Europe and Foreign Affairs, *"Supporting State operators and businesses,"* Crisis and Support Centre (CDCS), updated in February 2024, available at: https://www.diplomatie.gouv.fr/fr/le-ministere-et-son-reseau/le-centre-de-crise-et-de-support/accompanying state operators and businesses/.

[9] Understanding "Éric CHEVALLIER," Franck GELLET not being in post during that period.

17

Thus, the inclination of LAFARGE and LCS executives to maintain operations at the Jalabiya cement plant appears to have been reinforced, or at least perceived as such, by the relations maintained with representatives of the French State and by the absence of any express request to bring them to an end.

Similarly, no warning was given to Bruno LAFONT by the representatives of the State with whom his duties as Chairman and Chief Executive Officer brought him into contact.

Indeed, Bruno LAFONT's diary shows that numerous meetings took place throughout the period between Bruno LAFONT, François HOLLANDE, and Laurent FABIUS (**D3156**).

Bruno LAFONT notably met the President of the Republic, François HOLLANDE:

- July 8, 2013: Bruno LAFONT attended a reception at the Élysée Palace;
- February 15, 2013: Bruno LAFONT accompanied Mr. François HOLLANDE on his official trip to India[10];
- on February 9, 2014, during a meeting attended by Mrs. Angela MERKEL and Mr. José Manuel BARROSO;
- on March 23, 2014, at a dinner at the Élysée;
- on June 6, 2014, at a dinner at the Élysée;
- on August 28, 2014, at the Ambassadors' Conference at the Élysée.

He also met with the Minister of Foreign Affairs, Laurent FABIUS:

- on July 8, 2013, at a dinner at the Quai d'Orsay;
- on June 20, 2014, at a meeting at the Quai d'Orsay;
- on July 2, 2014, at a lunch at the Quai d'Orsay;
- on August 27, 2014, at a breakfast;
- on October 1, 2014, at a meeting at the Quai d'Orsay.

On none of these occasions was Bruno LAFONT ever asked to put an end to LAFARGE's activities in Syria.

### III.    French intelligence services

In addition to the established links with various representatives of the Ministry of Foreign Affairs, the case cannot be understood without taking into account the constant interactions, during the period covered by the charges, between several of the protagonists within LAFARGE and agents of the French State intelligence services.

The existence, importance, and usefulness of these relationships were revealed during the investigation and confirmed before the court.

The investigations carried out during the inquiry revealed collaboration between certain LCS or LAFARGE executives and, on the one hand, agents of the Directorate-General for External Security (DGSE) and the Directorate of Military Intelligence (DRM), attached to the Ministry

---

10    *Le Journal du dimanche, "Hollande in India: Behind the scenes of a business trip,"* February 15, 2013, lejdd.f

18

of the Armed Forces, and, on the other hand, the Directorate-General for Internal Security (DGSI), attached to the Ministry of the Interior.

With regard to Jean-Claude VEILLARD, this collaboration in his capacity as LAFARGE's correspondent with the DGSE was formally established by a letter from Éric OLSEN dated December 16, 2008:

> *"Mr. Director General,*
>
> *In order to f**ormalize the relationship with the Business Liaison Office of the DGSE**, I am pleased to inform you that, since October 1, 2008, the Lafarge group has created the position of Director of Security for the entire group. Mr. Jean-Claude VEILLARD holds this position.*
>
> *In order to improve our sources of information for threat analysis, I would like* the**Lafarge group to have the opportunity to maintain a privileged relationship with your services, through your business liaison office.**
>
> *In this capacity,* **I have appointed Mr. Jean-Claude VEILLARD as your correspondent for our group**. **He holds *'Secret Défense' (security)*** *clearance until 2012"* (**D1921/34**).

At the hearing, after stating under oath that he had never acted with the French intelligence services other than on his own initiative and in a personal capacity, Jean-Claude VEILLARD, when questioned about this letter contradicting his testimony, ultimately acknowledged: *"Yes, of course, I remember this step very well. It's a traditional approach. It is a letter* **of my own initiative intended to formalize and justify my presence [with the services]."**

It further emerges from the examination of the sealed materials (**JCV/DOM01 and LAFARGE DOC-013, 014, and 015**) seized at his home and at his office at LAFARGE headquarters, as well as from the few declassified notes and the testimonies gathered during the investigation and before the court, that Jean-Claude VEILLARD maintained sustained relations with the various French intelligence services (DGSE, DGSI, and DRM).

A large number of meetings with regular DGSE and DRM contacts are recorded in his diary, for example (**D1961**):

- 11 meetings with Lieutenant-Colonel BINIOT of the DGSE between 2013 and 2014: September 7, 2011; November 15, 2011; January 13, 2012; July 5, 2012; October 9, 2012; January 25, 2013; July 19, 2013; October 23, 2013; March 28, 2014; September 25, 2014; and November 25, 2014;

- a lunch with General Christophe GOMART, then head of the DRM, at LAFARGE headquarters on March 18, 2013 (**Exhibit No. 3**);

- 21 meetings with Lieutenant Colonel DE VRIERES of the DRM: on August 29, 2011; September 29, 2011; January 10, 2012; May 10, 2012; June 22, 2012; July 5, 2012; August 29, 2012; September 10, 2012 October 30, 2012; December 6, 2012; December 21, 2012; February 27, 2013; April 25, 2013; May 27, 2013; June 5, 2013; October 18, 2013; June 27, 2014; August 28, 2014; September 8 and 9, 2014; and November 20, 2014.

19

The collaboration between the Group's Director of Security and the French intelligence services was not limited to these numerous meetings, as it also involved the regular transmission of written information through emails and reports (**D1460/5**).

Thus, in an email dated September 13, 2013, sent to Bernard DEVAVRIN, correspondent of the DRM's Business Liaison Office, Jean-Claude VEILLARD:

- <u>on the one hand,</u> on the one hand, forwarded an email dated August 13, 2013, which had been sent to LCS management by an individual named Abu ZAID in his capacity as "Head of the Office of the Security and Legitimacy (Sharia) Committee," containing information relating to the "*management of the affairs of your Jalabiya plant,*" and in particular the designation of Amro TALEB to "*negotiate on [their] behalf*" with LCS;
  _____
- on the other hand, attached a document entitled *"Monthly Report for August 2013"* (**D1961/18**).

At the hearing, General Christophe GOMART stated that it was normal for his deputy, head of the Business Liaison Office, to receive this type of report from Jean-Claude VEILLARD: *"Yes, that was entirely normal;* **it was a monthly report received by the liaison office.** *I do not know whether I received them personally, but it is possible that I read one or two."*

It should be noted that these monthly reports from Jean-Claude VEILLARD to the DRM, relating to the acts prosecuted and covering the entire period of the charges, have never been declassified, despite repeated requests for declassification made during the investigation (**D1346, D1457, D2508, D2940, D3025**).

<u>With regard to the Ministry of the Interior,</u> it is established that on April 19, 2018, the National Defence Secrecy Commission issued a favorable opinion for the partial declassification of ten documents, none of which correspond to the period covered by the charges (the first dating from June 2009, the second from June 2015), and those disclosed were almost entirely redacted, rendering them unusable (**D1274**).

<u>With regard to the Ministry of the Armed Forces,</u> 33 documents were initially declassified, of which only nine predate the evacuation of the plant on September 19, 2014.

A second declassification, requested by the investigating judges, took place on January 21, 2019, and resulted in the transmission of three additional notes, <u>including the note dated August 26, 2014</u> (**D1527**).

It should first be emphasized that this note specifies that *"following requests from the Directorate of Intelligence concerning the Iraqi crisis"* (…) the latter obtained from *"its correspondent [name redacted] the following information."*

It therefore clearly responds to a *"request"* for information made by the Intelligence Directorate, which contradicts the theory that the intelligence services were exclusively passive and merely collected unsolicited information from their correspondent, the Security Director of the LAFARGE group.

Secondly, the information transmitted expressly refers to a financial agreement concluded for a two-week period between Daesh and LCS, through Firas TLASS, to allow the resumption of the plant's commercial activities and travel on the roads of northern Syria.

Lastly, it reproduces word for word the information transmitted the previous day, on August 25, 2014, by Jean-Claude VEILLARD to his DGSE contact, "Grosmarmotte" (**D3223/40**).

This note dated August 26, 2014 illustrates, among other elements, the privileged relationship that existed between Jean-Claude VEILLARD, Security Director of LAFARGE, and the French intelligence services, as well as the nature of the information he transmitted.

As regards Firas TLASS, a Syrian figure at the heart of the facts forming the subject of the prosecution, his links with the intelligence services, particularly the French services, are also documented by various elements of the case file and witness statements.

It emerges in particular from emails exchanged between Firas TLASS and Alexis TROUSSICOT (**D2326**), from the transcript of the documentary broadcast on April 2, 2023 on the M6 channel entitled *"Lafarge Cement Plant: the Multinational, Daesh and the Spies,"* directed by Nicolas JAILLARD and Guillaume DASQUIÉ (**D2917**), as well as from the latter's testimony before the court, that:

- Alexis TROUSSICOT was acting, at the time of the events prosecuted, on behalf of the DGSE;

- Firas TLASS was in regular contact with him.

This collaboration between Firas TLASS and the DGSE is further described in the book by Philippe HARDOUIN entitled L'affaire Lafarge en Syrie et ses guerres de l'ombre, which reports statements by Firas TLASS according to which *"they worked together from 2012 to form teams, gather intelligence, and serve France"*[11].

To conclude on the existence and usefulness of this collaboration, General Christophe GOMART, in his capacity as former Director of the DRM from 2013 to 2017, stated under oath at the hearing:

- that Jean-Claude VEILLARD, who had served under his command in Afghanistan, subsequently became, in his capacity as Security Director of the LAFARGE group, a regular correspondent of the DRM;

- that LAFARGE's presence in Syria was useful insofar as France no longer had any relay there;

- *that LAFARGE had served its country: "I can indeed say it again: France was not directly involved in Syria, but it follows the affairs of this geopolitical world; in practice, in order to obtain information and make decisions, sources of information were needed."* **Yes, I think these sources did indeed help to serve France "**

While Bruno LAFONT was always entirely uninvolved in this collaboration between LAFARGE and the intelligence services revealed in the investigative file, it is at the very least capable of shedding light on a number of decisions, behaviors, and motivations of LAFARGE and LCS executives.

---

[11]    Philippe Hardouin, *The Lafarge affair and its shadow wars*, le cherche-midi p.97-98.

21

It follows from the foregoing developments that:

- the late and often confused recognition of certain entities as terrorist organizations;
- France's position, resolutely hostile to Bashar al-Assad, to the point of indiscriminately supporting the rebellion in all its components;
- the sustained relationship that existed between certain representatives of LCS or LAFARGE and the French diplomatic authorities and intelligence services;

all constitute factors capable of generating confusion and influencing decision-making relating to the management and continuation of the plant's operations in Syria.

\*\*\*\*\*

After recalling the exact terms of the charges and their evolution during the investigation, it will be explained why they cannot justify any finding of guilt against Bruno LAFONT, for failure to meet the constituent elements of the offense of financing terrorism (Part One), and for lack of factual substantiation (Part Two).

## PART ONE: THE CHARGES ARE NOT FACTUALLY SUPPORTED

As a preliminary matter, and in order to assess the possibility of entering a conviction against him, it is necessary to precisely delineate the facts alleged against Bruno LAFONT and that justified his referral to the criminal court.

It must be observed that there has been a substantial evolution in the nature of the facts imputed to him and which, according to the referral order, might establish the offense of financing terrorism.

This observation moreover justified the filing of motions challenging the irregularity of the referral order, raised in limine litis, and resulting in a decision on November 5, 2025 to join the procedural incident to the merits.

Independently of the procedural consequences arising therefrom, it must be noted, at the stage of substantive examination of the prosecution before the court, that the charges no longer present any criminal nature.

Under the terms of his indictment (**D587**), Bruno LAFONT was accused of having, between 2011 and 2015, *"financed a terrorist enterprise"* by knowingly:

- *"paying intermediaries in order to be supplied with raw materials (oil, pozzolana, limestone, and sand) by the 'Islamic State' organization or any other terrorist group present in the Iraqi-Syrian zone, whose aim was to seriously disturb public order through intimidation or terror"*;

- *"paying commissions and 'taxes' to the 'Islamic State' organization or any other terrorist group present in Syria, in order to facilitate the movement of employees and goods of the Jalabiya plant (Syria) within territory occupied by said terrorist organizations, including by remunerating one or more intermediaries for that purpose, for an amount that may have reached at least EUR 8,009,215"*;

22

- *"making available the cement manufactured by the Jalabiya plant for the benefit of the terrorist organization 'Islamic State,' thereby allowing said organization to use and/or resell that material."*

At the indictment stage, Bruno LAFONT, acting in his capacity as Chairman and Chief Executive Officer of LAFARGE SA—was thus accused of affirmative acts consisting of paying intermediaries, paying commissions, and making cement available for the benefit of terrorist organizations.

The magistrates then considered that the elements of the record allowed them to infer the existence of serious or corroborating indications against him of <u>financing</u> a terrorist enterprise.

However, under the terms of the final order, Bruno LAFONT is ultimately accused of:

> *"having, on national territory and indivisibly in Syria, <u>during 2013 and until September 19, 2014</u>, […] in the context of his duties as Chairman and Chief Executive Officer of Lafarge SA, which controlled its Syrian subsidiary <u>LCS, participated in the financing of terrorist enterprises</u>, […] <u>in particular by authorizing the continuation of operations of the cement plant operated by LCS</u>, while he alone was authorized to bring them to an end, with full knowledge that such operations involved, inter alia, security payments agreed for the benefit of those terrorist entities, the remuneration of suppliers operating from areas under their control, and intermediaries dealing with those groups."*

Bruno LAFONT is therefore now accused before the criminal court of having authorized the continuation of the cement plant's operations, even though he was allegedly the only person empowered to put an end to them.

The evolution of the charges must be emphasized, as it reveals the fragility of the prosecution's case against Bruno LAFONT.

This evolution is threefold and relates to:

- <u>the time period of the alleged facts</u>, since Bruno LAFONT, initially indicted for acts committed between 2011 and 2015, is ultimately referred for acts allegedly committed during 2013 through September 19, 2014;

- <u>the nature of the alleged acts</u>, since Bruno LAFONT, initially indicted for paying intermediaries, paying commissions, and making cement available, is ultimately referred for having authorized the continuation of operations of the cement plant when he was allegedly the only person authorized to stop them;

- <u>the legal establishment of the facts</u>, since Bruno LAFONT, initially indicted for *"financing a terrorist enterprise,"* is ultimately referred for *"participating in the financing of terrorist enterprises."*

This significant evolution of the accusation constitutes an important, albeit insufficient, retreat and results in allegations of conduct incapable of constituting any criminal offense.

Indeed, the charges ultimately retained do not withstand analysis.

While Article 421-2-2 of the Criminal Code criminalizes the act of financing a terrorist enterprise, mere "participation" in the financing of a terrorist enterprise is not criminalized by law (**I**).

23

Moreover, and in any event, a conviction on this count necessarily requires the identification of one of the affirmative acts of financing exhaustively listed by those provisions, such that the sole omission actually alleged against Bruno LAFONT, namely, not having closed the plant when he was allegedly the only person able to do so, falls, by its very nature, outside the scope of the offense (**II**).

## I. "Participating" in the financing of a terrorist enterprise is not criminalized by law.

With respect to Bruno LAFONT's referral for having *"participated in the financing of terrorist enterprises,"* it is first necessary to clarify the scope of the offense under Article 421-2-2 of the Criminal Code.

Pursuant to Article 111-4 of the Criminal Code, *"criminal law is subject to strict interpretation."* This fundamental principle in criminal matters aligns with the broader principle of legality expressed in Article 111-3 of the Criminal Code, as well as in Article 7 of the European Convention on Human Rights.

As the European Court of Human Rights has explained, *"Article 7 of the Convention, which also enshrines, more generally, the principle of the legality of offenses and penalties, […] requires that criminal law not be applied expansively to the detriment of the accused, for example by analogy"* (ECHR, Del Río Prada v. Spain, July 10, 2012, Application No. 42750/09, § 51).

Accordingly, these principles preclude any extension of the scope of criminal offenses to situations not expressly provided for by law.

They therefore require that no conflation be made between the definitions of the various terrorist offenses set out in the Criminal Code.

In this respect, it should be recalled that, under Article 421-2-2 of the Criminal Code:

> *"Constitutes an act of terrorism the financing of a terrorist enterprise by providing, collecting, or managing funds, securities, or any property, or by providing advice for that purpose, with the intention that such funds, securities, or property be used, or knowing that they are intended to be used, in whole or in part, to commit any of the acts of terrorism provided for in this chapter, regardless of whether such an act actually occurs."*

These provisions clearly and exclusively target the act of financing a terrorist enterprise, to the exclusion of mere participation in such financing.

Conversely, that mode of commission is expressly provided for in relation to offenses such as criminal conspiracy, particularly in terrorist matters.

Indeed, pursuant to Article 421-2-1 of the Criminal Code, which precedes the offense of financing terrorism:

> *"Also constitutes an act of terrorism the fact of participating in a group formed or an agreement established with a view to the preparation, established by one or more material acts, of one of the acts of terrorism referred to in the preceding articles."*

That article therefore criminalizes participation in a group with a view to preparing terrorist acts as defined by Articles 421-1 and 421-2 of the Criminal Code—that is, t**he articles that precede it**—the wording of which must therefore be examined.

24

Pursuant to the provisions of Article 421-1 of the Criminal Code:

> *"The following offenses constitute acts of terrorism when they are intentionally connected with an individual or collective undertaking having the purpose of seriously disturbing public order through intimidation or terror:*
>
> *1) Intentional attacks on life; intentional attacks on physical integrity; kidnapping and unlawful detention; as well as the hijacking of aircraft, vessels, or any other means of transport, as defined in Book II of this Code;*
>
> *2) Theft, extortion, destruction, damage, and deterioration, as well as computer-related offenses, as defined in Book III of this Code;*
>
> *3) Offenses relating to combat groups and dissolved movements as defined in Articles 431-13 to 431-17, as well as offenses defined in Articles 434-6 and 441-2 to 441-5;*
>
> *4) Offenses relating to weapons, explosive products, or nuclear materials as defined in Articles 222-52 to 222-54, 322-6-1, and 322-11-1 of this Code; Article L. 1333-9(I); Articles L. 1333-11 and L. 1333-13-2; Articles L. 1333-13-3(II) and L. 1333-13-4; Articles L. 1333-13-6, L. 2339-2, L. 2339-14, L. 2339-16, L. 2341-1, L. 2341-4, L.*
> *2339-16, L. 2341-1, L. 2341-4, L. 2341-5, L. 2342-57 to L. 2342-62, L. 2353-4, paragraph 1 of Article L. 2353-*
> *5(1), and Article L. 2353-13 of the Defense Code; as well as Articles L. 317-7 and L. 317-8 of the Internal Security Code, with the exception of Category D weapons as defined by decree of the Conseil d'État;*
>
> *5) Receiving the proceeds of one of the offenses listed in 1) through 4) above;*
>
> *6) Money-laundering offenses provided for in Chapter IV of Title II of Book III of this Code; 7)*
>
> *Insider-trading offenses provided for in Articles L. 465-1 to L. 465-3 of the Monetary and*
>
> *Financial Code.*

Article 421-2 of the Criminal Code further provides:

> *"Also constitutes an act of terrorism, when intentionally connected with an individual or collective undertaking aimed at seriously disturbing public order through intimidation or terror, the introduction into the atmosphere, onto the ground, into the subsoil, into food or food components, or into water, including territorial waters, of a substance likely to endanger human or animal health or the natural environment."*

These provisions thus establish a list—necessarily exhaustive—of acts for the preparation of which mere participation in a group constitutes the offense set out in Article 421-2-1.

By contrast, Article 421-2-2—which defines financing a terrorist enterprise as "an act of terrorism"— **—immediately follows these provisions**, such that it cannot, under any circumstances, fall within the scope of terrorist criminal conspiracy.

Accordingly, participation in a group for the purpose of preparing such an act is not criminalized by law.

While the prosecution's temptation to rely on the notion of *"participation"* in a group is readily understandable, insofar as this notion, regarding the legal element, lies further upstream and within a

25

materially less clearly defined phase of the iter criminis, it cannot be accepted for the prosecution of terrorist-financing offenses.

Such an approach results from an assimilation of the material elements of these offenses that is manifestly contra legem and, as such, directly contrary to the principles of strict interpretation and legality of offenses and penalties.

This is further confirmed by the differing treatment of attempts to commit these offenses.

It is the specific material element of the offense of participation in a group provided for in Article 421-2-1—and the fact that it proceeds, as legal scholarship explains, from an *"elongation of the iter criminis"* (Michel Masse, RSC 2012, p. 89)—that explains why attempts to commit this offense are not prosecuted, due to insufficient material substance.

Conversely, attempts to commit the offense of financing terrorism are expressly punishable under Article 421-5, paragraph 3, precisely because that offense entails a more clearly defined material element, allowing identification of a commencement of execution.

Legal scholarship confirms this distinction, noting that "in the case of financing a terrorist enterprise by providing, collecting, or managing funds, securities, or any property, or by providing advice for that purpose, […] such acts fall within a phase that is materially far more substantial" (Y. Mayaud, Répertoire pénal et procédure pénale, Terrorism, Offense, Terrorism by Financing, § 216).

This definitively demonstrates the difference in material elements between these offenses, which cannot be disregarded for reasons of convenience.

**In the present case**, although Bruno LAFONT was initially accused of having "financed a terrorist enterprise," he was ultimately committed for trial for allegedly "participating in the financing of terrorist enterprises," still on the basis of Article 421-2-2 of the Criminal Code.

As shown above, however, those provisions do not criminalize participation in an act of terrorist financing; accordingly, as framed and based on the facts alleged against Bruno LAFONT, the charge precludes any possibility of conviction on this count.

On this ground alone, acquittal is required.

## II. The absence of any allegation that an act of terrorist financing was committed, thereby preventing establishment of the offense

The wording of Article 421-2-2 of the Criminal Code sets out an exhaustive list of conduct capable of constituting the offense of terrorist financing, which does not include the act of authorization attributed to Bruno LAFONT (**1**).

It follows that this offense requires the commission of an affirmative act, such that any omission—such as the alleged failure to bring about the closure of the plant attributed to Bruno LAFONT—necessarily falls outside the scope of criminal liability (**2**).

**A.** **The exhaustive nature of the conduct criminalized under the offense of terrorist financing excludes the alleged act of authorization attributed to Bruno LAFONT**

As recalled above, the offense of terrorist financing is defined by Article 421-2-2 of the Criminal Code as follows:

> *"Also constitutes an act of terrorism the financing of a terrorist enterprise by providing, collecting, or managing funds, securities, or any property, or by providing advice for that purpose, with the intention that such funds, securities, or property be used, or knowing that they are intended to be used, in whole or in part, to commit any of the acts of terrorism provided for in this chapter, regardless of whether such an act actually occurs."*

The material element of the offense therefore lies exclusively in one of the modalities exhaustively listed in that provision, namely, alternatively:

- the provision of funds, securities, or any property;
- the collection of funds, securities, or any property;
- the management of funds, securities, or any property;
- the provision of advice for that purpose.

Absent precise identification of the personal commission by an individual of one of these acts, the offense cannot be regarded as established.

Accordingly, a mere agreement cannot constitute the offense of terrorist financing as defined by these provisions.

**In the present case**, the conduct attributed to Bruno LAFONT does not permit entry into a finding of guilt.

After several years of investigation, the prosecution no longer contends that Bruno LAFONT committed any of the acts targeted by the statute.

*It is ultimately alleged only that he "authorized the continuation of operations at the cement plant operated by LCS, even though he alone was authorized to bring them to an end."*

The deficiency is twofold.

First, it is clear that the notion of *"authorization"*—relied upon by the investigating judges—does not appear anywhere in the statute; accordingly, both the principle of legality of offenses and penalties and the principle of strict interpretation of criminal law preclude its use as the basis for a finding of guilt on this count.

Conversely, the charges do not allege—rightly so—that Bruno LAFONT "provided," "collected," or "managed" funds, or "gave advice for that purpose," for the benefit of a terrorist group.

This observation alone suffices to preclude any conviction on this count.

Moreover, the authorization attributed to Bruno LAFONT, as framed in the charges upheld, does not even relate to any of the conduct targeted by the incriminating provision.

27

Bruno LAFONT is in no way accused of having "authorized" the provision, collection, or management of funds, or the provision of advice, for the purpose of committing terrorist acts.

Ultimately, authorizing the continuation of a plant's operations—assuming it were established (see below)—is far too remote from both the letter and the spirit of the offense set out in Article 421-2-2 of the Criminal Code to give rise to any criminal liability.

This finding, in itself, already bars any conviction on the charge of financing terrorism.

## B. **Absence of any allegation that Bruno LAFONT committed a positive act of financing**

In any event, the offense of financing terrorism, as established by Article 421-2-2 of the Criminal Code, can only be an intentional offense of action, requiring the "commission" of a positive act and, conversely, excluding any conduct consisting of omission.

By way of reminder, criminal law traditionally distinguishes between offenses of action, where "a positive act contrary to the obligation not to act is alleged," and offenses of omission, which "punish the failure to act where the law imposes a duty to act" (Yves Mayaud, Droit pénal général, 7th ed., §177).

It is therefore necessary to refer to the "formulations" and the "often expressive and meaningful terminology" of the incriminating provisions in order to respect their purpose, since this distinction between action and omission derives from the legislature's determination, "in the exercise of its sovereignty and in light of the constraints of legality and foreseeability," of the type of conduct that merits consideration for a given offense (ibid., §178).

The principle of legality indeed prohibits any assimilation of an omission to an act.

As authoritative legal doctrine explains:

> *"There is […] no action by omission, nor any offense of commission by omission. Action is understood in a technical sense, not a generic one. It is not synonymous with any conduct, but with positive conduct,***which precludes characterizing as an action or commission, in the criminal-law sense, a situation in which the result of the offense is achieved by an omission.** *Whether offenses of action or omission, the underlined necessity of applying them in the sense intended by the legislature requires a careful reading of the statutory texts. Since misconduct is divided between these two modalities, it is necessary, on a case-by-case basis, to ascertain the material element involved and to apply the law in conformity with what it expressly refers to, one or the other, or possibly both. Respect for legality requires this approach to incrimination, so as not to betray the legally enshrined construction. The interpretation of criminal law thus presents itself as an important issue in distinguishing between offences of action and offences of omission. It is the guardian of what separates them and contributes to affirming their autonomy"* (ibid., §183).

From an exegesis of Article 421-2-2 of the Criminal Code, it is beyond dispute that the offense of financing a terrorist enterprise is an offense of action.

As recalled, this provision exhaustively criminalizes the acts of providing funds, securities, or any property whatsoever; collecting them; managing them; or giving advice for that purpose.

**These are all positive acts, which exclude any conduct consisting of omission.**

28

It is also worth emphasizing that the text itself stresses that each of these modalities of financing constitutes *"an act of terrorism."*

This express reference to the notion of an act all the more clearly excludes establishing the offense where there is merely an omission.

In the same vein, it should be noted that this article, within Title II entitled *"Terrorism,"* is inserted in Chapter I entitled *"Acts of Terrorism."*

This is further confirmed by the legislative history of Law No. 2001-1062 of November 15, 2001, by which Article 421-2-2 was introduced into the Criminal Code, with Member of Parliament Bruno Leroux stating unequivocally, regarding the amendment under discussion, that it "establishes a specific offense for the act of financing a terrorist enterprise" (B. Leroux, Report No. 3352, filed October 24, 2001, p. 15).

The terminology chosen by the legislature leaves no ambiguity as to its intention to make this offense one of action and, conversely, to exclude any conviction based on conduct consisting of omission.

This is precisely what the investigating magistrates confirmed when, in dismissing the charges against Éric Olsen—then prosecuted on this count—they held that while "it may legitimately be considered […] that he had information regarding the conditions for maintaining operations, […] the investigations carried out […] have not, at this stage, established that he may have committed **intentional positive acts "** ( **D1514/2** ).

In the present case, however, **analysis of the charges reveals that no positive act is attributed to Bruno LAFONT.**

As recalled, he is accused of having *"authorized the continuation of operations of the cement plant operated by LCS."*

Yet a reading of the reasoning of the referral order—by reference to which the charges, forming an indivisible whole with it, must necessarily be interpreted—shows that what is actually alleged against Bruno LAFONT is not the issuance of an instruction to continue operations, but rather the absence of any instruction to cease operations.

Indeed, the referral order states, in justification of Bruno LAFONT's committal on the charge of financing terrorism:

> *"Christian HERRAULT maintained that he had informed him of the principle of payments to armed groups as early as October 2012, and subsequently of the emergence of the Islamic State 'on the scene' in October 2013,* **without ever receiving any instruction to close the plant"** (Referral Order, p. 244, §2).

Expressly, it is the absence of "closure instructions"—that is, an omission—that is alleged against Bruno LAFONT.

However, as demonstrated, the offense of financing a terrorist enterprise, as defined by Article 421-2-2 of the Criminal Code, is exclusively and expressly an offense of action.

On this ground as well, and all the more so, Bruno LAFONT must be acquitted of this charge.

## PART TWO: THE CHARGES ARE NOT FACTUALLY SUPPORTED

As should be recalled, Bruno LAFONT is brought before the Court for allegedly having committed the following acts:

> *"On national territory and indivisibly in Syria, during 2013 and until September 19, 2014, in any event during a period not barred by the statute of limitations, in his capacity as Chairman and Chief Executive Officer of Lafarge SA controlling its Syrian subsidiary LCS, participated in the financing of terrorist enterprises by providing, collecting, or managing funds, securities, or any property whatsoever, <u>or by giving advice for that purpose, with the intention that such funds be used, or knowing that they were intended to be used</u>, in whole or in part, to commit acts of terrorism, irrespective of their occurrence, for the benefit of the terrorist entities Ahrar al-Sham, Jabhat al-Nosra, and the Islamic State in Iraq and the Levant, later known as the Islamic State; in particular by authorizing the continuation of operations of the cement plant operated by LCS, <u>while he alone was empowered to bring them to an end, knowing that such operations necessarily involved, inter alia, agreed security payments for the benefit of those terrorist entities, remuneration of suppliers operating from areas that had fallen under their control, and intermediaries with those groups.</u>*

Bruno LAFONT could not have been *"aware that the operation of the plant entailed"* the existence of payments made to terrorist groups, since he never had any knowledge of them. As the intentional element required by law is lacking, acquittal is warranted on that ground alone (**II**).

Nor is the material element established. Indeed, even assuming that the Court were to consider that authorization to keep a plant in operation falls within the scope of the offense, no such authorization exists in the present case; moreover, Bruno LAFONT was not the only person empowered to order the closure of the plant (**III**).

According to the prosecution, these proceedings are driven by a financial motive which allegedly led Bruno LAFONT to authorize the continuation of the plant's operations despite knowledge of the unlawful conduct in question, a motive that must be dismissed outright, as it is wholly unfounded (**I**).

### I.    Preliminary Observation: Absence of Any Financial Motive

While the content of the proceedings and the course of the hearings demonstrate that Bruno LAFONT had no knowledge of the incriminated payments, rendering the prosecution wholly unfounded, the latter is, moreover, based on an alleged motive devoid of any substance.

*The order referring the case to the criminal court, using a highly vague formulation common to all defendants, states that "the defendants as a whole, <u>in a logic of seeking profits for the economic entity they served, or, for some, direct personal profit,</u> organized, validated, facilitated, or implemented a policy involving the channeling of financing to terrorist organizations operating around the cement plant"* (**ORTC, p. 174**).

In its summary report, the investigating authority had already indicated in this regard that "Mr. LAFONT's choice" to "endorse payments to Daesh in order to continue operations" might have found its source:

- in his stated desire to avoid anything that could cast a shadow on the quality of LAFARGE's acquisition of the ORASCOM group (the initiator of the construction of the Jalabiyah plant) in December 2007;

- in Bruno LAFONT's submission to so-called *"obligations of result,"* allegedly leading him to oppose any decision likely to negatively impact the group's profits (**D2189/61**).

30

This theory is, as far as Bruno LAFONT is concerned, utterly devoid of any foundation.

**As will be further developed, no element of the case file, nor any statement made during the hearing, indicates, or even suggests, that Bruno LAFONT ever opposed a recommendation by his subordinates to close the plant, a fortiori on the basis of any financial considerations whatsoever.**

Among the few emails sent by Bruno LAFONT concerning Syria, financial considerations are, moreover, never mentioned. By contrast, the interested party explicitly recalled: **"No compromise is possible on security" (D391-3/BLA/E3; see below).**

It is, moreover, established that from 2012 onward, the Syrian plant was frequently shut down, sometimes for lengthy periods, which never gave rise to the slightest reproach from Bruno LAFONT when he was informed of it, always after the fact.

Furthermore, as Bruno LAFONT emphasized in particular during the hearings, economic and financial rationality, while naturally occupying an important place in his decisions, was not the determining criterion for activities in crisis countries such as Syria, where, as the case file amply confirms, the objective was to maintain operations as long as security and compliance with the rules were ensured.

Finally, LAFARGE's diversification across numerous countries allowed it, should these requirements no longer be met, to cease the activity in question without calling into question the group's overall financial health.

In any event, the thesis that the continued operation of the plant was compelled by economic considerations does not withstand analysis.

    *a.*   <u>The marginal financial impact of the Syrian plant at the group level</u>

As established by the investigation and confirmed by all persons heard during the hearings, the financial weight of LAFARGE's Syrian operations was, at the group level, in no way significant, whether from the standpoint of:

- du chiffre d'affaires (€45 million in 2013 and €30 million in 2014 for LCS, representing respectively 0.34% and 0.23% of the Group's consolidated revenue for those fiscal years [12] (**D2001/54 and 57**);

- of EBITDA [13] (€15 million in 2013 and €11 million in 2014, representing respectively 0.53% and 0.4% of the Group's consolidated EBITDA for those fiscal years [14] (**D2001/54 and 57**);

---

[12]    Namely, €13.1 billion in 2013 and €12.8 billion in 2014, according to LAFARGE's annual financial report for fiscal year 2014.

[13]    *Earnings before interest, taxes, depreciation, and amortization (EBITDA), which in substance corresponds in France to gross operating surplus.*

[14]    LAFARGE annual financial report for fiscal year 2014.

- of net income, since LCS was structurally loss-making (**D2001/156 and 159**), whereas the Group's adjusted net income amounted to €384 million in 2013 and €423 million in 2014.[15]

- of asset value (2% of the Group's balance sheet) and related debt (at most 3% of total debt);

- of industrial capacity (in the case of a plant with an annual cement production capacity of 2.6 million metric tons (**D232/3 and 4, D587/10**), which is significantly lower, considering only countries in the Middle East and Africa region, than that of the United Arab Emirates, South Africa, Jordan, Iraq, Algeria, Nigeria, or Morocco, and representing approximately 1% of the Group's production capacity)[16] (**D1218/3, D1267/25**).

It was in light of these figures that, during the hearings on December 3, 2025, Bruno LAFONT reiterated that Syria's financial situation had never been a *"driving factor"* in LAFARGE Group decisions, with results there being *"very small."*

This assessment is shared by all Group executives—including those who were never implicated in the present investigation.

This is the case, for example, with Jean-Claude BLOCK, Director of Finance Operations (**D1067/2**), and Jean-Jacques GAUTHIER, Chief Financial Officer (**D1062/1 and D1069/4**).

The views of the members of the Board of Directors were exactly the same, including Nassef SAWIRIS (**D1096/2–3**), Gérard LAMARCHE (**D875/17**), Philippe CHARRIER (**D1954/4**), Bertrand COLLOMB (**D1393/12**), and Oscar FANJUL (**D1958/5**), as further evidenced by the fact that Syria was virtually never mentioned during Board meetings (**D638/12–20, D639/20, and D675**).

Even taking into account, as investigators did (**D2189/61**), the commercial opportunity that a hypothetical "reconstruction of the country" might have represented at an indeterminate future date, such opportunity would not have been impeded by an indefinite closure of the site, which could have been reopened if and when appropriate.

    *b.*   The non-material nature of LCS's debt at the Group level

With respect specifically to the indebtedness generated by construction of the Syrian plant, Nicolas VANIER, Head of External Financing at LAFARGE from 2008 to 2015, stated that LCS's debt of €340 million *"did not represent a very significant amount at the Group level (whose debt was, to the best of my recollection, €16 billion) but was among the largest external debts of the subsidiaries"* (**D1418/3**).

As Bruno LAFONT explained during the hearings, the Group's debt, which did indeed exceed €16 billion in 2008, was progressively reduced to approximately €10 billion by 2013 (a decrease of nearly 40%).

---

[15] LAFARGE annual financial report for fiscal year 2014.

[16] LAFARGE reference document for fiscal year 2011, pp. 35–37.

At the Group level, the fact that LCS's debt ranked among the largest external debts of the subsidiaries had no particular significance, in that it did not create any specific systemic risk for LAFARGE.

What mattered was that, in the event of early maturity or a call on Group guarantees, the Group would be able to pay the amounts due without jeopardizing its financial equilibrium, which was indeed the case.

The relative size of LCS's debt simply reflects the fact that this subsidiary's operations were in a start-up phase when the Syrian unrest broke out, such that it had not yet been able to repay a significant portion of the debt.

For this reason, Bruno LAFONT was able to state categorically at the hearing, without contradiction, that the possibility of early repayment of LCS's debt was *"absolutely not"* taken into account in the decision to maintain or cease the plant's operations.

As Bernard KASRIEL, a former senior LAFARGE executive called as a witness by Christian HERRAULT, aptly reminded the court, asset impairment recorded upon the closure of a plant or cessation of operations is an accounting entry that has absolutely no impact on the amount of debt.

As for the amount of impairment to be recorded following the evacuation of the plant, it was determined, consistent with standard practice, by LAFARGE's finance department and approved by its Audit Committee.

No evidence supports any involvement or influence by Bruno LAFONT in this process.

The amount in question was determined— as required by law—through a so-called "prudent" assessment of the situation (i.e., not assuming either assured resumption or, conversely, the absolute absence of any possibility of resumption of the plant's operations).

Investors were duly informed of this impairment and its consequences in the 2014 annual report, which stated as follows:

- First, that *"the Group's share of net income amounted to €143 million in 2014 and was affected by various non-recurring items: including an asset impairment of €385 million, notably related to the current situation in Syria;"* and

- Second, that this was only one item among others and was therefore not intended to materially affect the value of LAFARGE shares: *"excluding the impact of these non-recurring items, net income increased by 10% year-on-year, rising from €384 million to €423 million in 2014." This figure reflects organic growth, improved results from our joint ventures, notably in the United Kingdom, as well as a reduction in financial expenses, which more than offset the negative impact of scope effects and exchange-rate movements"* [17].

---

[17] Lafarge, *Reference Document 2014* , March 23, 2015, **p. 61** , available online.

c. The absence of any impact of the deterioration of the situation in Syria and the shutdown of the Jalabiyah plant on LAFARGE's financial health and on the merger with HOLCIM

No criticism whatsoever, whether from the Group's directors or its shareholders, has ever been directed at Bruno LAFONT in relation to Syria:

- neither at the time when the Syrian operations began to be identified, from 2011 onward, as a cash-generating unit subject to impairment, as noted in LAFARGE's reference document for that fiscal year (**D1175/2**);

- nor at the time when the plant was effectively shut down, in September 2014 (**D1267/26, D818/11**).

As succinctly summarized by Jérôme GUIRAUD, a member of LAFARGE's Board of Directors, who, like all other directors at the time, has never been subject to prosecution, *"Syria was not a financial issue"* (D1218/3).

At the hearing, Bernard KASRIEL confirmed the absurdity, in his view, of the theory that the continuation of the plant's operations was driven by financial considerations:

> "[Syria] represents three thousandths of LAFARGE Group EBITDA; you do not pursue risky operations for that."

For the same reasons, although the shutdown of the plant occurred in the midst of the merger process between LAFARGE and HOLCIM, which had been publicly announced in April 2014, this event in no way impeded the completion of the merger in 2015.

The shutdown and the subsequent impairment of the plant's residual value had no impact whatsoever on the merger exchange ratio agreed with HOLCIM (**D1122/6, D1267/24**); the issue was not even raised during the negotiations, as confirmed by several LAFARGE directors (**D639/27, D640/36**).

Moreover, as Bernard KASRIEL pointed out, none of the numerous financial analyst reports on LAFARGE shares published at the time made any reference to Syria.

From the perspective of institutional investors and shareholders, the primary criterion for assessing the Group's performance and attractiveness lay not in the operating results of a marginal unit such as Syria, but in the overall performance of LAFARGE's share price, which rose from €28 in January 2012 to €65 in March 2015.

From the standpoint of strict economic and financial rationality, nothing could therefore justify the Group's chief executive exposing the company to such a risk.

Conversely, maintaining operations in Syria while knowing that they involved illegal payments to terrorist entities would obviously have exposed LAFARGE—and the ongoing merger with HOLCIM—to a considerable risk that Bruno LAFONT would never have taken.

34

### d. The absence of any personal financial interest on the part of Bruno LAFONT in maintaining the Syrian plant in operation

Although this theory was never advanced during the investigation, certain questions raised during the hearings may have suggested that Bruno LAFONT had a direct financial interest, linked to his remuneration, in keeping the Syrian plant in operation.

This is plainly not the case.

First, it should be noted that such a theory is, once again, unsupported by any exchange or statement contained in the case file.

Moreover, Bruno LAFONT's remuneration, whether fixed or variable, as well as any exceptional compensation he may have received, was determined exclusively by the Board of Directors in his absence and without any request or negotiation on his part.

Bruno LAFONT further specified during the hearings that he had received exceptional compensation only in connection with the successful completion of transactions of major importance for the Group, such as strategic transactions or significant restructurings, and never in connection with the performance of a single operational unit, all the more so a marginal one such as Syria.

Thus, the exceptional compensation received in 2012 resulted from the reorganization of the Group around countries and bore no relation whatsoever to the performance of any particular operational unit.

This reality, as a matter of principle, rules out the possibility that the continued operation of the Jalabiyah plant could have constituted any lever of personal remuneration for him.

From every standpoint, the profit motive advanced by the prosecution does not withstand analysis.

*****

On the contrary, the relatively minor value of the Syrian plant at the Group level, far from justifying any blind determination on the part of LAFARGE SA's executives to maintain operations, appears instead to have resulted in a lower degree of attention.

In this regard in particular, Jean-Jacques GAUTHIER, the Group's Chief Financial Officer, referred to "streamlined control procedures" with respect to LCS (**D1701/2**).

This is also explained by Arnaud PLANTA, a statutory auditor at DELOITTE, who described the Syrian subsidiary as *"out of scope [as opposed to critical or significant entities]"* due to its *"insignificant figures"* (**D1124/2**).

When questioned about the nature of the work he carried out in relation to this entity, he replied: "*It was out of scope, which means we did nothing. We did not even issue instructions; we did nothing"* (**D1124/2)**.

Frédéric GOURD, also a statutory auditor at DELOITTE, explained that, as a *"very small country,"* Syria *"was not audited for the purposes of the LAFARGE Group's consolidated accounts"* (**D1115/3**).

Likewise, by emphasizing that Syria "had no objectives" (**D1607/4**), that it "was not an issue" (**D1607/2**), and that it "had no impact—€10 million in results or zero, it's nothing" for the Group, Jean-Claude BLOCK, Director of Operations Finance from 2013 onward, stated that this country "was not on [his] radar" (**D1607/2**).

35

In that regard, he added: *"Syria was somewhat out of scope. There were no interlocutors there. I was never asked to analyze the situation there"* (**D1607/2**).

More broadly, it appears that the low value of the Syrian plant led not only to streamlined control procedures—by both internal and external auditors—but also to a complete lack of concern regarding the robustness of those controls.

As explained by Valérie BAZIN, Director of Control and Consolidation:

> *"The turnover of countries with a low level of internal control and those with a satisfactory level of internal control was aggregated, and if the percentage of countries with a satisfactory level of internal control exceeded, overall, 70% or 80%, I no longer recall precisely, the Group's level of internal control was considered satisfactory. Accordingly, if small countries such as SYRIA were classified as having a low level of internal control, this did not call into question the Group's overall level of internal control, due to the materiality of their turnover (and therefore their potential impact on the Group's results)"* (**D1425/2**).

While these considerations definitively confirm the absence of any financial motive, they also help to explain the lack of detection, and thus the failure to escalate information to the Group, of any irregularities in the management of the Syrian plant.

## II.    Intent: Bruno LAFONT was ntot **"aware that this operation notably involved agreed-upon security payments for the benefit of these terrorist entities."**

The prosecution against Bruno LAFONT is based on the premise that, in his capacity as CEO, he was informed of, or could not have been unaware of, the disputed payments referred to in the committal order.

Such knowledge or awareness would constitute the intentional element of the offense of financing terrorism.

However, it will be demonstrated that:

- the organization of the Group as such does not in any way give rise to a presumption of knowledge of criminal acts committed in the course of the operations of a subsidiary in a foreign country (**A**);

- the elements of the case file relied upon by the prosecution do not establish proof of such knowledge (**B**);

- on the contrary, an objective and thorough analysis of the file and of the facts underlying the charges <u>excludes</u> the possibility that Bruno LAFONT was informed of the existence of these payments, which were decided upon and organized within the framework of confidential management by his subordinates (**C**).

### A.   The Corporate Structure of LAFARGE S.A., in Which Bruno LAFONT Served as Chief Executive Officer, Precludes Any Presumption of Knowledge of the Conduct Alleged in the Charges

Bruno LAFONT is being prosecuted *"in the context of his duties as Chairman and Chief Executive Officer of Lafarge SA, which controls its Syrian subsidiary LCS."*

It is therefore appropriate to briefly set out what these CEO duties entail (2), within a group such as LAFARGE SA whose cement business has certain specific characteristics (1), and to recall the position of the Syrian subsidiary LCS within this organization (3).

### 1.  A Globally Operating Group Structured to Reflect the Specific Characteristics of the Cement Industry

Among the companies listed on the "CAC 40," the LAFARGE Group was recognized as one of the finest examples of French industrial exports worldwide.

Thus, its operations comprised 64,000 employees across 1,636 production sites located in 62 countries, generating consolidated revenue in excess of €15 billion in 2013.

Moreover, the establishment of LAFARGE's heavy industrial operations had to be comprehensive in each of these countries: cement cannot realistically be produced other than "on site," given both manufacturing constraints (heavy raw materials can only be sourced from a quarry in the immediate vicinity) and transport constraints (the finished product is particularly heavy and therefore costly to move).

Supplying a single country with cement therefore required the construction and operation, within that country, of one or more production plants (for example, Christian HERRAULT was responsible for 40 cement plants across some fifteen countries (**D1231/10**) and, as a result, substantial capital and human investment, which had to be replicated at each location.



Map of Lafarge's locations around the world as of December 31, 2013 (plants and commercial offices)

This presence of LAFARGE in more than 60 countries, approximately one-third of the globe at the time of the events, naturally had repercussions on the Group's organizational and management structure.

### 2.  Role and Responsibilities of the Chief Executive Officer

Each day of the week, the Group generated nearly 450,000 man-hours of work (7 hours × 64,000 employees), corresponding to an equivalent number of issues and new matters, with no interruption due to its presence across all continents.

37

Faced with such a reality, the CEO must assume a precise and specific role, at the head of a particularly structured and hierarchical organization, divided into departments and comprising numerous subsidiaries.

---

Henri LACHMANN, heard as a witness at the hearing (Thursday, September 4), explained that, based on his experience as a former executive of Schneider Electric, the CEO of a group of this scale is in fact "the company's true HR director," whose fundamental role is, first, to define the Group's strategy and, second, to select the men and women who will, unlike him, be responsible for implementing it within the Group's various activities and subsidiaries.

Such an analysis of the CEO's very specific role is obviously not unique to Bruno LAFONT or Henri LACHMANN. For example, it was recently echoed by AXA's CEO, Thomas BUBERL, in an interview aimed at the general public[18], which merely restated in different terms Henri LACHMANN's observation that "a CEO cannot," and above all **must not**," know everything.

—————

---

## 2.1  Bruno LAFONT's specific functions as CEO

The role of CEO Bruno LAFONT consisted essentially of knowing and dealing with the many systemic and strategic issues for LAFARGE, that is to say, those likely to affect the group as a whole, as opposed to the other issues that arose daily within the framework of the activities of the different departments (finance, legal, human resources, security, etc.), but also on a more operational level, of the many subsidiaries.

Bruno LAFONT's specific skills and missions were based on a threefold orientation:

    *(i)        To shareholders:*

As a professional executive (and not a shareholder), Bruno LAFONT was accountable to LAFARGE's shareholders, in particular through the Board of Directors, composed of 18 members, which he chaired.

It was for the Board of Directors, acting collectively, to determine the Group's strategic orientations and objectives, based on proposals submitted by its Chairman, Bruno LAFONT.

At the time of the events, LAFARGE had two major family shareholder groups, which had made the deliberate choice to represent themselves directly on the Board of Directors:

- the "Groupe Bruxelles Lambert" (GBL), jointly owned by the FRÈRE family (Belgium) and the DESMARAIS family (Quebec), which in 2014 held 29.3% of LAFARGE's voting rights and three board seats: (i) Paul Desmarais, Jr. himself and (ii) the two GBL executives, Ian Gallienne and Gérard Lamarche; and

- "NNS Holding," owned by Nassef SAWIRIS (owner of the ORASCOM Group prior to its sale to LAFARGE), which in 2014 held 19.4% of LAFARGE's voting rights and two board seats: (i) Nassef Sawiris himself and (ii) the CEO of the ORASCOM Group, Jérôme Guiraud.

---

[18]    https://youtu.be/J0MwHFZaiSU?si=uOxuWpqYS-grStA5 : *"A good CEO is a CEO who fully understands his role. His role is not to be a micromanager or the company's foremost technical expert. The CEO is the 'Chief Engagement Officer,' or the 'Chief Excitement Officer': we are there to engage people, to help our teams express themselves, and to bring out their best. Not to coerce them or micromanage them."*

One of Bruno LAFONT's essential functions was therefore to engage personally and consistently with these owners of the company, who proved to be particularly attentive and demanding directors, given that each was directly managing and developing one of their most strategic family assets.

Beyond these key stakeholders, Bruno LAFONT was also responsible for addressing the broader body of shareholders, retail investors and potential investors alike, that is, the market. This entailed, in addition to at least two annual roadshows, continuous and regular financial communication, including through formal quarterly reports.

It was within this particularly demanding context that Bruno LAFONT was renewed in his mandate as Chairman for nearly ten years by his fellow directors, as representatives of the shareholders.

Each meeting of the Board of Directors and its various committees (notably the Audit Committee) required preparation and careful follow-up throughout the year on all complex matters relating to the definition and implementation of the Group's strategic orientations.

> *(ii)       To external partners:*

As Chief Executive Officer of LAFARGE, Bruno LAFONT was also responsible for representing the Group vis-à-vis its strategic partners, which required very frequent travel worldwide to meet commercial partners (major clients and strategic suppliers), financial partners (banks and creditors), as well as state and governmental stakeholders (political leaders, local communities).

Bruno LAFONT was therefore regularly required to travel several times within the same week. Thus, for example, between Monday, September 1st and Friday, September 12, 2014, Bruno LAFONT spent two days in London for professional reasons, three days on the U.S. West Coast (including one day of outbound and return travel), and was scheduled to spend two days in Indonesia (a trip ultimately canceled due to other obligations imposed by the ongoing merger process; see below).

> *(iii)      To the group itself:*

Finally, matters that were not delegated included, in particular, for the CEO:
- the determination and evolution of the Group's organizational structure (which was significantly overhauled in 2012), the setting of objectives and their monitoring (organizational charts, delegations of authority, policies and rules, monitoring and control systems);
- the allocation of responsibilities among employees and oversight of the effectiveness of the organization;
- decisions not falling within the remit of the Board of Directors and not delegated, in accordance with the Group's approval rules (**D527/21–55**): acquisitions, capital increases, investments or divestments exceeding €25 million and their monitoring, and appointments at the N-1 and N-2 levels;
- the Group's policy, strategy, and budget;
- the chairmanship of the Board of Directors and the Executive Committee, as well as that of the Careers Committee (appointments to key positions and monitoring of talent);
- the design, launch, and oversight of "Group" projects;
- the Group's representation and communications;
- visits to operations at production sites.

In addition, Bruno LAFONT simultaneously sat on the boards of directors of *(i)* EDF (with revenue of approximately €70 billion in 2014) and *(ii)* ArcelorMittal (with revenue of approximately $80 billion in 2014), two companies in whose management and strategic direction he was therefore also actively involved.

At the time of the events, Bruno LAFONT was also heavily absorbed by negotiations for the merger with HOLCIM, then considered one of the most significant transactions of the decade worldwide (with an announced market value of $60 billion).

Initiated at the end of 2013, these negotiations led to a public announcement in April 2014, with the merger not being finalized until July 2015.

> The execution of a stock market transaction of such magnitude, among the most complex and demanding projects in modern industrial history, requires exceptionally sustained involvement by the executives of the companies concerned and their advisors (amounting to several tens of thousands of cumulative working hours).
>
> Accordingly, for example, in early September 2014, in the midst of the legal implementation of the merger, Bruno LAFONT explained that "the number of tasks created by our merger process with HOLCIM create a true challenge for my agenda" (**D3156/130**).

Bruno LAFONT's own responsibilities were therefore, in themselves, extremely significant and resulted in an exceptionally demanding schedule (**D3156**).

This is illustrated by the following request sent by Bruno LAFONT to his assistant for a brief three-day period between two flights (Wednesday, September 10; Thursday, September 11; and Friday, September 12, 2014):

> *"If I do not go to Indonesia, which I will decide on Monday [September 8], I would like to keep my agenda [from September 10 to 12] as free as possible to meet people or attend the following meetings.*
> *I would need to be available for an additional Divco on Wednesday or Thursday.*
> *I would like to see Artinien, Kuperfarb, OLSEN, Rocca, and, if possible, Gauthier together on Wednesday or Thursday in preparation for the Integration Committee meeting on Friday in Zurich (1 to 2 hours).*
> *I want to have a meeting with Berthier, Claret, and Meaney on Wednesday or Thursday (1 to 2 hours). I would like to prepare for Sitges on Friday.*
> *I need time with Alexandra, please schedule two 45-minute sessions.*
> *I would like to see Hoddinott and the EVPOs individually (30 to 60 minutes each). I would like to have an appointment with Sonia ARTINIAN on Wednesday or Thursday (1 hour). If Luc Callebat is present, please schedule 30 minutes on Friday.*
> *Finally, please arrange a two-hour meeting with Jean Desazars.*
> *Do not accept anything else without consulting me; allow me time to get to the office on Wednesday [landing in Paris at 11:25 a.m. after an overnight flight from Los Angeles], and leave free slots. In short, it is very simple, and I thank you for organizing all of this as effectively as possible"* (**D3156/131**).

In this context, information was conveyed primarily orally, as Bruno LAFONT's colleagues were aware that he could not systematically read the volume of emails addressed to him, let alone those on which he was merely copied.

40

## 2.2  The imperative of delegation

Such an organization, in a CAC 40 group like this one as in others, necessarily rests on a very strong logic of cascading delegation to highly qualified and trusted collaborators (operational deputy chief executive officers such as Christian HERRAULT, functional directors such as Jean-Claude VEILLARD, country managers such as Bruno PESCHEUX, etc.), which requires the CEO, as well as other senior executives, to focus their efforts on non-delegated tasks.

In accordance with market practice, Bruno LAFONT had moreover ensured, with the assistance of the Group's legal department and external counsel, that formal, written, and particularly detailed delegations of authority were entered into with his direct reports: Guillaume ROUX (Deputy CEO, Performance), Tom FARRELL (Deputy CEO, Operations), Jean-Carlos ANGULO (Deputy CEO, Operations), Christian HERRAULT (Deputy CEO, Operations) (**Exhibit No. 4**), Bi-Yong CHUNGUNCO (General Counsel), Gérard KUPERFARB (Deputy CEO, Innovation), etc. (Written delegations transmitted to the Court by LAFARGE SA on December 2, 2015.)

The explanatory memorandum for these delegations states: **"In light of the size of the LAFARGE Group (hereinafter the 'Group'), the diversity of its activities and locations, and the scale of its workforce, the Delegator considers it necessary to delegate certain powers that he holds within the Group."**

More specifically, as regards the delegation granted to Christian HERRAULT as of December 20, 2012, under the "supervision" of Bruno LAFONT, it notably provided that:

- security and safety powers were delegated to him for Syria and the approximately fifteen other countries under his responsibility;

- Christian HERRAULT (who was himself authorized to "sub-delegate" his powers pursuant to Article II) was required to implement and ensure, using the financial, human, and material resources made available to him (for example by the security department), the achievement of the Group's objectives in these areas, in particular by "anticipating risks [and] new constraints," always "in accordance with applicable legal, regulatory, and contractual provisions" and "in compliance with the Group's policies, rules, and procedures" (Art. III-1);

- Christian HERRAULT had the "duty to inform [Bruno LAFONT] *at any time of any significant difficulties likely to hinder the proper exercise"* of his delegation (Art. IV-2); and he expressly acknowledged that *"his personal liability (in particular criminal liability) may be incurred in the event of breaches of these requirements, in particular those relating to health, safety, environment, and security"* (Art. V-3).

Beyond security and safety matters, Christian HERRAULT had also assumed responsibility for the *"supervision, on behalf of the Group, of commercial and industrial activities"* and for the *"proper management"* of LCS, thereby relieving Bruno LAFONT of any operational monitoring of that subsidiary.

This was the case for all of the Group's subsidiaries, each of which fell under the direct responsibility of one of the operational Deputy CEOs.

> ➢ **An organization further characterized by a "country-based" delegation logic**

In this context, a major reform of the LAFARGE organization, aimed at extensive decentralization and empowerment of country entities, was implemented from 2012 onward, based on a "by-country" delegation model, as reported throughout the investigation (**D232, D253, D260, D685, D975, D1603**, etc.) and confirmed by the various witnesses at the hearing, beginning with the testimony of Bernard KASRIEL on Wednesday, November 19.

The operational Deputy CEOs, known as "regional" directors (including Christian HERRAULT), thus directly supervised the "country" directors, here, Bruno PESCHEUX and then Frédéric JOLIBOIS for Syria, who were themselves responsible for an autonomous unit with its own functional and operational teams.

This decentralization policy was not, once again, specific to the LAFARGE Group, as Michel BON testified at the hearing on Wednesday, November 19, with respect to the CARREFOUR Group, which he previously headed and which likewise operated under a dual principle of decentralized delegation. The same approach has also been described outside the present proceedings by the current CEO of AXA in a recent interview addressed to the general public[19].

* * *

Within this particularly organized and structured framework, the operational Deputy Chief Executive Officers, who acted on a daily basis within the scope of their delegated authority without generally having to seek the opinion or authorization of the Chairman and Chief Executive Officer, had the opportunity to report key information to him, where appropriate on a country-by-country basis, during one-on-one meetings, generally lasting one hour, held every four to six weeks— in addition, of course, to the possibility of meeting with Bruno LAFONT
on an ad hoc basis, whose *"door was always open"* (**D1267/10**) when he was in Paris.

If necessary, they could also contact him by telephone or email, without, however, having any assurance— in the absence of a response— that their message had in fact been received.

> The dates of the regular meetings (every four to six weeks) between Bruno LAFONT and Christian HERRAULT appear on the agenda submitted by the former in support of his submissions seeking dismissal (**D3156/1**), which constitutes a more up-to-date version than that filed by LAFARGE in the investigation file (**D1705/39**).
>
> For example, the meeting initially scheduled between Bruno LAFONT and Christian HERRAULT on Friday, October 18, 2013, was canceled due to a summons to a meeting of the EDF board of directors received by Mr. LAFONT the day before (**Exhibit No. 5**), as reflected in the agenda provided by Bruno LAFONT himself.
>
> During that period, the two executives nevertheless met on October 2 and again on October 31, 2013.

---

[19] https://youtu.be/J0MwHFZaiSU?si=uOxuWpqYS-grStA5 : *"It is true, we are a large company, but we are a collection of many boats. This is not a company that is run from this headquarters [in Paris]; this headquarters sets the direction, and it is a multitude of small boats in the countries that run AXA. We have a very decentralized philosophy: primary responsibility lies with the countries; it is the countries that lead because they are the closest to our customers, not us. A problem solved where it arises is a thousand times better than a problem solved 1,000 kilometers away. Yes, the company is large, but there are many small companies within AXA, which follow the same framework, the same values, and the same rules; however, it is the local company that makes the difference."*

*The main functional departments*

Alongside the CEO and his three operational Deputy CEOs, LAFARGE headquarters housed the various functional departments (finance, human resources, communications, etc.), which collectively formed the Executive Committee and were called upon to assist the Group's operational teams with their specific issues.

Their mission was to establish Group-level policies and rules and to issue recommendations within their respective fields of expertise.

➢ The finance department:

Under the leadership of Jean-Jacques GAUTHIER (Deputy CEO, Finance), it was notably responsible for preparing all accounting and financial work for the Group, enabling monitoring of Group-level figures and ultimately leading to the publication of the annual financial statements.

The annual report was thus signed, on the one hand, by Jean-Jacques GAUTHIER and, on the other hand, by Bruno LAFONT.

As he explained at the hearing, Bruno LAFONT was not personally involved in this preparatory work, this being a substantive task requiring dedicated personnel, which it was obviously not the CEO's role to carry out, but it was his responsibility, at the final stage, to affix his signature to the Group's financial statements in his capacity as the company's legal representative.

Because LAFARGE is a listed company, the CEO's signature was the only one capable of certifying to the market and to investors that these were the figures officially reported by the company.

In other words, by signing the annual report as CEO, Bruno LAFONT committed the company as a whole, and therefore the collective work carried out in particular by the finance department.

➢ Internal control and audit:

These functions (distinct from one another) are intended to analyze the company's operations, manage risks, ensure compliance with regulations, and optimize performance.

Supported by external controls (statutory auditors at headquarters and financial auditors of subsidiaries, such as Deloitte for Syria), internal control and audit were organized on three levels:

- At the top, the **Audit Committee of the Board of Directors** was responsible, in the words of its chairman, for ensuring "the existence within the company of a sound and coherent internal control and risk management system," particularly in accounting and financial matters (**D1134/4–5**).

- Next, Group **internal control** was carried out by a team of 70 to 80 people led by Valérie BAZIN at headquarters, whose mission, under the responsibility of the finance department, was:

  o to develop Group-level rules and procedures so that subsidiaries ensured compliance with laws and regulations and limited the risk of fraud;

43

o to assist internal controllers present within each subsidiary (under the local responsibility of the country's finance or general manager) in carrying out their control assignments and implementing Group policies.

- Finally, under the responsibility of the CEO (to whom he reported directly) and of the finance department, Eric MEURIOT headed the **internal audit** function, comprising 25 people, who audited the effectiveness of the Group's internal control procedures on a country-by-country basis at regular intervals, thereby enabling Eric MEURIOT in particular to report to the Audit Committee "what [he] considered significant" within the scope of his mission, after discussing it "internally with Bruno LAFONT or Mr. GAUTHIER" (**D1305/3**).

➤ The legal department:

LAFARGE had a legal department headed by Bi-Yong CHUNGUNCO.

Its team, composed of experienced lawyers, was notably responsible for monitoring regulations relating to economic sanctions and embargoes.

This department intervened, for example, when the assets of Firas TLASS, a shareholder of LCS, were seized by the Syrian government in 2013 (**D794**), and again in August 2014 when country manager Frédéric JOLIBOIS contacted Jean-Jérôme KHODARA directly by email regarding the compliance of certain indirect commercial interactions with the Islamic State, which had just been placed under UN sanctions (**D490/45-48**).

➤ The "security" department:

At Bruno LAFONT's initiative, LAFARGE established in 2008 a specific and autonomous security function, headed by Jean-Claude VEILLARD, who reported hierarchically to the HR Director (**D145**).

As summarized in a document prepared by Sonia ARTINIAN, then HR Director, on December 4, 2013 (D1105/4), entitled "Mandate of the Security Committee," the committee "must take into account strategic and operational aspects and anticipate the analysis of risks likely to affect performance, in order to provide the COMEX with response options in the event of occurrences likely to generate a crisis situation." *To that end, the Security Committee's responsibilities include:*
- *validating the level of risk by country based on the different types of threats;*
- *making decisions on the orientation of action plans and overseeing their implementation;*
- *validating, or having validated by the Executive Committee, the various directives and recommendations proposed by the Security Director;*
- *adapting the Group Security Policy as necessary and submitting it to the Executive Committee for approval;*
- *promoting the coordination and animation of the security network across all Group countries.*
- *"To develop the Security organization and the scope of responsibilities."*

Monthly meetings were organized with the permanent members, and others at less regular intervals, to which "occasional" members were added.

Each meeting was *"the subject of an agenda proposed by the Security Director,"* and *"reports are drafted by the latter, including a record of and follow-up on any decisions"* (**D1105/4**).

Moreover, the Chair of the Security Committee ensured *"liaison with the COMEX"* (**D1105/4**).

It appears from the reading of the minutes of the Executive Committee meeting of May 24, 2013, that an instruction was given by Bruno LAFONT to Éric OLSEN, then Director of Human Resources and, in that capacity, Chair of the Security Committee: *"following the attacks targeting an AREVA site in Niger […] to systematically forward the report of the Security Committee to all members of the COMEX."*

Indeed, the day before that COMEX meeting, a serious car-bomb attack had targeted an AREVA site in Niger, which had evidently placed LAFARGE on alert, as it operated a plant in Ashaka, in the Nigerian state bordering Niger.

However, it does not appear from the file that this instruction was followed through, as members of the Executive Committee subsequently stated that they had not received the report of the Security Committee (**D1705/7**).

Ensuring security (anticipating, detecting, and protecting against malicious acts and threats) for employees and assets was an "absolute priority" for the group, as attested, for example, by Christian HERRAULT (**D1267/18**): *"VEILLARD, LAFONT, and I myself [HERRAULT] were on the same floor [at headquarters]; security is an important function, it is a core concern"* (**D566/4**).

The importance of security was very frequently reiterated by Bruno LAFONT to his closest collaborators, for example in an email to Christian HERRAULT regarding the activity of the Syrian plant in July 2012: *"no compromise is possible on security"* (**D391-3/BLA/Email/3**).

The email sent by Jean-Claude VEILLARD to Bruno CARETTI, then posted in Nigeria, dated February 20, 2013—and included among the sealed exhibits—is particularly telling in this respect: *"BL really emphasized security again during the results announcement conference call. The message to the CCEOs is clear: either you comply with the security rules or you will have future problems… discipline, discipline, discipline!!! a word previously unknown at Lafarge!"* (**Exhibit No. 6**).

This absolute priority given by Bruno LAFONT was unanimously recalled by the persons heard during the investigation:

> *"At LAFARGE, they hammered this into all of us. There was not a single meeting that did not start with 'safety'"* (Sophie FAURE, assistant to Bruno LAFONT) (**D1017/3**);

> *"All members of the COMEX, without exception, had this objective, because it was the Group's number-one priority established by Bruno LAFONT from the moment he took office as CEO. Every year, I had this objective"* (Jean-Jacques GAUTHIER, Chief Financial Officer) (**D1069/1 and 2**);

> *"Bruno would take the first 10 to 20 minutes of each board meeting to discuss operational safety. I think he is passionate about people's safety and all those aspects"* (Nassef Sawiris, director) (**D1099/5**);

> *"Bruno LAFONT was keen to begin all board meetings with safety, workplace accidents… He did not project the image of a boss indifferent to employees' fate. […] This is the very opposite of the company's culture"* (Jérôme Guiraud, director) (**D1218/6**).

In order to ensure the effectiveness of this new function, responsibility for security was entrusted—on the proposal of Christian HERRAULT and Éric OLSEN—to Jean-Claude VEILLARD, a career officer who served for more than 30 years in the armed forces, notably within the French Navy's special forces.

45

Thus, Jean-Claude VEILLARD and his team in Paris (in addition to all local security managers) were responsible for protecting persons and property at the group's 3,500 sites (head offices, plants, quarries, etc.), in coordination with country managers, who were responsible on site for employee safety and security, assisted where appropriate by an expert they recruited (**D1267/18**), for example Jacob WAERNESS and later Ahmad JALOUDI in Syria.

As Éric OLSEN explained, *"Jean-Claude's expertise enabled a country manager to develop a security action plan. For example, in Nigeria following kidnappings, Jean-Claude recommended to the country manager that night travel be prohibited"* (**D527/2**).

Bruno LAFONT consistently sought to ensure that this function was provided with the tools necessary to operate satisfactorily, for example by questioning Jean-Claude VEILLARD, who wrote to Éric OLSEN in an email dated February 20, 2013: "**The Lafarge Chairman called me at length last night to talk about the situation in Cameroon and Nigeria. He asked me whether I had all the material and human resources at my disposal to ensure the security of our operations.** *I dodged the question by answering in the affirmative, as I would prefer to discuss it with you before making any comment, but it is true that the workload is increasing exponentially"* (**FRMLAT 3783**).

An "Operational Security Guide," prefaced by Bruno LAFONT, was developed and served in particular as a reference for country managers and, where applicable, local security correspondents (**D1106**).

In addition, a "Security Committee" met monthly at group level under the chairmanship of the Human Resources Director, in the presence of Jean-Claude VEILLARD, the Deputy Chief Executive Officers (including Christian HERRAULT), and several functional directors (legal, social policies, insurance, performance, internal audit, communications, etc.).

The committee's missions were as follows: "to validate risk levels by country according to different types of threats; to make decisions regarding the orientation of action plans and oversee them; to validate or have validated by the COMEX the directives and recommendations proposed by the Security Director; to adapt the Group Security Policy where necessary and submit it to the COMEX for approval; to foster the animation of the Security network across all Group countries; to develop the Security organization and the scope of responsibilities" (**D1108**).

Within this framework, Jean-Claude VEILLARD prepared an "agenda" and a "report," which were circulated to all members.

Although Bruno LAFONT was not a member of the Security Committee, he had asked Jean-Claude VEILLARD, in order to demonstrate his support for the function at its creation in 2008, to have a paper copy of the report delivered to his office.

It was also possible for the Security Director, as for the other "functional" directors and the operational Deputy Chief Executive Officers, to meet directly with Bruno LAFONT whenever necessary, particularly on a "security" matter.

In his capacity as a functional director, and with his office located near that of Bruno LAFONT, Jean-Claude VEILLARD had opportunities for direct contact with him: *"When I took up my position, I had regular meetings with him. Then things became somewhat diluted, and those meetings became more informal. He would call me when he had time, to get a very quick update on the country situations, to review the organization, and to see whether it was being*

46

*put in place. Sometimes he would raise a specific issue related to an event, for example when an Air France plane crashed"* (**D840/16**).

However, Jean-Claude VEILLARD stated repeatedly that while he did discuss the "pressures from the PYD" with Bruno LAFONT, he never informed him that, in order to keep the plant operating, local management was required to negotiate with other armed factions—including terrorist groups—operating in the area (**D478/6, D482/3 and 4**).

Similarly, Éric OLSEN (**D536/3**), Sonia ARTINIAN (**D716/2**), Bi-Yong CHUNGUNCO (**D806/2**), and Jean DESAZARS (**D1603/12**) also emphasized that it was "very easy" to contact Bruno LAFONT to discuss important matters and that, had they been aware of payments or agreements with terrorist groups, they would have done so immediately.

1.  The LCS subsidiary

Like any other operating subsidiary, LAFARGE CEMENT SYRIA—a single-plant subsidiary (Jalabiya)—followed the group's harmonized organizational methods:

-   An autonomous country manager (Bruno PESCHEUX, then Frédéric JOLIBOIS as of July 20, 2014), with functional teams including a plant manager, a finance director, a sales director, a human resources director, a security director (Jacob WAERNESS, then Ahmad JALOUDI), a legal manager, an administration and personnel manager, and an accounting manager (**D239/9 and 4**), overseeing the industrial activities of up to 350 employees spread between the plant itself and the power station, as well as an equivalent number of on-site subcontractors; and

-   This country manager did not have an "operational" superior. Group supervision of LCS, ensured for Syria by Deputy CEO Christian HERRAULT, was therefore intended solely to ensure that the subsidiary (like the approximately fifteen other subsidiaries under his supervision) complied with LAFARGE's group-wide decisions and rules, which were not specific to Syria.

For his part, Bruno LAFONT had no direct involvement in the operation of the LCS subsidiary, whose activity he monitored only through his Deputy Chief Executive Officer, Christian HERRAULT.

Within such a group organization, Bruno LAFONT could and should, in his capacity as CEO, have been informed of any problems arising in the operation of a plant located abroad and owned by a subsidiary:

-   through the escalation of information from his Deputy Operational Director, in this case Christian HERRAULT;

-   through alerts that could be transmitted to him by the functional departments responsible for internal control, audit, legal affairs, and security.

However, as will be demonstrated, none of these channels, in this case, enabled the transmission of the relevant information.

**B.   The Case File Contains No Evidence That Bruno LAFONT Was Aware of Payments to Terrorist Organizations**

From his very first statements, Bruno LAFONT consistently indicated that he had never been informed of any direct or indirect payments to terrorist entities and that he learned only at the Executive Committee meeting of August 27, 2014—at the end of which it was agreed with Christian HERRAULT to close the plant—that LCS was preparing to enter into a financial agreement with a terrorist group.

It should be recalled at the outset that the procedural record contains:

- no written or reported intervention by Bruno LAFONT pointing to participation in or incitement of the financing of a terrorist group;

- no trace of any information provided to him concerning such financing prior to the minutes of the Executive Committee meeting of August 27, 2014 (**D442/9**).

In particular, with regard to the issue of payments or agreements with terrorist groups in Syria, all the protagonists except Christian HERRAULT—and in particular Bruno PESCHEUX, Frédéric JOLIBOIS, Jean-Claude VEILLARD, Bi-Yong CHUNGUNCO, Sonia ARTINIAN, Éric OLSEN, and Hélène SEGUIN—explicitly stated that they never informed Bruno LAFONT of any potential agreements before September 2014, the very month in which the plant was closed (**D467/2; D478/8; D814/4; D716/1; D956/17; D701/2**).

Bruno PESCHEUX and Frédéric JOLIBOIS confirmed at the hearing that they had never shared any information of this nature with Bruno LAFONT.

More generally, it is imperative to avoid conflating information relating to payments to terrorist groups with writings or statements referring only to:

- payments to armed but non-terrorist groups, insofar as such payments—which did exist in the context of the operation of the Syrian plant (PYD, FSA in particular)—are neither prosecuted nor criminal;

- the evolution of terrorist groups in the region or near the plant, particularly in the context of their opposition to Kurdish groups or those of the FSA for control of the area.

This confusion is, however, one of the pitfalls into which the committal order falls, as it cites elements which, even if assumed to be established, would prove the transmission of information concerning matters that are admittedly troubling but non-criminal and unrelated to the facts alleged in the charges.

In reality, the considerations advanced indiscriminately in support of the committal order, as well as the report of the Security Committee and the accusations made by Christian HERRAULT, establish neither proof nor even sufficient indicia of knowledge of payments to terrorist entities, without which no intentional element can exist.

48

On the contrary, both the review of the file and the course of the hearings highlight that the disputed payments were managed "within a very restricted committee" (**D490/79**), excluding any sharing of knowledge with Bruno LAFONT.

**1. Arguments Relied Upon by the Prosecution to Suggest that Bruno LAFONT Must Necessarily Have Been Informed of Payments to Terrorist Organizations**

It is necessary to examine successively the incriminating elements on which the committal order is based:

- The alleged transmission of information to Bruno LAFONT (1.1), said to result from:
  - o the accusations made by Christian HERRAULT claiming that he orally transmitted to him "all relevant information" (statements made during the hearings) (**1.1.1**);
  - o emails sent by Christian HERRAULT to Bruno LAFONT (**1.1.2**);
- Report of the Security Committee (**1.2**);
- other emails and materials (**1.3**);
- opinions asserting that Bruno LAFONT knew or could only have known (**1.4**).

As a preliminary matter, and more generally regarding the substance of the information allegedly transmitted to Bruno LAFONT, the developments below must be examined in light of the very specific security context of the Jalabiya plant, as previously described.

Thus, review of the file shows that the information communicated from LCS to the group, and sometimes to Bruno LAFONT via Christian HERRAULT, related to:

- information provided at a time when operation of the Syrian plant involved passing checkpoints and possible negotiations with non-terrorist armed groups, particularly Kurdish ones;

- information revealing the emergence of the Islamic State in the "landscape" as a new actor, through clashes with Kurdish groups, without implying any payments in its favor.

However concerning they may be, these elements never in fact concern the existence of any terrorist financing.

1.1 The alleged transmission of "relevant" information by Christian HERRAULT to Bruno LAFONT

The prosecution is based on the premise that Christian HERRAULT, in his capacity as Deputy Operational Director directly subordinate to Bruno LAFONT, kept the latter informed, orally (**1.1.1**) or by email (**1.1.2**), of developments in the situation in Syria, as well as of payments to terrorist entities.

*1.1.1    The inconsistency and lack of credibility of Christian HERRAULT's accusations*

At the outset, it must be emphasized that Christian HERRAULT's statements are those of a co-indicted person and co-defendant seeking to defend himself, and their scope must therefore be assessed in light of that status.

49

The committal order asserts that the "reality of this transmission of information" was "confirmed by Christian HERRAULT throughout the investigation, including during his confrontation with Bruno LAFONT before the investigating judge, during which he maintained that he had informed him of the situation and had acted with his agreement (D1383/4), *explaining that the latter was aware of the financing arrangements, whether road tolls or taxation of goods, but without knowing the specific modalities, just like him"* (**ORTC, p. 244**).

It then states that:

- "[Christian HERRAULT] s*aid he had obtained Bruno LAFONT's authorization by describing the entire system to him and receiving the response 'we continue.'"* He added that his superior had told him that *"the general interest is made up of particular interests" (D1383/5)* (**ORTC, p. 244)**;

- *"Christian HERRAULT claimed that he had informed him of the principle of payments to armed groups as early as October 2012, then informed him of the emergence of the Islamic State 'on the scene' in October 2013, without ever receiving instructions to close" (D1383/12)* (**ORTC, p. 244**).

Even before examining in detail the reality and scope of Christian HERRAULT's statements, it must be noted—very significantly—that the committal order itself <u>contains no assertion that information relating to payments to terrorist groups</u> was transmitted to Bruno LAFONT.

As repeatedly recalled, the Jalabiya plant operated from 2011 onward in a context involving sometimes geographical, sometimes relational proximity to "armed groups," notably Kurdish rebels, which could give rise to security tensions of which Bruno LAFONT was occasionally informed.

In these circumstances, the statement in the committal order that "[Christian HERRAULT] said he obtained Bruno LAFONT's authorization by describing the entire system to him and receiving the response 'we continue'" (**ORTC, p. 244)** is not, in itself, indicative of knowledge of criminal conduct.

The same applies to the assertions that *"Christian HERRAULT claimed to have informed him of the principle of payments* **to armed groups as early as October 2012" or that he informed him of "the emergence of the Islamic State 'on the scene' in October 2013,** *without ever receiving instructions to close."*

This information, which was not in itself capable of revealing the existence or project of payments to terrorist entities, clearly warranted subsequent updating and clarification by Christian HERRAULT, something that never occurred.

At the hearing, Christian HERRAULT summarized his position regarding Bruno LAFONT's information by stating that he transmitted to his superior "all relevant information" regarding the situation, an assertion whose vagueness is revealing.

The "relevant" and illuminating nature of the information allegedly provided by Christian HERRAULT emerges neither from the investigation file nor from the totality of his statements, whose careful examination instead reveals their evasive, shifting, and frequently contradictory character.

50

Thus, during his first interview with customs authorities on April 3, 2017, reacting to the "errors of judgment" referenced by LAFARGEHOLCIM in its press release, Christian HERRAULT stated:

> " […] I take responsibility because there are no mistakes. "There was a choice between two bad solutions […] and no one at LAFARGE asked us to stop. The plant was worth €600 million in 2011, and Bruno PESCHEUX managed to make it a 100% Syrian plant. **I talked about it with Bruno LAFONT and we were thinking it through: We were being extorted, but they were 'good people.' We decided to withdraw expatriates, Alawites, and Christians, and the French government strongly encouraged us to stay; it was still the largest French investment in Syria, and it was the French flag. So yes, Bruno LAFONT said, 'We're staying'" (D253/11)**.

Clearly, the elements referenced in this statement relate exclusively to 2012, marked by extortion carried out "by good people" (the Kurds) and the evacuation of expatriates during the summer of 2012 (**D371/2**).

Immediately thereafter, Christian HERRAULT added: *"I discussed with Bruno LAFONT. In this extortion situation, there are people who know… and don't want to dig deeper"* (**D253/12**).

During his third police custody interview on December 6, 2017, when questioned about Bruno LAFONT's level of knowledge of the situation at the Syrian plant as described by the latter, Christian HERRAULT replied:

*"It's an honor he gives me, I had 12 or 15 countries, but Syria was still a special country within the group, and I spoke to him very precisely about the situation. (…) I spoke to him in particular about TLASS's role, the Gaziantep episode, the seizure of TLASS's assets, the episode with Daesh, and the episodes with the Kurds in the first quarter of 2014. He was aware that I held a meeting with Franceschi and the head of the PYD in Paris regarding the situation at the plant. He was informed by email in July 2014 that there were serious incidents around the plant, and I sent him an email because he was not there and I did not want him to be surprised if we had to close the plant on an emergency basis"* (**D568/4**).

Once again, Christian HERRAULT, who moreover lists only very occasional communications, refers to no information transmitted to Bruno LAFONT regarding payments to terrorist entities. He merely alludes vaguely to the evolution of the forces present around the plant during the summer of 2014 and to the "episode" mentioned in question 12 (**D568/3**) concerning the September 2013 summons of Jacob WAERNESS and Bruno PESCHEUX before the Islamic court in Raqqah.

Such a summons by ISIS, one they did not attend and whose reality is itself questioned, would rather suggest, on the contrary, the absence of any negotiation with that entity.

It was only for the first time, during his fourth police custody interview on December 7, 2017, when specifically asked whether he confirmed that Bruno PESCHEUX had informed him of Firas TLASS's request *"to include in the amount a sum for the Islamic State,"* and whether he himself had reported this to Bruno LAFONT, that Christian HERRAULT replied:

> *"Yes, he reported it to me; I don't know whether he reported it to anyone else. At the Security Committee meeting in October 2013, I reminded the committee that there had been a September summons with ISIS regarding taxation; I reminded them that Firas had negotiated, that an agreement had been reached, and that the plant had restarted. With LAFONT, I was more specific.*

*I told him about the Daesh summons, that Firas had negotiated, that an agreement had been reached, that the plant had restarted normally, and I added, 'one more racketeer'"* **(D569/5**).

In doing so, Christian HERRAULT first refers to information he claims to have transmitted to the Security Committee meeting of October 15, 2013, an assertion contested by all interviewed participants and not reflected in the report of that meeting.

He then invokes an alleged communication to Bruno LAFONT, which he describes as *"more specific,"* while remaining particularly vague.

Moreover, when asked whether he knew the terms of those negotiations and whether he had informed Bruno LAFONT of them, Christian HERRAULT replied that he did not know the details at the time, implicitly acknowledging that he could not have informed Bruno LAFONT of them.

For his part, Bruno LAFONT, without ever varying in his statements and without ever being contradicted by any objective element of the file, has consistently and firmly denied having been informed of financial negotiations with a terrorist entity, particularly Daesh.

<u>During his fifth police custody interview on December 7, 2017</u>, statements were <u>again recorded for the first time</u>, under the conditions described by the investigators:

> *"Question 07: In its summary memorandum outlining the internal investigation conducted at the request of LAFARGE-HOLCIM, the law firm BAKER McKENZIE states, in paragraph I entitled 'Overview,' that LSA (LAFARGE SA) was regularly informed of LCS (LAFARGE CEMENT SYRIA) security issues and sometimes had the approval of Paris management to pay Firas TLASS so that he would redistribute the money to local armed groups, notably to IS as of November 2013.* **What do you say about that? Did you give your approval or were you aware that approval had been given?**
>
> **Answer 07: Yes, that is what is in the security reports and that is what I said. You are asking me whether LAFONT gave me his approval.**
>
> **[Investigators' note: After a long hesitation, and after turning to his attorneys, Mr. HERRAULT replies:]**
>
> **In that case, he did not give me his approval any more than I gave mine to PESCHEUX.**
>
> **[Investigators' note: At the request of Counsel Doumic, we are interrupting the present hearing at 4:00 p.m. so that she may confer with her client.**
> **Let us say we resume the hearing at 4:05 p.m.]**
>
> **Yes, LAFONT gave me his approval after the presentation I gave him, telling me that what mattered was ensuring the safety of the employees"** **(D570/2).**

This response by Christian HERRAULT—evasive, to say the least—is not spontaneous. It comes after a "long period of hesitation," followed by a suspension requested by his counsel in order to confer.

It also appears contradictory to the substance of the statements made earlier that same morning, when Christian HERRAULT declared that he himself did not know the details of the groups and the payments

52

(**D569/5**).

In any event, Christian HERRAULT once again responds in a highly evasive manner to a question relating to "payments to local armed groups" and not to terrorist groups.

During his sixth hearing while in police custody, in response to the following question: *"When you say that LAFONT wanted the plant to continue, does that mean that he told you so clearly?"* Christian HERRAULT replies:

> *"Yes yes. I regularly informed LAFONT of the state of operations in Syria, of which he was fully aware, and I always had his approval to continue without taking any risk to the safety of our employees. This approval was given to me at every critical stage, whether Gaziantep or October 2013 after the meeting with Daesh. Likewise with the incidents involving the Kurds"* (**D572/1**).

Here again, this response is in direct contradiction with the statements made by Christian HERRAULT a few hours earlier, when he stated unequivocally: "I have never heard the words 'we must continue' come from his mouth, just as I have not heard the words 'we must stop' come from his mouth" (**D569/4**).

Moreover, a thorough review of the case file does not allow identification of the alleged "meeting with Daesh" prior to "October 2013," at the end of which a new approval would allegedly have been given by Bruno LAFONT.

To the following question: *"Did you understand that LAFONT was asking you to do everything necessary so that LCS would continue operating despite payments to groups recognized as terrorist?"* Christian HERRAULT answers simply, "yes."

Asked to clarify this terse response, he claims that the statements allegedly made by Bruno LAFONT were as follows: *"He said that the general interest is made up of particular interests, which for me means that the general interest passes through extortion"* (**D572/1**).

Beyond the fact that these abstract remarks, assuming they were actually made, cannot be analyzed either as an instruction or even as an approval, it must be emphasized that during the confrontation of October 9, 2018, Christian HERRAULT dated to October 2012 the conversation during which Bruno LAFONT allegedly said *"that the general interest was made up of particular interests"* (**D1383/6**).

In other words, the only "approval" by Bruno LAFONT that Christian HERRAULT appears able to identify would have been given in **October 2012**, nearly one year before the start of the charged period, at a time when there was absolutely no question of any payments to terrorist entities.

During that same confrontation of October 9, 2018 before the investigating judges, Christian HERRAULT revisited the information conveyed around the summer of 2012, and more specifically an interview with Bruno LAFONT that he places in October 2012, during which his superior allegedly told him: "we continue, no risk to the safety of the employees" (**D1383/5**).

During that confrontation, Christian HERRAULT no longer refers to the alleged upward transmission of information in 2013 that he had described in a very imprecise manner during his police custody, except to state that "*the only significant militia was ISIS, which appeared on the scene in September–October 2013, which I informed Bruno LAFONT of*" (**D1383/12**), and to refer in rather unclear terms to an alleged "discussion I had already given" when the Islamic State "came onto the list" (**D1383/15**).

53

In response to a more specific question from the investigating magistrate, Christian HERRAULT went back even further in time to the recommendation to "continue" the plant's activity that he claimed to have received from Bruno LAFONT:

> *"How is it possible to talk about this before Gaziantep, when you indicate that it was during that meeting that the system was defined?"*
> *It was a different context. During our interview in July 2012, we agreed that either we would stay or we would leave. There was no intermediate solution"* **(D1383/6).**

Bruno LAFONT has always acknowledged, without ever varying in his statements, that in the summer of 2012 he decided with Christian HERRAULT to continue operating the plant, at the time when the issue of expatriates leaving arose following a letter from the Ministry of Foreign Affairs **(D371/2, D1267/9, D1383/5)**.

With regard to the alleged purchase of <u>raw materials</u> from terrorist entities, Christian HERRAULT states that he himself was not precisely informed of the system implemented within LCS for such purchases, and that Bruno LAFONT could therefore not have known more: "he knew the principle like I did, but he did not know more, and not at all the details. *I myself did not know them"* **(D1383/5)**.

Ultimately, it must be observed that none of Christian HERRAULT's statements during the confrontation contain any allegation that he informed his superior of the existence of payments to armed and terrorist groups. Moreover, it is undisputed that in 2012 and until mid-2013, no relationship whatsoever even existed between LCS and any terrorist group.

During the proceedings before the Criminal Court, the explanations provided by Christian HERRAULT, as co-defendant, remained just as vague, inconsistent, and contradictory regarding Bruno LAFONT's alleged knowledge of payments to terrorist groups.

### 1.1.2 *Emails sent by Christian HERRAULT to Bruno LAFONT, containing no indication of payments to terrorist groups*

The committal order also refers to several emails sent by Christian HERRAULT to Bruno LAFONT which, although they sometimes contain troubling information about the situation in Syria and around the plant, reflecting the tense and volatile context previously described, are not such as to inform him of the existence of payments made by LCS to terrorist groups.

Thus, to quote the terms of the committal order:

- the email of June 25, 2013 **(D452/6)** from Christian HERRAULT, forwarding to Bruno LAFONT, Guillaume ROUX, and Éric OLSEN "a message from Bruno PESCHEUX describing the complexity of the situation in Syria and indicating that he had increasingly less visibility on the continuity of business in Syria, adding: 'if we withdraw BP within two or three months, I do not see how the plant will be able to continue operating (even with him, it is becoming really challenging)'." As the ORTC itself notes, "it was not a matter of payments to terrorist entities but of the constantly renewed demands of the PYD" **(ORTC, p. 237)**;

- the email of July 24, 2013 detailing the results of certain countries and including a postscript: *"PS: Note that we were forced to shut down our Syrian plant yesterday because the fighting between the Kurds and the jihadists was getting dangerously close. We are monitoring the situation hour by the hour.*

54

*We are still delivering cement to trucks that are coming to or are at the plant, as there is still cement in the silos"* (**D1705/52; ORTC, p. 237**).

Like the other emails received by Bruno LAFONT concerning Syria, eleven in total, none refers to payments by LCS to terrorist groups between 2012 and 2014. Thus:

- **For the year 2012:** three emails (**D391-3/BLA/Email/3 to 5**):

On July 23, 2012, Christian HERRAULT (**D565/1 and 2**) forwarded to Bruno LAFONT an email he had sent to Bruno PESCHEUX, in which he provided a general update on the operation of the plant the situation of expatriates, and asked Bruno PESCHEUX to "plan for a situation in which we might have to shut down the entire plant" due to "turbulence."

Far from expressing any opposition to such a closure scenario, Bruno LAFONT replied: **"Thank you, this level of information suits me very well. No compromise is possible on safety."**

On August 23, 2012, Christian HERRAULT forwarded to Bruno LAFONT an email from Bruno PESCHEUX describing the handling of the kidnapping of a former employee—assessed as probably false— and the decision to send the Chinese expatriates home.

Christian HERRAULT's summary to Bruno LAFONT was brief and concluded with the following sentence: *"We are monitoring the situation daily,"* intended to reassure the recipient that the situation was under control.

On October 8, 2012, Bruno LAFONT was copied—along with Éric OLSEN and Alexandra ROCCA—on an email sent by Jean-Claude VEILLARD to Christian HERRAULT concerning the kidnapping of Syrian employees by the Free Syrian Army (FSA).

It emerges from this exchange that the situation was being directly monitored by Bruno PESCHEUX, Jean-Claude VEILLARD, Jacob WAERNESS, and Christian HERRAULT. All of the employees concerned were ultimately released by their captors (**D1354**).

- **For the year 2013:** five email exchanges (**D391-3/BLA/Email/6 to 9, D1705/52, and FRMLAT4940 to 4944**):

An email dated May 30, 2013, from Christian HERRAULT informed Bruno LAFONT, after the fact, of a six-day shutdown of the plant and of the resumption of operations in an "acrobatic" but *"functional"* context (**D556/17**).

Bruno LAFONT took note of this information and congratulated "those who are doing the work."

An email dated June 26, 2013, from Christian HERRAULT, forwarding to Bruno LAFONT, Éric OLSEN, and Guillaume ROUX an email from Bruno PESCHEUX, summarized the various operational difficulties encountered by the Jalabiya plant from a logistical standpoint (supply difficulties), social standpoint (dissatisfaction among certain employees), financial standpoint (unfavorable exchange rates), industrial standpoint (mechanical breakdowns), and in its relations with the PYD (requests for cement and taxes, which LCS resisted).

No reference is made to terrorist groups.

55

Christian HERRAULT's forwarding email mentions the possible departure of Bruno PESCHEUX from his position: *"if we withdraw BP within two to three months, I do not see how the plant will be able to continue operating (even with him, it is becoming 'challenging')." <u>For your information"</u>* (**D1721/73**).

The email <u>dated July 24</u>, 2013, entitled "month of July," from Christian HERRAULT to Bruno LAFONT, Jean-Jacques GAUTHIER, Valérie BAZIN, and Stéphanie BILLET, was intended to present the results for the countries under Christian HERRAULT's responsibility for the month of July.

In a postscript, it is stated that the Syrian plant was shut down due to the escalation of fighting between Kurds and jihadists, with Christian HERRAULT specifying: *"we are monitoring the situation hour by the hour."*

A few days after sending this email, following a meeting with Christian HERRAULT, Bruno LAFONT drafted a note stating with regard to Syria: *"complicated situation. We are withdrawing quietly"* (**D311/13**).

This note dates from the beginning of the period during which, alerted to the complexity and volatility of the security situation, Bruno LAFONT considered closing the plant as a possible option, an assessment that the committal order erroneously interprets as an instruction that was not followed through (**ORTC, p. 242**).

This was clarified by Bruno LAFONT during the hearing in the following terms: *"What is reflected in my note is not an instruction but a direction I had in mind, which I believe I shared with CH, and I needed his support to know when it would be the right time to leave."*

Two emails dated September 6 and 7, 2013, from Amro TALEB, addressed to Bruno LAFONT, which it is established he did not read, as they came from an unknown sender. (**D556/14**).

- **For the year 2014**, up to the closure of the plant on September 19: three emails **(D391-3/BLA/Email/10 and 19, FRMLAT857, and FRMLAT7513):**

A brief email from Christian HERRAULT dated April 11, 2014, stating with regard to the Jalabiya plant: *"it had a good Q1, but the situation is more volatile than ever, so I cannot say anything other than that the plant continues to operate today."*

An email dated July 10, 2014, from Christian HERRAULT to Bruno LAFONT, with Jean-Claude VEILLARD copied, informing him after the fact of the shutdown of the kiln and the power plant at the Jalabiya plant <u>due to the cessation</u> of commercial activity, caused by the blocking of access roads by *"ISIS (also known as Daesh or ISIL)."*

Christian HERRAULT specifies: *"We therefore decided to halt production in order to gain clarity and to obtain 'clear' agreements with the belligerents so that operations could resume without taking undue risks. I will keep you informed should there be any significant developments."*

This email gives rise to several observations:

- Bruno LAFONT is once again informed after the fact of a decision to shut down the plant and makes <u>no comments</u>;

- the clarifications provided by Christian HERRAULT regarding the designation of the Islamic State suggest that this group had not been mentioned in their earlier exchanges;

- the main information conveyed—the halt in operations due to road blockages by *"ISIS"*—is linked to the fact that no agreement had been concluded between this group and LCS;

- as noted by Bruno LAFONT during the investigation (**D232/8**), it is not specified that the "agreement" sought with the "belligerents" was or could be of a financial nature;

- Christian HERRAULT states that he will keep Bruno LAFONT informed of any *"significant developments"*—which he will not do until the executive committee meeting of August 27, 2014, at which the closure of the Jalabiya plant was decided—despite the fact that, in the meantime, Christian HERRAULT closely followed direct and specific negotiations with the Islamic State in July and August 2014 together with Frédéric JOLIBOIS and under the oversight of Jean-Claude VEILLARD, without ever including Bruno LAFONT in those exchanges (**D556/14, D1705/9, D490/51**).

_____

Finally, an email dated August 14, 2014, from Frédéric JOLIBOIS to Bruno LAFONT, forwarding the action plan for security in Syria—a document that was requested from all country managers—and informing him of the reduced level of activity at the plant, due to road blockages by Kurdish forces and the Islamic State, without any mention of any agreement (or any attempt to seek an agreement) with any terrorist group (**D2011/28**).

\*\*\*\*\*\*

The foregoing developments in no way demonstrate that Bruno LAFONT was informed by Christian HERRAULT of payments to terrorist entities.

Conversely, several elements in the case file support this absence of information being passed up by the latter.

Thus, particularly revealing are the confidences made by Christian HERRAULT to his friend Patrice FRANCESCHI, a specialist on the Kurdish issue, who, both in his written statement (**D1703/22**) and in his testimony (**D1703**), and finally at the hearing, recounts the "dilemma" with which Christian HERRAULT was confronted, without ever suggesting that his hierarchy influenced his difficult decision.

Stating that he had, *"in 2013 and 2014 […] very often seen Christian Herrault during the friendly meetings that have linked us for years,"* Patrice FRANCESCHI declares that he could *"shed light on what truly happened in northern Syria during the period concerned and on Christian Herrault's state of mind at the time, his motivations, and his determination"* (**D1703/22**).

Among the considerations that he states were those of Christian HERRAULT in connection with the management of the Jalabiya plant, Patrice FRANCESCHI notably refers to:

- regular contacts with the French ambassador, who "had urged Lafarge to maintain its activity";

- "the fate of the plant employees [who] needed to work in order to survive";

57

- the fact that "the Kurds wanted the plant to operate and at the very least be preserved because they regarded it as part of their 'heritage' for the future";

- more broadly, the fact that "everyone would one day need concrete for the reconstruction of the country."

Patrice FRANCESCHI thus never mentions—among the circumstances that placed "Christian HERRAULT, grappling with an impossible situation"—any order or even any explicit or implicit encouragement from his hierarchy, and in particular from Bruno LAFONT.

Also revealing in this respect are the <u>details communicated by Christian HERRAULT to Bertrand COLLOMB</u>, former CEO of LAFARGE SA and a "personal friend" (**D1393/8**).

Indeed, it emerges from the material in the file that Christian HERRAULT met regularly with Bertrand COLLOMB and kept him informed of the situation in Syria, as evidenced by email exchanges and the numerous discussions they had at the time (**D1393/8–9; D1393/53–61**).

Bertrand COLLOMB's account of the information reported to him by Christian HERRAULT concerning Syria is as follows (**D1393/8 and 9**):

> *"Regarding Syria in particular, he told me that our plant was in an area where there was no fighting, at least initially. I am not able to say at what point the situation became more difficult, 2012 or 2013. At the beginning, our plant was in an area 'protected' by the Kurds. When the Kurds left to fight in KOBANE, Daesh arrived and our plant was shut down."*

> *"I can say that Christian HERRAULT spoke to me a great deal about Syria and the confusion among the various groups. Because we did not know who was allied with whom or opposed to whom. He told me about his contacts with the French Embassy, which seemed to support our presence, but he never discussed operational details with me and never asked for my opinion as to whether we should stay or leave."*

Bertrand COLLOMB accordingly stated that he was aware that *"the general situation in Syria was deteriorating,"* having been informed in particular of kidnappings, which he nevertheless described as *"the day-to-day reality of operations in troubled areas"* (**D1393/14**).

He also indicated that he had been informed of the role of Firas TLASS as an intermediary, partner, and shareholder of LAFARGE in Syria, and that he had personally met Amro TALEB twice, before being informed by Christian HERRAULT that he was a *"dangerous guy"* whom he should no longer receive.

In conclusion, after noting the absence of fighting in the immediate vicinity of the plant prior to its evacuation, Bertrand COLLOMB stated: *"at the time, nothing that Christian HERRAULT said shocked me or triggered any alert on my part. It was not an easy situation, but it was a situation under control"* (**D1393/9**).

It is striking to note that the substance of the information transmitted by Christian HERRAULT to Bertrand COLLOMB concerning Syria is very similar to what Bruno LAFONT states he received, without any reference to payments to terrorist groups.

Finally, it must be noted that this alleged information allegedly conveyed to Bruno LAFONT by Christian HERRAULT does not appear <u>at any point, explicitly or implicitly,</u> in any objective element of the case file, in particular:

58

- the countless email exchanges between Christian HERRAULT and his subordinates or other interlocutors useful for managing the Syrian situation during the period covered by the charges, or even thereafter;

- the first detailed memorandum on the Syrian situation, drawn up directly following the revelations published by Le Monde on June 29, 2016, by Christian HERRAULT, addressed to Bertrand COLLOMB, but also to Éric OLSEN and forwarded *"for opinion"* to Jean-Claude VEILLARD (**D1995/13**): it is revealing to note that it contains no mention of payments to terrorist entities and that it corresponds precisely to the reporting which Bruno LAFONT claims to have received at the time of the events (**D1995/14**).

To conclude on this point, nothing calls into question the clear and consistent statements of Bruno LAFONT, according to which the first intelligible information he received from Christian HERRAULT concerning a <u>financial agreement with a terrorist entity</u>, namely Daesh, emerged during the executive committee meeting of August 27, 2014.

The date of this revelation, to the exclusion of any prior alert, is all the more credible in that the case file shows that it occurred only a few days after:

- the establishment, in the summer of 2014, of a <u>direct</u> provisional agreement lasting 15 days with Daesh, decided by Christian HERRAULT after consultation with Jean-Claude VEILLARD, without Bruno LAFONT's knowledge (**D490/51**);

- the transmission by Frédéric JOLIBOIS to the legal department of the LAFARGE SA group of information concerning the terrorist classification of Daesh by the United Nations on August 15, 2014 (**D1705/12**).

Clearly, <u>in this context, the discovery by the group of the existence of financial relations with terrorist entities, and at the very least with Daesh, became inevitable</u>, as demonstrated by the questioning of Bruno LAFONT by the legal director Bi-Yong CHUNGUNGO a few days after the COMEX, on September 4, 2014 (**D804/3, D806/3**).

### 1.2   Report of the Security Committees

The committal order maintains that, as early as November 2012, the report of the Security Committee drafted by Jean-Claude VEILLARD *"were all handed over to Bruno LAFONT"* and that *"the latter necessarily had to take note of them in order to monitor developments in the protection of the group's interests and assets worldwide."* It further notes that these committees presented "in particular the evolution of the forces present around the plant" and described "the kidnappings of employees [and] the rise in power of Salafist groups in the region" (**ORTC, p. 243**).

It treats as an element of evidence against Bruno LAFONT the content of the report of the <u>Security Committee dated November 8, 2012, December 18, 2012, September 12, 2013, and October 15, 2013</u> (**ORTC, p. 243**).

As a preliminary matter, it must be recalled that, by definition, the very purpose of the security committee is to address situations involving security risks, particularly in countries affected by instability. Whether concerning Saudi Arabia (**D432/10**), Algeria (**D432/12**), Nigeria (**D432/16**), Kenya (**D432/21**), Morocco (**D432/32**), or Iraq (**D432/57**), the reports relating to these countries almost systematically referred to the

59

existence of a terrorist threat, as well as recurring incidents linked to terrorism (kidnapping, theft, extortion).

It is therefore in light of the natural function of the security committee, to address and thus to mention particularly sensitive situations, that the perception of its reports by their reader must be assessed.

In this context, it will be demonstrated that:

- <u>on the one hand</u>, as regards Syria, the content of these reports, although undeniably concerning with respect to the environment of the plant, did not contain clear information relating to financial agreements with terrorist groups;

- <u>on the other</u> hand, Bruno LAFONT, although a recipient of these documents, only became aware of them when a member of the committee drew his attention to a major difficulty, something that did not occur with respect to Syria.

### 1.2.1    *Content of the report of the Security Committee*

The committal order rightly begins by noting that the 2012 security committee reports "presented in particular the evolution of the forces present around the plant, described the kidnappings of employees, and reported the rise in power of Salafist groups in the region" (**ORTC, p. 243**).

By contrast, it is erroneously asserted that *"as early as September 2013, these reports had clearly identified the financial implications of keeping the plant in operation"* (**ORTC, p. 243**).

As explained below, although certain security committee reports relating to Syria did contain troubling security-related information, they were not such as to reveal the existence of financial relationships between LCS and terrorist groups.

The repor of the security committee dated November 8, 2012, in particular refers to *"the rise in power of extremist terrorist groups," "the Al-Nusra network, supported and financed by Qatar, [which] is the most visible,"* and which
*"constitutes an additional threat."*

This report further specifies that this information was followed up *"with the pre-crisis cell"* (**D432/27**).

The report of the security committee of December 18, 2012 refers to a *"continuous deterioration of the security situation,"* and to *"tensions between the Kurds of the PYD and militias claiming affiliation with the Free Syrian Army (FSA) or Salafist networks (the Al-Nusra Front now listed as a terrorist organization by the United States)."*

It further specifies that the roads to Manbij and Aleppo are controlled by the FSA and the Kurds.

It is also noted that Jean-Claude VEILLARD is monitoring the situation with the pre-crisis cell, that Éric OLSEN is to define the strategy for the plant, and that Christian HERRAULT is to assess its "exposure" (**D432/29/30**).

The report of the security committee of September 11, 2013 states that *"since July 2013, logistical flows and personnel movements have been disrupted, and in some cases even blocked, by Islamist groups, AN and ISIS." These groups demand that a "tax be paid" in order to authorize the passage of trucks and vehicles. Bruno PESCHEUX and Jacob*

60

*WAERNESS were moreover "summoned" before the Islamic court of Raqqah by ISIS to answer accusations brought against them: cooperation with the Syrian regime, vandalism of roads, ethnic favoritism, etc. The presence of these Islamist groups constitutes the main threat that must be taken into account. It is becoming increasingly difficult to operate without being required to negotiate, directly or indirectly, with these networks classified as terrorist by international organizations and the United States. The major difficulty lies in assessing how far their demands and threats may extend and, consequently, the limits that should be set for the operation of the site."*

*It is also noted that Jean-Claude VEILLARD is to "propose new benchmarks for risk assessment."* **(D432/55/56).**

This report does indeed refer to an escalation of the conflict and to the presence of Islamist groups demanding that a tax be paid in order to allow the free movement of vehicles belonging to the plant. However, a careful reading of this segment reveals that:

- these demands were not met by LCS representatives, which is why Bruno PESCHEUX and Jacob WAERNESS were allegedly summoned by ISIS;

- Jean-Claude VEILLARD questions the reality of "their demands and threats" and, consequently, the limits that should be set for the operation of the site.

While this presentation reflects a complex security environment in the vicinity of the plant, the committal order is wrong to claim that *"as early as September 2013, these reports had clearly highlighted the financial implications of keeping the plant in operation"* (**ORTC, p. 243**).

The report of the security committee of October 15, 2013 states, for its part, that "around the plant, the Kurdish forces of the PYD remain very present and hold the ground. *Control of border posts remains a major issue, giving rise to numerous armed clashes between the PYD and the other forces present. ISIS, al-Nusra...*

*Thanks to negotiations conducted with the various stakeholders, logistical flows and the movement of people were able to resume."* Sales were thus able to reach average daily levels in excess of 3,000 tonnes. "Supplies are generally assured" (**D432/57**).

From a security standpoint, one paragraph of this report sets out the positive information that the plant remains under the protection of the Kurdish forces of the PYD, who "hold the ground," while specifying that control of the border posts leads these forces to confront the groups "ISIS [and] al-Nusra." The Kurds of the PYD are thus expressly identified as the only forces in contact with the plant.

In a separate paragraph, reference is then made to "negotiations conducted with the various stakeholders" that made it possible to resume the plant's operation, "negotiations" whose scope and participants cannot be ascertained from the report.

Jean-Claude VEILLARD, the author of the report, moreover himself stated in this regard: *"At the time I wrote this, these negotiations involved only the PYD and the FSA. That is why the second paragraph is separate from the first"* (**D475/9**).

More generally, with regard to the security committees and their reports, Jean-Claude VEILLARD has always maintained that there was never, on such occasions, any discussion of payments to terrorist groups.

61

Thus, as early as June 12, 2017, in a lengthy letter addressed to Beat HESS in his capacity as Chairman of the Board of Directors of LafargeHolcim concerning the Baker & McKenzie report, Jean-Claude VEILLARD firmly challenged what he considered to be an erroneous interpretation according to which the security committee reports could have revealed the existence of negotiations and payments to terrorist groups (**D345/5**).

On November 30, 2017, while being questioned in police custody, Jean-Claude VEILLARD again stated: **"Regarding the transactions mentioned, obviously they were not discussed in the security committee; it was a matter for a triumvirate: TLASS, PESCHEUX, HERRAULT" (D478/8).**

In order to deny Jean-Claude VEILLARD whistleblower status, the PNAT itself noted, in support of its final indictment, the absence of any explicit reference to such payments in the report of the Security Committees:

> *"The security director claims to have been a whistleblower, which would relieve him of any responsibility for the actions of the group in which he worked and whose situation in Syria he specifically monitored.* It is undisputed that he provided input to the Security Committee, which included in particular his own superiors and whose minutes were communicated to the Chief Executive Officer, **without, however, the records of his security assessments making any explicit mention of the illegal practice of payments for the benefit of armed terrorist groups**, nor recording any advice to abandon the Syrian cement plant" (**RD, p. 201**).

In his observations in response to that indictment, Jean-Claude VEILLARD stated that:

> *"The reports of the two security committees of September 11, 2013 and October 15, 2013, which expressly address the presence of terrorist entities and are cited in the final indictment, merely describe the forces present around the plant and warn of the racketeering practices of the various factions operating in its vicinity, without mentioning any issue specific to Lafarge"* (**D3157/8**).

He adds that *"this report, which merely provide a neutral and objective assessment of the security issues to which Lafarge's plants were exposed, and which in no way constitute 'advice', and which contain no reference whatsoever to negotiations or payments, cannot constitute any participation by Mr. Jean-Claude VEILLARD in the alleged 'security payment process'"* (**D3157/9**).

At the hearing, the PNAT itself devoted considerable time to questioning Jean-Claude VEILLARD in order to establish that his internal notes, some of which were drafted in terms very close to those of the two relevant security committee reports, did not provide any explicit information concerning the payment of terrorist groups by LCS.

The settlement order itself likewise holds, in the same vein, in order to justify a dismissal in his favour, that in the security committee reports he chaired, *"he did not explicitly mention either the illegal practice of payments for the benefit of armed terrorist groups*, nor any advice to abandon the Syrian cement plant" (**ORTC, p. 220**).

And for good reason: as will be further developed below, the issue of security payments, whether direct or indirect, to armed groups was never discussed within the security committee, and was reserved for a much more restricted committee composed of operational staff.

In this respect, Jean-Claude VEILLARD stated in particularly clear terms: **"Regarding the transactions mentioned, obviously they were not discussed in the security committee" (D478/8).**

62

In this regard, it is particularly revealing that the names of Firas TLASS and Amro TALEB are never mentioned in any security committee report, even though the use of these intermediaries appears, from a review of the case file, to be a central element with respect to the payments at issue.

These elements are capable of explaining the statements made by all members of the security committees, who unequivocally affirmed their total ignorance of any payments made for the benefit of a terrorist group, despite their participation in the meetings, namely Sonia ARTINIAN (**D718/1; D836/14**), Bi-Yong CHUNCUNGO (**D1481/9, 10 and 19**), Guillaume ROUX (**D686/2**), and Éric MEURIOT (**D1306/2**).

It must therefore be observed that the content of these security committee reports did not contain any references revealing illegal practices of payments by LCS to terrorist entities.

Moreover, even assuming an interpretation of the content of the disputed security committee reports that would run counter to that of their author, all members of the security committee, the final indictment, and the committal order, no evidence has been adduced to establish that Bruno LAFONT actually read them.

### 1.2.2    *CEO's knowledge of the security committee reports*

- Bruno LAFONT did not *"systematically" review* the reports of the Security Committee.

As regards whether Bruno LAFONT actually read those reports, the referral order relies on an unsubstantiated assumption, asserting that he *"necessarily had to review them in the context of monitoring the protection of the Group's interests and assets worldwide"* (**ORTC, p. 243**).

It should be recalled in this regard that Bruno LAFONT was not a member of the Security Committee, which was chaired by the Group's Head of Human Resources (Eric OLSEN, followed by Sonia ARTINIAN from September 2013 onward).

According to the document entitled "*Mandate of the Security Committee*" dated December 4, 2013 and referred to above, the Security Committee operated as an autonomous body, separate from the Executive Committee, with reporting limited to the following functions:

- to validate, or submit for validation by the Executive Committee, the directives and recommendations proposed by the Security Director;

- to approve amendments to the Group's security policy.

The same document further provides that it was the responsibility of the Chair of the Security Committee to *"serve as the link with the COMEX [Executive Committee]"* (**D1105/4**).

Each member of the Security Committee was, moreover, in a position to escalate any relevant information directly to the CEO.

In these circumstances, Bruno LAFONT was not a routine recipient of the Security Committee reports and only reviewed them on an exceptional basis, given that:

- the responsibility had been entrusted to senior executives;

- he relied on those executives to alert him to any significant issues requiring his attention (as Sonia ARTINIAN did following the Security Committee meeting of September 11, 2013 (**D391-2/SecCom49**));

- his professional schedule was particularly demanding, requiring him to focus on his own core responsibilities.

He nevertheless asked, when the Committee was created in 2008, to receive a hard copy of the reports from these meetings, as a way of signaling the importance he attached to the function from the outset (**D232/5, D587/4**):

> *"I was the one who asked to receive these reports. I requested them from Jean-Claude VEILLARD as soon as the Committee was established, to show my support for the work he was doing and to demonstrate my interest at the start of his mandate"* (**D1267/13**).

Bruno LAFONT further explained that, on occasion, he would skim those sections of the Security Committee reports dealing with overarching policy issues falling within his remit as CEO (**D1267/14**).

While Christian HERRAULT claims that he discussed the Security Committee with Bruno LAFONT and suggests that the latter was already familiar with its reports, this amounts in reality to speculation, as he merely states that he
"*believes he had read them*" (**D568/2**), *while acknowledging that he never saw Bruno LAFONT consult the hard-copy reports during their meetings (D568/2) and conceding that he "cannot say for certain with respect to any particular committee"* (**D1223/5**).

As Jean-Claude VEILLARD further explained, Bruno LAFONT would on occasion contact him to seek clarification on a specific point raised in a Security Committee meeting. He also specified that over time such calls—approximately ten between 2011 and 2015 (**D478/5**)—became increasingly infrequent (**D840/16**), as Bruno LAFONT had satisfied himself that the Group's security function was operating properly.

Accordingly, the sole fact that Bruno LAFONT, at the time the Security Committee was created and for the reasons already set out, requested to receive its reports does not in any way support the inference that he read them systematically or in their entirety.

- The email sent by Bruno LAFONT on September 15, 2013 does not demonstrate that he read the report of the Security Committee meeting of September 11, 2013 in full.

The referral order likewise advances an ineffective argument in claiming that Bruno LAFONT's email of September 15, 2013, responding to one of the issues discussed at the Security Committee meeting of September 11, 2013, would establish that he had read the entire report, or indeed all prior reports (**ORTC, p. 238**).

64

It should be recalled in this respect that Sonia ARTINIAN assumed her duties as Group Human Resources Director, and in that capacity as Chair of the Security Committee, in September 2013.

The Security Committee meeting of September 11, 2013 was therefore the first she chaired, and indeed the first in which she participated.

Sonia ARTINIAN stated that, following that Security Committee meeting, she escalated information to the CEO by alerting him to an issue relating to the Group policy on the security of business travel:

> *"I had a monthly meeting with him in which we discussed HR matters about 90% of the time.* **I raised security issues with him when a Group security policy needed to be revised or when I had been alerted that such a policy had not been implemented and the country manager was doing nothing. I had to intervene twice in two years: once regarding the security policy for business travel (because we had found that employees were not complying with it by failing to inform the relevant department when traveling), and once regarding plant protection action plans" (D714/2)."**

A review of Bruno LAFONT's diary confirms that Sonia ARTINIAN did indeed meet with him on September 11, 2013 from 3:45 p.m. to 4:15 p.m., after the Security Committee meeting and before he departed for the United States (**D3156/51**).

It was in these circumstances, and as a direct follow-up to that escalation, that Bruno LAFONT became aware of the page of the Security Committee report devoted to "business travel" (**D704/88**), and that he sent an email on Sunday, September 15, 2013, the day of his return from a business trip (**D3156/52**), to the members of the Executive Committee, with the subject line "security," stating:

> "The latest report of the Security Committee ([dated] September 12) **_appears to point_** _to breaches of security procedures relating to business travel." "We will make a decision tomorrow, but I suggest that you first assess the precise scope of the issue within your respective areas of responsibility before we take action"_ (**D1705/7**).

Far from constituting evidence against Bruno LAFONT, the circumstances surrounding this September 15, 2013 email instead corroborate his consistent statements regarding his role vis-à-vis the Security Committees.

- The accusatory syllogism drawn from a combined reading of the Security Committee meetings of September 11 and October 15, 2013 does not withstand scrutiny.

Finally, with respect to the Security Committees, the referral order (pp. 243–244) essentially argues that, based both on the evolution of the wording in the Security Committee reports of September 11 and October 15, 2013 and on the operating rules of those committees, that**it would be "inconceivable" that Christian HERRAULT, who attended the meeting, and Sonia ARTINIAN, who chaired it and was allegedly responsible for submitting the Security Director's recommendations to the Executive Committee, did not discuss that evolution with the CEO of LAFARGE—an assertion said to explain the references appearing in the subsequent Security Committee report of October 15, 2013" (ORTC, p. 243).**

65

Quite apart from the fact that this passage is nearly unintelligible in the causal link it purports to draw between the evolution of the wording in the two reports and the alleged transmission of information to the Executive Committee and/or the CEO, the assertion itself is entirely unfounded.

First, it should be recalled that the purported responsibility of Sonia ARTINIAN "to have the Security Director's recommendations validated by the Executive Committee" appears only in the document entitled "Mandates of the Security Committee" dated December 4, 2013 (**D1105**), i.e. after the October 2013 Security Committee meeting.

Second, the report of the Security Committee meeting of September 11, 2013 shows that it resulted in no "recommendations" or *"directives"* to be submitted to the Executive Committee, as the only two entries appearing in the right-hand column are the following:

- *"JCV: propose new risk-assessment benchmarks"* (**D432/55**);
- *"JCV: monitor updates to plans: crisis, business continuity, evacuation"* (**D432/56**).

Moreover, the Executive Committee meeting of September 16, 2013, which took place between those two Security Committee meetings, contains no reference whatsoever to Syria (**D391-2, NA0161R01-00000737-00049, pp. 48/62**).

Third, although the Court noted that a meeting with Christian HERRAULT appears, seven days after that committee meeting, on October 18, 2013 at 5:00 p.m., in one of Bruno LAFONT's diaries provided by LAFARGE SA (**D1705/43**), a review of Bruno LAFONT's other diary, produced by his counsel in support of the motion to dismiss (D3156), shows that this meeting did not in fact take place.[20]

Finally, Sonia ARTINIAN stated that she discussed no subject other than business travel with Bruno LAFONT following the Security Committee meeting of September 11, 2013 (**D718/1; D718/6; D836/14**).

In these circumstances, the referral order is wrong to presume that any escalation of information occurred between the two Security Committee meetings in question.

It follows from the foregoing that, at the relevant time, the Security Committee reports were not capable, by their content alone, of revealing the existence of payments by LCS to terrorist entities, and that Bruno LAFONT reviewed them only exceptionally and solely in relation to the implementation of the Group's overarching policies, in keeping with his role.

    1.3   <u>Other emails and materials cited in the referral order in an attempt to substantiate the claim that Bruno LAFONT was aware of payments to terrorist groups:</u>

- <u>The text message of August 2, 2013</u>

ORTC notes that: *"Jean-Claude VEILLARD wrote to his deputy, Hélène SEGUIN, to relay remarks by Antoine SFEIR announcing an offensive toward the east in the coming days. He also shared with her the content of the text message he said he had sent to Bruno LAFONT: "The text message I sent to BL: long exchange with A. Sfeir. His analysis*

---

[20]    It should be noted in this regard that the first diary produced by LAFARGE SA was clearly abandoned partway through the year and replaced by a second diary submitted by the defense of Bruno LAFONT, review of which shows that it alone can be relied upon as a complete and accurate record of Bruno LAFONT's professional and personal schedule.

*Confirms our assessment. Somewhat optimistic regarding the military options of the loyalist forces. However, based on the information shared, no change was made to the decisions already taken: shut down the plant, secure our personnel, preserve our assets, and ride out the storm. It is too early and too dangerous to take sides. Our neutrality remains our greatest asset. Next update with him on Tuesday"* (D2010/8) (**ORTC, p. 237**).

As a preliminary matter, it should be noted that the text message referred to by Jean-Claude VEILLARD does not appear in the investigative record.

In any event, the apparent purpose of this text message was to inform Bruno LAFONT that the decision taken as of July 23, 2013 to temporarily shut down the plant (**D1705/5**), in order to "secure personnel," "preserve our assets," and "ride out the storm", was reinforced by Antoine SFEIR's analysis.

The substance of this message in no way constitutes incriminating evidence and, on the contrary, serves to confirm:

- Bruno LAFONT's understanding of the security situation, as reflected in his note dated July 29, 2013, and his lack of opposition to shutting down the plant: *"Syria. A complicated situation. We are withdrawing quietly"* (**D311/1**).

- as well as the introduction of Antoine SFEIR to Jean-Claude VEILLARD and Christian HERRAULT, so as to provide them with informed guidance in managing security issues at the plant in Syria.

- The email exchange between Christian HERRAULT and Bruno PESCHEUX dated February 16, 2014.

The referral order further states that "*on February 16, 2014, Bruno PESCHEUX explicitly reported to Christian HERRAULT that the situation with the Islamic State, which controlled Manbij where employees were residing, was calm and allowed for the procurement of fuel and pozzolana, and that Christian HERRAULT replied by writing 'I'll pass it on'* (D452/97, document FRMLAT_00006324)" (**ORTC, p. 238**).

On the one hand, it should be noted that this truncated presentation of the exchanges between Christian HERRAULT and Bruno PESCHEUX is misleading, insofar as it wrongly suggests that the information Christian HERRAULT indicated he intended to pass on, without identifying any recipient,
—was the following: *"the situation with Daesh (the jihadists of the Islamic State in Iraq and the Levant (ISIS)) is relatively calm and we are currently finalizing the purchase of pozzolana and fuel oil"* (**D452/97**).

In reality, however, in his email of February 16, 2014, Bruno PESCHEUX provided Christian HERRAULT with a series of distinct items concerning the plant's overall situation, including the following specific point relating to the PYD: *"the main issue is related to the behavior of PYD, which is seeking to interfere more and more in plant matters (recruitment, purchasing)"* (**D452/97**).

It is precisely this information to which Christian HERRAULT responded as follows:

> *"Thank you. I note that the PYD has not changed its attitude in any way.*
> *I'll pass it on. What can we do to help you?* (**D452/97**)

This full quotation, unlike the excerpt cited in the referral order, clearly shows that Christian HERRAULT was not responding to the point concerning Daesh, but exclusively to the issue relating to the PYD.

67

Accordingly, the phrase *"I'll pass it on"* refers solely to the information that the PYD's conduct toward the plant was becoming increasingly problematic.

<u>Moreover</u>, Christian HERRAULT did not specify any recipient in connection with the phrase *"I'll pass it on."*

It is not established in the record:

- that this information was transmitted to anyone at all;
- nor that it was transmitted to Bruno LAFONT.

In this respect, it should also be recalled that, in early 2014, on matters relating to the Kurdish issue, Christian HERRAULT's primary interlocutor was his friend Patrice FRANCESCHI (**D1703/7 and D1703/8**).

Under these circumstances, this element relied upon in the referral order does not allow one either to conclude or even to presume that Bruno LAFONT received any information whatsoever relating to the Islamic State.

- <u>The alleged dinner between Firas TLASS, Nassef SAWIRIS, and Bruno LAFONT (May 8–18, 2014)</u>

The referral order further states: *"On March 25, 2014, Firas TLASS announced that he planned to travel to France from May 8 to May 18 and that he had planned a dinner with Nassef SAWIRIS, the majority shareholder of Orascom, who had since joined Lafarge's shareholding structure, and Bruno LAFONT." The Syrian intermediary was urgently requesting a meeting with Christian HERRAULT and Jean-Claude VEILLARD "before seeing LAFONT."* Christian HERRAULT had the existence of the alleged dinner verified" (D556/19–20) (**ORTC, p. 238**).

Bruno LAFONT has consistently denied that such a dinner ever took place, and in any event no such meeting appears on any agenda.

Brigitte SELLIER and Sophie FAURE, when questioned on this point, stated that they could "neither confirm nor deny it" (**D662**; **D1017**).

In fact, it is undisputed that no meeting or discussion whatsoever took place between Firas TLASS and Bruno LAFONT after 2010 (**D556/19–20**).

- <u>Emails sent by Christian HERRAULT to Bruno LAFONT on April 11 and 13, 2014</u>

The referral order also refers to the following:

*"On April 11, 2014, Christian HERRAULT sent Bruno LAFONT his 2014 EBITDA table for the countries under his responsibility and summarized the main trends: "1) Q1 is better than I had announced, as some countries performed better than forecast, notably China, Iraq, and Syria. We are close to budget, i.e., nearly €50 million more than last year. 3) Countries likely to suffer in Q2 (in addition to South Africa): 32) Syria, where the plant is operating under conditions that are difficult to imagine." On April 13, he added: "I am setting Syria aside because it had a good Q1, but the situation is more volatile than ever, so I cannot say anything other than that the plant is still operating today" (document FRMLAT_000075_13.eml, working copy attached as D1949)* (**ORTC, p. 238**).

68

This email, which merely summarizes an EBITDA table, a mandatory internal accounting document, does no more than present consolidated financial data and general observations on operational difficulties, without containing any concrete or factual information capable of alerting to potential unlawful conduct.

- Emails exchanged between Christian HERRAULT and Bruno LAFONT on August 7, 2014.

The referral order states that *"on August 7, 2014, regarding the situation in Iraq, Christian HERRAULT reported to Bruno LAFONT on clashes between the Kurdish Peshmerga and the Islamic State, whose various designations he again detailed as 'ISIL (or ISIS or Daesh)'"* (document FRMLAT_00003696) (**ORTC, p. 238**).

In this email sent at 2:05 p.m., which contains no reference to payments to terrorist groups, Christian HERRAULT informed Bruno LAFONT about the situation in Iraq, not Syria, and again deemed it useful to clarify the various names corresponding to "ISIL (ISIS or Daesh)."

This element therefore cannot constitute incriminating evidence, particularly since the case file shows that on the day before and the very same day, Christian HERRAULT and Frédéric JOLIBOIS were discussing the precise financial terms of a possible arrangement with Daesh, with Christian HERRAULT stating on the morning of August 7, 2014: *"I would not want the 'taxes' collected to exceed 50% of the normal contribution"* (D1028/43). "Otherwise, it no longer makes much sense" (**D1028/43**), which clearly demonstrates, at a minimum, a highly incomplete flow of information.

None of the foregoing elements supports the prosecution's theory that one or more items of information relating to payments to terrorist groups were transmitted to Bruno LAFONT.

### 1.4 Assertions that Bruno LAFONT "knew" or "could not have been unaware."

With the sole exception of Christian HERRAULT, none of the individuals questioned during the proceedings claimed to have transmitted, or witnessed the transmission of, information to Bruno LAFONT concerning payments to terrorist entities.

A very small number of witnesses merely expressed the opinion that, as CEO, Bruno LAFONT could not have been unaware of events in Syria.

The referral order thus cites:

- Jean-Claude VEILLARD, who retrospectively made the following ironic comment on June 28, 2016, to Frédéric JOLIBOIS and Bruno PESCHEUX:
  *"For your information, the situation is worsening with the Paris Prosecutor's Office and probably the parliamentary commission getting involved. But BL knows nothing about it, it's our Virenque! Without his knowledge or consent!!"* (**D1995/79**, **ORTC, p. 240**);

- *Eliane FOURMONT, Christian HERRAULT's assistant, who, when asked whether Bruno LAFONT could have been unaware if LAFARGE SA had financed Islamist groups through the validation of "donations" in Paris,* replied: "*No. I can't*

69

*state that as a fact. That's what I believe. Bruno LAFONT was a very authoritarian CEO, and nothing happened at LAFARGE without him being informed"* (**D1010/4**).

- Laurie WADDY, Head of Compliance at LAFARGEHOLCIM, who, when asked: *"Do you think Bruno LAFONT was aware?"* answered that *"people below Bruno LAFONT were afraid of being blamed for actions they had taken and therefore reported them, that's my understanding. And also that Bruno LAFONT knew, or at least could not have been unaware"* (**D1032/10**).

- Gérard LAMARCHE, a director of LAFARGE SA for GBL, who, when questioned by Belgian authorities about what had been reproached to Bruno LAFONT and Éric OLSEN following the internal investigation to justify their forced resignations, replied: "that they were at least informed and did not react" (**D875/24**).

These subjective and biased statements, which are not based on any personal or direct observation, have no probative value whatsoever, and their invocation in the referral order as incriminating evidence merely highlights the weakness of the case against Bruno LAFONT.

They are further contradicted by other opinions, including those of:

- Sophie FAURE, Bruno LAFONT's personal assistant for twenty years, who stated: *"Mr. LAFONT did not deserve this. This is really exaggerated. And knowing him, I cannot imagine him giving millions to terrorists. To me, this is outrageous. Moreover, all local entities were completely independent. I would not be surprised if he was unaware of all this"* (**D1017/3**);

- Dominique MARS: *"I consider Mr. LAFONT to be an upright man, a committed Catholic, and he has never given me any reason to question his words or his conduct. I believe what he tells me, given the sense of integrity he inspires. I would entrust him with my children's health"* (**D1429**);

- Rezlaine ZAHER, another assistant to Bruno LAFONT at LAFARGE between 2006 and 2009, who spontaneously wished to provide testimony stating that she perceived in him, in particular, *"a keen sense of integrity, a constant commitment to honesty, and a strong consistency between his words and his actions"* (statement submitted to the record).

In conclusion, none of these elements, whether considered individually or collectively, contradicts Bruno LAFONT's consistent statements that he was never informed of payments to terrorist groups, which the record instead shows were handled autonomously and confidentially.

### 2. <u>Autonomous Management of Security Conditions at the Jalabiya Plant</u>

An objective review of the record highlights a shift in the management of security at the Jalabiya plant, from Lafarge's standard group-wide security mechanisms toward an ad hoc system tailored as closely as possible to operational constraints and entrusted to a restricted committee (**2.1**).

The autonomy with which this system was immediately endowed proved—upon review of the case file— to be particularly pronounced with respect to negotiations with armed groups, resulting in an exceptionally limited flow of information (**2.2**).

2.1  <u>Security management at the Jalabiya plant by a restricted committee.</u>

While it is undisputed that Bruno LAFONT regarded security as a priority upon assuming leadership of the LAFARGE Group, he consistently sought to develop it through mechanisms whose practical implementation rested with those closest to on-the-ground realities.

In this context, and to complement the more general mandate of the Group-level Security Committee, it was provided that operational units be established to manage, in countries where warranted, situations considered exceptional (**D1106/17**).

The establishment of a **crisis unit** at the initiative of the Group Security Committee is expressly provided for in the "Operational Security Guide" (**D1106/17**).

In practice, where appropriate, the Security Committee could precede the creation of a crisis unit with a so-called pre-crisis unit, defined by Jean-Claude VEILLARD as "a meeting organized around a security issue relating to a specific country, in order to determine whether activation of a crisis unit is warranted" (**D479/1**).

Once such a unit was established alongside the Security Committee, it became the effective decision-making body, by virtue of its operational nature and its close proximity to conditions on the ground.

Having himself "been in charge of crisis cells" during his career within the Lafarge Group, Guillaume ROUX describes it as "the structure in which day-to-day decisions were taken in light of how the situation was evolving […] and not within the Security Committee" (**D689/1-2**).

Directly corroborating this division of roles between the various existing security mechanisms, Jean-Claude VEILLARD explains more specifically:

> "By way of comparison, **the Security Committee is not intended to take operational decisions** in the management of operations. *In other words, decision-making authority does not lie with the members of the Security Committee. That said, operations directors do participate in the Security Committee and may draw on the information discussed, take ownership of the issues, and make decisions on the basis of what emerges.* **The crisis cell does have decision-making authority. Its purpose is to focus on a specific situation and it includes the country's general management"** (**D840/12**).

With respect to Syria, a pre-crisis cell, very quickly converted into a crisis cell, according to Jean-Claude VEILLARD (**D479/1**), was put in place as early as late 2011.

Regarding the specific arrangements implemented, Hélène SEGUIN, a member of the Security Department, explained as follows:

> *"Question 12: What can you tell us about the 'Syria pre-crisis cell' that was set up at Lafarge?*
>
> *Answer 11: This dates back to <u>late 2011</u>. The situation in Syria was deteriorating, and I assume it was initiated by Jean-Claude, since he was the one raising the alerts. At the time, the members necessarily included HERRAULT, the Group HR Director, PESCHEUX, possibly Communications, and certainly Mr. WAERNESS.* **The idea was to monitor the situation and take stock—to review the measures put in place and identify the elements that would allow a decision to be taken as to whether operations should continue or not.** *[…] The difference between the pre-crisis cell and the Security*

71

*Committee is that, in the former, the country manager is present and it is possible to go into much greater detail.*

*This pre-crisis cell existed because VEILLARD, HERRAULT and PESCHEUX identified the situation as dangerous, in the sense that matters could escalate, in particular due to difficulties accessing airports"* (**D701/3**).

It is therefore established that, at the initiative of Jean-Claude VEILLARD, Christian HERRAULT and Bruno PESCHEUX, an operational unit, fully apprised of on-the-ground realities and capable of taking appropriate decisions, was set up.

Although initiated in compliance with the security frameworks in force within the Lafarge Group, the management of security at the Jalabiyah plant in practice quickly shifted toward governance by a more restricted committee (**D1106/17**).

This is evidenced by numerous annotations in the margins of the Security Committee reports (**D432/14, D432/15, D432/16, D432/20, D432/23, D432/26, D432/28, D432/30, D432/33**), referring in particular to: *"monitoring of the situation with the pre-crisis cell, conference call,"* with meetings of that cell moving from a *"weekly"* to a *"daily"* frequency.

This is notably explained by Éric OLSEN, Group HR Director until 2013:

> *"Judge's question: On what date was this pre-crisis committee created?*
>
> *Mr. OLSEN's answer: In December 2011, to ensure that the Group was prepared to manage a crisis in Syria. There were a total of 9 meetings. The last one took place in November 2012.* **After that, it was the country organization, under the leadership of Christian HERRAULT and with input from Jean-Claude, that was expected to manage the crisis directly***.*
> *[…]*
> *Judge's question: Why was this pre-crisis committee discontinued while the crisis was intensifying?*
>
> *Mr. OLSEN's answer:* **There is no specific explanation as to why these meetings stopped. At a certain point, Christian HERRAULT took over direct management.***. What I can say is that once the expatriates had been evacuated, the main remaining issue was whether to maintain operations, which did not fall within the remit of the pre-crisis committee"* (**D956/14**).

This assessment is also acknowledged by members of the operational chain themselves, in particular Christian HERRAULT, who stated:

> *"Judge's question: Why was the headquarters-level pre-crisis committee discontinued precisely as the crisis was worsening?*
>
> *Mr. HERRAULT's answer:* **I don't think it was discontinued, but rather absorbed into daily meetings that were held every day under the direction of Jean-Claude VEILLARD and his team, together with local management**" (**D1231/4**).

Similarly, when questioned about the composition of this decision-making body, Jean-Claude VEILLARD replied:

> *"Judge's question: Ms. ARTINIAN indicates that she was not involved in this crisis cell as a replacement for Mr. OLSEN, even though she was in office during the most critical period, namely 2013–2014. Why do you think that was? What do you think is the reason?*

72

*Answer:* **The reason seems to me both simple and complex**. *Throughout 2012, there were regular meetings, almost every week.* **From the end of 2012 onward, bearing in mind that Christian HERRAULT took up his position in January 2013, there was only a country-level crisis cell, in which only the Group security function participated on an ad hoc basis. There was no longer a Group-level crisis cell**" (**D840/12**).

Jean-Claude VEILLARD thus expressly acknowledges that, from the end of 2012, responsibility for managing the security situation at the plant was assumed by a *"country-level crisis cell."*

According to him, these meetings did not give rise to any "formal reports," and "the responsibility for passing information [to Bruno LAFONT] lay with Mr. HERRAULT'" (**D840/12**).

2.2  Management of security payments by the restricted committee

In an email dated September 7, 2014, addressed to Frédéric JOLIBOIS and relating to Bi-Yong CHUNGUNCO's reaction upon the disclosure of agreements with Daesh, Jean-Claude VEILLARD stated:

*"Biyong suddenly became aware that we had, around the plant, unsavory actors with whom we had to deal, directly or indirectly […] She does not accept indirect relationships with ISIS, the influence of Firas TLASS, the agreements with the Kurds, etc.* **It is true that for the past 3 years we have been managing all of this within a very restricted committee,** *and I do not have full command of all the subtleties"* (**D490/79**).

Clarifying the decision-making perimeter of this "very restricted committee," Jean-Claude VEILLARD further stated:
 **"Regarding the transactions in question, of course they were not discussed within the Security Committee; that was the domain of a triumvirate: TLASS, PESCHEUX, HERRAULT"** **(D478/8)**

This is corroborated by the statements of Christian HERRAULT, who, when questioned about the information available to Frédéric JOLIBOIS prior to his arrival concerning the *"unlawful arrangements implemented,"* replied:

**"He met Firas TLASS with Bruno PESCHEUX in Dubai […] Jean-Claude VEILLARD, and attended the crisis meetings that were held daily between LCS management and the Security Department."** (**D1223/19**)

He added that he had thus "verified that Frédéric JOLIBOIS had met **all the key individuals**," before indicating to the investigating magistrate—when asked whether a meeting with Bruno LAFONT was planned:
*"No, that is not planned during the proceedings"* (**D1223/20**).

This autonomous, restricted-committee management continued even after Bruno PESCHEUX's departure in the summer of 2014, at a time when the case file shows that negotiations with Daesh were under consideration.

An exchange of emails in the case file shows that the decision to enter into a fifteen-day agreement was taken following discussions between Christian HERRAULT, Jean-Claude VEILLARD and Frédéric JOLIBOIS, after the latter gave his approval for a limited duration of fifteen days.

73

In an email sent by Frédéric JOLIBOIS to Christian HERRAULT on August 15, 2014, he wrote:

> *"Hello Christian,*
> *I am forwarding this message from Firas to inform you of the situation.*
> *As you know, we reached an agreement with ISIS a week ago (10M + 7,500 t), whose implementation I have been monitoring day by day with Firas.*
> *We were supposed to obtain the 'passes' today, and now Firas informs me of a sudden change. I am currently verifying the accuracy of Firas's statements."* (**D1750/10**)

That same day, Christian HERRAULT forwarded this email to Jean-Claude VEILLARD, indicating that he wished to "discuss it before moving forward" (**D1705/10**), and then replied to Frédéric JOLIBOIS on August 16, 2014:

*"Wait for my discussion with Jean-Claude before giving your agreement with ISIS. Thank you"* (**D1705/9**).

Thirty minutes later, writing again to Frédéric JOLIBOIS and copying Jean-Claude VEILLARD, he gave his approval in the following terms:

> *"I spoke with Jean-Claude and I would agree with Firas's proposal, but only for a maximum period of 15 days, in order to see whether they honor their commitments both toward us and with respect to Turkish imports.*
> *During these 15 days, we will be able to assess the economic impact of the deal and understand how the situation is evolving. Do not hesitate to call me if necessary. Kind regards, ChH"* (**D1705/9**).

At no point during this decision-making process was Bruno LAFONT's opinion sought, nor was he even informed.

On the contrary, this email exchange clearly illustrates the decision-making autonomy of the restricted committee, particularly with regard to negotiations and agreements with armed groups, and the confidentiality surrounding its actions.

Moreover, with the sole exception of Christian HERRAULT, whose allegations have already been recalled and addressed, the members of this restricted committee, all of whom were in a position to speak with Bruno LAFONT, unanimously stated that they never discussed with him the existence of negotiations or payments involving armed or terrorist groups.

When questioned about the information he may have conveyed to Bruno LAFONT on this subject, Jean-Claude VEILLARD stated:

> *"Q 29: Who did you alert?*
> *A 29: Who did I alert? My superior was Mr. Herrault.*
>
> *Q 30: Mr. LAFONT, for example?*
> *A 30: Yes, I could perhaps have gone around Mr. HERRAULT, but in my view it was his responsibility to do so.*
>
> *Q 31: Was Mr. LAFONT aware of these negotiations and this agreement?*
> *A 31: I don't know. But it was Mr. HERRAULT'S responsibility to inform him.*
>
> *Q 32: Why didn't you alert him? Don't you think he was the best person to put an end to the funding of terrorist organizations?*
> *A 32: I did not take the initiative, nor did I have the opportunity to do so"* (**D482/3-4**).

74

This is also consistent with <u>Bruno PESCHEUX'S</u> statements on this point:

> "*Q 28: Mr. LAFONT could only have known about the financing of local militias through Mr. HERRAULT, who reported to him, correct?*
>
> *A 28:* **I do not know whether Mr. HERRAULT kept him informed,** *, but Mr. Veillard had the information and could have done so* **(D467/3).**

Finally, and again in the same sense, <u>Frédéric JOLIBOIS</u> stated while in police custody:

> "*Q 66: Were Bruno LAFONT and Éric OLSEN informed of, and parties to, these negotiations? A*
>
> *66:* **I don't know. Not by me, no** " **(D500/7).**

All of these statements were reiterated at the hearing, thereby establishing that Bruno LAFONT was not informed by Bruno PESCHEUX, Frédéric JOLIBOIS, or Jean-Claude VEILLARD, that is, by the members of the committee which, alongside Christian HERRAULT, handled the issue of the disputed payments.

The intentional element, which requires prior knowledge of the very object of the offence, namely the payments at issue, is therefore lacking as regards Bruno LAFONT, such that his acquittal is warranted.

### III.    Material Elements: Bruno LAFONT did not knowingly "authorize the continuation of operations at the cement plant operated by LCS, even though he was allegedly the only person empowered to shut it down"

As previously recalled, Article 421-2-2 of the French Criminal Code criminalizes, <u>as the material element,</u> only the acts of providing, collecting, or managing funds for the benefit of a terrorist group, or of giving advice for that purpose.

The prosecution nevertheless targets a different act, one not provided for by law, allegedly consisting in having:
*"authorized the continuation of operations at the cement plant operated by LCS, even though he was allegedly the only person empowered to shut it down."*

Even assuming such conduct were established, it would not support a conviction of Bruno LAFONT for financing a terrorist enterprise.

In any event, it will be shown that the allegation that Bruno LAFONT—while being the only person allegedly able to bring the activity of the cement plant in Syria to an end—authorized its continuation is unfounded, such that acquittal is also required on this ground.

As will be demonstrated:

- the premise underlying the prosecution—namely that Bruno LAFONT was the only person capable of halting the plant's activity—is erroneous (**A**);

- Bruno LAFONT never granted any *"authorization"* for the plant to continue operating during the period covered by the charges (**B**).

75

#### A. Bruno LAFONT was not the only person empowered to bring the plant's operations to an end

The accusation is built on a flawed assumption, since Bruno LAFONT was not the only person capable of halting operations at the Jalabiya plant (**1**), as evidenced by the fact that the plant was shut down several times during the relevant period without any intervention on his part (**2**).

#### 1. Bruno LAFONT Was Not the Only Person With Authority to Terminate Operations at the Jalabiya Plant

Under Lafarge Group internal approval rules, a "decision to close a site/plant/production line/office (with possible expensing of non-recurring items)" with a book value exceeding €25 million, in the sense of a definitive closure, falls within the authority of the Group Chairman and CEO (**D527/21–55**).

It is not disputed that Bruno LAFONT had full discretion, at any time, to decide to <u>close the plant, for a defined period or indefinitely, and to instruct his teams</u>, acting within their delegated authority, to implement that decision.

However, where the issue was the management of an ongoing and evolving crisis—at country or even plant level—Bruno LAFONT could only make a decision on the basis of information coming from the field through his teams, notably via his Deputy Head of Operations, himself informed by the Country Director.

76

Moreover, it is established that individuals other than the Chairman and CEO were fully authorized to decide to halt the plant's activity, which in itself could have brought the disputed payments to an end, as implicitly suggested by the prosecution.

Such a decision did not necessarily entail the definitive cessation of Lafarge's activities in Syria, but rather an indefinite shutdown of the plant, lasting as long as the security situation, particularly insofar as it involved any payments to terrorist entities, remained unchanged.

In particular, both Bruno PESCHEUX and Christian HERRAULT had such authority, as they themselves stated (**D460/1, D512/3, D566/1, D975/8**), as did all managers questioned on this point, including Guillaume ROUX (**D687/6**).

Christian HERRAULT thus stated at his first interview, without referring to any approval required from Bruno LAFONT:

> *"The only power I had was one of life or death over the cement plant: <u>we stop, or we continue.</u>"* (***D253/4***).

Asked about an email sent by Éric OLSEN to Christian HERRAULT referring to "a difficult decision to be made," Jean-Claude VEILLARD replied:

> "I think Mr. OLSEN was referring to business continuity, <u>*and that decision regarding business continuity fell entirely within Mr. HERRAULT's remit.*"</u> (**D840/6**).

When asked about his ability to shut down the plant, Bruno PESCHEUX replied:

> *"If it's an emergency, I alone decide. If it's not an emergency, then not me alone"* (**D239/9**).

Jean-Claude VEILLARD summarized the situation as follows:

> <u>*"With regard to shutting down the plant, four people had that authority: the plant manager, who can close the plant in an emergency; the Country Director, who has full authority; the Head of Operations; and the CEO."*</u> (**D840/13**).

The autonomy of Christian HERRAULT and Bruno PESCHEUX in defining the very criteria that, in their view, should lead to the shutdown of the plant is further illustrated by an exchange of emails from July 2012 (**D572/33 and 34**).

Acting on this prerogative, they in fact decided on several occasions during the period covered by the charges to shut down the plant, without first consulting Bruno LAFONT (**D750/6 and 7; D391-3/BLA/Email/6 and 19**).

### 2. Individuals Other Than Bruno LAFONT Did, in Fact, Order the Closure of the Jalabiya Plant During the Period Covered by the Charges

The case file shows that on at least three occasions (April/May 2013, July 2013, and July 2014), the Jalabiyah plant was shut down solely on the decision of members of the operational chain.

Thus, in an <u>email dated May 30, 2013</u>, Christian HERRAULT informed Bruno LAFONT as follows:

> *"As I had mentioned to you, the kiln at our Syrian plant was successfully restarted a few days ago without any major issues. <u>I didn't bother you with this, but we had a 6-day plant shutdown</u> in May because of a strike by our plant guards (Kurdish), but everything is back to normal and we are currently selling 3300/3700 tonnes/day"* (**D556/17**).

Christian HERRAULT thus informed his superior, nearly one month after the fact, of an interruption in plant operations caused by a strike by plant guards between April 28 and May 6, 2013, and by increasing interference from the PYD (**D463/24–26**).

By <u>email dated July 24, 2013</u>, Christian HERRAULT once again informed Bruno LAFONT after the fact of a plant shutdown:

> *"<u>Please note that we were forced to shut down our Syrian plant yesterday,</u> as fighting between the Kurds and jihadists was drawing dangerously close. We are monitoring the situation hour by hour"* (**D1705/4**).

Similarly, <u>on July 10, 2014</u>, Christian HERRAULT sent Bruno LAFONT the following email:

> "*<u>We shut down the kiln at our plant the day before yesterday,</u> and the power plant yesterday.*
> *Indeed, access roads to the plant are controlled by ISIS (also known as Daesh or ISIL), and commercial activity was no longer possible.*
> *There are violent clashes between ISIS and Kurdish forces around the plant (a spillover from events in Iraq). "<u>We therefore decided to halt production</u> in order to gain greater clarity and to secure 'clear' agreements with the belligerents before resuming operations, without taking undue risks.*
> *<u>I will keep you informed should there be any significant developments.</u> ChH (…)"* (**D556/16**).

The autonomy of the members of the operational chain in deciding to shut down the Jalabiyah plant is therefore fully established, as is their awareness that they could exercise this authority independently, without requesting or even seeking advice from the CEO.

In practice, during the period covered by the charges, Bruno LAFONT observed, without ever doubting this point, that Christian HERRAULT, and later Bruno PESCHEUX and then his successor Frédéric JOLIBOIS, did indeed use the option of placing operations on hold as one response among others to the evolving security situation at the Syrian plant.

Moreover, the alleged *"authorization"* to maintain operations attributed to Bruno LAFONT by the prosecution is entirely lacking.

### B. Bruno LAFONT Issued No Authorization to Maintain Operations at the Jalabiya Plant During the Period Covered by the Charges

As has just been demonstrated, Bruno LAFONT was never aware of the facts underlying the charges, which precludes any finding of criminal liability against him due to the absence of intent.

Even assuming, arguendo, that the Court were to attribute such prior knowledge to him, it would still have to conclude that the material element relied upon by the prosecution, namely, *"authorizing the continuation of operations at the cement plant operated by LCS",* cannot be established during the relevant period.

78

A review of the case file makes it clear that no such authorization, whether explicit or implicit, exists.

In fact

- First, in 2012, well before the start of the period covered by the charges, Bruno LAFONT, in discussions with Christian HERRAULT, provided general guidance to the effect that operations could continue provided that safety could be ensured (1);

- Second, between 2013 and August 27, 2014 (the date on which he would order the closure of the plant, see below), Bruno LAFONT monitored the situation through Christian HERRAULT, while also following the broader geopolitical context through expert Antoine SFEIR. In doing so, he both understood and made clear to Christian HERRAULT that he was prepared to close the plant indefinitely if circumstances so required, an approach that is the exact opposite of an authorization to continue operations, and far closer to an authorization to shut down (**2**).

In the summer of 2012, when the French Embassy recommended the first repatriations of non-Syrian nationals, particularly French citizens, the question arose as to whether operations could be maintained in this new context. Bruno LAFONT and Christian HERRAULT decided to keep the plant operating, provided that safety would not be compromised.

In this respect, the referral order states:

> "[Christian HERRAULT] *stated that he had obtained Bruno LAFONT's authorization by describing the entire system to him and receiving the response: 'we continue.'" He added that his superior had told him that "the general interest is made up of particular interests"* (D1383/5) (**ORTC, p. 244**).

This allegedly incriminating element is not incriminating at all, once it is placed in its proper chronological context, namely, in 2012.

At that time, although numerous rebel groups were present in the region surrounding the plant, the actors operating in the immediate vicinity of the cement works were clearly identified: the Kurds, through the YPG; the Free Syrian Army around Manbij; and the regular army, which still controlled extensive areas between Manbij, Kobané, and Raqqa. The Kurds were providing security for the plant.

That said, the situation elsewhere in Syria was more troubling. The Ministry of Foreign Affairs reacted by sending a letter on July 25, 2012, to Jean-Claude VEILLARD, stating: *"The French Embassy in Amman has informed my department of the presence today in Damascus of two French nationals, Mr. Bruno PESCHEUX and Mr. Valery MIRAKOFF, employees of your company"* (**D1921/21**). The Ministry's representative concluded that *"it would seem reasonable t*o prohibit travel by your employees to Syria" (**D1921/21**).

A report of an interview with Jean DESAZARS de MONTGAILHARD, Deputy Chief Executive Officer for Strategy, Development and Public Affairs of the Lafarge Group, prepared by the North Africa and Middle East Department and dated October 23, 2012, states as follows: "Ultimately, it was agreed to establish a regular liaison between the Lafarge Group and this department in order to monitor political and security developments and to keep the Projects Department informed of the company's activities in the region (RR)." (**D919/2**)

It was therefore in this context that, in the summer of 2012, Bruno LAFONT set a clear line with Christian HERRAULT: operations could be maintained provided that safety remained assured.

Referring to a discussion in which Bruno LAFONT allegedly stated that "*the general interest is made up of particular interests, which for me means that the general interest comes through extortion*" (**D572/1**), Christian HERRAULT himself places this exchange in October 2012 (**D1383/6**).

Christian HERRAULT thus describes Bruno LAFONT's position in the following terms: "*we continue, with no risk to the safety of employees*" (**D1383/5**), while also stating that "*during our meeting in July 2012, we agreed that either we stayed or we left. There was no intermediate solution*" (**D1383/6**), or again: "*it was at that time, I believe, that he told me that the general interest was made up of particular interests, which means what it means*" (**D1383/6**).

This account is indeed corroborated by an email dated July 23, 2012, sent by Christian HERRAULT to Bruno LAFONT (**D906/313**), containing a general update on the operation of the plant, apparently prepared by Bruno PESCHEUX, in which the latter asks his superior to **"anticipate a situation in which we might have to shut down the entire plant"** due to "*turbulence.*"

That email refers in particular to the following elements:

- an "*accident (LTI) involving two Chinese subcontractors working at the power plant*";
- the "*postponement of plant maintenance pending greater clarity regarding the plant's security situation*";
- the fact that "*there are no longer any expatriates in Damascus,*"
- the repatriation of the "*Jordanian plant manager*";
- that "*there are still ten Lafarge expatriates currently at the plant*";
- that "*by the end of the week there should be four expatriates left, or possibly none at all, if the situation requires it*"; that "*the plant would then operate with Syrian personnel*";
- and that "*the country security director, who is Norwegian, is at the plant and is monitoring the situation*" (**D906/313**).

Far from expressing any opposition to such a potential shutdown scenario, Bruno LAFONT replied: **"Thank you, this level of information suits me perfectly. No compromise is possible when it comes to safety."** (**D906/313**).

The directive given to Christian HERRAULT was therefore unequivocal, as he himself later summarized it as follows:
"*The very clear conclusion he had already sent me in an email two months earlier, even though the situation was not at all the same, was:* **'we continue, with no risk to the safety of employees.'**" (**D1383/6**).

At that time, Bruno LAFONT and Christian HERRAULT agreed on a dual assessment, namely that:

- the unrest affecting Syria was occurring primarily in the south of the country, far from the area where the Jalabiyah plant was located;

- although the situation was worrying and required constant monitoring, the plant could continue operating.

From the summer of 2013 onward, however, rather than an authorization to continue operations, it was effectively an "authorization to shut down" that was given to Christian HERRAULT.

80

Beginning in 2013, Bruno PESCHEUX reported increasing operational difficulties affecting the functioning of the plant, more or less directly linked to the evolution of the Syrian conflict, including supply disruptions due to road blockages, unfavorable exchange rates, increasing demands from Kurdish militias, and industrial difficulties (**D391-3/BLA/Email/6**).

These difficulties, relayed by Christian HERRAULT and, more sporadically, by Jean-Claude VEILLARD (**D478/6**), led Bruno LAFONT to reassess his 2012 position regarding Syria. A withdrawal by Lafarge became conceivable, if not preferable, and the plant was to be shut down as soon as Bruno PESCHEUX and Christian HERRAULT recommended it.

It was precisely in this increasingly tense context that Antoine SFEIR, a political scientist and journalist, and a consultant to Lafarge who regularly informed Bruno LAFONT of developments in Syria, stated the following: *"In June 2013, I was, as usual, in my capacity as a consultant to Lafarge, in the office of its Chairman, Mr. Bruno Lafont. […] In my presence, he called Mr. Christian Hérault, the regional manager, and I was able to hear what he said to him: "It goes without saying that we must take the necessary measures in the event that Daesh forces approach our plant. There can be no question of dealing with them. We may reach an understanding with the Kurds to protect the plant, and even install Kurdish forces there."'* (**D1382/7**)

One month later, in notes taken following his monthly meeting with Christian HERRAULT on July 29, 2013, Bruno LAFONT wrote the following with respect to Syria, the last country discussed: *"A complicated situation. We are withdrawing quietly"* (**D311/13**).

During his questioning, Bruno LAFONT explained this entry as follows:

> *"I found no reason not to remain until July 2013, when I realized that the situation was becoming more complicated. I wrote in my personal notes: 'we withdraw calmly.'"* (**D587/6**)

This does not mean, as the referral order contends in an attempt to identify a contradiction between his words and his actions (**ORTC, p. 242**), that Bruno LAFONT decided to close the plant at that time.

At that stage, he had been informed by Christian HERRAULT of a temporary shutdown of the plant's operations, a decision to which he naturally raised no objection, and which, more broadly, ushered in a period of uncertainty during which the question of continued operations would arise repeatedly and therefore required appropriate monitoring (**D1267/10 and 14, D1383/7 and 8**).

This is the meaning of the phrase a **"complicated situation. We withdraw calmly"** (**D311/13**), which Bruno LAFONT's defense, in the context of the Baker & McKenzie investigation, described as a decision to "prepare for withdrawal," that is, to prepare for the increasingly likely possibility of a shutdown, a course of action for which Bruno LAFONT immediately expressed his support to Christian HERRAULT (**D311/4**).

In reality, from that point onward, and contrary to the notion of any alleged authorization to maintain operations on which the prosecution is based, Bruno LAFONT expressly conveyed to Christian HERRAULT that closure remained an option at any time.

Accordingly, from that date forward, Bruno LAFONT repeatedly asked Christian HERRAULT, during their regular meetings, whether Lafarge's operations in Syria could continue (**D1267/10 and 14, D1383/7 and 8**), remaining attentive to any signal or warning that might be conveyed to him.

81

It must be noted, however, that no such warning was ever communicated to him in any form, at least not until the Executive Committee meeting of August 27, 2014.

While Bruno LAFONT stated during the investigation, *"[Christian HERRAULT] never recommended that I close the plant.* He would tell me, 'we can continue, we're managing'" (**D1267/11, D1383/9**), Christian HERRAULT himself clearly acknowledged that he had never **"asked Bruno LAFONT to permanently shut down LCS's operations," "except after the end of August 2014, following the Executive Committee meeting"** (**D569/4**).

This absence of any recommendation to close the plant prior to the Executive Committee meeting of August 27, 2014 was reiterated by Christian HERRAULT on several occasions during the hearing.

In this respect, Christian HERRAULT's own statements, as the person responsible for the *"transmission of information"* (**D840/12**), demonstrate that he never considered the situation to be out of control, believing that he *"could manage it"* (**D566/6**), which naturally explains why he presented the situation to his superior as difficult but under control.

Reference may usefully be made to the emails previously mentioned, sent by Christian HERRAULT to Bruno LAFONT concerning the situation in Syria. While these emails contain information that was at times concerning, they also describe a situation being managed on the ground and under control, and they indicate that Bruno LAFONT would be kept informed of any developments.

This portrayal of the situation is consistent with numerous elements in the record reflecting Christian HERRAULT's conviction, for reasons specific to him, that the plant needed to remain operational (**D566/7, D566/8, D568/3, D975/11, D1703/22, D1383/21**), including up to the presentation made to the Executive Committee on August 27, 2014 (**D669/7**).

Christian HERRAULT's relatively reassuring presentation of the situation to Bruno LAFONT, which in any event never suggested the need for an immediate decision to close the plant, closely mirrors the account he provided to other individuals within the group.

*This is the case, for example, with Bernard COLLOMB, a close associate of Christian HERRAULT and at the time a director and honorary chairman of Lafarge SA, who stated with respect to the "risk elements communicated to him by Christian HERRAULT" that HERRAULT emphasized the absence of fighting around the plant and "the presence of the Kurds," such that "at the time, nothing Christian HERRAULT said shocked me or triggered any alarm." "It was not an easy situation, but it was a situation under control" (**D1393/9**).*

Similarly, Sonia ARTINIAN indicated that she had "*the feeling that the risks had been identified and that the operational teams responsible for protecting people and property from a safety and security standpoint were not alarmist. Neither Jean-Claude VEILLARD nor Christian HERRAULT raised any alerts*" (**D715/1**).

Laurent BARBAGLI, Director of Risk and Insurance, when asked about his assessment of the situation in Syria, stated, *"I trusted management, which said that the situation was under control and that stronger protective measures would be put in place when necessary"* (**D1595/12**).

82

Moreover, Sapna SOOD, Director of Safety and Health from 2013 onward, who explained that she had *"conversations about the plant in Syria and its difficulties with Christian HERRAULT,"* stated as follows:

- *"I also saw him once a month, and we discussed all the countries. I asked him whether there were plans, how things were going given the situation, and how matters were being managed at the plant, always from a health and safety perspective. HERRAULT always replied that things were going well and that they were able to operate under safe conditions for employees"* (**D1414/5**);

- *"I was surprised that Lafarge remained and continued operating there, which is why I asked questions about how the situation was evolving. HERRAULT, PESCHEUX, and JOLIBOIS reassured me by telling me that everything was going well in my area of responsibility"* (**D1414/6**);

- *"I was led to believe that things were going well inside and around the plant"* (**D1414/7**).

Such information tends to demonstrate that although Christian HERRAULT had, in the summer of 2013, received the green light from the Chairman and CEO to close the plant when he and his country teams deemed it appropriate, he nonetheless, instead of making such a recommendation, continued in 2013 and throughout 2014 until August 27 to provide Bruno LAFONT and other group executives with information portraying the situation as being under control.

Ultimately, the instructions given by Bruno LAFONT, which consistently reflected the absolute priority placed on employee safety and security, never allowed for the continuation of operations at any cost, nor did they amount to any authorization to maintain plant operations with knowledge of the disputed payments.

From the summer of 2013 onward, Bruno LAFONT's conduct and instructions, contrary to the characterization adopted by the prosecution, in fact pointed toward an authorization, at least implicit, to close the plant at any time.

This is further confirmed by the absence of any reproach expressed by Bruno LAFONT whenever he was informed after the fact of plant shutdowns, as well as by the absence of any written communication from him exerting explicit or implicit pressure to keep the plant operating.

The charges are therefore manifestly unfounded.

On this basis as well, the Court must acquit Bruno LAFONT.

2.1 Bruno LAFONT decided to close the plant as soon as he discovered, during the Executive Committee meeting of August 27, 2014, that a financial agreement with Daesh was being contemplated.

In light of the elements set out above, both the substance of the decision taken on August 27, 2014 during the Executive Committee meeting, at which Bruno LAFONT learned that an agreement was to be concluded with Daesh (1.1), and the manner in which that decision was subsequently implemented, as reconstructed a posteriori on the basis of the evidence in the record (1.2), definitively exclude any authorization by Bruno LAFONT to maintain the plant's operations with full knowledge of the facts.

83

**a.** The decision to close the plant taken at the Executive Committee meeting of August 27, 2014.

Upon learning from Christian HERRAULT, during the Executive Committee meeting held on August 27, 2014, that a financial agreement was to be concluded with the Islamic State, Bruno LAFONT immediately reacted and instructed that the Jalabiyah plant be closed, so that such an agreement would never be carried out.

Throughout the proceedings, and through repeated statements made at the hearing, Bruno LAFONT and Christian HERRAULT agreed on this point: it was indeed at the conclusion of the Executive Committee meeting of August 27, 2014 that the decision was taken to cease the operations of the Syrian *plant indefinitely*, with Christian HERRAULT responsible for implementing that decision.

This fact is attested by Antoine SFEIR, who testified that *"at the end of August 2014, Mr. Lafont told me during a meeting that he had given instructions for the closure of the plant"* (**D1382/7**).

During that Executive Committee meeting, the notes taken by Nermine SAFRAOU, who served as secretary and confirmed that she faithfully transcribed the statements made (**669/3**), show that Christian HERRAULT began by stating the following regarding Syria (**D669/7**):

> *"August was not good, because there was no commercial activity. We reached an agreement with the Kurds and Daesh, so we are starting to sell a little this week. The situation in Syria remains fragile. Qatar will be more cautious in financing these extremists." "In our agreement with Daesh, we stated that, in terms of taxation, we must receive the same treatment as Turkish imports."*

Upon discovering for the first time that a financial agreement was to be concluded with Daesh, Bruno LAFONT was the only participant at the Executive Committee meeting to react.

He immediately interrupted Christian HERRAULT's presentation, stating, according to the secretary's notes, *"we must ensure that what we are doing is risk-free, including with respect to the United States"* (**D572/37**).

The meaning of these remarks is clear: no risk was to be taken. This necessarily included legal risk, but not exclusively, as the reference to the United States is introduced parenthetically and preceded by the word "also."

This was the argument that immediately came to Bruno LAFONT's mind upon such a discovery, allowing him to express his disagreement by invoking legal risk in general, and more specifically the risk associated with sanctions imposed at the time by U.S. authorities on numerous groups and their executives and employees, including several French entities, such as BNP Paribas only a few weeks earlier, in June 2014[21].

These remarks were understood in precisely that sense, namely the absolute impossibility of acting in violation of any law, including U.S. law, not only by their direct recipient, Christian HERRAULT (**D1383/11**), but also by Bi-Yong CHUNGUNCO, to whom the investigators presented the meeting report (**D806/4**).

---

[21]    See Information Report No. 4082 submitted by the Committee on Foreign Affairs and the Committee on Finance concerning the extraterritorial application of U.S. legislation, dated October 5, 2016.

84

Following this intervention by Bruno LAFONT, Christian HERRAULT continued by stating: "*The best protection is to keep the plant operating.* Sales have resumed, and we are maintaining contact with everyone" (**D572/37**).

This conviction expressed by Christian HERRAULT is consistent with the position he stated on numerous occasions at the time of the events, during the investigation, and at the hearing (**D923/1, D1703/22, D1705/33, D568/3, D569/1**). It aligns with similar views expressed by Jean-Claude VEILLARD (**1998/246)** and Frédéric JOLIBOIS (**1998/250 and 251**).

In order to provide an urgent response to a situation whose seriousness he perceived, but without placing Christian HERRAULT in a difficult position before the full Executive Committee (**D1383/11**), Bruno LAFONT asked him to join him in his office and told him that *"all our rules had to be applied"* (**D587/5**).

As Bruno LAFONT stated during his initial court appearance, "it was the substance of that meeting that led us to decide to leave Syria" (**D587/5**).

During the confrontation, Bruno LAFONT summarized that discussion as follows:

> *"I think it is important to understand the sequence of events that morning in August 2014. The first phase took place during the Executive Committee meeting. Christian HERRAULT reported on his operations regarding Syria and, for the first time, mentioned an agreement with Daesh. I reacted immediately and briefly, and Christian HERRAULT stated that the best solution for the plant was to continue operating.* **Immediately after that Executive Committee session, Christian HERRAULT came to my office. We spoke, and at the end of the conversation, Christian suggested closing the plant, which I approved"** (**D1383/11**).

He added:

> **"I think there were several views expressed at the same time, and my intervention certainly influenced his eventual decision to close the plant**. *The announcement of that agreement with DAESH deeply shocked me.* **I did not want to put Christian in a difficult position. I wanted the plant to be closed immediately, with the decision taken jointly by both of us, ideally based on Christian's own recommendation" (D1383/11).**

Bruno LAFONT explained his desire to involve Christian HERRAULT as closely as possible in both the decision to close the plant and its implementation by noting that "*he was in charge of all operations and best placed to manage the orderly and safe closure of the plant*" (**D1383/11**), in keeping with the logic of delegation. It was important to Bruno LAFONT to secure Christian HERRAULT's agreement to the closure decision, which he summarized as follows: *"I wanted the plant to be closed immediately, with the decision taken jointly by both of us, ideally based on Christian's recommendations"* (**D1383/1**).

Although their accounts differ in certain details, both men agree that a joint decision to close the plant was made at that time.

Christian HERRAULT stated during that same confrontation:

> *"I provided a factual description of the situation in Syria, and then Bruno LAFONT made a statement that I found astonishing: 'we have to see whether what we are doing is risk-free, including with respect to the Americans.' I must say that this response infuriated me to the highest degree, and I reminded him that the best protection for the plant was for it to continue operating."*

85

*"Sales had resumed, and we were 'talking with everyone.' After that, I went to see Bruno, who did in fact criticize me sharply for how things were being handled. I told him that, in any event, FIRAS had lost control of the negotiations and that the plant had to be closed." I believe that is what I said while in police custody. Bruno LAFONT then told me, 'Okay, we're closing'"* (**D1383/11**).

While in custody, when asked whether he had requested that Bruno LAFONT "permanently stop LCS's operations," Christian HERRAULT replied, "No, except after the end of August 2014, following the Executive Committee meeting of August 27, 2014. I told him that the pressure on the plant was such that we could no longer operate safely and that we had to close, and that I needed a few weeks to empty the silos" (**D569/4**). He further stated that "the decision to close was taken with Mr. Lafont at the end of August 2014, but first, I wanted to empty the silos, and second, the closure had to remain confidential so that it could be carried out smoothly" (**D569/4, D572/1**).

Ultimately, it is established that:

- Christian HERRAULT reported, during the Executive Committee meeting of August 27, 2014, that a potential agreement had been reached with Daesh, a fact recorded in the meeting notes (**D572/37**);

- Following that disclosure, Bruno LAFONT interrupted Christian HERRAULT's presentation to state that no risk-taking, and therefore no violation of the law, was conceivable (**D572/1, D1383/11**), a point likewise recorded in the meeting notes (**D572/37**);

- Christian HERRAULT responded by stating that *"the best protection is to keep the plant operating";*

- Thereafter, Christian HERRAULT and Bruno LAFONT spoke privately, during which discussion the decision was made to close the plant (**D1231/14, D1383/11**).

Although the referral order (**ORTC, p. 239**) appears to criticize the absence of a more explicit "veto" by Bruno LAFONT in the minutes of that Executive Committee meeting, it must instead be emphasized that he reacted with an unambiguous intervention and that, as he recalled at the hearing, closing the plant was a sensitive operation whose execution required confidentiality.

Christian HERRAULT himself underscored the need for confidentiality surrounding the plant closure, noting that it "ran counter to the wishes of all those directly involved in the operation of the plant, each of whom had an interest in its continued operation" (**D3149/54**).

The record therefore shows that, in practice, as soon as he was informed of the potential conclusion of an agreement between LCS and Daesh, Bruno LAFONT instructed that the Jalabiyah plant be closed in order to prevent such an agreement from being implemented.

This finding stands in direct contradiction to the premise underlying the charges against Bruno LAFONT, namely that he authorized the continuation of plant operations with knowledge of payments made to terrorist groups, a premise that is manifestly unsupported by the facts and must therefore result in his acquittal.

**b.** Implementation of the decision to close the plant taken at the Executive Committee meeting of August 27, 2014

Following the Executive Committee meeting of August 27, 2014, during which Christian HERRAULT informed Bruno LAFONT that the closure would take several weeks, responsibility for implementing the closure decision fell to Christian HERRAULT, a point he never disputed, through the issuance of appropriate instructions to his subordinates.

As he stated on several occasions during the investigation and at the hearing, Christian HERRAULT was determined to "empty the silos" in order to avoid the risk of abandoning them to terrorist groups.

Christian HERRAULT accordingly stated, successively:

- *"[...] The decision to close was taken with Mr. Lafont at the end of August 2014, but first, I wanted to empty the silos, and second, the closure had to remain confidential so that it could be carried out smoothly"* (**D569/4**);

- *"He had given me his approval, and I told him that I needed several weeks to empty the silos"* (**D572/1**);

- *"The decision to leave was taken at the Executive Committee meeting at the end of August 2014. I asked for time to empty the silos"* (**D1231/14**).

Jean-Claude VEILLARD was able to confirm that this requirement relating to the need to empty the silos was already part of Christian HERRAULT's line of reasoning in August 2014 (**D952/14**).

For his part, from September 1 to September 10, 2014, Bruno LAFONT held numerous meetings as part of the presentation of the Group's results to its shareholders, known as "roadshows," first in Paris on Monday, September 1 and Tuesday, September 2, then in London on Wednesday, September 3 and Thursday, September 4, and then in the United States from Sunday, September 7 to Wednesday, September 10, following a stop in Évian on Friday, September 5 and Saturday, September 6, to attend the Franco-German Meetings (**D3156/123**).

On Friday, September 12, two days after his return to France, Bruno LAFONT held a 45-minute meeting with Christian HERRAULT, as recorded in his agenda (**D3156/125**) and confirmed at the hearing.

On that occasion, Bruno LAFONT questioned Christian HERRAULT about the progress of the operations to close the Syrian plant, and the latter told him that *"the closure was progressing, but that it was taking time"* (**D1267/26**).

Bruno LAFONT then reiterated his instruction, stressing the need for the closure to become effective quickly.

From that date onward, the evidence in the file and the statements collected explicitly reflect the implementation of the plant's closure.

Thus, on the afternoon of September 12, 2014, Christian HERRAULT had a telephone conversation with Frédéric JOLIBOIS (**D1998/249 and 250**), during which he asked him to prepare the cessation of sales (**D497/9, D517/3**).

On Saturday, September 13, 2014, Jean-Claude VEILLARD wrote to his contact at the DGSE, known as *"grosmarmotte,"* stating:

> *"Although the plant's activity is satisfactory, with 3,500 tonnes sold last Tuesday,* and 4,700 tonnes on Wednesday, **we are going to stop sales** *because our distributors are forced to deal with jihadists, and this risks putting everyone in difficulty"* (**D1961/23**).

On Sunday, September 14, 2014, Christian HERRAULT asked Frédéric JOLIBOIS to prepare a plan to terminate relations with Firas TLASS (**D517/3**), a plan that was to be presented at a meeting scheduled by Christian HERRAULT at the Group's Paris headquarters on September 19, 2014.

That same day, Frédéric JOLIBOIS sent Christian HERRAULT a cash-flow forecast assuming the absence of any sales between October and December 2014 (**D1998/258**), a document that had been sent earlier that morning by Ammar KHAYER and Nabil SANDOOK (**FRMLAT 1177**)

On Monday, September 15, 2014, Christian HERRAULT contacted Frédéric JOLIBOIS by telephone to *"stop sales and prepare the break with Firas TLASS"* (**D497/9**).

That same day, Frédéric JOLIBOIS wrote to Bruno PESCHEUX to inform him of the instruction given by Christian HERRAULT and to request his support in preparing the plan as requested (**D1998/257**).

On Tuesday, September 16, 2014, Christian HERRAULT wrote to Frédéric JOLIBOIS to inform him that the meeting on Syria scheduled for September 19, which also involved the legal department, was to take place <u>"no matter what," meaning that it was mandatory</u> (**D1998/263**).

Thereafter, the closure process thus initiated accelerated further due to the proximity of fighting around the plant.

Accordingly, on the morning of September 18, 2014, Frédéric JOLIBOIS informed Christian HERRAULT that preparations for evacuation were necessary:

> *"Hello Christian,*
>
> *Daesh aims to conquer the Kurdish enclave before the start of American and allied offensives. Ali said that the Kurds would defend the plant in the event of a Daesh invasion.*
>
> *The most likely scenario is therefore that the plant will become a battleground. I believe we need to prepare for evacuation. Frederic"* (**D1998/267**).

That same day, most employees left the plant, with the exception of 25 employees who remained on site to monitor the cooling of the kiln (**D1998/268**). All remaining employees left the plant on the morning of September 19, 2014, and the plant was invaded by the Islamic State later that evening (**D1998/279**).

These developments demonstrate that the decision to close the plant, taken at the conclusion of the Executive Committee meeting of August 27, 2014 by Bruno LAFONT together with Christian HERRAULT, and firmly reiterated at their meeting of September 12, 2014, was effectively implemented.

That closure decision was formalized by a resolution of the LCS Board of Directors dated September 27, 2014, signed by Christian HERRAULT in his capacity as Chairman, Guillaume ROUX, and Amal TANTAWY, and stating that all operations were suspended for as long as the prevailing security situation persisted (**D350/126**).

      **c.**   The simultaneous discovery by <u>LAFARGE's legal department of the existence of financial interactions with terrorist groups</u>

The referral order seeks to cast doubt on the nevertheless well-substantiated reality of the decision to close the plant taken by Bruno LAFONT on August 27, 2014, by asserting:

> "*It is in fact the subsequent exchanges, occurring in the context of a strong reaction by Bi-Yong CHUNGUNCO on September 11 and 12, 2014, that appear to have led to a decision to cease operation of the cement plant, as demonstrated by the writings of Jean-Claude VEILLARD and Frédéric JOLIBOIS, and by the latter's statements*" (ORTC, p. 243).

This allegation is unfounded.

It is indeed established that, in parallel and almost concurrently with Bruno LAFONT's discovery on August 27, 2014 of a possible agreement with Daesh, the Group's legal department was alerted to interactions between LCS and groups classified as terrorist organizations by the United Nations.

Thus, on August 11, 2014, Johnny MOUTY, who held a legal position within LCS, informed Frédéric JOLIBOIS of the likely adoption by the United Nations Security Council of a resolution prohibiting any interaction with terrorist militias in Syria and Iraq, including the Islamic State and Al-Nusra (**D482/43**).

On August 16, 2014, having been informed by Johnny MOUTY of the adoption of the resolution in question, Frédéric JOLIBOIS contacted Mr. Jean-Jérôme KHODARA, legal counsel responsible for the Middle East region, to determine whether that adoption was likely to pose risks to LCS with respect to *"agreements with suppliers linked to Daesh"* (**D1998/161**).

On August 19, 2014, following exchanges with Jean-Claude VEILLARD and Christian HERRAULT, Jean-Jérôme KHODARA contacted the Syrian law firm Sayed & Sayed in order to conduct an analysis of the legal risks arising from the payment of transit fees to Daesh and/or the purchase of raw materials from that organization (**D1998/163, D787/1**).

On September 2, 2014, having not yet received a response from Jean-Jérôme KHODARA, Frédéric JOLIBOIS met at LAFARGE's Paris headquarters with Gilles VANLERBERGHE, a member of the legal department responsible for financing matters (**D1998/201, 203 to 209**).

Having been informed of the issues raised by Frédéric JOLIBOIS, Gilles VANLERBERGHE indicated that he would promptly refer the matter to the Group's General Counsel, Ms. Bi-Yong CHUNGUNCO (**D497/9**).

On September 3, 2014, a further meeting was held between Jean-Claude VEILLARD, his assistant Hélène SEGUIN, Gilles VANLERBERGHE, Jean-Jérôme KHODARA, Neil CURTIS, another member of the legal department, and Bi-Yong CHUNGUNCO (**D482/29, D804/3, D391-3/FJ/E-94**).

Bi-Yong CHUNGUNCO stated that during this meeting, which took place in a tense atmosphere, she was informed that the Islamic State controlled the access roads to the plant, that transporters were paying taxes to that group, and that raw materials were being purchased from quarries under its control.

The General Counsel immediately wished to discuss the matter directly with Bruno LAFONT in order to recommend the suspension of operations at the Jalabiyah plant (**D804/3**), without knowing that such a decision had already been taken on August 27 (**D804/3**).

Following this meeting, which took place between September 3 and 5, 2014, during which Bi-Yong CHUNGUNCO understood that Bruno LAFONT agreed with the need to close the plant (**D804/4**), he invited her to contact Christian HERRAULT, who was already in charge of implementing the closure at that time.

During the proceedings on December 5, 2025, Christian HERRAULT confirmed that Bi-Yong CHUNGUNCO contacted him after speaking with Bruno LAFONT (**D3149/56**), and that he informed her that the closure had been decided and was underway.

In this respect, it should be noted that the *"strong reaction"* attributed to Bi-Yong CHUNGUNCO in the referral order, dated to September 11 or 12, 2014, appears to be based on an email from Frédéric JOLIBOIS dated September 11, 2014, which refers to a meeting between the General Counsel and Bruno LAFONT that Jean-Claude VEILLARD had mentioned to him, without specifying its date (**D1998/246**).

However, all of the individuals involved, including Bi-Yong CHUNGUNCO herself, agree that the meeting between her and Bruno LAFONT in fact took place earlier, immediately following the September 3, 2014 meeting (**D804/3, D806/3, D391-3/JCV/E-213**).

In any event, regardless of the precise date of the meeting between Bi-Yong CHUNGUNCO and Bruno LAFONT, it is in no way incompatible with the decision to close the plant taken as early as August 27, 2014, and subsequently implemented on the instructions of the Chairman and CEO himself.

On the contrary, the fact that Bi-Yong CHUNGUNCO contacted Bruno LAFONT during the first half of September to recommend closing the Syrian plant, unaware that such closure had already been ordered, reflects the normal functioning of the legal department.

## ALLEGED OFFENSE OF NON-COMPLIANCE WITH CUSTOMS SANCTIONS

Bruno LAFONT is also referred to the criminal court *"for having, on national territory and indivisibly in Syria, from June 30, 2013, to September 19, 2014, in any event during a period not barred by the statute of limitations, in his capacity as Chairman and Chief Executive Officer of Lafarge SA, which controlled its Syrian subsidiary LCS, intentionally violated the provisions of Community Regulation 881/2002 of February 27, 2002, and its implementing Regulation (EU) 632/2013 of June 28, 2013, which prohibit any financial or commercial relationship with the jihadist organizations Jabhat al-Nosra and the Islamic State in Iraq and the Levant, later known as the Islamic State; in particular by authorizing the continuation of operations of the cement plant operated by LCS, while he alone was empowered to bring them to an end, knowing that such operations necessarily involved, inter alia, agreed security payments for the benefit of those terrorist entities, remuneration of suppliers operating from areas that had fallen under their control, and intermediaries with those groups."*

On this ground as well, acquittal is required, for several reasons.

First, the facts being prosecuted are strictly identical. Indeed, Bruno LAFONT's referral for the offense of failure to comply with international financial sanctions is justified solely by reference to *"the same developments as those presented in the section devoted to the facts of financing terrorism"* (**ORTC, p. 254**).

However, it has been demonstrated, particularly in connection with the offense of financing terrorism, that any financial interactions maintained by LCS with terrorist groups, whatever their nature, remained unknown to Bruno LAFONT until the Executive Committee meeting of August 27, 2014.

In reality, even on that occasion, only a financial agreement with Daesh was mentioned, to the exclusion of any other transaction, in particular any commercial transaction.

Moreover, the evidence in the record shows that this agreement, even if contemplated in connection with Firas TLASS, was never executed and did not give rise to any payment.

Accordingly, in the absence in particular of the requisite intentional element, which presupposes knowledge, the offense cannot be established against Bruno LAFONT.

More generally, the record shows that Bruno LAFONT never knowingly authorized the continuation of the plant's operations, nor, a fortiori, did he participate in or approve any interactions with terrorist entities.

Thus, none of the constituent elements of the offense is established or attributable to him, and acquittal is therefore required.

Second, acquittal is unavoidable because the facts of the case are, by their very nature, incompatible both with the repressive application of French customs law (**A**) and with that of the European regulations cited in the charges (**B**).

### A. Inapplicability of French Customs Law

Failure to comply with international financial sanctions is an offense provided for under Title XIV of the French Customs Code, which relates exclusively to *"litigation concerning financial relations with foreign countries."*

Chapters III (*"Prosecution of offenses"*) and IV (*"Penal provisions"*) of that Title each specify, in a single article:

91

- 458: that prosecution of offenses against regulations governing *"financial relations with foreign countries"* may be pursued only under specific procedural conditions;

- 459: that it is punishable to contravene regulations governing *"financial relations with foreign countries."*

Accordingly, and pursuant to the principles of strict interpretation of criminal law and legality of offenses and penalties, the French customs judge may sanction only financial flows *"with foreign countries,"* meaning flows between France and an entity located in a foreign territory.

Any other financial scheme falls outside the scope of repressive customs regulations, whether it involves a flow from one foreign country to another foreign country, or an internal flow within the same foreign country.

Article 451 bis of the Customs Code **definitively establishes the requirement to ascertain the existence of a financial flow on French territory, by expressly providing as follows:** *"For the purposes of this Code, all financial transactions carried out* **in France** *by or on behalf of the natural or legal persons covered by Community regulations […] or by international treaties and agreements duly approved and ratified shall be deemed to constitute financial relations with foreign countries."*

The very purpose of the Customs Code likewise excludes consideration by the French courts of financial flows occurring entirely **within** a single foreign country, in this case Syria.

The customs judge may consider only flows of goods and/or funds **crossing** the borders of what Article 11 of the Customs Code defines as the French "customs territory."

In the present case, the financial flows at issue were carried out by LCS within Syria and toward Syria.

These were therefore **not financial transactions with a foreign country**, but financial transactions abroad, which by definition fall outside the jurisdiction of the French customs courts.

Accordingly, no customs offense can be established in this case.

### B. Inapplicability of the European Union Regulations Cited in the Charges

Furthermore, application of Council Regulation No. 881/2002 of May 27, 2002, and its implementing Regulation No. 632/2013 of June 28, 2013, would directly violate the principle of territoriality, which is firmly established in European law, particularly in the field of economic sanctions.

Under that principle, a State's legal sovereignty is exercised only within the limits of its territory.

Accordingly, as provided in Articles 52 of the Treaty on European Union and 355 of the Treaty on the Functioning of the European Union, the legal effects of European Union acts are limited to the territory of the Member States.

Conversely, the European Union has consistently and firmly opposed the extraterritorial application of sanctions imposed by third countries within EU territory.

Council Regulation (EC) No. 2271/96 of November 22, 1996, protecting against the effects of the extraterritorial application of legislation adopted by a third country, expressly states, with respect to

92

measures enacted by the United States, that *"by their extraterritorial application, these laws, regulations, and other legislative instruments violate international law."*

In keeping with this principle, Article 11 of Regulation No. 881/2002, relied upon in the charges, provides only for:

- two strictly defined bases of jurisdiction ratione loci; *"This Regulation shall apply: (**1**) within the territory of the Community, including its airspace; (**2**) on board any aircraft or vessel subject to the jurisdiction of a Member State."*

- Three strictly defined cases of jurisdiction ratione personae, all linked to the European Union: *"**3**.] any national of a Member State; […] [**4**.]any legal person […] that is established or constituted under the legislation of a Member State; and  [**5**.] any legal person […] that maintains commercial relations within the Community."*

Accordingly, a financial flow (i) that is, first, internal to Syrian territory and therefore external to European territory, and second, carried out by a company governed by Syrian law, namely LCS, which was neither incorporated under the law of a Member State of the European Union nor, in practice, maintained commercial relations with the European Union, necessarily falls outside the scope of enforcement of European economic sanctions.

Any contrary conclusion would amount to an extraterritorial application of those regulations, in direct contradiction with the fundamental principles of international law.

Given **the inapplicability of the provisions** forming the basis of this prosecution, Bruno LAFONT <u>must therefore necessarily be acquitted of the charge of failure to comply with international financial sanctions.</u>

In any event, and purely in the alternative, application of the principle of non bis in idem precludes the cumulative prosecution of this offense together with that of financing terrorism.

Under that principle, the same individual may not be prosecuted twice on the basis of identical facts.

While the cumulative classification of offenses has on occasion been accepted, in particular in the field of criminal and customs sanctions, where it is established that each offense protects a distinct social interest, such cumulative prosecution is strictly prohibited where the protected social interest is identical.

In the present case, it is undisputed that, on the basis of strictly identical facts, Bruno LAFONT is being prosecuted on two grounds, first for financing terrorism and second for failure to comply with international financial sanctions.

Such cumulative prosecution cannot be upheld, since both offenses serve to protect the same social interest.

This is unsurprising, as both offenses stem from the transposition of a single legal instrument, namely <u>United Nations Security Council Resolution No. 1373 of September 28, 2001.</u>

Under that resolution, the UN Security Council expressly *"called upon all States [...] to become parties as soon as possible to international conventions and protocols relating to terrorism, including the International Convention for the Suppression of the Financing of Terrorism of December 9, 1999" (Resolution 1373 (2001),* p. 3).

It was in the immediate aftermath of that Resolution, and in implementation thereof, that the offense of financing terrorism was introduced into French criminal law, "the definition of which reproduces the terms

93

of the International Convention for the Suppression of the Financing of Terrorism adopted on December 9, 1999," as evidenced by the parliamentary record of Law No. 2001-1062 of November 15, 2001 (Bruno Le Roux, Report submitted on behalf of the Committee on Constitutional Laws, Legislation, and General Administration of the Republic, in preparation for the final reading of the bill on daily security, filed with the Presidency of the National Assembly on October 24, 2001, p. 15).

It was also by expressly recalling, in its very wording, *the obligation to fully implement Resolution 1373,* that the Council of the European Union adopted Council Regulation No. 881/2002 of 27 May 2002.

The principle of non bis in idem strictly precludes such cumulative prosecution.

94

**FOR THESE REASONS**

The Court is respectfully requested to:

– **ACQUIT** Mr. Bruno LAFONT of all charges;

– **DISMISS** all claims brought by the civil parties.

Done in Paris, on December 15, 2025.

**Quentin DE MARGERIE**          **Jacqueline LAFFONT-HAIK**          **Grégoire BERTROU**

*Attorney at law*                        *Attorney at law*                        *Attorney at law*

*Exhibits submitted (6):*

1. *Formal notice letter sent by Mr. LAFONT's counsel to HOLCIM, dated March 7, 2022*
2. *Judgment of the Paris Economic Activities Court dated April 8, 2025*
3. *Email from Jean-Claude VEILLARD dated March 18, 2013*
4. *Delegation of authority granted to Christian HERRAULT*
5. *Email from Christine COLLAERT dated October 18, 2013*
6. *Email from Jean-Claude VEILLARD dated February 20, 2013*

95

morningtrans.com



# TRANSLATION CERTIFICATION

Date: February 14, 2026

To whom it may concern:

I, ODA SCHWAB a translator fluent in the French and English languages, on behalf of Morningside, do solemnly and sincerely declare that the following is, to the best of my knowledge and belief, a true and correct translation of the document(s) listed below in a form that best reflects the intention and meaning of the original text.

The document is designated as:

- 02 B. LAFONT - Conclusions de relaxe - 15122025 -proj

Signature

ODA SCHWAB

Print

**QUESTEL CONFIDENTIAL**

**4001 S 700 East, Suite 500 #B17**
**Salt Lake City, UT 84107**

*Défense de Monsieur Bruno LAFONT*
*Relaxe – Projet du 15 décembre 2025*

*A Madame la Présidente,*
*Madame, Monsieur les Juges composant la 16ᵉ chambre*
*correctionnelle du Tribunal judiciaire de Paris*

**N° Parquet : 16322001114**
**Audience du 4 novembre au 19 décembre 2025**

---

## CONCLUSIONS DE RELAXE

---

**POUR :**        **Monsieur Bruno LAFONT**
Né le ^REDACTED - GDPR à Boulogne-Billancourt (92)
De nationalité française
Demeurant        REDACTED - GDPR

*PRÉVENU*

*Ayant pour avocats :*        **Maître Jacqueline LAFFONT-HAIK**
**HAIK & ASSOCIES AARPI**
Avocat à la Cour
15 rue Soufflot – 75005 Paris
Tél. : 01 43 25 73 73 – Fax. : 01 43 25 62 19
Vestiaire : E 1305 – Courriel : j.laffont@cabinethaik.com

**Maître Quentin de MARGERIE**
**TEMIME AARPI**
Avocat à la Cour
156 rue de Rivoli – 75001 Paris
Tél. : 01 49 27 00 55 – Fax. : 01 42 60 62 44
Vestiaire : C 1537 – Courriel : quentin.demargerie@temime.fr

**Maître Grégoire BERTROU**
**WILKIE FARR & GALLAGHER**
Avocat à la Cour
21 boulevard Malesherbes – 75008 Paris
Tél. : 01 53 43 45 00 – Fax. : 01 53 43 46 99
Vestiaire : J003 – Courriel : GBertrou@willkie.com

**CONTRE :**        **LE MINISTERE PUBLIC**

# TABLE DES MATIERES

PARTIE LIMINAIRE ....................................................................................................6

I.    Une procédure marquée par l'atteinte à la présomption d'innocence de Bruno LAFONT résultant des choix procéduraux de LAFARGE, sous l'égide de son nouvel actionnaire ................6

    A.    Une instruction visant une personne morale privée d'autonomie ...............................6

    B.    La conclusion par la personne morale, sous l'égide de son nouvel actionnaire, d'un accord de plaider-coupable aux Etats-Unis, dont l'utilisation porte atteinte aux droits de Bruno LAFONT .........................9

II.   Des poursuites empreintes d'une analyse rétrospective du contexte géopolitique syrien ......10

    A.    Une filiale de LAFARGE intervenant dans un contexte géopolitique national évolutif et d'une grande complexité...................................................................................10

        1.  Du Printemps arabe à l'Etat islamique : la radicalisation du conflit syrien ...........................11

        2.  La difficile appréhension des forces armées formant la rébellion ...........................11

    B.    La spécificité de la position géographique de la cimenterie de Jalabiyah sous contrôle kurde .........14

    C.    Le positionnement de la France face au conflit syrien ...........................14

        1.  Sur le plan politique.............................................................................15

        2.  Sur le plan diplomatique ....................................................................16

III.  Les services de renseignement français ........................................................18

PREMIERE PARTIE : LA PREVENTION N'EST PAS FONDEE EN DROIT.....................22

I.    Le fait de « participer » au financement d'entreprise terroriste n'est pas incriminé par la loi 24

II.   L'absence de tout reproche de commission d'un acte de financement de terrorisme, empêchant la caractérisation de ce délit................................................26

    A.    Le caractère limitatif des comportements incriminés au titre du délit de financement de terrorisme, exclusif du comportement d'autorisation reproché à Bruno LAFONT...................27

    B.    L'absence de reproche à Bruno LAFONT d'un acte positif de financement ......................28

SECONDE PARTIE : LA PREVENTION N'EST PAS FONDEE EN FAIT ........................30

I.    A titre liminaire : l'inexistence d'un quelconque mobile financier ..........................30

II.   Intentionnalité : Bruno LAFONT n'a pas eu « conscience que cette exploitation supposait notamment des paiements de sécurité convenus au profit de ces entités terroriste » ..................36

    A.    La structuration du groupe LAFARGE SA dans lequel Bruno LAFONT occupait la fonction de PDG, exclusive de toute présomption de connaissance des agissements visés à la prévention ...............36

        1.  Un groupe à rayonnement mondial, structuré en considération des spécificités de l'activité de cimentier.............................................................................37

        2.  La place et les fonctions du PDG...........................................................37

    B.    Le dossier n'apporte aucune preuve de la connaissance par Bruno LAFONT de paiements à des entités terroristes.........................................................................48

        1.  Les éléments mis en avant par l'accusation pour tenter de soutenir que Bruno LAFONT aurait été nécessairement informé de paiements à des entités terroristes ........................49

        2.  La gestion autonome du contexte sécuritaire de l'usine de Jalabiyah................................70

III.  Matérialité : Bruno LAFONT n'a pas « autorisé la poursuite d'activité de la cimenterie exploitée par LCS alors qu'il aurait été le seul habilité à y mettre fin » en connaissance de cause76

    A.    Bruno LAFONT n'était pas le seul « habilité » à mettre fin à la poursuite de l'activité de l'usine .....76

        1.  Bruno LAFONT n'était pas le seul à pouvoir mettre fin à l'activité de l'usine de Jalabiya .............76

        2.  D'autres que Bruno LAFONT ont effectivement fermé l'usine de Jalabiyah au cours de la prévention..........................................................................77

    B.    Bruno LAFONT n'a délivré aucune autorisation de maintien de l'activité de l'usine de Jalabiyah au cours de la période de prévention.........................................................78

SUR L'INFRACTION DE NON-RESPECT DES SANCTIONS DOUANIERES....................91

2

A.    Sur l'inapplicabilité du droit douanier français..................................................................91
B.    Sur l'inapplicabilité des règlements européens visés à la prévention....................................92
**PAR CES MOTIFS** ....................................................................................................................**95**



**PLAISE AU TRIBUNAL**

Par ordonnance du 16 octobre 2024, au terme d'une information judiciaire ouverte sur plainte avec constitution de partie civile (**D1**) par un réquisitoire introductif du 9 juin 2017 (**D204**), Bruno LAFONT a été renvoyé devant le Tribunal correctionnel pour des faits différents de ceux visés dans le cadre de sa mise en examen du 8 décembre 2017 (**D587**), énoncés de la manière suivante :

> « *sur le territoire national et de manière indivisible en Syrie, courant 2013 et jusqu'au 19 septembre 2014, en tout cas depuis temps non couvert par la prescription dans le cadre de ses fonctions de président directeur général de Lafarge SA contrôlant sa filiale syrienne LCS, participé au financement d'entreprises terroristes, en fournissant, réunissant, gérant des fonds, valeurs ou biens quelconques, ou en donnant des conseils à cette fin, dans l'intention de voir ces fonds utilisés ou en sachant qu'ils étaient destinés à être utilisés, en tout ou partie, en vue de commettre des actes de terrorisme, indépendamment de leur survenance, au profit des entités terroristes Ahrar al-Sham, Jabhat al-Nosra et État islamique en Irak et au Levant devenu État islamique, en l'espèce notamment en autorisant la poursuite d'activité de la cimenterie exploitée par LCS, alors qu'il était seul habilité à y mettre fin, en conscience que cette exploitation supposait notamment des paiements de sécurité convenus au profit de ces entités terroristes, la rémunération de fournisseurs opérant depuis les zones tombées sous leur contrôle, et d'intermédiaires avec ces groupes ;*
>
> > *Faits qualifiés de financement d'entreprises terroristes, prévus et réprimés par les articles 113-2, 113-13, 421-1, 421-2-2, 421-5, 421-7, 421-8, 422-3, 422-4, 422-6, 422-7 du code pénal (natinf 25457) ;*
>
> > *Sur le territoire national et de manière indivisible en Syrie, du 30 juin 2013 au 19 septembre 2014, en tout cas depuis temps non couvert par la prescription, dans le cadre de ses fonctions de président directeur général de Lafarge SA contrôlant sa filiale syrienne LCS, intentionnellement violé les dispositions du règlement communautaire 881/2002 du 27 février 2002 et de son règlement d'exécution (UE) 632/2013 du 28 juin 2013 visant à interdire toute relation financière ou commerciale avec les organisations djihadistes Jabhat al-Nosra et État islamique en Irak et au Levant devenu État islamique, en l'espèce notamment en autorisant la poursuite d'activité de la cimenterie exploitée par LCS, alors qu'il était seul habilité à y mettre fin, en conscience que cette exploitation supposait notamment des paiements de sécurité convenus au profit de ces entités terroristes, la rémunération de fournisseurs opérant depuis les zones tombées sous leur contrôle, et d'intermédiaires avec ces groupes ;*
>
> > *Faits qualifiés de non-respect de sanctions financières internationales, prévus et réprimés par les articles 113-2 du code pénal, 459 §1. §1 bis, §1 ter, §2, §4, §5, 451, 451-bis, 432-bis, 433-bis du code des douanes, le règlement communautaire 881/2002 du 27 février 2002 et de son règlement d'exécution (UE) 632/2013 du 28 juin 2013 (natinf 23134)*

Bruno LAFONT, ancien PDG de LAFARGE SA, se trouve ainsi poursuivi devant le Tribunal aux côtés de la personne morale qu'il a dirigée et représentée, ainsi que de cinq de ses anciens salariés et/ou mandataires de sa filiale locale, à raison de paiements qui auraient été effectués à des groupes terroristes dans le cadre de l'activité de l'usine de Jalabiya en Syrie, entre 2013 et jusqu'au 19 septembre 2014.

La procédure dans laquelle ces poursuites s'inscrivent présente d'indéniables spécificités tenant au positionnement de la personne morale LAFARGE SA, entre-temps absorbée par HOLCIM, notamment vis-à-vis des autorités américaines, lesquelles méritent d'être soulignées en complément des demandes déposées *in limine litis* (**I**).

4

Doit ensuite immanquablement être reconstitué, par une analyse rétrospective fondée principalement sur les éléments du dossier, le <u>contexte général</u> dans lequel se sont inscrites les interactions entre LAFARGE CEMENT SYRIA (ci-après « LCS ») et des groupes armés voire terroristes durant cette période (**II**).

A la lumière de ces composantes de l'affaire, il sera démontré qu'<u>aucune infraction</u> n'est caractérisée à l'égard de Bruno LAFONT, à défaut d'élément matériel comme d'élément intentionnel (**III**).



5

---
**PARTIE LIMINAIRE**
---

La configuration du dossier qui est soumis à l'examen du tribunal correctionnel est inédite, sur la forme comme sur le fond, dans la mesure où l'accusation portée contre Bruno LAFONT :

- s'est construite dans le cadre d'une procédure d'information marquée par l'accusation portée contre LAFARGE par le groupe HOLCIM, lequel l'a absorbée, tant juridiquement qu'économiquement, et lui a fait conclure une transaction pénale aux Etats-Unis l'empêchant de se défendre (**I**) ;

- repose, au fond, et s'agissant des paiements à des groupes terroristes qui sont au cœur de la poursuite, sur une lecture rétrospective d'un contexte géopolitique complexe (**II**) ;

- refuse de prendre en considération l'impact éventuel sur les comportements en cause de la collaboration étroite ayant existé entre les services de l'Etat français et, notamment, le responsable de la sûreté chez LAFARGE durant la période de prévention (**III**).

Ces spécificités, ci-après exposées, doivent pourtant être prises en considération dans l'appréciation des faits poursuivis ainsi que du rôle de Bruno LAFONT dans la présente affaire.

I. **Une procédure marquée par l'atteinte à la présomption d'innocence de Bruno LAFONT résultant des choix procéduraux de LAFARGE, sous l'égide de son nouvel actionnaire**

Aux termes de l'ordonnance de renvoi, il est reproché à LAFARGE d'avoir participé au financement d'entreprises terroristes notamment par « *l'action de ces organes ou représentants (…) à savoir Bruno PESCHEUX et Frédéric JOLIBOIS, (…) Christian HERRAULT en qualité de supérieur hiérarchique des précédents (…) et Bruno LAFONT, dirigeant du groupe, ayant validé la stratégie suivie en maintenant l'activité de la cimenterie en connaissance des financements distribués aux groupes terroristes* » (**D3346/264**).

L'information judiciaire ayant donné lieu à cette ordonnance de renvoi a été menée, en pratique, en l'absence de LAFARGE, entité qui n'a plus aucune autonomie depuis que le groupe HOLCIM en a pris le contrôle (**A**).

Plus grave, LAFARGE a renoncé à contester les faits qui lui sont imputés en concluant, sous l'égide de son nouvel actionnaire, un accord de plaider-coupable aux Etats-Unis, dont l'utilisation au cours de l'instruction et jusqu'à l'ordonnance de règlement a irrémédiablement porté atteinte aux droits de Bruno LAFONT (**B**).

A. **Une instruction visant une personne morale privée d'autonomie**

A l'encontre de l'ambition initiale visant à bâtir un leader mondial du ciment né d'une fusion entre égaux, LAFARGE a, dans les faits, été progressivement absorbée par HOLCIM, de sorte qu'elle a aujourd'hui disparu en tant qu'entité autonome au profit de son ancien concurrent.

C'est ainsi une entité contrôlée par HOLCIM qui a comparu au cours de l'instruction et qui a renoncé à se défendre.

6

Annoncé le 7 avril 2014 au terme de plusieurs mois de négociations confidentielles entre leurs dirigeants respectifs, le projet de fusion entre LAFARGE et HOLCIM, qui devait prendre la forme d'une offre publique d'échange, avait initialement pour vocation d'être un projet strictement égalitaire.

Cette vocation était reflétée dans la parité d'échange (une action LAFARGE pour une action HOLCIM) et la composition du conseil d'administration de la nouvelle entité, composé de sept membres issus de chacune des deux entreprises.

A la fin du mois de mars 2015, cependant, les conditions financières et de gouvernance du projet de fusion entre égaux ont été remises en cause par HOLCIM et celle-ci a obtenu un ratio d'échange plus favorable (9 actions HOLCIM pour 10 actions LAFARGE). Bruno LAFONT, initialement pressenti pour exercer la direction générale de l'entité fusionnée, s'est alors vu cantonné à une fonction, non exécutive, de co-président du conseil d'administration.

Achevée en juillet 2015, la fusion a donné lieu à la création du groupe LafargeHolcim, résultant de l'acquisition de LAFARGE SA et ses filiales par l'entité suisse HOLCIM, présidé par l'ancien président d'HOLCIM et ayant pour directeur général Monsieur Eric OLSEN.

A la suite de la publication par le journal Le Monde, le 21 juin 2016, d'articles imputant à LAFARGE d'avoir financé des groupes terroristes dans le cadre de son activité en Syrie, le groupe LafargeHolcim annonçait l'ouverture d'une enquête interne chargée de faire la lumière sur la réalité des agissements dénoncés.

Par un nouveau communiqué du 24 avril 2017, LafargeHolcim annonçait la clôture par le conseil d'administration de l'enquête sur la Syrie et la mise en place de mesures correctives (**D265**).

Les démissions d'Éric OLSEN (**D265**) et le départ de Bruno LAFONT intervenaient au printemps 2017, à la suite des conclusions du rapport d'enquête interne rédigé par le cabinet d'avocats Baker & McKenzie (**D1958/8**).

Le 14 décembre 2017, le journal Libération publiait un article intitulé « *L'affaire Lafarge fait les affaires de Holcim* », selon lequel : « *L'accusation de financement de l'Etat islamique en Syrie sème le trouble dans le groupe Lafarge-Holcim, récemment créé. Les Français suspectent les Suisses de profiter des déboires judiciaires afin de les marginaliser au sein de la direction* ».

De fait, en mai 2018, LafargeHolcim annonçait le transfert de son siège social ainsi que l'ensemble de ses fonctions de direction en Suisse, à Zoug. Puis, lors de son assemblée générale du 4 avril 2021, LafargeHolcim approuvait la modification du nom social de « LafargeHolcim Ltd » en « HOLCIM Ltd ».

Aujourd'hui, plus aucun ancien membre de LAFARGE ne siège au sein du conseil d'administration de la nouvelle entité HOLCIM, signant ainsi la disparition de la société française, laquelle n'est plus qu'une filiale du nouveau groupe, dénuée de toute autonomie décisionnelle.

L'absorption de fait de LAFARGE par HOLCIM n'a pas échappé aux enquêteurs ni au ministère public.

Les premiers relevaient dans un procès-verbal du 24 avril 2017 : « *la fusion entre LAFARGE et HOLCIM n'en est pas une mais que c'est un bien rachat du Français par le suisse et que les administrateurs ex-LAFARGE sont écartés les uns derrière les autres* » (**D264/1**).

7

Le second soulignait dans son réquisitoire définitif qu'au terme de la fusion « *Lafarge SA devenait filiale de Holcim Ltd, mais subsistait, sans vocation opérationnelle, en tant que holding détenant l'ensemble des entités du groupe Lafarge, du moins immédiatement après la fusion* » (**D3128/78**).

Le constat de la presse était identique. Le 9 avril 2021, un article du Figaro publiait un article intitulé « *Le cimentier enterre définitivement Lafarge* ». Le 11 septembre 2021, Le Point titrait pour sa part : « *Soupçonnés d'avoir financé Daech en Syrie, les ciments Lafarge ont été rayés de la carte, avalés par le suisse Holcim avec qui ils avaient fusionné* ».

Devenue une filiale sans autonomie, LAFARGE n'a pu déterminer librement sa défense dans le cadre de la conduite de l'instruction.

<u>D'une part</u>, bien qu'ayant conservé sa personnalité morale, ses représentants n'ont jamais été les interlocuteurs directs des juges.

Tant à l'occasion de l'interrogatoire de première comparution du 28 juin 2018 (**D1338**) que de l'interrogatoire du 21 novembre 2021 (**D2654**), la représentante légale de LAFARGE, Magali ANDERSON, « délégu[ait] *ses pouvoirs* » au président du conseil d'administration d'HOLCIM, Beat HESS.

Ce dernier déclarait au juge : « *Je sais que je suis présent aujourd'hui formellement en ma qualité de représentant de la société LAFARGE SA en vertu d'une procuration que vous avez dans le dossier mais je suis également ici en ma qualité de président du conseil d'administration de la société HOLCIM compte tenu de la gravité de la situation* » (**D2654/2**).

<u>D'autre part et surtout</u>, lors de son second interrogatoire en tant que représentant de LAFARGE, Beat HESS entreprenait de mettre expressément en avant la responsabilité de « *neuf anciens cadres* » du groupe français – parmi lesquels Bruno LAFONT – dont il affirmait qu'ils avaient sciemment dissimulé les faits poursuivis à HOLCIM lors de la fusion, adoptant ainsi une posture relevant de la défense exclusive des intérêts de ce groupe, et non de ceux de LAFARGE.

L'attitude était d'autant plus surprenante que dans le même temps, l'intéressé assumait qu'il « *ne savai*[t] *pas ce qui se passait à LAFARGE* » (**D2654/21**).

Moins de 48 heures après l'interrogatoire, le groupe HOLCIM publiait un communiqué de presse intitulé « *Déclaration du Groupe Holcim à la suite de l'audition de Lafarge SA du 29 novembre 2021, Paris, France* » dans lequel était indiqué : « *Holcim poursuit sa totale coopération avec la justice française qui a auditionné ce lundi 29 novembre le représentant de Lafarge SA, pour la seconde fois depuis juin 2018* ». Ce même communiqué rapportait la déclaration de Beat HESS selon laquelle « *Le Conseil d'administration de Holcim et moi-même tenons à rappeler à quel point nous sommes choqués et outrés par les faits reprochés à Lafarge SA* »[1].

C'est dans ces circonstances – son dirigeant ayant reconnu à la fois qu'il « *se sen*[t] *[…] comme quelqu'un de totalement étranger à ces évènements* » et qu'il n'a « *aucune connaissance d'analyse complémentaire au-delà du rapport de Baker Mckenzie* » (**D2654**) – que le groupe LafargeHolcim, devenu HOLCIM, a fait le choix assumé de ne pas défendre sa filiale ni l'action des anciens dirigeants de celle-ci.

---

[1]     https://www.holcim.com/sites/holcim/files/documents/20211201_press_holcim_declaration_du_groupe_fr.pdf.

8

### B. La conclusion par la personne morale, sous l'égide de son nouvel actionnaire, d'un accord de plaider-coupable aux Etats-Unis, dont l'utilisation porte atteinte aux droits de Bruno LAFONT

Après avoir fait l'objet d'une enquête interne commanditée par le conseil d'administration de LafargeHolcim et à destination exclusive de ce dernier (**D596**), LAFARGE s'est vue imposer par son nouvel actionnaire la conclusion d'un accord de plaider-coupable avec les autorités américaines, sans doute opportun pour le groupe HOLCIM sur un plan commercial, mais conclu au mépris des personnes physiques aujourd'hui renvoyées devant le tribunal.

S'octroyant une compétence territoriale pour le moins discutable tirée de l'utilisation par certains des protagonistes – qui n'incluent pas Bruno LAFONT – de messageries Gmail (« *Many of the LAFARGE and LCS executives involved in the offense conduct also used personal email accounts serviced by U.S.-based email service providers, instead of their LAFARGE corporate email addresses, to carry out some aspects of the conspiracy* »), les autorités américaines ont ainsi entamé, à une date aujourd'hui encore indéterminée en dépit des multiples demandes sur ce point émanant de la défense de Bruno LAFONT, des discussions avec les dirigeants du groupe HOLCIM, qui ont débouché, le 18 octobre 2022, sur la conclusion par LAFARGE d'un *guilty plea* avec le *Department of Justice* des Etats-Unis.

Aux termes de ce *guilty plea*, la personne morale s'est engagée à verser la somme de 777,78 millions de dollars pour des faits de « *conspiration pour fournir un soutien matériel à une ou plusieurs organisations terroristes étrangères* » (en anglais : « *conspiracy to provide material support to one or more foreign terrorist organizations* ») (**D2798, D2800**).

Aux termes de cet accord, LAFARGE a reconnu sa culpabilité en imputant celle-ci aux agissements supposés de divers anciens cadres, au premier rang desquels figure Bruno LAFONT qui incarnait le groupe en sa qualité de PDG au moment de la période des faits en cause.

LAFARGE a dû admettre que les allégations factuelles énoncées dans l'acte d'accusation et l'exposé des faits du *guilty plea* « *sont vraies et correctes, qu'ils* [LAFARGE et LCS] *sont responsables des actes de leurs dirigeants, administrateurs, employés et agents décrits dans l'acte d'accusation, et que l'acte d'accusation et l'exposé des faits reflètent fidèlement la conduite criminelle des défendeurs* » (**D2800/9**), et une clause muselière insérée dans le *guilty plea* interdit aujourd'hui à LAFARGE de revenir sur les faits qu'elle a admis, sous peine de voir les poursuites américaines réactivées.

Bruno LAFONT apparaît à plusieurs endroits et de manière parfaitement identifiable dans le *guilty plea*, derrière le terme « *executive 6* », dans le récit factuel que constitue le « *statement of facts* », sur lequel la reconnaissance de culpabilité prend appui (**D2794/33**).

Sous cette dénomination transparente, Bruno LAFONT est à plusieurs reprises présenté publiquement comme coupable des faits de « *conspiracy to provide material support to one or more foreign terrorist organization* ».

Le procédé est d'autant plus contestable que la signature de cet accord par LAFARGE est intervenue sans la moindre implication ni information des personnes physiques concernées, et notamment des anciens dirigeants, pourtant mis en cause et désignés comme coupables dans la version des faits arrêtée avec les autorités américaines. Seul Jacob WAERNESS semble avoir pu participer à ces « discussions » avec le DOJ américain, ce que Bruno LAFONT n'a découvert qu'à l'occasion des déclarations de ce dernier lors de l'audience.

9

A cette exception, aucun des protagonistes personnes physiques du dossier n'a ainsi été associé, ni même entendu, dans le cadre de cette procédure, alors même que Bruno LAFONT avait spécifiquement mis en demeure HOLCIM, par courrier en date du 7 mars 2022, de « *ne faire aucun aveu de fait ou de droit dans le cadre de ses discussions en cours avec le Département de la Justice des États-Unis (ou toute autre procédure similaire), sans avoir préalablement permis à M. LAFONT d'exercer pleinement son droit à se défendre* » (**Pièce n°1**).

Bruno LAFONT a appris l'existence du *guilty plea* par voie de presse.

Ainsi que l'a jugé le Tribunal des activités économiques de Paris dans une décision du 8 avril 2025, statuant sur une demande reconventionnelle de Bruno LAFONT formée dans le cadre d'une action indemnitaire initiée par HOLCIM et LAFARGE à son encontre pour le voir condamner à leur verser pas moins de 200 millions d'euros de dommages et intérêts (à parfaire), les communiqués publiés par ces deux sociétés à l'occasion de la conclusion du *guilty plea* violent frontalement la présomption d'innocence de Monsieur LAFONT (**Pièce n°2**).

Plus grave encore, ainsi que l'a déjà exposé Bruno LAFONT dans des conclusions *in limine litis* dont le tribunal a joint l'examen au fond, l'exploitation à charge par les magistrats instructeurs du *guilty plea* et des poursuites civiles intentées par LAFARGE et HOLCIM à son encontre violent, derechef, sa présomption d'innocence, et entrainent la nullité de l'ordonnance de renvoi devant le tribunal correctionnel.

Pour sa part, dans les mois qui ont suivi la conclusion de cet accord, HOLCIM a ainsi a annoncé l'introduction à la bourse de New York de sa branche américaine (« Amrize »), avec des perspectives financières sur ce marché de 20 milliards de francs suisses (soit les deux-tiers du chiffre d'affaires actuel du groupe).

Une telle entrée en bourse, préparée de longue date, ne pouvait évidemment pas se faire sans que le groupe ne se soit auparavant débarrassé de la menace de poursuites qui pesait aux Etats-Unis contre sa filiale LAFARGE, grâce à son acceptation de l'accord de plaider-coupable, dicté par des intérêts financiers manifestes.

## II.    Des poursuites empreintes d'une analyse rétrospective du contexte géopolitique syrien

Les poursuites conduites à l'encontre des anciens dirigeants de LAFARGE SA reposent sur une lecture rétrospective d'évènements géopolitiques survenus en Syrie entre mars 2011 et septembre 2014, d'une extrême complexité.

Il convient de replacer les faits visés par l'ordonnance de renvoi dans le contexte de l'époque : d'abord quant à la compréhension générale du conflit syrien (**A**), ensuite quant aux événements survenus aux abords de l'usine (**B**), et enfin au regard de la position de l'État français et des autorités diplomatiques (**C**).

### A.    Une filiale de LAFARGE intervenant dans un contexte géopolitique national évolutif et d'une grande complexité

Initialement pacifiques, les mouvements de protestation à l'encontre du régime de Bachar al-Assad se sont rapidement intensifiés face à la violence de la répression organisée depuis Damas. Les demandes de réformes, exigées dans les premières semaines de la révolte, ont rapidement fait place à une contestation frontale du régime baathiste et de la famille Assad.

Très vite, le pays s'est alors enfoncé dans un conflit d'une extrême violence. Peu à peu, la guerre s'est radicalisée. Mais cette radicalisation, perceptible aujourd'hui avec le recul, ne l'était nullement à l'époque (**1**).

Les forces présentes étaient multiples et leurs allégeances changeantes rendant leur identification par la communauté internationale quasi impossible et donc très tardive (**2**).

### 1. <u>Du Printemps arabe à l'Etat islamique : la radicalisation du conflit syrien</u>

En mars 2011, des manifestations pacifiques ont éclaté à travers la Syrie, inspirées par le vent du changement démocratique du Printemps arabe. Le régime baasiste, y a répondu par une répression féroce[2].

La révolte syrienne a d'abord été comparable, sur les plans social et économique, aux événements survenus en Tunisie et en Égypte, puis elle s'en est progressivement distinguée en raison du communautarisme exacerbé structurant la société syrienne.

Ce caractère « clanique » de la société syrienne constitue un éclairage essentiel : il démontre que la situation dans une région donnée n'était pas transposable ailleurs sur le territoire, et cela avant même que la révolte n'éclate.

Dès le début de cette révolte, l'opposition syrienne a souffert de profondes divisions. Les groupes contestataires ne sont pas parvenus à s'entendre et des divergences idéologiques ont empêché leur unité.

L'Armée syrienne libre (ASL), bras armé du soulèvement, a dû composer avec ces divisions.

En 2012, le conflit armé s'est étendu rapidement dans le nord et l'est de la Syrie. Le régime de Bachar al-Assad a donc choisi de se recentrer sur l'axe stratégique Lattaquié-Damas et s'est retiré de certaines zones. Ce retrait a permis aux forces kurdes, en particulier les Unités de protection du peuple (YPG), de s'emparer d'une grande partie du Kurdistan syrien, incluant la région de Jalabiya où se trouvait la cimenterie.

L'année 2013 a constitué un tournant. La montée en puissance des factions djihadistes et salafistes a entraîné le déclin progressif de l'ASL et des groupes d'opposition modérés. Dans ce climat de confusion et de désagrégation, des factions plus radicales ont émergé et ont commencé à imposer leur influence.

Toutefois, l'émergence de l'État islamique comme acteur central du conflit ne doit pas faire oublier qu'à l'origine, et jusqu'au début de l'année 2014, cette organisation combattait aux côtés de la rébellion, comme l'a justement relevé l'assistant spécialisé du pôle Crime contre l'humanité du TGI de Paris dans sa note sur le contexte en Syrie en 2013/2014 (**D1693/25**).

Ainsi, si le conflit syrien a progressivement basculé dans une violence extrême, la radicalisation de certains groupes n'a pas pu être immédiatement identifiée, tant la lutte contre Bachar al-Assad rassemblait et coalisait, dans un premier temps, de nombreuses milices, allant de l'Armée syrienne libre aux groupes islamistes.

### 2. <u>La difficile appréhension des forces armées formant la rébellion</u>

Si le conflit syrien peut apparaître aujourd'hui comme ayant été structuré autour de grandes forces : l'ASL, le Front al-Nosra, son allié Ahrar al-Sham, l'État islamique ou encore les Kurdes, en réalité à l'époque des

---

[2]    Balanche Fabrice, « *Géographie de la révolte syrienne* », Outre-Terre, vol. 29, no. 3, 2011, p. 437-458.

11

faits en cause et sur le terrain, la rébellion syrienne était constituée d'une multitude de petites unités armées - les *katibats*.

Chaque groupe, défendant avant tout ses intérêts locaux, portait allégeance à telle ou telle organisation en fonction des avantages reçus, qu'il s'agisse de rémunérations ou d'armes fournies (**D1950/13**).

Ainsi, Jean-Claude VEILLARD, directeur sûreté en charge de surveiller l'avancée du conflit autour de l'usine, a déclaré : « *Certains militaires qui étaient un jour kurde ou de l'armée libre pouvaient être le lendemain AL NOSRA ; et cela dépendait aussi des financements si ça venait des qataris ou des saoudiens* » (**D236/6**).

Le 14 novembre 2017, la DGSI a pu recenser dans une note <u>une trentaine de groupes armés</u> présents en Syrie à partir de 2011 dont la majorité était et demeure totalement inconnue (**D423**).

La situation sur le terrain était donc difficilement lisible, *a fortiori* alors qu'existait une très forte porosité entre les multiples factions rebelles en présence, ce qu'a confirmé lors de l'audience l'agent de la DGSI cité par le PNAT, s'agissant notamment de combattants de l'ASL qui rejoignaient progressivement les rangs de groupes djihadistes.

Cette complexité et cette volatilité rendaient l'appréciation de la situation particulièrement complexe pour les salariés et dirigeants de LCS, ainsi que pour ceux du groupe LAFARGE.

### 2.1 <u>La confusion quant à la qualification « terroriste » de certaines factions</u>

La prévention retient à l'encontre de Bruno LAFONT le fait d'avoir, en autorisant la poursuite de l'activité de l'usine, participé à un financement « *au profit d'entités terroristes Ahrar al-Sham, Jabhat al-Nosra et État islamique en Irak et au Levant devenu État islamique* » (**ORTC p.262**).

Comme il n'a cessé de l'affirmer tout au long de la procédure, Bruno LAFONT n'a jamais eu connaissance de paiements faits à un quelconque groupe terroriste.

En tout état de cause, la qualification terroriste des organisations précitées était particulièrement incertaine et difficile à appréhender à l'époque des faits.

#### (i)    *S'agissant du mouvement Ahrar al Sham*

Créé en janvier 2012 par d'anciens détenus jihadistes libérés de la prison de Seydnaya (Damas), Ahrar al-Sham s'est constitué comme un groupe rebelle salafiste distinct du Jabhat al-Nosra, revendiquant l'instauration de la charia sans s'inscrire néanmoins dans une logique terroriste, l'islamisme ou le salafisme ne pouvant être assimilés en soi au terrorisme, contrairement à ce qu'affirme l'ordonnance de renvoi (**ORTC p.57**).

Il est constant que ce groupe n'a jamais été qualifié d'organisation terroriste ni par l'Union européenne, ni par le Conseil de sécurité des Nations unies, ni par aucune autre instance internationale.

En mai 2016, la France a fait usage de son droit de veto au Conseil de sécurité de l'ONU pour s'opposer à la proposition russe visant à faire inscrire Ahrar al-Sham sur la liste des organisations terroristes[3].

---

[3]    The New Arab, « *Russian attempt to blacklist Syria's Islamist rebels blocked* », 11 mai 2016.

Il est également établi qu'Ahrar al-Sham n'a jamais figuré sur la liste annexée à la position commune 2001/931/PESC du Conseil de l'Union européenne, pas davantage que sur la liste des organisations terroristes étrangères publiée par le Département d'État américain (Foreign Terrorist Organizations).

Certes, la Cour de cassation a pu, dans un arrêt inédit rendu en 2021, approuver la motivation d'une cour d'appel qui avait retenu le délit de participation à une association de malfaiteurs terroriste s'agissant d'un individu qui avait rejoint cette organisation.

A cette occasion, elle a précisé que « *la qualification d'actes de terrorisme doit être recherchée, par le juge répressif français, saisi d'une poursuite contre un prévenu, par le seul examen des faits qui lui sont reprochés au regard des critères de l'article 421-1 du code pénal* » (Crim. 14 avr. 2021, n° 20-83.420).

Pour autant, dans cet arrêt, la Cour de cassation a pris le soin de relever que la cour d'appel s'était « *déterminée en retenant la participation concrète du prévenu à la préparation d'actes de terrorisme* ».

C'est ainsi par une référence concrète tant aux actes qu'aux aspirations affichées du prévenu lui-même, qui tendaient concrètement à la réalisation d'actions à caractère terroriste, que les juges se sont prononcés dans cette espèce.

L'arrêt, rendu au demeurant très longtemps après la période de prévention, n'est pas transposable au cas d'espèce et ne consacre en aucun cas l'intégration *in abstracto* du goupe *Ahrar Al Sham* dans le champ de l'article 421-1 du code pénal.

Or, il ressort des éléments du dossier l'absence d'une quelconque adhésion aux valeurs de ce groupe par Bruno LAFONT, ni de la commission du moindre acte à caractère violent.

Ce seul constat justifie que la relaxe soit prononcée pour l'ensemble des faits en lien avec ce groupe.

(ii)    *S'agissant du mouvement Jabhat al -Nosra*

De la même manière, il n'est pas reproché à Bruno LAFONT un quelconque contact avec ce groupe, ni une adhésion à une quelconque idéologie terroriste.

Dans ces conditions, et pour respecter le principe de prévisibilité de la loi pénale, il convient de tenir compte de la double circonstance fondamentale que la classification du Jabhat al-Nosra comme de l'État islamique ou Daesh sont <u>contemporains</u> de la période de prévention allant de 2013 jusqu'au 19 septembre 2014, voire très tardif dans cette période pour le second.

La poursuite a retenu la date du 30 mai 2013 comme celle de la reconnaissance du Jabhat al-Nosra en tant qu'organisation terroriste (résolution du Conseil de sécurité SC/11019).

Or, la décision adoptée ce jour-là par le Comité des sanctions du Conseil de sécurité des Nations unies s'est en réalité bornée à modifier une entrée déjà existante dans la liste des personnes, groupes et entités visés par le gel des avoirs. Ce document, qui compte près d'une centaine de pages, a simplement été actualisé pour

13

préciser les alias d'Al-Qaïda, et ne saurait donc être interprété comme une qualification autonome du Jabhat Al-Nosra en tant qu'organisation terroriste.

> *(iii)    S'agissant de l'État islamique en Irak et au Levant devenu État islamique*

Ce n'est qu'à partir du mois d'août 2014 que la nature terroriste de l'État islamique en Irak et au Levant (EIIL) a fait l'objet d'une reconnaissance spécifique par le Conseil de sécurité de l'ONU, avec l'adoption, le 15 août 2014, de la résolution 2170 (2014).

Par la suite, le 17 décembre 2015, par sa résolution 2253 (2015), le Conseil de sécurité des Nations unies a élargi les critères de désignation, mentionné explicitement Daesh et consolidé tant la qualification de cette organisation que le dispositif de sanctions applicable.

Ainsi, il conviendra de retenir que ce n'est qu'à partir du 15 août 2014 que Daesh a été reconnu comme terroriste par les organisations internationales, soit un mois avant la fermeture définitive de l'usine.

En toute hypothèse, la rapide radicalisation d'un conflit initialement présenté comme un simple soulèvement populaire, conjuguée à la difficile et tardive qualification des groupes terroristes, illustre la complexité extrême du conflit syrien.

### B.    La spécificité de la position géographique de la cimenterie de Jalabiyah sous contrôle kurde

L'usine de Jalabiyah est demeurée, en raison de sa position géographique, sous le contrôle des factions kurdes de l'été 2012 à septembre 2014, ce que plusieurs ont souligné et ce que Jean-Claude VEILLARD a rappelé : « *l'usine était sure. On est en zone kurde, très isolée comparativement aux autres multinationales qui étaient plus exposées* » (**D236/6**).

Implantée dans le nord-est de la Syrie, au sein du gouvernorat d'Alep, au cœur du Kurdistan syrien et à proximité de Kobané, l'usine était en effet située dans une zone que le régime syrien a délaissée dès 2012.

À cette époque, l'usine a été placée sous le contrôle des forces kurdes lesquelles ont formalisé avec LCS, à partir d'octobre 2013 et par l'intermédiaire de l'administration du PYD, un engagement de protection du site (**D411/1**), tout en exerçant sur LCS une pression constante, sous la forme de racket et de chantage (**D371/28** ; **D452/38** ; **D1912/58**).

Une note déclassifiée de la DGSE du 7 novembre 2013 rapporte que « *globalement, l'ordre régnait dans les zones contrôlées par le régime syrien ou par les Kurdes, et l'activité économique entre les régions y demeurait possible.* » (**D1253/1**).

### C.    Le positionnement de la France face au conflit syrien

L'analyse du positionnement de l'État français au moment des faits met en évidence une orientation politique et diplomatique marquée par une ferme opposition au régime de Bachar al-Assad et un soutien affirmé à la rébellion syrienne.

14

1. **Sur le plan politique**

Cette position s'est traduite par un engagement direct et assumé de la France aux côtés de l'opposition, jusqu'à un basculement doctrinal tardif, intervenu après les attentats de 2015, lorsque la lutte contre le terrorisme est devenue la priorité.

Les prises de position publiques des différents responsables politiques en faveur des rebelles (**D1706**) ont été nombreuses et ont systématiquement confirmé la politique résolument « anti Bachar » de l'État français.

Ainsi :

- le 26 avril 2011, Monsieur Nicolas SARKOZY, Président de la République a affirmé qu'il fallait « *accompagner, soutenir, aider les peuples qui ont choisi d'être libres* »[4] ;

- le 16 avril 2011, Alain JUPPE, ministre des Affaires étrangères, a déclaré :

   « ***M. Ben Salem nous a dit tout à l'heure que les islamistes allaient nous surprendre. Chiche ! Surprenez-nous, je ne demande que cela****. Et nous allons nous aussi vous surprendre, parce que nous ne sommes pas du tout dans une disposition d'esprit qui consiste à stigmatiser le monde musulman ou la religion musulmane, mais bien au contraire, de dialoguer avec elle* »[5].

Ce positionnement de la France a été réaffirmé après l'élection de François HOLLANDE en 2012.

Le 12 décembre 2012, Laurent FABIUS, ministre des Affaires étrangères, lors d'une conférence de presse à Marrakech (Maroc), interrogé sur les liens de la rébellion syrienne avec le Front al-Nosra, s'est refusé à disqualifier ceux qui, selon ses termes, menaient une action « *efficace et utile* » contre le régime syrien précisant que la France pouvait avoir une vision différente de celle des Etats-Unis sur la classification terroriste du Front al-Nosra :

   « *Il y a eu une discussion sur ce sujet, vous avez raison. Parce qu'il y a des groupes divers. Et il y a en particulier un groupe qui a des positions militaires qui sont importantes, mais les Américains ont estimé que ce groupe, compte tenu de ses orientations, **devait être mis sur la liste des terroristes** [une référence claire au Front al-Nosra]. **D'autres pays, je pense à un certain nombre de pays arabes, ont dit que cela ne leur paraissait pas pertinent.** Et le président de la coalition a dit que, bien évidemment, **on pouvait avoir des visions différentes sur ce sujet mais que, <u>lorsqu'un groupe menait une action qui était efficace et utile au service des Syriens et contre Bachar al-Assad, c'était très difficile de le récuser en tant que tel.</u> En ce qui concerne la France, nous allons examiner cette question de manière** parce que c'est une question que l'on ne peut pas éluder* »[6].

---

[4]    Nicolas Sarkozy. Allocution télévisée sur l'évolution politique dans les pays arabes, le 27 février 2011. Disponible sur : http://discours.vie-publique.fr/notices/117000524.html.

[5]    Alain Juppé. Déclaration sur le renouveau et la transition politique dans les pays arabes, Institut du monde arabe, 16 avril 2011. Disponible sur : http://discours.vie-publique.fr/notices/113000969.html.

[6]    https://www.vie-publique.fr/discours/186636-conference-de-presse-de-m-laurent-fabius-ministre-des-affaires-etrange.

15

Le 20 août 2014, dans une interview au journal *Le Monde*, François HOLLANDE a confirmé que la France avait livré des armes à « *l'opposition démocratique* » syrienne, justifiant ce choix par la nécessité de soutenir les rebelles contre Bachar al-Assad[7].

Ces livraisons d'armes, bien que présentées comme conformes aux engagements européens, ont abouti dès 2014 à la marginalisation de l'Armée syrienne libre et au renforcement de groupes islamistes.

Dans une interview donnée cette fois aux journalistes Guillaume DASQUIE et Nicolas JAILLARD, pour leur documentaire sur la cimenterie LAFARGE en Syrie diffusé le 2 avril 2023, François HOLLANDE a déclaré :

> « *La préoccupation qui était la mienne était à la fois d'assurer une livraison à cette opposition militaire à Bachar el-Assad et d'éviter que ces armes-là tombent dans des mains hostiles. (…)* <u>*Est-ce qu'il n'y a pas eu des pertes en ligne ? C'est possible*</u>, *parce que cette Armée syrienne libre, elle, était finalement composite. Et lorsqu'il y a eu effectivement, à partir d'août 2013, l'éclatement de l'opposition syrienne et la radicalité de cette opposition, notamment du côté d'al-Nosra, peut être qu'une partie de ces armes a été utilisée, mais elles l'ont toujours été contre le régime de Bachar el-Assad* » (**D2925/15**).

À l'audience, le général Christophe GOMART, ancien directeur du renseignement militaire, a confirmé qu'il existait une « *polarisation des* [hommes] *politiques français autour de Bachar -Assad et sur la chute de Bachar al-Assad* », soulignant à deux reprises que ce n'est qu'à la suite des attentats de janvier 2015 qu'un véritable changement d'état d'esprit au sein des services de renseignement français était intervenu.

Au cours de l'instruction, l'agent de la DGSI en contact avec Jean-Claude VEILLARD avait déjà relevé le tournant que constituait, pour les services de renseignement, les attentats sur le sol français (**D1454/5 et 8**).

Ce positionnement des autorités politiques françaises à l'époque des faits peut s'expliquer par une absence de connaissance précise et lisible des contours de la rébellion syrienne ainsi que par la conviction d'une chute rapide du régime de Bashar al-Assad.

## 2. Sur le plan diplomatique

Les éléments du dossier démontrent l'existence de relations suivies et reconnues entre l'État français et LAFARGE, sans qu'aucune alerte ni recommandation particulière ait été adressée aux salariés ou à Bruno LAFONT en sa qualité de PDG.

Si l'ordonnance de renvoi retient « *certaines pièces* [montrent] *que la situation de Lafarge en Syrie au début de la guerre civile syrienne avait donné lieu à un suivi* » tout en estimant que ne figure au dossier aucune trace d'un « <u>*partage avec les autorités diplomatiques françaises des modalités de gestion du risque sécuritaire par Lafarge et d'une incitation par ces mêmes autorités à maintenir l'activité malgré les risques*</u> » (**ORTC p.91**), l'existence d'un suivi effectif des activités de LAFARGE en Syrie par les autorités diplomatiques françaises est avérée.

---

[7]  Le Monde, « *Les principales annonces de François Hollande au "Monde"* », 20 août 2014
Gérard Davet et Fabrice Lhomme. *Un président ne devrait pas dire ça*, Paris, Stock, 2016.

Au-delà des simples conseils aux voyageurs à destination des personnes physiques, il incombe aux autorités diplomatiques d'accompagner et d'alerter les entreprises françaises installées à l'étranger et confrontées à des contextes politiques aussi difficiles que celui dans lequel évoluait LAFARGE en Syrie[8].

Cette surveillance et ce contrôle de LCS par les autorités diplomatiques française sont attestés par le courrier du 25 juillet 2012, adressé par Serge MOSTURA, représentant du centre de crise du ministère des Affaires étrangères, à Jean-Claude VEILLARD : « *l'Ambassade de France à Amman a informé mes services de la présence à Damas aujourd'hui de deux ressortissants français, M. Bruno PESCHEUX et M. Valery MIRAKOFF, employés de votre société* » (**D1921/21**).

Par ailleurs, ce courrier formule expressément une recommandation de la part du ministère des Affaires étrangères à LAFARGE : « *dans ce contexte, **il me paraît raisonnable** de proscrire les déplacements de vos collaborateurs en Syrie* » (**D1921/21**).

Ce courrier atteste d'un suivi particulièrement étroit et attentif par les autorités diplomatiques françaises des activités de LCS en Syrie et des déplacements de ses salariés, l'information relative à la présence à Damas de deux d'entre eux ayant été portée à leur connaissance le jour même.

Les investigations ont par ailleurs établi l'existence de relations nourries entre LCS et les services du ministère des Affaires étrangères.

Le compte-rendu d'entretien du Directeur d'ANMO – la Direction d'Afrique du Nord et du Moyen Orient – attachée au ministère des Affaires étrangères - avec Jean DESAZARS de MONTGAILHARD, directeur général adjoint pour la stratégie, le développement et les affaires publiques du groupe LAFARGE, en date du 23 octobre 2012, est ainsi rédigé : « *In fine, il a été convenu d'établir un lien régulier entre le groupe Lafarge et cette direction pour suivre les évolutions politiques et sécuritaires et informer le Département des projets de cette société dans la région. (RR)* » (**D919/2**).

L'existence de ces contacts directs avec les ambassadeurs de France en Syrie, Éric CHEVALLIER ou Franck GELLET est également établie par les déclarations de :

- Jean-Claude VEILLARD : « *En août 2012, l'ONU qualifie juridiquement la Syrie de pays en guerre civile. Pourquoi rester dans un pays en guerre ? Qui prend cette décision ?*
  *Réponse 47 :* […] **On a toujours eu le soutien de l'ambassadeur, Monsieur GELLET[9] nous a toujours soutenu et tant qu'on pouvait maintenir l'activité en sûreté, on devait le faire** *car cela maintenait un tissu économique local très important pour les Syriens* » (**D236/6**).

- Christian HERRAULT : « *Tous les six mois on allait voir le Quai d'Orsay qui nous poussait à rester. Le Quai d'Orsay nous encourageait vivement, en 2012, à rester. [..]Le Quai d'Orsay dit qu'il faut tenir, que ça va se régler* » (**D253/4/6**).

---

[8]    Ministère de l'Europe et des Affaires étrangères, « *Accompagner les opérateurs de l'État et les entreprises* », Centre de crise et de soutien (CDCS), mis à jour en février 2024, disponible sur : https://www.diplomatie.gouv.fr/fr/le-ministere-et-son-reseau/le-centre-de-crise-et-de-soutien/accompagner-les-operateurs-de-l-etat-et-les-entreprises/.

[9]    Comprendre « Éric CHEVALLIER », Franck GELLET n'étant pas en poste à cette période.

17

Ainsi, l'inclination des cadres de LAFARGE et LCS au maintien de l'activité de la cimenterie de Jalabiya apparaît avoir été confortée, ou à tout le moins perçue comme l'étant, par les relations entretenues avec les représentants de l'Etat français et par l'absence de toute demande expresse d'y mettre un terme.

De la même manière, aucun avertissement n'a été donné à Bruno LAFONT par les représentants de l'État avec lesquels ses fonctions de Président directeur général l'amenaient à être en contact.

Il ressort en effet de l'agenda de Bruno LAFONT qu'ont eu lieu, tout au long de la période, de nombreuses rencontres entre Bruno LAFONT, François HOLLANDE et Laurent FABIUS (**D3156**).

Bruno LAFONT a notamment rencontré le président de la République François HOLLANDE :

- le 8 juillet 2013 : Bruno LAFONT a participé à une réception à l'Elysée ;
- le 15 février 2013 : Bruno LAFONT a accompagné Monsieur François HOLLANDE lors de son voyage officiel en Inde[10] ;
- le 9 février 2014 lors d'une réunion en présence de Madame Angela MERKEL et Monsieur José Manuel BARROSO ;
- le 23 mars 2014 lors d'un dîner à l'Elysée ;
- le 6 juin 2014 lors d'un dîner à l'Elysée ;
- le 28 août 2014 lors la conférence des ambassadeurs à l'Elysée.

Il a par ailleurs rencontré le ministre des Affaires étrangères Laurent FABIUS :

- le 8 juillet 2013 lors d'un dîner au Quai d'Orsay ;
- le 20 juin 2014 lors d'un rendez-vous au Quai d'Orsay ;
- le 2 juillet 2014 lors d'un déjeuner au Quai d'Orsay ;
- le 27 août 2014 lors d'un petit-déjeuner ;
- le 1er octobre 2014 lors d'un rendez-vous au Quai d'Orsay.

A ces différentes occasions, il n'a jamais été demandé à Bruno LAFONT de mettre un terme aux activités de LAFARGE en Syrie.

### III.    Les services de renseignement français

Outre les liens avérés avec différents représentants du ministère des Affaires étrangères, le dossier ne saurait être appréhendé sans tenir compte des interactions constantes, au cours de la période de la prévention, entre plusieurs protagonistes du dossier au sein de LAFARGE et des agents des services de renseignement de l'État français.

L'existence, l'importance et l'utilité de ces relations ont été révélées par l'instruction et confirmées devant le tribunal.

Les investigations réalisées au cours de l'information ont, en effet, mis à jour une collaboration entre certains cadres de LCS ou de LAFARGE et d'une part, des agents de la Direction générale de la Sécurité extérieure (ci-après « DGSE ») et de la Direction du Renseignement militaire (ci-après « DRM ») rattachés au ministère

---

[10]     *Le Journal du dimanche*, « Hollande en Inde : les coulisses d'un voyage d'affaires », 15 février 2013, lejdd.f

18

des Armées, et d'autre part, de la Direction générale de la Sécurité intérieure (ci-après « DGSI ») rattachée au ministère de l'Intérieur.

S'agissant de Jean-Claude VEILLARD, cette collaboration en qualité de correspondant pour LAFARGE auprès de la DGSE a été officiellement actée par un courrier d'Éric OLSEN en date du 16 décembre 2008 :

> *« Monsieur le Directeur général,*
>
> *Afin de* **formaliser la relation avec le bureau de liaison entreprises auprès de la DGSE,** *j'ai le plaisir de vous informer que, depuis le 1er octobre 2008, le groupe Lafarge a créé la fonction de Directeur de la sûreté pour l'ensemble de notre groupe. Monsieur Jean-Claude Veillard en assure la direction.*
>
> *Afin d'améliorer nos sources d'informations pour l'analyse de la menace, je souhaiterais que* **le groupe Lafarge puisse avoir la possibilité d'entretenir un lien privilégié avec vos services,** *par l'intermédiaire de votre bureau de liaison avec les entreprises.*
>
> *À ce titre, j'ai nommé Monsieur Jean-Claude Veillard votre correspondant pour notre groupe.* **Il est habilité « secret défense » jusqu'en 2012 »** (**D1921/34**).

Lors de l'audience, après avoir affirmé sous serment qu'il n'avait jamais agi auprès des services français de renseignement que de sa propre initiative et à titre personnel, Jean-Claude VEILLARD interrogé sur ce courrier contredisant son témoignage a fini par reconnaître : « *oui, bien sûr, je me souviens bien de cette démarche. C'est une démarche traditionnelle. C'est un* **courrier de mon initiative qui vise à officialiser et à justifier ma présence** [auprès des services] *»*.

Il ressort en outre de l'exploitation des scellés (**JCV/DOM01 et LAFARGE DOC-013, 014 et 015**) saisis à son domicile et à son bureau au siège de LAFARGE, ainsi que des rares notes déclassifiées et des témoignages recueillis lors de l'instruction comme devant le tribunal, que Jean-Claude VEILLARD a entretenu une relation soutenue avec les différents services français de renseignement (DGSE, DGSI et DRM).

Un grand nombre de rencontres avec des interlocuteurs habituels de la DGSE et de la DRM sont ainsi mentionnées dans son agenda, et par exemple (**D1961**) :

- 11 rencontres avec le lieutenant-colonel BINIOT de la DGSE entre 2013 et 2014 : les 7 septembre 2011, 15 novembre 2011, 13 janvier 2012, 5 juillet 2012, 9 octobre 2012, 25 janvier 2013, 19 juillet 2013, 23 octobre 2013, 28 mars 2014, 25 septembre 2014 et 25 novembre 2014 ;

- un déjeuner avec le Général Christophe GOMART, à l'époque chef de la DRM, au siège de LAFARGE le 18 mars 2013 (**Pièce n°3**) ;

- 21 rencontres avec le lieutenant-colonel DE VRIERES de la DRM : les 29 août 2011, 29 septembre 2011, 10 janvier 2012, 10 mai 2012, 22 juin 2012, 5 juillet 2012, 29 août 2012, 10 septembre 2012, 30 octobre 2012, 6 décembre 2012, 21 décembre 2012, 27 février 2013, 25 avril 2013, 27 mai 2013, 5 juin 2013, 18 octobre 2013, 27 juin 2014, 28 août 2014, 8 et 9 septembre 2014 et 20 novembre 2014.

19

La collaboration du directeur de la Sûreté du groupe avec les services français de renseignement ne s'est pas limitée à ces multiples rendez-vous, puisqu'elle s'est aussi traduite par des transmissions régulières d'informations écrites par l'envoi de courriels et de comptes-rendus (**D1460/5**).

Ainsi, dans un courriel du 13 septembre 2013 adressé à Bernard DEVAVRIN, correspondant du bureau de liaison entreprises de la DRM, Jean-Claude VEILLARD a :

- d'une part, transféré un mail du 13 août 2013 qui avait été envoyé à l'administration de LCS par un dénommé Abu ZAID en sa qualité de « *Chef du bureau du comité de sécurité et de la légitimité (charia)* », contenant des informations relative à la « *gestion des affaires de votre usine de Jalabiya* » et notamment la désignation de Amro TALEB pour « *négocier en* [leur] *nom* » avec LCS ;

- d'autre part, joint un document intitulé « *Rapport mensuel du mois d'août 13* » (**D1961/18**).

Au cours de l'audience, le Général Christophe GOMART a indiqué qu'il était normal que son adjoint, chef du bureau de liaison entreprise, soit destinataire de ce type de rapports émanant de Jean-Claude VEILLARD : « *Oui, c'était tout à fait normal, il s'agissait* **d'un rapport mensuel que recevait le bureau de** **liaison**. *Je ne sais pas si je les recevais personnellement, mais il est possible que j'en aie lu un ou deux* ».

Il sera observé que ces rapports mensuels de Jean-Claude VEILLARD à la DRM, en lien avec les faits poursuivis et intervenus tout au long de la période de prévention, n'ont jamais été déclassifiés en dépit des demandes répétées de déclassification formulées au cours de l'instruction (**D1346, D1457, D2508, D2940, D3025**).

S'agissant du ministère de l'Intérieur, il est acquis que le 19 avril 2018, la Commission du secret de la défense nationale a émis un avis favorable à la déclassification partielle de dix documents, dont aucun ne correspond à la période de prévention (le premier datant de juin 2009, le deuxième datant de juin 2015, et dont ceux communiqués ont été biffés dans leur quasi-intégralité, rendant leur exploitation impossible (**D1274**).

S'agissant du ministère des Armées, 33 documents ont d'abord été déclassifiés, dont 9 seulement sont antérieurs à l'évacuation de l'usine le 19 septembre 2014.

Une seconde déclassification, qui avait été sollicitée par les magistrats instructeurs, est intervenue le 21 janvier 2019, et a donné lieu à la transmission de trois autres notes dont la note du 26 août 2014 (**D1527**).

Il doit être souligné en premier lieu que cette note précise que « *suite aux demandes de la Direction du Renseignement sur la crise Iraquienne* » (…) cette dernière a obtenu de la part de « *son correspondant* [nom biffé] *les renseignements suivants* ».

Elle répond donc clairement à une « *demande* » d'information formulée par la Direction du Renseignement, ce qui contredit la thèse selon laquelle les services de renseignement auraient été exclusivement passifs en se bornant à recueillir de leur correspondant, directeur de la sûreté du groupe LAFARGE, des renseignements non sollicités.

En deuxième lieu, que les informations qui y sont transmises font expressément état d'un « *agreeement* » financier conclu pour deux semaines entre « *Daesh* » et LCS par l'intermédiaire de Firas TLASS pour permettre la reprise des activités commerciales de l'usine et la circulation sur les routes du nord de la Syrie.

20

En dernier lieu, qu'elle reproduit mot pour mot les informations transmises, la veille 25 août 2014, par Jean-Claude VEILLARD à son contact de la DGSE « Grosmarmotte » (**D3223/40**).

Cette note du 26 août 2014 illustre, parmi d'autres éléments, la relation privilégiée qui existait entre Jean-Claude VEILLARD, directeur de sûreté de LAFARGE, les services français de renseignement ainsi que la nature des informations qu'il transmettait.

<u>S'agissant de Firas TLASS</u>, personnage syrien au cœur des faits objets de la poursuite, ses liens avec les services de renseignement notamment français sont également renseignés par différents éléments du dossier et témoignages.

Il ressort, en effet et notamment, de courriels échangés entre Firas TLASS et Alexis TROUSSICOT (**D2326**), de la transcription du documentaire diffusé le 2 avril 2023 sur la chaîne M6 intitulé « *Cimenterie Lafarge : la multinationale, Daesh et les espions* », réalisé par Nicolas JAILLARD et Guillaume (**D2917**) ainsi que du témoignage de ce dernier devant le tribunal que :

- Alexis TROUSSICOT agissait à l'époque des faits poursuivis pour le compte de la DGSE ;

- Firas TLASS était en relation régulière avec ce dernier.

Cette collaboration de Firas TLASS avec la DGSE est enfin décrite dans le livre de Philippe HARDOUIN intitulé « *L'affaire Lafarge en Syrie et ses guerres de l'ombre* », lequel a recueilli les déclarations de Firas TLASS selon lesquelles : « ils *ont travaillé ensemble depuis 2012 pour former des équipes, obtenir des renseignements et servir la France* »[11].

Pour conclure sur l'existence et l'utilité de cette collaboration, le Général Christophe GOMART, en sa qualité d'ancien directeur de la DRM de 2013 à 2017, a affirmé à l'audience sous serment :

- que Jean-Claude VEILLARD, qui avait servi sous ses ordres en Afghanistan, avait ensuite été en sa qualité du directeur de la sûreté du groupe LAFARGE un correspondant régulier de la DRM ;

- que l'implantation de LAFARGE en Syrie était utile dans la mesure où la France n'y disposait plus d'aucun relai ;

- que LAFARGE avait servi son pays : « *je peux le redire en effet, la France n'était pas directement impliquée en Syrie, mais elle suit les affaires de ce monde géopolitique ; de fait, pour faire remonter les informations et prendre des décisions, il y avait besoin de sources d'information.* **Oui, je pense que ces sources ont en effet aidé à servir la France** ».

Si Bruno LAFONT a toujours été totalement étranger à cette collaboration entre LAFARGE et les services de renseignement, révélée dans le dossier d'information, celle-ci est *a minima* susceptible d'éclairer un certain nombre de décisions, de comportements et de motivations des cadres de LAFARGE et LCS.

---

[11]    Philippe Hardouin, *L'affaire Lafarge et ses guerres de l'ombre*, le cherche-midi p.97-98.

Il résulte des développements qui précèdent que :

- la reconnaissance tardive et souvent confuse de certaines entités comme organisations terroristes ;
- la position de la France, résolument hostile à Bachar al-Assad, au point de soutenir indistinctement la rébellion dans toutes ses composantes ;
- la relation soutenue ayant existé entre certains représentants de LCS ou de LAFARGE avec les autorités diplomatiques et les services de renseignement français

constituent autant d'éléments qui ont pu engendrer de la confusion et peser sur les prises de décision relatives à la gestion et au maintien de l'activité de l'usine en Syrie.

*****

Après avoir rappelé les termes exacts de la prévention et son évolution au cours de l'instruction, il sera exposé en quoi celle-ci, ne peut justifier une quelconque déclaration de culpabilité de Bruno LAFONT à défaut de correspondre aux éléments constitutifs du délit de financement de terrorisme (Première partie), et à défaut d'être établie en fait (Seconde partie).

### PREMIERE PARTIE : LA PREVENTION N'EST PAS FONDEE EN DROIT

A titre liminaire, et pour apprécier la possibilité d'entrer en voie de condamnation à son encontre, il importe de circonscrire précisément les faits qui sont reprochés à Bruno LAFONT et qui ont justifié son renvoi devant le tribunal correctionnel.

Force est de constater une évolution substantielle de la nature des faits qui lui sont imputés et qui seraient susceptibles, selon l'acte de renvoi, de caractériser l'infraction de financement de terrorisme.

Ce constat a d'ailleurs justifié le dépôt de conclusions d'irrégularité visant l'ORTC, soutenues *in limine litis*, et ayant donné lieu à un jugement de jonction de l'incident au fond le 5 novembre 2025.

Indépendamment des conséquences procédurales qui s'imposent à cet égard, il convient de constater au moment de l'examen au fond de la poursuite qui saisit le tribunal que celle-ci ne revêt plus aucun caractère infractionnel.

Aux termes de sa mise en examen (**D587**), il a été reproché à Bruno LAFONT d'avoir, entre 2011 et 2015, « *financé une entreprise terroriste* » en ayant sciemment :

- « *rémunéré des intermédiaires afin d'être approvisionnée en matières premières (pétrole, pouzzolane, calcaire et sable) par l'organisation "Etat Islamique" ou tout autre groupe terroriste présent en zone irako-syrienne ayant pour but de troubler gravement l'ordre public par l'intimidation ou la terreur* » ;

- « *versé des commissions et des "taxes" à l'organisation "Etat Islamique" ou tout autre groupe terroriste présent en Syrie, afin de faciliter la circulation des employés et des marchandises de l'usine de Jalabiya (Syrie) sur le territoire occupé par lesdites organisations terroristes, et en rémunérant un ou plusieurs intermédiaires à cette fin et ce, pour un montant susceptible d'avoir atteint la somme de 8,009.215 euros a minima* » ;

22

- « *mis à disposition le ciment fabriqué par l'usine de Jalabiya au bénéfice de l'organisation terroriste "Etat Islamique", permettant ainsi à ladite organisation d'utiliser et/ou de revendre ce matériau* ».

Au stade de la mise en examen, il a donc été reproché à Bruno LAFONT – en sa qualité de Président Directeur Général de la société LAFARGE SA – des actes positifs ayant consisté en la rémunération d'intermédiaires, le versement de commissions ainsi que la mise à disposition de ciment au bénéfice d'organisations terroristes.

Les magistrats avaient alors cru pouvoir déduire des éléments de la procédure l'existence d'indices graves ou concordants, à son encontre, de <u>financement</u> d'une entreprise terroriste.

Cependant, aux termes de l'ordonnance de règlement, il est en définitive reproché à Bruno LAFONT :

> « *d'avoir sur le territoire national et de manière indivisible en Syrie, <u>courant 2013 et jusqu'au 19 septembre 2014</u>, […]dans le cadre de ses fonctions de président directeur Lafarge SA contrôlant sa filiale syrienne LCS, <u>participé au financement d'entreprises terroristes</u>, […] en l'espèce <u>notamment en autorisant la poursuite d'activité de la cimenterie exploitée par LCS, alors qu'il était seul habilité à y mettre fin</u>, en conscience que cette exploitation supposait notamment des paiements de sécurité convenus au profit de ces entités terroristes, la rémunération de fournisseurs opérant depuis les zones tombées sous leur contrôle, et d'intermédiaires avec ces groupes* ».

C'est donc désormais le fait d'avoir autorisé la poursuite d'activité de la cimenterie, et ce alors qu'il aurait été le seul à pouvoir y mettre fin, qui est reproché à Bruno LAFONT devant le tribunal correctionnel.

Les évolutions de la prévention doivent être soulignées tant elles sont révélatrices de la fragilité des poursuites à l'encontre de Bruno LAFONT.

Elles sont triples et ont trait :

- <u>à la période des faits</u>, puisqu'initialement mis en examen pour des faits commis entre 2011 et 2015, Bruno LAFONT est finalement renvoyé pour des faits prétendument intervenus courant 2013 jusqu'au 19 septembre 2014 ;

- <u>à la nature des faits</u>, puisqu'initialement mis en examen pour avoir rémunéré des intermédiaires, versé des commissions et mis à disposition du ciment, Bruno LAFONT est finalement renvoyé pour avoir autorisé la poursuite d'activité de la cimenterie alors qu'il était seul habilité à y mettre fin ;

- <u>à la qualification des faits</u>, puisqu'initialement mis en examen pour avoir « *financé une entreprise terroriste* », Bruno LAFONT est finalement renvoyé pour avoir « *participé au financement d'entreprises terroristes* ».

Cette évolution notable de l'accusation constitue un recul important, bien qu'insuffisant, et aboutit à énoncer des comportements impropres à caractériser une quelconque infraction.

En effet, la prévention retenue *in fine* ne résiste pas à l'analyse.

Il est acquis que si l'article 421-2-2 du code pénal réprime le fait de financer une entreprise terroriste, la seule « participation » au financement d'entreprise terroriste n'est pas incriminée par la loi (**I**).

23

En outre, et en tout état de cause, l'entrée en voie de condamnation de ce chef suppose impérativement l'identification de l'un des actes positifs de financement limitativement énumérés par ces dispositions, de sorte que la seule abstention en réalité reprochée à Bruno LAFONT – celle de n'avoir pas fermé l'usine lorsqu'il était prétendument le seul à pouvoir le faire – sort par essence du champ infractionnel (**II**).

I.    Le fait de « participer » au financement d'entreprise terroriste n'est pas incriminé par la loi

S'agissant du renvoi de Bruno LAFONT pour avoir « *participé au financement d'entreprises terroristes* », il importe, tout d'abord, de préciser le champ d'incrimination de l'infraction de l'article 421-2-2 du code pénal.

Aux termes de l'article 111-4 du code pénal, « *la loi pénale est d'interprétation stricte* ». Cette prescription essentielle en matière pénale rejoint celle, plus large, du principe de légalité exprimé à l'article 111-3 du Code pénal mais également à l'article 7 de la Convention européenne des droits de l'homme.

Comme l'explique la Cour européenne, « *l'article 7 de la Convention [qui] consacre aussi, de manière plus générale, le principe de la légalité des délits et des peines […] commande de ne pas appliquer la loi pénale de manière extensive en défaveur de l'accusé, par exemple par analogie* » (CEDH, *Del Rio Prada c. Espagne*, 10 juillet 2012, Req. n° 42750/09, §51).

Aussi, ces principes font-ils obstacle à toute extension du champ d'application des incriminations à des hypothèses que la loi n'a pas expressément prévues.

En ce sens, ils commandent qu'aucun amalgame ne soit opéré entre les définitions des différentes infractions à caractère terroriste prévues par le Code pénal.

A cet égard, il convient de rappeler qu'aux termes de l'article 421-2-2 du code pénal :

> « *Constitue également un acte de terrorisme le fait de financer une entreprise terroriste en fournissant, en réunissant ou en gérant des fonds, des valeurs ou des biens quelconques ou en donnant des conseils à cette fin, dans l'intention de voir ces fonds, valeurs ou biens utilisés ou en sachant qu'ils sont destinés à être utilisés, en tout ou partie, en vue de commettre l'un quelconque des actes de terrorisme prévus au présent chapitre, indépendamment de la survenance éventuelle d'un tel acte* ».

Ces dispositions visent clairement et uniquement le fait d'avoir financé une entreprise terroriste, à l'exclusion d'une participation à un tel financement.

*A contrario*, cette modalité de commission de l'infraction est expressément prévue pour les infractions telles que l'association de malfaiteurs, notamment en matière terroriste.

En effet, aux termes de l'article 421-2-1 du code pénal qui précède le financement de terrorisme :

> « *Constitue également un acte de terrorisme le fait de participer à un groupement formé ou à une entente établie en vue de la préparation, caractérisée par un ou plusieurs faits matériels, d'un des actes de terrorisme mentionnés aux articles précédents* ».

Cet article incrimine donc la participation à un groupement en vue de la préparation des actes terroristes définis par les articles 421-1 et 421-2 du code pénal - soit les articles **qui le précèdent** – dont il convient, dès lors, d'examiner la lettre.

24

Aux termes des dispositions de l'article 421-1 du code pénal :

> « *Constituent des actes de terrorisme, lorsqu'elles sont intentionnellement en relation avec une entreprise individuelle ou collective ayant pour but de troubler gravement l'ordre public par l'intimidation ou la terreur, les infractions suivantes :*
>
> *1° Les atteintes volontaires à la vie, les atteintes volontaires à l'intégrité de la personne, l'enlèvement et la séquestration ainsi que le détournement d'aéronef, de navire ou de tout autre moyen de transport, définis par le livre II du présent code ;*
>
> *2° Les vols, les extorsions, les destructions, dégradations et détériorations, ainsi que les infractions en matière informatique définis par le livre III du présent code ;*
>
> *3° Les infractions en matière de groupes de combat et de mouvements dissous définies par les articles 431-13 à 431-17 et les infractions définies par les articles 434-6 et 441-2 à 441-5 ;*
>
> *4° Les infractions en matière d'armes, de produits explosifs ou de matières nucléaires définies par les articles 222-52 à 222-54,322-6-1 et 322-11-1 du présent code, le I de l'article L. 1333-9, les articles L. 1333-11 et L. 1333-13-2, le II des articles L. 1333-13-3 et L. 1333-13-4, les articles L. 1333-13-6, L. 2339-2, L. 2339-14, L. 2339-16, L. 2341-1, L. 2341-4, L. 2341-5, L. 2342-57 à L. 2342-62, L. 2353-4, le 1° de l'article L. 2353-5 et l'article L. 2353-13 du code de la défense, ainsi que les articles L. 317-7 et L. 317-8 à l'exception des armes de la catégorie D définies par décret en Conseil d'Etat, du code de la sécurité intérieure ;*
>
> *5° Le recel du produit de l'une des infractions prévues aux 1° à 4° ci-dessus ;*
>
> *6° Les infractions de blanchiment prévues au chapitre IV du titre II du livre III du présent code ;*
>
> *7° Les délits d'initié prévus aux articles L. 465-1 à L. 465-3 du code monétaire et financier* ».

L'article 421-2 du code pénal dispose quant à lui :

> « *Constitue également un acte de terrorisme, lorsqu'il est intentionnellement en relation avec une entreprise individuelle ou collective ayant pour but de troubler gravement l'ordre public par l'intimidation ou la terreur, le fait d'introduire dans l'atmosphère, sur le sol, dans le sous-sol, dans les aliments ou les composants alimentaires ou dans les eaux, y compris celles de la mer territoriale, une substance de nature à mettre en péril la santé de l'homme ou des animaux ou le milieu naturel* ».

Ces dispositions dressent ainsi une liste – nécessairement limitative – d'actes pour la préparation desquels la seule participation à un groupement caractérise le délit prévu à l'article 421-2-1.

A l'inverse, l'article 421-2-2 – qui identifie comme « *un acte de terrorisme le fait de financer une entreprise terroriste* » - **succède immédiatement à ces dispositions**, de sorte qu'il ne peut en aucun cas entrer dans le champ de l'association malfaiteurs à caractère terroriste.

En conséquence, la participation à un groupement en vue de la préparation d'un tel acte n'est pas légalement incriminée.

Si la tentation pour l'accusation de recourir à la notion de « *participation* » à un groupement se conçoit aisément, dans la mesure où celle-ci se situe, s'agissant de l'élément légal, plus en amont et dans une zone

25

moins bien définie matériellement de l'*iter criminis*, celle-ci ne peut être admise pour la répression du financement de terrorisme.

Elle procède d'une assimilation de la matérialité de ces délits manifestement *contra legem,* et en ce sens frontalement contraire aux principes d'interprétation stricte et de légalité des délits et des peines.

Il suffit pour achever de s'en convaincre de souligner la différence de traitement quant à la répression de la tentative de ces délits.

C'est la matérialité particulière de l'infraction de participation à un groupement prévu à l'article 421-1-1 - et le fait qu'elle procède comme l'explique la doctrine d'une « *élongation de l'iter criminis* » (Michel MASSE, RSC 2012. 89) – qui justifie que la tentative de cette infraction ne soit <u>pas</u> poursuivie, faute de consistance matérielle suffisante.

A l'inverse, la tentative de l'infraction de financement de terrorisme est expressément réprimée par l'article 421-5, alinéa 3, précisément car celle-ci recouvre une matérialité plus définie, permettant la détermination d'un commencement d'exécution.

C'est l'analyse de la doctrine qui, au moment de comparer ces infractions, identifie dans « *le cas du financement d'une entreprise terroriste en fournissant, en réunissant ou en gérant des fonds, des valeurs ou des biens quelconques, ou en donnant des conseils à cette fin, […] autant d'actions s'inscrivant dans une phase nettement plus consistante en matérialité* » (Y. MAYAUD, Rep. Pénal et procédure pénale, Terrorisme -infraction, Terrorisme par financement, § 216).

C'est démontrer définitivement la différence de matérialité entre ces infractions, qui ne saurait être ignorée par commodité.

**En l'espèce,** et alors même qu'il lui était initialement reproché d'avoir « *financé une entreprise terroriste* », Bruno LAFONT a finalement été renvoyé pour avoir prétendument « *participé au financement d'entreprises terroristes* », toujours sur le fondement de l'article 421-2-2 du code pénal.

Comme exposé pourtant, ces dispositions ne répriment pas la participation à un acte de financement de terrorisme, de sorte que, libellée ainsi, et adossée à des faits tels que ceux reprochés à Bruno LAFONT, la prévention exclut l'entrée en voie de condamnation de ce chef.

A ce titre, déjà, la relaxe s'impose.

## II.   L'absence de tout reproche de commission d'un acte de financement de terrorisme, empêchant la caractérisation de ce délit

La lettre de l'article 421-2-2 du code pénal comporte une liste limitative de comportements susceptibles de caractériser l'infraction de financement de terrorisme, aux termes de laquelle ne figure pas l'acte d'autorisation reproché à Bruno LAFONT (**1**).

Il en résulte que ce délit implique la commission d'un acte positif, de sorte que tout comportement d'abstention – tel que celui de ne pas avoir provoqué la fermeture de l'usine, que l'on reproche à Bruno LAFONT - sort par essence du champ d'incrimination (**2**).

26

### A. Le caractère limitatif des comportements incriminés au titre du délit de financement de terrorisme, exclusif du comportement d'autorisation reproché à Bruno LAFONT

Comme rappelé, le délit de financement de terrorisme est défini par les dispositions de l'article 421-2-2 du code pénal en ces termes :

*« Constitue également un acte de terrorisme le fait de financer une entreprise terroriste en fournissant, en réunissant ou en gérant des fonds, des valeurs ou des biens quelconques ou en donnant des conseils à cette fin, dans l'intention de voir ces fonds, valeurs ou biens utilisés ou en sachant qu'ils sont destinés à être utilisés, en tout ou partie, en vue de commettre l'un quelconque des actes de terrorisme prévus au présent chapitre, indépendamment de la survenance éventuelle d'un tel acte ».*

L'élément matériel du délit réside donc dans l'une des modalités limitativement visées par ce texte, à savoir, alternativement :

- la fourniture de fonds, de valeurs ou de biens quelconques ;
- le recueil de fonds, de valeurs ou de biens quelconques ;
- la gestion de fonds, de valeurs ou de biens quelconques ;
- la fourniture de conseils à cette fin.

Sauf à identifier précisément la commission personnelle par un individu de l'un de ces actes, ce délit ne peut être considéré comme caractérisé.

En ce sens, un simple accord n'est pas susceptible de constituer le délit de financement de terrorisme tel qu'il est défini par ces dispositions.

**En l'espèce**, à cet égard, le comportement reproché à Bruno LAFONT ne permet pas d'entrer en voie de condamnation.

Au terme de plusieurs années d'instruction, la prévention ne soutient plus que Bruno LAFONT aurait commis l'un des actes visés par la loi.

Il est retenu *in fine* qu'il aurait « *autoris[é] la poursuite d'activité de la cimenterie exploitée par LCS, alors qu'il était seul habilité à y mettre fin* ».

La carence est double.

Il est tout d'abord manifeste que la notion d'« *autorisation* » - utilisée par les magistrats – n'apparaît nulle part dans la loi, de sorte que le principe de légalité des délits et des peines, autant que celui d'interprétation stricte de la loi pénale, interdisent d'en faire le socle d'une déclaration de culpabilité de ce chef.

Réciproquement, la prévention ne soutient pas - à juste titre - que Bruno LAFONT aurait « *fourni* », « *réuni* » ou « *géré* » des fonds, ou « *donné des conseils à cette fin* », à destination d'un groupe terroriste.

Ce seul constat suffit à écarter toute condamnation de ce chef.

Mais plus encore, l'autorisation que l'on reproche à Bruno LAFONT, aux termes de la prévention retenue, ne porte même pas sur l'un des comportements visés par le texte d'incrimination.

27

Il n'est nullement reproché à Bruno LAFONT d'avoir « *autorisé* » la fourniture, la réunion, la gestion des fonds ou la fourniture de conseils en vue de la commission d'actes terroristes.

En définitive, le fait d'autoriser la poursuite de l'activité d'une usine – si tant est qu'il soit établi (*cf infra*) - apparaît beaucoup trop éloigné de la lettre comme du sens de l'incrimination prévue à l'article 421-2-2 du code pénal pour pouvoir engager une quelconque responsabilité pénale.

Ce constat fait d'ores et déjà obstacle à toute condamnation du chef de financement de terrorisme.

### B. L'absence de reproche à Bruno LAFONT d'un acte positif de financement

En tout état de cause, le délit de financement de terrorisme tel qu'institué par l'article 421-2-2 du code pénal ne peut qu'être un délit intentionnel d'action, impliquant la « commission » d'un acte positif, et excluant réciproquement tout comportement d'abstention.

Pour rappel en effet, sont traditionnellement distinguées les infractions d'action, aux termes desquelles « *est reproché un acte positif contraire à l'obligation de ne pas agir* », des infractions d'omission, lesquelles « *sanctionne[nt] le fait de s'abstenir là où la loi oblige à agir* » (Yves MAYAUD, Droit pénal général, 7ème Ed., §177).

Il importe alors de se référer « *aux formules* » et à la « *terminologie [souvent] expressive et porteuse* » des textes d'incrimination, pour en respecter la destination, cette classification entre action et omission procédant de la détermination par le législateur « *dans sa souveraineté et au nom des contraintes qui pèsent sur lui en termes de légalité et de prévisibilité, [du] type de comportement [qui] mérite d'être pris en compte pour une infraction déterminée* » (*Ibid*, §178).

Le principe de légalité proscrit en effet toute assimilation d'un comportement d'omission à un comportement d'action.

Comme l'explique la doctrine autorisée :

> « *Il n'est […] pas d'action par omission, ni d'infraction de commission par omission. L'action se comprend techniquement, et non pas génériquement. Elle n'est pas synonyme de tout comportement, mais d'un comportement positif,* ce qui interdit de voir une action ou une commission au sens pénal du terme là où le résultat de l'infraction est atteint par une omission. *Qu'elles soient d'action ou d'omission, du fait même de la* nécessité d'avoir à les appliquer dans le sens voulu par le législateur, *les infractions invitent à une lecture attentive des textes. Les inconduites se partageant entre les deux modalités,* il importe de se convaincre, cas par cas, de la matérialité engagée, et de faire des applications conformes à ce que la loi contient de référence à l'une ou à l'autre, *voire aux deux.* Le respect de la légalité passe par cette approche de l'incrimination, afin de ne rien trahir de la version juridiquement consacrée. *L'interprétation de la loi pénale se présente ainsi comme un enjeu d'importance dans la distinction des infractions d'action et des infractions d'omission. Elle est la gardienne de ce qui les sépare, et contribue à marquer leur autonomie* » (*Ibid.*, §183).

De l'exégèse de l'article 421-2-2 du code pénal, il ressort incontestablement que le délit de financement d'entreprise terroriste constitue une infraction d'action.

Comme rappelé, ce texte incrimine limitativement le fait de fournir des fonds, valeurs ou bien quelconque, de les réunir, de les gérer, ou de donner des conseils à cette fin.

**Autant d'actes positifs excluant tout comportement d'omission.**

28

Il n'est d'ailleurs pas vain de souligner que le texte lui-même insiste sur le fait que chacune de ces modalités de financement constitue « *un acte de terrorisme* ».

Cette référence expresse à la notion d'acte exclut de plus fort la caractérisation du délit dans l'hypothèse d'une simple omission.

Dans le même sens d'ailleurs, il faut souligner que cet article, au sein du Titre II intitulé « *du terrorisme* », a été inséré dans le chapitre Ier nommé « *Des actes de terrorisme* ».

C'est au demeurant ce que corroborent les travaux préparatoires de la loi n° 2001-1062 du 15 novembre 2001, aux termes desquels l'article 421-2-2 a été introduit dans le code pénal, le député Bruno LEROUX déclarant sans détours, à propos de l'amendement discuté, que celui-ci « *institue une incrimination spéciale de l'acte de financement d'une entreprise terroriste* » (B. LEROUX, Rapport n° 3352 enregistré le 24 octobre 2001, p. 15).

La terminologie choisie par le législateur est dépourvue de toute équivoque quant à son intention de faire de ce délit une infraction d'action et, réciproquement, d'exclure toute condamnation à raison d'un comportement d'abstention.

C'est précisément ce que confirment les magistrats instructeurs lorsqu'ils retiennent, pour justifier la démise en examen de Eric OLSEN – alors poursuivi de ce chef – que si l' « *on peut légitimement considérer […] qu'il disposait d'informations sur les conditions du maintien de l'activité, […] les investigations accomplies […] n'ont pas en l'état confirmé que ce dernier avait pu commettre* **des actes positifs intentionnels** » (**D1514/2**).

Or, en l'espèce, l'analyse de la prévention révèle qu'**aucun acte positif n'est reproché à Bruno LAFONT**.

Comme rappelé, ce dernier s'y voit reprocher le fait d'avoir « *autorisé la poursuite d'activité de la cimenterie exploitée par LCS* ».

Pour autant, la lecture des motifs de l'ordonnance de renvoi – à l'aune desquels il convient nécessairement d'interpréter la prévention avec lesquels elle fait corps – démontre que ce <u>qui est en réalité reproché à Bruno LAFONT ne tient pas à la délivrance d'une consigne tendant à la continuité de l'activité, mais bien à l'absence de délivrance de consigne d'arrêt de l'activité</u>.

Il y est en effet affirmé, pour justifier le renvoi de Bruno LAFONT du chef de financement de terrorisme :

> « *Christian HERRAULT soutenait l'avoir informé du principe des paiements aux groupes armés dès le mois d'octobre 2012, puis lui avoir fait part de l'apparition de l'Etat islamique « dans le paysage » en octobre 2013,* **sans jamais recevoir d'instruction de fermeture** » (Ordonnance de renvoi, p. 244, §2).

Expressément, c'est l'absence « *d'instruction de fermeture* » - soit une abstention – qui apparaît reprochée à Bruno LAFONT.

Or, comme démontré, le financement d'entreprise terroriste, tel que défini par l'article 421-2-2 du code pénal, constitue exclusivement et expressément une infraction d'action.

A ce titre encore, et à plus forte raison, la relaxe de Bruno LAFONT de ce chef s'impose.

29

## SECONDE PARTIE : LA PREVENTION N'EST PAS FONDEE EN FAIT

Ainsi qu'il mérite d'être rappelé, Bruno LAFONT est renvoyé devant le Tribunal pour avoir prétendument commis les faits suivants :

> « *sur le territoire national et de manière indivisible en Syrie, courant 2013 et jusqu'au 19 septembre 2014, en tout cas depuis temps non couvert par la prescription dans le cadre de ses fonctions de président directeur général de Lafarge SA contrôlant sa filiale syrienne LCS, participé au financement d'entreprises terroristes, en fournissant, réunissant, gérant des fonds, valeurs ou biens quelconques, ou en donnant des conseils à cette fin, <u>dans l'intention de voir ces fonds utilisés ou en sachant qu'ils étaient destinés à être utilisés</u>, en tout ou partie, en vue de commettre des actes de terrorisme, indépendamment de leur survenance, au profit des entités terroristes Ahrar al-Sham, Jabhat al-Nosra et État islamique en Irak et au Levant devenu Etat islamique, en l'espèce notamment en autorisant la poursuite d'activité de la cimenterie exploitée par LCS, alors qu'il était seul habilité à y mettre fin, <u>en conscience que cette exploitation supposait notamment des paiements de sécurité convenus au profit de ces entités terroristes, la rémunération de fournisseurs opérant depuis les zones tombées sous leur contrôle, et d'intermédiaires avec ces groupes</u>* ».

Bruno LAFONT n'a pourtant pu avoir « *conscience que [l']exploitation [de l'usine] supposait* » l'existence de paiements effectués à des groupes terroristes dans la mesure où il n'en a jamais eu connaissance. L'élément intentionnel requis par la loi faisant défaut, la relaxe s'impose pour cette seule raison (**II**).

L'élément matériel n'est pas davantage caractérisé. En effet, à supposer même que le Tribunal estime qu'une autorisation de maintien d'une usine en activité entre dans le champ d'application de l'infraction, une telle autorisation fait défaut en l'espèce, étant en outre précisé que Bruno LAFONT n'était pas le seul à pouvoir ordonner la fermeture de l'usine (**III**).

Cette poursuite répond selon l'accusation à un mobile financier qui aurait, s'agissant de Bruno LAFONT, conduit à autoriser le maintien de l'usine en connaissance de ces agissements infractionnels, mobile qu'il convient d'écarter d'emblée tant il est dénué de fondement (**I**).

### I.    A titre liminaire : l'inexistence d'un quelconque mobile financier

Si le contenu de la procédure comme le déroulement des débats démontrent que Bruno LAFONT n'avait pas connaissance des paiements incriminés, ce qui rend la poursuite totalement infondée, celle-ci repose de surcroit sur un prétendu mobile dénué de toute consistance.

L'ordonnance de renvoi devant le tribunal correctionnel, usant d'une formule très évasive et commune à tous les prévenus, énonce que « [l]*'ensemble des mis en examen ont, <u>dans une logique de recherche de profits pour l'entité économique qu'ils servaient, ou pour certains de profit personnel direct</u>, organisé, validé, facilité ou mis en œuvre une politique supposant de faire parvenir un financement aux organisations terroristes implantées autour de la cimenterie* » (**ORTC, p. 174**).

Dans son rapport de synthèse, le service enquêteur indiquait déjà sur ce point que « *le choix pour Monsieur LAFONT* » de « *cautionner des paiements à Daesh pour continuer l'activité* » aurait pu trouver sa source :

–  dans sa volonté affirmée d'éviter tout ce qui pouvait porter ombrage à la qualité de l'acquisition du groupe ORASCOM (initiateur de la construction de l'usine de Jalabiya) par LAFARGE en décembre 2007 ;

–  dans la soumission de Bruno LAFONT à des « *obligation de résultat* » l'amenant à s'opposer à toute décision susceptible d'impacter négativement le profit du groupe (**D2189/61**).

30

Cette thèse est, s'agissant de Bruno LAFONT, dénuée du moindre fondement.

**Ainsi qu'il le sera plus amplement développé, aucun élément du dossier, ni aucune déclaration effectuée lors de l'audience, n'indique, ni même ne suggère, que Bruno LAFONT se serait jamais opposé à une recommandation de ses subordonnés de fermer l'usine, *a fortiori* sur le fondement de quelconques considérations financières.**

Parmi les quelques courriels envoyés par Bruno LAFONT au sujet de la Syrie, les considérations financières ne sont d'ailleurs jamais évoquées. Par contraste, il est explicitement rappelé par l'intéressé : « *Aucun compromis n'est possible sur la sûreté* » (**D391-3/BLA/E3 ; *cf infra***).

Il est d'ailleurs acquis qu'à partir de 2012, l'usine syrienne a été fréquemment arrêtée, parfois pour de longues périodes, ce qui n'a jamais entraîné le moindre reproche de la part de Bruno LAFONT lorsqu'il en a été informé, toujours *a posteriori*.

En outre, et comme Bruno LAFONT l'a souligné notamment lors des débats, la rationalité économique et financière, qui occupait naturellement une place importante dans ses décisions n'était pas le critère déterminant pour les activités dans des pays en crise comme la Syrie dans lesquels, comme le dossier le confirme amplement, l'objectif était de maintenir l'activité tant que la sûreté et le respect des règles étaient assurés.

Enfin, la diversification de LAFARGE dans de nombreux pays lui permettait, dans l'hypothèse où ces impératifs ne pouvaient être respectés, de faire cesser l'activité en cause sans remettre en question la santé financière globale du groupe.

En tout état de cause, la thèse d'un maintien en activité de l'usine rendue obligatoire par des considérations économiques ne résiste pas à l'analyse.

> a. L'impact financier marginal de l'usine syrienne à l'échelle du groupe

Ainsi que l'a établi l'instruction et que l'ont confirmé l'ensemble des personnes entendues au fil de l'audience, le poids financier des opérations syriennes de LAFARGE n'était, à l'échelle du groupe, nullement significatif, que ce soit du point de vue :

- du chiffre d'affaires (45 millions d'euros en 2013 et 30 millions d'euros en 2014 pour LCS, soit respectivement 0,34% et 0,23% du chiffre d'affaires consolidé du groupe au cours de ces exercices[12]) (**D2001/54 et 57**) ;

- de l'EBITDA[13] (15 millions d'euros en 2013 et 11 millions d'euros en 2014, soit respectivement 0,53% et 0,4% de l'EBITDA consolidé du groupe au cours de ces exercices[14]) (**D2001/54 et 57**) ;

---

[12]  A savoir 13,1 milliards d'euros en 2013 et 12,8 milliards d'euros en 2014, d'après le rapport financier annuel de LAFARGE pour l'exercice 2014.

[13]  *Earnings before interests, taxes, depreciation and amortization*, correspondant en substance en France à l'excédent brut d'exploitation.

[14]  Rapport financier annuel de LAFARGE pour l'exercice 2014.

31

- du résultat net, puisque LCS était structurellement déficitaire (**D2001/156 et 159**), alors que le résultat net ajusté du groupe s'est élevé à 384 millions d'euros en 2013 et 423 millions d'euros en 2014[15]

- de la valeur des actifs (2% du bilan du groupe) et de la dette liée (3% de la dette totale au maximum) ;

- de la capacité industrielle (s'agissant d'une usine dont la capacité de production annuelle de ciment était de 2,6 millions de tonnes (**D232/3 et 4, D587/10**), largement inférieure, pour ne reprendre que les pays de la zone Moyen-Orient et Afrique, à celle des Émirats Arabes Unis, de l'Afrique du Sud, de la Jordanie, de l'Irak, de l'Algérie, du Nigéria ou encore du Maroc, et représentant environ 1% de la capacité de production du groupe)[16] (**D1218/3, D1267/25**).

C'est à l'aune de ces chiffres qu'au cours des débats, le 3 décembre 2025, Bruno LAFONT a rappelé que la situation financière de la Syrie n'avait jamais été un « *élément moteur* » des décisions du groupe LAFARGE, le résultat y étant « *tout petit* ».

Ce constat est partagé par l'ensemble des dirigeants du groupe – y compris ceux qui n'ont jamais été mis en cause dans le cadre de la présente instruction.

Il en va ainsi, par exemple, de Jean-Claude BLOCK, directeur Finance opérations (**D1067/2**) ou encore de Jean-Jacques GAUTHIER, directeur financier (**D1062/1 et D1069/4**).

L'avis des membres du conseil d'administration était exactement le même : ainsi de ceux de Nassef SAWIRIS (**D1096/2-3**), Gérard LAMARCHE (**D875/17**), Philippe CHARRIER (**D1954/4**), Bertrand COLLOMB (**D1393/12**) ou encore Oscar FANJUL (**D1958/5**), ce dont témoigne encore le fait que la Syrie n'était pratiquement jamais mentionnée lors des conseils d'administration (**D638/12-20, D639/20 et D675**).

Même en prenant en compte, comme se sont plus à le faire les enquêteurs (**D2189/61**), l'opportunité commerciale qu'aurait constitué une hypothétique « *reconstruction du pays* » à un horizon indéterminé, celle-ci n'aurait pas été entravée par une fermeture du site *sine die*, pour le rouvrir le cas échéant le moment venu.

### *b.* Le caractère non significatif de la dette de LCS à l'échelle du groupe

S'agissant spécifiquement de l'endettement généré par la construction de l'usine syrienne, Nicolas VANIER, responsable du financement externe au sein de LAFARGE de 2008 à 2015, a indiqué que le montant de la dette portée par LCS à hauteur de 340 millions « *ne représent*[ait] *pas un montant très significatif à l'échelle du Groupe (dont la dette était de mémoire 16 milliards) mais faisait partie des dettes externes des filiales les plus importantes* » (**D1418/3**).

Comme l'a précisé Bruno LAFONT lors des débats, l'endettement du groupe, qui excédait effectivement 16 milliards d'euros en 2008, a été progressivement réduit pour atteindre environ 10 milliards d'euros en 2013 (soit une baisse de près de 40%).

---

[15]    Rapport financier annuel de LAFARGE pour l'exercice 2014.

[16]    Document de référence de LAFARGE pour l'année 2011, p. 35 à 37.

A l'échelle du groupe, le fait que la dette de LCS figure parmi les dettes externes les plus importantes des filiales n'a pas de signification particulière, au sens où cette situation ne créait pas pour LAFARGE de risque systémique spécifique.

Seul importait en effet le fait qu'en cas d'exigibilité anticipée ou d'appel en garantie du groupe, ce dernier soit en mesure de régler les sommes dues sans mettre à mal son équilibre financier, ce qui a effectivement été le cas.

L'importance relative de la dette de LCS témoigne simplement de ce que l'activité de cette filiale était en démarrage au moment où les troubles syriens ont éclaté, de sorte qu'elle n'avait pas encore été en mesure d'en rembourser une part significative.

C'est la raison pour laquelle Bruno LAFONT a pu indiquer de manière catégorique à l'audience, sans être contredit, que la possibilité d'un remboursement anticipé de la dette de LCS n'était « *absolument pas* » entrée en ligne de compte dans la décision de maintenir ou de faire cesser l'activité de l'usine.

Ainsi que l'a utilement rappelé à l'audience Bernard KASRIEL, ancien cadre dirigeant de LAFARGE cité comme témoin par Christian HERRAULT, la dépréciation d'actifs accompagnant la fermeture d'une usine ou la cessation des activités est une écriture comptable, qui n'a strictement aucun impact sur le montant de la dette.

S'agissant du montant de la dépréciation à enregistrer à la suite de l'évacuation de l'usine, celui-ci a été fixé, comme cela était la règle en la matière, par la direction financière de LAFARGE et validé par son comité d'audit.

Aucun élément ne permet de retenir la moindre implication ni la moindre influence de Bruno LAFONT dans ce processus.

La fixation du montant en cause s'est effectuée – comme la loi le requiert – via analyse dite « prudente » de la situation (c'est-à-dire ne prenant pas pour seule hypothèse la reprise assurée, ou au contraire l'absence absolue de toute possibilité de reprise, des activités de l'usine).

Les investisseurs ont été dûment informés de cette dépréciation et de ses conséquences dans le rapport annuel 2014, ce dernier indiquant sur ce point :

- d'une part, que « *le résultat net part du Groupe est ressorti à 143 millions d'euros en 2014 et est affecté par différents éléments non récurrents : – une dépréciation d'actifs de 385 millions d'euros, notamment liée à la situation actuelle en Syrie* » ; et

- d'autre part, qu'il ne s'agissait là que d'un élément parmi d'autres, qui n'avait donc pas vocation à impacter matériellement la valeur de l'action LAFARGE : « *en excluant l'impact de ces éléments non récurrents, le résultat net ressort en hausse de 10 % sur l'année, passant de 384 millions d'euros à 423 millions d'euros en 2014. Ce chiffre reflète la croissance organique, une progression des résultats de nos coentreprises, notamment au Royaume-Uni, ainsi que la réduction des frais financiers qui ont plus que compensé l'impact négatif des effets de périmètre et des taux de change* »[17].

---

[17]      Lafarge, *Document de référence 2014*, 23 mars 2015, **p. 61**, disponible en ligne.

33

        *c.*    <u>L'absence de conséquence de la dégradation de la situation syrienne comme de la fin de l'activité de l'usine de Jalabiyah sur la santé financière de LAFARGE et sur la fusion avec HOLCIM</u>

Aucune critique n'a jamais été formulée par quiconque, notamment par les administrateurs du groupe ou ses actionnaires, à l'endroit de Bruno LAFONT, concernant la Syrie :

- ni au moment où l'activité syrienne a commencé à être identifiée comme une unité génératrice de trésorerie susceptible de dépréciation, à compter de l'année 2011, comme cela est mentionné dans le document de référence de LAFARGE de cet exercice (**D1175/2**) ;

- ni au moment où l'usine a été effectivement fermée, au mois de septembre 2014 (**D1267/26, D818/11**).

Comme l'a synthétisé Jérôme GUIRAUD, membre du conseil d'administration de LAFARGE, lequel ne fait, à l'instar de tous les autres administrateurs d'alors, l'objet d'aucune poursuite, « *la Syrie n'était pas un enjeu financier* » (**D1218/3**).

A l'audience, Bernard KASRIEL a confirmé l'absurdité que constituait, de son point de vue, la thèse d'une poursuite de l'activité de l'usine guidée par des motifs financiers :

        « [La Syrie] *c'est 3 millièmes du RBE* [résultat brut d'exploitation] *du groupe LAFARGE, on ne poursuit pas une exploitation risquée pour ça* ».

Pour les mêmes raisons, alors que la fermeture de l'usine est intervenue en plein processus de fusion entre LAFARGE et HOLCIM, laquelle avait été rendue publique en avril 2014, cet évènement n'a en rien entravé sa finalisation en 2015.

La fermeture et la dépréciation subséquente de valeur résiduelle de l'usine n'ont même eu <u>aucune conséquence</u> sur la parité de fusion convenue avec HOLCIM (**D1122/6, D1267/24**), le sujet n'ayant pas même été évoqué au cours des négociations, ainsi que l'ont confirmé plusieurs administrateurs de LAFARGE (**D639/27, D640/36**).

D'ailleurs, comme l'a relevé Bernard KASRIEL, aucun des nombreux rapports d'étude financière portant sur l'action LAFARGE parus à l'époque des faits ne fait mention de la Syrie.

Du point de vue des investisseurs et actionnaires institutionnels, en effet, le principal critère d'évaluation de la performance et de l'attractivité du groupe réside non dans le résultat opérationnel d'une unité marginale comme la Syrie, mais dans l'évolution globale du cours de bourse de LAFARGE, lequel s'est apprécié en passant de 28 euros en janvier 2012 à 65 euros en mars 2015.

Du point de vue de la stricte rationalité économique et financière, rien ne pouvait ainsi justifier pour le dirigeant du groupe de faire courir un tel risque à ce dernier.

Et à l'inverse, maintenir l'activité syrienne en sachant qu'elle impliquait des versements illégaux à des entités terroristes aurait de toute évidence fait courir à LAFARGE – ainsi qu'à la fusion en cours avec HOLCIM – un risque considérable que Bruno LAFONT n'aurait jamais pris.

34

*d.* L'absence de tout intérêt financier personnel de Bruno LAFONT au maintien de l'usine syrienne en activité

Bien que cette thèse n'ait jamais été avancée au cours de l'instruction, certaines questions posées lors des débats ont pu laisser entendre que Bruno LAFONT aurait eu un intérêt financier direct au maintien de l'usine syrienne, lié à sa rémunération.

Il n'en est évidemment rien.

Il sera d'abord relevé qu'une telle thèse n'est, à nouveau, appuyée par aucun échange ni aucune déclaration du dossier.

Par ailleurs, la rémunération de Bruno LAFONT, qu'elle soit fixe ou variable, ainsi que les rémunérations exceptionnelles dont il a pu bénéficier, étaient exclusivement déterminées par le conseil d'administration hors sa présence, et sans la moindre demande ou négociation de sa part.

Bruno LAFONT a d'ailleurs précisé lors des débats qu'il n'avait perçu de rémunérations exceptionnelles que dans le cadre de la réussite d'opérations d'une importance majeure pour le groupe, telles que des transactions stratégiques ou des restructurations significatives, et jamais en lien avec la performance d'une seule unité opérationnelle, *a fortiori* marginale comme la Syrie.

S'agissant ainsi de la rémunération exceptionnelle perçue en 2012, elle résultait de la réorganisation du groupe autour des pays, sans aucun lien avec la performance d'une unité opérationnelle particulière.

Cette réalité exclut par principe que le maintien en activité de l'usine de Jalabiyah ait pu constituer, pour lui, un quelconque levier de rémunération personnelle.

A tous points de vue, le mobile lucratif avancé par l'accusation ne résiste pas à l'analyse.

*****

En revanche, la valeur toute relative de l'usine syrienne à l'échelle du groupe, loin de justifier une volonté aveugle de maintien chez les dirigeants de LAFARGE SA semble avoir conduit à une attention moindre.

En ce sens notamment, Jean-Jacques GAUTHIER, directeur financier du groupe a fait état de « *procédures de contrôle allégées* » concernant LCS(**D1701/2**).

C'est ce qu'explique également Arnaud PLANTA, commissaire aux comptes chez DELOITTE, qui désigne la filiale syrienne comme « *hors scope, [par opposition aux entités critiques ou significatives]* », à raison de ses « *chiffres insignifiants* » (**D1124/2**).

Interrogé sur la nature des travaux qu'il effectuait sur cette entité, il répond : « *c'était hors scope donc cela veut dire que l'on ne fait rien. On ne rend même pas d'instruction on ne fait rien* » (**D1124/2**).

Frédéric GOURD, également commissaire aux comptes chez Deloitte, explique quant à lui qu'étant « *un tout petit pays* », la Syrie « *n'était pas auditée pour les besoins des comptes consolidés du groupe Lafarge* » (**D1115/3**).

C'est encore en soulignant que la Syrie « *n'avait pas d'objectifs* » (**D1607/4**), qu'elle « *n'était pas un enjeu* » (**D1607/2**), et « *n'avait pas d'impact – 10 millions d'euros de résultat ou zéro, ce n'est rien* » - pour le groupe, que Jean Claude BLOCK, directeur finance des opérations à compter de 2013, affirme que ce pays n'« *était pas dans [s]on radar* » (**D1607/2**).

35

A cet égard, il précise : « *la Syrie était un peu hors scope. Il n'y avait pas d'interlocuteurs là-bas. On ne m'a jamais demandé d'analyser la situation là bas* » (**D1607/2**).

Plus encore, il apparait que la faible valeur de l'usine syrienne a non seulement induit des procédures de contrôle allégées – par les contrôleurs internes autant que par les contrôleurs externes - mais aussi une absence totale de préoccupation quant à la consistance de ce contrôle.

Comme l'explique Valérie BAZIN, directrice du contrôle et de la consolidation :

> « *Le chiffre d'affaire des pays présentant d'une part un faible niveau de contrôle interne et d'autre part un niveau de contrôle interne satisfaisant était totalisé, et si le pourcentage des pays présentant un niveau contrôle interne satisfaisant était supérieur, globalement à 70 % ou 80 %, je ne sais plus, Le niveau de contrôle interne pour le Groupe était considéré comme satisfaisant. Par conséquent, si les petits pays comme la SYRIE étaient classés comme présentant un niveau de contrôle interne faible, ça ne mettait pas en cause le niveau de contrôle interne du Groupe, pour des raisons de matérialité de leur chiffre d'affaires (et donc de l'impact possible sur les résultats du Groupe)* » (**D1425/2**).

Si ces considérations achèvent de convaincre de l'absence d'un quelconque mobile financier, celles-ci semblent en revanche permettre d'expliquer l'absence de détection, et donc de remontée d'information vers le groupe d'éventuelles irrégularités dans la gestion de cette usine syrienne.

## II.     Intentionnalité : Bruno LAFONT n'a pas eu « *conscience que cette exploitation supposait notamment des paiements de sécurité convenus au profit de ces entités terroriste* »

La poursuite contre Bruno LAFONT repose sur l'idée selon laquelle il aurait été informé ou ne pouvait ignorer, en sa qualité de PDG, l'existence des paiements litigieux visés par l'ordonnance de renvoi.

Cette connaissance ou cette conscience constituerait l'élément intentionnel de l'infraction de financement de terrorisme.

Or, il sera démontré que :

- l'organisation du groupe en tant que telle ne permet nullement de <u>présumer</u> une quelconque connaissance d'évènements infractionnels intervenus dans le cadre du fonctionnement d'une filiale dans un pays étranger (**A**) ;

- les éléments du dossier mis en avant par l'accusation ne rapportent <u>pas</u> la <u>preuve</u> d'une telle connaissance (**B**) ;

- au contraire une analyse objective et approfondie du dossier et de faits objets de la prévention <u>excluent</u> que Bruno LAFONT ait été informé de l'existence de ces paiements décidés et organisés dans le cadre d'une gestion confidentielle par ses subordonnés (**C**).

### A.   <u>La structuration du groupe LAFARGE SA dans lequel Bruno LAFONT occupait la fonction de PDG, exclusive de toute présomption de connaissance des agissements visés à la prévention</u>

Bruno LAFONT est poursuivi « *dans le cadre de ses fonctions de président directeur général de Lafarge SA contrôlant sa filiale syrienne LCS* ».

36

Il convient d'exposer brièvement en quoi consistent ces fonctions de PDG (**2**), dans un groupe tel que LAFARGE SA ayant une activité de cimentier présentant certaines spécificités (**1**) et de rappeler la place de la filiale syrienne LCS dans cette organisation (**3**).

### 1. <u>Un groupe à rayonnement mondial, structuré en considération des spécificités de l'activité de cimentier</u>

Au sein des sociétés du « CAC 40 », le groupe LAFARGE était reconnu comme l'un des plus beaux exemples d'exportation de l'industrie française à travers le monde.

C'est ainsi que son activité regroupait 64.000 collaborateurs dans 1.636 sites de production répartis dans 62 pays, pour un chiffre d'affaires consolidé supérieur à 15 milliards d'euros en 2013.

En outre, l'implantation de l'industrie lourde de LARFARGE se devait d'être complète dans chacun de ces pays : il n'est en effet pas envisageable de produire du ciment autrement que « sur place », étant données les contraintes liées à la fois à la fabrication (les matières premières lourdes ne peuvent provenir que d'une carrière à proximité directe) et au transport (produit fini particulièrement lourd et donc coûteux à déplacer).

L'approvisionnement d'un même pays en ciment nécessitait donc la construction et l'exploitation, sur son propre territoire, d'une ou plusieurs usines de production (par exemple, Christian HERRAULT avait sous sa charge 40 cimenteries pour une quinzaine de pays (**D1231/10**)) et, de ce fait, un investissement matériel et humain conséquent, qu'il convenait de répliquer pour chacun des sites d'implantation.



La carte des implantations de Lafarge dans le monde au 31 décembre 2013 (usines et bureaux commerciaux).

Cette présence de LAFARGE dans plus de 60 pays, soit un tiers du globe, à l'époque des faits se répercutait évidemment dans le mode d'organisation et de direction du groupe.

### 2. <u>La place et les fonctions du PDG</u>

Chaque jour de la semaine, le groupe produisait près de 450.000 heures-homme de travail (7 heures x 64.000 collaborateurs), soit autant de problématiques et de sujets nouveaux, et sans aucune interruption du fait de la présence sur tous les continents.

37

Face à une telle réalité, le PDG doit s'astreindre à jouer un rôle précis et spécifique, à la tête d'une structure particulièrement organisée et hiérarchisée, divisée en directions et composée de nombreuses filiales.

> Henri LACHMANN, auditionné en qualité de témoin lors de l'audience (jeudi 4 septembre), expliquera ainsi que, dans son expérience d'ancien dirigeant de Schneider Electric, le PDG d'un groupe de cette ampleur est en réalité « *le véritable DRH de l'entreprise* », son rôle étant fondamentalement, dans un premier temps, de définir la stratégie du groupe puis, dans un second temps, de choisir les hommes et femmes qui auront, contrairement à lui, la charge de sa mise en œuvre au sein des différentes activités et filiales du groupe.
>
> Une telle analyse du rôle si particulier du PDG n'est évidemment pas propre à Bruno LAFONT ou Henri LACHMANN. Par exemple, celle-ci était encore récemment partagée par le dirigeant d'AXA, Thomas BUBERL, dans un entretien à destination du grand public[18], qui ne fait que reprendre avec d'autres termes l'observation de Henri LACHMANN selon laquelle « *un PDG ne peut* » et, surtout, « ***ne doit*** » pas tout savoir.

### 2.1 Les fonctions propres de Bruno LAFONT en qualité de PDG

Le rôle du PDG Bruno LAFONT consistait en substance à connaitre et à traiter les nombreux sujets systémiques et stratégiques pour LAFARGE, c'est-à-dire susceptibles d'affecter le groupe dans son ensemble, par opposition aux autres sujets qui se posaient quotidiennement dans le cadre des activités des différentes directions (financière, juridique, ressources humaines, sûreté…), mais également sur un terrain plus opérationnel, des nombreuses filiales.

Les compétences et missions propres à Bruno LAFONT répondaient à une triple orientation :

*(i)     Vers l'actionnariat :*

En tant que dirigeant professionnel (non-actionnaire), Bruno LAFONT devait rendre des comptes aux actionnaires de LAFARGE, à travers notamment le conseil d'administration, composé 18 membres, qu'il présidait.

Il revenait à la collégialité du conseil d'administration de déterminer les orientations et objectifs du groupe, à partir des propositions de son président Bruno LAFONT.

A l'époque des faits, LAFARGE comptait deux grands groupes d'actionnaires familiaux, qui avaient fait le choix fort de se représenter eux-mêmes au conseil d'administration :

- le « Groupe Bruxelles Lambert » (GBL), propriété conjointe de la famille FRÈRE (Belgique) et DESMARAIS (Québec), qui disposait en 2014 de 29,3% des droits de vote de LAFARGE et de trois administrateurs : *(i)* Paul Desmarais, Jr. en personne et *(ii)* les deux dirigeants de GBL, Ian Gallienne et Gérard Lamarche ; et

- « NNS Holding », détenue par Nassef SAWIRIS (propriétaire du groupe ORASCOM avant sa cession à LAFARGE), qui disposait en 2014 de 19,4% des droits de vote de LAFARGE et de deux administrateurs : *(i)* Nassef Sawiris en personne et *(ii)* le CEO du groupe ORASCOM, Jérôme Guiraud.

---

[18]     https://youtu.be/J0MwHFZaiSU?si=uOxuWpqYS-grStA5 : « *Un bon CEO c'est le CEO qui comprend bien son rôle. Son rôle n'est pas d'être le micro-manageur et le meilleur expert de l'entreprise. Le CEO c'est le 'Chief Engagement Officer', ou le 'Chief Excitement Officer', on est là pour [impliquer] ces gens, on est là pour aider ses collaborateurs à s'exprimer, pour donner le meilleur. Et pas pour les contraindre et pour micro-manager* ».

L'une des fonctions essentielles de Bruno LAFONT était donc de traiter personnellement et assidûment avec ces propriétaires de l'entreprise, lesquels se révélaient être des administrateurs particulièrement attentifs et rigoureux – dès lors qu'il s'agissait pour chacun d'eux de gérer et développer, en accès direct, l'un de leurs actifs familiaux les plus stratégiques.

Au-delà de ces acteurs de référence, Bruno LAFONT avait la charge de s'adresser au plus grand ensemble composé de la masse des actionnaires, petits porteurs et investisseurs potentiels, c'est-à-dire au marché. Cela impliquait, outre au moins deux « roadshows » par année pour le PDG, une communication financière constante et régulière, y compris via des rapports formels établis tous les trimestres.

C'est dans ce contexte particulièrement exigeant que, pendant près de 10 années, Bruno LAFONT a été renouvelé dans son mandat de président par ses co-administrateurs, représentants des actionnaires.

Chaque réunion du conseil d'administration et de ses différents comités (notamment celui d'audit) devait faire l'objet d'une préparation puis d'un suivi attentif, tout au long de l'année, sur l'ensemble des sujets complexes intéressant la définition et la mise en œuvre des orientations de l'activité du groupe.

> (ii)    *Vers les partenaires extérieurs :*

En tant que directeur général de LAFARGE, Bruno LAFONT était également chargé de la représentation du groupe vis-à-vis de ses partenaires stratégiques, ce qui impliquait pour lui des voyages très fréquents à travers le monde afin de rencontrer des partenaires commerciaux (très grands comptes clients et fournisseurs stratégiques), financiers (banques et créanciers) ou encore étatiques et gouvernementaux (dirigeants politiques, communautés locales).

Bruno LAFONT était ainsi régulièrement amené à voyager plusieurs fois dans une même semaine. Ainsi par exemple, simplement entre le lundi 1er septembre et le vendredi 12 septembre 2014, Bruno LAFONT a pour des raisons professionnelles passé 2 jours à Londres, passé 3 jours sur la côte ouest américaine (avec une journée de voyage aller et retour) et devait passer 2 jours en Indonésie (déplacement finalement annulé du fait d'autres obligations imposées par le processus de fusion en cours, cf. *infra*).

> (iii)    *Vers le groupe lui-même :*

Enfin, les domaines non délégués incluaient notamment pour le PDG :
- La détermination et l'évolution du mode d'organisation du groupe (ce dernier ayant notamment été modifié en profondeur en 2012), la fixation des objectifs et leur suivi (un organigramme, des délégations, des politiques et des règles, des systèmes de suivi et de contrôle) ;
- La répartition des tâches entre les collaborateurs et le suivi de l'efficacité de l'organisation ;
- Les décisions ne relevant pas du conseil d'administration et non déléguées, conformément aux règles d'approbation du groupe (**D527/21 à 55**) : acquisitions, augmentations de capital, investissements ou désinvestissements supérieurs à 25 millions d'euros ainsi que leur suivi, nomination des N-1 et N-2 ;
- La politique, la stratégie et le budget du groupe ;
- La présidence du conseil d'administration et du comité exécutif, ainsi que celle du comité des carrières (nominations aux postes importants et suivi des potentiels) ;
- La conception, le lancement et le suivi des projets « groupe » ;
- La représentation, la communication du groupe ;
- Des visites des opérations sur les sites de production.

En outre, Bruno LAFONT siégeait en parallèle aux conseils d'administration *(i)* d'EDF (chiffre d'affaires d'environ 70 milliards d'euros en 2014) et *(ii)* d'ArcelorMittal (chiffre d'affaires d'environ 80 milliards de dollars en 2014), deux entreprises dans la direction et orientation desquelles il était donc également activement impliqué.

A l'époque des faits, Bruno LAFONT s'est de surcroit trouvé absorbé par les négociations en vue de la fusion avec HOLCIM, alors considérée comme l'une des plus importantes de la décennie dans le monde (pour une valeur de marché annoncée de 60 milliards de dollars).

Entamées à la fin de l'année 2013, ces négociations avaient donné lieu à une annonce en avril 2014, la fusion n'étant finalisée qu'au mois de juillet 2015.

> La réalisation d'une opération boursière d'une telle ampleur, qui compte parmi les projets les plus complexes et laborieux du monde industriel moderne, suppose une implication extrêmement soutenue de la part des dirigeants des entreprises concernées et de leurs conseils (plusieurs dizaines de milliers d'heures de travail en cumulé).
>
> C'est ainsi que, par exemple, Bruno LAFONT expliquait début septembre 2014, en plein processus de mise en œuvre juridique de la fusion, que « *the number of tasks created by our merger process with HOLCIM create a true challenge for my agenda* » (**D3156/130**).

Les tâches propres de Bruno LAFONT étaient ainsi, à elles seules, très significatives, et se traduisaient par un emploi du temps extrêmement chargé (**D3156**).

En témoigne cette demande de Bruno LAFONT à son assistante pour une simple période de 3 jours entre deux avions (mercredi 10, jeudi 11 et vendredi 12 septembre 2014) :

> « *Si je ne vais pas en Indonésie, ce que je déciderai lundi [8 septembre], je souhaite garder un agenda [du 10 au 12 septembre] le plus libre possible pour voir les personnes ou participer aux réunions suivantes.*
> *Il me faudrait être disponible pour un Divco additionnel le mercredi ou le jeudi.*
> *Je souhaite voir Artinien, Kuperfarb, OLSEN, Rocca et si possible Gauthier ensemble le mercredi ou le jeudi en prévision de l'intégration Committee de vendredi à Zurich (1 à 2 heures)*
> *Je veux avoir une réunion avec Berthier, Claret et Meaney le mercredi ou le jeudi (1 à 2 heures)*
> *Je souhaite préparer Sitges le vendredi.*
> *J'ai besoin de temps avec Alexandra prévoir deux fois 45 mn.*
> *Je souhaite voir Hoddinott et les EVPOs individuellement (30 à 60 mn chacun)*
> *Je souhaite avoir un RV avec Sonia ARTINIAN le mercredi ou le jeudi (1h)*
> *Si Luc Callebat est là, prévoir 30 mn le vendredi.*
> *Enfin il me fait un RV de deux heures avec Jean Desazars.*
> *N'acceptez rien d'autre sans m'en parler, laissez moi du temps pour arriver au bureau mercredi [atterrissage à Paris à 11h25 après un vol de nuit depuis Los Angeles], et laissez des temps libres. Bref c'est très simple et je vous remercie d'organiser tout cela au mieux* » (**D3156/131**).

Dans ce cadre, la transmission d'informations s'opérait de manière privilégiée par oral, les collaborateurs de Bruno LAFONT étant informés que ce dernier ne pouvait pas lire systématiquement la masse de courriels dont il était destinataire et encore moins ceux qu'il recevait « en copie ».

2.2 L'impératif de délégation

Une telle organisation, dans ce groupe du CAC 40 comme dans d'autres, repose nécessairement sur une très forte logique de délégation en chaîne au profit de collaborateurs très qualifiés, et de confiance (les directeurs généraux adjoints opérationnels comme Christian HERRAULT, les directeurs de fonction comme Jean-Claude VEILLARD, les patrons de pays comme Bruno PESCHEUX, *etc.*), qui imposent au PDG comme aux autres cadres dirigeants de concentrer leurs efforts sur les tâches non déléguées.

Conformément aux pratiques de marché, Bruno LAFONT s'était d'ailleurs assuré, avec l'assistance de la direction juridique et des conseils externes du groupe, que des délégations de pouvoir, formelles, écrites et particulièrement détaillées, soient conclues avec ses collaborateurs directs : Guillaume ROUX (DGA performance), Tom FARRELL (DGA Opérations), Jean-Carlos ANGULO (DGA Opérations), Christian HERRAULT (DGA Opérations) (**Pièce n°4**), Bi Yong CHUNGUNCO (DJ), Gérard KUPERFARB (DGA Innovation), *etc.* (Délégations écrites transmises au Tribunal par LAFARGE SA le 2 décembre 2015).

L'exposé des motifs de ces délégations énonce : « *au regard de la taille du groupe LAFARGE (ci-après le « Groupe »), de la diversité de ses activités et localisations, ainsi que de l'importance des effectifs employés, le Délégant estime nécessaire de déléguer certains des pouvoirs qu'il détient au sein du Groupe* ».

S'agissant, plus particulièrement, de la délégation consentie à Christian HERRAULT à compter du 20 décembre 2012, sous la « supervision » de Bruno LAFONT, celle-ci prévoyait notamment :

- que les pouvoirs en matière de sécurité et sûreté lui étaient délégués pour la Syrie et la quinzaine d'autres pays sous sa charge ;

- que Christian HERRAULT (pouvant lui-même « subdéléguer » ses pouvoirs en vertu de l'article II) devait faire appliquer et s'assurer, à l'aide des moyens financiers, humains et matériels qui lui étaient offerts (par exemple par la direction sûreté), de l'atteinte des objectifs du groupe dans ces matières, notamment en « *anticipant les risques [et] nouvelles contraintes* » , et ce toujours « *conformément aux disposition légales, réglementaires et conventionnelles applicables* » et « *dans le respect des politiques, règles et procédures du Groupe* » (art. III, 1) ;

- que Christian HERRAULT avait le « *devoir d'aviser à tout moment [Bruno LAFONT] des difficultés importantes qui seraient de nature à entraver le bon exercice* » de sa délégation (at. IV, 2), et avait expressément reconnu que « *sa responsabilité personnelle (notamment pénale) est susceptible d'être engagée en cas d'infractions à ces prescriptions et notamment celles en matière de santé, sécurité, environnement et sûreté* » (art. V, 3).

Au-delà même de la sécurité et sûreté, Christian HERRAULT avait accepté la charge de la « *supervision pour le Groupe des activités commerciales et industrielles* » et la « *bonne gestion* » de LCS, déchargeant dès lors Bruno LAFONT de ce suivi opérationnel.

Ce qui était vrai pour l'ensemble des filiales du groupe, chacune sous la responsabilité directe de l'un des DGA opérationnels.

41

> ➢ **Une organisation en outre marquée par une logique de délégation « pays »**

Dans cet esprit, une réforme importante de l'organisation LAFARGE, dans le sens d'une très forte décentralisation et autonomisation des pays, avait été mise en place selon une logique de délégation « par pays » à compter de l'année 2012, comme cela a été rapporté tout au long de l'instruction (**D232, D253, D260, D685, D975, D1603**, *etc.*) et confirmé par les différents intervenants lors de l'audience, à commencer par le témoignage de Bernard KASRIEL du mercredi 19 novembre.

Les directeurs adjoints opérationnels dits directeurs « région » (dont Christian HERRAULT) supervisaient ainsi eux-mêmes les directeurs « pays », dont ici Bruno PESCHEUX puis Frédéric JOLIBOIS pour la Syrie, lesquels avaient la charge d'une unité autonome avec leurs propres équipes fonctionnelles et opérationnelles.

Cette politique de décentralisation n'était, à nouveau, par une spécificité du groupe LAFARGE, comme Michel BON a par exemple pu en témoigner à l'audience le mercredi 19 novembre, s'agissant du groupe CARREFOUR dont il a assuré la direction et qui fonctionnait lui aussi selon un double principe de délégation décentralisée. Ou encore, en dehors de cette audience, comme l'a récemment exposé l'actuel dirigeant d'AXA dans un entretien à destination du grand public[19].

\*\*\*

Dans ce cadre particulièrement organisé et structuré, les DGA opérationnels, qui agissaient quotidiennement dans le cadre de leur délégation sans généralement avoir à solliciter l'avis ou l'autorisation du Président directeur général, avaient l'occasion de faire remonter les informations clés à ce dernier, le cas échéant pays par pays, à l'occasion d'entretiens individuels, généralement d'une durée d'une heure, organisés toutes les 4 à 6 semaines – outre la possibilité évidemment d'aller voir de manière ponctuelle Bruno LAFONT, dont la « *porte était toujours ouverte* » (**D1267/10**), lorsqu'il se trouvait à Paris.

Si besoin, ils pouvaient également le solliciter par téléphone ou courriel, sans toutefois avoir l'assurance – en l'absence de réponse – que leur message était bien passé.

---

Les dates des réunions régulières (4 à 6 semaines) entre Bruno LAFONT et Christian HERRAULT figurent sur l'agenda versé par le premier à l'appui de ses observations aux fins de non-lieu (**D3156/1**), lequel constitue une version plus à jour que celle versée par LAFARGE dans le dossier d'instruction (**D1705/39**).

Par exemple, la réunion initialement prévue entre Bruno LAFONT et Christian HERRAULT le vendredi 18 octobre 2013 a été annulée, du fait d'une convocation à un conseil d'administration d'EDF reçue par Monsieur LAFONT la veille (**Pièce N°5**), ce qui ressort de l'agenda fourni par Bruno LAFONT lui-même.

A cette période, les deux dirigeants se sont rencontrés le 2 puis 31 octobre 2013.

---

[19] https://youtu.be/J0MwHFZaiSU?si=uOxuWpqYS-grStA5 : « *C'est vrai, nous sommes une grande entreprise, mais nous sommes un ensemble de beaucoup de bateaux. C'est pas une entreprise qui est dirigée de ce siège [à Paris], ce siège donne la direction et c'est plein de petits bateaux dans des pays qui dirigent AXA. Nous avons une philosophie très décentralisée, la responsabilité principale est dans les pays, ce sont les pays qui dirigent parce que c'est eux qui sont les plus proches de nos clients, pas nous. Un problème résolu à l'endroit où le problème émerge c'est mille fois mieux qu'un problème résolu à 1.000 kilomètres de l'endroit. Oui l'entreprise est grande, mais il y plein de petites entreprises au sein d'AXA, qui suivent même cadre, qui suivent les mêmes valeurs, qui suivent les mêmes règles, mais c'est l'entreprise locale qui fait la différence* ».

42

*Les grandes directions fonctionnelles*

Aux côtés du PDG et de ses trois directeurs généraux adjoints opérationnels, se trouvaient au siège de LAFARGE les différentes directions fonctionnelles (direction financière, des ressources humaines, de la communication, *etc.*) – formant collectivement le comité exécutif – lesquelles pouvaient notamment être amenées à assister les équipes opérationnelles du groupe sur leurs problématiques spécifiques.

Elles avaient pour mission de mettre en place des politiques et règles au niveau du groupe, et d'émettre des recommandations selon leurs champs de compétence respectifs.

> ➢ La direction financière :

Sous la direction de Jean-Jacques GAUTHIER (DGA Finance), elle avait notamment la charge de préparer en amont tout le travail comptable et financier du Groupe, permettant le suivi des chiffres Groupe et menant *in fine* à la publication des comptes annuels.

Le rapport annuel était ainsi signé, d'une part, par Jean-Jacques GAUTHIER et, d'autre part, par Bruno LAFONT.

Comme il l'a expliqué lors de l'audience, Bruno LAFONT ne s'impliquait pas personnellement dans ce travail de préparation (il s'agissait là d'un travail de fond, nécessitant l'implication de collaborateurs dédiés, qu'il n'appartenait évidemment pas au PDG de mener) mais il lui revenait, en aval, d'apposer sa signature sur tous ces éléments chiffrés à l'échelle du groupe, en sa qualité de représentant de la société.

LAFARGE étant une société cotée, cette signature du PDG était la seule qui pouvait certifier au marché et aux investisseurs qu'il s'agissait des chiffres officiellement portés par la société.

En d'autres termes, en apposant sa signature de PDG sur le rapport annuel, Bruno LAFONT engageait la société dans son ensemble, et donc le travail collectif notamment de la direction financière.

> ➢ Le contrôle et l'audit interne :

Ces fonctions (distinctes l'une de l'autre) ont vocation à analyser le fonctionnement de l'entreprise, à maîtriser les risques, à garantir le respect de la réglementation et à optimiser les performances.

Appuyé par des contrôles externes (commissaires aux comptes du siège et auditeurs financiers des filiales, par exemple le cabinet Deloitte pour la Syrie), le contrôle et l'audit interne étaient déployés sur trois niveaux :

- Au sommet, le **comité d'audit du conseil d'administration** était en charge, pour reprendre les termes de son président de s'assurer « *de l'existence [au] sein de la société d'un dispositif valable et cohérent [de contrôle interne et gestion des risques]* », notamment comptables et financiers (**D1134/4 et 5**).

- Puis, le **contrôle interne** du groupe était incarné par une équipe de 70 à 80 personnes dirigée par Valérie BAZIN au siège, avec pour mission, sous la responsabilité de la direction financière :

  o d'élaborer les règles et procédures au niveau du groupe pour que les filiales s'assurent de la conformité de leurs activités aux lois et règlements et limitent le risque de fraude ;

43

   o d'assister les contrôleurs internes présents dans chacune des filiales (sous la responsabilité locale du directeur financier ou général du pays) dans la réalisation de leurs missions de contrôle et la mise en œuvre des politiques de groupe.

- Enfin, sous la responsabilité du PDG (à qui il rapportait directement) et de la direction financière, Éric MEURIOT était responsable de la fonction **d'audit interne**, composée de 25 personnes, lesquelles auditait l'effectivité des procédures de contrôle interne du groupe, pays par pays, à intervalles réguliers, permettant ainsi notamment à Eric MEURIOT de faire part au comité d'audit du conseil d'administration de « *ce qui [lui] semblait significatif* » dans le champ de sa mission, après en avoir discuté « *en interne avec Bruno LAFONT ou M. GAUTHIER* » (**D1305/3**).

  ➤ Le département juridique :

LAFARGE était dotée d'un département juridique dirigé par Bi-Yong CHUNGUNCO.

Son équipe, composée de juristes expérimentés, avait notamment la charge du suivi des règlementations en matière de sanctions économiques et embargos.

Cette direction est par exemple intervenue lorsque les actifs de Firas TLASS, actionnaire de LCS, ont été saisis par le gouvernement syrien en 2013 (**D794**), ainsi qu'au mois d'août 2014 lorsque le patron pays Frédéric JOLIBOIS a saisi directement par courriel Jean-Jérôme KHODARA de la question de la conformité de certaines interactions commerciales indirectes avec l'Etat islamique qui venait d'être placée sous sanction par l'ONU (**D490/45-48**).

  ➤ Le département « sûreté » :

Sous l'impulsion de Bruno LAFONT, LAFARGE s'est dotée en 2008 d'une fonction sûreté spécifique et autonome, dirigée par Jean-Claude VEILLARD, qui répondait hiérarchiquement au DRH (**D145**).

Comme le résume un document établi par Sonia ARTINIAN, alors DRH, le 4 décembre 2013 (**D1105/4**) intitulé « *mandat du comité de sûreté* », celui-ci « *doit prendre en compte les aspects stratégiques et opérationnels, et anticiper l'analyse des risques susceptibles d'affecter la performance, pour offrir au COMEX des éléments de réponse en cas d'évènements susceptibles d'engendrer une situation de crise. Dans cet esprit, le Comité Sûreté a pour mission de :*
- *Valider le niveau de risques par pays en fonction des différents types de menaces ;*
- *Prendre des décisions sur l'orientation des plans d'actions et les piloter ;*
- *Valider ou faire valider par le COMEX les différentes directives et recommandations proposées par le directeur Sûreté ;*
- *Adapter si besoin la Politique Sûreté Groupe et la soumettre à l'approbation du COMEX ;*
- *Favoriser l'animation du réseau Sûreté dans l'ensemble des pays du Groupe ;*
- *Faire évoluer l'organisation Sûreté et le périmètre des responsabilités* ».

Des réunions mensuelles étaient organisées avec les membres permanents, et d'autres à échéances moins régulières auxquelles s'ajoutaient les membres « occasionnels ».

Chaque réunion faisait « *l'objet d'un ordre du jour proposé par le directeur sûreté* » et « *un compte rendu est rédigé par celui-ci avec le relevé et le suivi des éventuelles décisions* » (**D1105/4**).

Par ailleurs, le Président du Comité sûreté assurait « *la liaison avec le COMEX* » (**D1105/4**).

44

Il semble ressortir de la lecture d'un compte-rendu de comité exécutif du 24 mai 2013 qu'une instruction aurait été donnée par Bruno LAFONT à Éric OLSEN, alors directeur des ressources humaines et à ce titre président du comité de sûreté : « *suite aux attentats visant un site d'Areva au Niger […] d'adresser systématiquement les comptes-rendus du Comité Sûreté à tous les membres du Comex* ».

En effet, la veille de cette réunion du COMEX, un grave attentat à la voiture piégée avait visé un site d'AREVA au Niger, ce qui avait manifestement mis en alerte LAFARGE qui disposait d'une usine à Ashaka, dans l'État limitrophe du Nigeria.

Pour autant, il ne ressort pas du dossier que cette instruction a été suivie d'effet, des membres du comité exécutif ayant au contraire indiqué postérieurement à cette réunion ne pas avoir reçu les comptes-rendus des comités de sûreté (**D1705/7**).

Assurer la sûreté (anticiper, détecter et protéger contre les actes de malveillance et menaces) des salariés et des biens était une « *priorité absolue* » pour le groupe, ainsi qu'en a par exemple attesté Christian HERRAULT (**D1267/18**) : « *VEILLARD, LAFONT et moi-même [HERRAULT] étions au même étage [au siège], la sûreté est une fonction importante, c'est une préoccupation essentielle* » (**D566/4**).

L'importance de la sûreté était très souvent rappelée par Bruno LAFONT à ses collaborateurs les plus proches, par exemple dans un courriel à Christian HERRAULT sur l'activité de l'usine syrienne en juillet 2012 : « *aucun compromis n'est possible sur la sûreté* » (**D391-3/BLA/Email/3**).

Le courriel que Jean-Claude VEILLARD adresse à Bruno CARETTI, alors en poste au Nigéria, en date du 20 février 2013 – figurant aux scellés – est particulièrement éloquent à cet égard : « *BL en a remis une louche sur la sûreté lors de la conf call annonce des résultats. Le message vers les CCEO est clair : ou vous respectez les règles sûreté ou vous avez des soucis d'avenir … discipline, discipline, discipline !!! un mot jusqu'alors inconnu chez Lafarge !* » (**Pièce n°6**).

Cette priorité absolue de Bruno LAFONT a été unanimement rappelée par les personnes entendues dans le cadre de l'instruction :

> « *Chez LAFARGE, ils nous bassinaient tous avec ça. Il n'y avait pas une réunion qui [ne] commençait [pas] avec le "safety"* » (Sophie FAURE, assistante de Bruno LAFONT) (**D1017/3**) ;

> « *L'ensemble des membres du COMEX sans exception avait cet objectif car c'était la première priorité du Groupe établie par Bruno LAFONT et ce dès sa prise de fonction en tant que PDG. Tous les ans j'ai eu cet objectif* » (Jean-Jacques GAUTHIER, directeur financier) (**D1069/1 et 2**) ;

> « *Bruno prenait les premières 10-20 minutes de chaque CA pour discuter de la sûreté opérationnelle. Je pense qu'il est passionné par la sûreté des gens et tous ces aspects-là* » (Nassef Sawiris, administrateur) (**D1099/5**) ;

> « *Bruno LAFONT avait à cœur de commencer tous les conseils par la sécurité, les accidents du travail … Il ne montrait pas l'image d'un patron désintéressé par le sort des employés. […]. C'est aux antipodes de la culture de l'entreprise* » (Jérôme Guiraud, administrateur) (**D1218/6**).

Afin de garantir l'efficacité de cette fonction nouvelle, la direction de la sûreté a été confiée – sur proposition de Christian HERRAULT et Éric OLSEN – à Jean-Claude VEILLARD, officier de carrière qui a servi plus de 30 années dans l'armée, notamment au sein des forces spéciales de la marine nationale.

45

Ainsi, Jean-Claude VEILLARD et son équipe à Paris, (outre tous les responsables sûreté locaux) avaient la charge de la protection des personnes et des biens des 3.500 sites du groupe (sièges, usines, carrières, *etc.*), en lien avec les patrons de pays, responsables sur site de la sûreté et de la sécurité des salariés, assistés le cas échéant d'un expert qu'ils recrutaient (**D1267/18**), par exemple Jacob WAERNESS puis Ahmad JALOUDI en Syrie.

Comme l'a expliqué Eric OLSEN, *« l'expertise de Jean-Claude permettait à un patron pays de construire un plan d'action sûreté. Par exemple, au Nigéria suite à des enlèvements, Jean-Claude a préconisé au patron de pays d'interdire les voyages de nuit »* (**D527/2**).

Bruno LAFONT a toujours entendu s'assurer que cette fonction était dotée des outils lui permettant de fonctionner de manière satisfaisante, par exemple en interrogeant Jean-Claude VEILLARD, lequel écrit à Éric OLSEN dans un courriel du 20 février 2013 : « **le Président Lafarge ma appelé longuement hier soir pour parler de la situation au Cameroun et au Nigeria Il ma demande si j'avais tous les outils matériels et personnels à ma disposition pour assurer la sureté de nos activités.** *J'ai esquive en répondant par l'affirmative car je prefererai t'en entretenir avant de faire un commentaire quelconque mais il est vrai que la charge augmente de manière exponentielle »* (**FRMLAT 3783**).

Un « Guide opérationnel de la Sûreté », préfacé par Bruno LAFONT, a été élaboré, lequel servait notamment de référence aux patrons de pays et, le cas échéant, aux correspondants sûreté locaux (**D1106**).

Par ailleurs, un « comité de sûreté » se tenait mensuellement au niveau du groupe sous la présidence du DRH, en présence de Jean-Claude VEILLARD, des directeurs généraux adjoints (dont Christian HERRAULT) et de plusieurs directeurs fonctionnels (directeur juridique, des politiques sociales, des assurances, de la performance, de l'audit interne, de la communication …).

Les missions de ce comité étaient les suivantes : *« valider le niveau de risques par pays en fonction des différents types de menaces ; prendre des décisions sur l'orientation des plans d'actions et les piloter ; valider ou faire valider par le COMEX les différentes directives et recommandations proposées par le directeur Sûreté ; adapter si besoin la Politique Sûreté Groupe et la soumettre à l'approbation du COMEX ; favoriser l'animation du réseau Sûreté dans l'ensemble des pays du Groupe ; faire évoluer l'organisation Sûreté et le périmètre des responsabilités »* (**D1108**).

Dans ce cadre, Jean-Claude VEILLARD établissait un « ordre du jour » et un « compte rendu » qui étaient transmis à l'ensemble de ses membres.

Si Bruno LAFONT n'était pas membre du comité de sûreté, il avait demandé à Jean-Claude VEILLARD, afin de marquer son soutien à la fonction lors de sa création en 2008, à se faire remettre dans son bureau une copie papier de ses comptes rendus.

Il était en outre possible pour le directeur sûreté, comme pour les autres directeurs « fonctionnels » mais également les directeurs adjoints opérationnels, de venir rencontrer Bruno LAFONT directement quand cela s'imposait, notamment sur un sujet « sûreté ».

En sa qualité de directeur fonctionnel et son bureau se trouvant à proximité de celui de Bruno LAFONT, Jean-Claude VEILLARD avait l'occasion de contacts directs avec ce dernier : « *A ma prise de fonction j'avais des réunions régulières avec lui. Puis ensuite ça s'est un peu dilué, ces réunions sont devenues plus informelles. Il m'appelait quand il avait le temps. [pour] faire un point très rapide sur la situation des pays, survoler l'organisation, voir si oui ou non l'organisation se mettait en place. Parfois il m'interpellait sur un sujet précis lié à un événement, comme par exemple lorsqu'un avion Air France s'était écrasé »* (**D840/16**).

46

Pour autant, Jean-Claude VEILLARD a précisé à plusieurs reprises que s'il avait bien évoqué avec Bruno LAFONT les « *pressions du PYD* », il ne l'avait en revanche jamais informé de ce que pour continuer à faire fonctionner l'usine, la direction locale était obligée de négocier avec d'autres factions armées – notamment les groupes terroristes – opérant sur zone (**D478/6, D482/3 et 4**).

De même, Éric OLSEN (**D536/3**), Sonia ARTINIAN (**D716/2**) Bi Yong CHUNGUNCO (**D806/2**) ou encore Jean DESAZARS (**D1603/12**) ont insisté sur le fait qu'il était « *très facile* » de prendre attache avec Bruno LAFONT pour discuter de sujets importants, et que s'ils avaient eu connaissance de paiements ou d'accords avec des groupes terroristes, c'est immédiatement ce qu'ils auraient fait.

1. La filiale LCS

De la même manière que toute autre filiale opérationnelle, LAFARGE CEMENT SYRIA – filiale à usine unique (Jalabiya) – répondait aux méthodes d'organisation harmonisées du groupe :

- Un patron de pays autonome (Bruno PESCHEUX puis Frédéric JOLIBOIS à compter du 20 juillet 2014) disposant d'équipes fonctionnelles, dont un directeur d'usine, un directeur financier, un directeur commercial, un directeur des ressources humaines, un directeur sûreté (Jacob WAERNESS puis Ahmad JALOUDI), un responsable juridique, un responsable administration et personnel et un responsable comptabilité (**D239/9 et 4**), lesquels chapeautaient les activités industrielles de jusqu'à 350 salariés répartis entre l'usine elle-même et la centrale électrique, et autant de sous-traitants à demeure sur le site ; et

- Ce patron de pays ne disposait pas de supérieur « opérationnel ». La supervision de LCS par le groupe, assurée pour la Syrie par le DGA Christian HERRAULT, n'avait ainsi vocation qu'à s'assurer du respect par la filiale (de la même manière que par la quinzaine d'autres filiales dont il assurait le suivi) des décisions et règles de LAFARGE dans son ensemble, décisions et règles qui n'étaient pas spécifiques à la Syrie.

Pour sa part, Bruno LAFONT n'avait pas d'implication directe dans le fonctionnement de la filiale LCS, dont il ne suivait l'activité qu'à travers son directeur général adjoint Christian HERRAULT.

Dans le cadre d'une telle organisation du groupe, Bruno LAFONT pouvait et devait, en sa qualité de PDG, être informé d'éventuels problèmes survenus dans le cadre du fonctionnement d'une usine située à l'étranger et détenue par une filiale :

- par la remontée d'informations de son directeur opérationnel adjoint, en l'occurrence Christian HERRAULT ;

- par des alertes susceptibles de lui être transmises par les directions fonctionnelles en charge du contrôle interne, de l'audit, du juridique et de la sûreté.

Or, ainsi qu'il le sera démontré, aucun de ces canaux n'a permis en l'espèce la transmission des informations pertinentes.

47

**B. Le dossier n'apporte aucune preuve de la connaissance par Bruno LAFONT de paiements à des entités terroristes**

Dès ses premières déclarations, Bruno LAFONT a indiqué avec constance n'avoir jamais été informé de quelconques paiements direct ou indirects à des entités terroristes et n'avoir appris qu'à l'occasion du comité exécutif du 27 août 2014 – à l'issue duquel il a été convenu avec Christian HERRAULT de fermer l'usine – que LCS s'apprêtait à conclure un accord financier avec un groupe terroriste.

Il convient d'emblée de rappeler qu'il ne ressort des éléments de la procédure :

- aucune intervention écrite ou rapportée de Bruno LAFONT allant dans le sens d'une participation ou incitation à un financement de groupe terroriste ;

- aucune trace de son information relative à de tels financements avant le procès-verbal du comité exécutif du 27 août 2014 (**D442/9**).

En particulier, s'agissant de la question des paiements ou accords avec des groupes terroristes en Syrie, <u>tous</u> les protagonistes excepté Christian HERRAULT – et notamment Bruno PESCHEUX, Frédéric JOLIBOIS, Jean-Claude VEILLARD, Bi-Yong CHUNGUNCO, Sonia ARTINIAN, Éric OLSEN et Hélène SEGUIN – ont <u>explicitement</u> indiqué n'avoir <u>jamais</u> informé Bruno LAFONT de potentiels accords avant le mois de septembre 2014, au cours duquel l'usine a précisément été fermée (**D467/2** ; **D478/8** ; **D814/4** ; **D716/1** ; **D956/17** ; **D701/2**).

Bruno PESCHEUX et Frédéric JOLIBOIS ont confirmé à l'audience n'avoir jamais partagé d'information en ce sens avec Bruno LAFONT.

Par ailleurs, de manière générale, il est impératif de prendre garde à ne pas faire d'amalgame entre des informations relatives à des paiements à des groupes terroristes, et des écrits ou des paroles qui ne feraient état que :

- de paiements à des groupes armés mais <u>non</u> terroristes, dès lors que ces paiements – qui existaient dans le cadre du fonctionnement de l'usine syrienne (PYD, ASL notamment) – ne sont ni poursuivis ni infractionnels ;

- de l'évolution de groupes terroristes dans la région ou à proximité de l'usine, notamment dans le cadre de leur opposition avec les groupes kurdes ou ceux de l'ASL pour le contrôle de la zone.

Cette confusion est pourtant l'un des écueils auquel cède l'ordonnance de renvoi, qui cite des éléments qui à les supposer démontrés seraient la preuve d'une information portant sur des éléments certes préoccupants mais non infractionnels et étrangers aux faits visés à la prévention.

En réalité, les considérations avancées pêle-mêle au soutien de l'ordonnance de renvoi, ainsi que les comptes-rendus des comités de sûreté et les accusations portées par Christian HERRAULT, ne caractérisent ni la preuve ni même des indices suffisants de la connaissance des paiements à des entités terroristes, sans laquelle aucun élément intentionnel ne peut exister (**1**).

48

Tout au contraire, la lecture du dossier comme le déroulement des débats mettent en lumière une gestion des paiements litigieux « *en comité très restreint* » (**D490/79**) – exclusive de tout partage de connaissance avec Bruno LAFONT (**2**).

### 1. Les éléments mis en avant par l'accusation pour tenter de soutenir que Bruno LAFONT aurait été nécessairement informé de paiements à des entités terroristes

Il convient d'envisager successivement les éléments à charge sur lesquels se fonde l'ordonnance de renvoi :

- La prétendue transmission d'information à Bruno LAFONT (**1.1**) qui résulterait :
  - o des accusations de Christian HERRAULT selon lesquelles il aurait transmis oralement à ce dernier « *toutes les informations pertinentes* » (propos tenus lors des débats) (**1.1.1**) ;
  - o des courriels adressés par Christian HERRAULT à Bruno LAFONT (**1.1.2**) ;
- Les comptes-rendus des comités de sûreté (**1.2**) ;
- Les autres courriels et éléments (**1.3**) ;
- Les opinions selon lesquelles Bruno LAFONT savait ou ne pouvait que savoir (**1.4**).

A titre liminaire et de manière générale, s'agissant de la teneur de l'information qui aurait été transmise à Bruno LAFONT, il convient d'examiner les développements qui suivent au regard du contexte sécuritaire très spécifique à l'usine de Jalabiya, tel que précédemment évoqué.

Ainsi, la lecture du dossier révèle que les informations qui remontent de LCS vers le groupe, et parfois vers Bruno LAFONT par l'intermédiaire de Christian HERRAULT, correspondent à :

- des informations données à un moment où le fonctionnement de l'usine syrienne impliquait le passage de *checkpoints* et d'éventuelles négociations avec des groupes armés non terroristes notamment kurdes ;

- des informations révélant l'apparition de l'Etat islamique dans le « paysage » comme un acteur nouveau, à travers des affronts avec les kurdes et sans que cela n'implique de quelconques paiements en leur faveur.

Or, aussi préoccupants soient-ils, ces éléments ne portent en réalité jamais sur l'existence d'un quelconque financement de terrorisme.

### 1.1 Les prétendues transmissions d'informations « *pertinentes* » par Christian HERRAULT à Bruno LAFONT

L'accusation repose sur le postulat selon lequel Christian HERRAULT aurait, en sa qualité de directeur opérationnel adjoint directement subordonné à Bruno LAFONT, tenu informé ce dernier, oralement (**1.1.1**) ou par courriel (**2.2.2**) des évolutions de la situation en Syrie, ainsi que de l'existence de paiements à des entités terroristes.

#### 1.1.1 *L'inconsistance et l'absence de crédibilité des accusations de Christian HERRAULT*

Au préalable, il doit être souligné que les déclarations de Christian HERRAULT sont celles d'un co-mis en examen et d'un co-prévenu appelé à se défendre et que leur portée doit donc être examinée à l'aune de ce statut.

49

L'ordonnance de renvoi retient que la « *réalité de cette transmission d'information* » serait « *confirmée par Christian HERRAULT tout au long de l'enquête, y compris lors de sa confrontation avec Bruno LAFONT devant la juge d'instruction, à l'occasion de laquelle il avait maintenu l'avoir informé de cette situation et avoir agi avec son accord (D1383/4), expliquant <u>que ce dernier était au courant des modalités de financement , que cela soit la taxation sur les routes et la taxation des marchandises , mais sans en connaître les modalités concrètes, tout comme lui</u>* » (**ORTC, p. 244**).

Elle soutient ensuite que :

- « *[Christian HERRAULT] <u>disait avoir obtenu l'autorisation de Bruno LAFONT en lui décrivant tout le système et en ayant eu en réponse « on continue »</u>. Il ajoutait que son supérieur lui avait dit que « l'intérêt général était fait d'intérêts particuliers » (D1383/5)* (**ORTC, p. 244**) ;

- « *<u>Christian HERRAULT soutenait l'avoir informé du principe des paiements</u> <u>**aux groupes armés**</u> <u>dès le mois d'octobre 2012, **puis** lui avoir fait part de l'apparition de l'Etat islamique « dans le paysage » en octobre 2013</u>, sans jamais recevoir d'instruction de fermeture (D1383/12)* » (**ORTC, p. 244**).

Avant même de reprendre en détail la réalité et la portée des déclarations de Christian HERRAULT, il convient de constater qu'il ne ressort des propres mentions de cette ordonnance – de manière très significative – aucune affirmation de ce que des informations <u>portant sur des paiements à des groupes terroristes</u> auraient été transmises à Bruno LAFONT.

Ainsi qu'il est constamment rappelé, l'usine de Jalabiyah a fonctionné à compter de 2011 dans un contexte qui impliquait une proximité parfois géographique, parfois relationnelle, avec des « *groupes armés* », rebelles notamment kurdes, ce qui a pu provoquer des tensions sécuritaires dont Bruno LAFONT a été ponctuellement informé.

Dans ces conditions, l'affirmation portée dans l'ordonnance de renvoi, selon laquelle « *[Christian HERRAULT] <u>disait avoir obtenu l'autorisation de Bruno LAFONT en lui décrivant tout le système et en ayant eu en réponse « on continue. »</u>* (**ORTC, p. 244**), n'est en tant que telle nullement révélatrice de la connaissance de faits infractionnels.

Il en est de même pour les deux affirmations selon lesquelles « *<u>Christian HERRAULT soutenait l'avoir informé du principe des paiements</u> <u>**aux groupes armés**</u> <u>dès le mois d'octobre 2012 »</u> ou « <u>lui avoir fait part de <u>**l'apparition de l'Etat islamique « dans le paysage » en octobre 2013**</u>, sans jamais recevoir d'instruction de fermeture »*.

Ces informations, qui n'étaient en elles-mêmes de nature à révéler l'existence ou le projet de paiements à des entités terroristes, méritaient à l'évidence d'être actualisées et précisées par la suite par Christian HERRAULT, ce qui n'a jamais été fait.

Lors de l'audience, Christian HERRAULT a, pour résumer sa position quant à l'information de Bruno LAFONT, indiqué qu'il avait transmis à son supérieur « *toutes les informations pertinentes* » sur la situation, assertion dont le caractère vague est révélateur.

Le caractère « *pertinent* » et éclairant des informations fournies par Christian HERRAULT ne ressort en effet ni du dossier d'instruction, ni de l'ensemble de ses déclarations dont l'examen attentif révèle au contraire le caractère évasif, évolutif et très souvent contradictoire.

50

<u>Ainsi, lors de sa première audition devant le service des douanes le 3 avril 2017</u>, Christian HERRAULT affirme, en réaction aux « *erreurs de jugement* » évoquées par LAFARGEHOLCIM dans son communiqué de presse :

> « [...] *J'assume parce qu'il n'y a pas d'erreurs. Il y avait le choix entre deux mauvaises solutions* [...] *et personne au sein de LAFARGE n'a demandé à ce qu'on s'arrête. L'usine c'est 600 millions d'euros en 2011 et Bruno PESCHEUX a réussi à en faire une usine 100% syrienne. J'en ai parlé à Bruno LAFONT et on* **réfléchit : On était racketté** <u>**mais c'était des bons, on décide de sortir les expats et les**</u> <u>**Alaouites, et les Chrétiens**</u>, *et le gouvernement français nous incite fortement à rester, c'est quand même le plus gros investissement français en Syrie et c'est le drapeau français. Donc oui Bruno LAFONT dit « On reste »* » (**D253/11**).

Manifestement, les éléments évoqués dans cette déclaration se réfèrent exclusivement à l'année 2012, marquée par un racket effectué « *par des bons* » (les kurdes) et l'évacuation des expatriés réalisée au cours de l'été 2012 (**D371/2**).

Directement à la suite de cette déclaration, Christian HERRAULT ajoute : « *J'ai eu mes discussions avec Bruno LAFONT.* <u>*Dans cette situation de racket*</u>, *il y a des gens qui savent … et n'ont pas envie de creuser* » (**D253/12**).

<u>Lors de sa troisième audition de garde à vue le 6 décembre 2017</u>, interrogé sur l'état de connaissance par Bruno LAFONT de la situation de l'usine en Syrie, tel que décrit par ce dernier dans son audition, Christian HERRAULT répond :

« *C'est un honneur qu'il me fait j'ai 12 ou 15 pays mais la Syrie était quand même un pays particulier au sein du groupe et je lui parlais très précisément de la situation. (…) Je lui ai parlé notamment du rôle de TLASS, de l'épisode de Gaziantep, du séquestre des biens de TLASS et de l'épisode avec daesh et des épisodes avec les kurdes au premier trimestre 2014, il est au courant que j'ai fait une réunion avec Franceschi et le responsable du PYD à Paris sur la situation de l'usine. Il est au courant par mail de juillet 2014 qu'il y a des incidents graves autour de l'usine et je lui mets un mel parce qu'il n'est pas là et je ne voulais pas qu'il soit surpris si on fermait l'usine en urgence* » (**D568/4**).

Une fois encore, Christian HERRAULT, qui liste au demeurant de très occasionnelles transmissions, ne fait état d'aucune information transmise à Bruno LAFONT relative à des paiements à des entités terroristes. Il se borne à évoquer de manière imprécise l'évolution des forces en présence autour de l'usine au cours de l'été 2014 ainsi que l'« *épisode* » relaté en question 12 (**D568/3**) relatif à la convocation en septembre 2013 de Jacob WAERNESS et Bruno PESCHEUX devant le tribunal islamique de Raqqah.

Une telle convocation par ISIS, à laquelle ces derniers ne se sont d'ailleurs pas rendus et dont la réalité semble d'ailleurs remise en cause, était plutôt de nature à traduire, au contraire, l'absence de toute négociation avec cette entité.

<u>Ce n'est que, pour la première fois, lors de sa quatrième audition de garde à vue le 7 décembre 2017</u>, à la question précise de savoir s'il confirme que Bruno PESCHEUX l'a informé de la demande de Firas TLASS « *d'inclure dans le montant une somme pour l'État islamique* » et s'il en a lui-même rendu compte à Bruno LAFONT, que Christian HERRAULT répondra :

> « *Oui, il a rendu compte à moi, je ne sais pas si il a rendu compte à quelqu'un d'autre. Au comité de sûreté d'octobre 2013, j'ai rappelé au comité que la convocation de septembre avec ISIS pour taxer, j'ai rappelé que Firas avait négocié et qu'un accord avait été obtenu et que l'usine avait redémarré. Avec LAFONT, j'ai été plus spécifique avec*

51

*la convocation de Daesh, je lui ai dit Firas avait négocié, qu'un accord avait été obtenu, que l'usine avait redémarré normalement et j'ai rajouté « un racketeur de plus »* (**D569/5**).

Ce faisant, Christian HERRAULT commence par faire état d'informations qu'il aurait transmises au comité de sûreté du 15 octobre 2013, ce qui est contesté par l'ensemble des participants interrogés, et ce qui ne figure pas non plus dans le compte-rendu de cette réunion.

Il invoque ensuite une prétendue information donnée à Bruno LAFONT, qu'il qualifie de « *plus spécifique* » tout en se montrant particulièrement imprécis.

D'ailleurs, à la question suivante de savoir si Christian HERRAULT connaissait les termes de ces négociations et s'il en avait fait part à Bruno LAFONT, l'intéressé répondait qu'il n'en connaissait pas les détails à l'époque, admettant ainsi implicitement qu'il n'avait pu en faire part à Bruno LAFONT.

Bruno LAFONT a quant à lui, sans jamais varier dans ses déclarations et sans jamais être contredit par un élément objectif du dossier, toujours fermement contesté avoir été informé de négociations financières avec une entité terroriste et notamment Daesh.

<u>Dans le cadre de sa cinquième audition de sa garde à vue du 7 décembre 2017</u>, sont recueillies, <u>ici encore pour la première fois</u> et dans les conditions explicitées par les enquêteurs, les déclarations suivantes :

> « *Question 07 : Le cabinet BAKER MCKENZIE, dans sa note de synthèse résumant l'enquête interne menée par le cabinet d'avocat à la demande de LAFARGE-HOLCIM, dans le paragraphe I intitulé « aperçu » le cabinet d'avocat estime, que LSA (LAFARGE SA) était régulièrement informé des questions de sécurité de LCS (LAFARGE CEMENT SYRIA) et parfois avait l'aval de la direction parisienne pour payer Firas TLASS pour qu'il redistribue l'argent <u>à des groupes armés locaux,</u> notamment à l'EI à partir de novembre 2013.* **Qu'en dites-vous ? Avez-vous donné votre aval ou eu connaissance d'un aval donné ?**
>
> *Réponse 07 : oui c'est ce qu'il y a dans les comptes rendus de sûreté et c'est ce que j'ai dit. Vous me demandez si LAFONT m'a donné son aval ».*
>
> *[Mention des enquêteurs : Après un long temps d'hésitation, et s'être tourné vers ses avocates, M. HERRAULT Répond : ]*
>
> *Dans ce cas il ne m'a pas donné plus son aval que j'ai donné le mien à PESCHEUX.*
>
> *[Mention des enquêteurs : A la demande de Maître Doumic nous interrompons la présente audition à 16h00 pour qu'elle puisse s'entretenir avec son client.*
> *Disons reprendre l'audition à 16h05]*
>
> *Oui LAFONT m'a donné son aval après l'exposé que je lui ai fait en me disant que l'important c'était d'assurer la sécurité des collaborateurs »* (**D570/2**).

Cette réponse de Christian HERRAULT – au demeurant évasive - n'est pas spontanée. Elle intervient après un « long temps d'hésitation », puis une suspension demandée par son conseil en vue d'un entretien.

Elle semble en outre contradictoire avec le sens des propos tenus le matin-même, lorsque Christian HERRAULT déclarait ignorer lui-même le détail des groupes et des versements (**D569/5**).

52

En toute hypothèse, Christian HERRAULT répond une fois encore de manière très évasive et à une question relative à « *des paiements à des groupes armés locaux* » et non terroristes.

Lors de sa sixième audition, en garde à vue, à la question suivante : « *Quand vous dites que LAFONT voulait que l'usine continue, ça veut dire qu'il vous l'a dit clairement ? »*, Christian HERRAULT répond :

> *"Oui, oui. J'ai régulièrement informé LAFONT de l'état des opérations en Syrie dont il n'ignorait rien et j'ai toujours eu son aval de continuer sans prendre de risque pour la sécurité de nos salariés. Cet aval m'a été donné à chaque étape critique que ce soit Gaziantep ou octobre 2013 après la rencontre avec Daesh. De même avec les Incidents avec les kurdes »* (**D572/1**).

Là encore, cette réponse est frontalement contradictoire avec les propos que Christian HERRAULT tenait quelques heures plus tôt, lorsqu'il affirmait sans équivoque : « *je n'ai jamais entendu de sa bouche les mots « il faut continuer » comme je n'ai pas plus entendu de sa bouche les mots « il faut arrêter* » (**D569/4**).

Par ailleurs, l'examen approfondi du dossier ne permet pas d'identifier la prétendue « *rencontre avec Daesh* » avant « *octobre 2013* » à l'issue de laquelle un nouvel aval aurait été délivré par Bruno LAFONT.

A la question suivante : « *Vous avez compris que LAFONT vous demandait de tout faire pour que LCS continue de fonctionner malgré le paiement de groupes reconnus comme terroristes ? »* Christian HERRAULT acquiesce par un simple « *oui* ».

Invité à préciser sa réponse laconique, il prétend que les propos qui auraient été tenus par Bruno LAFONT étaient les suivants : « *Il disait que l'intérêt général est fait d'intérêts particuliers, ce qui veut dire pour moi, l'intérêt général passe par le racket* » (**D572/1**).

Au-delà du fait que ces propos abstraits, à les supposer exacts, ne peuvent s'analyser ni comme une consigne ni même comme un aval, il faut impérativement souligner que lors de la confrontation du 9 octobre 2018, Christian HERRAULT situait à octobre 2012 l'entretien au cours duquel Bruno LAFONT aurait dit « *que l'intérêt général était fait d'intérêts particuliers* » (**D1383/6**).

En d'autres termes, le seul « aval » de Bruno LAFONT que Christian HERRAULT semble en mesure d'identifier aurait été délivrée **en octobre 2012,** soit près d'un an avant le début de la période de prévention, alors qu'il n'était nullement question de quelconques paiements à des entités terroristes.

Lors de cette même confrontation du 9 octobre 2018 devant les juges d'instruction, Christian HERRAULT est revenu sur les informations transmises autour de l'été 2012, et plus précisément sur un entretien avec Bruno LAFONT qu'il situe à octobre 2012, à l'occasion duquel son supérieur lui aurait dit : « *on continue, aucun risque sur la sûreté des collaborateurs* » (**D1383/5**).

Christian HERRAULT n'évoque plus, lors de cette confrontation, les prétendues remontées d'information en 2013 évoquées de manière très imprécise pendant sa garde à vue, hormis pour affirmer que « *la seule milice significative était ISIS, qui est apparue dans le paysage en septembre octobre 2013 ce dont j'ai informé LAFONT Bruno »* (**D1383/12**) et faire référence en des termes assez peu compréhensibles à une prétendue « *discussion que j'ai déjà donné* » quand l'Etat islamique « *est arrivé dans la liste* » (**D1383/15**).

53

Sur question plus précise du magistrat instructeur, Christian HERRAULT remonte encore dans le temps la recommandation de « continuer » l'activité de l'usine qu'il aurait reçue de Bruno LAFONT :

> « *Comment est-ce possible de parler de ça avant Gaziantep, alors même que vous indiquez que c'est au cours de cette réunion qu'a été défini le système ?*
> *C'était un autre contexte. Au cours de notre entretien en juillet 2012 nous avons convenu que soit nos restions soit nous partions. Il n'y avait pas de solution intermédiaire* » (**D1383/6**).

Bruno LAFONT a toujours admis, sans jamais varier dans ses déclarations, qu'il avait à l'été 2012 décidé avec Christian HERRAULT de poursuivre l'activité de l'usine, au moment où la question du départ des expatriés s'est posée à la suite d'un courrier du ministère des Affaires étrangères (**D371/2, D1267/9, D1383/5**).

S'agissant de l'achat prétendu de <u>matières premières</u> à des entités terroristes, Christian HERRAULT affirme qu'il n'était lui-même pas informé précisément du système mis en place au sein de LCS pour de tels achats et que Bruno LAFONT ne pouvait dès lors en savoir davantage : « *il connaissait le principe comme moi mais il n'en savait pas plus, et pas du tout le détail. Moi-même je ne le connaissais pas* » (**D1383/5**).

En définitive, force est de constater qu'il ne ressort de ces déclarations de Christian HERRAULT en confrontation aucune allégation selon laquelle il aurait informé son supérieur de l'existence de paiements à des groupes armés <u>et</u> terroristes. Il n'est au demeurant pas contesté qu'en 2012 et jusque courant 2013, aucune relation n'a même existé entre LCS et un quelconque groupe terroriste.

Lors des débats devant le Tribunal correctionnel, les explications fournies par Christian HERRAULT, co-prévenu, sont demeurées tout aussi floues, inconsistantes et contradictoires s'agissant de la prétendue connaissance par Bruno LAFONT de paiements à des groupes terroristes.

### 1.1.2    *Les courriels adressés par Christian HERRAULT à Bruno LAFONT, exclusifs de toute indication relative à des paiements à des groupes terroristes*

L'ordonnance de renvoi fait par ailleurs état de quelques mails envoyés par Christian HERRAULT à Bruno LAFONT qui, s'ils contiennent parfois des informations préoccupantes sur la situation en Syrie et autour de l'usine, en écho au contexte tendu et volatil qui a été rappelé, ne sont pas de nature à l'informer de l'existence de paiements émanant de LCS vers des groupes terroristes.

Ainsi, pour reprendre les termes de l'ordonnance de renvoi :

-    du mail du 25 juin 2013 (**D452/6**) de Christian HERRAULT, transférant à Bruno LAFONT, Guillaume ROUX et Éric OLSEN « *un message de Bruno PESCHEUX décrivant la complexité de la situation en Syrie et indiquant avoir de moins en moins de visibilité sur la continuité « du business » en Syrie*, ajoutant : « *si nous retirons BP dans les 2 ou 3 mois, je ne vois pas comment l'usine pourra continuer à tourner (même avec lui cela devient vraiment sportif)* ». Comme le relève l'ORTC elle-même, « *il n'était pas question de paiements à des entités terroristes mais des exigences sans cesse renouvelées du PYD* » (**ORTC, p. 237**) ;

-    du mail du 24 juillet 2013 détaillant les résultats de certains pays et comportement un post-scriptum : « *PS: A noter que nous avons été obligés d'arrêter hier notre usine syrienne car les combats entre les kurdes et les djihadistes s'en rapprochaient dangereusement. Nous "monitorons" la situation heure par heure.*

54

*Nous livrons toujours en ciment les camions qui sont/viennent à l'usine car il reste du ciment dans les silos »* (**D1705/52 ; ORTC, p. 237**).

A l'instar des autres courriels reçus par Bruno LAFONT au sujet de la Syrie, au nombre de onze au total, aucun ne fait référence à des paiements de LCS à des groupes terroristes entre 2012 et 2014. Ainsi :

- **Pour l'année 2012** : trois courriels (**D391-3/BLA/Email/3 à 5**) :

Le 23 juillet 2012, Christian HERRAULT (**D565/1 et 2**) fait suivre à Bruno LAFONT un courriel qu'il a envoyé à Bruno PESCHEUX, dans lequel il fait un point général sur le fonctionnement de l'usine, la situation des expatriés et demande à Bruno PESCHEUX de « *prévoir une situation dans laquelle nous aurions à fermer toute l'usine* » en raison des « *turbulences* ».

Loin d'émettre la moindre opposition à un tel projet de fermeture, Bruno LAFONT répond : **«** *Merci, ce niveau d'information me convient très bien. Aucun compromis n'est possible sur la sûreté* **».**

Le 23 août 2012, Christian HERRAULT fait suivre à Bruno LAFONT un courriel de Bruno PESCHEUX faisant état de la gestion d'un kidnapping d'un ancien employé – analysé comme étant probablement faux – et de la décision de renvoyer chez eux les expatriés chinois.

La synthèse de Christian HERRAULT à destination de Bruno LAFONT est courte et se conclut par cette phrase : « *Nous suivons la situation quotidiennement* », de nature à confirmer au destinataire que la situation est sous contrôle.

Le 8 octobre 2012, Bruno LAFONT est placé en copie – avec Éric OLSEN et Alexandra ROCCA – d'un courriel envoyé par Jean-Claude VEILLARD à Christian HERRAULT, concernant le kidnapping d'employés syriens par l'armée syrienne libre (« FSA »).

Il ressort de cet échange que la situation est directement suivie par Bruno PESCHEUX, Jean-Claude VEILLARD, Jacob WAERNESS et Christian HERRAULT. Tous les employés en cause seront finalement libérés par leurs ravisseurs (**D1354**).

- **Pour l'année 2013** : cinq échanges de courriels (**D391-3/BLA/Email/6 à 9, D1705/52 et FRMLAT4940 à 4944**) :

Un courriel du 30 mai 2013 de Christian HERRAULT informe Bruno LAFONT, *a posteriori*, d'un arrêt de l'usine pendant six jours et de la reprise d'activité dans un contexte « *acrobatique* » mais qui « *fonctionne* » (**D556/17**).

Bruno LAFONT prend acte et félicite « *ceux qui sont à l'œuvre* ».

Un courriel du 26 juin 2013 de Christian HERRAULT, faisant suivre à Bruno LAFONT, Éric OLSEN et Guillaume ROUX un courriel de Bruno PESCHEUX, synthétise les diverses difficultés opérationnelles rencontrées par l'usine de Jalabiya sur les plans logistique (difficultés d'approvisionnement), social (mécontentement de certains salariés), financier (taux de change défavorable), industriel (pannes mécaniques) et des relations avec le PYD (demandes de ciment et de taxes, auxquelles LCS résiste).

Il n'est pas fait référence à des groupes terroristes.

55

Le mail de transmission de Christian HERRAULT évoque l'éventuel départ de Bruno PESCHEUX de son poste : « *si nous retirons BP dans les 2 à 3 mois, je ne vois pas comment l'usine pourra continuer à tourner (même avec lui cela devient "sportif"). Pour info* » (**D1721/73**).

Le courriel du 24 juillet 2013 intitulé « *mois de juillet* » de Christian HERRAULT à Bruno LAFONT, Jean-Jacques GAUTHIER, Valérie BAZIN et Stéphanie BILLET, a pour objet de présenter les résultats des pays dont Christian HERRAULT a la charge pour le mois de juillet.

En *post-scriptum* il est indiqué que l'usine syrienne a été arrêtée en raison du rapprochement des combats entre kurdes et djihadistes, Christian HERRAULT précisant : « *nous « monitorons » la situation heure par heure* ».

C'est quelques jours après l'envoi de ce courriel qu'à l'issue d'un entretien avec Christian HERRAULT, Bruno LAFONT établira une note indiquant à propos de la Syrie : « *situation compliquée. On replie calmement* » (**D311/13**).

Cette note se situe au début de la période au cours de laquelle, alerté de la complexité et de la volatilité de la situation sécuritaire, Bruno LAFONT a considéré la fermeture de l'usine comme une option envisageable, ce que l'ordonnance de renvoi interprète de manière erronée comme une instruction non suivie d'effet (**ORTC, p.242**).

C'est ce qui a été précisé par Bruno LAFONT lors de l'audience en ces termes : « *Ce qui est reflété dans ma note n'est pas une instruction mais une orientation que j'ai dans la tête et que je pense avoir partagé à CH et j'avais besoin de son support pour savoir quand est-ce que c'est le moment de partir* ».

Deux courriels des 6 et 7 septembre 2013 émanant d'Amro TALEB, adressés à Bruno LAFONT et dont il est acquis qu'il ne les a pas lus, s'agissant d'un émetteur inconnu. (**D556/14**).

- **Pour l'année 2014**, jusqu'à la fermeture de l'usine le 19 septembre : trois courriels (**D391-3/BLA/Email/10 et 19, FRMLAT857 et FRMLAT 7513**) :

Un bref courriel de Christian HERRAULT du 11 avril 2014, indiquant au sujet de l'usine de Jalabiya : « *elle a fait un bon Q1 mais la situation est plus que jamais volatile, donc, je ne peux rien dire si ce n'est que l'usine continue aujourd'hui à tourner* ».

Un courriel du 10 juillet 2014 de Christian HERRAULT à Bruno LAFONT, avec Jean-Claude VEILLARD en copie, informant *a posteriori* de l'arrêt du four et de la centrale de l'usine de Jalabiya en raison de l'arrêt de l'activité commerciale de celle-ci, causée par le blocage des routes d'accès par « *l'ISIS (appelé encore Daesh ou l'EIIL)* ».

Christian HERRAULT précise : « *Nous avons décidé ainsi d'arrêter l'activité de production pour y voir plus clair et avoir des accords « clairs » avec les belligérants pour la poursuite de l'activité sans prendre de risque inconsidéré. Je t'informerai s'il devait y avoir des évolutions significatives de la situation* ».

Ce courriel appelle plusieurs constats :

- Bruno LAFONT est, de nouveau informé *a posteriori* d'une décision d'arrêter l'usine, et ne fait aucun commentaire ;

56

- les précisions de dénomination apportées par Christian HERRAULT au sujet de l'État Islamique laissent à penser que ce groupe n'a pas été mentionné par ce dernier dans leurs échanges antérieurs ;

- l'information principale délivrée – l'arrêt de l'activité en raison du blocage des routes par « *l'ISIS* » – est reliée au fait qu'aucun accord n'a été conclu entre ce groupe et LCS ;

- comme l'a relevé Bruno LAFONT lors de l'enquête (**D232/8**), il n'est pas précisé que l'« *accord* » recherché avec les « *belligérants* » serait ou pourrait être de nature financière ;

- Christian HERRAULT indique qu'il tiendra Bruno LAFONT informé de toute « *évolution significative* » – ce qu'il ne fera pas avant le comité exécutif du 27 août 2014 à l'occasion duquel sera décidée la fermeture de l'usine de Jalabiya – malgré le fait que dans l'intervalle, Christian HERRAULT suivra de très près des négociations directes et précises avec l'Etat islamique en juillet et août 2014 avec Frédéric JOLIBOIS et sous l'œil de Jean-Claude VEILLARD, mais sans jamais inclure Bruno LAFONT dans les échanges (**D556/14, D1705/9, D490/51**).

Enfin, un courriel du 14 août 2014, de Frédéric JOLIBOIS à Bruno LAFONT adressant le plan d'action pour la sûreté en Syrie – document qui était demandé à tous les patrons de pays – et l'informant du niveau réduit d'activité de l'usine, en raison du blocage des routes par les forces kurdes et l'État Islamique, sans qu'il soit fait état du moindre accord (ni d'une recherche d'accord) avec un quelconque groupe terroriste (**D2011/28**).

\*\*\*\*\*\*

Les développements qui précèdent ne démontrent nullement que Bruno LAFONT a été informé par Christian HERRAULT de paiements à des entités terroristes.

A l'inverse, plusieurs éléments du dossier confortent cette absence de remontée d'information de la part de ce dernier.

Ainsi, sont également particulièrement révélatrices les confidences faites par Christian HERRAULT à son ami Patrice FRANCESCHI, spécialiste de la question kurde, qui tant dans son attestation écrite (**D1703/22**) que dans son audition (**D1703**), et enfin à l'audience, relate le « *dilemme* » auquel Christian HERRAULT s'est trouvé confronté, sans jamais laisser entendre que sa hiérarchie aurait influencé sa difficile résolution.

Exposant avoir « *en 2013 et 2014 […] très souvent vu Christian Herrault pour les rencontres amicales qui [les] lient depuis des années* », Patrice FRANCESCHI déclare pouvoir « *éclairer sur ce qui s'est véritablement passé dans le nord de la Syrie au cours de la période concernée et ce qu'était l'état d'esprit de Christian Herrault à cette époque, ses motivations et sa volonté* » (**D1703/22**).

Au titre des considérations qu'il affirme avoir été celles de Christian HERRAULT, dans le cadre de la gestion de l'usine de Jalabiya, Patrice FRANCESCHI évoque notamment :

- les contacts réguliers avec l'ambassadeur de France qui « *avait poussé Lafarge à maintenir son activité* » ;

- « *le sort des employés de l'usine [lesquels] avaient besoin de travailler pour survivre* » ;

57

- le fait que « *les Kurdes souhaitaient que l'usine fonctionne et soit à tout le moins préservée car ils la considéraient comme faisant partie de leur « patrimoine » pour l'avenir* » ;

- plus largement, le fait que « *tout le monde aurait un jour besoin de béton pour la reconstruction du pays* ».

Patrice FRANCESCHI ne fait ainsi jamais mention – parmi les circonstances qui ont placé « *Christian HERRAULT, aux prises avec une situation impossible* » – d'un ordre ou même d'un quelconque encouragement explicite ou implicite de sa hiérarchie, et notamment de Bruno LAFONT.

Sont également révélatrices à cet égard les <u>informations transmises par Christian HERRAULT à Bertrand COLLOMB</u>, ancien PDG de LAFARGE SA et « *ami personnel* » (**D1393/8**).

En effet, il ressort des éléments présents au dossier que Christian HERRAULT rencontrait régulièrement Bertrand COLLOMB et le tenait informé de la situation en Syrie, comme en attestent les échanges de courriels et les nombreuses discussions qu'ils ont eues à cette époque (**D1393/8-9 ; D1393/53-61**).

Le récit par Bertrand COLLOMB des éléments qui lui ont été rapportés par Christian HERRAULT au sujet de la Syrie est le suivant (**D1393/8 et 9**) :

> « *Sur la Syrie particulièrement, il m'a dit que notre usine était dans une zone où il n'y avait pas de combats, au début en tout cas. Je ne suis pas capable de dire à partir de quel moment la situation est devenue plus difficile, 2012 ou 2013. Au début, notre usine était dans une zone « protégée » par les Kurdes. Quand les Kurdes sont partis pour combattre à KOBANE, Daech est arrivé et notre usine a été arrêtée* » ;

> « *Je peux dire que Christian HERRAULT m'a beaucoup parlé à propos de la Syrie de la confusion entre les différents groupes. Du fait qu'on ne savait pas qui était allié de qui ou opposé à qui. Il m'a parlé de son contact avec l'Ambassade de France qui tendait à soutenir semble-t-il notre présence, mais il ne m'a jamais parlé des détails opérationnels et ne m'a jamais demandé mon avis pour savoir si on devait rester ou pas* ».

Bertrand COLLOMB a en conséquence précisé avoir eu conscience de ce que « *la situation générale en Syrie était en train de se détériorer* », ayant notamment été informé de kidnappings, qu'il décrivait néanmoins comme « *le quotidien des opérations en zones troublées* » (**D1393/14**).

Il a également indiqué avoir été informé du rôle de Firas TLASS en tant qu'intermédiaire, partenaire et actionnaire de LAFARGE en Syrie, et avoir personnellement rencontré Amro TALEB à deux reprises, avant d'être informé par Christian HERRAULT de ce qu'il s'agissait d'un « *gars dangereux* » qu'il ne devait plus recevoir.

En conclusion, après avoir relevé l'absence de combats aux abords directs de l'usine avant son évacuation, Bertrand COLLOMB a indiqué : « *à l'époque, rien de ce que n'a dit Christian HERRAULT ne m'a choqué ou a déclenché chez moi une alerte. Ce n'était pas une situation facile mais une situation sous contrôle* » (**D1393/9**).

Il est frappant de constater que la teneur des informations transmises par Christian HERRAULT à Bertrand COLLOMB au sujet de la Syrie sont très similaires à que Bruno LAFONT affirme avoir reçues, sans aucune référence à des paiements à des groupes terroristes.

Enfin, force est de constater que cette prétendue information de Bruno LAFONT par Christian HERRAULT ne ressort <u>à aucun moment, explicitement ou implicitement,</u> d'aucun élément objectif de l'information et notamment :

58

- des innombrables échanges de courriels entre Christian HERRAULT et ses subordonnés ou interlocuteurs utiles pour la gestion de la situation syrienne pendant la période visée à la prévention ou même après ;

- du premier mémorandum détaillé sur la situation syrienne, établi directement à la suite des révélations du Monde, le 29 juin 2016, par Christian HERRAULT, à destination de Bertrand COLLOMB, mais également de Eric OLSEN et transféré « *pour avis* » à Jean-Claude VEILLARD (**D1995/13**) : il est révélateur de constater qu'il ne comporte aucune mention de paiements à des entités terroristes et qu'il correspond précisément au *reporting* dont Bruno LAFONT affirme avoir été destinataire à l'époque des faits (**D1995/14**).

Pour conclure sur ce point, rien ne permet de mettre en doute la parole claire et constante de Bruno LAFONT, selon laquelle la première information compréhensible qu'il a reçue de Christian HERRAULT quant à un accord financier avec une entité terroriste, en l'occurrence Daesh, est apparue au cours du comité exécutif du 27 août 2014.

La date de cette révélation, à l'exclusion de toute autre alerte antérieure, est d'autant plus crédible que le dossier démontre qu'elle intervient quelques jours après :

- la mise en place à l'été 2014 d'un accord provisoire direct de 15 jours avec Daesh, décidé par Christian HERRAULT après consultation de Jean-Claude VEILLARD, à l'insu de Bruno LAFONT (**D490/51**) ;

- la transmission par Frédéric JOLIBOIS à la direction juridique du groupe LAFARGE SA d'informations relatives à la classification terroriste de Daesh par l'ONU intervenue le 15 août 2014 (**D1705/12**).

Manifestement, dans ce contexte, la découverte par le groupe de l'existence de rapports financiers avec des entités terroristes, et à tout le moins avec Daesh, devenait inéluctable, ce que démontrera l'interpellation de Bruno LAFONT par la directrice juridique Bi-Yong CHUNGUNGO quelques jours après le COMEX, le 4 septembre 2014 (**D804/3, D806/3**).

### 1.2   Les comptes-rendus des comités de sûreté

L'ordonnance de renvoi soutient que dès novembre 2012, les comités de sûreté rédigés par Jean-Claude VEILLARD « *étaient tous remis à Bruno LAFONT* » et que « *ce dernier devait nécessairement* [en] *prendre connaissance s'agissant du suivi de l'évolution de la protection des intérêts et du patrimoine du groupe au niveau mondial"*. Elle relève encore que ces comités présentaient "*notamment l'évolution des forces en présence autour de l'usine*" et décrivait "*les enlèvements de salariés [et] la montée en puissance des groupes salafistes dans la région* » (**ORTC, p. 243**).

Elle retient comme un élément à charge contre Bruno LAFONT le contenu des comptes-rendus des comités de sûreté des 8 novembre 2012, 18 décembre 2012, 12 septembre 2013, 15 octobre 2013 (**ORTC, p. 243**).

A titre liminaire, il convient de rappeler que, par définition, l'objet même de ce comité de sûreté est de traiter des situations à risque sur le plan sécuritaire, et en particulier dans les pays en proie à l'instabilité. Qu'il s'agisse de l'Arabie Saoudite (**D432/10**), de l'Algérie (**D432/12**), du Nigéria (**D432/16**), du Kenya (**D432/21**), du Maroc (**D432/32**), ou encore de l'Irak (**D432/57)** les comptes-rendus relatifs à ces pays

59

faisaient quasi systématiquement état de l'existence d'une menace terroriste, ainsi que d'incidents récurrents liés au terrorisme (kidnappings, vols, rackets).

C'est donc à l'aune de la vocation naturelle du comité de sûreté à traiter et donc à évoquer des situations particulièrement sensibles que doit être appréciée la perception de leur compte-rendu par leur lecteur.

Dans ce contexte, il sera démontré que :

- d'une part, s'agissant de la Syrie, la teneur de ces comptes-rendus, si elle était incontestablement préoccupante quant à l'environnement de l'usine, ne contenait pas d'informations claires relatives à des accords financiers avec des groupes terroristes ;

- d'autre part, Bruno LAFONT, bien que destinataire de ces documents, n'en prenait connaissance que lorsque l'un des membres du comité venait attirer son attention sur une difficulté majeure, ce qui n'a pas été le cas s'agissant de la Syrie.

### 1.2.1   *Le contenu des comptes-rendus des comités de sûreté*

L'ordonnance de renvoi commence par relever à juste titre que les comptes-rendus de comité de sûreté de 2012 ont « *présenté notamment l'évolution des forces en présence autour de l'usine, décrit les enlèvements de salariés, signalé la montée en puissance des groupes salafistes dans la région* » (**ORTC, p. 243**).

En revanche, c'est de manière erronée qu'il est soutenu que « *dès septembre 2013, ces comptes-rendus avaient mis clairement le doigt sur les implications financières du maintien de l'usine en activité* » (**ORTC, p. 243**).

Ainsi qu'exposé ci-après en effet, si certains comptes-rendus de comité de sûreté relatifs à la Syrie faisaient état d'informations sécuritaires inquiétantes, elles n'étaient pas de nature à révéler l'existence de relations financières de LCS avec des groupes terroristes.

Le compte-rendu du comité de sûreté du 8 novembre 2012, relate notamment « *la montée en puissance des groupes extrémistes terroristes", "le réseau Al Nousra, soutenu et financé par le Qatar,* [qui] *est le plus visible* » et qui « *constitue une menace supplémentaire* ».

Ce compte-rendu précise que cette citation est suivie « *avec la cellule de pré-crise* » (**D432/27**).

Le compte-rendu du comité de sûreté du 18 décembre 2012, fait état d'une « *dégradation continue de la situation sécuritaire", "de tensions entre les Kurdes du PYD et des milices se réclamant de l'Armée Syrienne Libre ASL ou des réseaux salafistes (Front Al Nousra désormais inscrit sur la liste des organisations terroristes par les USA)* ».

Il précise en outre que les routes de Manbij et d'Alep sont tenues par l'ASL et par les Kurdes.

Il est encore mentionné que Jean-Claude VEILLARD suit la situation avec la cellule de pré-crise, que Eric OLSEN doit définir la stratégie pour l'usine et que Christian HERRAULT doit en évaluer « *l'exposition* » (**D432/29/30**).

Le compte-rendu du comité de sûreté du 11 septembre 2013, mentionne que « *depuis juillet 2013, les flux logistiques et-les mouvements de personnels sont perturbés, voire parfois bloqués par les islamistes, AN et ISIS. Ces derniers exigent que leur soit « versée une taxe » afin d'autoriser le passage des camions et des véhicules. Bruno Pescheux et Jacob*

60

*Waerness sont d'ailleurs « convoqués « devant le tribunal islamique de Raqqah par l'ISIS afin de rendre compte des accusations portées contre eux: coopération avec le régime syrien, vandalisme à l'encontre des routes, favoritisme ethnique... La présence de ces groupes islamistes constitue pour nous la menace principale à prendre en compte. Il devient de plus en plus difficile d'opérer sans être amené à négocier directement ou indirectement avec ces réseaux classés terroristes par les organisations internationales et les Etats-Unis. La difficulté majeure étant d'évaluer jusqu'où peuvent aller leurs exigences et leurs menaces et, par voie de conséquence les limites que l'on veut se fixer pour le fonctionnement du site ».*

Il est également noté que Jean-Claude VEILLARD doit « *proposer de nouveaux repères de l'évaluation des risque*s » **(D432/55/56).**

Ce compte-rendu fait certes état d'une aggravation du conflit et de la présence de groupes islamistes exigeant qu'une taxe soit versée pour permettre la libre circulation des véhicules de l'usine. La lecture de ce passage fait néanmoins ressortir :

- qu'il n'a pas été répondu à ces demandes par les représentants de LCS, raison pour laquelle Bruno PESCHEUX et Jacob WAERNESS auraient été convoqués par ISIS ;

- que Jean-Claude VEILLARD s'interroge sur la réalité de « *leurs exigences et leurs menaces* » et *par voie de conséquence* [sur] *les limites que l'on veut se fixer pour le fonctionnement du site* ».

Si cette présentation reflète un contexte sécuritaire complexe aux abords de l'usine, c'est à tort que l'ordonnance de renvoi prétend que « *dès septembre 2013, ces comptes-rendus avaient mis clairement le doigt sur les implications financières du maintien de l'usine en activité* » (**ORTC, p. 243**).

Le compte-rendu du comité de sûreté du 15 octobre 2013 énonce quant à lui qu'« *autour de l'usine, les forces kurdes du PYD restent très présentes et tiennent le terrain. Le contrôle des postes frontières reste un enjeu fort qui donne lieu à de nombreux accrochages armés opposant le PYD aux autres forces en présence. ISIS, al Nusra...*

*Grâce à des négociations menées avec les différents intervenants, les flux logistiques et les mouvements de personnes ont pu reprendre. Les ventes ont ainsi pu atteindre des niveaux moyens journaliers supérieurs à 3000 tonnes. Les approvisionnements sont globalement assurés* » (**D432/57**).

Sur le plan sécuritaire, un paragraphe de ce compte-rendu relate l'information positive selon laquelle l'usine reste sous la protection des forces kurdes du PYD qui « *tiennent le terrain* » mais précise que le contrôle des postes frontières conduit ces dernières à s'opposer aux groupes « *ISIS* [et] *al Nusra* ». Les Kurdes du PYD sont ainsi expressément désignés comme les seules forces en contact avec l'usine.

Dans un paragraphe distinct, il est ensuite fait état de « *négociations menées avec les différents intervenants* » ayant permis la reprise de l'activité de l'usine, « *négociations* » dont il n'est pas permis de comprendre ce qu'elles recouvrent et qui elles impliquent.

Jean-Claude VEILLARD, le rédacteur de compte-rendu, a d'ailleurs lui-même déclaré à son sujet : « *à l'époque où j'écris cela ces négociations n'impliquent que le PYD et la FSA. C'est pour cela que le deuxième paragraphe est dissocié du premier* » (**D475/9**).

De manière générale, concernant les comités de sûreté et leurs comptes-rendus, Jean-Claude VEILLARD a toujours affirmé qu'il n'avait jamais pu être question à ces occasions de paiements à des groupes terroristes.

61

Ainsi, et dès le 12 juin 2017, dans un long courrier qu'il adressait au sujet du rapport Baker & McKenzie à Beat HESS en sa qualité de Président du conseil d'administration de LafargeHolcim, Jean-Claude VEILLARD a fermement contesté l'interprétation, erronée selon lui, au terme de laquelle les comptes-rendus des comités de sûreté auraient pu révéler l'existence de négociations et de paiements à des groupes terroristes (**D345/5**).

Le 30 novembre 2017, alors qu'il était interrogé en garde à vue, Jean-Claude VEILLARD a encore affirmé que « *concernant les transactions évoquées évidemment qu'on en parlait pas en comité de sûreté, c'était l'affaire d'un triumvirat TLASS, PESCHEUX, HERRAULT* » (**D478/8**).

Pour dénier à Jean-Claude VEILLARD le statut de lanceur d'alerte, le PNAT a lui-même relevé, au soutien de son réquisitoire définitif, l'absence d'évocation explicite de tels paiements dans les comptes-rendus des comités de sûreté :

> « *Le directeur sûreté oppose avoir été un lanceur d'alerte, ce qui ne lui conférerait aucune responsabilité dans les agissements du groupe dans lequel il officiait et dont il suivait spécifiquement la situation en Syrie. Il est constant qu'il a alimenté le comité sûreté comportant notamment sa propre hiérarchie et dont les procès-verbaux étaient communiqués au président directeur général, <u>sans cependant que les traces de ses évaluations sécuritaires ne portent mention explicites de la pratique illégale de paiements au profit de groupes armés terroristes</u>, ni que des conseils en vue d'abandonner la cimenterie syrienne n'y soient consignés* » (**RD, p. 201**).

Dans ses observations en réponse à ce réquisitoire, Jean-Claude VEILLARD a affirmé que :

> « *les comptes-rendus des deux comités des 11 septembre 2013 et 15 octobre 2013 abordant expressément la présence d'entités terroristes, repris dans le réquisitoire définitif, ne font qu'évoquer les forces en présence autour de l'usine et alerter sur les pratiques de racket des différentes factions autour de l'usine, sans d'ailleurs évoquer un problème propre à Lafarge* » (**D3157/8**).

Il ajoute que « *<u>ces procès-verbaux, qui ne font qu'un état des lieux neutre et objectif des enjeux sécuritaires auxquels les usines Lafarge étaient exposées et ne revêtent en rien le caractère de « conseils » et qui ne contiennent aucune évocation de négociations ou paiements</u>, ne sauraient constituer une quelconque participation de Monsieur Jean-Claude Veillard au « processus de paiement de sécurité » dénoncé* » (**D3157/9**).

A l'audience, le PNAT a lui-même consacré un long moment à interroger Jean-Claude VEILLARD pour établir le fait que ses notes aux services, dont certaines sont rédigées dans des termes très proches des deux comptes-rendus des comités de sûreté concernés, ne donnaient aucune information explicite quant au paiement de groupes terroristes par LCS.

L'ordonnance de règlement elle-même retient dans le même sens, pour justifier un non-lieu en sa faveur, que dans les comptes-rendus des comités de sûreté qu'il présidait, « *<u>il ne mentionnait explicitement ni la pratique illégale de paiements au profit de groupes armés terroristes, ni des conseils en vue d'abandonner la cimenterie syrienne</u>* » (**ORTC p. 220**).

Et pour cause, ainsi qu'il sera ultérieurement développé, la question des paiements de sécurité, directs ou indirects, à des groupes armés, n'a jamais été discutée en comité de sûreté, et était réservée à un comité beaucoup plus restreint composé d'opérationnels.

En ce sens, Jean-Claude VEILLARD a affirmé de manière particulièrement éloquente : « *concernant les transactions évoquées évidemment qu'on en parlait pas en comité sureté* » (**D478/8**).

62

Il est à cet égard particulièrement révélateur de constater que les noms de Firas TLASS et d'Amro TALEB ne sont jamais mentionnés dans un compte-rendu de comité de sûreté, alors que le recours à ces intermédiaires apparaît à la lecture du dossier comme un élément central s'agissant des paiements en cause.

Ces éléments sont susceptibles d'expliquer les déclarations de l'ensemble des membres des comités de sûreté affirmant sans équivoque l'ignorance totale de quelconques paiements au profit d'un groupe terroriste, malgré leur participation aux séances, notamment Sonia ARTINIAN (**D718/1 ; D836/14**), Bi-Yong CHUNCUNGO (**D1481/9, 10 et 19**), Guillaume ROUX (**D686/2**), Éric MEURIOT (**D1306/2**).

Force est de constater que la teneur de ces comptes-rendus de comité de sûreté ne renfermait pas de mentions révélant des pratiques illégales de paiements par LCS à des entités terroristes.

De surcroît, et même à retenir une interprétation du contenu des comptes-rendus des comités de sûreté litigieux qui serait contraire à celle, tout à la fois de leur rédacteur, de tous les membres du comité de sûreté, du réquisitoire définitif et de l'ordonnance de renvoi, la preuve n'est pas rapportée de leur lecture effective par Bruno LAFONT.

### 1.2.2 *La connaissance des comptes-rendus des comités de sûreté par le PDG*

- Bruno LAFONT ne prenait pas « *nécessairement connaissance* » des comptes-rendus des comités de sûreté

Sur la question de la prise de connaissance effective de ces comptes-rendus par le PDG Bruno LAFONT, l'ordonnance de renvoi se fonde sur une déduction péremptoire, en affirmant que « *ce dernier devait nécessairement (en) prendre connaissance s'agissant du suivi de l'évolution de la protection des intérêts et du patrimoine du groupe au niveau mondial* » (**ORTC, p. 243**).

Il doit être rappelé à ce sujet que Bruno LAFONT n'était pas membre du comité de sûreté, dont la présidence était assurée par le DRH du groupe (Eric OLSEN puis Sonia ARTINIAN à compter de septembre 2013).

Aux termes du document intitulé « *mandat du comité de sûreté* » établi le 4 décembre 2013 rappelé ci-dessus, le comité de sûreté était une structure autonome et indépendante du COMEX, dont l'information n'était prévue que pour :

- valider ou faire valider par le COMEX les différentes directives et recommandations proposées par le directeur Sûreté ;

- approuver les adaptations de la politique sûreté groupe.

Le même document précise en outre qu'il appartient à la présidente du comité de sûreté de « *faire la liaison avec le COMEX* » (**D1105/4**).

Chacun des membres composant le comité de sûreté était par ailleurs en mesure d'assurer toute remontée d'informations utiles au PDG.

63

Dans ces conditions, Bruno LAFONT n'était pas dans la boucle des destinataires des comptes-rendus des comités de sûreté et n'en prenait que très ponctuellement connaissance, dès lors que :

- il s'agissait d'une mission déléguée à des collaborateurs de haut niveau ;

- il ne doutait pas que ces derniers lui feraient remonter toutes difficultés majeures susceptibles de le concerner (comme a précisément pu le faire Sonia ARTINIAN s'agissant du comité du sûreté tenu le 11 septembre 2013 (**D391-2/SecCom49**)) ;

- il était astreint à un rythme professionnel particulièrement dense imposant qu'il se concentre sur ses activités propres.

Il avait néanmoins demandé à se faire remettre une copie papier des procès-verbaux de ces réunions – lors de sa création en 2008 - de manière à signifier l'importance accordée à cette fonction à compter de sa mise en place en 2008 (**D232/5, D587/4**) :

> *« C'est moi qui ai demandé à être destinataire de ces comptes-rendus. Je les avais demandé à Jean-Claude VEILLARD dès la mise en place de ce comité pour lui signifier que je soutenais le travail qu'il accomplissait et pour lui témoigner l'intérêt que je témoignais au démarrage de ses fonctions »* (**D1267/13**).

Bruno LAFONT a expliqué qu'il lui était arrivé, de manière occasionnelle, de parcourir les points de politique générale des comptes-rendus des comités de sûreté qui concernaient ses fonctions propres de PDG (**D1267/14**).

Si Christian HERRAULT soutient quant à lui qu'il évoquait avec Bruno LAFONT les comités de sûreté et prétend que ce dernier ne les découvrait pas, il formule en réalité de simple suppositions, soutenant qu'il « *pense qu'il les avait lus* » (**D568/2**) tout en précisant n'avoir jamais vu Bruno LAFONT « *consult[er] la version papier pendant [leurs] entretiens* » (**D568/2**), et concédant qu'il « *ne peu[t] être affirmatif pour tel ou tel comité* » (**D1223/5**).

Comme l'a indiqué par ailleurs Jean-Claude VEILLARD, Bruno LAFONT pouvait parfois l'appeler pour obtenir des précisions sur l'un des points évoqués lors d'un comité de sûreté, tout en précisant qu'avec le temps, ces appels – une dizaine entre 2011 et 2015 (**D478/5**) – s'étaient faits de plus en plus rares (**D840/16**), Bruno LAFONT ayant pu s'assurer que la fonction « sûreté » fonctionnait de manière satisfaisante.

Ainsi, la seule circonstance que Bruno LAFONT a, lors de la création du comité de sûreté et pour les raisons déjà exposées, sollicité la remise de ces comptes-rendus ne permet aucunement d'en déduire qu'il les lisait systématiquement et entièrement.

- Le courriel envoyé par Bruno LAFONT le 15 septembre 2013 ne démontre en rien qu'il ait lu la totalité du compte-rendu du comité de sûreté du 11 septembre 2013

L'ordonnance de renvoi soutient de manière également inopérante que le mail de Bruno LAFONT en date du 15 septembre 2013 dans lequel il réagissait à l'un des sujets abordés lors du comité de sûreté du 11 septembre 2013, démontrerait qu'il avait lu l'intégralité de ce compte-rendu et plus généralement de tous les autres (**ORTC p.238**).

64

Il convient de rappeler à cet égard que Sonia ARTINIAN a pris ses fonctions en tant que DRH, et à ce titre de présidente du comité de sûreté, au mois de septembre 2013.

Le comité de sûreté du 11 septembre 2013 était donc le premier qu'elle présidait, et même le premier auquel elle participait.

Sonia ARTINIAN a déclaré qu'à l'issue du ce comité de sûreté, elle avait opéré une remontée d'information à son PDG, en l'alertant d'une difficulté relative à la politique de sûreté des déplacements professionnels :

> « *J'avais un point mensuel où nous évoquions 90% du temps des sujets RH et **j'ai pu lui parler de sûreté quand une politique sûreté groupe devait évoluer ou quand j'avais été alerté qu'une politique sûreté groupe n'avait pas été mis en place et que le directeur pays ne faisait rien, <u>j'ai du intervenir deux fois en deux ans, une fois concernant la politique sûreté des déplacements professionnels (car nous avions constaté que des employés ne respectaient pas cette politique en informant le service concerné qu'ils se déplaçaient)</u> et concernant les plans d'action de protection des usines*** » (**D714/2**).

La consultation de l'agenda de Bruno LAFONT confirme que Sonia ARTINIAN l'a bien rencontré le 11 septembre 2013 de 15h45 à 16h15, après le comité de sûreté et avant que ce dernier ne s'envole pour les Etats-Unis (**D3156/51**).

C'est dans ces circonstances et dans le prolongement de cette remontée d'informations que Bruno LAFONT a pu prendre connaissance de la page de ce compte-rendu consacrée au sujet des « *déplacements professionnels* » (**D704/88**) et qu'il a adressé le dimanche 15 septembre 2013, jour de son retour de déplacement professionnel (**D3156/52**), un mail aux membres du COMEX avec pour objet : « s*ûreté* », indiquant :

> « *Le dernier compte rendu du Comité Sûreté ([établi le] 12 septembre) <u>**semble faire état** de manquements à la procédure sûreté concernant les voyages professionnels</u>. Nous prendrons une décision demain mais je suggère que vous preniez la mesure exacte du phénomène dans votre domaine de responsabilité avec que nous agissions* » (**D1705/7**).

Loin de constituer une charge à l'encontre de Bruno LAFONT, les circonstances de ce mail du 15 septembre 2013 illustrent au contraire ses déclarations constantes relatives à son positionnement par rapport aux comités de sûreté.

- Le syllogisme accusatoire résultant de la lecture combinée des comités de sûreté des 11 septembre et 15 octobre 2013 ne résiste pas à l'analyse

Enfin, au sujet des comités de sûreté, l'ordonnance de renvoi (p. 243/244) soutient en substance qu'il résulterait d'une part de l'évolution des mentions des comptes-rendus de sûreté des 11 septembre et 15 octobre 2013, et d'autre part des règles de fonctionnement des comités de sûreté, qu'« *il n'est pas envisageable de soutenir que Christian HERRAULT qui a assisté à ce comité, que Sonia ARTINIAN qui le présidait avec la charge de faire valider par le COMEX les recommandations proposées par le directeur Sûreté n'ont pas évoqué cette évolution avec le PDG de LAFARGE, qui expliquerait que soit mentionné au compte-rendu du comité sûreté suivant du 15 octobre 2013 (les mentions ci-avant rapportées)* » *(*ORTC p.243).

65

Au-delà du fait que cette phrase est quasiment incompréhensible dans le lien qu'elle prétend rapporter entre l'évolution des mentions des deux comptes-rendus et l'information qui aurait été donnée au COMEX et/ou au PDG, cette assertion est dépourvue de tout fondement.

En effet, en premier lieu déjà, il convient de rappeler que « *la charge [de Sonia ARTINIAN) de faire valider par le COMEX les recommandations proposées par le directeur sûreté* », n'apparaît que dans le document intitulé « *mandats du comité de sûreté* » établi le 4 décembre 2013 (**D1105**), soit postérieurement au comité de sûreté d'octobre 2013.

En deuxième lieu, il résulte du compte-rendu du comité de sûreté du 11 septembre 2013 que celui-ci n'a donné lieu à aucune « *recommandation* » ou « *directive* » devant être transmise au COMEX puisque les deux seules indications qu'il supporte dans la colonne de droite sont les suivantes :

- « *JCV : proposer de nouveaux repères d'évaluation des risques* » (**D432/55**) ;
- « *JCV : suivre les mises à jour des plans : crise, continuité d'activités, évacuation* » (**D432/56**).

D'ailleurs, il ne ressort du COMEX du 16 septembre 2013, intervenu entre ces deux comités de sûreté, aucune mention relative à la Syrie (**D391-2, NA0161R01-00000737-00049 (p. 48/62)**).

En troisième lieu, si comme l'a relevé le Tribunal un rendez-vous avec Christian HERRAULT apparaît bien, sept jours après ce comité, le 18 octobre 2013 à 17 heures sur l'un des agendas de Bruno LAFONT communiqué par LAFARGE SA (**D1705/43**), la consultation de l'autre agenda de Bruno LAFONT, communiqué par ses conseils à l'appui de ses observations aux fins de non-lieu (**D3156**), démontre que ce rendez-vous n'a en réalité pas eu lieu[20].

En dernier lieu, Sonia ARTINIAN a affirmé n'avoir évoqué avec Bruno LAFONT aucun autre sujet que celui des déplacements à l'issue du comité de sûreté du 11 septembre 2013 (**D718/1, D718/6, D836/14**).

Dans ces conditions, c'est à tort que l'ordonnance de renvoi croit pouvoir présumer qu'une remontée d'information se serait opérée entre les deux comités de sûreté précités.

Il résulte de ces développements, que la seule lecture des comités de sûreté à l'époque des faits n'était pas de nature à révéler l'existence de paiements à des entités terroristes par LCS et que Bruno LAFONT n'en a pris connaissance que de manière très exceptionnelle et en se concentrant sur la mise en œuvre des politiques générales du groupe, conformément à sa mission.

    1.3  <u>Les autres courriels et éléments visés dans l'ordonnance de renvoi pour tenter de crédibiliser la thèse de la connaissance par Bruno LAFONT des paiements à des groupes terroristes :</u>

- <u>Le SMS du 2 août 2013</u>

L'ORTC retient que : « *Jean-Claude VEILLARD écrivait à son adjointe Hélène SEGUIN pour lui rapporter les propos d'Antoine SFEIR annonçant une offensive vers l'Est dans les jours à venir. Il lui communiquait le contenu du SMS qu'il disait avoir envoyé à Bruno LAFONT : « le SMS que j'ai envoyé à BL : long échange avec A. Sfeir. Son analyse*

---

[20]    Il doit être observé à cet égard que le premier agenda communiqué par LAFARGE SA a manifestement été abandonné en cours d'année et remplacé par un second agenda, communiqué par la défense de Bruno LAFONT, et dont la consultation établit qu'il est le seul à pouvoir faire foi et à recenser de façon complète le calendrier professionnel et personnel de Bruno LAFONT.

*confirme notre vision. Un peu optimiste sur les options militaires des forces loyalistes. Toutefois, sur la base des informations partagées, pas de décisions différentes par rapport à celles déjà prises : stopper l'usine, mettre nos personnels à l'abri, préserver nos biens, faire le dos rond en laissant passer l'orage. Il est trop tôt et trop dangereux de prendre parti. Notre neutralité reste notre meilleur atout. Prochain point avec lui mardi » (D2010/8) »* (**ORTC p .237**).

A titre liminaire, il convient de relever que le SMS évoqué par Jean-Claude VEILLARD ne figure pas au dossier d'instruction.

En toute hypothèse, ce SMS semble avoir pour objet de faire savoir à Bruno LAFONT que la décision qui a été prise depuis le 23 juillet 2013 d'arrêter provisoirement l'usine (**D1705/5**) pour mettre les « *personnels à l'abri* », « *préserver [nos]biens et laisser passer l'orage* », est confortée par l'analyse d'Antoine SFEIR.

La teneur de ce message ne constitue nullement une charge et vient en réalité confirmer :

- la perception par Bruno LAFONT de la situation sécuritaire telle qu'elle apparaît dans sa note établie le 29 juillet 2013 et son absence d'opposition à un arrêt de l'usine : « *Syrie. Situation compliquée. <u>On replie calmement</u>* » (**D311/1**) ;

- la mise en relation d'Antoine SFEIR avec Jean-Claude VEILLARD et Christian HERRAULT afin de leur permettre de bénéficier d'un éclairage avisé dans la gestion de la sûreté de l'usine en Syrie.

- <u>L'échange de courriels entre Christian HERRAULT et Bruno PESCHEUX le 16 février 2014</u>

L'ordonnance retient encore que « *le 16 février 2014, Bruno PESCHEUX rendait explicitement compte à Christian HERRAULT d'une situation calme avec l'État islamique qui tenait Manbij où les employés résidaient, et qui permettait de procéder à des acquisitions de fuel et de pouzzolane, <u>Christian HERRAULT répondait en écrivant « je transmets »</u> (D452/97, pièce FRMLAT_00006324)* »* (**ORTC p. 238**).

<u>D'une part</u>, il convient d'observer que cette présentation tronquée des échanges entre Christian HERRAULT et Bruno PESCHEUX est trompeuse en ce qu'elle laisse croire à tort que l'information que Christian HERRAULT indique vouloir transmettre - sans aucune précision quant à l'identité du destinataire - serait la suivante : « *situation with Daech (the jihadists of Islamic State in Iraq and Sham (ISIS)) is relatively calm and we are currently finalizing purchasing of pozzolana and fuel oil* » (**D452/97**).

Or en réalité, dans ce mail du 16 février 2014, Bruno PESCHEUX transmet à Christian HERRAULT une liste d'informations distinctes relatives à la situation générale de l'usine et notamment la suivante concernant le PYD : « *the main issue is related to the behavior of PYIJ who wants te interfere more and more in the plant issues (people recruitment, purchasing)* » (**D452/97**).

Et c'est précisément à cette information que Christian HERRAULT répond en ces termes :

> « *Merci. Je note que le PYD n'a en rien changé son attitude. Je transmets.*
> *Que pouvons nous faire pour t'aider!* » (**D452/97**).

Cette citation complète, contrairement à celle mentionnée dans l'ordonnance de renvoi, <u>démontre clairement que Christian HERRAULT ne répond pas au point relatif à Daesh mais exclusivement à celui concernant le PYD.</u>

67

La phrase « *je transmets* » porte donc sur l'information selon laquelle le comportement du PYD vis-à-vis de l'usine deviendrait de plus en plus problématique.

D'autre part, aucun destinataire n'est rattaché par Christian HERRAULT à cette phrase, « *je transmets* ».

Il n'est établi au dossier :

- ni que cette information ait été transmise à quiconque ;
- ni qu'elle ait été transmise à Bruno LAFONT.

Et à cet égard, il ne peut être manqué de rappeler que début 2014, s'agissant de la question kurde, l'interlocuteur privilégié de Christian HERRAULT est son ami Patrice FRANCESCHI (**D1703/7 et 1703/8**).

Dans ces conditions, cet élément relevé par l'ordonnance de renvoi ne permet ni de conclure ni même de supposer que Bruno LAFONT aurait été destinataire d'une quelconque information relative à l'Etat Islamique.

- <u>Le prétendu dîner prévu entre Firas TLASS, Nassef SAWIRIS et Bruno LAFONT entre le 8 et 18 mai 2014</u>

L'ordonnance de renvoi retient encore : « *le 25 mars 2014, Firas TLASS annonçait prévoir de se rendre en France du 8 au 18 mai et avoir alors prévu un dîner avec Nassef SAWIRIS, l'actionnaire majoritaire d'Orascom ayant depuis intégré l'actionnariat de Lafarge, et Bruno LAFONT. L'intermédiaire syrien demandait instamment une réunion avec Christian HERRAULT et Jean-Claude VEILLARD « avant de voir LAFONT ». Christian HERRAULT faisait vérifier la réalité du dîner évoqué » (D556/19-20)* » (**ORTC, p. 238**).

Bruno LAFONT a toujours contesté l'existence même de ce dîner, qui n'est d'ailleurs inscrit sur aucun agenda.

Brigitte SELLIER et Sophie FAURE, interrogées à ce sujet, ne peuvent « *ni le confirmer, ni l'infirmer* » (**D662 ; D1017**).

Il est en réalité constant qu'il n'y a jamais eu d'entretien ni de rencontre entre Firas TLASS et Bruno LAFONT depuis 2010 (**D556/19-20**).

- <u>Les courriels envoyés par Christian HERRAULT à Bruno LAFONT les 11 et 13 avril 2014</u>

L'ordonnance de renvoi évoque encore :

> « *Le 11 avril 2014, Christian HERRAULT envoyait à Bruno LAFONT son tableau EBITDA 2014 pour ses pays et résumait les grandes tendances :« 1) Le Q1 est meilleurs que celui que j'avais annoncé car quelques pays ont fait mieux que leurs prévisions, notamment Chine, Irak et Syrie. Nous arrivons au budget, soit près de 50 millions d'euros de plus que l'année dernière. 3) Les pays qui risquent de souffrir en Q2 (en sus de l'Afrique du Sud) 32) La Syrie où l'usine tourne dans des conditions difficiles à imaginer ». Le 13 avril, il précisait : « Je mets la Syrie à part, car elle avait un bon Q1 mais la situation est plus que jamais volatile, donc, je ne peux rien dire si ce n'est que l'usine continue aujourd'hui à tourner » (pièce FRMLAT 000075 13.eml issue de la copie de travail annexée en D1949)* » (**ORTC, p. 238**).

68

Ce courriel qui synthétise un tableau EBITDA, document comptable interne obligatoire, se borne à présenter des données financières consolidées et des commentaires généraux sur la situation opérationnelle difficile à l'exclusion de toute indication concrète ou factuelle de nature à alerter sur d'éventuels agissements illicites.

- Les courriels échangés entre Christian HERRAULT et Bruno LAFONT le 7 août 2014

L'ordonnance de renvoi retient que « *le 7 août 2014, au sujet de la situation en Irak, Christian HERRAULT rapportait à Bruno LAFONT les affrontements entre les peshmergas kurdes et l'État islamique, dont il détaillait de nouveau les appellations d'alors comme étant « l'EIIL (ou ISIS ou Daesh) »* (pièce FRMLAT_00003696) » (**ORTC p.238**).

Dans ce courriel envoyé le 7 août à 14h05, qui ne fait pas état de paiements à des groupes terroristes, Christian HERRAULT informe Bruno LAFONT de la situation en Irak et non en Syrie, et pense de nouveau utile de rappeler à ce dernier ce à quoi correspondent les différentes appellations « *EIIL (ISIS ou Daesh)* ».

Cet élément ne peut donc en aucun cas constituer une charge, d'autant moins que l'examen du dossier démontre que la veille et le jour même, Christian HERRAULT et Frédéric JOLIBOIS discutent des modalités financières précises d'un éventuel accord avec Daesh, Christian HERRAULT indiquant notamment le 7 août 2014 au matin à ce sujet : « *je ne voudrais pas que les taxes « perçues » dépassent 50% de la contribution normale. Sinon cela ne fait plus grand sens* » (**D1028/43**), ce qui démontre une remontée d'information pour le moins incomplète.

Aucun des éléments qui précède ne permet d'étayer la thèse de la poursuite selon laquelle une ou plusieurs information(s) relative(s) à des paiements à des groupes terroristes aurait été transmise à Bruno LAFONT.

1.4 Les opinions selon lesquelles Bruno LAFONT « savait » ou « ne pouvait que savoir »

A l'exception de Christian HERRAULT, aucune des personnes interrogées au cours de la procédure ne soutient avoir transmis ou avoir été le témoin d'une transmission, à Bruno LAFONT, d'informations relatives à des paiements à des entités terroristes.

Quelques rares personnes entendues ont seulement exprimé leur opinion selon laquelle Bruno LAFONT, en sa qualité de PDG, ne pouvait ignorer ce qu'il se passait en Syrie.

L'ordonnance de renvoi cite ainsi :

- Jean-Claude VEILLARD, qui a formulé rétrospectivement, le 28 juin 2016, auprès de Frédéric JOLIBOIS et de Bruno PESCHEUX, le commentaire ironique suivant sur Bruno LAFONT : « *pour info la situation s'aggrave avec le parquet de Paris et probablement la commission parlementaire qui mettent les pieds dans le plat. Mais BL n'est au courant de rien., c'est notre Virenque !!! A l'insu de son plein gré !!* » (**D1995/79**, **ORTC, p. 240**) ;

- Eliane FOURMONT, assistante de Christian HERRAULT, qui à la question de savoir : « *s'il y a eu financement de groupes islamistes par LAFARGE SA grâce à la validation de "donations" par Christian HERRAULT à Paris, Bruno LAFONT pouvait-il l'ignorer ?* », a répondu : « *Non. Je ne peux pas*

69

_affirmer ce que je dis. C'est ce que je crois._ Bruno LAFONT _était un président très autoritaire et rien ne se passait chez_ LAFARGE _sans qu'il en soit informé_ » (**D1010/4**) ;

- Laurie WADDY, responsable de la conformité de LAFARGEHOLCIM, qui à la question « _pensez-vous que Bruno LAFONT était au courant?_ » a répondu « _les personnes d'un niveau inférieur à Bruno LAFONT craignait d'être blâmées pour des choses qu'ils avaient faites et en référaient, c'est ce que j'ai pu comprendre. Et également, que Bruno LAFONT savait ou en tout cas ne pouvait pas ignorer_ » (**D1032/10**) ;

- Gérard LAMARCHE, administrateur de LAFARGE SA pour GBL, qui interrogé par les services belges sur ce qui avait été reproché à Bruno LAFONT et à Éric OLSEN à l'issue de l'enquête interne pour justifier que leur démission ait été provoquée, a répondu : « _d'être au minimum informés et de ne pas avoir réagi_ » (**D875/24**).

Ces déclarations, subjectives et orientées, ne reposant sur aucun constat personnel et direct, n'ont évidemment aucune portée probatoire, et leur évocation au sein de l'ordonnance de renvoi à titre de charge est révélatrice de la faiblesse de l'accusation portée contre Bruno LAFONT.

Elles sont en outre contredites par d'autres opinions, telles que celles de :

- Sophie FAURE, assistante personnelle de Bruno LAFONT durant vingt ans, selon laquelle « _Monsieur LAFONT n'a pas mérité ça. C'est vraiment exagéré. Et le connaissant, je ne le vois pas donner des millions à des terroristes. Pour moi, c'est énorme. En plus, tous les locaux étaient complètement indépendants. Je ne serais pas étonné qu'il n'ait pas été au courant de tout ça_ » (**D1017/3**) ;

- Dominique MARS :« _Je considère Monsieur LAFONT comme un homme droit; catholique convaincu et qu'il ne m'a jamais fourni l'occasion de remettre en cause ses propos ou son attitude. Je crois ce qu'il me dit, étant donné le sentiment de probité qu'il m'inspire. Je lui confierai la santé de mes enfants_ » (**D1429**) ;

- Rezlaine ZAHER, autre assistante de Bruno LAFONT au sein de LAFARGE entre 2006 et 2009, qui a spontanément souhaité apporter son témoignage selon lequel elle a pu notamment percevoir en lui « _un sens aigu de l'intégrité, un attachement constant à l'honnêteté et une grande cohérence entre ses paroles et ses actes_ » (Attestation versée aux débats).

Ainsi, en définitive, ces éléments, pris individuellement ou dans leur ensemble, ne contredisent en rien les déclarations constantes de Bruno LAFONT selon lesquelles il n'a jamais été informé de paiements à des groupes terroristes, dont le dossier révèle au contraire qu'ils ont manifestement été gérés de manière autonome et confidentielle.

### 2. La gestion autonome du contexte sécuritaire de l'usine de Jalabiyah

L'analyse objective du dossier met en exergue le glissement de la gestion de la sûreté de l'usine de Jalabiyah, des dispositifs classiques de sûreté du groupe Lafarge, vers un dispositif _ad hoc_, au plus proche des contraintes opérationnelles, placé entre les mains d'un comité restreint (**2.1**)

L'autonomie dont a immédiatement été pourvu ce dispositif s'est révélée – à l'examen du dossier – exacerbée en matière de négociation avec des groupes armés, se traduisant par une remontée d'information particulièrement limitée (**2.2**).

70

2.1  <u>La gestion de la sûreté de l'usine de Jalabiya par un comité restreint</u>

S'il est acquis que Bruno LAFONT a considéré la sûreté comme l'une de ses priorités lorsqu'il a pris la tête du groupe LAFARGE, c'est par l'établissement de dispositifs dont la mise en œuvre pratique reposait sur les individus les plus proches des réalités du terrain qu'il s'est toujours attaché à la développer.

Dans ce contexte, et pour compléter la mission du comité de sûreté à vocation plus générale et agissant au niveau du groupe, il a été prévu <u>la mise en place de cellules, à vocation opérationnelle</u>, assurant spécifiquement dans les pays qui le justifiaient, <u>la gestion des situations considérées comme exceptionnelles</u> (**D1106/17**).

La mise en place, à l'initiative du comité de sûreté du groupe, d'une **cellule de crise** est en effet prévue par le « *Guide opérationnel de la sûreté* » (**D1106/17**).

En pratique, et le cas échéant, le comité de sûreté pouvait faire précéder la création d'une cellule de crise par une cellule dite de pré-crise, c'est-à-dire selon Jean-Claude VEILLARD « *une réunion organisée sur la thématique sûreté sur un sujet sur un pays pour voir s'il y a lieu d'activer la cellule de crise* » (**D479/1**).

Dès lors qu'une telle cellule venait s'ajouter au comité de sûreté, elle devenait l'organe décisionnaire, du fait de son caractère opérationnel et de sa proximité avec les réalités du terrain.

Ayant lui-même « *été responsable de cellules de crise* » au cours de sa carrière dans le groupe LAFARGE, Guillaume ROUX la qualifie en effet comme « *la structure où se prenaient les décisions quotidiennes compte tenu de l'évolution de la situation […] et non pas au sein du comité de sûreté* » (**D689/1-2**).

Corroborant directement cette articulation entre les différents dispositifs de sûreté existant, Jean-Claude VEILLARD explique plus précisément :

> « *pour comparer avec* <u>***le comité de sûreté, ce dernier n'a pas vocation à prendre des décisions sur un plan opérationnel***</u>*, dans la gestion des opérations. Je veux dire par là que ce ne sont pas les membres du comité de sûreté qui peuvent décider. Toutefois les directeurs des opérations participent au comité de sûreté et peuvent utiliser les informations évoquées, s'approprier le sujet et prendre des décisions en fonction de ce qui est révélé.* <u>***La cellule de crise elle peut prendre des décisions. Elle a vocation à se focaliser sur une situation particulière et intègre la direction générale du pays***</u> » (**D840/12**).

S'agissant de la Syrie, une cellule de pré-crise, très rapidement devenue une cellule de crise selon Jean-Claude VEILLARD (**D479/1**), a été mise en place dès la fin de l'année 2011.

Sur le dispositif spécifique mis en place, Hélène SEGUIN, membre de la Direction Sûreté, explique ainsi :

> « *Question 12 : Que pouvez vous nous dire de la cellule de « pré-crise Syrie » mise en place chez Lafarge ?*
>
> *Réponse 11 : On parle de* <u>*fin 2011*</u>*. La situation se dégradait en Syrie, je suppose que c'est à l'initiative de Jean Claude puisque c'est lui qui alerte. A l'époque, parmi les membres il y avait forcément HERRAULT, le DRH, PESCHEUX, peut être la communication, sûrement M. WAERNESS.* <u>***L'idée est de suivre la situation et de faire le point, de voir les actions mises en place, les éléments qui permettraient de prendre la décision de continuer l'activité ou pas***</u>*. […] La différence entre la cellule de pré crise et le comité sûreté est que dans la première, le patron pays est présent et que l'on peut d'avantage entrer dans le détail.*

71

*Cette cellule de pré-crise existe parce que VEILLARD, HERRAULT et PESCHEUX identifient la situation comme dangereuse, à savoir que les choses pouvaient dégénérer, notamment la difficulté d'accès aux aéroports »* (**D701/3**).

Il est donc établi qu'à l'initiative de Jean-Claude VEILLARD, de Christian HERRAULT et de Bruno PESCHEUX, une cellule opérationnelle, informée des réalités du terrain et en mesure de prendre des décisions adaptées, a été instaurée.

Initiée dans le respect des dispositifs de sûreté en vigueur au sein du groupe LAFARGE, la gestion de la sûreté de l'usine de Jalabiyah a en pratique rapidement glissé vers une gestion en comité plus restreint (**D1106/17**).

En témoignent de nombreuses mentions portées en marge des comités de sûreté (**D432/14, D432/15, D432/16, D432/20, D432/23, D432/26, D432/28, D432/30, D432/33**), essentiellement : « *suivi de la situation avec la cellule de pré-crise, réunion téléphonique* », la réunion de cette cellule évoluant d'une fréquence « *hebdomadaire* » à une fréquence « *quotidienne* »).

C'est ce qu'explique notamment Éric OLSEN, DRH jusqu'en 2013 :

> « *Question du juge : A quelle date a été créé ce comité de pré-crise ?*
>
> *Réponse de M. OLSEN : En décembre 2011 pour s'assurer que le groupe était prêt à assurer la gestion d'une crise en Syrie. Il y a eu 9 rendez-vous au total. Le dernier a eu lieu en novembre 2012. **Après c'est le pays sous la direction de Christian HERRAULT et avec la contribution de Jean-Claude qui avait vocation à gérer en direct cette crise**.*
>
> *[…]*
>
> *Question du juge : Pourquoi ce comité de pré-crise a-t-il été supprimé alors que la crise prenait de l'ampleur ?*
>
> *Réponse de M. OLSEN : **Il n'y a pas d'explications sur le fait que ces rendez-vous aient cessé. A un moment donné Christian HERRAULT a géré en direct**. Ce que je peux indiquer est qu'à partir du moment où les expatriés ont été évacués, la majeure question qui demeurait était celle du maintien de l'activité qui ne relevait pas du champ de la cellule du comité de pré-crise* » (**D956/14**).

C'est aussi ce que concèdent les membres de la chaîne opérationnelle eux-mêmes, et notamment Christian HERRAULT, qui a déclaré à ce sujet :

> « *Question du juge : Pourquoi ce comité de pré-crise au niveau du siège a-t-il été supprimé alors que la crise prenait précisément de l'ampleur ?*
>
> *Réponse de M. HERRAULT : **Je pense qu'il n'a pas été supprimé mais qu'il a été absorbé par des réunions quotidiennes qui se tenaient chaque jour sous la direction de Jean-Claude VEILLARD et de son équipe avec le management local*** » (**D1231/4**).

Dans le même sens, interrogé sur la composition de cette cellule décisionnaire, Jean-Claude VEILLARD a répondu :

> « *Question du juge : Mme ARTINIAN indique ne pas avoir été associée à cette cellule de crise pour remplacer M. OLSEN alors même qu'elle est en poste sur la période la plus critique, c'est-à-dire 2013/2014. Pour quelle raison selon vous ?*

72

*Réponse : __la raison me paraît à la fois simple et compliquée__. Pendant toute l'année 2012 il y a eu des réunions régulières, presque toutes les semaines. __A partir de la fin de l'année 2012, étant précisé que Christian HERRAULT a pris son poste en janvier 2013, il n'y a plus qu'une cellule de crise pays à laquelle seule participe la fonction sûreté du groupe sur initiative. Il n'y a plus de cellule de crise groupe__* » (**D840/12**).

Jean-Claude VEILLARD concède ainsi expressément la prise en charge, à partir de fin 2012, de la gestion de la situation sécuritaire de l'usine par une « *cellule de crise pays* ».

Selon lui, ces réunions ne donnaient lieu à aucun « *compte rendu formel* » et « *la transmission d'information [à Bruno LAFONT] incombait à M. HERRAULT* » (**D840/12**).

### 2.2 La gestion par ce comité restreint des paiements de sécurité

Aux termes d'un courriel en date du 7 septembre 2014 adressé à Frédéric JOLIBOIS, relatif à la réaction de Bi-Yong CHUNGUNCO lors de la révélation d'accords avec Daesh, Jean-Claude VEILLARD déclare :

« *Biyong s'est éveillée à la vie en prenant conscience que nous avions autour de l'usine des gens peu fréquentables avec lesquels nous devions, directement ou indirectement traiter [...] Elle ne conçoit pas les relations indirectes avec ISIS, l'existence des influences Firas Tlass, les accords avec les kurdes ... etc. __Il est vrai que depuis 3 ans nous gérons tout cela en comité très restreint__ et je ne maitrise pas toutes les subtilités* » (**D490/79**).

Précisant le périmètre décisionnel de ce « *comité très restreint* », Jean-Claude VEILLARD déclare : « __*concernant les transactions évoquées évidemment qu'on n'en parlait pas en comité des sûreté, c'était l'affaire d'un triumvirat TLASS, PESCHEUX, HERRAULT*__ » (**D478/8**).

C'est ce que corroborent les déclarations de Christian HERRAULT, lorsqu'interrogé sur les informations dont disposait Frédéric JOLIBOIS avant son arrivée sur les « *modalité délictueuses mises en œuvre* », il répond :

« *il a rencontré Firas TLASS avec Bruno PESCHEUX à Dubai [...] Jean Claude VEILLARD et a assisté aux réunions de crise qui se tenaient quotidiennement entre les dirigeants de LCS et la direction de la sûreté* » (**D1223/19**).

Il précise avoir ainsi « *vérifié [que Frédéric JOLIBOIS] avait rencontré __tous les gens importants__* », avant d'indiquer au magistrat instructeur qui l'interrogeait sur une éventuelle rencontre avec Bruno LAFONT : « *non, ça n'est pas prévu pendant la procédure* » (**D1223/20**).

Cette gestion autonome en comité restreint se prolonge encore après le départ de Bruno PESCHEUX, à l'été 2014, au moment où il ressort du dossier qu'il est question de négocier un accord avec Daesh.

Il résulte d'un échange de courriels figurant au dossier que la décision de conclure pour une durée de quinze jours cet accord est prise au terme d'une discussion par Christian HERRAULT entre lui-même, Jean-Claude VEILLARD et Frédéric JOLIBOIS, après feu vert donné par ce dernier pour une durée de quinze jours.

Dans un courriel adressé par Frédéric JOLIBOIS à Christian HERRAULT le 15 août 2014, celui-ci écrit :

> « *Bonjour Christian*
> *Je te fais suivre ce message de Firas pour t'informer de la situation.*
> *Comme tu le sais, nous avions trouvé un accord avec ISIS il y a une semaine (10M + 7501t), dont je suivais la mise en oeuvre jour par jour avec Firas.*
> *Nous étions supposés obtenir les "laissez-passer" aujourd'hui, et voilà que Firas m'informe d'un changement soudain.*
> *Je suis en train de vérifier la véracité des dires de Firas* » (**D1750/10**).

Le même jour, Christian HERRAULT transfère ce courriel à Jean-Claude VEILLARD lui indiquant qu'il souhaite « *en parle[r] avant d'« avancer »* » (**D1705/10**), puis répond le 16 août 2014, à Frédéric JOLIBOIS : « *Attends ma discussion avec Jean Claude avant de donner ton accord avec l'ISIS. Merci* » (**D1705/9**).

Trente minutes plus tard, s'adressant à nouveau à Frédéric JOLIBOIS, et plaçant Jean-Claude VEILLARD en copie, il donne son feu vert en ces termes :

> « *J'ai parlé avec Jean Claude et je serais d'accord avec la proposition de Firas mais pour une durée de 15 jours maximum* -, *le temps de voir s'ils tiennent leur parole tant vis à vis de nous que des importations turques.*
> *Pendant ces 15 jours, nous pourrons faire le bilan économique du deal et comprendre l'évolution de la situation.*
> *N'hésite pas à m'appeler si nécessaire. Fdlt ChH* » (**D1705/9**).

Jamais il n'est question, lors de ce processus décisionnel, de demander l'avis de Bruno LAFONT ni même de l'informer.

Cette boucle de mails illustre au contraire clairement l'autonomie décisionnelle du comité restreint, tout particulièrement concernant les négociations et accords avec les groupes armés, et la confidentialité qui l'entourait.

D'ailleurs, à l'exception de Christian HERRAULT dont les allégations ont été précédemment rappelées et discutées, les membres de ce comité restreint, qui étaient tous susceptibles de s'entretenir avec Bruno LAFONT, ont unanimement affirmé n'avoir jamais évoqué avec lui l'existence de négociations ou de paiements avec des groupes armés et terroristes.

Interrogé sur les informations qu'il aurait communiquées à Bruno LAFONT à ce sujet, Jean-Claude VEILLARD a ainsi déclaré :

> « *Q 29 : Qui vous avez alerté ?*
> *R 29 : Qui j'ai alerté ? Le patron c'est M. Herrault.*
>
> *Q 30 : M. LAFONT par exemple ?*
> *R 30 : Oui j'aurais pu peut-être passer outre M. HERRAULT, mais pour moi c'est son rôle de le faire.*
>
> *Q 31 : M. LAFONT était-il au courant de ces négociations et de cet accord ?*
> *R 31 : Je n'en sais rien. Mais c'est la mission de M. HERRAULT de le faire.*
>
> *Q 32 : Pourquoi ne l'avez-vous pas alerté ? Ne pensez-vous pas qu'il était le mieux placé pour mettre fin aux financements d'organisation terroristes ?*
> *R 32 : Je n'ai pas eu l'initiative ou l'opportunité de le faire* » (**D482/3-4**).

74

C'est également le sens des déclarations de <u>Bruno PESCHEUX</u> sur ce point :

« *Q 28 : M. LAFONT ne pouvait que connaître les financements des milices locales par le biais de M. HERRAULT, qui lui rendait compte ?*

*R 28 :* **Je ne sais pas si M. HERRAULT l'a tenu au courant, mais M. VEILLARD avait** *l'information et pouvait le faire* » (**D467/3**).

Enfin, et encore en sens, <u>Frédéric JOLIBOIS</u> a déclaré en garde à vue :

« *Q 66 : Bruno LAFONT et Eric OLSEN étaient-ils-avisés et parties prenantes de ces tractations ?*

*R 66 :* **Je ne sais pas. Par moi, non** » (**D500/7**).

Ces déclarations ont toutes été réitérées à l'audience, de sorte que l'absence d'information donnée à Bruno LAFONT par Bruno PESCHEUX, Frédéric JOLIBOIS et Jean-Claude VEILLARD, soit par les membres du comité qui, aux côtés de Christian HERRAULT, ont géré la question des paiements litigieux, est établie.

L'élément intentionnel, qui suppose la connaissance préalable de l'objet même de l'infraction, en l'occurrence les paiements poursuivis, fait donc défaut à l'égard de Bruno LAFONT, de sorte que sa relaxe s'impose.

75

III.    **Matérialité : Bruno LAFONT n'a pas « autorisé la poursuite d'activité de la cimenterie exploitée par LCS alors qu'il aurait été le seul habilité à y mettre fin » en connaissance de cause**

Ainsi qu'il a été rappelé, l'article 421-2-2 du code pénal réprime, au titre de l'élément matériel, les seuls faits de fournir, réunir ou gérer des fonds à destination d'un groupe terroriste ou de donner des conseils à cette fin.

La prévention vise pourtant un fait différent, non prévu par la loi, et qui aurait consisté dans le fait d'avoir « *autorisé la poursuite d'activité de la cimenterie exploitée par LSC alors qu'il aurait été le seul habilité à y mettre fin* ».

Un tel comportement, à le supposer établi, ne permet pas d'entrer en voie de condamnation du chef de financement d'une entreprise terroriste à l'encontre de Bruno LAFONT.

En tout état de cause, il sera démontré que l'allégation selon laquelle Bruno LAFONT aurait, alors qu'il était le seul à pouvoir mettre fin à l'activité de la cimenterie en Syrie, autorisé sa poursuite est infondée, de sorte qu'à cet égard encore, la relaxe s'impose.

Ainsi qu'il le sera démontré :

- le postulat qui fonde la prévention - selon lequel Bruno LAFONT aurait été le seul en mesure d'interrompre l'activité de l'usine - est erroné (**A**) ;

- Bruno LAFONT n'a jamais délivré « *d'autorisation* » de maintien de l'usine en activité au cours de la prévention (**B**).

A. **Bruno LAFONT n'était pas le seul « *habilité* » à mettre fin à la poursuite de l'activité de l'usine**

L'accusation se construit sur un présupposé erroné puisque Bruno LAFONT n'était pas le seul à pouvoir mettre fin à l'activité de l'usine de Jalabiya (**1**), comme en attestent l'existence de plusieurs fermetures de l'usine pendant la période de prévention, en dehors de toute intervention de ce dernier (**2**).

1. **Bruno LAFONT n'était pas le seul à pouvoir mettre fin à l'activité de l'usine de Jalabiya**

En application des règles d'approbation interne du groupe LAFARGE, la « *décision de fermeture de site/usine/ligne de production/bureau (avec passation en charges possible des éléments non récurrents)* » d'une valeur comptable supérieure à 25 000 000 €, au sens de fermeture « définitive », relève du Président directeur général du groupe (**D527/21 à 55**).

Il n'est pas contesté par ailleurs que Bruno LAFONT avait toute latitude pour décider, à tout moment, de la fermeture de l'usine, pour une période prédéfinie ou *sine die*, et de demander à ses collaborateurs, agissant dans leur domaine délégué, de mettre en œuvre cette décision.

Pour autant, s'agissant en l'espèce de gérer une crise, en cours et évolutive, à l'échelle du pays voire de l'usine elle-même, Bruno LAFONT ne pouvait – dans un cas comme dans l'autre – se déterminer qu'au regard des données du terrain qui lui remontaient par ses collaborateurs, notamment par le truchement de son directeur opérationnel adjoint lui-même informé par le directeur pays.

76

De surcroît, il est acquis que d'autres que le Président directeur général étaient pleinement « *habilité[s]* » à décider d'un arrêt de l'activité de l'usine, susceptible en tant que tel de faire cesser les paiements litigieux au sens où semble implicitement l'évoquer la prévention.

De fait, une telle décision n'imposait pas nécessairement la cessation définitive des activités de LAFARGE en Syrie, mais simplement une fermeture de l'usine *sine die*, valable tant que la situation sécuritaire (en particulier en ce qu'elle impliquait de quelconques paiements à des entités terroristes) resterait inchangée.

En particulier, tant Bruno PESCHEUX que Christian HERRAULT disposaient de ce pouvoir, comme ils l'ont eux-mêmes déclaré (**D460/1, D512/3, D566/1, D975/8**), à l'instar de l'ensemble des cadres interrogés sur ce point, par exemple Guillaume ROUX (**D687/6**).

Christian HERRAULT a ainsi affirmé lors de sa première audition, sans alors faire référence à un quelconque aval nécessaire de Bruno LAFONT :

> « *Le seul pouvoir que j'avais, c'était de vie ou de mort sur la cimenterie : on arrête ou on continue* » (**D253/4**).

Interrogé sur un courriel adressé par Éric OLSEN à Christian HERRAULT évoquant « *un choix difficile à prendre* », Jean-Claude VEILLARD a répondu :

> « *Je pense que M. OLSEN fait référence à la continuité de l'activité et cette décision de continuité de l'activité appartient totalement à M. HERRAULT* » (**D840/6**).

Bruno PESCHEUX, interrogé sur sa capacité à mettre un terme à l'activité de l'usine, a répondu :

> « *S'il y a urgence, moi seul. S'il n'y a pas urgence, pas moi seul* » (**D239/9**).

Jean-Claude VEILLARD a quant à lui résumé :

> « *S'agissant de la fermeture de l'usine, quatre personnes avaient ce pouvoir : le directeur de l'usine qui en situation d'urgence peut fermer l'usine, le directeur général du pays qui a plein pouvoir, le directeur général des opérations et le PDG* » (**D840/13**).

L'autonomie de Christian HERRAULT et de Bruno PESCHEUX dans la définition même des critères devant conduire selon eux à l'arrêt de l'usine est d'ailleurs illustrée au dossier par un échange de mails de juillet 2012 (**D572/33 et 34**).

Faisant usage de cette prérogative, les intéressés ont d'ailleurs pris, à plusieurs reprises pendant la période de prévention, la décision de fermer l'usine, sans consulter au préalable Bruno LAFONT (**D750/6 et 7, D391-3/BLA/Email/6 et 19**).

## 2. **D'autres que Bruno LAFONT ont effectivement fermé l'usine de Jalabiyah au cours de la prévention**

Il ressort de la procédure qu'à trois reprises au moins (avril/mai 2013, juillet 2013 et juillet 2014), l'usine de Jalabiya a été fermée sur seule décision des membres de la chaîne opérationnelle.

Ainsi, par un courriel du 30 mai 2013, Christian HERRAULT informe Bruno LAFONT :

> « *Comme je te l'avais laissé entendre, le four de notre usine de Syrie a bien redémarré il y a quelques jours sans pb majeur. Je ne t'ai pas ennuyé avec cela mais nous avons eu un arrêt de l'usine de 6 jours en mai à cause d'une grève de nos gardiens de l'usine (kurdes) mais tout est rentré dans l'ordre et nous vendons actuellement 3300/3700 tonnes/jour* » (**D556/17**).

Christian HERRAULT informe ainsi on supérieur d'une interruption de l'activité de l'usine intervenue près d'un mois plus tôt à raison d'une grève des gardiens de l'usine entre le 28 avril et le 6 mai 2013 et des interférences grandissantes du PYD (**D463/24-26**).

Par un courriel du 24 juillet 2013, Christian HERRAULT informe une nouvelle fois *a posteriori* Bruno LAFONT d'un arrêt de l'usine :

> « *A noter que nous avons été obligés d'arrêter hier notre usine syrienne car les combats entre les kurdes et les djihadistes s'en rapprochaient dangereusement. Nous « monitorons » la situation heure par heure* » (**D1705/4**).

Dans le même sens, le 10 juillet 2014, Christian HERRAULT adresse à Bruno LAFONT un courriel indiquant :

> « *Nous avons arrêter avant hier le four de notre usine et hier la power plant.*
> *En effet les routes d'accès à l'usine sont contrôlées par l'ISIS (appelé encore Daesh ou l'EIIL) et l'activité commerciale n'était plus possible.*
> *Il y a des combats violents entre ISIS avec les kurdes autour de l'usine (c'est une retombée des événements irakiens).*
> *Nous avons décidé ainsi arrêter l'activité de production pour y voir plus clair et avoir des accords « clairs » avec les belligérants pour la poursuite de l'activité sans prendre de risques inconsidérés*
> *Je t'informerai s'il devait y avoir des évolutions significatives de la situation. ChH (…)* » (**D556/16**).

L'autonomie des membres de la chaîne opérationnelle dans la décision de la fermeture de l'usine de Jalabiyah est donc parfaitement établie, tout autant que la conscience que ces opérationnels avaient de pouvoir en user indépendamment de toute demande ou même de tout avis à solliciter ou recevoir de la part du PDG.

En pratique, au cours de la période visée à la prévention, Bruno LAFONT a pu constater, sans jamais avoir de doute à cet égard, que d'une part Christian HERRAULT et d'autre part Bruno PESCHEUX puis son successeur Frédéric JOLIBOIS, utilisaient bien cette possibilité de mettre en sommeil l'activité comme élément de réponse, parmi d'autres, à la gestion de la situation sécuritaire de l'usine en Syrie.

Par ailleurs, la prétendue « *autorisation* » de maintien de l'activité reprochée à Bruno LAFONT aux termes de la prévention fait également défaut.

### B. Bruno LAFONT n'a délivré aucune autorisation de maintien de l'activité de l'usine de Jalabiyah au cours de la période de prévention

Ainsi qu'il vient d'être démontré, Bruno LAFONT n'a jamais eu connaissance des faits visés à la prévention, ce qui exclut qu'un quelconque délit soit retenu à son encontre, faute d'élément intentionnel.

Mais à supposer même que, par extraordinaire, le Tribunal lui impute cette connaissance préalable, il constatera que l'élément matériel visé à la poursuite, celui d'« *autoriser la poursuite d'activité de la cimenterie exploitée par LCS* », ne peut pas être caractérisé au cours de la période de la prévention.

78

A la lecture du dossier, force est de constater qu'<u>une telle autorisation, qu'elle soit explicite ou implicite, n'existe pas</u>.

En effet :

- dans un premier temps, c'est en 2012 et donc bien avant le début de la prévention, que Bruno LAFONT a pu, dans le cadre de discussions avec Christian HERRAULT, délivrer des orientations, d'ordre général, tenant à la poursuite de l'activité à la condition que la sûreté puisse être garantie (**1**) ;

- dans un second temps, entre 2013 et le 27 août 2014 (date à laquelle il ordonnera la fermeture de l'usine, *cf infra*), Bruno LAFONT a suivi la situation par l'intermédiaire de Christian HERRAULT, en s'intéressant dans le même temps au contexte géopolitique général par le biais du spécialiste Antoine SFEIR, <u>en ayant compris et fait comprendre à Christian HERRAULT qu'il était prêt à fermer l'usine *sine die* lorsque la situation l'imposerait, ce qui est précisément l'inverse d'une autorisation de poursuivre puisque s'apparentant davantage à une autorisation de fermeture</u> (**2**).

A l'été 2012, au moment où les premiers rapatriements de non-syriens, et notamment des français, ont été préconisés par l'ambassade de France, la question s'est posée de la possibilité du maintien de l'activité dans ce nouveau contexte, et il a été décidé par Bruno LAFONT et Christian HERRAULT de maintenir l'usine en activité, à la condition de ne pas compromettre la sûreté.

L'ordonnance de renvoi énonce à cet égard :

> « [*Christian HERRAULT*] <u>*disait avoir obtenu l'autorisation de Bruno LAFONT en lui décrivant tout le système et en ayant eu en réponse « on continue ». Il ajoutait que son supérieur lui avait dit que « l'intérêt général était fait d'intérêts particuliers »*</u> *» (D1383/5)* (**ORTC, p. 244**).

Cet élément prétendument à charge n'en est pas un, si tant est qu'il soit replacé dans sa juste chronologie, c'est-à-dire en 2012.

Cette année-là, de nombreux groupes rebelles se trouvent dans la région de l'usine, mais les acteurs présents autour de la cimenterie sont clairement identifiés : les kurdes avec les YPG, l'ASL autour de Manbij et l'armée régulière qui contrôle encore de larges zones entre Manbij, Kobané et Raqqa. Les kurdes assurent la protection de l'usine.

Néanmoins, la situation dans le reste de la Syrie est plus inquiétante, le Ministère des affaires étrangères réagit d'ailleurs en envoyant le 25 juillet 2012 à Jean-Claude VEILLARD un courrier indiquant : *« l'Ambassade de France à Amman a informé mes services de la présence à Damas aujourd'hui de deux ressortissants français, M. Bruno PESCHEUX et M. Valery MIRAKOFF, employés de votre société »* (**D1921/21**). Il est conclu par le représentant du ministère qu'il *« paraît raisonnable de proscrire les déplacements de vos collaborateurs en Syrie »* (**D1921/21**).

Un compte-rendu d'entretien avec Jean DESAZARS de MONTGAILHARD, directeur général adjoint pour la stratégie, le développement et les affaires publiques du groupe LAFARGE, établi par la Direction d'Afrique du Nord et du Moyen Orient, en date du 23 octobre 2012, indique : *« In fine, il a été convenu d'établir un lien régulier entre le groupe Lafarge et cette direction <u>pour suivre les évolutions politiques et sécuritaires</u> et informer le Département des projets de cette société dans la région (RR) »* (**D919/2**).

79

C'est donc dans ce contexte qu'à l'été 2012, Bruno LAFONT a fixé avec Christian HERRAULT une ligne à tenir : le maintien possible de l'activité à la condition que la sûreté reste assurée.

Évoquant un entretien dans lequel Bruno LAFONT « *disait que l'intérêt général est fait d'intérêts particuliers, ce qui veut dire pour moi, l'intérêt général passe par le racket* » (**D572/1**), Christian HERRAULT le situe lui-même <u>à octobre 2012</u> (**D1383/6**).

Christian HERRAULT évoque la position de Bruno LAFONT en ces termes : « *on continue, aucun risque sur la sûreté des collaborateurs* » (**D1383/5**), tout en indiquant « *au cours de notre entretien en juillet 2012 nous avons convenu que soit nous restions soit nous partions. Il n'y avait pas de solution intermédiaire* » (**D1383/6**), ou encore « *c'est à cette époque je crois qu'il m'a dit que l'intérêt général était fait d'intérêts particuliers ça veut dire ce que ça veut dire* » (**D1383/6**).

C'est effectivement ce que confirme un courriel du 23 juillet 2012 envoyé par Christian HERRAULT à Bruno LAFONT (**D906/313**), comportant un point général sur le fonctionnement de l'usine qui semble établi par Bruno PESCHEUX, lequel demande à son supérieur de « ***prévoir une situation dans laquelle nous aurions à fermer toute l'usine*** » en raison des « *turbulences* ».

Dans ce courriel, sont évoqués les éléments suivants :

- un « *accident (LTI) survenu à deux sous-traitant chinois travaillant dans [l'] usine électrique* » ;
- le « *report de la maintenance de l'usine en attendant d'y voir plus clair sur la situation sécuritaire de l'usine* » ;
- le fait qu' « *il n'y a plus d'expatrié à Damas* » ;
- le rapatriement du « *directeur de l'usine jordanien* » ;
- « *il reste encore 10 expatriés Lafarge à ce jour à l'usine* » ;
- « *en fin de semaine il devrait rester 4 expatriés, voire même aucun, si la situation l'exigeait. Alors l'usine [...] fonctionnerait avec du personnel syrien* » ;
- « *le directeur sûreté du pays (qui est norvégien) est à l'usine et surveille la situation* » (**D906/313**).

Loin d'émettre la moindre opposition à un tel projet de possible fermeture, Bruno LAFONT répond : « ***Merci, ce niveau d'information me convient très bien. Aucun compromis n'est possible sur la sûreté*** » (**D906/313**).

La directive confiée à Christian HERRAULT était donc claire, ce qu'il rapportera lui-même en ces termes : « *la conclusion très claire qu'il m'avait déjà envoyé dans un mail deux mois avant, même si la situation n'était pas du tout la même, c'était « on continue, **aucun risque sur la sûreté des collaborateurs*** » (**D1383/6**).

Bruno LAFONT et Christian HERRAULT s'accordaient alors sur le double constat selon lequel :

- les troubles affectant la Syrie se déroulaient essentiellement dans le sud du pays, loin de la zone d'implantation de l'usine de Jalabiyah ;

- la situation était préoccupante et nécessitait un suivi constant, mais l'usine pouvait continuer de fonctionner.

A partir de l'été 2013, à l'inverse d'une autorisation de poursuivre l'activité, c'est une « autorisation de fermer » qui a été délivrée à Christian HERRAULT.

A compter de 2013, Bruno PESCHEUX a fait état de difficulté opérationnelles croissantes pesant sur le fonctionnement de l'usine, liées plus ou moins directement à l'évolution du conflit syrien (problèmes d'approvisionnement en raison de blocages sur les routes, taux de change défavorable, demandes croissantes des milices kurdes, difficultés industrielles, etc.) (**D391-3/BLA/Email/6**).

Ces difficultés, relayées par Christian HERRAULT et, de manière plus ponctuelle, par Jean-Claude VEILLARD (**D478/6**), ont conduit Bruno LAFONT à réévaluer sa position de 2012 au sujet de la Syrie : un départ de LAFARGE devenait envisageable voire préférable et l'usine devrait être fermée dès que Bruno PESCHEUX et Christian HERRAULT le recommanderaient.

C'est précisément dans ce contexte de plus en plus tendu que Antoine SFEIR, politologue et journalise, consultant de LAFARGE informant régulièrement Bruno LAFONT de l'évolution de la situation en Syrie, a attesté : « *En Juin 2013, je me trouvais comme à mon habitude, en ma qualité de conseil de la société Lafarge, dans le bureau de son Président M. Bruno Lafont. […] Il appela en ma présence M. Christian Hérault, responsable de la zone, et je pus entendre ce qu'il lui dit : « Il est bien entendu qu'il faut prendre des dispositions nécessaires au cas où les troupes de l'organisation Daech se rapprocheraient de notre usine. Il n'est pas question de traiter avec eux. On peut s'entendre avec les Kurdes pour protéger l'usine, et même y installer les éléments kurdes* » (**D1382/7**).

Un mois plus tard, dans ses notes prises à l'issue de son entretien mensuel avec Christian HERRAULT le 29 juillet 2013, Bruno LAFONT a ainsi écrit, au sujet de la Syrie (dernier pays abordé par Christian HERRAULT) : « *Situation compliquée. On replie calmement* » (**D311/13**).

Au cours de son interrogatoire, Bruno LAFONT a indiqué à ce sujet précis :

> « *Je n'ai trouvé aucune raison de ne pas rester jusqu'en juillet 2013 où je prends conscience que la situation se complique. J'ai écrit dans mes notes personnelles « on se replie dans le calme* » (**D587/6**).

Ce n'est pas dire – comme le soutient l'ordonnance de renvoi pour tenter d'identifier une contradiction entre ses paroles et ses actes (**ORTC, p. 242**) – que Bruno LAFONT a pris à cette date la décision de procéder à la fermeture de l'usine.

A cette époque, il avait été informé par Christian HERRAULT d'un arrêt temporaire de l'activité de l'usine, auquel il ne s'était évidemment pas opposé, et qui de manière plus globale, ouvrait une période d'incertitude dans laquelle la question du maintien en activité se poserait régulièrement et devait donc faire l'objet d'un suivi adéquat (**D1267/10 et 14, D1383/7 et 8**).

C'est le sens de la mention « *situation compliquée. On replie calmement* » (**D311/13**), exposée par la défense de Bruno LAFONT dans le cadre de l'enquête Baker & McKenzie comme un choix de « *préparer la retraite* », c'est-à-dire de se préparer à l'éventualité – de plus en plus probable – d'un arrêt, au sujet duquel Bruno LAFONT a d'emblée marqué son soutien à Christian HERRAULT (**D311/4**).

En réalité, dès ce moment, Bruno LAFONT avait exprimé auprès de Christian HERRAULT, à l'exact inverse de l'idée d'une prétendue autorisation de maintien de l'activité sur le fondement de laquelle il est poursuivi, la possibilité d'une fermeture à tout moment.

A compter de cette date, en conséquence, Bruno LAFONT a demandé de manière répétée à Christian HERRAULT, au cours de leurs entretiens réguliers, si l'activité de LAFARGE en Syrie pouvait se poursuivre (**D1267/10 et 14, D1383/7 et 8**), attentif à tout signal ou alerte qui lui serait donné.

81

Mais force est de constater que cette alerte ne lui est jamais remontée, de quelque manière que ce soit, en tout cas jusqu'au COMEX du 27 août 2014.

Tandis que Bruno LAFONT a indiqué au cours de l'instruction : « *[Christian HERRAULT] ne m'a jamais recommandé de fermer l'usine. Il me disait « on peut continuer, on gère »* (**D1267/11, D1383/9**), Christian HERRAULT a lui-même très clairement admis **n'avoir jamais « *demand[é] de stopper définitivement les opérations de LCS »* à Bruno LAFONT, « *sauf après fin août 2014 après le COMEX »* (**D569/4**).

Cette absence de recommandation de fermer l'usine avant le COMEX du 27 août 2014 a été réitérée par Christian HERRAULT à plusieurs reprises lors de l'audience.

A cet égard, les propres déclarations de Christian HERRAULT, en charge de « *la transmission d'informations »* (**D840/12**), démontrent que ce dernier n'a jamais considéré la situation comme étant hors de contrôle, « *pens[ant] pouvoir l[a] gérer »* (**D566/6**), ce qui explique mécaniquement sa présentation d'une situation certes difficile mais maîtrisée à son supérieur.

Il est utile de renvoyer aux courriels déjà évoqués précédemment, envoyés par Christian HERRAULT à Bruno LAFONT au sujet de la situation en Syrie, qui s'ils contiennent des informations parfois préoccupantes, évoquent dans le même temps une situation gérée sur le terrain et sous contrôle, et annoncent à Bruno LAFONT qu'il sera tenu informé de son évolution.

Cet exposé de la situation rejoint les nombreux éléments du dossier dont s'évincent la conviction qu'avait Christian HERRAULT, pour des raisons qui lui appartiennent, de la nécessité de maintenir l'usine en activité (**D566/7, D566/8, D568/3, D975/11, D1703/22, D1383/21**), et ce y compris jusqu'à la présentation faite au COMEX le 27 août 2014 (**D669/7**).

Cette présentation relativement rassurante par Christian HERRAULT de la situation à Bruno LAFONT (et qui en tout cas jamais n'a laissé transparaître la nécessité d'une décision immédiate de fermeture) rejoint d'ailleurs assez précisément celle qu'il a pu en faire à d'autres personnes au sein du groupe.

Ainsi en est-il de Bernard COLLOMB, proche de Christian HERRAULT, et alors administrateur et président d'honneur de la SA LAFARGE, qui déclare à propos des « *éléments de risque qui [lui] ont été communiqués par Christian Herrault »*, que celui-ci lui soulignait l'absence de combats autour de l'usine et *«la présence des kurdes »*, de sorte qu'« *à l'époque rien de ce que n'a dit Christian HERRAULT ne [l]'a choqué ou a déclenché chez [lui] une alerte. Ce n'était pas une situation facile mais c'était une situation sous contrôle »* (**D1393/9**).

Sonia ARTINIAN de la même façon, indique avoir eu « *le sentiment que [l]es risques ont été identifiés et que les opérationnels en charge de la protection des biens et des personnes en termes de sûreté et de sécurité ne sont pas alarmistes. Ni Jean-Claude VEILLARD ni Christian HERRAULT ne font remonter des alertes »* (**D715/1**).

Laurent BARBAGLI, Directeur risque et assurance, interrogé sur son appréciation de la situation en Syrie, répond : « *je croyais en la direction qui disait que la situation était maitrisée et qu'on mettrait les gens dans des conditions de protection beaucoup plus fortes quand cela serait nécessaire »* (**D1595/12**).

82

Plus encore, Sapna SOOD, Directrice sécurité et santé à compter de 2013, qui explique avoir « *[eu des conversations […] sur l'usine en Syrie et ses difficultés] avec Christian Herrault* » relate :

- « *Je le voyais aussi une fois par mois et nous discutions de tous les pays. Je l'ai interrogé s'il y avait des plans, comment les choses se passaient vu la situation, comment les choses étaient gérées dans l'usine toujours sur ma problématique de santé et de sécurité. Herrault répondait toujours que les choses allaient bien et qu'ils arrivaient à travailler dans des conditions sûres pour les employés* » (**D1414/5**) ;

- « *J'ai été étonné que LAFARGE reste et continue son activité là-bas, c'est pour cela que je posais les questions sur l'évolution de la situation. HERRAULT, PESCHEUX et JOLIBOIS me rassuraient en me disant que tout se passait bien dans mon domaine d'activité* » (**D1414/6**) ;

- « *On m'a fait croire que les choses allaient bien à l'intérieur et autour de l'usine* » (**D1414/7**).

De telles informations tendent à démontrer qu'alors que Christian HERRAULT avait, à l'été 2013, reçu le feu vert du Président directeur général DG pour fermer l'usine lorsque lui-même et ses équipes « pays » le jugeraient souhaitable, Christian HERRAULT a – au lieu de formuler cette recommandation – continué de diffuser, en 2013 puis en 2014 jusqu'au 27 août, à Bruno LAFONT comme à d'autres membres du groupe, des informations sur la situation qu'il présentait comme étant sous contrôle.

En définitive, les consignes délivrées par Bruno LAFONT – pour toujours traduire la priorité absolue donnée à la sûreté et à la sécurité des employés - n'ont jamais laissé place à la poursuite de l'activité à tout prix, ni à une quelconque autorisation de maintenir l'activité de l'usine en connaissance des paiements litigieux.

L'attitude de Bruno LAFONT comme les consignes qu'il a pu donner allaient même, à compter de l'été 2013, et contrairement au libellé de la prévention, dans le sens d'une « autorisation », à tout le moins implicite, de fermer l'usine à tout moment.

C'est ce que confirme encore l'absence du moindre reproche exprimé par Bruno LAFONT à chaque fois qu'il a été informé *a posteriori* de l'arrêt de l'usine, ainsi que l'absence de tout écrit de sa part exprimant une pression explicite ou même implicite en vue d'un maintien de l'usine en activité.

La prévention est donc manifestement infondée.

A ce titre encore, le Tribunal prononcera la relaxe de Bruno LAFONT.

2.1 Bruno LAFONT a décidé de fermer l'usine dès qu'il a découvert, lors du COMEX du 27 août 2014, qu'un accord financier avec Daesh était envisagé

Dans le prolongement des éléments qui viennent d'être exposés, tant la teneur de la décision prise le 27 août 2014 lors du COMEX au cours duquel Bruno LAFONT a découvert qu'un accord devait être conclu avec Daesh (1.1) que sa mise en œuvre reconstituée *a posteriori* à la lumière des éléments du dossier (1.2), achèvent d'exclure une quelconque autorisation de Bruno LAFONT de maintenir l'activité de l'usine en connaissance de cause.

83

*a.* <u>La décision de fermeture prise par à l'occasion du COMEX du 27 août 2014</u>

Apprenant de la part de Christian HERRAULT, lors du comité exécutif tenu le 27 août 2014, qu'un accord financier devait être conclu avec l'État Islamique, Bruno LAFONT a immédiatement réagi et donné pour instruction que l'usine de Jalabiyah soit fermée, afin qu'un tel accord ne soit jamais exécuté.

Tout au long de la procédure, et par des déclarations réitérées lors de l'audience, Bruno LAFONT et Christian HERRAULT se sont accordés sur ce point : c'est bien à l'issue du comité exécutif du 27 août 2014 qu'a été prise la décision de faire cesser *sine die* l'activité de l'usine syrienne, cessation que Christian HERRAULT avait la charge de mettre en œuvre.

Ce fait est attesté par Antoine SFEIR qui a témoigné de ce que « *fin août 2014, M. Lafont me fait part lors d'un entretien qu'il avait donné instructions pour la fermeture de l'usine* » (**D1382/7**).

Au cours de ce comité exécutif, il ressort des notes prises par Nermine SAFRAOU, qui tenait le rôle de secrétaire et qui a confirmé qu'elle retranscrivait fidèlement les propos qui étaient tenus (**669/3**), que Christian HERRAULT a commencé par indiquer ce qui suit au sujet de la Syrie (**D669/7**) :

> « *le mois d'Aout pas bon, car pas d'activité commerciale, nous avons trouvé un accord avec les Kurde et Daesh, nous commençons donc à vendre un peu cette semaine, la situation syrienne reste toujours fragile. le Qatar va être plus prudent dans le financement de ces fous furieux. Dans notre accord avec Daesh, nous avons dit qu'en termes de taxation on doit avoir Le même traitement que les importations turques* ».

Découvrant pour la première fois qu'un accord financier devait être conclu avec Daesh, Bruno LAFONT est le seul participant du COMEX à avoir réagi.

Il a immédiatement interrompu le cours de la présentation de Christian HERRAULT en indiquant selon les notes prises par la secrétaire : « *il faut s'assurer que ce que nous faisons est risk free (aussi vis à vis des US)* » (**D572/37**).

Le sens de ces propos est clair : aucun risque ne devait être pris, ce qui incluait évidemment le risque juridique, mais pas exclusivement puisque cette mention « *vis-à-vis des US* » est introduite entre parenthèse et par le terme « aussi ».

C'est l'argument qui est spontanément venu à l'esprit de Bruno LAFONT face à une telle découverte, pour signifier immédiatement son désaccord en invoquant le risque légal au sens général, et plus particulièrement celui lié aux sanctions imposées à cette époque par les autorités américaines à de nombreux groupes et à leurs dirigeants et salariés, dont plusieurs français – à l'instar notamment de BNP Paribas quelques semaines auparavant, en juin 2014[21].

C'est bien en ce sens – l'impossibilité totale de se placer en contravention d'une quelconque loi, y compris américaine – que ces propos ont été compris, non seulement par leur destinataire, Christian HERRAULT (**D1383/11**), mais également par Bi-Yong CHUNGUNCO à laquelle les enquêteurs ont présenté le compte-rendu (**D806/4**).

---

[21]    Voir le rapport d'information n° 4082 déposé par la commission des affaires étrangères et la commission des finances sur l'extraterritorialité de la législation américaine le 5 octobre 2016.

A la suite de cette intervention de Bruno LAFONT, Christian HERRAULT a poursuivi en indiquant : « *La meilleure protection c'est maintenir l'usine en activité, le commercial a repris, nous maintenons le contact avec tout le monde* » (**D572/37**).

Cette conviction de Christian HERRAULT apparaît conforme à celle qu'il a exprimée à de multiples reprises à l'époque des faits, au cours de l'instruction et lors des débats à l'audience (**D923/1, D1703/22, D1705/33, D568/3, D569/1**). Elle rejoint la conviction similaire exprimée par Jean-Claude VEILLARD (**1998/246**) et Frédéric JOLIBOIS (**1998/250 et 251**).

Afin de pouvoir apporter une solution urgente à cette situation dont il percevait la gravité, mais sans mettre Christian HERRAULT en porte-à-faux devant l'ensemble des membres du comité exécutif (**D1383/11**), Bruno LAFONT a demandé à ce dernier de le rejoindre dans son bureau, pour lui dire qu'il « *fallait appliquer toutes nos règles* » (**D587/5**).

Comme l'a déclaré Bruno LAFONT lors de son interrogatoire de première comparution, « *c'est la teneur de cette réunion qui nous a conduit à décider le départ de Syrie* » (**D587/5**).

Dans le cadre de la confrontation, Bruno LAFONT résume cet entretien de la manière suivante :

> « *je crois qu'il faut bien comprendre la séquence de cette matinée d'aout 2014. Une première période qui se passe en comité exécutif, HERRAULT Christian rend compte d ses opérations à propos de la Syrie il mentionne pour la première fois un accord avec DAESH, je réagis immédiatement et brièvement et HERRAULT Christian déclare que la meilleure solution pour l'usine c'est de continuer. Immédiatement après cette séquence du comité exécutif, HERRAULT Christian est avec moi dans mon bureau nous parlons, et à la fin de la conversation Christian me suggère la fermeture de l'usine, ce que j'approuve* » (**D1383/11**).

Il ajoute :

> « *je pense qu'il y avait plusieurs avis au même moment et certainement mon intervention a eu une influence sur sa détermination finalement de fermer l'usine. L'annonce de cet accord avec DAESH à la suite des faits m'a stupéfait. Je n'ai pas voulu mettre Christian en porte à faux, j'ai voulu que cette usine soit fermée sur le champ, que la décision soit prise par tous les deux, si possible sur les suggestions de Christian* » (**D1383/11**).

Bruno LAFONT a expliqué cette volonté d'impliquer au maximum Christian HERRAULT dans la décision de fermeture et son exécution par le fait que « *c'est lui qui a toutes les opérations en charge, c'est lui qui est le mieux capable de gérer dans l'ordre la fermeture de l'usine en toute sûreté* » (**D1383/11**), conformément à la logique de délégation. Il était important pour Bruno LAFONT de recueillir l'adhésion de Christian HERRAULT à la décision de fermeture de l'usine, ce qu'il a résumé en ces termes : « *j'ai voulu que cette usine soit fermée sur-le-champ, que la décision soit prise par tous les deux, si possible sur les suggestions de Christian* » (**D1383/1**).

Si la teneur exacte du récit diverge, les deux hommes se rejoignent sur le fait qu'une décision conjointe de fermer l'usine a alors été arrêtée.

En effet, Christian HERRAULT déclare lors de cette même confrontation :

> « *je fais une description factuelle de la situation syrienne et là Bruno LAFONT dit une phrase qui me semble hallucinante « il faut voir ce que l'ont fait c'est RISK FREE aussi vis-à-vis des américains » je dois dire que cette réponse m'énerve au plus haut point et je lui rappelle que la meilleure protection de l'usine c'est qu'elle fonctionne, et*

85

*le commercial a repris « on discute avec tout le monde » <u>après je vais voir Bruno où effectivement il m'engueule sur la forme, je lui dis « de toute façon FIRAS a perdu le contrôle des négociations et il faut fermer ». C'est je pense ce que j'ai dit en garde à vue. LAFONT Bruno me dit « ok on ferme »</u>* (**D1383/11**).

En garde à vue, à la question de savoir s'il avait demandé à Bruno LAFONT « *de stopper définitivement les opérations de LCS* », Christian HERRAULT a répondu : « *non sauf après fin août 2014 après le COMEX du 27/08/2014, je lui ai dit que la pression sur l'usine était telle qu'on ne pouvait plus fonctionner en sécurité et que nous devions fermer et qu'il me fallait quelques semaines pour vider les silos* » (**D569/4**), puis que « *la décision de fermeture a été prise avec LAFONT fin août 2014, mais, un je voulais vider les silos et deux, la fermeture devait rester confidentielle pour qu'elle puisse bien se passer* » (**D569/4, D572/1**).

En définitive, il est acquis que :

- Christian HERRAULT a fait état, lors du comité exécutif du 27 août 2014, d'un accord potentiellement trouvé avec Daesh, ce qui a été acté dans les notes de la réunion (**D572/37**) ;

- à la suite de cette révélation, Bruno LAFONT a interrompu la présentation de Christian HERRAULT pour indiquer qu'aucune prise de risque – et dès lors, aucune violation de la loi – n'était envisageable (**D572/1, D1383/11**), ce qui a également été acté dans les notes de la réunion (**D572/37**) ;

- Christian HERRAULT a répliqué en indiquant que « *la meilleure protection c'est de maintenir l'usine en activité* » ;

- à la suite de quoi, Christian HERRAULT et Bruno LAFONT ont échangé en privé dans le cadre d'un entretien au cours duquel la fermeture de l'usine a été décidée (**D1231/14, D1383/11**).

Si l'ordonnance de renvoi (**ORTC, p. 239**) semble reprocher l'absence de « *véto* » plus clairement posé par Bruno LAFONT dans les notes du compte-rendu de ce COMEX, il convient au contraire de rappeler qu'il a réagi par une intervention dénuée d'ambiguïté, et que comme Bruno LAFONT l'a rappelé lors de l'audience, la fermeture de l'usine constituait une opération délicate dont la mise en œuvre imposait une certaine confidentialité.

Christian HERRAULT rappelle lui-même l'impératif de confidentialité des opérations de fermeture de l'usine au motif qu'elle « *était en opposition avec le désir de toutes les personnes concernées en direct par la marche de l'usine qui trouvaient chacune un intérêt à ce qu'elle fonctionne* » (**D3149/54**).

Le dossier démontre ainsi qu'en pratique, dès qu'il a été informé de la conclusion d'un potentiel accord entre LCS et Daesh, Bruno LAFONT a donné pour instruction de fermer l'usine de Jalabiyah, afin d'en empêcher la réalisation.

Ce constat s'inscrit en contradiction frontale avec le postulat sur lequel repose la prévention s'agissant de Bruno LAFONT – autoriser le maintien de l'activité de l'usine en connaissance des paiements faits à des groupes terroristes – qui manque donc manifestement en fait, ce qui doit conduire à sa relaxe.

86

***b.*** <u>La mise en œuvre de la décision de fermeture de l'usine prise lors du COMEX du 27 août 2014</u>

A la suite de ce comité exécutif du 27 août 2014 au cours duquel Christian HERRAULT avait indiqué à Bruno LAFONT que cette fermeture prendrait quelques semaines, il revenait à Christian HERRAULT – qui ne l'a jamais contesté – de procéder à la mise en œuvre de la décision de fermeture en transmettant les consignes appropriées à ses propres subordonnés.

Ainsi qu'il l'a précisé à diverses reprises au cours de l'instruction et lors de l'audience, Christian HERRAULT tenait absolument à « *vider les silos* » de l'usine pour ne pas risquer de les abandonner aux mains de groupes terroristes.

Christian HERRAULT a ainsi successivement déclaré :

-   « […] *la décision de fermeture a été prise avec* LAFONT *fin août 2014, mais, un <u>je voulais vider les silos</u> et deux, la fermeture devait rester confidentielle pour qu'elle puisse bien se passer* » (**D569/4**) ;

-   « *il m'avait donné son aval et je lui ai dit que <u>j'avais besoin de plusieurs semaines pour vider les silos</u>* » (**D572/1**) ;

-   « *la décision avait été prise de partir lors du COMEX de fin août 2014. <u>J'avais demandé du temps pour vider les silos</u>* » (**D1231/14**).

Jean-Claude VEILLARD a pu confirmer que cet impératif tenant à la nécessité de vider les silos était déjà présent dans l'« *argumentaire* » de Christian HERRAULT en août 2014 (**D952/14**).

De son côté, du 1ᵉʳ au 10 septembre 2014, Bruno LAFONT a multiplié les réunions dans le cadre de la présentation des résultats du groupe à ses actionnaires (« *roadshows* »), d'abord à Paris (les lundi 1ᵉʳ et mardi 2 septembre), puis à Londres (les mercredi 3 et jeudi 4 septembre), puis aux États-Unis (du dimanche 7 au mercredi 10 septembre) après un passage par Évian (les vendredi 5 et samedi 6 septembre) pour participer aux Rencontres franco-allemandes (**D3156/123**).

Le vendredi 12 septembre, le surlendemain de son retour en France, Bruno LAFONT a eu une réunion de 45 minutes avec Christian HERRAULT, ce qui est inscrit à son agenda (**D3156/125**) et a été confirmé lors de l'audience.

A cette occasion, Bruno LAFONT a interrogé Christian HERRAULT sur l'avancement des opérations de fermeture de l'usine syrienne, et ce dernier lui a indiqué que « *la fermeture avançait mais que cela prenait du temps* » (**D1267/26**).

Bruno LAFONT a alors renouvelé son instruction en insistant sur la nécessité que la fermeture soit effective rapidement.

A compter de cette date, les éléments du dossier et les déclarations recueillies rendent explicitement compte de la mise en œuvre de la fermeture de l'usine.

Ainsi, l'après-midi même du 12 septembre 2014, Christian HERRAULT a eu une conversation téléphonique avec Frédéric JOLIBOIS (**D1998/249 et 250**) au cours de laquelle il lui a été demandé de préparer l'arrêt des ventes (**D497/9, D517/3**).

87

Le samedi 13 septembre 2014, Jean-Claude VEILLARD a écrit à son contact à la DGSE (« *grosmarmotte* ») pour lui indiquer :

> « *Bien que l'activité de l'usine soit satisfaisante, 3500 tonne vendues mardi dernier. 4700 mercredi,* **nous allons stopper les ventes** *car nos distributeurs sont obligés de traiter avec les djihadistes et cela risque de mettre tout le monde en difficulté* » (**D1961/23**).

Le dimanche 14 septembre 2014, Christian HERRAULT a demandé à Frédéric JOLIBOIS de préparer un plan de rupture des relations avec Firas TLASS (**D517/3**), plan qui devait être présenté lors d'une réunion fixée par Christian HERRAULT au siège parisien du groupe fixée le 19 septembre 2014.

Le même jour, Frédéric JOLIBOIS a transmis à Christian HERRAULT un prévisionnel de trésorerie postulant l'absence de toute vente entre octobre 2014 et décembre 2014 (**D1998/258**), document qui avait été transmis par Ammar KHAYER et Nabil SANDOOK le matin même (**FRMLAT 1177**).

Le lundi 15 septembre 2014, Christian HERRAULT a contacté Frédéric JOLIBOIS par téléphone pour « *arrêter les ventes et préparer la rupture avec Firas TLASS* » (**D497/9**).

Le même jour, Frédéric JOLIBOIS a écrit à Bruno PESCHEUX pour lui faire part de l'instruction donnée par Christian HERRAULT et lui demander son soutien dans la préparation du plan ainsi sollicité (**D1998/257**).

Le mardi 16 septembre 2014, Christian HERRAULT a écrit à Frédéric JOLIBOIS pour lui indiquer que la réunion sur la Syrie prévue pour le 19 septembre suivant, qui impliquait également le département juridique, devrait se tenir « *no matter what* », c'est-à-dire impérativement (**D1998/263**).

Par la suite, le processus de fermeture ainsi initié s'est encore accéléré en raison du rapprochement des combats de l'usine.

Ainsi, dans la matinée du 18 septembre 2014, Frédéric JOLIBOIS a informé Christian HERRAULT qu'il convenait de préparer l'évacuation :

> « *Bonjour Christian,*
>
> *Daech a l'objectif de conquérir la poche kurde avant le début des offensives américaines/alliées. Ali a dit que les Kurdes défendraient l'usine en cas d'invasion de Daech.*
>
> *Le plus probable est donc que l'usine devienne un terrain de combat. Je crois qu'il faut préparer l'évacuation. Frederic* » (**D1998/267**).

Le même jour, l'essentiel des employés a quitté l'usine, à l'exception de 25 salariés restés sur place pour surveiller le refroidissement du four (**D1998/268**). La totalité des salariés restants a quitté l'usine le matin du 19 septembre 2014, l'usine étant envahie par l'Etat Islamique dans la soirée (**D1998/279**).

Ces développements démontrent que la décision de fermeture de l'usine prise à l'issue du COMEX du 27 août 2014 par Bruno LAFONT, avec Christian HERRAULT, et fermement rappelée à l'occasion de leur réunion du 12 septembre 2014, a bien été suivie d'effets.

Cette décision de fermeture a été actée par une résolution du conseil d'administration de LCS du 27 septembre 2014, signée par Christian HERRAULT en sa qualité de président, Guillaume ROUX et Amal TANTAWY, et indiquant que toutes les opérations étaient suspendues aussi longtemps que la situation sécuritaire d'alors persisterait (**D350/126**).

        *c.*   <u>La découverte concomitante de l'existence d'interactions financières avec des groupes terroristes par le service juridique de LAFARGE</u>

L'ordonnance de renvoi cherche à mettre en doute la réalité pourtant étayée de la décision de fermeture de l'usine prise par Bruno LAFONT le 27 août 2014 en soutenant :

> « *ce sont en réalité davantage les échanges, postérieurs et survenus dans le contexte d'une vive réaction de Bi-Yong CHUGUNCO des 11 et 12 septembre 2014, qui semblent avoir donné lieu à une décision de cessation de l'exploitation de la cimenterie, tels que les écrits de Jean-Claude VEILLARD et Frédéric JOLIBOIS, et les déclarations de ce dernier, semblent le démontrer* » (ORTC, p. 243).

Cette allégation est infondée.

Il est certes constant que de manière parallèle et presque concomitante à la découverte par Bruno LAFONT, le 27 août 2014, d'un possible accord avec Daesh, le service juridique du groupe a été de son côté alerté au sujet d'interactions de LCS avec des groupes classés terroristes par l'ONU.

Ainsi, le 11 août 2014, Johnny MOUTY, occupant une fonction juridique au sein de LCS, a informé Frédéric JOLIBOIS de l'adoption probable par le conseil de sécurité de l'ONU d'une résolution prohibant toute interaction avec les milices terroristes en Syrie et en Irak, notamment l'Etat Islamique et Al-Nosra (**D482/43**).

Le 16 août 2014, informé par Johnny MOUTY de l'adoption de la résolution en cause, Frédéric JOLIBOIS a sollicité Monsieur Jean-Jérôme KHODARA, juriste en charge de la région Moyen-Orient, afin de savoir si cette adoption était susceptible de poser des risques à LCS, s'agissant « *d'accords avec des fournisseurs liés à Daesh* » (**D1998/161**).

Le 19 août 2014, après des échanges avec Jean-Claude VEILLARD et Christian HERRAULT, Jean-Jérôme KHODARA a pris attache avec le cabinet d'avocats syrien Sayed & Sayed afin de procéder à une analyse des risques juridiques induits par le paiement de droits de passage à Daesh et/ou l'achat de matières premières auprès de cette organisation (**D1998/163, D787/1**).

Le 2 septembre 2014, n'ayant pas encore obtenu de retour de la part de Jean-Jérôme KHODARA, Frédéric JOLIBOIS a rencontré au siège de LAFARGE à Paris Gilles VANLERBERGHE, membre de la direction juridique chargé des financement (**D1998/201, 203 à 209**).

Informé des problématiques relayées par Frédéric JOLIBOIS, Gilles VANLERBERGHE a indiqué qu'il en réfèrerait sans tarder à la directrice juridique du groupe, Madame Bi-Yong CHUNGUNCO (**D497/9**).

Le 3 septembre 2014, une nouvelle réunion s'est alors tenue entre Jean-Claude VEILLARD, son assistante Hélène SEGUIN, Gilles VANLERBERGHE, Jean-Jérôme KHODARA, Neil CURTIS (autre membre de la direction juridique) et Bi-Yong CHUNGUNCO (**D482/29, D804/3, D391-3/FJ/E-94**).

89

Bi-Yong CHUNGUNCO a indiqué qu'au cours de cette réunion, qui s'était déroulée dans un climat tendu, elle avait été informée du contrôle des routes d'accès à l'usine par l'Etat Islamique, du paiement de taxes par les transporteurs à ce groupe et de l'achat de matières premières auprès de carrières qu'il contrôlait.

La directrice juridique a immédiatement souhaité en parler directement avec Bruno LAFONT pour lui exprimer sa recommandation de l'arrêt des activités de l'usine de Jalabiyah (**D804/3**), sans savoir qu'une telle décision avait déjà été prise le 27 août (**D804/3**).

A l'issue de cette rencontre, intervenue entre le 3 et le 5 septembre 2014, au cours de laquelle Bi-Yong CHUNGUNCO a compris que Bruno LAFONT était en ligne avec cette nécessité de fermer l'usine (**D804/4**), ce dernier l'a invitée à se rapprocher de Christian HERRAULT qui était à ce moment-là déjà en charge de cette fermeture.

Au cours des débats, le 5 décembre 2025, Christian HERRAULT a confirmé que Bi-Yong CHUNGUNCO avait pris attache avec lui après avoir échangé avec Bruno LAFONT (**D3149/56**), et qu'il l'avait informée de ce que la fermeture avait été décidée et était en cours.

Sur ce point, il convient de relever que la « *vive réaction* » de Bi-Yong CHUNGUNCO dont fait mention l'ordonnance de renvoi en la datant au 11 ou au 12 septembre 2014 s'appuie vraisemblablement sur un courriel de Frédéric JOLIBOIS du 11 septembre 2014, lequel fait mention d'une rencontre entre la directrice juridique et Bruno LAFONT dont l'aurait informé Jean-Claude VEILLARD, sans toutefois la dater précisément (**D1998/246**).

Or l'ensemble des protagonistes – et notamment Bi-Yong CHUNGUNCO elle-même – s'accorde pour dire que la rencontre entre celle-ci et Bruno LAFONT s'est en réalité tenue plus tôt, dans la foulée immédiate de la réunion du 3 septembre 2014 (**D804/3, D806/3, D391-3/JCV/E-213**).

En tout état de cause, quelle que soit la date précise de l'entrevue entre Bi-Yong CHUNGUNCO et Bruno LAFONT, celle-ci n'est en rien incompatible avec la décision de fermeture prise dès le 27 août 2014 puis mise en œuvre sur instruction du président directeur général lui-même.

Au contraire, le fait que Bi-Yong CHUNGUNCO ait, au cours de la première quinzaine de septembre, pris attache avec Bruno LAFONT pour lui recommander de faire procéder à la fermeture de l'usine syrienne – ignorantt que cette fermeture avait déjà été ordonnée – procède d'un fonctionnement normal du département juridique.

90

## SUR L'INFRACTION DE NON-RESPECT DES SANCTIONS DOUANIERES

Bruno LAFONT est également renvoyé devant le tribunal correctionnel « *pour avoir sur le territoire national et de manière indivisible en Syrie, du 30 juin 2013 au 19 septembre 2014, en tout cas depuis temps non couvert par la prescription, dans le cadre de ses fonctions de président directeur général de Lafarge SA contrôlant sa filiale syrienne LCS, intentionnellement violé les dispositions du règlement communautaire 881/2002 du 27 février 2002 et de son règlement d'exécution (UE) 632/2013 du 28 juin 2013 visant à interdire toute relation financière ou commerciale avec les organisations djihadistes Jabhat al-Nosra et État islamique en Irak et au Levant devenu État islamique, en l'espèce notamment en autorisant la poursuite d'activité de la cimenterie exploitée par LCS, alors qu' il était seul habilité à y mettre fin, en conscience que cette exploitation supposait notamment des paiements de sécurité convenus au profit de ces entités terroristes, la rémunération de fournisseurs opérant depuis les zones tombées sous leur contrôle, et d'intermédiaires avec ces groupes* ».

De ce chef également, la relaxe s'impose, et ce à plusieurs titres.
D'une part, ce sont des faits strictement identiques qui sont poursuivis. C'est d'ailleurs par renvoi aux « *mêmes développements que ceux présentés dans la partie consacrée aux faits de financement du terrorisme* » qu'est justifié le renvoi de Bruno LAFONT pour le délit de non-respect de sanctions financières internationales (**ORTC, p. 254**).

Or, il a notamment été démontré, sur le terrain du délit de financement de terrorisme, que les éventuelles interactions financières entretenues au niveau de LCS avec des groupes terroristes, quelles qu'elles soient, sont demeurées ignorées de Bruno LAFONT jusqu'au COMEX du 27 août 2014.

Et en réalité, même à cette occasion, c'est seulement un accord de nature financière avec Daesh qui a été évoqué, à l'exclusion de toute autre transaction notamment commerciale.

Et les éléments du dossier démontrent que cet accord, s'il a été envisagé en lien avec Firas TLASS, n'a jamais été exécuté ni n'a donné lieu à un quelconque paiement.

De sorte que faute, notamment, d'élément intentionnel qui présuppose la connaissance, l'infraction ne saurait être retenue à l'égard de Bruno LAFONT.

De manière plus générale, il ressort des éléments de la procédure que Bruno LAFONT n'a jamais autorisé le maintien de l'activité de l'usine en connaissance de cause, ni a fortiori participé ou même donné son aval pour de quelconques interactions avec des entités terroristes.

Aussi, aucun des éléments de l'infraction n'est constitué et ne saurait lui être imputé, et la relaxe s'impose.

D'autre part, la relaxe est incontournable dans la mesure où les faits de l'espèce sont, par nature, incompatibles tant avec l'application répressive du droit douanier français (**A**) qu'avec celle des règlements européens visés à la prévention (**B**).

### A. Sur l'inapplicabilité du droit douanier français

Le non-respect des sanctions financières internationales constitue une infraction prévue par le Titre XIV du Code des douanes, uniquement relatif au « *contentieux des relations financières avec l'étranger* ».

Les Chapitres III (« *poursuite des infractions* ») et IV (« *dispositions répressives* ») de ce Titre précisent ainsi, chacun, dans un unique article :

91

- 458 : que la poursuite des infractions à la règlementation « *des relations financières avec l'étranger* » ne peut être exercée que dans certaines circonstances procédurales ;

- 459 : qu'est punissable le fait de contrevenir à la règlementation « *des relations financières avec l'étranger* ».

Le juge douanier français ne peut donc, par définition - et conformément aux principes d'interprétation stricte de la loi pénale et de légalité des délits et des peines -, réprimer que les seuls flux financiers « *avec l'étranger* », c'est-à-dire entre la France et une entité d'un territoire étranger.

Tout autre schéma financier ne relève pas du champ d'application de la réglementation douanière répressive, qu'il s'agisse d'un flux partant d'un [pays étranger 1] et à destination d'un [pays étranger 2] ou d'un flux interne à un [même pays étranger].

L'article 451 bis du code des douanes établit **définitivement la nécessité de constater l'existence d'un flux financier sur le territoire français**, en disposant expressément : « *pour l'application du présent code, sont assimilées à des relations financières avec l'étranger toutes les opérations financières effectuées* **en France** *par ou pour le compte des personnes physiques et morales visées par les règlements communautaires […] ou par les traités et accords internationaux régulièrement approuvés et ratifiés* ».

La raison d'être du code des douanes exclut quant à elle la prise en compte des flux **internes** à un même pays étranger (au cas d'espèce, la Syrie) par le juge français.

Celui-ci ne peut s'intéresser qu'à des flux (de marchandises et/ou financiers) **franchissant** les frontières de ce que l'article 1er dudit Code définit comme le « *territoire douanier* » français.

Or, en l'espèce, les flux financiers incriminés ont été effectués par LCS depuis et vers la Syrie.

Il s'agit d'opérations financières **non avec** l'étranger, mais d'opérations financières à l'étranger ce qui échappe par définition à la compétence du juge français.

Aucune infraction douanière n'est donc caractérisable en l'espèce.

## B. Sur l'inapplicabilité des règlements européens visés à la prévention

En outre, l'application du règlement 881/2002 du 27 mai 2002 et de son règlement d'exécution 632/2013 du 28 juin 2013, violerait frontalement le principe de territorialité, dont la vigueur en droit européen, et notamment en matière de sanctions économiques, est acquise.

En vertu de ce principe, la souveraineté juridique d'un Etat ne s'exerce que dans les limites de son territoire.

En ce sens, et comme en disposent les article 52 du Traité de l'Union européenne et 355 du Traité sur le fonctionnement de l'Union européenne, les effets juridiques des actes de l'Union européenne se limitent au territoire des Etats membres.

Réciproquement, l'Union européenne a toujours fermement contesté l'application extraterritoriale de sanctions par un pays tiers, sur le territoire de l'Union européenne.

Le Règlement (CE) n° 2271/96 du Conseil du 22 novembre 1996 portant protection contre les effets de l'application extraterritoriale d'une législation adoptée par un pays tiers, affirmait ainsi, à propos des mesures

92

édictées par les Etats Unis, que « *par leur application extraterritoriale, ces lois, règlements et autres instruments législatifs violent le droit international* ».

Dans le respect de ce principe, l'article 11 du règlement n° 881/2002 visé à la prévention ne prévoit que :

- deux cas strictement définis de compétence *ratione loci* : « *Le présent règlement s'applique : [1.] sur le territoire de la Communauté, y compris son espace aérien, [2.] à bord de tout aéronef ou de tout navire relevant de la juridiction d'un Etat membre* » ;

- trois cas strictement définis de compétence ratione personae, toujours en lien avec l'Union européenne : « *[3.] à tout ressortissant d'un État membre […] [4.] à toute personne morale […] qui est établi[e] ou constitué[e] selon la législation d'un État membre, et [5.] à toute personne morale […] qui entretient des relations commerciales dans la Communauté* ».

Or, un flux financier (i) interne au territoire syrien - et donc externe au territoire européen - ; et (ii) provenant d'une société de droit syrien (LCS) qui n'était pas constituée selon la législation d'un Etat membre de l'Union européenne, pas plus qu'elle n'entretenait dans les faits des relations de commerce avec l'Union européenne, ne peut qu'être exclu du champ de répression des sanctions économiques européennes.

Toute solution contraire s'analyserait en une application extraterritoriale des règlements, en frontale contradiction avec les principes fondamentaux du droit international.

Compte tenu de **l'inapplicabilité des dispositions** qui fondent cette poursuite, <u>Bruno LAFONT sera donc nécessairement relaxé du chef de non-respect de sanctions financières internationales</u>.

En toute hypothèse, et à titre infiniment subsidiaire, l'application du principe *non bis in idem* fera obstacle au cumul de cette infraction avec celle de financement de terrorisme.

En vertu de ce principe, une même personne ne peut être poursuivie pour des faits identiques à un double titre.

Si le cumul de qualifications a pu être admis – notamment en matière de sanctions pénale et douanière – dès lors qu'il est établi que chacun des fondements envisagés protège des valeurs sociales propres, celui-ci est strictement impossible au regard d'une identité de valeur sociale protégée.

En l'espèce, il est constant qu'au titre de faits strictement identiques, Bruno LAFONT est poursuivi à double titre, d'une part pour financement de terrorisme, et d'autre part pour non-respect de sanctions financières internationales.

Un tel cumul ne peut être admis, dans la mesure où ces deux incriminations participent de la protection d'une valeur sociale strictement identique.

Et pour cause, <u>elles procèdent de la transposition d'un même texte, la résolution n°1373 du conseil de sécurité des Nations-Unies le 28 septembre 2001</u>.

Aux termes de cette résolution, le Conseil de sécurité de l'ONU a expressément « *demandé à tous les Etats […] de devenir dès que possible parties aux conventions et protocoles internationaux relatifs au terrorisme, y compris la Convention internationale pour la répression du financement du terrorisme en date du 9 décembre 1999* » (Résolution 1373 (2001), p. 3).

93

C'est immédiatement en réaction à cette Résolution et en application de celle-ci qu'a été introduite en droit pénal français l'infraction de financement de terrorisme, « *dont la définition reprend les termes de la Convention pour la répression du financement du terrorisme adoptée, le 9 décembre 1999* », comme le révèlent les travaux parlementaires de la loi n° 2001-1062 du 15 novembre 2001(Bruno LE ROUX, Rapport fait au nom de la commission des lois constitutionnelles, de la législation et de l'administration générale de la République, en vue de la lecture définitive du projet de loi relative à la sécurité quotidienne, Enregistré à la Présidence de l'Assemblée nationale le 24 octobre 2001, p. 15).

C'est également en rappelant dans sa lettre même, « *l'obligation de mettre pleinement en œuvre [la] résolution 1373* », que le Conseil de l'Union européenne a adopté le règlement 881/2002 du Conseil du 27 mai 2002.

Le principe *non bis in idem* s'oppose strictement à un tel cumul.

**PAR CES MOTIFS**

Il est demandé au Tribunal de :

- **RELAXER** Monsieur Bruno LAFONT des fins de la poursuite ;

- **DEBOUTER** les parties civiles de l'ensemble de leurs demandes.


Fait à Paris, le 15 décembre 2025


**Quentin DE MARGERIE**          **Jacqueline LAFFONT-HAIK**          **Grégoire BERTROU**

*Avocat*                                    *Avocat*                                    *Avocat*


*Pièces versées (6) :*
1. *Courrier de mise en demeure des conseils de M. LAFONT à HOLCIM du 7 mars 2022*
2. *Jugement du Tribunal des activités économiques de Paris du 8 avril 2025*
3. *Courriel de Jean-Claude VEILLARD du 18 mars 2013*
4. *Délégation de pouvoir à Christian HERRAULT*
5. *Courriel de Christine COLLAERT du 18 octobre 2013*
6. *Courriel de Jean-Claude VEILLARD du 20 février 2013*