# EXHIBIT 5



T E M I M E

| Incoming correspondence received |
| --- |
| on    **MARCH 8, 2024** |
| at the office of<br>Investigating Division –<br>Public Health Unit |

Corinne Dreyfus-Schmidt
Julia Minkowski
Martin Reynaud
Léon Del Forno
Olinka Malaterre
Harold Teboul

*Partners*

**Clerk's Office of Mr. Nicolas AUBERTIN**
First Vice-President in charge of the investigation
Paris Judicial Court
Parvis du Tribunal de Paris
75859 PARIS Cedex 1

*Filed with the Clerk's Office*

Paris, March 8, 2024

**Re: LAFONT Bruno / MP**
Prosecutor's Office No.: P16322001114
Investigating Case No.: JI510/22/01

Madam Clerk,

I am writing to you in my capacity as counsel for Mr. Bruno LAFONT in the matter referenced above.

Pursuant to the provisions of Article 175 IV and VI of the French Code of Criminal Procedure, please find enclosed the observations seeking a dismissal and responding to the final submissions of the prosecution, which I hereby file on behalf of my client.

Please acknowledge receipt hereof.
Yours faithfully,

Attorney at the Court

[signature]

Quentin DE MARGERIE
Attorney at the Court

*Attachment: Observations seeking a dismissal in favor of Mr. Bruno LAFONT*

156, rue de Rivoli 75001 Paris | Tel.: +33 1 49 27 00 55 | Fax: +33 1 42 60 62 44 | cabinet@temime.fr | Palais C1537
Secondary offices | 24, rue Edouard Delanglade 13006 Marseille | Tel.: +33 4 28 38 11 45 | Fax: +33 4 28 38 11 46 |
16a, avenue de la Liberté L-1930 Luxembourg, Luxembourg | Tel.: +352 28 80 48 14 |cabinet@temime.lu
Member of an approved association. Payment of fees by check is accepted.

| **TEMIME ET ASSOCIES** | **WILLKIE FARR & GALLAGHER** | **HAÏK ET ASSOCIES** |
|---|---|---|
| Attorneys at the Court | Attorneys at the Court | Attorneys at the Court |
| 156, rue de Rivoli | 21, boulevard Malesherbes | 27, boulevard Saint-Michel |
| 75001 Paris | 75008 Paris | 75005 Paris |
| Tel.: 01 49 27 00 55 | Tel.: 01 53 43 45 00 | Tel.: 01 43 25 73 73 |
| Fax: 01 42 60 62 44 | Fax: 01 53 43 46 99 | Fax: 01 43 25 62 19 |
| Bar mailbox: C1537 | Bar mailbox: J003 | Bar mailbox: E1305 |

**Mr. Nicolas AUBERTIN**
*First Vice-President in charge of the investigation*

**Ms. Fabienne BERNARD**
**Ms. Stéphanie TACHEAU**
*Vice-Presidents in charge of the investigation*

Paris Judicial Court

Filed with the Clerk's Office

Paris, March 8, 2024

Re:                     Mr. Bruno LAFONT v. Public Prosecutor (MP)
Prosecutor's Office No.:   16322001114
Investigating Case No.:   J1/510/22/01

## OBSERVATIONS SEEKING A DISMISSAL AND
## RESPONSE TO THE FINAL SUBMISSIONS OF THE PROSECUTION
## (ARTICLE 175, IV AND VI OF THE CODE OF CRIMINAL PROCEDURE)

Madam Presidents and Mr. President,

On June 23, 2023, counsel for Bruno LAFONT received a notice of partial completion of the investigation in the matter referenced above, concerning the following offenses (**D2979**):

–   Financing of a terrorist enterprise;

–   Failure to comply with an international measure restricting economic and financial relations with a foreign country; and

–   Sale of cement and other similar materials for the benefit of armed groups of a terrorist nature or facilitated by such groups (period subsequent to the attack on the Jalabiya plant on September 19, 2014).

By letter filed with the Clerk's Office on June 29, 2023, counsel for Bruno LAFONT indicated, pursuant to Article 175 III of the French Code of Criminal Procedure, that it intended to exercise one or more of the rights provided for in paragraphs IV and VI of the same article (**D2989**).

As new investigative measures were carried out after the first notice of partial completion of the investigation, a second notice, similar to the first, was served on the parties on December 14, 2023 (**D3041**).

By letter filed with the Clerk's Office on December 19, 2023, counsel for Bruno LAFONT again indicated that it intended to exercise one or more of the rights provided for in Article 175 IV and VI of the French Code of Criminal Procedure (**D3048**).

On February 9, 2024, the National Anti-Terrorism Prosecutor's Office (PNAT) notified its final submissions seeking a partial dismissal, referral to the Criminal Court, and continuation of judicial supervision.

With respect specifically to Bruno LAFONT, the PNAT considered that the investigation had produced sufficient evidence against him to justify his referral to the Criminal Court for having:

*"On national territory, indivisibly in Syria, during the year 2013 and until September 19, 2014, in any event since a time not barred by the statute of limitations, in his capacity as Chairman and Chief Executive Officer of LAFARGE SA controlling its Syrian subsidiary LCS, participated in the financing of terrorist enterprises by providing, collecting, managing funds, assets or property of any kind, or by providing advice for this purpose, with the intention that such funds be used, or knowing that they were intended to be used, in whole or in part, for the purpose of committing acts of terrorism, irrespective of whether such acts occurred, for the benefit of the terrorist entities Ahrar al-Sham, Jabhat al-Nusra, and the Islamic State in Iraq and the Levant, later known as the Islamic State, for a total cumulative amount exceeding €5,000,000, in particular by authorizing the continuation of operations of the cement plant operated by LCS, although he alone had the authority to terminate such operations, in full awareness that such operations required, in particular, the payment of agreed security payments for the benefit of those terrorist entities, the remuneration of suppliers operating from areas under their control, and intermediaries with those groups;*
*Facts classified as financing of terrorist enterprises, provided for and punishable under Articles 421-1, 421-2-2, 421-5, 421-7, 421-8, 422-3, 422-4, 422-6, and 422-7 of the Criminal Code (offense classification code 25457);*

*On national territory, indivisibly in Syria, from June 30, 2013 to September 19, 2014, in any event since a time not barred by the statute of limitations, in his capacity as Chairman and Chief Executive Officer of LAFARGE SA controlling its Syrian subsidiary LCS, intentionally violated the provisions of Council Regulation 881/2002 of February 27, 2002 and its implementing Regulation (EU) 632/2013 of June 28, 2013 prohibiting any financial or commercial relationship with the jihadist organizations Jabhat al-Nusra and the Islamic State in Iraq and the Levant, later known as the Islamic State, for a total cumulative amount of €4,672,500, in particular by authorizing the continuation of operations of the cement plant operated by LCS, although he alone had the authority to terminate such operations, in full awareness that such operations required, in particular, the payment of agreed security payments for the benefit of those terrorist entities, the remuneration of suppliers operating from areas under their control, and intermediaries with those groups;*
*Facts classified as non-compliance with international financial sanctions, provided for and punishable under Articles 459 §1, §1 bis, §1 ter, §2, §4, §5, 451, 451-bis, 432-bis, and 433-bis of the Customs Code, Council Regulation 881/2002 of February 27, 2002 and its implementing Regulation (EU) 632/2013 of June 28, 2013 (offense classification code 23134)."*

Counsel for Bruno LAFONT considers that investigative measures essential for establishing the truth, and constituting a necessary prerequisite for any admissible decision on the disposition of the case, must still be carried out.

For this reason, on February 28, 2024, the defense filed three requests for investigative measures, seeking *(i)* the examination of Bruno LAFONT, *(ii)* the examination of Firas TLASS, and *(iii)* the questioning of witnesses and the transmission of new requests for declassification.

On the same day, counsel for Bruno LAFONT filed a priority question of constitutionality (QPC) concerning the legal regime governing the declassification of documents covered by national defense secrecy where the request originates from a defense request for investigative measures.

To date, no ruling has been made on these requests for investigative measures, nor on the referral of the QPC to the Court of Cassation.

In light of the time limits provided for in Article 175 IV and VI of the French Code of Criminal Procedure, and notwithstanding the manifestly incomplete nature of the ongoing investigation, which leaves numerous issues unresolved, counsel for Bruno LAFONT nevertheless intends at this stage to submit the present observations seeking a dismissal.

* * *

3

b. <u>By way of example: the calculation of the sums allegedly paid to terrorist groups</u>

152. The report presents an assessment of the amounts—calculated with the assistance of PwC—that may have been paid to terrorist organizations (strikingly left unidentified) by the LAFARGE group in Syria. At the conclusion of work sorely lacking in rigor, the report arrived at the fanciful figure of more than $15 million (or approximately €13 million at the time) (**D380/D381**).

153. This calculation was used on numerous occasions during the investigation as incriminating evidence without first having been verified (**D596/13, D836/18 et seq., D951/3, D952/5 et seq., D956/22 et seq., D975/19 et seq., D1400/4 et seq.**), all the way up to the Court of Cassation, which stated *"that it followed [...] that Lafarge, through subsidiaries, financed ISIS's activities in the amount of several million dollars"* (Criminal Chamber, September 7, 2021, 19-87.367).

154. This calculation was also widely repeated in the press[52] and by counsel for certain civil parties. Thus, on December 13, 2017, counsel for the NGO Sherpa, Ms. Marie DOSÉ, stated during a radio program on France Inter:

– In response to the journalist's question *"How much money is involved?"*: *"€13 million was paid by Lafarge during the period in question, meaning 2011–2014, directly or indirectly, to terrorist organizations [...]. **That is currently the figure adopted by the investigating judges, namely €13 million"*** ; and

– In response to the journalist's question *"What is the evidence? How do you arrive at that figure?"*: *"**It is not the investigating judges who arrived at that figure, and that is what is interesting. It is an internal audit report—in fact the Baker McKenzie report**—which had been commissioned after the merger by LafargeHolcim, which brought in the expertise of another firm, and it is that other firm that arrives at the figure of €13 million [...]."*[53]

155. Under these circumstances, Bruno LAFONT's defense was compelled to carry out substantial verification work, which made it possible to demonstrate that, given the state of the investigation, the maximum amount of sums that could have been passed on to organizations listed as terrorist amounted to $563,054 (as opposed to $15,348,804 in the Baker McKenzie report, i.e., less than 4%) (**D1507**; see also **D2336**).

---

[52] See, for example: https://www.lefigaro.fr/societes/2017/12/13/20005-20171213ARTFIG00097-lafarge-aurait-verse-pres-de-13-millions-d-euros-a-des-groupes-armes-en-syrie.php – "Lafarge allegedly paid nearly €13 million to armed groups in Syria."

[53] https://www.marie-dose-avocat.com/deux-ong-portent-plainte-contre-le-cimentier-francais-lafarge-le-journal-de-22h-france-culture-15112016-2/.

156. Following that verification work, the investigating authorities commissioned a specialized assistant who prepared a memorandum on the PwC report and concluded that she was not in a position to challenge the amount determined by Bruno LAFONT's counsel (**D1796**). Furthermore, the Judicial Financial Investigations Service (SEJF) also carried out work calculating the amounts that may have been paid to terrorist organizations and arrived at a range—still greatly overstated, to be sure, but potentially three times lower than PwC's—of between €4,781,153 and €10,294,153 (**D2016**). **Ultimately, neither of those two analyses confirmed the estimates made by PwC for Baker McKenzie; quite the contrary**.

157. Quite rightly, the final submission notes that Beat HESS, when questioned as the representative of the LAFARGE group (a HOLCIM subsidiary), maintained the figure of approximately $15 million without taking into account the later analyses (those of Bruno LAFONT's defense, the specialized assistant, or the SEJF).

> *"[Beat HESS] nevertheless stood by the figure of USD 15,000,000 resulting from the Baker McKenzie report, offering no assessment of the alternative calculation proposed by Bruno LAFONT's attorneys, which estimated the disputed payments at USD 563,054, or of the investigators' estimate of between €4,781,153 and €9,964,153 (D2654)"* (**final submission, p. 256**).

158. By contrast, <u>the final submission fails to note that Beat HESS</u>, after stating that he had conducted no additional investigation and had not even reviewed the documents on which that report was based, <u>indicated that the very author of the report had told him that in such circumstances one can never know to whom the sums ultimately go</u>:

> *The judges: **<u>At the time, did you request access to these documents assembled by Baker McKenzie?</u>***
>
> *Answer: **<u>No, I only read the Baker McKenzie report.</u>***
>
> *Well, perhaps—I do not remember anymore—perhaps certain documents were later given to me. But I am not certain. The report itself was fairly detailed.*
>
> *The judges: **<u>The passage from the report that has just been read highlighted a problem of interpretation, the relativity of the results, and subjectivity. Did that not trouble you?</u>***
>
> *Answer: **<u>Yes, of course. I remember asking the attorney in charge of the report, Fayhee Ryan</u>**, whether it was his conclusion that sums had been paid to terrorist groups. If I remember correctly, **<u>his answer at the time was always to say 'you know, in those circumstances, at that time, one never knew whether these were terrorist groups or ordinary criminals, whether they were gangs, the police, the Syrian police, the Kurdish police'</u>**; that left me with the impression that in that chaotic situation, it was likely that sums had been paid to those terrorist groups, but that it was difficult to determine where exactly that money may have gone [...]"* (**D2654/7**).

159. Then, despite what he had just said, Beat HESS went on and stated that he had no information other than the Baker McKenzie report, which he had no reason to doubt, before concluding that *<u>"we will probably never know what sums were paid to whom in those chaotic circumstances"</u>*:

*"The judges: Do you dispute this total amount of USD 15.5 million adopted in the report of the internal investigation that you yourself ordered?*

*Answer: **That was the report's conclusion.** I accepted the report's conclusions, which for me established facts. **I assumed, and I still assume today, that Baker McKenzie did good work.** So at the time I proceeded, and I still proceed, on the basis that they did proper work.*

*The judges: After reviewing that work and the contents of the entire investigation file, did the corporation LAFARGE, which has been placed under formal investigation, carry out a calculation of the amounts that may have been paid to the Islamic State between November 2013 and September 2014 through various channels, as Mr. Bruno LAFONT did, for example (see memoranda D1507 and D2336)?*

*Answer: **Yes, I refer to the approximate figure of 15 million that was communicated to me.** I would add that personally, like the Board of Directors, I was horrified that sums had been paid and to learn the amount of those sums. Moreover, **I have no reason to doubt the work carried out by Baker McKenzie or the conclusion regarding the payment of the sums.***

*The judges: Bruno LAFONT's attorneys conclude that 'it remains established that the sums belonging to LCS that may ultimately have benefited a terrorist enterprise amount, at most, to $563,054.' Do you have a view on their analysis?*

*Answer: **I am not aware of their analysis**; I cannot tell you to what extent it was carried out professionally. **For my part, I considered, and I have no reason to change my view today, that the conclusions of the Baker McKenzie report were correct.***

*The judges: The investigator in charge of the judicial commission calculated the total amount to be taken into account in LAFARGE's financing of ISIS (D2016 and 2016/6 for the summary table) and adopted [...] a total between €4,781,153 and €9,964,153. Did you conduct an analysis of that document, both as to the amounts and the reasoning regarding the different types of methods of financing the Islamic State?*

*Answer: My first reaction to that is that **these different amounts you have just referred to probably show that, in a way, we will probably never know what sums were paid to whom in those chaotic circumstances** [...]"* (**D2654/9**).

160. For its part, the final submission ultimately adopts an estimate of "*more than €5,000,000*" (**final submission, p. 268 et seq.**). Quite apart from the fact that this figure is disputed by Bruno LAFONT's defense, it should be noted that it is not even consistent with the amounts advanced in the body of the final submission itself. Indeed, as explained in greater detail below (regarding the material element of the offense of financing terrorism), in its argument the final submission advances, on the one hand, with respect to the security payments, the sum of €3,130,000 (**final submission p. 259 et seq.**) and, on the other hand, with respect to the acquisition of inputs, the sum of €187,000 (which would correspond to a 10% tax on an amount of approximately €1,900,000) (**final submission p. 262 et seq.**), for a total of €3,317,000.

60

161. This accusation ultimately does not, at any point, criticize the conclusions of the Baker McKenzie report (see, in particular, **final submission p. 52 et seq.**). Even more seriously, although it has been established that the investigation was conducted in a prosecutorial manner and drew erroneous conclusions, and that the figures put forward by that report are false and were contradicted during the judicial investigation, the final submission repeatedly relies on that same report to support the prosecution's case (see, in particular, with respect to Bruno LAFONT, **final submission p. 239 et seq**.).

162. **Ultimately, in roughly ten pages, this report addresses more than five years of the LAFARGE group's activity in Syria, without ever conveying the complexity of the local situation or offering the slightest nuance depending on the role and responsibilities of each of the executives implicated. This situation leads to errors of assessment with serious consequences in the context of the criminal proceedings for which it formed the foundation (D291).**

163. Finally, it should be noted that **on July 7, 2020**, this report was also transmitted to the U.S. authorities by Darrois Villey Maillot Brochier, counsel for the LafargeHolcim group in the present proceedings. This report thus once again served as the basis for the opening of proceedings against the LAFARGE group, this time in the United States (**D1951**).

164. On this point, the final submission fails to make the connection between *(i)* on the one hand, the statements made by Beat HESS—Chairman of the Board of Directors of the HOLCIM group and representative of the LAFARGE group (a HOLCIM subsidiary) in the present proceedings—during the investigation and, *(ii)* on the other hand, the fact that under his chairmanship the group decided to enter into a plea agreement in the United States.

165. Indeed, it is, to say the least, surprising that such an agreement could have been entered into in 2022, necessarily following a phase of negotiation, while Beat HESS was stating to the investigating judges on November 29, 2021 (**D2654**):

– **That he had no particular information regarding how the events unfolded:**

▪ "*The judges: Are you able to tell us what knowledge LAFARGE SA had of the Al-Nusra Front and the Islamic State (ISIS / DAESH) in the first half of 2013?*

Answer: I cannot answer you, ___I was not there, I do not know what knowledge LAFARGE or the people at LAFARGE had___ *(answer in French)*" (**D2654/14**);

▪ "*The judges: [...] How did Lafarge SA deal with that type of information conveyed in the press in the summer of 2013?*

*Answer:* ___I do not know, I was not at LAFARGE___ *[...]*" (**D2654/15**);

▪ "*Let it be noted that Mr. HESS is reminded that the question is not being put to him personally but in his capacity as representative of LAFARGE.*

*Mr. HESS:* ___I understand your position and I am stating mine; I assume that this information was known to LAFARGE at the time___" (**D2654/16**);

- ▪ *"The judges: [...] Who within LAFARGE was supposed to analyze this press coverage and carry out open-source research in order to document the situation for management?*

  *Answer: <u>__I assume, but I do not know for certain, that LAFARGE, like any large company, has a__ __press department__</u> that informs management on a daily basis of any event in the world that may be of importance to the company"* (**D2654/16**);

- ▪ *"The judges: [...] What did you know of the existence of this contract and of these notes on Syria?*

  *Answer: <u>__I have no knowledge of these contracts, or of these proposed contracts if I understood__ __correctly. I would say that in these circumstances it is customary to receive proposals from press__ __services"__</u>* (**D2654/16**);

- ▪ *"The judges: [...] For what reasons, while the situation was seriously deteriorating, was it requested that the frequency of these notes be reduced from twice monthly to monthly (email of July 22, 2013, D1433/5)?*

  *Answer of Mr. HESS: <u>__I do not know why__</u>; it seems odd, but I do not know why.*

  *Answer of Mr. GARTNER: It is somewhat difficult for us, not having had knowledge of these summaries, to be able to answer; <u>__I therefore think that it is not possible for us to respond__</u>.*

  *Let it be noted that Mr. GARTNER is reminded that he is present in his capacity as representative of the previously indicted company LAFARGE.*

  *Mr. HESS: <u>__We understand your position and that this may create frustration on the part of the__ __judicial authority, but I can only remind you that we are here, and I can only offer our apologies"__</u>* (**D2654/18**);

- ▪ *"The judges: [...] Who within LAFARGE arbitrated between these conflicting concerns: in order to take advantage of the strong economic potential, it was necessary to pay sums to groups composed of would-be jihadists?*

  *Answer: That is really the great question to which I would myself like to know the answer. Please allow me a moment to think. <u>__Once again, I do not know the conditions that prevailed at the time__ __within LAFARGE; I can only give you my personal opinion, and I can give you examples where__ __I personally had to make decisions__</u> [...]"* (**D2654/18**);

– **That he had not reviewed the documents on which the Baker McKenzie report was based:**

- ▪ *"The judges: At the time, did you ask to review these documents assembled by Baker McKenzie?*

  *Answer: <u>__No, I only read the Baker McKenzie report.__</u>*

  *Well, perhaps, I do not remember anymore, perhaps some documents may have been given to me later. But I am not certain. The report itself was fairly detailed"* (**D2654/7**);

62

> > ■ "*The judges: [...] Did you analyze this document, both the amounts and the reasoning concerning the different modes of financing the Islamic State?*
> >
> > *[...] The answer to the specific question is that <u>**I have no knowledge of any supplemental analysis beyond the Baker McKenzie report.**</u> It is entirely possible that this was done, but it was not brought to my attention*" (**D2654/9**);

> – **That he had initiated no supplemental investigation on the grounds that judicial proceedings were underway and would shed light on those facts:**

> > ■ "*The judges: [...] What follow-up was given to these proposals for further analysis?*
> >
> > *Answer: I was not involved in the details of the investigation. [...] The report was presented to us as the final report and, <u>**as I have already mentioned, I relied on the judicial investigation to establish the truth**</u> in this matter, but already at that time we had taken measures against the persons involved*" (**D2654/8**);

> > ■ "*The judges: [...] Did you review this report and did you search for these documents?*
> >
> > *Answer: I do not know whether other documents may have been presented. The only thing I know is that I read the Baker McKenzie report, including the annexes as I recall, and, as I have already indicated, I did not know whether there were still outstanding questions. <u>**As far as I was concerned, I knew that the matter would take its course and that the French authorities had the means to establish the truth**</u>*" (**D2654/8**).

166. Under these circumstances, Bruno LAFONT's defense notes that Beat HESS, the representative of the LAFARGE group (a HOLCIM subsidiary) in the present investigation, pillories the French industrial group, together with its former executives, on the sole basis of a discredited report in order to favor the HOLCIM group from which he comes.

### 3. The LAFARGE group (a HOLCIM subsidiary), a legal entity having an interest in implicating its former executives, now unable to defend itself

167. The policy pursued by HOLCIM's former executives at the head of the new LafargeHolcim group had the effect of causing the near-disappearance of the LAFARGE group to the benefit of the HOLCIM group (**a**.). On the judicial level, that policy manifested itself in a reversal of the defense strategy of the LAFARGE group (a HOLCIM subsidiary) in the investigation that is the subject of the present proceedings (**b.**) and in the conclusion of a plea agreement in the United States, with the prior filing of a civil liability action against the former executives of the LAFARGE group as a prerequisite (**c.**).

#### a. <u>A merger of "equals" that became an absorption</u>

168. **In 2013**, the LAFARGE group employed approximately 65,000 people and generated revenue of €15.2 billion; the HOLCIM group employed approximately 70,000 people and generated revenue of €16.1 billion.

63

morningtrans.com



# TRANSLATION CERTIFICATION

Date: March 28, 2026

To whom it may concern:

I, Hugh T. Robinson, a translator fluent in the French and English languages, on behalf of Morningside, do solemnly and sincerely declare that the following is, to the best of my knowledge and belief, a true and correct translation of the document(s) listed below in a form that best reflects the intention and meaning of the original text.

The document is designated as:

- Observations aux Fins de Non-Lieux et reponse au requisitoire definitif (Excerpt)

*Hugh T. Robinson*
_____
Signature

Hugh T. Robinson
_____
Print

Questel Confidential: Limited External Use

299 South Main Street, Suite 1300
Salt Lake City, UT 84111



T E M I M E



Courrier arrivé

le          0 8 MARS 2024

au cabinet
Instruction-pôle santé

Corinne Dreyfus-Schmidt
Julia Minkowski
Martin Reynaud
Léon Del Forno
Olinka Malaterre
Harold Teboul

*Avocats associés*

**Greffe de Monsieur Nicolas AUBERTIN**
Premier Vice-Président chargé de l'instruction
Tribunal judiciaire de Paris
Parvis du Tribunal de Paris
75859 PARIS Cedex 1

*Par déclaration au greffe*

Paris, le 8 mars 2024

**Aff. : LAFONT Bruno / MP**
N° Parquet : P16322001114
N° Instruction : JI510/22/01

Madame la Greffière,

Je viens vers vous en ma qualité de conseil de Monsieur Bruno LAFONT dans l'affaire rappelée en références.

En application des dispositions de l'article 175 IV et VI du Code de procédure pénale, je vous prie de bien vouloir trouver ci-joint les observations aux fins de non-lieu et en réponse au réquisitoire définitif que je dépose au bénéfice de mon client.

Je vous en souhaite bonne réception et vous prie de croire, Madame la Greffière, en l'assurance de ma parfaite considération.

Quentin DE MARGERIE
Avocat à la Cour

*P.J. : Observations aux fins de non-lieu en faveur de Monsieur Bruno LAFONT*

156, rue de Rivoli 75001 Paris   Tél. : +33 1 49 27 00 55   Fax : +33 1 42 60 62 44   cabinet@temime.fr   Palais C1537

Cabinets secondaires   24, rue Edouard Delanglade 13006 Marseille   Tél. : +33 4 28 38 11 45   Fax : +33 4 28 38 11 46

16a, avenue de la Liberté L-1930 Luxembourg, Luxembourg   Tél. : +352 28 80 48 14   cabinet@temime.lu

Membre d'une association agréée, le règlement des honoraires par chèque est accepté.

| TEMIME ET ASSOCIES | WILLKIE FARR & GALLAGHER | HAÏK ET ASSOCIES |
|---|---|---|
| Avocats à la Cour | Avocats à la Cour | Avocats à la Cour |
| 156, rue de Rivoli | 21, boulevard Malesherbes | 27, boulevard Saint-Michel |
| 75001 Paris | 75008 Paris | 75005 Paris |
| Tél : 01 49 27 00 55 | Tél : 01 53 43 45 00 | Tél : 01 43 25 73 73 |
| Fax : 01 42 60 62 44 | Fax : 01 53 43 46 99 | Fax : 01 43 25 62 19 |
| Toque : C1537 | Toque : J003 | Toque : E1305 |

**Monsieur Nicolas AUBERTIN**
*Premier Vice-Président chargé de l'instruction*

**Madame Fabienne BERNARD**
**Madame Stéphanie TACHEAU**
*Vice-Présidentes chargées de l'instruction*

Tribunal judiciaire de Paris

Par déclaration au greffe

Paris, le 8 mars 2024

Aff. :             Monsieur Bruno LAFONT c/ MP
N° Parquet :       16322001114
N° Instruction :   JI/510/22/01

## OBSERVATIONS AUX FINS DE NON-LIEU ET
## REPONSE AU REQUISITOIRE DEFINITIF
## (ART. 175, IV ET VI DU CODE DE PROCEDURE PENALE)

Mesdames et Monsieur les Présidents,

Le 23 juin 2023, la défense de Bruno LAFONT a été rendue destinataire d'un avis de fin d'information partiel dans l'affaire dont les références sont rappelées en objet, concernant les infractions suivantes (**D2979**) :

— Financement d'entreprise terroriste ;

— Non-respect d'une mesure internationale de restriction des relations économiques et financières avec l'étranger ; et

— Vente de ciment et autres matériaux assimilés, effectués au profit de groupes armés et de nature terroriste ou facilités par ces mêmes groupes (période postérieure à l'attaque de l'usine de Jalabiya le 19 septembre 2014).

D3155/3

Par courrier déposé au greffe le 29 juin 2023, la défense de Bruno LAFONT a indiqué, conformément aux dispositions de l'article 175, III du Code de procédure pénale, qu'elle entendait exercer un ou plusieurs des droits prévus aux IV et VI de ce même article (**D2989**).

De nouveaux actes d'instruction ayant été accomplis postérieurement au premier avis de fin d'information partiel, un second avis, similaire au premier, a été notifié aux parties le 14 décembre 2023 (**D3041**).

Par courrier déposé au greffe le 19 décembre 2023, la défense de Bruno LAFONT a de nouveau indiqué qu'elle entendait exercer un ou plusieurs des droits prévus aux IV et VI de l'article 175 du Code de procédure pénale (**D3048**).

Le 9 février 2024, le Parquet national antiterroriste (PNAT) a notifié son réquisitoire définitif aux fins de non-lieu partiel, renvoi devant le Tribunal correctionnel et maintien sous contrôle judiciaire.

S'agissant en particulier de Bruno LAFONT, le PNAT a considéré qu'il résultait de l'information des charges suffisantes à son encontre justifiant son renvoi devant le Tribunal correctionnel, pour avoir :

« *Sur le territoire national, de manière indivisible en Syrie, courant 2013 et jusqu'au 19 septembre 2014, en tout cas depuis temps non couvert par la prescription, dans le cadre de ses fonctions de président directeur général de LAFARGE SA contrôlant sa filiale syrienne LCS, participé au financement d'entreprises terroristes, en fournissant, réunissant, gérant des fonds, valeurs ou biens quelconques, ou en donnant des conseils à cette fin, dans l'intention de voir ces fonds utilisés ou en sachant qu'ils étaient destinés à être utilisés, en tout ou partie, en vue de commettre des actes de terrorisme, indépendamment de leur survenance, au profit des entités terroristes Ahrar al-Sham, Jabhat al-Nosra et État islamique en Irak et au Levant devenu État islamique, pour un total cumulé de plus de 5 000 000 €, en l'espèce notamment en autorisant la poursuite d'activité de la cimenterie exploitée par LCS, alors qu'il était seul habilité à y mettre fin, en conscience que cette exploitation supposait notamment des paiements de sécurité convenus au profit de ces entités terroristes, la rémunération de fournisseurs opérant depuis les zones tombées sous leur contrôle, et d'intermédiaires avec ces groupes ;*
*Faits qualifiés de financement d'entreprises terroristes, prévus et réprimés par les articles 421-1, 421-2-2, 421-5, 421-7, 421-8, 422-3, 422-4, 422-6, 422-7 du code pénal (natinf 25457) ;*

*Sur le territoire national, de manière indivisible en Syrie, du 30 juin 2013 au 19 septembre 2014, en tout cas depuis temps non couvert par la prescription, dans le cadre de ses fonctions de président directeur général de LAFARGE SA contrôlant sa filiale syrienne LCS, intentionnellement violé les dispositions du règlement communautaire 881/2002 du 27 février 2002 et de son règlement d'exécution (UE) 632/2013 du 28 juin 2013 visant à interdire toute relation financière ou commerciale avec les organisations djihadistes Jabhat al-Nosra et État islamique en Irak et au Levant devenu État islamique, pour un total cumulé de 4 672 500 €, en l'espèce notamment en autorisant la poursuite d'activité de la cimenterie exploitée par LCS, alors qu'il était seul habilité à y mettre fin, en conscience que cette exploitation supposait notamment des paiements de sécurité convenus au profit de ces entités terroristes, la rémunération de fournisseurs opérant depuis les zones tombées sous leur contrôle, et d'intermédiaires avec ces groupes ;*
*Faits qualifiés de non-respect de sanctions financières internationales, prévus et réprimés par les articles 459 §1, §1 bis, §1 ter, §2, §4, §5, 451, 451-bis, 432-bis, 433-bis du code des douanes, le règlement communautaire 881/2002 du 27 février 2002 et de son règlement d'exécution (UE) 632/2013 du 28 juin 2013 (natinf 23134)* ».

D3155/4

La défense de Bruno LAFONT considère que des investigations indispensables à la manifestation de la vérité et constituant un préalable nécessaire à toute décision recevable de règlement doivent encore être diligentées.

C'est la raison pour laquelle le 28 février 2024, elle a déposé trois demandes d'actes, sollicitant *(i)* l'interrogatoire de Bruno LAFONT, *(ii)* l'interrogatoire de Firas TLASS et *(iii)* l'audition de témoins et la transmission de nouvelles demandes de déclassification.

Le même jour, la défense de Bruno LAFONT a déposé une question prioritaire de constitutionnalité relative au régime de déclassification des documents couverts par le secret de la défense nationale lorsque la demande émane, à l'origine, d'une demande d'actes de la défense.

Il n'a pas été à ce jour statué sur ces demandes d'actes, pas plus que sur la transmission de la QPC à la Cour de cassation.

Eu égard aux délais prévus par l'article 175, IV et VI du Code de procédure pénale, et nonobstant le caractère manifestement inachevé de l'instruction en cours qui laisse subsister de nombreuses zones d'ombre, la défense de Bruno LAFONT entend d'ores et déjà présenter les présentes observations aux fins de non-lieu.

* * *

3

          b.    A titre d'exemple : le calcul des sommes prétendument versées à des groupes terroristes

152.    Le rapport présente une évaluation des montants – calculés avec l'aide du cabinet PWC – ayant pu être versés à des organisations terroristes (étonnement non identifiées) par le groupe LAFARGE en Syrie. Au terme d'un travail manquant cruellement de sérieux, le rapport conclut à une somme fantaisiste de plus de 15 millions de dollars (soit à l'époque env. 13 millions d'euros) (**D380/D381**).

153.    Ce chiffrage était utilisé comme un élément à charge à de nombreuses reprises dans le cadre de l'instruction sans avoir préalablement été vérifié (**D596/13, D836/18 et s., D951/3, D952/5 et s., D956/22 et s., D975/19 et s., D1400/4 et s.**), jusqu'à la Cour de cassation qui a pu indiquer « *qu'il se déduisait […] que la société Lafarge a financé, via des filiales, les activités de l'EI à hauteur de plusieurs millions de dollars* » (Crim., 7 sept. 2021, 19-87.367).

154.    Ce chiffrage était également largement repris dans la presse[52] et par les conseils de certaines parties civiles. Ainsi, le 13 décembre 2017, l'avocate de l'ONG Sherpa, Maître Marie DOSE, indiquait lors d'une émission de radio sur France Inter :

    –    En réponse à la question de la journaliste « *Combien d'argent sont en cause ?* » : « *13 millions d'euros ont été versés par Lafarge sur la période incriminée donc 2011-2014, directement ou indirectement, à des organisations terroristes […]. **On est actuellement à ce chiffre retenu par les magistrats instructeurs de 13 millions d'euros** » ; et

    –    En réponse à la question de la journaliste « *Quelles sont les preuves ? Comment est-ce que vous arrivez à ce chiffre ?* » : « ***Ce ne sont pas les magistrats instructeurs qui arrivent à ce chiffre et c'est ça qui est intéressant. C'est un rapport d'audit interne, en fait c'est le rapport Baker McKenzie*** *qui avait été commandé après la fusion par LafargeHolcim qui s'est adjoint les compétences d'un autre cabinet et c'est cet autre cabinet qui parvient à ce chiffre de 13 millions d'euros […]* »[53].

155.    Dans ces conditions, la défense de Bruno LAFONT était contrainte d'effectuer un important travail de vérification qui permettait de démontrer qu'en l'état des investigations le montant maximum des sommes ayant pu être reversées à des organisations listées comme terroristes s'élevait à 563.054 dollars (contre 15.348.804 dollars dans le rapport Baker McKenzie, soit moins de 4 %) (**D1507** ; v. également **D2336**).

---

[52]    V. par ex. : https://www.lefigaro.fr/societes/2017/12/13/20005-20171213ARTFIG00097-lafarge-aurait-verse-pres-de-13-millions-d-euros-a-des-groupes-armes-en-syrie.php – « Lafarge aurait versé près de 13 millions d'euros à des groupes armés en Syrie ».

[53]    https://www.marie-dose-avocat.com/deux-ong-portent-plainte-contre-le-cimentier-francais-lafarge-le-journal-de-22h-france-culture-15112016-2/.

156. A la suite de ce travail de vérification, l'instruction missionnait une assistante spécialisée qui réalisait une note sur le rapport PWC, laquelle concluait qu'elle n'était pas en mesure de remettre en cause le montant déterminé par les conseils de Bruno LAFONT (**D1796**). Par ailleurs, le SEJF effectuait également un travail de calcul des montants ayant pu être versés à des organisations terroristes et concluait à une fourchette – certes toujours très surévaluée, mais potentiellement trois fois plus faible que PWC – comprise entre 4.781.153 euros et 10.294.153 euros (**D2016**). **En définitive, aucune de ces deux analyses ne confirmait les évaluations réalisées par PWC pour le cabinet Baker McKenzie, bien au contraire.**

157. A juste titre, le réquisitoire définitif relève que Beat HESS, lorsqu'il était interrogé en qualité de représentant du groupe LAFARGE (filiale d'HOLCIM), restait au chiffre d'environ 15 millions de dollars, sans prendre en considération les analyses postérieures (de la défense de Bruno LAFONT, de l'assistante spécialisée ou encore du SEJF).

> « *[Beat HESS] en restait cependant au chiffre de 15 000 000 USD résultant du rapport Baker McKenzie, ne livrant pas d'éléments d'appréciation sur le chiffrage alternatif proposé par les avocats de Bruno LAFONT, estimant les paiements litigieux à 563 054 USD, ou sur l'estimation des enquêteurs établie entre 4 781 153 € et 9 964 153 € (D2654)* » (**RD p. 256**).

158. En revanche, le réquisitoire définitif omet de relever que Beat HESS, après avoir indiqué qu'il n'avait effectué aucune investigation complémentaire et qu'il n'avait pas même pris connaissance des pièces sur lesquelles se fondait ce rapport, indiquait que l'auteur même du rapport lui avait rapporté que dans de telles circonstances on ne sait jamais à qui vont les sommes *in fine* :

> « *Les juges :* **Avez-vous demandé à l'époque à prendre connaissance de ces documents réunis par Baker McKenzie ?**
>
> *Réponse :* **Non, je n'ai fait que lire le rapport de Baker McKenzie.**
>
> *Enfin, peut-être, je ne m'en souviens plus, peut-être que certains documents ont pu m'être remis par la suite. Mais je n'en suis pas certain. Le rapport lui-même était assez circonstancié.*
>
> *Les juges :* **Le passage du rapport qui vient d'être lu mettait en exergue un problème d'interprétation, de relativité des résultats, de subjectivités. Ça ne vous a pas interpelé ?**
>
> *Réponse :* **Oui bien sûr, je me souviens avoir demandé à l'avocat en charge du rapport, Fayhee Ryan**, *si c'était sa conclusion que des sommes avaient été payées à des groupes terroristes. Si je me souviens bien,* **sa réponse à l'époque, était toujours de dire "vous savez, dans telles circonstances, on ne savait jamais à cette époque s'il s'agissait de groupes terroristes ou de criminels de droit commun, si c'étaient des bandes, la police, la police syrienne, la police kurde"**, *ça m'a laissé l'impression que dans cette situation chaotique, il était vraisemblable que des sommes aient été payées à ces groupes terroristes mais qu'il était difficile de déterminer où cet argent a pu aller exactement [...]* » (**D2654/7**).

159. Ensuite, en dépit de ce qu'il venait d'indiquer, Beat HESS poursuivait et déclarait ne pas avoir d'autres informations que le rapport Baker McKenzie, dont il n'avait aucune raison de douter avant de conclure que « *nous n'allons probablement jamais savoir quelles sommes ont été versées à qui dans ces circonstances chaotiques* » :

*« Les juges : Contestez-vous ce montant total de 15,5 millions d'USD retenu dans le rapport de l'enquête interne que vous avez vous-même ordonné ?*

*Réponse : **C'était la conclusion du rapport**. J'acceptais les conclusions du rapport qui pour moi établissaient des faits. **Je présumais et je présume encore aujourd'hui que Baker McKenzie a fait du bon travail**. Donc je partais du principe à l'époque et je pars toujours du principe qu'ils ont fait un travail correct.*

*Les juges : Après avoir pris connaissance de ces travaux et du contenu de l'entier dossier d'instruction, la société anonyme LAFARGE, qui est mise en examen, a-t-elle procédé à un chiffrage des montants qui auraient été versés à l'Etat Islamique entre novembre 2013 et septembre 2014 par différents biais, comme l'a fait par exemple M. Bruno LAFONT (cf. notes D1507 et D2336) ?*

*Réponse Oui, **moi je me réfère au chiffre approximatif de 15 millions qu'on m'a communiqué**. Je précise qu'à titre personnel j'étais, comme le conseil d'administration, horrifié que des sommes avaient été payées et d'apprendre le montant desdites sommes. Par ailleurs **je n'ai aucune raison de douter du travail effectué par le cabinet Baker McKenzie ni de la conclusion sur le versement des sommes**.*

*Les juges : Les avocats de Bruno LAFONT arrivent à la conclusion qu'"il reste acquis que les sommes appartenant à LCS ayant pu bénéficier in fine à une entreprise terroriste s'élèvent, au maximum, à 563.054 dollars.". Avez-vous un point de vue sur leur analyse ?*

*Réponse : **Je ne suis pas au courant de leur analyse**, je ne peux pas vous dire à quel point elle a été réalisée de manière professionnelle. **Moi je considérais et je n'ai aucune raison de changer d'avis aujourd'hui que les conclusions du rapport Baker Mckenzie étaient justes**.*

*Les juges : L'enquêteur en charge de la commission rogatoire a procédé à un chiffrage du montant total à prendre en compte dans le financement de l'EI par LAFARGE (D2016 et 2016/6pour le tableau récapitulatif) et a retenu [...] un total compris entre 4.781.153 euros et 9.964.153 euros. Avez-vous procédé à une analyse de ce document tant sur les montants que les raisonnements sur les différents types de mode de financement de l'Etat islamique ?*

*Réponse : Ma première réaction à cela est que **ces différents montants que vous venez d'évoquer montrent sans doute que d'une certaine manière nous n'allons probablement jamais savoir quelles sommes ont été versées à qui dans ces circonstances chaotiques** [...] »* **(D2654/9)**.

160. Le réquisitoire définitif quant à lui retient finalement une évaluation de « *plus de 5.000.000 euros* » (**RD, p. 268 et s.**). Outre le fait que ce chiffre est contesté par la défense de Bruno LAFONT, il sera relevé qu'il n'est pas même cohérent avec les montants avancés dans le corps du réquisitoire définitif lui-même. En effet, comme exposé plus en détail *infra* (sur l'élément matériel de l'infraction de financement du terrorisme), dans son argumentation, le réquisitoire définitif avance d'une part, s'agissant des paiements de sécurité, la somme de 3.130.000 euros (**RD p. 259 et s.**) et, d'autre part, s'agissant des acquisitions d'intrants, la somme de 187.000 euros (qui correspondrait à une taxe de 10 % sur un montant d'environ 1.900.000 euros) (**RD p. 262 et s.**), soit un total de 3.317.000 euros.

161. Cette accusation ne critiquera finalement à aucun moment les conclusions rapport Baker McKenzie (cf. not. **RD p. 52 et s.**). Plus grave encore, alors même qu'il est établi que l'enquête a été menée à charge et a tiré des conclusions erronées, et que les chiffres avancés par ce rapport sont faux et ont été contredits dans le cadre de l'information judiciaire, le réquisitoire définitif s'appuiera à de nombreuses reprises sur ce même rapport pour soutenir l'accusation (cf. notamment s'agissant de Bruno LAFONT, **RD p. 239 et s.**).

162. **En définitive, ce rapport traite en une dizaine de pages de l'activité pendant plus de 5 années du groupe LAFARGE en Syrie, sans à aucun moment retranscrire la complexité de la situation locale, ni apporter la moindre nuance en fonction du rôle et des responsabilités de chacun des dirigeants mis en cause. Cette situation conduit à des erreurs d'appréciation lourdes de conséquences dans le cadre de la procédure pénale dont il a constitué le socle (D291).**

163. Enfin, il sera relevé que **le 7 juillet 2020**, ce rapport était également transmis aux autorités américaines par le cabinet Darrois Villey Maillot Brochier, avocat du groupe LafargeHolcim dans la présente procédure. Ce rapport servait ainsi à nouveau de fondement à l'ouverture d'une procédure contre le groupe LAFARGE, cette fois-ci aux Etats-Unis (**D1951**).

164. Sur ce point, le réquisitoire omet de faire le lien entre *(i)* d'une part, les déclarations de Beat HESS – président du conseil d'administration du groupe HOLCIM et représentant du groupe LAFARGE (filiale d'HOLCIM) dans la présente procédure – lors de l'instruction et, *(ii)* d'autre part, le fait que sous sa présidence le groupe décide de conclure un accord de plaider-coupable aux Etats-Unis.

165. En effet, il est pour le moins surprenant qu'un tel accord ait pu être conclu en 2022, nécessairement à l'issue d'une phase de négociation, alors même que Beat HESS indiquait aux magistrats instructeurs le 29 novembre 2021 (**D2654**) :

– **N'avoir aucune information particulière sur le déroulement des faits :**

  ▪ « *Les juges : Êtes-vous en mesure de nous indiquer quelle connaissance avait LAFARGE SA du Front Al Nosra et de l'Etat islamique (ISIS / DAECH), au premier semestre 2013 ?*

    *Réponse : Je ne peux pas vous répondre, **je n'étais pas là, je ne sais pas quelle connaissance LAFARGE ou les gens de LAFARGE avaient** (réponse en français)* » (**D2654/14**) ;

  ▪ « *Les juges : [...] Comment Lafarge SA traitait-elle ce type d'informations véhiculées dans la presse à l'été 2013 ?*

    *Réponse : **Je ne sais pas Je n'étais pas à LAFARGE** [...]* » (**D2654/15**) ;

  ▪ « *Mentionnons rappeler à M. HESS que la question ne lui est pas posée personnellement mais en sa qualité de représentant de la société LAFARGE.*

    *M. HESS : **Je comprends votre position et je fais état de la mienne, je suppose que ces informations étaient connues de LAFARGE à l'époque** * » (**D2654/16**) ;

61

- « *Les juges : [...] Qui au sein de* LAFARGE *devait faire l'analyse de cette presse et les recherches en sources ouvertes pour documenter la situation à la direction ?*

  *Réponse :* **_je suppose mais je ne le sais pas de façon certaine que LAFARGE, comme toute grande entreprise, dispose d'un service de presse_** *qui informe au quotidien la direction de tout évènement dans le monde pouvant revêtir une importance pour la société* » (**D2654/16**) ;

- « *Les juges : [...] Que saviez-vous de l'existence de ce contrat et de ces notes sur la Syrie ?*

  *Réponse :* **_Je n'ai pas connaissance de ces contrats, ou de ces contrats proposés si j'ai bien compris. Je dirais que dans ces conditions il est habituel de recevoir des propositions de la part de services de presse_** » (**D2654/16**) ;

- « *Les juges : [...] Pour quelles raisons, alors que la situation se dégradait fortement, a t -il été demandé de réduire la périodicité de ces notes, de bimensuelle à mensuelle (mail du 22 juillet 2013, D1433/5) ?*

  *Réponse de M HESS :* **_Je ne sais pas pourquoi_**, *ça paraît curieux mais je ne sais pas pourquoi*

  *Réponse de M GARTNER : c'est un peu compliqué pour nous n'ayant pas eu connaissance de ces synthèses que de pouvoir répondre,* **_je pense que par conséquent il ne nous est pas possible de répondre_**.

  *Mentionnons rappeler à M. GARTNER qu'il est présent en sa qualité de représentant de la société* LAFARGE *préalablement mise en examen.*

  *M HESS :* **_Nous comprenons votre position et que cela pourrait créer une frustration de l'autorité judiciaire mais je ne peux que vous rappeler que nous sommes la et je ne peux que vous présenter nos excuses_** » (**D2654/18**) ;

- « *Les juges : [...] Qui arbitrait au sein de* LAFARGE *entre ces enjeux contradictoires : pour profiter du fort potentiel économique, il était nécessaire de verser des sommes à des groupes composés de djihadistes en puissance ?*

  *Réponse : C'est vraiment la grande question à laquelle j'aimerais moi-même connaître la réponse. Permettez-moi de réfléchir un instant.* **_Encore une fois je ne connais pas les conditions qui régnaient à l'époque au sein de LAFARGE Je ne peux que vous donne, mon avis personnel et je peux vous donner des exemples ou j'ai dû trancher personnellement_** *[...]* » (**D2654/18**) ;

- **Ne pas avoir pris connaissance des pièces ayant fondé le rapport Baker McKenzie :**

- « *Les juges : Avez-vous demandé à l'époque à prendre connaissance de ces documents réunis par Baker McKenzie ?*

  *Réponse :* **_Non, je n'ai fait que lire le rapport de Baker McKenzie._**

  *Enfin, peut-être, je ne m'en souviens plus, peut-être que certains documents ont pu m'être remis par la suite. Mais je n'en suis pas certain. Le rapport lui-même était assez circonstancié* » (**D2654/7**) ;

- « *Les juges : [...] Avez-vous procédé à une analyse de ce document tant sur les montants que les raisonnements sur les différents types de mode de financement de l'Etat islamique ?*

  *[...] La réponse à la question précise est que __je n'ai aucune connaissance d'analyse complémentaire au-delà du rapport de Baker McKenzie__. Il est tout à fait possible que cela ait été fait mais ce n'est pas parvenu à mon attention* » (**D2654/9**) ;

– **N'avoir initié aucune investigation complémentaire au motif qu'une procédure judiciaire était en cours et qu'elle ferait la lumière sur ces faits :**

  - « *Les juges : [...] Quelles suites ont été données à ces propositions d'analyses complémentaires ?*

    *Réponse : Je n'étais pas impliqué dans le détail de l'enquête. [...] Le rapport nous a été présenté comme le rapport définitif et __comme je l'ai déjà évoqué je comptais sur l'instruction judiciaire pour arriver à la manifestation de la vérité__ dans ce dossier mais déjà à l'époque, nous avons pris des mesures contre les personnes impliquées* » (**D2654/8**) ;

  - « *Les juges : [...] Avez vous pris connaissance de ce rapport et avez-vous procédé à la recherche de ces documents?*

    *Réponse : j'ignore si d'autres documents ont pu être présentés, la seule chose que je sache est que j'ai lu le rapport de Baker Mckenzie y compris les annexes dont je me souviens, et comme je l'ai déjà indiqué, j'ignorais s'il y avait encore des questions en suspends. __Pour moi, je savais que ça suivrait son cours et que les autorités judiciaires françaises disposaient de moyens pour pouvoir parvenir à la manifestation de la vérité__* » (**D2654/8**).

166. Dans ces conditions, la défense de Bruno LAFONT constate que Beat HESS, le représentant du groupe LAFARGE (filiale d'HOLCIM) dans le cadre de la présente instruction, met au pilori le groupe industriel français, et avec ses anciens dirigeants, sur le seul fondement d'un rapport disqualifié afin de favoriser le groupe HOLCIM dont il est issu.

### 3. Le groupe LAFARGE (filiale d'HOLCIM), une personne morale ayant intérêt à la mise en cause de ses anciens dirigeants, aujourd'hui dans l'impossibilité de se défendre

167. La politique menée par les anciens dirigeants d'HOLCIM à la tête du nouveau groupe LafargeHolcim a eu pour conséquence la quasi-disparition du groupe LAFARGE au profit du groupe HOLCIM (**a.**). Sur le plan judiciaire, cette politique s'est manifestée par une volte-face de la ligne de défense du groupe LAFARGE (filiale d'HOLCIM) dans le cadre de l'instruction objet des présentes (**b.**) et par la conclusion d'un accord de plaider-coupable aux Etats-Unis avec comme préalable l'introduction d'une action en responsabilité civile contre les anciens dirigeants du groupe LAFARGE (**c.**).

#### a. Une fusion d'« égaux » devenue une absorption

168. **En 2013**, le groupe LAFARGE employait environ 65.000 personnes et réalisait un chiffre d'affaires de 15,2 milliards d'euros ; le groupe HOLCIM employait environ 70.000 personnes et réalisait un chiffre d'affaires de 16,1 milliards d'euros.