# EXHIBIT 6

*To the Presiding Judge,*
*and to the Honorable Judges of the 16th Criminal Division of*
*the Paris Judicial Court*

**Parquet No.: 16322001114**
**Hearing from November 4 to December 16, 2025**

---

**CONCLUSIONS FOR THE ANNULMENT OF THE REFERRAL ORDER**
Article 385 of the Code of Criminal Procedure

---

**FOR :**          **Bruno LAFONT**
Born on **REDACTED - GDPR** Boulogne-Billancourt (92)
Of French nationality
Residing at          **REDACTED - GDPR**

*DEFENDANT*

*Attorneys of record:*          Attorney Jacqueline **LAFFONT-HAIK**
**HAIK & ASSOCIATES AARPI**
Attorney at Law
27 Boulevard Saint-Michel – 75005 Paris
Tel.: 01 43 25 73 73 – Fax: 01 43 25 62 19
Lawyer ID number: E 1305 – Email: j.laffont@cabinethaik.com

Attorney Quentin de **MARGERIE**
**TEMIME ET ASSOCIES**
Attorney at Law
156 rue de Rivoli – 75001 Paris
Tel.: 01 49 27 00 55 – Fax: 01 42 60 62 44
Lawyer ID number: C 1537 – Email: quentin.demargerie@temime.fr

Attorney Grégoire **BERTROU**
**WILKIE FARR & GALLAGHER**
Attorney at Law
21 boulevard Malesherbes – 75008 Paris
Tel.: 01 53 43 45 00 – Fax: 01 53 43 46 99
Lawyer ID number: J003 – Email: GBertrou@willkie.com

**VERSUS:**          **THE PUBLIC PROSECUTOR'S OFFICE**

1

**THE COURT IS RESPECTFULLY REQUESTED TO**

### I-    BACKGROUND OF THE PROCEEDINGS

1.    By order dated October 16, 2024, following a judicial investigation opened upon a criminal complaint with a civil party application (**D1**), initiated by an introductory prosecutorial submission dated June 9, 2017 (**D204**), Bruno LAFONT was referred to trial before the Criminal Court for acts other from those referred to in his indictment of December 16, 2024 (D587), described as follows:

> *"On French territory and indivisibly in Syria, during 2013 and until September 19, 2014, in any event during the period not covered by the statute of limitations, in his capacity as Chairman and CEO of Lafarge SA, which controlled its Syrian subsidiary LCS, participated in the financing of terrorist enterprises by providing, collecting, managing, or advising on the use of funds, securities, or any other assets, with the intention of seeing these funds used, or knowing that they were intended to be used, in whole or in part, to commit acts of terrorism, regardless of their occurrence, for the benefit of the terrorist entities Ahrar al-Sham, Jabhat al-Nusra, and the Islamic State in Iraq and the Levant (now the Islamic State), specifically by authorizing the continued operation of the cement plant run by LCS, even though he alone was authorized to shut it down, knowing that this operation involved, among other things, security payments agreed upon for the benefit of these terrorist entities, and the remuneration of suppliers operating from areas that fell under their control, and intermediaries with these groups;*
>
> *Acts characterized as financing of terrorist enterprises, provided for and punished by Articles 113-2, 113-13, 421-1, 421-2-2, 421-5, 421-7, 421-8, 422-3, 422-4, 422-6, 422-7 of the criminal code (NATINF No. 25457):*
>
> *On French territory and indivisibly in Syria, from June 30, 2013, to September 19, 2014, in any event during the period not covered by the statute of limitations, in his capacity as Chairman and CEO of Lafarge SA, which controlled its Syrian subsidiary LCS, he intentionally violated the provisions of Council Regulation 881/2002 of February 27, 2002, and its implementing Regulation (EU) 632/2013 of June 28, 2013, aimed at prohibiting any financial or commercial relationship with the jihadist organizations Jabhat al-Nusra and the Islamic State in Iraq and the Levant (now the Islamic State), in particular by authorizing the continued operation of the cement plant run by LCS, even though he alone had the authority to terminate it, knowing full well that this operation involved, among other things, agreed-upon security payments to these terrorist entities, the remuneration of suppliers operating from areas under their control, and of intermediaries with these groups;*
>
> *Acts characterized as non-compliance with international financial sanctions, provided for and punishable under Articles 113-2 of the Criminal Code, 459 §1, §1 bis, §1 ter, §2, §4, §5, 451, 451-bis, 432-bis, 433-bis of the Customs Code, Council Regulation 881/2002 of 27 February 2002 and its implementing Regulation (EU) 632/2013 of 28 June 2013 (NATINF No. 23134)".*

2.    In the same proceedings, LAFARGE SA, of which Bruno LAFONT was the Chairman and CEO (hereinafter "CEO") at the time of the alleged offenses, was referred to the same court for:

> *"In Paris, on French territory, and indivisibly in Syria and Egypt, during 2013 and until September 19, 2014, <u>while exercising full control, through the holding companies Sofimo and LCH, over the activities of its Syrian subsidiary LCS, which operated the Jalabiya cement plant, and while financing it through intra-group loans, he participated in the financing of terrorist enterprises</u> by providing, collecting, managing, or advising on the use of funds, securities, or any other assets, with the intention of seeing these funds used, or knowing that they were intended to be used, in whole or in part, to commit acts of terrorism, regardless of their occurrence, for the benefit of the terrorist entities Ahrar al-Sham, Jabhat al-Nusra, and the Islamic State in Iraq and the Levant (now the Islamic State), <u>specifically by transferring funds to its subsidiary</u> **and by maintaining the activity, as part of a concerted strategy, of a production site located in a war zone, fully aware that this operation entailed, in particular, agreed-upon security payments to these terrorist entities,** <u>the remuneration of suppliers operating from areas that have fallen under</u>*

2

*their control, and of intermediaries with these groups, doing so:*

*through the actions of these bodies or representatives, namely Bruno PESCHEUX and Frédéric JOLIBOIS as expatriate executives managing LCS, having conducted and entered into the agreements and validated the payments to these entities; Christian HERRAULT as the hierarchical superior of the former, who validated their decisions, participated in the negotiations, validated certain agreements and participated in the coverage of certain payments,* **and Bruno Lafont, the group's leader, having validated the strategy followed by maintaining the cement plant's activity despite knowing about the funding distributed to terrorist groups***;*

*having acted in its name and on its behalf, the actions attributed to the managers in the exercise of their functions being part of a strategy to maintain the production and sales activity of the only cement plant managed by LCS in the war zone, and therefore responding to a rationale of results, as well as preservation of the asset, for the subsidiary and for the group, in accordance with the interests of Lafarge SA;*

*Acts classified as financing of terrorist enterprises, provided for and punished by Articles 121-2, 113-2, 113-13, 13 1-38, 13 1-39, 42 1-1, 42 1-2-2, 421-5, 422-5, 422-6, 422-7 of the criminal code (NATINF No. 25457);*

*In Paris and throughout French territory, and indivisibly in Syria and Egypt, from June 30, 2013, to September 19, 2014, while exercising full control, through the holding companies Sofimo and LCH, over the activities of its Syrian subsidiary LCS, which operated the Jalabiya cement plant, and while financing it through intra-group loans, he intentionally violated the provisions of Council Regulation 88/2002 of February 27, 2002, and its implementing Regulation (EU) 632/2013 of June 28, 2013, aimed at prohibiting any financial or commercial relationship with the jihadist organizations Jabhat al-Nusra and the Islamic State in Iraq and the Levant (now the Islamic State) for a cumulative total of €4,672,500, specifically by transferring funds to its subsidiary and maintaining operations, within the framework of a concerted strategy, from a production site located in a war zone, with the awareness that this operation entailed, in particular, security payments agreed upon for the benefit of these terrorist entities, the remuneration of suppliers operating from areas that had fallen under their control, and of intermediaries with these groups, doing so:*

*through the actions of these bodies or representatives, namely Bruno PESCHEUX and Frédéric JOLIBOIS as expatriate executives managing LCS, having conducted and entered into the agreements and validated the payments to these entities, Christian HERRAULT as the hierarchical superior of the former who validated their decisions, participated in the negotiations, validated certain agreements and participated in the coverage of certain payments,* **and Bruno Lafont,** **the group's leader, having validated the strategy followed by maintaining the cement plant's activity despite knowing about the funding distributed to terrorist groups***;*

*having acted in its name and on its behalf, the actions attributed to the managers in the exercise of their functions being part of a strategy to maintain the production and sales activity of the only cement plant managed by LCS in the war zone, and therefore responding to a rationale of results, as well as preservation of the asset, for the subsidiary and for the group, in accordance with the interests of Lafarge SA;*

*Acts characterized as non-compliance with international financial sanctions, provided for and punished by articles 113-2 of the criminal code, 459 §1, §1 bis, §1 ter, §2, §4, §5, 45 1, 451-bis, 432-bis, 433-bis of the customs code, 11 3-2, 113-1 3, 12 1-2, 131-38, 13 1-39 of the Criminal Code, Council Regulation 881/2002 of February 27, 2002, and its implementing Regulation (EU) 632/2013 of June 28, 2013 (NATINF No. 23134)."*

It is in this state that Bruno LAFONT submits to the Court referred for these proceedings a request for the annulment of the settlement order, as well as a secondary request to have any reference to the guilty plea agreement entered into between LAFARGE SA and the DoJ excluded from the proceedings (**D2794** and **D2800**).

## II-    DISCUSSION

3.    Per these *in limine litis* submissions, Bruno LAFONT requests the Court to set aside the request for the annulment of the referral order on the two grounds that:

1.    on the one hand, this indictment is based on an exploitation to his detriment, one that is unjustifiable in view of the principles of the presumption of innocence and the rights to defense, of the plea agreement entered into between the U.S. Department of Justice ("DOJ") and the company LAFARGE SA on October 18, 2022 (**A**);

2.    on the other hand, this indictment simultaneously refers Bruno LAFONT and LAFARGE SA to the Court to be tried for identical facts in the context of the same trial, whereas LAFARGE SA is, by virtue of the aforementioned guilty plea (**D2794** and **D2800** for the French translation), bound by a gag order preventing it from contradicting the version of the facts on which this criminal transaction is based (Art. 35 of this agreement), which contravenes Bruno LAFONT's right to defend himself, in particular by obstructing his right to question a crucial witness (**B**).

It is also requested, as a subsidiary matter, that any direct or indirect reference to the guilty plea of October 18, 2022, submitted to the judicial investigation be excluded from the proceedings.

**A.    Regarding the invalidity of the ORTC [Referral Order to the Criminal Court] resulting from the exploitation against Bruno LAFONT of a guilty plea agreement entered into by LAFARGE SA, of which he was the CEO at the time of the alleged offense, without his participation and without his knowledge**

The conventional requirements of the European Court of Human Rights and of the Court of Justice of the European Union applicable to the effects of a guilty plea with regard to a third party to this settlement (1) were not respected by the investigating judges in the context of the referral order (2).

1.    In law: a guilty plea agreement entered into by a third party cannot be used as the basis for an accusation.

4.    Article 6§1 of the European Convention for the Protection of Human Rights (hereinafter "ECHR") enshrines the right to a fair trial, including the principle of adversarial proceedings and equality of arms, as well as the impartiality of the tribunal.

According to Article 6§2, "*everyone charged with an offense shall be presumed innocent until proven guilty according to law.*"

And under Article 6§3, specific to criminal matters, the rights to defense imply that every accused person has the right, in particular, to "*have the time and facilities necessary for the preparation of his or her defense.*"

5.    The European Court has consistently held that "the *presumption of innocence enshrined in Paragraph 2 of Article 6 (Art. 6-2) is among the elements of a fair criminal trial required by Paragraph 1 (Art. 6-1)*" (ECHR, February 10, 1995, *Allenet de Ribemont v. France*, No. 5175/89, §35).

The Court specifies in this regard that Article 6§2 "*guarantees that no person shall be designated or treated as guilty of an offense before his or her guilt has been established by a court (see, mutatis mutandis, Allenet de Ribemont, cited above, pp. 16-17, §§35-36, and YB et al. v. Türkiye, judgment of October 28, 2004, §43). Therefore, it demands, among other things, that in*

4

*fulfilling their duties,* **the members of the court not start from the preconceived idea that the defendant committed the incriminating act.** *(Barberà, Messegué and Jabardo v. Spain, judgment of December 6, 1988, Series A No. 146, §77). The presumption of innocence is undermined by statements or decisions which reflect the feeling that the person is guilty, which incite the public to believe in his or her guilt or which prejudge the assessment of the facts by the competent judge (YB et al., cited above, §50).*" (ECHR, March 30, 2010, *Poncelet v. Belgium*, No. 44418/07, §51).

**6.**   The principle of the presumption of innocence also applies <u>when parallel proceedings are involved</u> for the <u>same facts against different people</u>.

Indeed, the European Court clarified that ***"the premature declaration of guilt of a suspect in a judgment rendered against suspects prosecuted separately can also, in theory, infringe upon the principle of the presumption of innocence**, as the petitioner argues in this case. In this regard, one should recall that the purpose and object of the Convention, an instrument for the protection of human beings, call for its provisions to be interpreted and applied in a way that makes its requirements concrete and effective. It expressly indicated that this imperative also applied to the right enshrined in Article 6§2 (see, for example, Allenet de Ribemont, cited above, §35, Lavents, cited above, §126, and Allen, cited above, §92).*" (ECHR, February 27, 2014, *Karaman v. Germany* No. 17103/10, §43).

In its judgment in *Bauraus v. Lithuania,* one should recall that the principle of presumption of innocence "*may, in theory, also be violated due to the premature expression of guilt of a suspect appearing in the context of a judgment rendered against co-suspects prosecuted separately (see Karaman v. Germany, No. 17103/10, §42, February 27, 2014).* **The Court held that such statements, although not binding on the petitioner, can have a prejudicial effect on the ongoing proceedings against the same, in the same way as a premature expression of guilt from any other public authority closely connected with pending criminal proceedings** *(ibid., §43).*" (ECHR, October 31, 2017, *Bauras v. Lithuania*, No. 56795/13, §52, loose translation from English).

**7.**   The question of respecting the presumption of innocence arises with even greater urgency in the context of a criminal settlement procedure based on an admission of guilt guided by a rationale of expediency and negotiation of the sentence, and not by the search for the manifestation of the truth.

As the doctrine points out, "**Distinguishing between civil and criminal procedures, GARRAUD noted that "<u>it is not enough for an accused person to consent to being convicted for their conviction to be legitimate; their guilt must be established</u>"** *" (R. GARRAUD, Traité théorique et pratique d'instruction criminelle et de procédure pénale* [Theoretical and Practical Treatise on Criminal Investigation and Criminal Procedure]*, 6 vols., 1912-1929, Sirey, Vol. II, No. 459***). However, the English system leads precisely to this result. Indeed, when the accused pleads guilty and then engages in plea bargaining, he or she effectively consents to being convicted, and the conviction is legitimate by virtue of that consent alone** *(C. AMBROISE-CASTÉROT, Le consentement en procédure pénale* [Consent in criminal procedure]*, in Mélanges Pradel, 2006, Cujas, p. 29 s.). The public prosecutor will not have to prove his or her guilt*" (Dalloz, Répertoire de droit pénal et de procédure pénale [Directory of criminal law and criminal procedure], Confeu – Coralie AMBROISE- CASTÉROT – April 2020, §101).

In this regard, "*in matters of plea bargaining, the Court has already had occasion to observe that the possibility for an accused person to obtain a reduction of charges or a reduction of sentence on condition that he or she acknowledges his or her guilt, or that he or she waives any pre-trial right to contest the facts or that he or she fully cooperates with the investigating authorities, is commonplace in the criminal justice systems of European States (see the comparative law study in the case of Natsvlishvili and Togonidze v. Georgia, No. 9043/05, §§62-75 and ECHR 2014 (extracts). Compromising on a charge or sentence is not in and of itself reprehensible (ibid., §§90-91), nor is waiving the right of appeal (Litwin v. Germany, No. 29090/06, §47, November 3, 2011).*" (ECHR, March 25, 2021, *Di Martino and Molinari v. Italy*, Nos. 15931/15, 16459/15, §35).

5

Nevertheless, the Court regulates this practice since it "*considers that a criminal settlement procedure leading to a ruling on a criminal charge <u>following a simplified judicial examination</u>* **essentially implies a waiver of certain procedural rights** *"* (ECHR, 29 April 2014, *Natsvlishvili and Togonidze v. Georgia*, No. 9043/05, §91).

**8.**     The European Court has had the opportunity to rule on the protection of the principle of the presumption of innocence when a criminal settlement procedure refers to acts committed by a third party prosecuted in a second procedure.

Thus, in its judgment *in Kratky v. Slovakia*, the Court concluded that there had been a violation of Article 6(2), in particular in that "t**he judgment approving the plea agreement of one of the petitioner's co-perpetrators (and the agreement itself) contained detailed references to the offenses in question, including the petitioner's role as one of the perpetrators and one of the leaders of the criminal group.** *This ruling, which was based on the description of these criminal acts, including a precise factual account of the petitioner's role, was therefore likely to raise concerns as to whether the petitioner himself met all of the necessary criteria to be considered as having committed the offenses.* **Referring to the petitioner and his actions in this way can, in principle, infringe upon his right to the presumption of innocence** *(see Mucha, cited above, §§55-56).* (ECHR, February 15, 2024, *Krárky v. Slovakia*, No. 35025/20, §14, loose translation from English).

**9.**     The European Court does not restrict its review to the terms used in the first decision alone, since <u>it requires that specific safeguards be put in place –in consideration of the requirements of a</u> <u>fair trial– in the second.</u>

In this regard, in its judgment *in Mucha v. Slovakia*, the European Court affirmed that the fairness of the proceedings can be compromised when a plea bargain establishes the guilt of a third party to the plea bargain and this is added to the file of a separate proceeding concerning the same facts and in which the third party is now accused:

> "*55. Secondly, the Court notes that <u>judgments approving the plea agreements of the petitioner's co-perpetrators contained a detailed factual description of their crimes, including the petitioner's role as a <u>co-perpetrator, and that the precise description of some of their criminal acts was identical to that of the acts attributed to the <u>petitioner</u>. Although these judgments do not contain any separate finding of guilt against the petitioner as such (see also Paragraphs 27 and 28 above), they must be read in the light of the constituent elements of the offenses in question –in particular the creation, design and direction of a criminal enterprise, which necessarily implies coordinated acts between co-perpetrators.* **Convicting the petitioner's co-perpetrators on the basis of such a description, including the precise factual definition of the petitioner's specific role, was therefore, in principle, likely to raise doubts as to whether this prejudged his own guilt** *(see Meng, cited above, §48, with other references).*
>
> *56.* **Referring in this way to the petitioner and his actions is, in principle, likely to jeopardize the protection of his right to the presumption of innocence..** *The Court is aware that any infringement of this right would have occurred first in the proceedings concerning the petitioner's co-perpetrators and that there is no indication that he directly challenged it*. **Nevertheless, such potential harm is linked to his own trial because of the identity of the court referred for the matter and the fact that, as that court itself acknowledged, <u>the convictions of the co-perpetrators formed an integral part of the petitioner's case file</u>** *(see Paragraph 18 above).* (ECHR, November 25, 2021, *Mucha v. Slovakia*, No. 63703/19, §§56-57, loose translation from English).

The Court judged that "*the accusations against the petitioners were based on the same facts as those directed against X, the three men being accused of conspiring to misappropriate the same assets. It is therefore undeniable that the facts established in the*

6

*proceedings against X and the legal findings made therein were directly relevant to the petitioners' trial. Under these conditions,* **it was essential that safeguards be put in place to ensure that procedural measures and decisions taken in the proceedings against X would not compromise the fairness of the petitioners' subsequent trial — especially since the latter were legally excluded from any participation in the separate proceedings and had no status enabling them to challenge the decisions and findings made therein"** (ECHR, February 23, 2013, *Navalnyy and Ofitserov v. Russia*, Nos. 46632/13 and 28671/14, §103, loose translation from English).

A transmission to the Moldovan government has recently taken place, with the European Court posing the following question:

> "*the decision to separate the criminal proceedings against A., the petitioner's inability to intervene in them, as well* <u>**as the potential use in the proceedings against the petitioner of the findings**</u> *made in the proceedings* <u>**against A.**</u> **compatible with the guarantees offered by Article 6, Paragraphs 1 and 2, of the Convention** (*Navalnyy and Ofitserov v. Russia, Nos. 46632/13 and 28671/14, §§ 103-05, February 23, 2016)*?" (ECHR, March 1, 2023, *Ticu v. Republic of Moldova*, No. 27945/20).

10.   The Court of Justice of the European Union (hereinafter "CJEU") has also ruled on this sensitive issue with regard to the requirements of Article 4(1) of Directive 2016/343, which provides that:

> "*Member States shall take the necessary measures to ensure that public statements by public authorities, as well as judicial decisions, other than those determining guilt, do not present a suspect or a person being prosecuted as being guilty until their guilt has been legally established. This provision is without prejudice to prosecution proceedings aimed at proving the guilt of the suspect or the accused, and without prejudice to preliminary procedural decisions taken by judicial or other competent authorities based on suspicion or incriminating evidence.*"

In its decision *AH e.a.*, C-377/18 of November 5, 2019, it indicated that the Directive "*does not preclude an agreement in which the accused person acknowledges his or her guilt in exchange for a reduction of sentence, which must be approved by a national court, from expressly mentioning as co-perpetrators of the criminal offence in question not only that person, but also other accused persons who have not acknowledged their guilt and are being prosecuted in separate criminal proceedings, provided, <u>firstly, that this mention is necessary for the</u> qualification of the legal responsibility of the person who entered into said agreement and, <u>secondly, that the same agreement</u> clearly indicates that these other persons are being prosecuted in separate criminal proceedings and that their guilt has <u>not been legally established</u>*" (CJEU, November 5, 2019, *AH e.a.*, C-377/18, §50).

This decision underlines that allegations made against third parties in initial proceedings, and *a fortiori* in settlement proceedings, must be made necessary to the case <u>and</u> that formal precautions must be taken –notably by recalling that their guilt has not been legally established– in order to distinguish the fate of these third parties from that of the persons being prosecuted.

The Court of Justice of the European Union also adopted the case law of the European Court of Human Rights, which affirmed that in the context of so-called "hybrid" procedures, namely those involving a plea bargain on the one hand and a standard procedure on the other, "*the reasoning behind judicial decisions must be*

7

*formulated in terms that are likely to avoid any potential premature judgment regarding the guilt of the third parties involved* **likely to compromise the fair examination of the charges brought against them in separate proceedings** *[See, in this regard, judgment of September 5, 2019, AH e.a. (Presumption of innocence), C-377/18, EU:C:2019:670, Paragraph 44; see also, to that effect, ECHR, 27 February 2014, Karaman v. Germany, CE:ECHR:20140227JUD001710310, §§ 64 and 65]."* (CJEU, March 18, 2021, *Pometon SpA v. Commission*, C-440/19 P, §63).

11. More generally, this question relates to that of the conditions for the administration of evidence which, according to the case law of the European Court, must ensure that "*the procedure, including the way in which the evidence was collected, was fair as a whole (Bykov v. Russia [GC], No. 4378/02, § 89, March 10, 2009, and the case law cited therein). The Court must ask itself, in particular* **if the petitioner was given the opportunity to challenge the evidence and object to its use**. *From the perspective of the rights to defense, questions may arise in the field of Article 6 concerning whether the evidence, both incriminating and exculpatory, which has been administered, was done in a manner that ensured a fair trial (Erkapić v. Croatia, No. 51198/08, § 73, April 25, 2013); the fairness of a trial implies respect for the adversarial principle in the procedure and equality of arms, which is why any deficiencies that may have vitiated the process of administering evidence can be examined from the perspective of Article 6 § 1 (Mirilachvili v. Russia, No. 6293/04, § 157, December 11, 2008). The quality of the evidence must also be taken into account, in particular whether the circumstances in which it was obtained cast doubt on its reliability or accuracy (Bykov, cited above, § 90)."* (ECHR [GC], September 26, 2023, *Yüksel Yalçinkaya v. Turkey*, No. 15669/20, §303).

12. Certainly, neither the ECHR nor the CJEU have yet had to rule on the specific issue of the guarantees applicable in a French procedure where a foreign guilty plea would be submitted establishing not only the guilt of the legal entity, but also that of its natural persons who directed such, who are nevertheless third parties to this agreement.

13. It can nevertheless be deduced from all of the aforementioned case law that such a criminal settlement procedure, even carried out abroad, if it infringes the presumption of innocence of a third party who is to be tried in another procedure in France, may compromise his or her right to a fair trial.

Such a circumstance is likely to influence magistrates in the preconceived idea that the accused committed the incriminating act, <u>or at least, according to the well-known concept of impartiality in its "objective" dimension, leaving legitimate doubt in this regard</u>.

When, at the end of a judicial investigation in France, the investigating magistrates decide in their referral order to refer to a guilty plea agreement entered into abroad by one of the parties to this investigation, <u>strict precautions are necessary to protect the rights of the other parties to the investigation, designated in this guilty plea without ever having participated therein</u>.

And it appears inconceivable from the point of view of the aforementioned rights that judges would incorporate the principle and content of this guilty plea into their examination of the charges against not only the person who entered into it, but also a third defendant in the context of the second procedure.

Ultimately, a criminal settlement that infringes on the right to the presumption of innocence of a third party – accused in a separate proceeding– cannot be added to the file of this second proceeding, and cited in the indictment, nor *a fortiori* be used against this third party, without compromising their right to a fair trial.

And the mere fact that the court of judgment is not, in and of itself, bound by the conclusions resulting from a settlement measure, cannot constitute a sufficient guarantee of respect for the fairness of the trial.

2. <u>In fact: a guilty plea entered into by LAFARGE SA in disregard of Bruno LAFONT's presumption of innocence, and nevertheless used against him to support the referral order</u>

14. Even though the guilty plea entered into by LAFARGE SA, now a co-defendant, was clearly not surrounded by any basic precautions regarding the protection of the presumption of innocence of Bruno LAFONT, who was its CEO for the entire duration of the events covered by the settlement agreement (**a**), the investigating magistrates showed no caution in the use of this agreement, going so far as to consider that the "*admission of the facts*" would "*however be based on solid evidence*" (ORTC, p. 247) and to use the civil proceedings of HOLCIM SA and LAFARGE SA against Bruno LAFONT at the time of the guilty plea (**b**).

### a) *A guilty plea that clearly violates Bruno LAFONT's right to the presumption of innocence*

15. **In this case**, it is established that under a guilty plea entered into with the U.S. DoJ on October 18, 2022 (**D2794**), LAFARGE SA, along with its Syrian subsidiary LCS, pleaded guilty to the offense of providing material support to terrorist organizations in Syria between August 2013 and October 2014, in particular in exchange for the payment of a fine of $777.78 million.

16. Besides the fact that this is a guilty plea which refers to alleged actions committed by third parties by presenting them as proven, the case in question has a specificity which makes the situation extremely sensitive and which will not escape the Court.

Indeed, under the terms of this guilty plea, <u>the legal entity LAFARGE SA has made the strategic choice to acknowledge guiltiness which almost automatically carries with it that of Bruno LAFONT, who embodied LAFARGE SA in his capacity as CEO at the time of the period of the events in question.</u>

LAFARGE SA has indeed admitted that the factual allegations set forth in the indictment and the statement of facts "**are true and correct, <u>that they</u> [LAFARGE SA and LCS] <u>are responsible for the actions of their leaders</u>**, *administrators, employees and agents* **described in the indictment** *and that* **the indictment and statement of facts accurately reflect the criminal conduct of the defendants"** (**D2800/9**).

This contractual commitment, supposed to bind only the legal entity to the DoJ, actually produces considerable collateral legal effects: natural persons who are not involved in it find themselves presented as guilty through <u>a narrative that was developed without them and against them.</u>

17. This is how Bruno LAFONT –CEO of this company from 2007 to 2015– appears several times and in a perfectly identifiable way behind the term "*Executive 6*" in the factual account that constitutes the " statement of facts " (**D2794/33**) on which the admission of guilt is based.

Executive 6 is described as "*a French citizen and national and was chairman of the board and chief executive of LAFARGE until the completion of the acquisition by Holcim in 2015. He was based at LAFARGE's headquarters in Paris, France*" (**D2800/25**).

9

18. Under this name, Bruno LAFONT has repeatedly been publicly presented as guilty of "*conspiracy to provide material support to one or more foreign terrorist organizations* " per a plea agreement dated October 18, 2022, which was widely publicized, and in which LAFARGE SA states, among other things, that:

- "*While other multinational companies have withdrawn and ceased their operations in Syria,* **the leaders of LAFARGE and LCS, through intermediaries, negotiated agreements to pay these armed groups** *in order to protect LCS employees, to ensure the continued operation of the Jalabiyeh cement plant and to gain an economic advantage over their competitors in the cement market in Syria*" (**D2800/26**);

- "**The leaders of LAFARGE and LCS conspired** *to make regular security guarantee payments to armed groups, including ISIS and FAN, and to purchase raw materials from suppliers controlled by ISIS, who paid ISIS based on the amount of their sales to LCS.*" (**D2800/26**);

- "**The leaders of LAFARGE and LCS also created invoices with false descriptions** *for the third-party intermediaries that they used to negotiate with ISIS, doing so in order to conceal the nature of the work that the intermediaries had carried out for LAFARGE and LCS and to allow LAFARGE and LCS to* **later falsely deny having knowledge of their activities"** (**D2800/28**).

Furthermore, to justify the negotiation, consideration was given to "*the fact that* **the guilty individuals responsible for the Defendants' wrongful conduct** *are the subject of effective prosecution in another jurisdiction*" (**D2800/4**).

19. At no point does the guilty plea indicate that the guilt of the leaders has not been "*legally established,*" so the minimum conditions required by the European Court and the Court of Justice of the European Union in order to preserve the right of third parties to the presumption of innocence are manifestly not met.

20. Furthermore, the signing of this agreement by LAFARGE SA, a legal entity, was undertaken without any involvement or even information given to natural persons, and in particular to former leaders, who were nevertheless implicated and designated as guilty in the version of events agreed upon with the U.S. authorities.

Bruno LAFONT thus learned of the existence of this guilty plea through the press.

And more specifically, he found out through a press release from LAFARGE SA which announced, on the day of the signing, that it had "**agreed to take responsibility for the actions of the former executives involved, whose behavior was in flagrant violation of Lafarge's code of conduct "** (**D2807, D2809**).

The violation of the presumption of innocence is blatant.

21. In civil matters, the Paris Economic Activities Court has already noted this in a judgment of April 8, 2025, resulting from a compensation action brought by HOLCIM and LAFARGE SA against its former leaders and employees, itself intrinsically linked to entering in the guilty plea (**Exhibit No. 1**).

In examining a counterclaim by Bruno LAFONT, the Economic Activities Court noted:

10

*"In its press release of October 18, 2022, Lafarge notably stated:* "Under the terms of the agreement, Lafarge SA and its now dissolved subsidiary Lafarge Centre Syrie ("LCS") will pay a fine of US$777.78 million and agree to plead guilty to the offense of providing material support to terrorist organizations in Syria between August 2013 and October 2014, when LCS ceased operations in the country [...] Lafarge SA and LCS have agreed to bear responsibility for the actions of the former executives involved, whose behavior was in flagrant violation of the Lafarge Code of Conduct. We deeply regret that this conduct occurred and have been working with the United States Department of Justice to find a resolution to this matter."

*Whereas in its press release of the same day, Holcim stated:* "Holcim supports the agreement reached by Lafarge SA with the United States Department of Justice ("DOJ") ending the DOJ's investigation into Lafarge SA and its Syrian subsidiary Lafarge Cement Syria ("LCS"), now dissolved, concerning the past actions of former Lafarge SA and LCS executives during the Syrian Civil War, prior to Holcim's acquisition of Lafarge SA.

*Under the terms of the agreement, Lafarge SA and LCS will pay a fine of US$ 777.78 million and agree to plead guilty to the offense of providing material support to terrorist organizations in Syria between August 2013 and October 2014, when LCS ceased operations in the country.*

*Holcim, which has never operated in Syria, as well as Lafarge's operations and employees in the United States, have never been involved in the events covered by the agreement. These practices are in total opposition to everything Holcim stands for. In its decision,* **the DOJ notes that former executives of Lafarge SA and LCS involved concealed these practices from Holcim and external auditors, both before and after the acquisition of Lafarge SA.**

*When Holcim was alerted by certain press articles in 2016, the company proactively requested a thorough investigation by a U.S. law firm under the supervision of the Board of Directors. Holcim made public the main findings of the investigation in 2017 and parted ways with the former executives of Lafarge SA and LCS who were involved";*

*Given that* **even though Bruno LAFONT is not specifically named, it is very easy to see that he is being referred to by the term "former executives of Lafarge SA"**;

*Given that, as of the date of publication of* **these statements, which were not accompanied by any disclaimer to emphasize the presumption of innocence of the executives "involved,"** *Bruno LAFONT was presumed innocent,*

*Given that this state of affairs, as of October 18, 2022, is in no way dependent on the outcome of the ongoing criminal proceedings, regardless of the decision taken against Bruno LAFONT;*

*The court will say that* **LAFARGE (LSA) and HOLCIM failed to respect Bruno LAFONT's right to the preservation of his innocence, and in doing so committed an error,** *and that it is appropriate, without delaying the decision, to rule on possible compensation for the damage suffered by Bruno LAFONT* " (**Document No. 1, Judgment, pp. 38 and 39**).

The Economic Activities Court has thus clearly noted the violation of the right to the presumption of innocence brought against Bruno LAFONT resulting from the terms of the guilty plea and the publicity that surrounded it without any consideration for the latter.

22. Despite all of these circumstances, reflecting a total disregard for Bruno LAFONT's right to the presumption of innocence, it appears from reading the referral order that the investigating magistrates clearly appropriated the terms of the plea agreement to justify the alleged existence of charges against him.

### b) *The use of the guilty plea and the civil proceedings brought by LAFARGE SA against Bruno LAFONT by the investigating magistrates in support of the referral order*

23. While it was intended to address all of the glaring violations of the presumption of innocence that have been recalled above, and which result from the guilty plea of October 18, 2022 (**D2794** and **D2800**), the referral order directly disregards the right to a fair trial, the rights to defense and the right to the presumption of innocence due to the significant reliance it places on this settlement agreement.

    Far from containing the safeguards that were legitimately expected in such a situation, the referral order which brings the matter before the Court is liable to be annulled for exploiting against a third party, in this case Bruno LAFONT, a plea agreement entered into purely opportunistically by LAFARGE SA and asserting without the slightest precaution the guilt of the individual directors.

24. The referral order expressly refers to the guilty plea and details its contents over three pages in a section titled "***focus sur la procédure américaine* [focus on the U.S. procedure]** *"* (ORTC, p. 54 et seq.).

    The order specifies, without it being possible to understand exactly what is deduced from it, that "With regard to individuals who were not prosecuted in the context of the U.S. proceedings, the agreement explicitly stated that they were subject to 'effective prosecution' in another country *(D2792)."*

25. Even more seriously, the investigating magistrates have <u>on the one hand</u> issued a value judgment on this settlement agreement, and <u>on the other hand</u> exploited, against Bruno LAFONT, the proceedings initiated against the individual directors before the Commercial Court in 2022.

    - <u>The investigating magistrates' assessment of the value of the guilty plea in support of the referral</u>

26. The referral order is not limited to a distant reference to the guilty plea entered into by LAFARGE SA and LCS.

    In the section devoted to "*the attribution of the offense of financing a terrorist enterprise to the legal entity LAFARGE SA,*" the investigating magistrates go so far as to consider:

    > "**<u>While the acknowledgment of the facts in the United States may have resulted from a strategic choice made locally by the company, it is nevertheless based on solid evidence,</u>** *which made it possible to objectively demonstrate the payments made by LCS to several terrorist entities via Firas TLASS and several suppliers under the control of these terrorist entities, notably represented by Amro TALO, <u>while Lafarge SA exercised effective control not only of capital, but also of operations and functions, over its subsidiary and its organs</u>*" (ORTC, p. 247).

    Thus, the investigating magistrates admit that the acknowledgment of facts made in the United States "*may have resulted from a strategic choice made locally by the company,*" but simultaneously affirm that it "*is based on solid evidence.*"

Such a statement amounts to depriving the initially formulated "reservation" of all significance and to explicitly granting, under the terms of the indictment, jurisdictional value to an act which is only the product of a negotiation.

As previously mentioned, a plea agreement is valid only if the person willing to participate acknowledges the facts, taking into account their own strategic and economic interests.

Consequently, by appreciating and affirming the "solidity" of the elements underlying the guilty plea, the judges completely distorted its transactional logic.

They have given it a judicial scope which it does not have and could not have in France without seriously compromising the presumption of innocence and the rights to defense of third parties to this procedure.

This assessment of the value of the "*evidence*" on which the guilty plea was based is all the more incomprehensible given that the elements of the U.S. procedure were never made available to the French judges.

27.     On this first ground, the referral order is undoubtedly liable to be annulled.

- The exploitation of the case in the referral order for the summons of Bruno LAFONT by LAFARGE SA before the Commercial Court, despite being linked to the guilty plea

28.     Finally, whether in the part of the referral order devoted to LAFARGE SA or to that devoted to Bruno LAFONT himself, the magistrates rely, in order to deduce the existence of charges justifying the referral of the latter, on the circumstance that in 2022, LAFARGE SA "turned" against its former CEO by way of summons before the Commercial Court.

29.     In this regard, it should be recalled that LAFARGE SA and HOLCIM SA summoned, before the Commercial Court of Paris on February 18, 2022 **(D2812)**, five natural persons targeted in the guilty plea, first among them Bruno LAFONT.

However, it is understood that the initiation of these proceedings before the Commercial Court is taking place while negotiations are underway between the DoJ and LAFARGE SA and HOLCIM SA

Indeed, Paragraph 35 of the summons issued by LAFARGE SA and HOLCIM SA specifies, in the section relating to the "*consequences of the defendants' wrongs against LSA and Holcim,*" that:

> "*The relationship between LCS and armed groups in Syria*" **led to requests for information from the U.S. Department of Justice (hereinafter the "DOJ") addressed to the Holcim group**. *In accordance with its obligations, Holcim informed the market of the DOJ's requests for information in its biannual report published on July 31, 2021. Holcim's share price fell significantly upon the publication of this announcement*" (**D2812/11**).

Such a presentation demonstrates that as early as July 2021, the DoJ was making requests for information and communications to HOLCIM SA and LAFARGE SA, and that it was precisely in this context that the latter filed claims for damages with the Paris Commercial Court against Bruno LAFONT, seeking compensation for "*financial losses related to legal fees that it*

13

*had to initiate proceedings following the opening of the French criminal proceedings <u>and requests for information sent by the DOJ</u>* " (**D2812/13**).

This summons also relies on the findings of the Baker & McKenzie report, which will also be used in the negotiations with the DoJ that led to the guilty plea.

<u>The civil proceedings initiated by HOLCIM SA therefore appear to be intrinsically linked to a strategic positioning aimed at preserving its own interests by sacrificing the directors of LAFARGE SA to the detriment of the manifestation of the truth.</u>

**30.**     However, these civil proceedings initiated by LAFARGE SA and HOLCIM in 2022, concurrently with the negotiations conducted with the DoJ to reach the final conclusion of a guilty plea on October 18, 2022, <u>were used against Bruno LAFONT.</u>
The referral order is liable to be annulled since the investigating magistrates stated, during the examination of the charges against LAFARGE SA:

> "*It is appropriate to note that Lafarge SA and Holcim SA decided to summon Bruno LAFONT, Bruno PESCHEUX, Frédéric JOLIBOIS, Christian HERRAULT, and Firas TLASS before the Paris Commercial Court by bailiff's writs issued in February 2018, noting that the four former directors of the LAFARGE group had 'played a decisive role in the links that were maintained between LCS and armed groups, some of which were affiliated with terrorist organizations.'*"

> *They asked the court to postpone ruling pending the outcome of the criminal proceedings, and in view of various heads of damage to the industrial group, to jointly and severally order Bruno LAFONT and Firas TLASS to pay the sum of 50,000,000 E in compensation to Lafarge SA, and to jointly and severally order Bruno LAFONT, Bruno PESCHEUX, Frédéric JOLIBOIS, Christian HERRAULT and Firas TLASS to pay the sum of 100,000,000 E in compensation to Holcim SA (D2812).* **In their presentation of the facts, <u>the plaintiffs stated that Bruno LAFONT had "interfered in the management of LCS"</u>**

> **<u>Thus, while acknowledging the facts before the U.S. judicial authorities, the company is attempting to shift the blame onto the individual responsibilities of its former executives, who in reality constitute the bodies that commit it"</u>** (ORTC, p. 246).

Moreover, given that the dismissal of Bruno LAFONT himself was also justified by this summons from HOLCIM and LAFARGE SA:

> **"in its summons before the commercial court in February 2022 (below), the LafargeHolcim group was going to argue that Bruno LAFONT** *had 'interfered in the management of LCS,' believing that he was 'at the origin of the decision to keep the Jalabiya cement plant in operation, despite the presence of armed groups operating in the region,' had asked to be informed of the situation of LCS in Syria on a very regular basis, in particular via the minutes of the security committees, had maintained privileged links with Bruno PESCHEUX, Frédéric JOLIBOIS and Christian HERRAULT, to whom he gave 'directions (...) in the context of the management of LCS during the Syrian civil war.'*

> *The summons finally emphasized that the decision to close the cement plant was within the purview of Bruno LAFONT according to the group's internal rules (D2812).*

14

> ***The group's official narrative regarding the disclosure of the facts, however, had been that 'Bruno Lafont was aware of the main operational challenges facing Lafarge Cement Syria, but he was never informed of any payments to terrorist organizations.*** *When Bruno Lafont was informed of the need to enter into agreements with terrorist groups, he created the conditions for an immediate closure of the factory, which was carried out in less than three weeks' (D1993)*" (ORTC, p. 241).

31.  Thus, the investigating magistrates used the change in positioning of HOLCIM SA and LAFARGE SA as evidence against Bruno LAFONT, materialized by the summons before the Commercial Court, in total disregard of the aforementioned principles, first and foremost the presumption of innocence and the rights to defense.

They did so, moreover, without drawing any exculpatory evidence from the fact that such an accusation was not at all present in the
group's initial "*official narrative,*" which nevertheless suggested that this action by legal entities was part of an opportunistic approach directly linked to the guilty plea agreement entered into in the United States.

32.  From this point of view again, the referral order directly violates the presumption of innocence, the right to a fair trial and the rights to defense as protected in particular by Article 6 of the European Convention and by the preliminary article of the Code of Criminal Procedure.

It inevitably risks being annulled on this basis.

B.  **Regarding the invalidity of the ORTC stemming from Bruno LAFONT's inability to question LAFARGE SA on his behalf, bound by a restrictive clause under the guilty plea**

33.  The cancellation of the ORTC is also necessary insofar as it refers Bruno LAFONT and LAFARGE SA to the Court so that they can be tried for identical facts in the context of the same trial, while LAFARGE SA is, by virtue of the aforementioned plea agreement, bound by a gag order preventing it from contradicting the version of facts agreed upon in the terms of this criminal transaction.

34.  This situation contravenes Bruno LAFONT's right to defend himself, in particular by obstructing his right to question a crucial witness, in violation of Article 6§3 of the European Convention.

This text, which has supranational value, guarantees the accused the right to "*question or have questioned the prosecution witnesses and to obtain the summons and questioning of defense witnesses under the same conditions as the prosecution witnesses.*"

In this regard, the European Court has consistently held that:

> "*the requirements of Paragraph 3(d) of Article 6 represent particular aspects of the right to a fair trial guaranteed by Paragraph 1 of that provision (Al-Khawaja and Tahery, cited above, §118); it will therefore examine the petitioner's complaint from the perspective of these two combined texts (Windisch v. Austria, September 27, 1990, §23, Series A No. 186, and Lüdi v. Switzerland, June 15, 1992, §43, Series A No. 238).*
>
> *101. When examining a complaint under Article 6§1, the Court essentially must determine whether the criminal proceedings were generally fair (see, among others, Taxquet v. Belgium [GC], No. 926/05, §84, ECHR 2010, and other references). To this end, it considers the procedure as a whole, including how the evidence was gathered, and verifies that not only the rights of the defense, but also the public and victims' interest in ensuring that the perpetrators of the offense are duly prosecuted, is respected (Gäfgen v. Germany).*

15

*[GC], No. 22978/05, §§ 163 and 175, ECHR 2010), as well as, where necessary, the rights of witnesses (Al-Khawaja and Tahery, cited above, §118, and other references, and Hümmer, cited above, §37)."* (ECHR [GC], December 15, 2015, *Schatschaschwili v. Germany*, 9154/10, §§100-101).

35. The concept of witness also has an autonomous meaning within the meaning of the European Convention, the Court considering that, as soon as a deposition is likely to form the basis of the conviction of the accused, it constitutes testimony triggering the applicability of the guarantees provided for in Article 6§§1 and 3(d) of the Convention.

Therefore, the fact that the statements come from a co-defendant does not preclude the guarantees arising from the aforementioned stipulations.

Indeed, the European Court consistently rules that "*the fact that such statements come from a co-defendant, as in the present case, and not from a witness, is not relevant. In this regard, the Court emphasizes that the term "witness" has, in the Convention system, an "autonomous" meaning (Vidal v. Belgium judgment of April 22, 1992, Series A No. 235-B, pp. 32-33, §33). Thus,* **once a deposition, whether made by a witness in the strict sense or by a co-defendant, is likely to substantially support the conviction of the defendant, it constitutes incriminating testimony, and the guarantees provided for in Article 6, Paragraphs 1 and 3d) of the Convention are applicable thereto** *(see, mutatis mutandis, the Ferrantelli and Santangelo v. Italy judgment of August 7, 1996, Collection 1996-III, pp. 950-951, §§51-52)."* (ECHR, February 27, 2001, *Lucà v. Italy*, No. 33354/96, §41).

It should be recalled that "*the interpretation given by the Court of Appeal of the law appears to have had an effect on the way in which it administered the proceedings, which gave rise to the complaint under Article 6§§1 and 3(d) of the Convention. The Court is forced to note that* **the Court of Appeal considered that, as a co-defendant, D was not a "witness" for the purposes of those provisions** *(Paragraph 10 above). According to the Supreme Court, the Court of Appeal assumed that the limits set by the Convention on the reading in court of statements made to the police did not apply to such statements made by a co-defendant (Paragraph 16 above).* **This interpretation by the Court of Appeal is hardly consistent with the autonomous meaning of the word "witness" in the Court's case law, from which it follows that the fact that the statements were made by a co-defendant rather than a witness is irrelevant (Vidal v. Belgium, April 22, 1992, §33, Series A No. 235-B).***). It should be recalled here that, as soon as a deposition, whether made by a witness in the strict sense or by a co-defendant, is likely to substantially support the conviction of the accused, it constitutes incriminating testimony, and the guarantees provided for in Article 6*
*Sections 1 and 3(d) of the Convention are applicable thereto (Lucà, cited above, § 41).* (ECHR, November 9, 2006, *Kaste and Mathisen v. Norway*, Nos. 18885/04, 21166/04, §53).

36. However, the European Court has ruled that hearing as a witness a co-defendant who has entered into a settlement agreement obliging the same to maintain, under penalty of prosecution, an incriminating version of events, is likely to undermine the fairness of the trial.

Indeed, it stated in its judgment *Navalnyy and Ofitserov v. Russia* that **X's conviction through an expedited guilty plea procedure has compromised their competence as a witness in the petitioners' case. As stated above, their conviction was based on the version of events agreed upon by the prosecution and the defendant in the guilty plea, and it was not required that this version be verified or corroborated by other evidence. <u>When appearing later as a witness, X was forced to repeat the statements made as an accused person in the framework of the guilty plea</u>.** *Indeed, if, during the petitioners' trial, X's earlier statements had been found to be false, the judgment based on their agreement could have been overturned, depriving them of the negotiated sentence reduction. Furthermore, by allowing their statements to be read before the defense could cross-examine them, the court could give an outside observer the impression of having encouraged the witness to maintain a specific version of facts.* **<u>All of these elements confirm the petitioners' argument that the procedure leading to the production and use of X's statements in their trial revealed manipulation incompatible with the concept of a fair trial.</u>"** (ECHR, *Navalnyy and Ofitserov v. Russia*, No. 46632/13 28671/14 §109, loose translation from English).

16

37. **However, in this case**, according to Article 35 of the guilty plea entered by LAFARGE SA:

> "*The Defendants expressly agree <u>that they will not, through attorneys, officers, directors, employees, agents or any other person authorized to speak on behalf of the Defendants, present or future, make any public statement, in any litigation or otherwise, contradicting the Defendants' acceptance of responsibility set forth above or the facts described in the Indictment and Statement of Facts</u>. Such a contradictory statement shall, subject to the Defendants' rights of remediation described below, constitute a breach of this Agreement, and the Defendants shall thereafter be subject to prosecution as set forth in Paragraphs 31 to 34 of this Agreement.*" (**D2800/18**).

It is further stated later in the same article: "*As indicated in Paragraph 19, the Defendants shall be permitted to raise defenses and assert affirmative allegations in other proceedings relating to the facts set forth in the Indictment and Statement of Facts, <u>provided that such defences and claims do not contradict, in whole or in part, any statement contained in the Indictment or Statement of Facts</u>. This paragraph does not apply to any statement made by any current or former officer, director, employee or agent of the Defendants, in their personal capacity, in any criminal, regulatory or civil proceedings brought against that person, unless that person is speaking on behalf of one or both of the Defendants.*"

LAFARGE SA, of which Bruno LAFONT was the CEO throughout the investigation, therefore undertook not to contradict, in whole or in part, the statement of facts on which the guilty plea is based, which constitutes a construction of facts agreed upon in consultation with the DoJ, in which Bruno LAFONT is already presented as guilty, as previously mentioned (*see above*, §§16 to 19).

Bruno LAFONT, a natural person, therefore finds himself having to appear before a Court to be judged for very serious acts, for which the legal person can no longer defend itself, whether for himself or for the latter, since he is expressly targeted among those "responsible" for the acts according to the terms of his negotiation with the DoJ.

Its testimony is not free and can only be used against Bruno LAFONT.

Therefore, the situation in which the referral order places Bruno LAFONT is radically incompatible with the basic requirements of the right to defense.

This grievance constitutes grounds for annulment of the referral order in and of itself.

38. However, within the framework of the *in globo* approach advocated by the European Court, this is added to the previous argument based on the violation of the presumption of innocence of Bruno LAFONT, thus concluding, from this stage of the proceedings, an irreparable infringement of the right to a fair trial and the rights to defense.

Under these circumstances, the annulment of the prosecution is unavoidable.

**\*\*\*\*\*\***

39.    **<u>As a very subsidiary matter</u>**, and for the legal and factual reasons previously set out in support of the application to set aside the committal order, Bruno LAFONT requests that the Court exclude from the proceedings the guilty plea of October 18, 2022, as well as any direct or indirect reference to this transaction.

# FOR THESE REASONS

*Given Article 6(1), 6(2) and 6(3) of the European Convention on Human Rights;*
*Given Article 48 of the Charter of Fundamental Rights of the European Union;*
*Given Articles One and 385 of the Code of Criminal Procedure;*

**The Court is requested to** :

*Primarily,*

- **ANNUL** the order to refer the case to the Criminal Court;

- **ORDER** the referral of the case file to the public prosecutor's office;

*Alternatively,*

- **CANCEL** the following passages within the referral order:

  o The paragraph titled "*Focus sur la procédure américaine* [Focus on the U.S. procedure]" (pp. 54-56);
  o *From "In its summons…" (p.241) to "in fewer than three weeks" (D 1993) "(p. 242);*
  o *From "It is worth noting that…" to " organs which engage its own" (p. 246);*
  o *From "If the recognition of facts..." to "on its subsidiary and its organs" (p. 247).*

*As a further subsidiary point,*

- **REMOVE** from the debates any reference to the *plea agreement* of October 18, 2022;

SUBJECT TO ALL RESERVATIONS

**Jacqueline LAFFONT-HAIK,**
**Quentin de MARGERIE,**
**Grégoire BERTROU**

*Attorneys at Law*

19

morningtrans.com



# TRANSLATION CERTIFICATION

Date: February 14, 2026

To whom it may concern:

I, Daniel Feather, a translator fluent in the French and English languages, on behalf of Morningside, do solemnly and sincerely declare that the following is, to the best of my knowledge and belief, a true and correct translation of the document(s) listed below in a form that best reflects the intention and meaning of the original text.

The document is designated as:

- 05 LAFONT - Conclusions présomption d_innocence 28.10.docx

_____

Signature

Daniel Feather

_____

Print

*A Madame la Présidente,*
*Mesdames et Messieurs les conseillers composant la 16ᵉ chambre*
*correctionnelle du Tribunal de Paris*

**N° Parquet : 16322001114**
**Audience du 4 novembre au 16 décembre 2025**

---

**CONCLUSIONS A FIN DE NULLLITE DE L'ORDONNANCE DE RENVOI**
Article 385 du code de procédure pénale

---

**POUR :**     **Monsieur Bruno LAFONT**
Né le ^REDACTED - GDPR à Boulogne-Billancourt (92)
De nationalité française
Demeurant        REDACTED - GDPR

*PRÉVENU*

*Ayant pour avocats :*     **Maître Jacqueline LAFFONT-HAIK**
**HAIK & ASSOCIES AARPI**
Avocat à la Cour
27 Boulevard Saint-Michel – 75005 Paris
Tél. : 01 43 25 73 73 – Fax. : 01 43 25 62 19
Vestiaire : E 1305 – Courriel : j.laffont@cabinethaik.com

**Maître Quentin de MARGERIE**
**TEMIME ET ASSOCIES**
Avocat à la Cour
156 rue de Rivoli – 75001 Paris
Tél. : 01 49 27 00 55 – Fax. : 01 42 60 62 44
Vestiaire : C 1537 – Courriel : quentin.demargerie@temime.fr

**Maître Grégoire BERTROU**
**WILKIE FARR & GALLAGHER**
Avocat à la Cour
21 boulevard Malesherbes – 75008 Paris
Tél. : 01 53 43 45 00 – Fax. : 01 53 43 46 99
Vestiaire : J003 – Courriel : GBertrou@willkie.com

**CONTRE :**      **LE MINISTERE PUBLIC**

1

**PLAISE AU TRIBUNAL**

### I-    RAPPEL DE LA PROCEDURE

1.    Au terme d'une information judiciaire ouverte sur plainte avec constitution de partie civile (**D1**) par un réquisitoire introductif du 9 juin 2017 (**D204**), Bruno LAFONT a été renvoyé devant le Tribunal correctionnel, par ordonnance du 16 octobre 2024, pour avoir :

> *« sur le territoire national et de manière indivisible en Syrie, courant 2013 et jusqu'au 19 septembre 2014, en tout cas depuis temps non couvert par la prescription dans le cadre de ses fonctions de président directeur général de Lafarge SA contrôlant sa filiale syrienne LCS, participé au financement d'entreprises terroristes, en fournissant, réunissant, gérant des fonds, valeurs ou biens quelconques, ou en donnant des conseils à cette fin, dans l'intention de voir ces fonds utilisés ou en sachant qu'ils étaient destinés à être utilisés, en tout ou partie, en vue de commettre des actes de terrorisme, indépendamment de leur survenance, au profit des entités terroristes Ahrar al-Sham, Jabhat al-Nosra et État islamique en Irak et au Levant devenu Etat islamique, en l'espèce notamment en autorisant la poursuite d'activité de la cimenterie exploitée par LCS, alors qu'il était seul habilité à y mettre fin, en conscience que cette exploitation supposait notamment des paiements de sécurité convenus au profit de ces entités terroristes, la rémunération de fournisseurs opérant depuis les zones tombées sous leur contrôle, et d'intermédiaires avec ces groupes ;*

> *Faits qualifiés de financement d'entreprises terroristes, prévus et réprimés par les articles 113-2, 113-13,421-1, 421-2-2, 421-5, 421-7, 421-8, 422-3, 422-4, 422-6, 422-7 du code pénal (natinf 25457) :*

> *Sur le territoire national et de manière indivisible en Syrie, du 30 juin 2013 au 19 septembre 2014, en tout cas depuis temps non couvert par la prescription, dans le cadre de ses fonctions de président directeur général de Lafarge SA contrôlant sa filiale syrienne LCS, intentionnellement violé les dispositions du règlement communautaire 881/2002 du 27 février 2002 et de son règlement d'exécution (UE) 632/2013 du 28 juin 2013 visant à interdire toute relation financière ou commerciale avec les organisations djihadistes Jabhat al-Nosra et État islamique en Irak et au Levant devenu État islamique, en l'espèce notamment en autorisant la poursuite d'activité de la cimenterie exploitée par LCS, alors qu'il était seul habilité à y mettre fin, en conscience que cette exploitation supposait notamment des paiements de sécurité convenus au profit de ces entités terroristes, la rémunération de fournisseurs opérant depuis les zones tombées sous leur contrôle, et d'intermédiaires avec ces groupes ;*

> *Faits qualifiés de non-respect de sanctions financières internationales, prévus et réprimés par les articles 113-2 du code pénal, 459 §1. §1 bis, §1 ter, §2, §4, §5, 451, 451-bis, 432-bis, 433-bis du code des douanes, le règlement communautaire 881/2002 du 27 février 2002 et de son règlement d'exécution (UE) 632/2013 du 28 juin 2013 (natinf 23134) ».*

2.    Dans le cadre de la même procédure, LAFARGE SA, dont Bruno LAFONT était le président directeur-général (ci-après « PDG ») au moment de la prévention, a été renvoyée devant le même tribunal pour :

> *« À Paris, sur le territoire national et de façon indivisible notamment en Syrie et en Égypte, courant 2013 et jusqu'au 19 septembre 2014, <u>alors qu'elle exerçait un contrôle intégral, via les holdings Sofimo et LCH, sur les activités de sa filiale syrienne LCS exploitant la cimenterie de Jalabiya, et qu'elle en assurait le financement dans le cadre de prêts intragroupes</u>, participé au financement d'entreprises terroristes, en fournissant, réunissant, gérant des fonds, valeurs ou biens quelconques, ou en donnant des conseils à cette fin, dans l'intention de voir ces fonds utilisés ou en sachant qu' ils étaient destinés à être utilisés, en tout ou partie, en vue de commettre des actes de terrorisme, indépendamment de leur survenance, au profit des entités terroristes Ahrar al-Sham, Jabhat al-Nosra et État islamique en Irak et au Levant devenu État islamique, <u>en l'espèce en transférant des·fonds au profit de sa</u>*

2

*filiale* **et en maintenant l'activité, dans le cadre d'une stratégie concertée, d'un site de production situé en zone de guerre en conscience que cette exploitation supposait notamment des paiements de sécurité convenus au profit de ces entités terroristes,** *la rémunération de fournisseurs opérant depuis les zones tombées sous leur contrôle, et d'intermédiaires avec ces groupes, et ce :*

*par l'action de ces organes ou représentants, à savoir Bruno PESCHEUX et Frédéric JOLIBOIS en qualité de cadres expatriés dirigeant LCS ayant conduit et conclu les accords et validé les paiements à ces entités, Christian HERRAULT en qualité de supérieur hiérarchique des précédents ayant validé leurs décisions, participé aux négociations, validé certains accords et participé à la couverture de certains paiements,* **et Bruno LAFONT, dirigeant du groupe, ayant validé la stratégie suivie en maintenant l'activité de la cimenterie en connaissance des financements distribués aux groupes terroristes** ;

*ayant agi en son nom et pour son compte, les agissements reprochés aux cadres dans l'exercice de leurs fonctions s'inscrivant dans le cadre d'une stratégie de maintien de l'activité de production et de vente de l'unique cimenterie gérée par LCS en zone de guerre, et répondant dès lors à une logique de résultats, ainsi que de préservation de l'actif, pour la filiale et pour le groupe, conforme aux intérêts de Lafarge SA ;*

*Faits qualifiés de financement d'entreprises terroristes, prévus et réprimés par les articles 121-2, 113-2, 113-13, 13 1-38, 13 1-39, 42 1-1, 42 1-2-2, 421-5, 422-5, 422-6, 422-7 du code pénal (natinf 25457) ;*

*À Paris et sur le territoire national, de façon indivisible notamment en Syrie et en Égypte, du 30 juin 2013 et jusqu'au 19 septembre 20 14, alors qu'elle exerçait un contrôle intégral, via les holdings Sofimo et LCH, sur les activités de sa filiale syrienne LCS exploitant la cimenterie de Jalabiya, et qu' elle en assurait le financement dans le cadre de prêts intragroupes, intentionnellement violé les dispositions du règlement communautaire 88 l / 2002 du 27 février 2002 et de son règlement d'exécution (UE) 632 / 2013 du 28 juin 2013 visant à interdire toute relation financière ou commerciale avec les organisations djihadistes Jabhat al-Nosra et État islamique en Irak et au Levant devenu État islamique, pour un total cumulé de 4 672 500 €, en l'espèce en transférant des fonds au profit de sa filiale et en maintenant l' activité, dans le cadre d' une stratégie concertée, d'un site de production situé en zone de guerre en conscience que cette exploitation supposait notamment des paiements de sécurité convenus au profit de ces entités terroristes, la rémunération de fournisseurs opérant depuis les zones tombées sous leur contrôle, et d'intermédiaires avec ces groupes, et ce :*

*par l'action de ces organes ou représentants, à savoir Bruno PESCHEUX et Frédéric JOLIBOIS en qualité de cadres expatriés dirigeant LCS ayant conduit et conc lu les accords, et validé les paiements à ces entités, Christian HERRAULT en qualité de supérieur hiérarchique des précédents ayant validé leurs décisions, participé aux négociations, validé certains accords et participé à la couverture de certains paiements,* **et Bruno LAFONT, dirigeant du groupe, ayant validé la stratégie suivie en maintenant l'activité de la cimenterie en connaissance des financements distribués aux groupes terroristes** ;

*ayant agi en son nom et pour son compte, les agissements reprochés aux cadres dans l'exercice de leurs fonctions s' inscrivant dans le cadre d ' une stratégie de maintien de l' activité de production et de vente de l' unique cimenterie gérée par LCS en zone de guerre, et répondant dès lors à une logique de résultats, ainsi que de préservation de l'actif, pour la filiale et pour le groupe, conforme aux intérêts de Lafarge SA ;*

*Faits qualifiés de non-respect de sanctions financières internationales, prévus et réprimés par les articles 113-2 du code pénal, 459 § 1, § 1 bis, § 1 ter, §2, §4, §5, 45 1, 451-bis, 432-bis, 433-bis du code des douanes, 11 3-2, 113-1 3, 12 1-2, 131-38, 13 1-39 du code pénal, le règlement communautaire 88l / 2002 du 27 février 2002 et de son règlement d'exécution (UE) 632 / 2013 du 28 juin 2013 (natinf 23134) ».*

C'est en cet état que Bruno LAFONT soumet au Tribunal saisi de ces poursuites une demande d'annulation de l'ordonnance de règlement, ainsi qu'une demande subsidiaire de voir écarter des débats toute référence au *guilty plea* conclu entre LAFARGE SA et le DoJ (**D2794** et **D2800**).

3

**II-    DISCUSSION**

3. Par les présentes conclusions *in limine litis*, Bruno LAFONT saisit le Tribunal d'une demande d'annulation de l'ordonnance de renvoi au double motif que :

1. d'une part, cet acte d'accusation repose sur une exploitation à son détriment, et injustifiable au regard des principes de la présomption d'innocence et des droits de la défense, du *plea-agreement* conclu entre le *Department of Justice* (« DOJ ») américain et la société LAFARGE SA le 18 octobre 2022 (**A**) ;

2. d'autre part, cet acte d'accusation renvoie simultanément Bruno LAFONT et LAFARGE SA devant le Tribunal afin d'être jugés pour des faits identiques dans le cadre d'un même procès alors que LAFARGE SA se trouve, en vertu du *guilty plea* précité (**D2794** et **D2800** pour la traduction française), tenue par une clause muselière l'empêchant de contredire la version des faits sur laquelle repose cette transaction pénale (art. 35 de cet accord), ce qui contrevient au droit de Bruno LAFONT de se défendre, notamment en faisant obstacle à son droit d'interroger un témoin crucial (**B**).

Il est également demandé, à titre subsidiaire, d'ordonner que soit écartée des débats toute référence directe ou indirecte au *guilty plea* du 18 octobre 2022 versé à l'information judiciaire.

### A. Sur la nullité de l'ORTC découlant de l'exploitation à charge contre Bruno LAFONT d'un *guilty plea* conclu par LAFARGE SA, dont il était le PDG à l'époque de la prévention, sans sa participation et à son insu

Les prescriptions conventionnelles de la Cour européenne des droits de l'homme comme de la Cour de justice de l'Union européenne applicables aux des effets du plaider-coupable à l'égard d'un tiers à cette transaction (1) n'ont pas été respectées par les juges d'instruction dans le cadre de l'ordonnance de renvoi (2).

1. En droit : une procédure de plaider-coupable conclue par un tiers ne saurait être utilisée comme support d'une accusation

4. L'article 6§1 de la Convention européenne de sauvegarde des droits de l'Homme (ci-après « CEDH ») consacre le droit à un procès équitable, incluant le principe du contradictoire et de l'égalité des armes, ainsi que l'impartialité du tribunal.

Selon son article 6§2, « *toute personne accusée d'une infraction est présumée innocente jusqu'à ce que sa culpabilité ait été légalement établie* ».

Et en vertu de l'article 6§3, spécifique à la matière pénale, les droits de la défense impliquent que tout accusé a droit notamment à « *disposer du temps et des facilités nécessaires à la préparation de sa défense* ».

5. La Cour européenne juge ainsi de manière constante que la « *présomption d'innocence consacrée par le paragraphe 2 de l'article 6 (art. 6-2) figure parmi les éléments du procès pénal équitable exigé par le paragraphe 1 (art. 6-1)* » (CEDH, 10 février 1995, *Allenet de Ribemont c. France*, n°5175/89, §35).

Elle précise à cet égard que l'article 6§2 « *garantit à toute personne de ne pas être désignée ni traitée comme coupable d'une infraction avant que sa culpabilité n'ait été établie par un tribunal (voir, mutatis mutandis, Allenet de Ribemont, précité, pp. 16-17, §§ 35-36, et Y.B. et autres c. Turquie, arrêt du 28 octobre 2004, § 43). Dès lors, elle exige, entre autres, qu'en*

*remplissant leurs fonctions,* **les membres du tribunal ne partent pas de l'idée préconçue que le prévenu a commis l'acte incriminé** *(Barberà, Messegué et Jabardo c. Espagne, arrêt du 6 décembre 1988, série A no 146, § 77). La présomption d'innocence se trouve atteinte par des déclarations ou des décisions qui reflètent le sentiment que la personne est coupable, qui incitent le public à croire en sa culpabilité ou qui préjugent de l'appréciation des faits par le juge compétent (Y.B. et autres, précité, § 50). »* (CEDH, 30 mars 2010, *Poncelet c. Belgique*, n°44418/07, §51).

6.     Le principe de la présomption d'innocence trouve également à s'appliquer <u>lorsque sont en cause des procédures menées en parallèle pour des mêmes faits à l'égard de personnes différentes.</u>

En effet, la Cour européenne a précisé que *« **l'expression prématurée de la culpabilité d'un suspect dans un jugement rendu à l'encontre de suspects poursuivis séparément peut aussi, en théorie, porter atteinte au principe de la présomption d'innocence**, comme le soutient le requérant en l'espèce. Elle rappelle à ce titre que le but et l'objet de la Convention, instrument de protection des êtres humains, appellent à interpréter et à appliquer ses dispositions d'une manière qui en rende les exigences concrètes et effectives. Elle a expressément indiqué que cet impératif s'appliquait également au droit consacré dans l'article 6 § 2 (voir, par exemple, Allenet de Ribemont, précité, § 35, Lavents, précité, § 126, et Allen, précité, § 92). »* (CEDH, 27 février 2014, *Karaman c. Allemagne* n°17103/10, §43).

Elle a ainsi rappelé dans son arrêt *Bauraus c. Lituanie* que le principe de présomption d'innocence « *peut, en théorie, être également violé en raison de l'expression prématurée de la culpabilité d'un suspect figurant dans le cadre d'un jugement rendu à l'encontre de co-suspects poursuivis séparément (voir Karaman c. Allemagne, no 17103/10, § 42, 27 février 2014).* **Elle a jugé que de telles déclarations, bien qu'elles ne lient pas le requérant, peuvent avoir un effet préjudiciable sur la procédure en cours contre lui, de la même manière qu'une expression prématurée de culpabilité émanant de toute autre autorité publique en lien étroit avec une procédure pénale pendante** *(ibid., § 43).* » (CEDH, 31 octobre 2017, *Bauras c. Lituanie*, n°56795/13, §52, traduction libre depuis l'anglais).

7.     La question du respect de la présomption d'innocence se pose avec d'autant plus d'acuité dans le cadre d'une procédure pénale transactionnelle reposant sur une reconnaissance de culpabilité guidée par une logique d'opportunité et de négociation de la peine, et non par la recherche de la manifestation de la vérité.

Comme le souligne la doctrine, *« **distinguant les procédures civile et pénale, GARRAUD remarquait qu'«** <u>**il ne suffit pas qu'un accusé consente à être condamné pour que sa condamnation soit légitime, il faut que sa culpabilité soit établie**</u> « *(R. GARRAUD, Traité théorique et pratique d'instruction criminelle et de procédure pénale, 6 t., 1912-1929, Sirey, t. II, no 459*). **Or, le système anglais conduit précisément à ce résultat. En effet, lorsque l'accusé plaide coupable (plea of guilty) puis se prête à ces négociations que constitue le plea-bargaining, il consent effectivement à être condamné, et la condamnation est légitime par l'effet de ce seul consentement** *(C. AMBROISE-CASTÉROT, Le consentement en procédure pénale, in Mélanges Pradel, 2006, Cujas, p. 29 s.). Le ministère public n'aura pas à démontrer sa culpabilité »* (Dalloz, Répertoire de droit pénal et de procédure pénale, Aveu – Coralie AMBROISE-CASTÉROT – Avril 2020, §101).

A cet égard, « *en matière de transactions pénales, la Cour a déjà eu l'occasion d'observer que la possibilité pour un accusé d'obtenir une atténuation des charges ou une réduction de peine à condition qu'il reconnaisse sa culpabilité, ou qu'il renonce avant le procès à contester les faits ou encore qu'il coopère pleinement avec les autorités d'enquête, est chose courante dans les systèmes de justice pénale des États européens (voir l'étude de droit comparé dans l'affaire Natsvlishvili et Togonidze c. Géorgie, no 9043/05, §§ 62-75 et, CEDH 2014 (extraits). Le fait de transiger sur un chef d'accusation ou sur une peine n'a rien de répréhensible en soi (ibidem, §§ 90-91), tout comme le fait de renoncer au droit d'appel (Litwin c. Allemagne, no 29090/06, § 47, 3 novembre 2011). »* (CEDH, 25 mars 2021, *Di Martino et Molinari c. Italie*, nos 15931/15, 16459/15, §35).

5

Néanmoins, la Cour encadre cette pratique puisqu'elle « *considère qu'une procédure de transaction pénale conduisant à ce qu'il soit statué sur une accusation pénale <u>à l'issue d'un examen judiciaire simplifié</u> <u>**implique en substance une**</u> <u>**renonciation à certains droits procéduraux**</u>* » (CEDH, 29 avril 2014, *Natsvlishvili et Togonidze c. Géorgie*, n°9043/05, §91).

8.  La Cour européenne a eu l'occasion de se prononcer sur la protection du principe de la présomption d'innocence lorsqu'une procédure de transaction pénale fait référence à des faits commis par un tiers poursuivi dans une seconde procédure.

Ainsi, dans son arrêt *Kratky c. Slovaquie*, la Cour a conclu à une violation de l'article 6§2 notamment en ce que « ***le jugement approuvant l'accord de plaidoyer de l'un des coauteurs du requérant (et l'accord lui-même) contenait des références détaillées aux infractions concernées, y compris le rôle joué par le requérant en tant que l'un des auteurs et l'un des chefs du groupe criminel.*** *Cet arrêt, qui était fondé sur la description de ces actes criminels, y compris un compte rendu factuel précis du rôle du requérant, était donc susceptible de soulever des préoccupations quant à la question de savoir si le requérant lui-même remplissait tous les critères nécessaires pour être considéré comme ayant commis les infractions.* ***Le fait de se référer au requérant et à ses actes de cette manière peut en principe engager la protection de son droit à la présomption d'innocence*** *(voir Mucha, précité, §§ 55-56).* » (CEDH, 15 février 2024, *Krárky c. Slovaquie*, n°35025/20, §14, traduction libre depuis l'anglais).

9.  La Cour européenne ne restreint pas son contrôle aux seuls termes employés au sein de la première décision, puisqu'elle <u>impose que des garanties spécifiques soient mises en place – en considération des exigences du procès équitable – dans la seconde</u>.

A ce titre, dans son arrêt *Mucha c. Slovaquie*, la Cour européenne a affirmé que l'équité de la procédure peut être compromise lorsqu'une transaction pénale établit la culpabilité d'un tiers à la transaction et que celle-ci est versée au dossier d'une procédure séparée concernant les mêmes faits et au sein de laquelle le tiers est désormais accusé :

> « *55. Deuxièmement, la Cour relève que <u>les jugements approuvant les accords de plaider-coupable des co-auteurs du requérant contenaient une description factuelle détaillée de leurs crimes, incluant le rôle du requérant en tant que coauteur, et que la description précise de certains de leurs actes criminels était identique à celle des actes imputés au requérant</u>. Bien que ces jugements ne contiennent aucune constatation distincte de culpabilité à l'égard du requérant en tant que telle (voir également paragraphes 27 et 28 ci-dessus), ils doivent être lus à la lumière des éléments constitutifs des infractions en question – notamment la création, la conception et la direction d'une entreprise criminelle, qui supposent nécessairement des actes coordonnés entre coauteurs. <u>**Condamner les co-auteurs du requérant sur la base d'une telle description, incluant la définition factuelle précise du rôle spécifique du requérant, était donc, en principe, susceptible de soulever des doutes quant à la question de savoir si cela ne préjugeait pas de sa propre culpabilité**</u> (voir Meng, précité, § 48, avec d'autres références).*
>
> *56. **Se référer ainsi au requérant et à ses actes est, en principe, susceptible de mettre en jeu la protection de son droit à la présomption d'innocence**. La Cour est consciente que toute atteinte à ce droit se serait d'abord produite dans la procédure concernant les co-auteurs du requérant et qu'il n'existe aucune indication qu'il l'ait contestée directement. **Néanmoins, une telle atteinte potentielle est liée à son propre procès en raison de l'identité du tribunal saisi et du fait que, comme ce tribunal l'a reconnu lui-même, <u>les condamnations des co-auteurs faisaient partie intégrante du dossier du requérant</u>** (voir paragraphe 18 ci-dessus).* (CEDH, 25 novembre 2021, *Mucha c. Slovaquie*, n°63703/19, §§56-57, traduction libre depuis l'anglais).

6

Elle a jugé que « *les accusations portées contre les requérants reposaient sur les mêmes faits que celles dirigées contre X, les trois hommes étant accusés d'avoir conspiré pour détourner les mêmes biens. Il est donc indéniable que les faits établis dans la procédure contre X et les constatations juridiques qui y avaient été faites étaient directement pertinents pour le procès des requérants. Dans ces conditions,* **il était essentiel que des garanties soient mises en place afin que les mesures procédurales et les décisions prises dans la procédure contre X ne compromettent pas l'équité du procès ultérieur des requérants — d'autant plus que ces derniers étaient légalement exclus de toute participation à la procédure disjointe et ne disposaient d'aucun statut leur permettant de contester les décisions et constats qui y étaient opérés** » (CEDH, 23 février 2013, *Navalnyy et Ofitserov c. Russie*, nos 46632/13 28671/14, §103, traduction libre depuis l'anglais).

Une transmission au gouvernement moldave est encore récemment intervenue, la Cour européenne posant la question suivante :

> « *la décision de disjoindre la procédure pénale à l'encontre de A., l'impossibilité pour la requérante d'y intervenir, ainsi que* **l'éventuelle utilisation dans la procédure dirigée contre la requérante des constats opérés dans la procédure dirigée contre A.** *sont-elles compatibles avec les garanties offertes par l'article 6 §§ 1 et 2 de la Convention (Navalnyy et Ofitserov c. Russie, nos 46632/13 et 28671/14, §§ 103-05, 23 février 2016) ?* » (CEDH, 1er mars 2023, *Ticu c. République de Moldova*, n° 27945/20).

10. La Cour de justice de l'Union européenne (ci-après « CJUE ») s'est également prononcée sur cette articulation sensible au regard des exigences de l'article à l'article 4, paragraphe 1, de la directive 2016/343 qui dispose que :

> « *Les États membres prennent les mesures nécessaires pour veiller à ce que les déclarations publiques des autorités publiques, ainsi que les décisions judiciaires, autres que celles statuant sur la culpabilité, ne présentent pas un suspect ou une personne poursuivie comme étant coupable aussi longtemps que sa culpabilité n'a pas été légalement établie. Cette disposition s'entend sans préjudice des actes de poursuite qui visent à prouver la culpabilité du suspect ou de la personne poursuivie et sans préjudice des décisions préliminaires de nature procédurale qui sont prises par des autorités judiciaires ou par d'autres autorités compétentes et qui sont fondées sur des soupçons ou sur des éléments de preuve à charge* ».

Elle a ainsi indiqué, dans sa décision *AH e.a*, C-377/18 du 5 novembre 2019, que la Directive « *ne s'oppose pas à ce qu'un accord dans lequel la personne poursuivie reconnaît sa culpabilité en échange d'une réduction de peine, qui doit être approuvé par une juridiction nationale, mentionne expressément en tant que coauteurs de l'infraction pénale en cause non seulement cette personne, mais également d'autres personnes poursuivies, lesquelles n'ont pas reconnu leur culpabilité et sont poursuivies dans le cadre d'une procédure pénale distincte, à la condition,* d'une part, que cette mention soit nécessaire pour la qualification de la responsabilité juridique de la personne qui a conclu ledit accord et, d'autre part, que ce même accord indique clairement que ces autres personnes sont poursuivies dans le cadre d'une procédure pénale distincte et que leur culpabilité n'a pas été légalement établie* » (CJUE, 5 novembre 2019, *AH e.a*, C-377/18, §50).

Cette décision souligne que des allégations portées contre des tiers dans une première procédure, et *a fortiori* dans une procédure transactionnelle, doivent être rendues nécessaires à la cause <u>et</u> que des précautions de forme doivent être prises – notamment en rappelant que leur culpabilité n'a pas légalement été établie – afin de distinguer le sort de ces tiers de celui des personnes poursuivies.

La Cour de Justice de l'Union européenne a par ailleurs repris la jurisprudence de la Cour européenne en ce qu'elle a affirmé que dans le cade des procédure dites « hybrides », à savoir en présence d'une transaction pénale d'une part, et d'une procédure classique d'autre part, que « *la motivation de décisions judiciaires doit être*

7

*formulée en des termes qui sont de nature à éviter un jugement prématuré potentiel relatif à la culpabilité des personnes tierces concernées,* **susceptible de compromettre l'examen équitable des charges retenues contre celles-ci dans le cadre d'une procédure distincte** *[voir, en ce sens, arrêt du 5 septembre 2019, AH e.a. (Présomption d'innocence), C-377/18, EU:C:2019:670, point 44 ; voir également, en ce sens, Cour EDH, 27 février 2014, Karaman c. Allemagne, CE:ECHR:20140227JUD001710310, §§ 64 et 65].* » (CJUE, 18 mars 2021, *Pometon SpA c. Commission*, C-440/19 P, §63).

11. Plus généralement, cette question rejoint celle des conditions d'administration de la preuve qui, aux termes de la jurisprudence de la Cour européenne, doit permettre de s'assurer que « *la procédure, y compris la manière dont les éléments de preuve ont été recueillis, a été équitable dans son ensemble (Bykov c. Russie [GC], no 4378/02, § 89, 10 mars 2009, et la jurisprudence qui s'y trouve citée). Elle doit se demander notamment* **si le requérant s'est vu offrir la possibilité de contester l'élément de preuve et de s'opposer à son utilisation.** *Du point de vue des droits de la défense, des questions peuvent se poser sur le terrain de l'article 6 relativement au point de savoir si les preuves, à charge comme à décharge, qui ont été administrées l'ont été d'une manière propre à assurer un procès équitable (Erkapić c. Croatie, no 51198/08, § 73, 25 avril 2013) ; l'équité d'un procès implique en effet le respect du contradictoire dans la procédure et l'égalité des armes, raison pour laquelle les éventuelles déficiences susceptibles d'avoir vicié le processus d'administration de la preuve peuvent être examinées sous l'angle de l'article 6 § 1 (Mirilachvili c. Russie, no 6293/04, § 157, 11 décembre 2008). Il faut prendre également en compte la qualité de l'élément de preuve, notamment le point de savoir si les circonstances dans lesquelles il a été recueilli font douter de sa fiabilité ou de son exactitude (Bykov, précité, § 90).* » (CEDH [GC], 26 septembre 2023, *Yüksel Yalçinkaya c. Turquie*, n°15669/20, §303).

12. Certes, ni la CEDH ni la CJUE n'ont encore eu à se prononcer sur la question spécifique des garanties applicables dans une procédure française où serait versé un *guilty plea* étranger établissant non seulement la culpabilité de la personne morale, mais également celle de ses dirigeants personnes physiques, pourtant tiers à cet accord.

13. Il se déduit néanmoins de l'ensemble de la jurisprudence précitée qu'une telle procédure de transaction pénale, même réalisée à l'étranger, si elle porte atteinte à la présomption d'innocence d'un tiers appelé à être jugé dans une autre procédure en France, peut compromettre son droit à un procès équitable.

Une telle circonstance est de nature à influencer les magistrats dans l'idée préconçue que le prévenu a commis l'acte incriminé, <u>ou du moins, et selon la conception bien connue de l'impartialité dans sa dimension « objective », à laisser planer un doute légitime à cet égard.</u>

Dès lors qu'au terme d'une information judiciaire en France, les magistrats instructeurs décident dans le cadre de leur ordonnance de renvoi de faire référence à un *guilty plea* conclu à l'étranger par l'une des parties à cette instruction, <u>des précautions strictes s'imposent pour protéger les droits des autres parties à l'instruction, désignées dans ce *guilty plea* sans y avoir jamais participé.</u>

Et il apparaît inconcevable du point de vue des droits précités que les juges intègrent le principe et le contenu de ce *guilty plea* dans leur examen des charges à l'encontre non seulement de la personne qui l'a conclu, mais également d'un tiers prévenu dans le cadre de la seconde procédure.

En définitive, une transaction pénale attentatoire au droit à la présomption d'innocence du tiers – accusé dans une procédure distincte – ne saurait être versée au dossier de cette seconde procédure, et citée dans l'acte de poursuite, ni *a fortiori* être exploitée à charge contre ce tiers, sans compromettre son droit à un procès équitable.

Et la seule circonstance que la juridiction de jugement ne soit pas, en elle-même, liée par les conclusions issues d'une mesure transactionnelle, ne saurait constituer une garantie suffisante du respect de l'équité du procès.

> 2. En fait : un plaider-coupable conclu par LAFARGE SA au mépris de la présomption d'innocence de Bruno LAFONT et néanmoins exploité à charge contre lui au soutien de l'ordonnance de renvoi

14. Alors même que le *guilty plea* conclu par LAFARGE SA, aujourd'hui co-prévenue, n'a manifestement été entouré d'aucune précaution élémentaire concernant la protection de la présomption d'innocence de Bruno LAFONT, qui était son PDG pendant toute la durée des faits objets de l'accord transactionnel (**a**), les magistrats instructeurs n'ont fait preuve d'aucune prudence dans l'utilisation de cet accord, allant jusqu'à considérer que la « *reconnaissance des faits* » reposerait « *cependant sur des éléments de preuve solides* » (ORTC, p. 247) et à utiliser à charge les poursuites civiles de HOLCIM SA et LAFARGE SA contre Bruno LAFONT dans le temps du *guilty plea* (**b**).

> ### a) *Un guilty plea manifestement attentatoire au droit à la présomption d'innocence de Bruno LAFONT*

15. **En l'espèce**, il est acquis qu'aux termes d'un *guilty plea* conclu avec le DoJ américain le 18 octobre 2022 (**D2794**), LAFARGE SA a, aux côtés de sa filiale syrienne LCS, plaidé coupable pour avoir commis l'infraction de soutien matériel à des organisations terroristes en Syrie entre août 2013 et octobre 2014, notamment contre le paiement d'une amende de 777,78 millions de dollars.

16. Outre le fait qu'il s'agit ici d'un *guilty plea* qui fait référence à de prétendus agissements commis par des tiers en les présentant comme avérés, le cas d'espèce présente une spécificité qui rend la situation extrêmement sensible et qui n'échappera pas au Tribunal.

En effet, aux termes du présent *guilty plea*, la personne morale LAFARGE SA a fait le choix stratégique de reconnaître une culpabilité qui emporte avec elle quasi-mécaniquement celle de Bruno LAFONT qui incarnait LAFARGE SA en sa qualité de PDG au moment de la période des faits en cause.

LAFARGE SA a en effet admis que les allégations factuelles énoncées dans l'acte d'accusation et l'exposé des faits « *sont vraies et correctes, qu'ils* **[LAFARGE S.A. et LCS]** *sont responsables des actes de leurs dirigeants, administrateurs, employés et agents décrits dans l'acte d'accusation, et que l'acte d'accusation et l'exposé des faits reflètent fidèlement la conduite criminelle des défendeurs* » (**D2800/9**).

Cet engagement contractuel censé lier uniquement la personne morale au DoJ produit en réalité des effets juridiques collatéraux considérables : les personnes physiques qui y sont pourtant étrangères se retrouvent présentées comme coupables à travers un récit qui a été élaboré sans elles et contre elles.

17. C'est ainsi que Bruno LAFONT – PDG de cette société de 2007 à 2015 – apparait à plusieurs reprises et de manière parfaitement identifiable derrière les termes « *executive 6* », dans le récit factuel que constitue le « *statement of facts* » (**D2794/33**), sur lequel la reconnaissance de culpabilité prend appui.

Le cadre 6 est présenté comme « *un citoyen et ressortissant français et était président du conseil d'administration et directeur général de LAFARGE jusqu'à la réalisation de l'acquisition par Holcim en 2015. Il était basé au siège social de LAFARGE à Paris, France* » (**D2800/25**).

9

18.   Sous cette dénomination, Bruno LAFONT a été à plusieurs reprises présenté publiquement comme coupable des faits de « *conspiracy to provide material support to one or more foreign terrorist organization* » par un *plea-agreement* du 18 octobre 2022 ayant fait l'objet d'une large publicité, aux termes duquel LAFARGE SA affirme notamment que :

-   « *Alors que d'autres sociétés multinationales se sont retirées et ont cessé leurs activités en Syrie, **les dirigeants de LAFARGE et de LCS, par le biais d'intermédiaires, ont négocié des accords pour payer ces groupes armés** afin de protéger les employés de LCS, afin d'assurer la poursuite de l'exploitation de la cimenterie de Jalabiyeh et afin d'obtenir un avantage économique sur leurs concurrents sur le marché du ciment en Syrie* » (**D2800/26**) ;

-   « ***Les dirigeants de LAFARGE et de LCS ont conspiré*** *pour effectuer des paiements réguliers de garantie de sécurité aux groupes armés, y compris DAECH et FAN, et pour acheter des matières premières aux fournisseurs contrôlés par DAECH qui payaient DAECH en fonction du montant de leurs ventes à LCS.* » (**D2800/26**) ;

-   « ***Les dirigeants de LAFARGE et LCS ont également créé des factures avec de fausses descriptions*** *pour les intermédiaires tiers qu'ils utilisaient pour négocier avec DAECH, afin de dissimuler la nature du travail que les intermédiaires avaient effectué pour LAFARGE et LCS, et pour permettre à LAFARGE et LCS de **nier ultérieurement faussement avoir connaissance de leurs activités*** » (**D2800/28**).

Était en outre pris en considération, pour justifier la négociation, « *le fait que **les individus coupables responsables de la conduite délictueuse des Défendeurs** font l'objet de poursuites effectives dans une autre juridiction* » (**D2800/4**).

19.   A aucun moment le *guilty plea* n'indique que la culpabilité des dirigeants n'a pas été « *légalement établie* », de sorte que les conditions minimales exigées par la Cour européenne et la Cour de Justice de l'Union européenne afin de préserver le droit des tiers à la présomption d'innocence ne sont manifestement pas remplies.

20.   En outre, la signature de cet accord par LAFARGE SA, personne morale, a été entreprise <u>sans aucune implication ni même information donnée aux personnes physiques</u>, et notamment aux anciens dirigeants, pourtant mises en cause et désignées comme coupables dans la version des faits arrêtée avec les autorités américaines.

Bruno LAFONT a ainsi appris l'existence de ce *guilty plea* par voie de presse.

Et plus précisément par un communiqué de LAFARGE SA qui annonçait, le jour de la signature, avoir « ***accepté de porter la responsabilité des actions des anciens cadres impliqués, dont le comportement était en violation flagrante avec le code de conduite de Lafarge*** » (**D2807, D2809**).

L'atteinte à la présomption d'innocence est patente.

21.   Sur le terrain civil, le Tribunal des activités économiques de Paris l'a d'ailleurs d'ores et déjà constatée dans un jugement du 8 avril 2025, issu d'une action indemnitaire menée par HOLCIM et LAFARGE SA contre ses anciens dirigeants et salariés, elle-même intrinsèquement liée à la conclusion du *guilty plea* (**Pièce n°1**).

Examinant une demande reconventionnelle de Bruno LAFONT, le Tribunal des activités économiques a relevé :

10

*« dans son communiqué du 18 octobre 2022, Lafarge a notamment indiqué : « Selon les termes de l'accord, Lafarge SA el sa filiale Lafarge Cernent Syrie ("LCS"), désormais dissoute, paieront une amende de 777, 78 millions de dollars américains et acceptent de plaider coupable pour l'infraction de soutien matériel à des organisations terroristes en Syrie entre août 2013 et octobre 2014, date à laquelle LCS a cessé ses activités dans le pays [ ... ] Lafarge SA et LCS ont accepté de porter la responsabilité des actions des anciens cadres impliqués, dont le comportement était en violation flagrante avec le Code de conduite de Lafarge. Nous regrettons profondément que cette conduite ait eu lieu et avons travaillé avec le Département de la Justice des États-Unis pour trouver une issue à cette affaire ».*

*Attendu que dans son communiqué du même jour, Holcim a de son côté affirmé : « Holcim apporte son soutien à l'accord conclu par Lafarge SA avec le Département de la Justice des États-Unis ("DOJ") mettant fin à l'enquête du DOJ sur Lafarge SA et sa filiale syrienne Lafarge Cernent Syria ("LCS'J, désormais dissoute, concernant les actions passées d'anciens dirigeants de Lafarge SA et de LCS pendant la guerre civile syrienne, avant l'acquisition de Lafarge SA par Holcim.*

*Selon les termes de l'accord, Lafarge SA et LCS, s'acquitteront d'une amende de 777, 78 millions de dollars américains et acceptent de plaider coupable pour l'infraction de soutien matériel à des organisations terroristes en Syrie entre août 2013 et octobre 2014, date à laquelle LCS avait cessé ses activités dans le pays.*

*Holcim, qui n'a jamais opéré en Syrie, ainsi que les opérations et salariés de Lafarge aux États-Unis, n'ont jamais été impliqués dans les faits objets de l'accord. Ces pratiques sont en totale opposition avec tout ce que Holcim représente. Dans sa décision,* **le DOJ relève que des anciens cadres de Lafarge SA et de LCS impliqués ont dissimulé ces pratiques à Holcim et aux auditeurs externes, en amont et en aval de l'acquisition de Lafarge SA.**

*Lorsqu'en 2016 Holcim a été alertée par certains articles de presse, la société a proactivement demandé une enquête approfondie par un cabinet d'avocats américains sous la supervision du Conseil d'administration. Holcim a rendu publiques les principales conclusions de l'enquête en 2017 et s'est séparée des anciens cadres de Lafarge SA et LCS qui étaient impliqués » ;*

*Attendu que* **même si M. Bruno LAFONT n'est pas nommément cité, il est très aisé de voir qu'il est visé par le terme « d'anciens dirigeants de Lafarge SA »** *;*

*Attendu qu'à la date de publication de* **ces communiqués, qui n'ont été assortis d'aucune mise en garde permettant de souligner la présomption d'innocence des cadres « impliqués »,** *M. Bruno LAFONT était présumé innocent,*

*Attendu que cet état de fait, à la date du 18 octobre 2022 ne dépend en rien de l'issue de la procédure pénale en cours, quel que soit la décision prise à l'encontre de M. Bruno LAFONT;*

*Le tribunal dira que* **LAFARGE(LSA) et HOLCIM n'ont pas respecté le droit de M. Bruno LAFONT au respect de son innocence, ont commis en cela une faute** *et qu'il y a lieu, sans surseoir à statuer, de se prononcer sur une éventuelle réparation du préjudice subi par M. Bruno LAFONT »* (**Pièce n°1, Jugement, p. 38 et 39**).

Le Tribunal des activités économiques a ainsi clairement constaté la violation du droit à la présomption d'innocence portée à Bruno LAFONT découlant des termes du *guilty plea* et de la publicité qui l'a entouré sans aucun ménagement de ce dernier.

11

22. En dépit de l'ensemble de ces circonstances, traduisant une absence totale de prise en compte du droit à la présomption d'innocence de Bruno LAFONT, il apparaît à la lecture de l'ordonnance de renvoi que les magistrats instructeurs se sont clairement appropriés les termes du *plea-agreement* pour justifier de l'existence prétendue de charges contre ce dernier.

### b) *L'exploitation à charge du guilty plea et des poursuites civiles de LAFARGE SA contre Bruno LAFONT par les magistrats instructeurs au soutien de l'ordonnance de renvoi*

23. Alors qu'elle devait pallier l'ensemble des atteintes criantes à la présomption d'innocence qui viennent d'être rappelées, et qui résultent du *guilty plea* du 18 octobre 2022 (**D2794** et **D2800**), l'ordonnance de renvoi méconnaît frontalement le droit à un procès équitable, les droits de la défense et le droit à la présomption d'innocence par l'appui significatif qu'elle prend sur cet accord transactionnel.

Loin, en effet, de comporter les garde-fous qui étaient légitimement attendus en pareille situation, l'ordonnance de renvoi qui saisit le Tribunal encourt l'annulation pour exploiter à charge et contre un tiers, en l'occurrence Bruno LAFONT, un accord de plaider-coupable conclu en pure opportunité par LAFARGE SA et affirmant sans la moindre précaution, la culpabilité des dirigeants personnes physiques.

24. L'ordonnance de renvoi se réfère expressément au *guilty plea* et en détaille le contenu sur trois pages dans une partie intitulée « **focus sur la procédure américaine** » (ORTC, p. 54 et s.).

Il est précisé dans l'ordonnance, sans qu'il soit possible de comprendre ce qui en est exactement déduit, que « *s'agissant des personnes physiques, non poursuivies dans le cadre de la procédure américaine, l'accord mentionnait explicitement qu'elles faisaient l'objet de « poursuites effectives » dans un autre pays (D2792) ».*

25. Plus grave encore, les magistrats instructeurs ont <u>d'une part</u> émis un jugement de valeur sur cette transaction pénale, et <u>d'autre part</u> exploité, à charge contre Bruno LAFONT, les poursuites initiées contre les dirigeants personnes physiques devant le Tribunal de commerce en 2022.

- <u>L'appréciation de la valeur du *guilty plea* par les magistrats instructeurs au soutien du renvoi</u>

26. L'ordonnance de renvoi ne se borne pas à une référence distanciée au *guilty plea* conclu par LAFARGE SA et LCS.

Dans la partie consacrée à « *l'imputabilité de l'infraction de financement d'une entreprise terroriste à la personne morale, LAFARGE SA* », les magistrats instructeur vont jusqu'à considérer :

« <u>*si la reconnaissance de faits aux Etats-Unis a pu résulter d'un choix stratégique fait localement par la société, elle repose cependant sur des éléments de preuve solides*</u> *ayant permis d'objectiver les paiements effectués par LCS à plusieurs entités terroristes via Firas TLASS et plusieurs fournisseurs sous le contrôle de ces entités terroristes notamment représentés par Amro TALO*, <u>*et ce alors que Lafarge SA exerçait un contrôle effectif, non seulement capitalistique, mais aussi opérationnel et fonctionnel, sa filiale et ses organes*</u> » (ORTC, p. 247).

Ainsi, les magistrats instructeurs admettent que la reconnaissance de faits opérée aux États-Unis « *a pu résulter d'un choix stratégique fait localement par la société* » mais affirment, simultanément, qu'elle « *repose sur des éléments de preuve solides* ».

12

Une telle affirmation revient à priver de toute portée la « réserve » formulée initialement, et à accorder explicitement, aux termes de l'acte d'accusation, une valeur juridictionnelle à un acte qui n'est pourtant que le produit d'une négociation.

Ainsi qu'il a été rappelé précédemment, un accord de plaider-coupable ne trouve son assise que dans la reconnaissance des faits par la personne qui veut bien y prendre part, en considération d'enjeux stratégiques et économiques qui lui sont propres.

En conséquence, en appréciant et en affirmant la « solidité » des éléments à l'origine du *guilty plea*, les magistrats ont totalement dévoyé sa logique transactionnelle.

Ils lui ont conféré une portée judiciaire qu'il n'a pas et ne saurait avoir en France sans que se trouvent gravement compromis la présomption d'innocence et les droits de la défense des tiers à cette procédure.

Cette appréciation de la valeur des « *éléments de preuve* » ayant fondé le *guity plea* est d'autant plus incompréhensible que les éléments de la procédure américaine n'ont jamais été mis à la disposition des juges français.

27. De ce premier chef, l'ordonnance de renvoi encourt incontestablement l'annulation.

- <u>L'exploitation à charge dans l'ordonnance de renvoi de l'assignation de Bruno LAFONT par LAFARGE SA devant le Tribunal de commerce, pourtant en lien avec le *guilty plea*</u>

28. Enfin, que ce soit dans la partie de l'ordonnance de renvoi consacrée à LAFARGE SA ou à celle consacrée à Bruno LAFONT lui-même, les magistrats se fondent, pour en déduire l'existence de charges justifiant le renvoi de ce dernier, sur la circonstance que LAFARGE SA s'est « retournée » en 2022 contre son ancien PDG, par voie d'assignation devant le Tribunal de commerce.

29. A cet égard, il convient de rappeler que LAFARGE SA et HOLCIM SA ont assigné, devant le Tribunal de commerce de Paris le 18 février 2022 **(D2812)**, cinq personnes physiques visées dans le *guilty plea*, au premier rang desquelles Bruno LAFONT.

Or, il est acquis que l'engagement de cette procédure devant le Tribunal de commerce intervient alors que des négociations sont en cours entre le DoJ et LAFARGE S.A et HOLCIM S.A.

En effet, il est précisé au paragraphe 35 de l'assignation délivrée par LAFARGE S.A et HOLCIM S.A, dans la partie relative aux « *conséquences des fautes commises par les défendeurs sur LSA et Holcim* » que :

> « *les relations entre LCS et des Groupes Armés en Syrie <u>ont conduit à des demandes d'information de la part du Department of Justice du gouvernement américain (ci-après le « DOJ ») adressées au groupe Holcim</u>. Conformément à ses obligations, Holcim a informé le marché des demandes d'information du DOJ dans son rapport biannuel publié le 31 juillet 2021. Le cours de bourse d'Holcim a chuté de manière significative à la publication de cette annonce* » (**D2812/11**).

Une telle présentation démontre que dès juillet 2021, le DoJ formulait des demandes d'informations et de communications auprès HOLCIM SA et LAFARGE SA et que c'est précisément dans ce contexte que ces dernières ont saisi le Tribunal de commerce de Paris de demandes indemnitaires à l'encontre de Bruno LAFONT, au titre desquelles était réclamé l'indemnisation d'« *un préjudice financier lié aux frais de conseil qu'elle*

13

*a dû engager à la suite de l'ouverture de la procédure pénale française et des demandes d'information adressées par le DOJ* » (**D2812/13**).

Cette assignation prend en outre appui sur les conclusions du rapport Baker & McKenzie, qui sera également exploité dans le cadre des négociations avec le DoJ ayant abouti au *guilty plea*.

Les poursuites civiles initiées par HOLCIM SA apparaissent donc intrinsèquement liées à un positionnement stratégique visant à préserver ses propres intérêts en sacrifiant les dirigeants de LAFARGE SA au détriment de la manifestation de la vérité.

30. Or, ces poursuites à caractère civil initiées par LAFARGE SA et HOLCIM en 2022, concomitamment avec les négociations menées avec le DoJ pour aboutir à la conclusion finale d'un *guilty plea* le 18 octobre 2022, ont été exploitées à charge contre Bruno LAFONT.

L'ordonnance de renvoi s'expose à l'annulation dès lors les magistrats instructeurs ont affirmé, dans le cadre de l'examen des charges contre LAFARGE SA :

> « *Il est opportun de relever que la société Lafarge SA et la société Holcim SA décidait d'assigner devant le tribunal de commerce de Paris Bruno LAFONT, Bruno PESCHEUX, Frédéric JOLIBOIS, Christian HERRAULT, et Firas TLASS par actes d'huissiers délivrés en février 2018, en relevant que les quatre anciens dirigeants du groupe LAFARGE avaient « joué un rôle déterminant dans les liens qui ont été entretenus entre LCS et des groupes armés dont certains étaient affiliés à des organisations terroristes ».*

> *Elles demandaient au tribunal de surseoir à statuer dans l'attente de l'issue de la procédure pénale, et eu égard à divers postes de préjudice pour le groupe industriel, de condamner in solidum Bruno LAFONT et Firas TLASS au paiement de la somme de 50 000 000 E en réparation à Lafarge SA, et de condamner in solidum Bruno LAFONT, Bruno PESCHEUX, Frédéric JOLIBOIS, Christian HERRAULT et Firas TLASS au paiement de la somme de 100 000 000 E en réparation à Holcim SA (D2812). **Dans sa présentation des faits, les demandeurs mentionnaient que Bruno LAFONT s'était « immiscé dans la gestion de LCS** ».*

> Ainsi, tout en reconnaissant les faits devant les autorités judiciaires américaines, la société tente de se dédouaner sur les responsabilités individuelles de ses anciens cadres, qui constituent en réalité les organes qui engagent la sienne* » (ORTC, p. 246).

Plus encore, dans la mesure où le renvoi de Bruno LAFONT lui-même a également été justifié par cette assignation de HOLCIM et de LAFARGE SA :

> « ***dans son assignation devant le tribunal de commerce en février 2022 (infra), le groupe LafargeHolcim allait soulever que Bruno LAFONT*** *s'était « immiscé dans la gestion de LCS », estimant qu' il était « à l'origine de la décision de maintenir la cimenterie de Jalabiya en activité, malgré la présence de groupes armés en activité dans la région », avait demandé à être informé de la situation de LCS en Syrie de manière très régulière notamment via les minutes des comités sûreté, avait maintenu des liens privilégiés avec Bruno PESCHEUX, Frédéric JOLIBOIS et Christian HERRAULT, auxquels il donnait « des directives (..) dans le cadre de la gestion de LCS pendant la guerre civile syrienne ».*

> *L'assignation soulignait enfin que la décision de fermeture de la cimenterie était du ressort de Bruno LAFONT aux termes des règles internes au groupe (D2812).*

14

> *Le narratif officiel du groupe dans le cadre de la révélation des faits avait pourtant été que « Bruno Lafont était informé des principaux défis opérationnels auxquels Lafarge Cement Syria était confrontée mais il n'a jamais été informé de paiements à des organisations terroristes. Quand Bruno Lafont a été informé de la nécessité de conclure des accords avec des groupes terroristes, il a créé les conditions d'une fermeture immédiate de l'usine, qui a été réalisée en moins de trois semaines » (D1993) »* (ORTC, p. 241).

31. Ainsi, les magistrats instructeurs ont utilisé comme élément à charge le changement de positionnement de HOLCIM SA et LAFARGE SA vis-à-vis de Bruno LAFONT, matérialisé par l'assignation devant le Tribunal commerce, en méconnaissance totale des principes ci-avant au premier rang desquels la présomption d'innocence et les droits de la défense.

    Et ce, sans d'ailleurs tirer d'élément à décharge du fait qu'une telle accusation ne figurait nullement dans le « *narratif officiel* » initial du groupe, ce qui laissait pourtant penser que cette action des personnes morales s'inscrivait dans une démarche d'opportunité en lien direct avec le plaider-coupable conclu aux Etats-Unis.

32. De ce point de vue à nouveau, l'ordonnance de renvoi viole frontalement la présomption d'innocence, le droit à un procès équitable et les droits de la défense tels qu'ils sont notamment protégés par l'article 6 de la Convention européenne et par l'article préliminaire du code de procédure pénale.

    Elle encourt inévitablement l'annulation à ce titre.

### B. Sur la nullité de l'ORTC découlant de l'impossibilité pour Bruno LAFONT d'interroger à décharge LAFARGE SA, liée par une clause muselière en vertu du *guilty plea*

33. L'annulation de l'ORTC s'impose également dans la mesure où elle renvoie Bruno LAFONT et LAFARGE SA devant le Tribunal afin qu'ils soient jugés pour des faits identiques dans le cadre d'un même procès, alors que LAFARGE SA se trouve, en vertu du *plea-agreement* précité, tenue par une clause muselière l'empêchant de contredire la version des faits arrêtée aux termes de cette transaction pénale.

34. Cette situation contrevient au droit de Bruno LAFONT de se défendre, notamment en faisant obstacle à son droit d'interroger un témoin crucial, en violation de l'article 6§3 de la Convention européenne.

    Ce texte à valeur supranationale garantit à l'accusé le droit d'« *interroger ou faire interroger les témoins à charge et obtenir la convocation et l'interrogation des témoins à décharge dans les mêmes conditions que les témoins à charge* ».

    A cet égard, la Cour européenne juge de manière constante que :

    > *« les exigences du paragraphe 3 d) de l'article 6 représentent des aspects particuliers du droit à un procès équitable garanti par le paragraphe 1 de cette disposition (Al-Khawaja et Tahery, précité, § 118) ; elle examinera donc le grief du requérant sous l'angle de ces deux textes combinés (Windisch c. Autriche, 27 septembre 1990, § 23, série A no 186, et Lüdi c. Suisse, 15 juin 1992, § 43, série A no 238).*

    > *101. Lorsqu'elle examine un grief tiré de l'article 6 § 1, la Cour doit essentiellement déterminer si la procédure pénale a globalement revêtu un caractère équitable (voir, entre autres, Taxquet c. Belgique [GC], no 926/05, § 84, CEDH 2010, et autres références). Pour ce faire, elle envisage la procédure dans son ensemble, y compris la manière dont les éléments de preuve ont été recueillis, et vérifie le respect non seulement des droits de la défense mais aussi de l'intérêt du public et des victimes à ce que les auteurs de l'infraction soient dûment poursuivis (Gäfgen c. Allemagne*

15

*[GC], no 22978/05, §§ 163 et 175, CEDH 2010), ainsi que, si nécessaire, des droits des témoins (Al-Khawaja et Tahery, précité, § 118, et autres références, et Hümmer, précité, § 37).* » (CEDH [GC], 15 décembre 2015, *Schatschaschwili c. Allemagne*, 9154/10, §§100-101).

35. La notion de témoin revêt par ailleurs un sens autonome au sens de la Convention européenne, la Cour estimant que, dès lors qu'une déposition est susceptible de fonder la condamnation du prévenu, elle constitue un témoignage déclenchant l'applicabilité des garanties prévues par l'article 6 §§ 1 et 3 d) de la Convention.

   Dès lors, la circonstance que les déclarations émanent d'un co-inculpé n'est pas de nature à exclure les garanties issues des stipulations précitées.

   En effet, la Cour européenne juge de manière constante que « *la circonstance que pareilles dépositions proviennent d'un coïnculpé, comme dans le cas d'espèce, et non d'un témoin n'est pas pertinente. A cet égard, la Cour souligne que le terme « témoin » a, dans le système de la Convention, un sens « autonome » (arrêt Vidal c. Belgique du 22 avril 1992, série A no 235-B, pp. 32-33, § 33). Ainsi,* **dès lors qu'une déposition, qu'elle soit faite par un témoin stricto sensu ou par un coïnculpé, est susceptible de fonder, d'une manière substantielle, la condamnation du prévenu, elle constitue un témoignage à charge et les garanties prévues par l'article 6 §§ 1 et 3 d) de la Convention lui sont applicables** *(voir, mutatis mutandis, l'arrêt Ferrantelli et Santangelo c. Italie du 7 août 1996, Recueil 1996-III, pp. 950-951, §§ 51-52).* » (CEDH, 27 février 2001, *Lucà c. Italie*, n°33354/96, §41).

   Elle a rappelé que « *l'interprétation que la cour d'appel a donnée de la loi semble avoir joué sur la manière dont elle a administré la procédure, qui a donné lieu au grief tiré de l'article 6 §§ 1 et 3 d) de la Convention. Force est à la Cour de constater que* **la cour d'appel a considéré qu'en tant que coaccusé D n'était pas « témoin » aux fins de ces dispositions** *(paragraphe 10 ci-dessus). Selon la Cour suprême, la cour d'appel serait partie du principe que les limites posées par la Convention à la lecture à l'audience des dépositions faites à la police ne s'appliquaient pas à de telles déclarations émanant d'un coaccusé (paragraphe 16 ci-dessus).* **Cette interprétation de la cour d'appel n'est guère conforme au sens autonome du mot « témoin » dans la jurisprudence de la Cour, d'où il découle que la circonstance que les dépositions aient été formulées par un coaccusé plutôt que par un témoin n'est d'aucune pertinence (Vidal c. Belgique, 22 avril 1992, § 33, série A no 235-B).** *Il faut rappeler ici que, dès lors qu'une déposition, qu'elle soit faite par un témoin stricto sensu ou par un coaccusé, est susceptible de fonder, d'une manière substantielle, la condamnation du prévenu, elle constitue un témoignage à charge et les garanties prévues par l'article 6 §§ 1 et 3 d) de la Convention lui sont applicables (Lucà, précité, § 41).* » (CEDH, 9 novembre 2006, *Kaste et Mathisen c. Norvège*, n° 18885/04, 21166/04, §53).

36. Or, la Cour européenne a jugé que le fait d'entendre comme témoin un co-inculpé ayant conclu un accord transactionnel le contraignant à maintenir, sous peine de poursuite, une version des faits à charge, est de nature à porter atteinte à l'équité du procès.

   En effet, elle a affirmé dans son arrêt *Navalnyy et Ofitserov c. Russie* que « **la condamnation de X par le biais d'une procédure de plaider-coupable et accélérée, a compromis sa compétence en tant que témoin dans l'affaire des requérants. Comme indiqué plus haut, sa condamnation reposait sur la version des faits arrêtée par le ministère public et l'accusé dans le cadre du plaider-coupable, et il n'était pas exigé que cette version soit vérifiée ou corroborée par d'autres éléments de preuve.** <u>**Lorsqu'il a ensuite comparu comme témoin, X était contraint de répéter les déclarations qu'il avait faites en tant qu'accusé dans le cadre du plaider-coupable**</u>*. En effet, si, lors du procès des requérants, les déclarations antérieures de X avaient été reconnues fausses, le jugement rendu sur la base de son accord aurait pu être annulé, le privant de la réduction de peine négociée. En outre, en autorisant la lecture de ses déclarations avant que la défense n'ait pu le contre-interroger, le tribunal pouvait donner à un observateur extérieur l'impression d'avoir encouragé le témoin à maintenir une version*

16

*particulière des faits.* __L'ensemble de ces éléments confirme l'argument des requérants selon lequel la procédure ayant conduit à la production et à l'utilisation des déclarations de X dans leur procès révélait une manipulation incompatible avec l'idée d'un procès équitable__. » (CEDH, *Navalnyy et Ofitserov c. Russie*, n° 46632/13 28671/14 §109, traduction libre depuis l'anglais).

37.    __Or, en l'espèce__, aux termes de l'article 35 du *guilty plea* conclu par LAFARGE SA :

> « *les Défendeurs conviennent expressément* __*qu'ils ne feront pas, par l'intermédiaire d'avocats, de dirigeants, de directeurs, d'employés, d'agents ou de toute autre personne autorisée à parler au nom des Défendeurs, présents ou futurs, de déclaration publique, dans le cadre d'un litige ou autre, contredisant l'acceptation de responsabilité des Défendeurs énoncée ci-dessus ou les faits décrits dans l'Acte d'accusation et l'Exposé des faits*__. *Une telle déclaration contradictoire constituera, sous réserve des droits de remédiation des Défendeurs décrits ci-dessous, une violation de cet Accord, et les Défendeurs seront par la suite sujets à des poursuites comme indiqué dans les Paragraphes 31 à 34 de cet Accord.* » (**D2800/18**).

Il est encore indiqué plus loin dans le même article : « *Comme indiqué au paragraphe 19, les Défendeurs seront autorisés à soulever des défenses et à faire valoir des allégations affirmatives dans d'autres procédures relatives aux faits exposés dans l'Acte d'accusation et l'Exposé des faits,* __*à condition que ces défenses et revendications ne contredisent pas, en tout ou en partie, une déclaration contenue dans l'Acte d'accusation ou l'Exposé des faits*__. *Ce paragraphe ne s'applique pas à toute déclaration faite par tout dirigeant, administrateur, employé ou agent actuel ou ancien des Défendeurs, à titre personnel, dans le cadre de toute affaire pénale, réglementaire ou civile engagée contre cette personne, à moins que cette personne ne parle au nom d'un ou des deux Défendeurs* ».

LAFARGE SA, dont Bruno LAFONT était le PDG tout au long de la prévention, s'est donc engagée à ne pas contredire, en tout ou partie, le *statement of facts* sur lequel repose le *guilty plea*, qui constitue une construction des faits arrêté en concertation avec le DoJ, dans laquelle Bruno LAFONT est d'ores et déjà présenté comme coupable, ainsi qu'il a été précédemment rappelé (*v. supra*, § 16 à 19).

Bruno LAFONT, personne physique, se retrouve donc à devoir comparaître devant un Tribunal pour être jugé de faits très graves, au titre desquels la personne morale ne peut plus se défendre, ni pour elle-même, ni pour ce dernier puisqu'il est expressément visé parmi les « responsables » des faits aux termes de sa négociation avec le DoJ.

Son témoignage n'est pas libre et ne peut être qu'à charge contre Bruno LAFONT.

Dès lors, la situation dans laquelle l'ordonnance de renvoi place Bruno LAFONT est radicalement incompatible avec les exigences élémentaires en matière de droit de la défense.

Ce grief constitue une cause d'annulation en tant que telle de l'ordonnance de renvoi.

38.    Il s'ajoute néanmoins, dans le cadre de l'approche *in globo* préconisée par la Cour européenne, au précédent moyen tiré de la violation de la présomption d'innocence de Bruno LAFONT, achevant de consacrer, dès ce stade de la procédure, une atteinte irrémédiable au droit à un procès équitable et aux droits de la défense.

Dans ces conditions, l'annulation de l'acte de poursuite est incontournable.

******

17

39. **<u>A titre très subsidiaire</u>**, et pour les raisons juridiques et factuelles précédemment exposées au soutien de la demande d'annulation de l'ordonnance de renvoi, Bruno LAFONT sollicite du Tribunal qu'il écarte des débats le *guilty plea* du 18 octobre 2022 ainsi que toute référence directe ou indirecte à cette transaction.

18

## PAR CES MOTIFS

*Vu l'article 6§1, 6§2 et 6§3 de la Convention européenne des droits de l'Homme ;*
*Vu l'article 48 de la Charte des droits fondamentaux de l'Union européenne ;*
*Vu les articles préliminaire et 385 du code de procédure pénale ;*

**Il est demandé au Tribunal de bien vouloir :**

*A titre principal,*

- **ANNULER** l'ordonnance de renvoi devant le Tribunal correctionnel ;

- **ORDONNER** le renvoi du dossier de la procédure au ministère public ;

*A titre subsidiaire,*

- **CANCELLER** les passages suivants au sein de l'ordonnance de renvoi :

  o Le paragraphe intitulé « *Focus sur la procédure américaine* » (p. 54 à 56) ;
  o *De « Dans son assignation… » (p. 241) à « en moins de trois semaines » (D 1993) »* (p. 242) ;
  o *De « Il est opportun de relever que… » à « organes qui engagent la sienne »* (p. 246) ;
  o *De « Si la reconnaissance de faits… » à « sur sa filiale et ses organes »* (p. 247).

*A titre encore subsidiaire,*

- **ECARTER** des débats toute référence au *plea-agreement* du 18 octobre 2022 ;

SOUS TOUTES RESERVES

**Jacqueline LAFFONT-HAIK**
**Quentin de MARGERIE**
**Grégoire BERTROU**

*Avocats à la Cour*

19